SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
--------------------------------------------------------------X
IN RE: NEW YORK CITY ASBESTOS LITIGATION    :    NYCAL
--------------------------------------------------------------X    I.A.S. Part 11
This Document Relates To:    :    (Madden, J.)
    :
FRANK BIANCO, et al.,    :    Index No. 115546-06
    :
                Plaintiff(s),    :
    :
  -against-    :    **ORDER TO SHOW**
    :    **CAUSE**
A.C. & S., et al.,    :
    :
             Defendants.    :
--------------------------------------------------------------X

Under the annexed Affirmation of Thomas Comerford, Esq., dated June 25, 2007,

Memorandum of Law in Support of Consolidation pursuant to C.P.L.R. § 602, and Rule

130 Certification, and upon the pleadings and proceedings heretofore and herein,

**LET** all defendants, by their attorneys show cause before the Supreme Court of

the State of New York, New York County, at Room 351, IAS Part 11 of the Courthouse

located at 60 Centre Street, New York, New York on July ____, 2007, to be heard why

an Order should not be issued by this Court granting Plaintiffs' Motion for a Joint Trial of

the following asbestos cases listed below:

FRANK BIANCO              Index No. 115546-06
JAMES DIRECTOR          Index No. 115923-06
KARL FELTEN              Index No. 114005-06
HARVEY HELFAND       Index No. 117176-06
CHRISTIAN HOLINKA     Index No. 114120-06
JACK NACHT               Index No. 114274-06
FREDERICK RITZER       Index No. 111328-06
JOSEPH SACCOMANO    Index No. 113299-06
ROBERT SHEPPARD       Index No. 117513-06

**SUFFICIENT CAUSE** being alleged, it is

**ORDERED** that service of a copy of this Order and the papers upon which it is based be made on or before the ___ day of June, 2007, by serving copies thereof on the respective counsel for the defendants in the above-captioned cases by <u>Federal Express next-day delivery</u>, and such service shall be deemed good and sufficient notice of this application, and it is further

**ORDERED** that service of answering papers, if any, be made on or before the 3rd of July, 2007, as ordered by Hon. Joan Madden at the June 15, 2007, conference in this matter, by serving copies thereof on Plaintiffs' counsel, by <u>Federal Express next-day delivery or by hand delivery</u>.

ENTER:

_____
J.S.C.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------X

IN RE:  NEW YORK CITY ASBESTOS LITIGATION    :    NYCAL

-------------------------------------------------------------------X    I.A.S. Part 11

This Document Relates To:    :    (Madden, J.)

    :

FRANK BIANCO, et al.,    :    Index No. 115546-06

    :

        Plaintiff(s),    :

    :    **AFFIRMATION**

    -against-    :    **IN SUPPORT OF**

    :    **PLAINTIFFS'**

A.C. & S., et al.,    :    **MOTION FOR A**

    :    **JOINT TRIAL**

        Defendants.    :

-------------------------------------------------------------------X

      THOMAS COMERFORD, being an attorney admitted to practice before the

courts of the State of New York, affirms pursuant to C.P.L.R. § 2106 and the penalty of

perjury:

1.    I am associated with Weitz & Luxenberg, P.C., attorneys for the following nine

plaintiffs or plaintiffs' decedents ("Plaintiffs") listed below:

| | |
|---|---|
| FRANK BIANCO | Index No. 115546-06 |
| JAMES DIRECTOR | Index No. 115923-06 |
| KARL FELTEN | Index No. 114005-06 |
| HARVEY HELFAND | Index No. 117176-06 |
| CHRISTIAN HOLINKA | Index No. 114120-06 |
| JACK NACHT | Index No. 114274-06 |
| FREDERICK RITZER | Index No. 111328-06 |
| JOSEPH SACCOMANO | Index No. 113299-06 |
| ROBERT SHEPPARD | Index No. 117513-06 |

These nine actions have all been transferred by Justice Freedman to this Court pursuant to

the NYCAL Amended Case Management Order's *in extremis* provisions.

2.     I am familiar with the facts of these cases, and I make this affirmation in support of Plaintiffs' motion for a joint trial of these nine actions, identified in paragraph 1, pursuant to C.P.L.R. § 602.

3.     These cases are personal injury cases alleging that exposure to asbestos caused plaintiffs' mesothelioma.   Each plaintiff has separately alleged that the defendants negligently and recklessly exposed the plaintiffs to asbestos that caused their injuries.

4.     As demonstrated below, and in the accompanying memorandum of law, a joint trial of these nine actions is warranted because plaintiffs meet all of the factors that are commonly used to determine the propriety of a joint trial pursuant to C.P.L.R. § 602. Additionally, individual legal and factual issues do not predominate over common issues.

5.     Some of the common factors presented by these actions are listed below:

- All plaintiffs suffer and/or suffered from mesothelioma;

- All 9 of the plaintiffs were exposed during the 1960s and 1970s while 6 have exposures extending back to the 1950s and 5 have exposures extending into the 1980s.   Therefore, because many of the plaintiffs' exposure histories have substantial overlap, historical State-of-the-Art evidence and expert testimony will also overlap;

- There are numerous defendants who are common in two or more cases, including: A.O. Smith, American Standard, Amchem, Amtico, Bell & Gossett, Blackman Plumbing Plumbing Supply Co., Burnham, Carrier, Crane Co., Fairbanks Co., Georgia Pacific, Goulds Pumps, Kaiser Gypsum, Kentile, Mannington Mills, Owens-Illinois, Union Carbide, Weil-McLain, and Westinghouse;

- In addition to the defendants at trial, and those tortfeasors that have settled prior to trial, it is very likely that any remaining defendants will seek to prove the allocable Article 16 share with respect to numerous non-party bankrupt tortfeasors in each of the nine cases, including many former asbestos-product manufacturers. This undoubtedly includes several bankrupt tortfeasors such as Owens Corning and Johns Manville. The evidence and testimony concerning these non-party tortfeasors will pose considerable overlap;

- Medical testimony will overlap in all nine of these mesothelioma cases; and

2

- All Plaintiffs are represented by Weitz & Luxenberg, P.C.

I.

### THE FACTS PRESENTED BY THESE
### NINE CASES SUPPORT CONSOLIDATION

6.  As demonstrated below, substantial factual overlap exists to warrant consolidation of these actions for a joint trial:

### A.  PLAINTIFFS

#### 1.  Frank Bianco

7.  Mr. Frank Bianco recently died from mesothelioma at the age of sixty-eight. Mr. Bianco was exposed to asbestos while in the US Navy between 1955 and 1959 as well as working as a residential plumber for three different employers between 1960 and 1972. In the US Navy, he served as a fireman on the USS Intrepid where he was exposed to various pumps. As a residential plumber, Mr. Bianco testified to exposure from boilers, pumps, and valves and that he bought asbestos-containing supplies from two suppliers. More specifically, he was exposed to various brands of boilers via installation and rip-out including exterior insulation and interior packing and rope; various brands of pumps during installation and repair including removal and re-application of exterior insulation; and during installation and repair of valves including asbestos packing inside and insulation on the exterior of the valve. Mr. Bianco regularly bought asbestos-containing plumbing materials, including bags of asbestos, from the same suppliers that was often delivered to work sites by the supplier.

#### 2.  James Director

8.  Mr. James Director recently died from mesothelioma at the age of fifty-three. Mr. Director was exposed to asbestos-containing wood fire doors and joint compound from

3

approximately 1969 through at least 1976 while working for his father's fire door installation company. Mr. Director worked doing installation at various New York City metropolitan area work-sites, including but not limited to, various New York schools, the VA Hospital in Brooklyn, La Guardia College, Kreedmore, and locations in Long Island such as Pilgrim Hill and Shoreham powerhouse. He testified to direct exposure to various fire door company products from work in the shop and on-site as well as bystander exposure from various specified joint compounds on-site. Mr. Director testified to the amount of dust released during drilling, sawing, morticing the fire doors, sweeping up the resulting asbestos dust as well as others' sanding and sweeping of joint compound.

### 3.    Karl Felten

9.    Mr. Karl Felten is a seventy-five old man currently suffering from mesothelioma. Mr. Felton was exposed to asbestos over a thirty-nine year period while employed as a mechanic in the boiler/heating plant at Mt. Sinai Hospital between 1958 and 1997. Mr. Director eventually became the Director of the Plant. He testified to exposure from asbestos cement, pipecovering, sheet gaskets, various brands of boilers, air conditioning units, chillers, turbines, and pumps, all located throughout the large and extended Mt. Sinai complex. Mr. Felton testified that at some point in the 1970s, the word came from Dr. Selikoff that no new asbestos was to be used in the Mt. Sinai heating plant. However, all of the existing asbestos-containing products remained until the 1980s when major abatement projects were undertaken.

4

### 4.    Harvey Helfand

10.    Mr. Harvey Helfand is a seventy-one year old man currently suffering from mesothelioma. Mr. Helfand was exposed to asbestos employed as a typesetter and while involved in general construction. Mr. Helfand began his career as an apprentice in the printing industry at a typesetter located in New York City where he worked for one year in the early 1950s. He testified that he worked in the vicinity of multiple Linotype machines that required operators to mix asbestos powder with a liquid to form a paste/cream that was applied to the inside of a pot located on the machine. This paste was later, after a few days, chipped out and thrown onto the floor and the process begun anew. Mr. Helfand was responsible for sweeping up the excess dust on the floor surrounding the Linotype machines. Between 1951 and the 1970s, Mr. Helfand was involved in general construction, personally and usually single-handedly, performing renovations to residences and some office spaces throughout the New York City area. He testified to exposure from asbestos-containing joint plaster, ceiling tile, and floor tile at these various work-sites.

### 5.    Christian Holinka

11.    Mr. Christian Holinka is a sixty-nine year old man currently suffering from mesothelioma. Mr. Holinka was exposed to asbestos doing medical laboratory and research work between 1956 and 1989. More specifically, Mr. Holinka testified to being exposed to asbestos from Bunsen burner covers, pads, and asbestos mittens. He used the products often and that when they became worn down, both the Bunsen burner pads and mittens would flake and create dust that he would breathe. Mr. Holinka worked at the following sites and locales at each site exposed to Bunsen burner covers, pads, and

mittens:   US Army, Germany, clinical laboratory work (1956); New York Hospital Medical Center of Queens/Booth Memorial, New York, lab technician (3 ½ months, 1959-1960); UC Berkeley, California, Dept. of Physiology research lab (1960-1962, 1964-1964); CUNY Hunter, New York, chemistry lab (1963); State University of New York, Stony Brook, New York, biological sciences (1971-1974); Columbia University, New York, Chemistry Department (1971-1974); USC, California, Biological Science Lab (1974-1977); and Mount Sinai School of Medicine, New York, Chemist (1977-1989).

### 6.      Jack Nacht

12.     Mr. Jack Nacht is an eighty-four year old man currently suffering from mesothelioma. Mr. Nacht was exposed to asbestos via his activities as owner of a retail flooring company, Dee Jay Carpet Co., between 1946 and 1977.  As the owner, he frequently went to commercial and residential job-sites in Long Island and Queens to supervise the installation of asbestos-containing tiles and sheets. Mr. Nacht testified to visiting a few sites per day for an hour or so at a time, usually making it a point to visit the work-sites at the end of the job to ensure that they were satisfactorily cleaned and swept.   In addition, Mr. Nacht's exposure to asbestos derived from his personally breaking various tile to show customers its composition. Mr. Nacht also testified that he was exposed, though rarely, to asbestos-containing pipe covering located near the boiler in the basement of his store sometime in the late 1940s/early 1950s.

### 7.      Frederick Ritzer

13.     Mr. Frederick Ritzer recently died from mesothelioma at age sixty-seven.  Mr. Ritzer is a lifetime union plumber who worked, starting in 1957, through Local Union 2. Mr. Ritzer worked at a number of sites in the New York metropolitan area, including but

not limited to:  Exxon Building, Port Authority Bus Terminal, World Trade Center, Bellevue Hospital, HBO Building, Trump Projects, Parker Towers, Hunter College, and Yankee Stadium.  Among other exposures, Mr. Ritzer worked with asbestos-containing plumbers' rope which was wrapped around pipe joints as hot lead was poured in to seal the joints, valves which were packed with asbestos packing, and preformed gaskets.

### 8.    Joseph Saccomano

14.    Mr. Joseph Saccomano recently died from mesothelioma at age sixty-nine.  Mr. Saccomano was exposed to asbestos as a <u>sheetmetal worker</u> and as a <u>home inspector</u>. During his employ as a sheetmetal worker between 1962 and 1983, Mr. Saccomano testified to working in various powerhouses (i.e. Northport, Ravenswood, Astoria, 14th Street), hospitals (i.e. St. Barnabas, St. Vincents, Sloan Kettering), airport hangers, the Pan Am Building, ABC Studios, and the AT&T Building in New York City.  Mr. Saccomano's exposure here to asbestos derived from removing and replacing old HVAC duct work which involved covering metal with insulation and working around others who were insulating equipment with asbestos, including pumps and valves.  In 1983, after retiring as a sheetmetal worker, Mr. Saccomano worked for the Town of Brookhaven as a home inspector during which he was exposed to asbestos from being around workers who were taking out old boilers, tiles, roofing, and siding.

### 9.    Robert Sheppard

15.    Mr. Robert Sheppard is a forty-eight year old man currently suffering from mesothelioma.  Mr. Sheppard was exposed to <u>asbestos from friction products, building electrical equipment, and working with ceiling tile</u> at various locations throughout New Jersey.  More specifically, between age eight (c. 1966) and twenty-two (c. 1980) Mr.

Sheppard helped his father replace brakes on the cars of numerous family members multiple times per year. Mr. Sheppard worked with Bakelite, drilling and cutting it for use in field phones and field switches at Star Dynamics in 1978, and doing the same at Aerolite in 1980, building radar and sonar units for the United States military. In approximately 1982, Mr. Sheppard began working in the recording industry. At RPM Studios, he was exposed to asbestos from in-place pipe covering and acoustic ceiling tile between 1982 and 1983. He was additionally exposed to asbestos between 1985 and 1987 while working with or around in-place ceiling tile, in place bats on ducts, and old junction boxes.

### B. NUMEROUS COMMON DEFENDANTS EXIST WITHIN THESE NINE ACTIONS

16.    All plaintiffs allege exposure to similar asbestos products, used either by them or co-workers, including but not limited to, asbestos-containing thermal insulation and cement, among various other asbestos-containing products. At least nineteen remaining defendants are common to two or more cases: A.O. Smith (Bianco, Saccomano), American Standard (Bianco, Saccomano), Amchem (All nine cases), Amtico (Helfand, Nacht), Bell & Gossett (Bianco, Felten, Saccomano), Blackman Plumbing Plumbing Supply Co. (Bianco, Director), Burnham (Bianco, Saccomano), Carrier (Felten, Saccomano), Crane Co. (Bianco, Felten, Ritzer, Saccomano), Fairbanks Co. (Bianco, Ritzer), Georgia Pacific (All nine cases), Goulds Pumps (Bianco, Felten), Kaiser Gypsum (Director, Helfand), Kentile (Helfand, Nacht, Saccomano), Mannington Mills (Helfand, Nacht), Owens-Illinois (Bianco, Felten, Helfand, Holinka, Nacht, Ritzer), Union Carbide (All nine cases), Weil-McLain (Bianco, Saccomano), and Westinghouse (Director, Felten).

C.  **PLAINTIFFS MEET THE "MALCOLM"
    FACTORS FOR CONSOLIDATION**

17.    The criteria outlined in <u>Malcolm v. National Gypsum Co.</u>, 995 F.2d 346, 351 (2d
Cir. 1993), provide a list of eight factors to be considered when the issue of consolidation
is before the Court, none of which is independently dispositive.  As demonstrated below,
plaintiffs meet the great majority of the criteria in <u>Malcolm</u> and a joint trial of these
actions is warranted.

D.    **MALCOLM FACTORS**

(i)    **<u>Similar Worksites</u>:**

18.    Although all nine Plaintiffs were not exposed at one common worksite, many of
the Plaintiffs were exposed to the same types of asbestos-containing products at the same
sites, and at similar types of job-sites common to many Plaintiffs, including:

- <u>Construction Sites</u>.  Seven of the Plaintiffs were exposed at various New York
  City metropolitan area construction sites, both *commercial* (Director-fire doors;
  Felton-boiler mechanic; Helfand-commercial general construction; Nacht-
  flooring; Ritzer-union plumber; Saccomano-sheetmetal worker) and *residential*
  (Bianco-residential plumber; Director-fire doors; Helfand-residential general
  construction; Nacht-flooring; Saccomano-home inspector).

19.    Moreover, the nature of each Plaintiff's asbestos exposure at these work sites
were the same in that each was exposed through his work, and/or through the work of
others building or repairing using asbestos-containing materials, whether it be involved in
construction, plumbing, boilers, flooring, or other industrial equipment.

9

### (ii)    Similar Occupations:

20.    All of the Plaintiffs were exposed to asbestos from performing labor using asbestos-containing products, or from performing manual labor next to others performing manual labor using asbestos-containing products.    Again, there is significant overlap between the Plaintiffs.  For instance, seven were exposed employing their trade involving intense manual labor directly with asbestos products or around those working with asbestos products:  plumber (Bianco, Ritzer), general construction (Helfand, Nacht), sheetmetal worker (Saccomano), boiler mechanic (Felten), and installation of fire doors (Director).

### (iii)    Similar Times Of Exposure:

21.    All nine of the Plaintiffs were exposed to asbestos during the 1960s and 1970s. Six of the Plaintiffs have exposure extending back to the 1950s (Bianco, Felten, Helfand, Holinka, Nacht, Ritzer) and five of the Plaintiffs have exposure into the 1980s (Felten, Holinka, Ritzer, Saccomano, Sheppard).   Thus, there is a substantial overlapping time period and the State-of-the-Art testimony concerning the known and knowable hazards associated with asbestos use.

### (iv)    Similar Disease:  All Have Mesothelioma:

22.    All nine of the Plaintiffs have been injured from asbestos-related mesothelioma. Plaintiffs do not anticipate that defendants will contest that something other than asbestos caused their mesothelioma.

### (v)    Status Of Discovery In Each Case:

23.    Although limited additional discovery must be completed, for the most part, discovery is at the same stage in each case in that the material fact witnesses have been

10

deposed and that only the depositions of family members remain to be completed. Contrary to the anticipated claims that the Defendants will make, there is no reason that discovery cannot be concluded in all cases in advance of a joint trial date set by this Court.

        (vi)    <u>All Plaintiffs Are Represented By The Same Counsel</u>:

24.    All nine Plaintiffs are represented by Weitz & Luxenberg, P.C.

        (vii)   **As Shown Above, Plaintiffs Meet The Malcolm Factors To Support Consolidation Of These Cases For Joint Trial**

25.    These factors demonstrate that these actions present enough common factors to warrant a joint trial. Moreover, although the defendants almost universally highlight the importance of Justice Freedman's Article 16 Decision which has motivated defendants to establish liability amongst bankrupt non-parties, <u>the defendants have always failed to recognize that the same proofs, historical knowledge, and other relevant State-of-the-Art will be interposed at trial with respect to each overlapping potentially culpable bankrupt party</u>.

26.    To this end, there are overlapping bankrupt non-parties in every action before the Court, and at trial, the defendants will attempt to establish the liability of those absentee tortfeasors. Thus, despite their expected efforts to have the Court only focus on the present defendants when considering the propriety of consolidation, the defendants are well aware of their repeated strategy to apportion liability amongst the absentee bankrupt tortfeasors, at least some of which will overlap in these nine cases. <u>See</u> <u>In Re Asbestos Litig.</u>, 1998 WL 230950, at *2 (S.D.N.Y. May 8, 1998).

11

**E.    NUMEROUSLY SIMILARLY-SITUATED COURTS HAVE CONSOLIDATED SIMILAR ASBESTOS CASES IN ACCORDANCE WITH APPELLATE PRECEDENT AND ACCEPTED CMO PROCEDURE**

27.    Attached hereto as **Exhibit A**, Plaintiffs submit a decision issued by Justice Marcy Friedman in this New York City Asbestos Litigation ("NYCAL"), granting plaintiffs' motion for a joint trial of five cases that were transferred as a cluster in the NYCAL. <u>See</u> Decision/Order, dated October 31, 2001, in <u>Charles Barrett et al.</u>, No. 119284/00; <u>see also</u> Plaintiffs' accompanying Memorandum of Law at pp. 3-4 for an explanation of the factual and legal analysis underlying Justice Friedman's decision.

28.    Attached hereto as **Exhibit B**, Plaintiffs submit the decision rendered in <u>Consorti v. Armstrong World Industries, Inc.</u>, 72 F.3d 1003, 1008 (2d Cir. 1995) in which the Second Circuit upheld the granting and manner in which consolidation was addressed before Judge Sweet. <u>See</u> Plaintiffs' accompanying Memorandum of Law at p. 4 for the discussion concerning how courts can implement measures to ensure that plaintiffs and defendants receive a trial by jury that fairly addresses the individual claims while effectively managing the resources of the court and giving the parties the benefit of an efficient and economical trial.

29.    Attached hereto as **Exhibit C**, Plaintiffs submit a copy of Justice Shulman's recent Decision in which the court joined eight asbestos actions for a single trial. <u>See</u> Decision and Order, dated February 28, 2005, in <u>Aliye D. Ak et al.</u>, Index No. 104333/04 ("Ak Decision"). <u>See also</u> Plaintiffs' accompanying Memorandum of Law at pp. 5-6 for an analysis of Justice Shulman's consolidation of six mesothelioma cases with an asbestosis case and a lung cancer case.

30.     Attached hereto as **Exhibit D**, Plaintiffs submit a copy of Justice Shulman's decision nearly one year later joining six of nine asbestos actions for a single trial.  <u>See</u> Decision and Order, dated January 19, 2006, in <u>Philip Altholz et al.</u>, Index No. 102034-05 ("Altholz Decision").  <u>See</u> <u>also</u> Plaintiffs accompanying Memorandum of Law at p. 6 for Judge Shulman's extensive discussion regarding his decision to join six of the cases in the face of the veritable avalanche of opposition papers submitted by forty-three defendants.

31.     Attached hereto as **Exhibit E**, Plaintiffs submit a copy of Justice Lippman's recent Decision in which the court joined three asbestos actions for a single trial.  <u>See</u> Decision and order, dated November 14, 2005, in <u>Joseph Tortorella et al.</u>, Index No. 100297/02 ("Tortorella Decision").  <u>See</u> <u>also</u> Plaintiffs' accompanying Memorandum of Law at p. 6 for an analysis of Justice Lippman's consolidation of two lung cancer cases with a mesothelioma case.

32.     In 2002, Justice Shirley Werner-Kornreich granted consolidation of four assigned asbestos actions for a single trial.  <u>See</u> Oral Ruling, August 19, 2002, in <u>Craig Gilbert et al.</u>, No. 104699/01 ("Gilbert Decision") relevant portions of transcript attached hereto as **Exhibit F**.  <u>See</u> <u>also</u> Plaintiffs' accompanying Memorandum of Law at p. 7 for a fuller description of Justice Kornreich's consolidation ruling.

33.     Similarly, in 2004, Justice Shirley Werner-Kornreich granted consolidation of four assigned asbestos actions for a single trial.  <u>See</u> Oral Ruling, July 8, 2004, in <u>Renow et al.</u>, ("Renow Decision") relevant portions of transcript attached hereto as **Exhibit G**.  <u>See</u> <u>also</u> Plaintiffs' accompanying Memorandum of Law at p. 7 for a fuller description of Justice Kornreich's consolidation ruling.

13

34.     Finally, in 2005, Justice Shirley Werner-Kornreich granted consolidation of six asbestos actions for a single trial, including one case that involved the issue of a plaintiff's renal cancer. See Decision/Order, dated June 23, 2005, in D'Amore et al., No. 107873/04 ("D'Amore Decision"), annexed hereto as **Exhibit H**. See also Plaintiffs' accompanying Memorandum of Law at p. 8 for a fuller description of Justice Kornreich's consolidation ruling.

35.     Attached hereto as **Exhibit I**, Plaintiffs submit Judge York's recent Decision in which the court joined six of its eight assigned asbestos actions for a single trial. See Decision and Order, dated October 29, 2003, in Richard Bretton, et al., No. 111000/02 ("York Decision I"). See also Plaintiffs' accompanying Memorandum of Law at pp. 9-11 for the complete analysis of this Court's consolidation and the arguments presented by the defendants – which will be the very same arguments presented by the defendants in these actions, including but not limited to the standard arguments that:  different legal issues are presented by the various cases; plaintiffs worked in different occupations; plaintiffs have different exposure histories; plaintiffs have been exposed to asbestos in different ways; plaintiffs have different defendants in each of the actions; and that individual issues predominate over the common issues within these cases.  All of these issues are addressed in the moving memorandum of law and all have been addressed in favor or consolidation in the NYCAL.

36.     Attached hereto as **Exhibit J**, Plaintiffs submit a copy of the Appellate Division, First Department's denial of an interim stay following Justice York's consolidation order addressed above.

37.    Attached hereto as **Exhibit K**, Plaintiffs submit a copy of Judge York's similarly

reasoned Decision to join five of nine assigned asbestos actions for a single trial.  See

Decision and Order, dated January 9, 2006, in Edwin De Jesus et al., Index No.

116431/04 ("York Decision II").  See also Plaintiffs' Accompanying Memorandum of

Law at p. 11 for a similar analysis granting consolidation based on overcoming discovery

issues, status of plaintiffs (dead versus alive), overall number of cases, and judicial

efficiency.

38.    Attached hereto as **Exhibit L**, Plaintiffs submit a copy of Justice Smith's recent

Decision in which the court joined four of its six assigned asbestos actions for a single

trial.  See Decision and Order, dated January 19, 2005, in Thomas Cullen et al., No.

120249/03 ("Cullen Decision").  See also Plaintiffs' accompanying Memorandum of Law

at pp. 11-12 for an analysis of Justice Smith's consolidation and her dealing with the

repetitive standard arguments presented by the defendants.

39.    Attached hereto as **Exhibit M**, Plaintiffs submit a copy of In re New York City

Asbestos Litig., 188 A.D.2d 214, 593 N.Y.S.2d 43, 50 (1st Dept); aff'd, 82 N.Y.2d 821

(1993), addressed at page p. 12 of Plaintiffs' moving memorandum of law.  By this

decision, the First Department upheld the consolidated trial of many more cases than the

four at issue here, and addressed how consolidation has the "potential to reduce the cost

of litigation, make more economical use of the trial court's time, and speed the

disposition of cases as well as to encourage settlements."

40.    Attached hereto as **Exhibit N**, Plaintiffs submit a copy of Section XIV.C, at p.30,

of the Amended Case Management Order in the New York City Asbestos Litigation,

which governs these four cases.  This provision expressly provides for the expedited

15

litigation for terminally-ill plaintiffs, who are assigned to "Accelerated Trial Clusters" for trial in May and November of each year. The trial judge to whom cases in these Accelerated Trial Clusters are assigned have similar broad discretion on how to try these cases: "The method of trial of cases assigned to the [in extremis] Clusters will be determined by the Court in light of all applicable legal considerations."

### CONCLUSION

41.    For the reasons set forth in this Affirmation and within Plaintiffs' accompanying Memorandum of Law, it is respectfully submitted that Plaintiffs' motion, pursuant to C.P.L.R. § 602, for a joint trial of these nine actions be granted in its entirety.

### Certification Pursuant To 22 N.Y.C.R.R. § 130-1

42.    I hereby certify, pursuant to 22 N.Y.C.R.R. § 130-1.1-a(b), that to the best of my knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the presentation of papers listed below or the contentions therein are not frivolous as defined in 22 N.Y.C.R.R. § 130-1.1-(c).

43.    No prior requests have been made for this or similar relief.


Dated: New York, New York
       June 25, 2007


By: _____.
       Thomas M. Comerford


16

**EXHIBIT A**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 57
_____x

CHARLES BARRETT                                    Index No. 119284/00
NORMAN BRODY                                                 119827/00
JOSEPH GENTILE                                               120286/00
GILBERT HARRISON                                            120515/00
MORTON SCHWARTZ                                              19595/00
MARTIN TUOHY,                                               120520/00
                          Plaintiffs,

                    -against-

VARIOUS DEFENDANTS.

_____x   DECISION/ORDER

This "cluster" of six cases was referred by this Court (H. Freedman, J.) to this Part for

trial by jury. One of the six cases, Brody, has apparently since been resolved. The remaining

five plaintiffs seek joinder of the cases for trial. Defendant American Standard, Inc. ("ASI")

contends that the Barrett and Tuohy cases should be tried separately. Certain defendants in the

Barrett and Tuohy cases also request separate trials. Oral argument was held on the joinder issue

on October 26, 2001.[1]

This court has discretion, pursuant to CPLR 602, to join for trial actions "involving a

common question of law or fact." The joint trial format furthers the interests of judicial

economy. (Matter of New York City Asbestos Litigation, 188 AD2d 214, 225 [1st Dept 1993],

affd for reasons stated below 82 NY2d 821.) However, such interests must clearly yield where

_____

[1] An initial oral argument on the joinder application was held on August 27, 2001. A transcript of
that argument has not been provided to the court, and this decision is based solely on the record made on
October 26. The parties' legal memorandum have been marked as Court Exhibits 1-6 on this
application.

joinder would prejudice or deny a fair trial to any party.  (See, e.g., Johnson v. Celotex Corp.,

899 F2d 1281 [2d Dir 1990], cert denied 498 US 920.) Factors to be considered in determining

whether joinder is appropriate include " '(1) common worksite; (2) similar occupation; (3)

similar time of exposure; (4) type of disease; (5) whether plaintiffs were living or deceased; (6)

status of discovery in each case; (7) whether all plaintiff were represented by the same counsel;

and (8) type of cancer alleged.' " (Id., at 1285 [citation omitted]; Aikman v. Atex, Inc., 224

AD2d 180 [1st Dept 1996][citing Johnson v. Celotex Corp. factors approvingly].)

Here, defendants argue that the Barrett and Tuohy cases are so dissimilar as to the

products to which plaintiffs were allegedly exposed and the periods of exposure as to require

separate trials in order to avoid juror confusion and prejudice.

Plaintiffs Gentile, Harrison, Schwartz and Tuohy all allege exposure at the Navy Yard.

Plaintiffs Harrison and Tuohy allege exposure not only at the Navy Yard but also while

employed as sheet metal installers.  Plaintiff Barrett alone does not allege Navy Yard exposure,

and claims that his exposure to asbestos-containing products occurred while he was employed as

a painter at the New York City Housing Authority.

While plaintiff Barrett does not share a worksite common to the other plaintiffs, he does

allege exposure to the same kinds of asbestos-containing materials (i.e., boilers and gaskets) to

which the other plaintiffs claim to have been exposed at the Navy Yard.   The court is

accordingly of the opinion that the mere fact that he did not share a common worksite with the

other plaintiffs should not bar joinder of his case.

Moreover, there are significant common issues in all of the cases as to the toxicity of

asbestos fibers, and the "state of the art" of the industry's knowledge of the dangers of asbestos

through the years of plaintiffs' exposure. (In fact, the alleged exposures of plaintiffs Barrett and Tuohy post-date that of the other plaintiffs). As all of the cases involve the same disease, mesothelioma, the issues as to the etiology of the disease are also common. (Cf., Consorti v. Armstrong World Indus.. inc., 72 F3d 1003, 1009 [2d Cir 1995], vacated on other grounds 513 US 1031 [1996].)

Under these circumstances, the court is of the opinion that neither Barrett nor Tuohy is a case in which individual issues predominate over the common issues, and that joinder of these cases for trial with the other three plaintiffs' cases is proper. (Compare, Bender v. Underwood, 93 AD2d 747 [1st Dept 1983].)

In so holding, the court notes that jury confusion and prejudice to defendants may be avoided by the use of "intelligent management devices," including the encouragement of note-taking by jurors, explanations during the trial by the trial judge as to the limited use of evidence, and special verdict forms. (See, Consorti v. Armstrong World Indus.. Inc., supra, at 1008.)

The motion of plaintiffs is accordingly granted to the extent of joining the Barrett, Gentile, Harrison, Schwartz and Tuohy cases for trial.

This constitutes the decision and order of the Court.

Dated: New York, New York
       October 31, 2001

MARCY FRIEDMAN, J.S.C.

3

**EXHIBIT B**

Westlaw.

72 F.3d 1003

72 F.3d 1003, 33 Fed.R.Serv.3d 79

(Cite as: 72 F.3d 1003)

United States Court of Appeals,
Second Circuit.
John CONSORTI & Frances Consorti,
Plaintiffs-Appellees,
v.
ARMSTRONG WORLD INDUSTRIES, INC.,
formerly known as Armstrong Cork Co.;
Combustion Engineering, Inc., et al., Defendants,
Owens-Corning Fiberglas Corp.,
Defendant-Appellant.
No. 857, Docket 94-7501.

Argued Nov. 14, 1994.
Decided Aug. 28, 1995.
Amended Dec. 22, 1995.

Worker brought products liability action against manufacturer of asbestos pipe-covering products, seeking damages for injuries suffered due to exposure to asbestos, and case was consolidated with other cases. The United States District Court for the Southern District of New York, Robert W. Sweet, J., entered judgment for plaintiffs, and defendant appealed. The Court of Appeals, Leval, Circuit Judge, held that: (1) plaintiffs wife could not maintain cause of action for loss of consortium; (2) consolidation of cases did not cause such confusion or prejudice as to warrant reversal; and (3) damage award of $12 million for pain and suffering to plaintiff was material deviation from award deemed reasonable under New York law.

Affirmed in part and vacated in part.

West Headnotes

[1] Federal Courts ⟨⟩813
170Bk813 Most Cited Cases
When issue for appellate court is whether trial court's decision to consolidate exceeded its discretion, question remains whether consolidation caused such confusion or prejudice as to render jury incapable of finding facts on basis of evidence.

[2] Federal Civil Procedure ⟨⟩8.1
170Ak8.1 Most Cited Cases

[2] Federal Civil Procedure ⟨⟩1953
170Ak1953 Most Cited Cases
Consolidation of products liability actions that arose from exposure to asbestos products did not prevent jury from rendering verdicts based on evidence as related to each independent claim and so consolidation was proper; jury was provided with specialized notebooks with photograph of each plaintiff, accompanied by undisputed biographical information, jurors were encouraged to take extensive notes during trial, counsel used charts to help jury distinguish among plaintiffs' exposure histories, judge gave numerous cautionary and limiting instructions, and verdict forms guided jury step by step through various issues it needed to consider and resolve.

[3] Federal Courts ⟨⟩415
170Bk415 Most Cited Cases
Determining whether damage award for pain and suffering is excessive is issue of substantive rights, and so is governed by state law.

[4] Federal Courts ⟨⟩872
170Bk872 Most Cited Cases
Under New York law, jury verdict may not exceed that amount which would deviate materially from reasonable compensation, which requires reviewing court to determine range it regards as reasonable, and to determine whether particular jury award deviates materially from that range, taking corrective action as it does; "material deviation" from reasonableness is less than that deviation required to find award so excessive as to shock conscience. N.Y.McKinney's CPLR 5501(c).

[5] Federal Courts ⟨⟩752
170Bk752 Most Cited Cases

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 F.3d 1003

72 F.3d 1003, 33 Fed.R.Serv.3d 79

(Cite as: 72 F.3d 1003)

Under New York law, on review of whether damage award was excessive, Court of Appeals will look to other jury awards condoned by courts of New York, recognizing that New York appellate courts regard prior awards as not binding but instructive.

[6] Damages ☞132(1)
115k132(1) Most Cited Cases
Damages of $12 million awarded to plaintiff in products liability action that arose from exposure to asbestos deviated materially from what is deemed reasonable under New York law, and so warranted new trial on issue of damages for pain and suffering, unless plaintiffs accepted remittitur of award to -$3.5 million; although plaintiff endured enormous suffering, pattern of prior similar cases revealed that range of damage awards from approximately $1 million to maximum of $3 million was deemed reasonable under New York law.

[7] Federal Civil Procedure ☞1973
170Ak1973 Most Cited Cases
Counsel's specifying target amounts for jury to award in damages is disfavored; such suggestions anchor jurors' expectations of fair award at place set by counsel, rather than by evidence.

[8] Federal Civil Procedure ☞1969
170Ak1969 Most Cited Cases
Judge's compliment of jury after jury returned its first verdict did not warrant mistrial on basis that his encouragement of jury was misunderstood as endorsement of generosity of its verdict, since judge gave curative instruction after counsel objected.

[9] Federal Civil Procedure ☞2337
170Ak2337 Most Cited Cases
Juror's mentioning during jury deliberations that one non-party defendant possessed $1 billion fund to pay attorney fees to fight asbestos litigation cases did not warrant new trial, in light of trial court's finding that any well-informed citizen could possess general knowledge about that defendant, and fact that report from juror was not prejudicial to defendants.

[10] Evidence ☞181
157k181 Most Cited Cases

Asbestos manufacturer failed to introduce computerized list, or make it available to court, or counsel, that was used for summary evidence that companies had purchased few asbestos-containing products from asbestos manufacturer, and so summary evidence was not admissible in products liability action against manufacturer that was based on harm from exposure to asbestos.

*1004 Steven J. Phillips, New York City (Moshe Maimon, Robert I. Komitor, Alani Golanski, Levy Phillips & Konigsberg, New York City, of counsel), for Plaintiffs-Appellees.

William G. Ballaine,- New York City (Mark S. Landman, Joanna L. Watman, Siff Rosen, New York City, of counsel), for Defendant-Appellant.

Before: NEWMAN, Chief Judge, ALTIMARI and LEVAL, Circuit Judges.

LEVAL, Circuit Judge:

Owens-Corning Fiberglas Corporation ("OCF"), a fabricator of asbestos pipe-covering products, appeals from jury verdicts in favor of John Consorti, a pipe insulation worker who developed mesothelioma as the result of exposure to asbestos dust, and his wife Frances for loss of consortium. The trial in the Southern District of New York before Robert W. Sweet, Judge, which consumed 25 trial days, consolidated the claims of four plaintiff couples against numerous manufacturers of asbestos products. The jury rendered verdicts for the plaintiffs totalling in excess of $47 million. OCF's main claims on appeal are: (1) that the four cases should not have been consolidated; (2) that the $12 million award for John Consorti's pain and suffering was excessive; and (3) that Frances Consorti had no claim under New York law for loss of consortium because John's noxious exposure occurred prior to their marriage. OCF also challenges the sufficiency of evidence on various points, and numerous rulings made at trial.

We certified the question of Mrs. Consorti's entitlement to sue for loss of consortium to the New York Court of Appeals. *1005 Consorti v. Owens-Corning Fiberglas Corp., 45 F.3d 48, 49 (2d

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 F.3d 1003

Page 3

72 F.3d 1003, 33 Fed.R.Serv.3d 79

(Cite as: 72 F.3d 1003)

Cir.1995). On October 24, 1995, the Court of Appeals ruled that the facts proved do not give rise to a cause of action for loss of consortium under New York law. *Consorti v. Owens-Corning Fiberglas Corp.*, 86 N.Y.2d 449, 634 N.Y.S.2d 18, 657 N.E.2d 1301 (1995). Accordingly, we vacate the award for loss of consortium. We affirm on all other issues except the size of John Consorti's award for pain and suffering, which we believe was beyond what New York law permits.

## BACKGROUND

A detailed account of the case is set forth in the district court's opinion in *In re New York Asbestos Litig.*, 847 F.Supp. 1086 (S.D.N.Y.1994) ( " *Consorti et al.*"). We include here only the facts necessary for the discussion below.

John Consorti ("Consorti") was a 40% owner of Veteran Pipe Covering, a family insulator business. He worked for Veteran as a pipe covering insulator from 1960 to 1963, and from 1970 to 1978. From 1963 to 1970, he worked as an insulator for another family business, State Pipe Covering. In 1978, he became Vice-President of Veteran, a position in which he remained until 1992. While working at these businesses, and at least through the mid-1970s, Consorti was exposed to asbestos products, including OCF's product.

Consorti began to suffer back problems in August 1991. In February 1992, he was diagnosed with pleural mesothelioma, an incurable cancer of the lining of the lung. He died after trial, at the age of 51, in November 1993.

Consorti initiated his asbestos personal injury action in August 1992 against numerous defendants in the Southern District of New York. His suit was one of the many thousands of asbestos cases reassigned by the Multi-District Litigation Panel to the Eastern District of Pennsylvania for discovery and pre-trial proceedings. Because of his rapidly advancing illness, his case was deemed an emergency "hardship", and was remanded to the Southern District of New York for expedited trial. It was consolidated for trial in 1993 with three other cases of mesothelioma due to asbestos exposure. *In*

*re New York Asbestos Litig.*, 145 F.R.D. 644 (S.D.N.Y.1993) (*"New York Asbestos I "*); *In re New York Asbestos Litig.*, 149 F.R.D. 490 (S.D.N.Y.1993) (*"New York Asbestos II "*). OCF was a defendant only in the Consorti action.

OCF moved to sever the Consortis' case from the other plaintiffs, and the court denied the motion. *New York Asbestos II*, 149 F.R.D. at 491.

The trial of the consolidated action began on June 21, 1993. At trial, Consorti proved that his incurable fatal disease was caused by his ingestion and respiration of asbestos fibers. He demonstrated that he had endured enormous suffering from the mesothelioma and was likely to die within a few more months.

On July 22, 1993, after a five-week trial, the jury returned its first special verdict, awarding another plaintiff, Vincent Tabolt, over $13 million in damages, including $7.5 million for approximately 18 months of pain and suffering. After the jury announced the award, Judge Sweet, seeking to encourage the panel after its long days of hard work, said:

You are probably the best jury that has ever been put together in the United States of America. You paid very close attention, you worked very hard.... Thank you very much for the good work you have done.

Outside the presence of the jury, OCF objected to the court's praise of the jury, arguing that the judge's remarks would be taken as approval of the enormous verdict and would influence the verdicts yet to be rendered. The following day, the court denied a motion for a mistrial, but gave a curative instruction:

I wanted to be clear that since you have entered a verdict in one case that I was referring, of course, not to the verdict in any way, about which I have no control, that is entirely in your hands, but, rather, in the way in which you conducted yourselves.... It's the way in which you have conducted yourself, not the verdict itself.

*1006 The jury then deliberated on the Consorti case. In summation, plaintiffs' counsel had suggested awards of $8 million for John Consorti's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 F.3d 1003

72 F.3d 1003, 33 Fed.R.Serv.3d 79

(Cite as: 72 F.3d 1003)

past pain and suffering, plus $4 million for his future suffering. The jury returned a verdict that awarded exactly those amounts. The jury found John's remaining life expectancy to be nine months. OCF was found 7% responsible for Consorti's injuries.

OCF moved for judgment as a matter of law, a new trial, or a remittitur, all of which were denied. However, the court did conclude that the jury's calculation of Frances Consorti's future non-economic loss was against the weight of the evidence and must be set aside. *Consorti et al.*, 847 F.Supp. at 1105. In lieu of a new trial, the parties stipulated to an award for non-economic consortium of $332,000. The district court also reduced the verdict on economic damages for Frances's loss of future consortium to $750,000. *Id.* at 1106.

After judgment molding, the district court entered judgment against OCF for more than $11.5 million. *Id.* at 1086. This appeal followed.

## DISCUSSION

OCF appeals numerous aspects of the case below and asks that the judgment be set aside or that remititur be ordered.

### A. *Consolidation*

Relying on a flawed understanding of our holding in *Malcolm v. Nat'l Gypsum Co.,* 995 F.2d 346 (2d Cir.1993), OCF contends that Judge Sweet erred in consolidating the cases of several plaintiffs into a single trial. OCF treats *Malcolm* as establishing a strong anti-consolidation bias. We take pains to emphasize that we have made no such suggestion. The reversal in *Malcolm* was attributable to factors unique to that case. We stressed that "[w]e do not wish to be understood as condemning all consolidations of asbestos cases." 995 F.2d at 354. In fact, after observing that the federal courts were "swamped with asbestos suits," 995 F.2d at 348, and that the " 'heyday' of individual adjudication of asbestos mass tort lawsuits has long passed,' " *id.* (quoting *In re Asbestos Prods. Liab. Litig. (No. VI),* 771 F.Supp. 415, 419 (J.P.M.L.1991)), we indicated that another consolidation of a

substantially larger number of asbestos cases coming from the Brooklyn Navy Yard (which were not appealed on that ground) would have passed muster. 995 F.2d at 353.

Consolidation is a valuable and important tool of judicial administration. This is especially true when the courts are overwhelmed with huge numbers of cases which involve substantially the same questions of fact, as happens when large numbers of plaintiffs allege that they have developed similar illnesses in reaction to a particular toxic substance. *See* Fed.R.Civ.P. 42(a). In such circumstances, consolidation permits the federal court to furnish trials in hundreds, even thousands of cases it might otherwise not reach for many years. If carefully and properly administered, as it was by Judge Sweet below, consolidation is also capable of producing, with efficiency and greatly reduced expense for all parties, a fairer, more rational and evenhanded delivery of justice.

We noted in *Malcolm* that at that time more than 200,000 asbestos cases had been filed in state and federal courts, with as many as 250,000 additional cases expected to come. 995 F.2d at 348. It requires little imagination to recognize that without consolidation the courts are simply incapable of handling litigation of such volume. The waste of time and expense involved in empaneling separate juries to decide the same sorts of questions over and over again is staggering. This is all the more true when one recognizes that each successive jury must be educated by expert witnesses to understand the toxicity of asbestos fibers, the etiology of asbestos-induced diseases, the state of the art regarding the industry's knowledge of these dangers through the years, and the economic issues involving loss of services and future income that recur so frequently in these cases.

Needless to say, efficiency cannot be permitted to prevail at the expense of justice. *Id.* at 350. The obligation of the courts to deliver justice is paramount, and it may not be scrapped for the benefit of cheaper and more rapid dispositions. *1007Johnson v. Celotex Corp.,* 899 F.2d 1281,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 F.3d 1003

72 F.3d 1003, 33 Fed.R.Serv.3d 79

(Cite as: 72 F.3d 1003)

1285 (2d Cir.), *cert. denied*, 498 U.S. 920, 111 S.Ct. 297, 112 L.Ed.2d 250 (1990). On the other hand, the judiciary, like every other institution, must be open to discarding habits that have outlived their usefulness, and must bend under the pressures of modern life to find greater efficiency in accomplishing its mission. When enormous savings of expense and gains of efficiency can be accomplished *without sacrifice of justice*, courts must be ready to alter their procedures. *See* American Law Institute, *Complex Litigation: Statutory Recommendations and Analysis* 16-18 (1994).

This is all the more true when increases in efficiency also *improve* the quality of the justice rendered. When cases are properly chosen for consolidation and well administered, this will be the case. One of the most persistent and troublesome problems in the administration of justice in our civil jury system is the unpredictable relationship between different juries' awards, particularly for intangibles such as pain and suffering. It of course should be the goal of the overall administration of such litigation that more seriously injured plaintiffs receive higher compensation than those less seriously injured. However, when each case is tried before a different jury, the relationship between the size of one judgment for intangibles and another will be largely happenstance. *See generally* James F. Blumstein et al., *Beyond Tort Reform: Developing Better Tools for Assessing Damages for Personal Injury*, 8 Yale J. on Reg. 171, 177 (1991). When numerous claims are tried before a single jury, that jury will recognize that an important part of its chore is to scale the relative seriousness of the various plaintiffs' injuries and to see to it that their respective awards are consistent with that scaling.

Different juries also can produce inconsistent verdicts on liability and the extent of responsibility. This may be encouraged by counsel's litigation strategy. When only a small segment of a much larger picture is before the jury, counsel can present a deceptive view of the relative responsibility of various actors--especially entities that are absent from the trial. This becomes far more difficult

when the jury is considering a broader spectrum of information and more of the relevant actors are present defending their positions. *See* Thomas D. Rowe, Jr. & Kenneth D. Sibley, *Beyond Diversity: Federal Multiparty, Multiforum Jurisdiction*, 135 U.Pa.L.Rev. 7, 15 (1986) ( "Beyond the sheer economy of not having to litigate the same matters twice, consolidation ... can reduce such problems as inconsistent outcomes, whip-sawing (from the ability of defendants in separate litigations to point to a nonparty as the one truly liable), and uncoordinated scrambles for the assets of a limited fund.") (footnotes omitted).

Furthermore, no logic supports the proposition that the incremental addition of similar cases will reduce the jury's ability to understand and resolve the issues placed before it. Without doubt, consideration of a single toxic tort case is challenging, requiring jurors to grapple with complicated issues of chemistry and medicine. But it does not follow that the jury will be less able to deal with those issues if the same questions are repeatedly put to it over a substantially longer period of time. Quite to the contrary, if a jury spends many weeks, or many months, considering numerous cases of asbestos disease, and repetitively hears the disputes of experts and the arguments of counsel on case after case, that jury is likely to develop a far deeper understanding of the issues than a jury whose exposure to those complicated questions is brief, and requires answering only a single set of questions.

*Malcolm* suggests nothing to the contrary. The majority in *Malcolm*, over Judge Walker's dissent, found various case-specific problems that led it to the conclusion that justice had been sacrificed. A principal problem identified in *Malcolm* was that the very basis of consolidation was found to be inapplicable to the case. The consolidation was premised on the supposed fact that each plaintiff had spent more than 50% of his work history at one or more of 40-odd power plant construction sites in New York State. *Malcolm*, 995 F.2d at 351. At trial, however, it emerged that several plaintiffs had spent only small fractions of their exposure history at power plant sites, and the jury in fact had before

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 F.3d 1003                                                                                         Page 6

72 F.3d 1003, 33 Fed.R.Serv.3d 79

(Cite as: 72 F.3d 1003)

it *1008 evidence of over 250 work sites with varying product mixes. *Id.* Another problem was that 13 days before trial, over 200 companies had been impleaded as third-party defendants, and some of them in turn impleaded fourth-party defendants. *Id.* at 348. The court expressly queried whether these late-added parties had adequate opportunity to prepare for trial. *Id.* at 352. The most critical problem undermining the *Malcolm* consolidated verdict was the majority's perception that, instead of apportioning responsibility on the basis of the evidence, the jury had simply "throw[n] up its hands," *id.*, and apportioned "an equal 9% liability to each defendant," *id.*, in spite of the fact that "the evidence regarding [plaintiffs'] exposure to [the defendant's] products was vague, minimal, and heavily circumstantial when compared to the extensive evidence regarding the products of [another defendant]...." *Id.*

[1][2] OCF argues that some of the factors we listed in *Johnson*, 899 F.2d at 1285, and *Malcolm*, 995 F.2d at 350-51, as helpful in analyzing the propriety of consolidation, weigh against consolidation here. Prior to trial, Judge Sweet entertained a reconsideration of consolidation in light of our newly-issued *Malcolm* decision. He reviewed those factors carefully and adhered to his decision that consolidation was proper. *New York Asbestos II*, 149 F.R.D. at 499. It is important to remember that factors noted by a court as helpful in analyzing a particular question are no more than that; they are not a substitute for answering the question itself. When the issue for an appellate court is whether the trial court's decision to consolidate exceeded its discretion, the question remains whether the consolidation caused such confusion or prejudice as to render the jury incapable of finding the facts on the basis of the evidence. It is clear the consolidation here had no such consequence.

Furthermore, we have noted repeatedly that a district court can greatly assist a jury in comprehending complex evidence through the use of intelligent management devices. *See, e.g., Johnson*, 899 F.2d at 1285; *Malcolm*, 995 F.2d at 349, 352-53. Such management devices include

organizing evidence by topic, using charts and visual aids, allowing note-taking by jurors, furnishing the jury with notebooks and albums of pertinent exhibits structured in a manner to help it master complex materials, interim explanations by the judge on issues of law and fact and on the limited use of evidence, interim addresses to the jury by counsel, [FN1] and questionnaires and special verdict forms to help the jury approach deliberations in a well-organized fashion.

> FN1. *See* Pierre N. Leval, *From the Bench: Westmoreland v. CBS*, Litigation, Fall 1985, at 7, 66.

Judge Sweet took numerous such steps to help the jury segregate the issues before it and distinguish among the four sets of plaintiffs and the various defendants. The jury was provided specialized notebooks with a photograph of each plaintiff, accompanied by undisputed biographical information. Jurors were encouraged to take extensive notes during trial. During opening statements and summations, counsel used charts to help the jury distinguish among the plaintiffs' exposure histories, together with time lines to help the jury differentiate between relevant periods in the state of the art. Counsel also provided citations to the trial record to help guide the jury to arguments regarding specific evidence. *Consorti, et al.*, 847 F.Supp. at 1093. Throughout the trial, Judge Sweet gave numerous cautionary and limiting instructions to assist the jury in its understanding of the bearing of the evidence on the various cases. The verdict forms which Judge Sweet prepared guided the jury step by step through the various issues it needed to consider and resolve. The jury was encouraged to consider each case separately.

By implementing such measures, Judge Sweet insured that plaintiffs and defendants received a trial by jury that fairly addressed the individual claims while effectively managing the resources of the court and giving the parties the benefit of an efficient and economical trial. We have no reason to believe that the consolidation prevented the jury from rendering verdicts based on the evidence as it related to each independent claim. OCF's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 F.3d 1003                                                                    Page 7

72 F.3d 1003, 33 Fed.R.Serv.3d 79

(Cite as: 72 F.3d 1003)

contention of improper consolidation is without merit.

*1009 B. *Excessiveness of Award for Pain and Suffering*

OCF claims that the award to John Consorti of $12 million for his pain and suffering was excessive and should be set aside. We agree.

1. *The Role of Judge and Jury*

We note at the start, our finding in no way deprecates the enormous suffering that John Consorti endured. He developed a tumor which gradually enveloped his spine. The tumor pressed against his vocal cords, causing him to lose his voice and choke. It interfered with eating, swallowing, even breathing. His circulatory system was impaired, causing painful and disfiguring swelling of his head and neck. And, as his disease progressed, it became increasingly difficult (later impossible) for him to walk or to care for himself. His pain grew worse as time passed, and was, of course, deepened by the certainty of imminent death. We take it as a given that reasonable people of his age, in good mental and physical health, would not have traded one-quarter of his suffering for a hundred million dollars, much less twelve.

It does not follow that courts should permit a verdict of a hundred million dollars, or twelve million, to stand. While the law seeks by reasonable compensation to make a plaintiff whole, we must recognize that compensation for suffering can be accomplished only in a symbolic and arbitrary fashion. There are at least two serious shortcomings to the endeavor. First, money awards do not make one whole; they do not alleviate pain. Second, there is no rational scale that justifies the award of any particular amount, as opposed to some very different amount, in compensation for a particular quantum of pain. *See Gibbs v. United States*, 599 F.2d 36, 39 (2d Cir.1979) ("measuring pain and suffering in dollars is inescapably subjective"); 2 American Law Institute, *Reporters' Study: Enterprise Responsibility for Personal Injury* 201-02 (1991). [FN2]

FN2. Juries may be especially inclined to make substantial awards when they believe that the defendant's liability is covered by insurance. While insurance frequently does cover the liability, jurors may neglect to consider the broader effect of their award on insurance premiums. *See* W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* 591 (5th ed. 1984).

We acknowledge furthermore that a judge's training in law gives the judge no greater ability than a jury to determine the dollar amount that appropriately compensates any particular level of suffering. *See* 2 American Law Institute, *supra*, at 202. This recognition can lead judges to abdicate responsibility for review of jury verdicts. As we have no greater knowledge than jurors of the amount of money that suitably compensates for suffering, the question arises why our assessment should take precedence over theirs?

Nonetheless, there are important reasons why courts cannot properly leave it to juries to set the limits of compensation for such injuries. Even where the law is incapable of furnishing a rational answer, it seeks at least to be evenhanded, fair, and predictable. It should be our goal that persons who endure a similar degree of suffering can expect to receive a roughly similar award of compensation, *see Nairn v. Nat'l R.R. Passenger Corp.*, 837 F.2d 565, 568 (2d Cir.1988) (vacating a damages award as excessive in light of awards for similar injuries in other cases), and that similarly situated defendants be burdened by similar judgments. If each jury is given unbridled authority to set the level of damages, awards will vary widely and unpredictably. Great discrepancies in awards destroy the fairness of the judicial system, as well as the predictability of litigation. This vigilance must be directed not only against awards that are too high, but also against those that are too low. *See, e.g., In re Brooklyn Navy Yard Asbestos Litig.*, 971 F.2d 831, 853-54 (2d Cir.1992) (ordering new trial on issue of pain and suffering where award of $25,000 was so low, given evidence of lengthy and intense suffering, as to shock the conscience). Such goals cannot be achieved unless courts

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 F.3d 1003                                                                                    Page 8

72 F.3d 1003, 33 Fed.R.Serv.3d 79

(Cite as: 72 F.3d 1003)

exercise responsibility to keep jury awards within limits. *Cf. Restatement (Second) of Torts* § 901 (1977) (note) (describing rules for determining damage awards); Fowler V. Harper et al., *The Law of Torts* 250-51 (2d ed. 1985) (describing judge's role in fashioning tort damages).

*1010 The unpredictability of jury awards is pernicious not only because it is unfair. Widely varying jury verdicts make it difficult for risk bearers to structure their behavior to efficiently manage risk. While it is an aim of tort law to deter wrongful conduct, *see Restatement (Second) of Torts* § 901 (1977), at the same time tort law seeks to avoid over-deterrence that would stifle socially valuable enterprise.

Where liability costs are relatively predictable, they can be avoided (where it is efficient to do so) or 'built in' to the costs of goods and services.... But errors in valuation may cause over-deterrence--the taking of too many costly precautions, or withdrawal from risky activity altogether. For example, during the liability insurance crisis of the 1980s, many obstetricians reportedly stopped delivering babies, and some manufacturers ceased development or production of certain drugs and goods.

Randall R. Bovbjerg et al., *Valuing Life and Limb in Tort: Scheduling "Pain and Suffering,"* 83 Nw.U.L.Rev. 908, 925 (1989) (citations omitted). *See also* Peter H. Schuck, *Agent Orange on Trial: Mass Toxic Disasters in the Courts* 289 (1987) (arguing that "individual juries acting in isolated tort cases ... seem especially prone to overdeter some risky activities," thereby "discourag[ing] the taking of risks from which society might well benefit"); Peter H. Schuck, Introduction to *Tort Law and the Public Interest* 31-36 (Peter H. Schuck ed. 1991) (describing empirical research); 2 American Law Institute, *supra*, at 202-03; Oscar G. Chase, *Helping Jurors Determine Pain and Suffering Awards*, 23 Hofstra L.Rev. 763, 769 (1995). When courts fail to exercise the responsibility to curb excessive verdicts, the effects are uncertainty and an upward spiral. One excessive verdict, permitted to stand, becomes precedent for another still larger one. [FN3] Unbridled, spiraling, excessive judgments

predictably impose huge costs on society.

FN3. See discussion below at n. 13.

A failure by courts to impose limits on jury verdicts would cause serious social dislocation. At the first level, unchecked costs attributable to tort liability, and resultant increases in insurance premiums, would inevitably raise the price of goods and services to the public. More serious exaggeration in unchecked jury awards can cause bankruptcies in productive enterprises, with consequent disappearance of jobs, and even bankruptcies among insurers, leaving segments of society unprotected. Finally, in the circumstance represented by asbestos litigation, where it appears virtually certain that the resources of major defendants will eventually be completely consumed by their liabilities, allowing excessive awards to stand in the early stages of the litigation of the many thousands of cases they face will mean that over-compensation of the early plaintiffs will leave insufficient resources for the equally deserving plaintiffs whose cases are heard later. [FN4]

FN4. For example, Keene Corporation informed the trial court that it had already spent over $430 million to resolve ??00 claims, with 98,000 others still pending; it had no further insurance coverage, and would "run out of funds long before all of the present claimants have been even partially compensated." Keene advised the court, "[T]here is no hope' that those who filed late claims or who file claims in the future will receive any compensation." *New York Asbestos II,* 149 F.R.D. at 499-500.

For all these reasons, even if courts have no better ability than jurors to measure the dollar value of pain, they must accept the responsibility of controlling the limits of jury awards. *See generally* David W. Leebron, *Final Moments: Damages for Pain and Suffering Prior to Death,* 64 N.Y.U.L.Rev. 256 (1989) (advocating increased judicial supervision of jury awards for pain and suffering prior to death). [FN5]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 F.3d 1003                                                                      Page 9

72 F.3d 1003, 33 Fed.R.Serv.3d 79

(Cite as: 72 F.3d 1003)

FN5. We note that in the punitive damages context, the Supreme Court has held the availability of judicial review over jury awards to be constitutionally required. *See Honda Motor Co., Ltd. v. Oberg,* 512 U.S. 415, ––– – –––, 114 S.Ct. 2331, 2340-41, 129 L.Ed.2d 336 (1994).

**2. The Award for Consorti's Pain and Suffering**

The first step in deciding whether the award of $12 million for John Consorti's pain and suffering is excessive must be to ascertain whether federal or state rules apply. *1011 The question has significance in this case because the New York rule, discussed below, is less deferential to the jury's verdict than the federal standard of whether the award was so excessive as to shock the conscience of the court. *Scala v. Moore McCormack Lines, Inc.,* 985 F.2d 680, 683 & n. 7 (2d Cir.1993); *see, e.g., Nairn v. National R.R. Passenger Corp.,* 837 F.2d 565, 567 (2d Cir.1988) (applying federal standard in FELA case). We held in *Martell v. Boardwalk Enters., Inc.,* 748 F.2d 740, 750 (2d Cir.1984), that in a federal court diversity suit state law governs the issue of excessiveness of a jury verdict on a motion for remittitur. Plaintiffs contend that decision was inconsistent with the Supreme Court's ruling in *Donovan v. Penn Shipping Co.,* 429 U.S. 648, 97 S.Ct. 835, 51 L.Ed.2d 112 (1977). Accordingly, we review the question.

Since the landmark decision of *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), it has been a hallmark of federalism that a federal court sitting in diversity, while using its own rules to govern procedural matters, will apply the substantive law of the forum state. The application of this standard to questions of remittitur has caused considerable confusion. *See In re Air Crash Disaster Near New Orleans,* 767 F.2d 1151, 1155 & n. 4 (5th Cir.1985) (noting "apparent conflict in the cases concerning whether the excessiveness of a verdict is a matter governed by state or federal law"); 19 Charles A. Wright, Arthur R. Miller and Edward H. Cooper, *Federal Practice and Procedure* § 4511 n. 23 (1982 & Supp.1995). [FN6] This is perhaps because courts

have not always recognized that a question of remittitur arising in a particular case can involve either procedural or substantive issues, or both.

FN6. Our court has twice found it unnecessary to resolve this question in the context of the New York remittitur statute. *Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1190 (2d Cir.), *cert. denied,* 506 U.S. 826, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992); *Gardner v. Federated Dep't Stores, Inc.,* 907 F.2d 1348, 1353 n. 1 (2d Cir.1990).

The Supreme Court's decision in *Donovan* involved a procedural question-- whether a plaintiff who has accepted a district court's offer of remittitur may nonetheless appeal its determination that the jury's verdict was excessive. The Supreme Court unsurprisingly ruled that such a question arising in a case heard in the federal diversity jurisdiction would be governed by federal law. In delivering its ruling, however, the Court made an extraordinarily broad statement that "[t]he proper role of the trial and appellate courts in the federal system in reviewing the size of jury verdicts is ... a matter of federal law...." *Donovan,* 429 U.S. at 649, 97 S.Ct. at 837. [FN7] Citing this language, plaintiffs contend that all remittitur questions are to be governed by federal rules. We do not agree.

FN7. This court, too, has made confusingly broad categorical statements on this subject in the past. *See West v. Jutras,* 456 F.2d 1222, 1225 n. 6 (2d Cir.1972); *Karlson v. 305 East 43rd Street Corp.,* 370 F.2d 467, 472 n. 1 (2d Cir.), *cert. denied,* 387 U.S. 905, 87 S.Ct. 1690, 18 L.Ed.2d 625 (1967).

[3][4] The question we face is how much money John Consorti may be awarded in damages by reason of his pain and suffering. This is an issue of substantive rights under the laws of New York. If, for example, New York's statutes provided that no compensation was to be awarded for nonpecuniary loss, or scheduled the awardable amounts in the manner of workers' compensation statutes—*i.e.,* SX

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 F.3d 1003

72 F.3d 1003, 33 Fed.R.Serv.3d 79

(Cite as: 72 F.3d 1003)

for injury to an arm, SY for injury to a leg, SZ maximum for pain and suffering--federal courts ruling in diversity would unquestionably be bound by those substantive rules. *See Blasky v. Wheatley Trucking, Inc.,* 482 F.2d 497, 498-99 (6th Cir.1973) (Ohio statute prohibiting award of nonpecuniary damages is controlling substantive state law). And if a jury's award exceeded those standards, the federal court would be required to reduce the verdict to bring it into compliance with the substantive law of New York. Here, New York law provides that a jury verdict may not exceed that amount which would "deviate[ ] materially from ... reasonable compensation." N.Y.Civ.Prac.L. & R. § 5501(c) (McKinney Supp.1995). This is the substantive rule provided by New York law. To disregard New York law in this case, in favor of the federal "shocks the conscience" standard, would violate the fundamental constitutional doctrine *1012 of *Erie,* 304 U.S. at 78, 58 S.Ct. at 822. [FN8]

> FN8. We recognize that, in cases where state and federal substantive standards differ, some courts have chosen to follow federal law. *See, e.g., Nodak Oil Co. v. Mobil Oil Corp.,* 533 F.2d 401, 410 (8th Cir.1976). For reasons stated in the text, we decline to follow this approach. No doubt it will sometimes be difficult to distinguish between procedural and substantive remittitur rules. Consider, for example, *American Business Interiors, Inc. v. Haworth, Inc.,* 798 F.2d 1135, 1146 (8th Cir.1986), which applied federal remittitur rules in a diversity case where the forum state had abolished remittitur. It is difficult in the case of a state law doing away with remittitur to determine whether the rule is procedural or substantive. Such a rule presents itself as a procedural bar, but it has significant substantive ramifications. In contrast, New York's "deviates materially" standard is quite clearly a substantive rule governing the allowable size of jury verdicts.

This is substantially clarified by a more recent

decision of the Supreme Court. *Browning-Ferris Indus. v. Kelco Disposal, Inc.,* 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989), involved a claim that a federal district court sitting in diversity had improperly failed to limit the size of a punitive damages award through remittitur. In that case, the Court reaffirmed the importance of applying federal procedural standards, but then made clear that "the propriety of an award of punitive damages ... [is a] question[ ] of state law." *Id.* at 278, 109 S.Ct. at 2922. The Court expressly refused to "craft some common-law standard of excessiveness" since "these are matters of state, and not federal, common law." *Id.* at 279, 109 S.Ct. at 2922. As here, "[a]dopting a rule along the lines petitioners suggest would require us to ignore the distinction between the state-law and federal-law issues." *Id.* Hence, the *Browning-Ferris* Court approved the district court judge's application of "the proper state-law standard in considering whether the verdict returned was excessive." *Id.* at 280, 109 S.Ct. at 2922.

[5] For purposes of deciding whether state or federal law is applicable, the question whether an award of *compensatory* damages exceeds what is permitted by law is not materially different from the question whether an award of *punitive* damages exceeds what is permitted by law. *Browning-Ferris* made clear that the excessiveness of punitive damages is governed by state, and not federal, law. The state's rule must also determine the excessiveness of compensatory damages. [FN9] Accordingly, we decided in *Martell,* 748 F.2d at 750, that, when conducting remittitur review as a court sitting in diversity, we would seek the governing standard in state court decisions. We therefore reject the plaintiffs' argument and look to the law of New York to determine whether the award was excessive. Like a New York court, we will "look ... to other jury awards condoned by the courts of" New York, recognizing that "New York appellate courts regard prior awards as not binding but instructive. *E.g., Senko v. Fonda,* 53 A.D.2d 638, 639, 384 N.Y.S.2d 849, 851 (2d Dep't 1976) (prior awards 'may guide and enlighten the court[s]' 'in the exercise of their discretion.')." *Martell,* 748 F.2d at 750.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN9. We note that, notwithstanding *Browning-Ferris*, a few courts have continued to apply federal standards of excessiveness in reviewing punitive damages. *See Mayer v. Gary Partners & Co. Ltd.*, 29 F.3d 330, 334 (7th Cir.1994); *Mattison v. Dallas Carrier Corp.*, 947 F.2d 95, 99 (4th Cir.1991); *The Post Office v. Portec, Inc.*, 913 F.2d 802, 809-10 (10th Cir.1990), *vacated and remanded*, 499 U.S. 915, 111 S.Ct. 1299, 113 L.Ed.2d 235 (1991), *appeal dismissed per stipulation*, 935 F.2d 1105 (10th Cir.1991). Some have avoided the issue by referring to both standards. *See Latham v. Nickerson American Plant Breeders*, 978 F.2d 1493, 1499 (8th Cir.1992), *cert. denied*, 509 U.S. 923, 113 S.Ct. 3037, 125 L.Ed.2d 724 (1993). Other courts have applied state standards of excessiveness. *See Hiltgen v. Sumrall*, 47 F.3d 695, 704 (5th Cir.1995); *American Employers Ins. Co. v. Southern Seeding Servs., Inc.*, 931 F.2d 1453, 1458 (11th Cir.1991). We do likewise.

The standard for determining excessiveness and the appropriateness of remittitur in New York is somewhat ambiguous. Prior to 1986, New York law employed the same standard as the federal courts, *see Matthews v. CTI Container Transport Int'l Inc.*, 871 F.2d 270, 278 (2d Cir.1989), which authorized remittitur only if the jury's verdict was so excessive that it "shocked the conscience of the court." *See, e.g., Neal v. Rainbow House Fruits*, 87 A.D.2d 511, 447 N.Y.S.2d 487, 488 (1982); *Juiditta v. Bethlehem Steel Corp.*, 75 A.D.2d 126, 428 N.Y.S.2d 535, 543 (1980); *1013Petosa v. City of New York, Dep't of Sanitation*, 63 A.D.2d 1016, 406 N.Y.S.2d 354, 355 (1978). In 1986, New York State legislated a new standard that required the Appellate Division of the Supreme Court to exercise closer control over jury awards. The new CPLR § 5501(c) provides,

   In reviewing a money judgment in an action in which an itemized verdict is required ... in which it is contended that the award is excessive or inadequate and that a new trial should have been

granted unless a stipulation is entered to a different award, the appellate division shall determine that an award is excessive or inadequate *if it deviates materially from what would be reasonable compensation.*

N.Y.Civ.Prac.L. & R. § 5501(c) (McKinney Supp.1995) (emphasis added). This standard requires the reviewing court to determine the range it regards as reasonable, and to determine whether the particular jury award deviates materially from that range, taking corrective action if it does. Material deviation from reasonableness is less than that deviation required to find an award so excessive as to "shock the conscience." [FN10]

FN10. Decisions of New York State courts show that the two standards are different. *See Harvey v. Mazal Amer. Partners*, 79 N.Y.2d 218, 581 N.Y.S.2d 639, 643, 590 N.E.2d 224, 228 (1992) (remanding to Appellate Division for reconsideration of remittitur using proper "deviates materially" standard, where Appellate Division had referred to both standards); *Shurgan v. Tedesco*, 179 A.D.2d 805, 578 N.Y.S.2d 658, 659 (1992) (affirming trial court's additur where court set aside jury award as materially deviating from what would be reasonable compensation).

Because this statute makes explicit mention only of the Appellate Division, courts have expressed some confusion as to whether its standard applies also at the trial level. *See, e.g., In re Joint E. & S. Dists. Asbestos Litig.*, 798 F.Supp. 925, 936-37 (E. & S.D.N.Y.1992) ("*McPadden et al.*"), *rev'd on other grounds*, 995 F.2d 343 (2d Cir.), *and rev'd on other grounds sub nom. Malcolm v. Nat'l Gypsum Co.*, 995 F.2d 346 (2d Cir.1993). *See also* David D. Siegel, *Supplementary Practice Commentary*, C5501:10, *reprinted in* McKinney's Consolidated Laws of New York Annotated, Vol. 7B at 5 (1995 Supp.). We need not resolve whether the "deviates materially" standard applies to trial courts as well as to the Appellate Division. Unquestionably, it provides the standard for appellate review and must therefore be applied by this court, regardless whether it also governed the district court sitting as

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 F.3d 1003                                                                    Page 12

72 F.3d 1003, 33 Fed.R.Serv.3d 79

(Cite as: 72 F.3d 1003)

a New York trial court.

Because the standard of excessiveness is furnished by state law, the best guide for a federal court, if available, would be decisions of the state's courts in comparable cases indicating at what point awards become excessive. *See Martell,* 748 F.2d at 750. Although a number of pertinent New York State judgments on damages for pain caused by mesothelioma were available, the district court relied instead on *McPadden,* a recent *federal* trial court decision. *Consorti et al.,* 847 F.Supp. at 1096-97. In *McPadden,* the district court upheld a jury award of $4.5 million for pain and suffering due to mesothelioma. *McPadden et al.,* 798 F.Supp. at 937-38.

[6] In discussing below the question of excessiveness of the jury's award to Tabolt of $7.5 million for pain and suffering, Judge Sweet converted the $4.5 million *McPadden* award to a monthly figure of $409,090.91 for McPadden's 11 months of suffering. Multiplication of that figure by Tabolt's 18 months of suffering produced a figure of $7,363,636.36, which was not substantially lower than the jury's award to Tabolt. *Consorti et al.,* 847 F.Supp. at 1097. Although it was not expressly discussed, the district court presumably used the same conversion of the *McPadden* award to a monthly amount to justify the jury's $12 million award to Consorti, whose disease the jury predicted to run 32 months from onset to death. Twelve million expressed as a monthly figure over 32 months is $375,000, which is below the $409,090.91 monthly figure Judge Sweet extrapolated from the *McPadden* judgment.

We disagree with the district court's use of *McPadden* to justify the jury's award to Consorti for two reasons. First, rigid application of a monthly multiplier for diseases of significantly different durations is an oversimplification, as well as inconsistent with New York precedent. [FN11] Unquestionably, the duration of suffering is a relevant factor. But it cannot be automatically assumed that suffering which lasts 30 months, from onset of illness to death, should command a verdict three times that of a case where ten months pass

from onset to death. In many cases, the degree of average daily suffering will be greater in a case where the disease progresses rapidly. The fact that McPadden's disease progressed three times more rapidly than Consorti's does not necessarily justify an award for Consorti nearly three times the size of McPadden's. Moreover, we believe the court relied excessively on federal district court precedent to justify the jury verdict, giving insufficient regard to a large number of recent New York State court decisions which strongly indicated that the Consorti award was far beyond what New York law permits.

FN11. See discussion below at n. 15.

Justice Helen Freedman is the trial judge to whom all New York asbestos litigation has been assigned by administrative order. In the period shortly prior to the Consorti trial, Justice Freedman rendered numerous judgments reducing awards in comparable cases of mesothelioma to levels far below what the jury awarded to Consorti. In *Didner v. Keene Corp.,* Justice Freedman reduced a $3.25 million award to $2.3 million; the plaintiff had suffered 26- 27 months of pain and suffering due to mesothelioma. *Didner v. Keene Corp.,* N.Y.L.J., Jan. 4, 1991, at 22 (N.Y.Sup.Ct. Dec. 17, 1990), *aff'd,* 18.  D.2d 15, 593 N.Y.S.2d 238 (App.Div.1993) (no discussion of remittitur), *modified,* 82 N.Y.2d 342, 604 N.Y.S.2d 884, 624 N.E.2d 979 (1993). The court concluded that while Didner's pain and suffering was severe, "courts in this jurisdiction have not countenanced awards of this size for two plus years of pain and suffering." *Id.*

Four months later, in the consolidated Brooklyn Navy Yard litigation, Justice Freedman reduced fourteen pain and suffering awards in mesothelioma death cases. *In re New York City Asbestos Litig.,* Index No. 40,000/88, slip. op. at 3-5 (N.Y.Sup.Ct. May 13, 1991), *aff'd in part, rev'd in part on other grounds,* 188 A.D.2d 214, 593 N.Y.S.2d 43 (App.Div.1993) (no discussion of remittitur), *aff'd,* 82 N.Y.2d 821, 605 N.Y.S.2d 3, 625 N.E.2d 588 (N.Y.1993). [FN12] The jury awards for pain and suffering from mesothelioma that Justice Freedman considered ranged from a low of $1 million, for a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 F.3d 1003

72 F.3d 1003, 33 Fed.R.Serv.3d 79

(Cite as: 72 F.3d 1003)

course of disease that took only three months, to a high of $5 million, in a case of 34 months of suffering. The jury awards thus ranged from 8% to 42% of this jury's award to Consorti. Justice Freedman found all those awards excessive under New York law. Those most comparable in duration to Consorti's were two awards of $5 million in cases where the suffering lasted 34 and 35 months (*Cohen* and *Lopez* ). Justice Freedman reduced these to $3 million. And as to three awards ranging from $3.2 to $4.25 million, for suffering periods of 26 to 29 months, they were reduced to $2.2 to $2.4 million (*Chierico, Savella,* and *Silver* ).

> FN12. Justice Freedman's published opinion at 151 Misc.2d 1, 572 N.Y.S.2d 1006, omits discussion of the specific remittiturs cited in the text.

While it is difficult, especially without a study of the complete record, to evaluate the pertinence of one judgment for pain and suffering for another, the strong pattern of Justice Freedman's rulings is helpful in evaluating the Consorti awards. In the face of so substantial a pattern of New York judgments communicating that New York courts find excessiveness in such cases at far lower levels, we believe it was error for the district court to conclude that the jury's $12 million award was within the range accepted by New York law. [FN13] We note furthermore that Justice Freedman employed the "shockingly excessive" standard, while we on appeal must use the standard of CPLR § 5501(c)--"deviates materially from ... reasonable compensation"--*1015 a standard less deferential to the jury's appraisal. [FN14]

> FN13. In *McPadden,* the district court observed that in the state court's Brooklyn Navy Yard consolidation, "Justice Freedman allowed several multimillion dollar awards for pain and suffering...." *McPadden et al.,* 798 F.Supp. at 938. Those awards, reducing $5 million verdicts to $3 million, initially served as authority justifying an award of $4.5 million to McPadden, which in turn, converted to a

monthly average figure, was used below to justify this award of $12 million.

> FN14. Although we apply the New York "deviates materially" standard, we note that Consorti's award was also so excessive as to "shock the conscience." Hence, we would remit this $12 million award for pain and suffering even if we were to follow federal law, although application of this standard might allow for a slightly higher award than the $3.5 million figure we have allowed.

Although we recognize that John Consorti's suffering was very great, Justice Freedman's cases also all involved deaths from mesothelioma. It is not suggested to us that the suffering of the plaintiffs she considered was any less horrendous. [FN15] We recognize that the New York decisions in question were at the trial court level, and thus less compelling as authority than a decision of New York's Court of Appeals. Nonetheless, especially given the uniformity of the large number of decisions, they provide a better indication of New York law than any other authorities cited to us. [FN16]

> FN15. We note that one of the difficulties of remittitur review is the limited data available about the particular cases used for comparison. *See* David C. Baldus et al., *Improving Judicial Oversight of Jury Damages Assessments,* 80 Iowa L.Rev. 825 (1995); Blumstein et al., *supra.* But even if we approach the New York precedents on a monthly basis--the way Judge Sweet used the *McPadden* precedent--they offer no better support for this award. Probably in recognition that the course of the disease will involve varying degrees of suffering in different periods, and that a short course is likely to cause greater average daily suffering than one which is slow to develop, Justice Freedman's judgments, stated on a monthly basis, vary roughly inversely to duration. The plaintiffs who died (or were expected

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 F.3d 1003

72 F.3d 1003, 33 Fed.R.Serv.3d 79

(Cite as: 72 F.3d 1003)

to) within a year of the disease's onset received monthly sums of $110,000 to $200,000, while those whose illness lingered from one and a half to three years received between $80,000 and $90,000 per month. This provides no authority for Consorti's monthly figure of $375,000.

FN16. In their petition for rehearing, plaintiffs cite two new authorities in support of the jury's verdict. In *Manning v. Georgia Pacific Corp.*, No. 102757/94 (N.Y.Sup.Ct. Feb. 3, 1995), Justice Freedman remitted a $5 million verdict for pain and suffering caused by mesothelioma to $4 million. The *Manning* decision does not alter our view of the problem. First, the reduction to $4 million does not differ significantly from our reduction to $3.5 million. Second, Justice Freedman, in raising the level of damages she considered acceptable, deferred to the very district court judgments (in *McPadden* and in this case) which we here criticize for insufficient deference to *her* earlier rulings.

Plaintiffs also point to a recent decision of New York's Appellate Division, 1st Department, *In re New York County DES Litigation*, 211 A.D.2d 500, 621 N.Y.S.2d 332 (1995). For several reasons, plaintiffs' submissions do not convince us to change our views of the present case. First, the Appellate Division's ruling gives no information about the verdict being upheld. It simply states, "As to damages, we do not find that there has been a material deviation from what would be reasonable compensation ... for the unique, far-ranging and severe physical and psychological injuries suffered by these plaintiffs." *Id.* 621 N.Y.S.2d at 333 (citations omitted). The decision tells neither the amounts of the verdicts, nor what they were awarded for. Plaintiffs submit a newspaper article reporting the decision, which asserts that among the judgments affirmed were judgments for

$12 million and $10 million. *DES Jury Verdicts Affirmed on Appeal*, N.Y.L.J., Jan. 19, 1995, at 1. Even this source, however, does not tell us how those judgments were composed or what elements they included. What we do know from the opinion of the First Department is that the reviewing court considered the injuries to involve "far-ranging and severe physical and psychological injuries." *New York County DES Litigation*, 621 N.Y.S.2d at 333. Material from the briefs in the case tells us that these awards were made to women of childbearing age who–as a result of DES exposure–contracted clear cell adenocarcinoma of the vagina and other diseases. Their illnesses required that they receive radical surgery, which eliminated their reproductive capacity. The elements of suffering submitted to the jury included severe sexual dysfunction, aborted pregnancy, fear and sadness relating to the fate of unborn children, disappointment of plans to conceive a family, as well as many years of past and future suffering from cancer. The First Department's opinion states that it considers those injuries to be "unique." In short, we have little guidance as to the exact nature of the verdicts upheld in the DES litigation, and the guidance we have tells us they involved quite different emotional considerations from those arising here. See *Nairn*, 837 F.2d at 568 (evaluating excessiveness by reference to other awards for similar injuries).

Given the consistent pattern, over a considerable number of cases of death by mesothelioma, of reduction of jury verdicts for pain and suffering by New York courts to figures ranging from approximately $1 million to a maximum of $3 million, we conclude an award exceeding $3.5 million would deviate materially from what is deemed reasonable under New York law. Accordingly, we direct entry of a conditional order of a new trial on the issue of damages for pain and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 F.3d 1003

72 F.3d 1003, 33 Fed.R.Serv.3d 79

(Cite as: 72 F.3d 1003)

*1016 suffering, unless plaintiffs accept remittitur to that amount.

### C. Counsel's Recommendation of an Award

OCF claims that error occurred during summation, when plaintiffs' counsel made specific dollar recommendations to the jury as to appropriate awards for pain and suffering. He suggested $8 million for John Consorti's pain and suffering to date and $4 million for future pain and suffering. He also suggested a specific figure for Frances Consorti's award. After the jury left the room, defense counsel objected to plaintiffs' counsel's request. . . .

OCF's protest is undermined by the fact that its own counsel was the first to suggest a value for Consorti's pain and suffering. Earlier in the summations, counsel for OCF told the jury:

And I feel that to make a suggestion to you that he's not entitled to any compensation would not be fair.... [if you decide] that he was entitled to maybe $750,000 to maybe even a million dollars, I don't think that that would be an unfair figure.

[7] While this court has not adopted a per se rule about the propriety of suggested damage amounts, see McPadden et al., 798 F.Supp. at 936, we wish to emphasize that specifying target amounts for the jury to award is disfavored. Such suggestions anchor the jurors' expectations of a fair award at a place set by counsel, rather than by the evidence. See Mileski v. Long Island R.R. Co., 499 F.2d 1169; 1172 (2d Cir.1974) ("A jury with little or no experience in such matters, rather than rely upon its own estimates and reasoning, may give undue weight to the figures advanced by plaintiff's counsel...."). A jury is likely to infer that counsel's choice of a particular number is backed by some authority or legal precedent. Specific proposals have a real potential to sway the jury unduly. While under the circumstances present here we do not yet reach the point of holding that it is error to permit such recommendations, it is not a desirable practice. We encourage trial judges to bar such recommendations.

### D. Comment by Judge

[8] As outlined above, after the jury returned its first verdict, the judge commented, among other things, that "you are probably the best jury that has ever been put together in the United States of America." After counsel objected, the judge gave a curative instruction. He told the jury that he had intended to praise "the way in which you have conducted yourself, not the verdict itself," and that he had no stake in their verdict.

OCF argues that the judge's comments impermissibly communicated to the jury his approval of their verdict. Judge Sweet immediately recognized that, coming on the heels of the generous verdict for Tabolt, his encouragement of the jury might be misunderstood as endorsement of the generosity of its verdict. His prompt corrective instruction cured the problem. There is no basis for a mistrial.

### E. Other Claims

[9] OCF asserts a number of other claims. OCF argues that the district court erred in failing to order a new trial due to the jury's receipt of extra-judicial information. A month after the jury returned its verdicts, the court received a letter from juror Carl D'Andrilli that said that during deliberations, another juror had mentioned "that Johns-Manville, a non-party defendant, possesses a one billion dollar fund to pay lawyer's fees to fight asbestos litigation cases." The district court ruled that any well-informed citizen could possess general knowledge about Johns-Manville and that the report from the juror was not prejudicial to the defendants. This ruling was certainly within the trial court's discretion.

[10] The district court was also within its discretion in excluding the summary evidence proffered by OCF. OCF attempted to use summary evidence—analyzing Veteran and State invoices using a computer list of asbestos-containing products—to demonstrate that the Consorti family companies had purchased few asbestos-containing products from OCF. OCF did not introduce the computerized list

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 F.3d 1003

72 F.3d 1003, 33 Fed.R.Serv.3d 79

(Cite as: 72 F.3d 1003)

Page 16

or make it available in court or to counsel. *1017 The district court ruled that: "In the absence of the list and any testimony concerning its preparation, the summary based upon it became inadmissible." We agree. The records may not have comprised the universe of Veteran documents, and the reason for the exclusion of certain invoices from the summaries was unclear.

We reject OCF's claims that the evidence was insufficient to support the jury's findings that OCF acted recklessly and in concert with other defendants. The record contains sufficient evidence to support the jury's determination.

### CONCLUSION

We have considered OCF's other claims and find them to be without merit. Based on the above, the verdict for John Consorti's pain and suffering will be set aside and a new trial ordered unless plaintiff-appellee agrees to accept an award of $3.5 million. The award for loss of consortium is vacated. The judgment of the district court is affirmed in all other respects.

72 F.3d 1003, 33 Fed.R.Serv.3d 79

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.