SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------x

In Re:  NEW YORK CITY
       ASBESTOS LITIGATION

------------------------------------------------------------x

This Document Relates To:

| | | |
|---|---|---|
| In Re: Frank Bianco | Index No. 115546-06 | Part 11 (Madden, J.) |
| In Re: James Director | Index No. 115923-06 | |
| In Re: Karl Felten | Index No. 114005-06 | |
| In Re: Harvey Helfand | Index No. 117176-06 | |
| In Re: Christian Holinka | Index No. 114120-06 | |
| In Re: Jack Nacht | Index No. 114274-06 | |
| In Re: Frederick Ritzer | Index No. 111328-06 | |
| In Re: Joseph Saccomano | Index No. 113299-06 | |
| In Re: Robert Sheppard | Index No. 117513-06 | |

------------------------------------------------------------x

---

## MEMORANDUM OF LAW IN OPPOSITION
## TO PLAINTIFFS' MOTION FOR A JOINT TRIAL

---

LAW OFFICES
GREENBERG TRAURIG LLP
MetLife Building
200 Park Avenue, 15th Floor
New York, New York 10166
Main No.: (212) 801-9200

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------------x
In Re:  NEW YORK CITY                            :
      ASBESTOS LITIGATION                     :
-----------------------------------------------------------------x
This Document Relates To:                         :
                                              :

| | | |
|---|---|---|
| In Re: <u>Frank Bianco</u> | Index No. 115546-06 | :    Part 11 (Madden, J.) |
| In Re: <u>James Director</u> | Index No. 115923-06 | : |
| In Re: <u>Karl Felten</u> | Index No. 114005-06 | : |
| In Re: <u>Harvey Helfand</u> | Index No. 117176-06 | : |
| In Re: <u>Christian Holinka</u> | Index No. 114120-06 | : |
| In Re: <u>Jack Nacht</u> | Index No. 114274-06 | : |
| In Re: <u>Frederick Ritzer</u> | Index No. 111328-06 | : |
| In Re: <u>Joseph Saccomano</u> | Index No. 113299-06 | : |
| In Re: <u>Robert Sheppard</u> | Index No. 117513-06 | : |

-----------------------------------------------------------------x

## MEMORANDUM OF LAW IN OPPOSITION
## TO PLAINTIFFS' MOTION FOR A JOINT TRIAL

Defendant Robert A. Keasbey Co. ("Keasbey"), a defendant only in <u>Saccomano</u>,

No. 113299-06, respectfully submits this memorandum of law in opposition to Plaintiffs'

motion to join <u>Saccomano</u> for trial with eight unrelated asbestos cases before this Court:

<u>Bianco</u>, No. 115546-06; <u>Director</u>, No. 115923-06; <u>Felten</u>, No. 114005-06; <u>Helfand</u>, No.

117176-06; <u>Holinka</u>, No. 114120-06; <u>Nacht</u>, No. 114274-06; <u>Ritzer</u>, No. 111328-06; and

<u>Sheppard</u>; No. 117513-06.

### PRELIMINARY STATEMENT

In their zeal for a joint trial, Plaintiffs improperly have swept <u>Saccomano</u> into

their consolidation motion alongside eight unrelated asbestos actions.  Consolidation of

<u>Saccomano</u> – the only case in which Keasbey is a party – with the other eight cases

involving 42 remaining defendants (including Keasbey) would be entirely inappropriate

on several grounds.  First and foremost, there is <u>no</u> commonality of disease among

Saccomano and the other cases. Keasbey hotly contests Plaintiffs' contention that Mr. Saccomano had mesothelioma, asbestosis or any other asbestos-related disease. Because Saccomano is the only case in which the diagnosis of mesothelioma is in dispute, the expert testimony in Saccomano will differ dramatically from that adduced in the other cases.

In addition, Saccomano and the other cases share no common questions of material fact. These factual differences go directly to such fundamental issues as how, when and where each Plaintiff was allegedly exposed to asbestos and, most importantly, by which, if any, of the 42 Defendants remaining in the nine actions. There are literally dozens of claimed exposure sites among the various Plaintiffs, including without limitation various residences, powerhouses, building construction sites, sound studios, schools, printing press shops, military bases and hospitals. None of the Plaintiffs alleges the same kind of exposures as Mr. Saccomano or shares the same occupations he did: U.S. Air Force aircraft mechanic, sheet metal worker and building inspector. Significantly, only Mr. Saccomano alleges exposure at powerhouses, including the construction of the Northport Powerhouse. As another court recognized in ordering a separate trial of the Michael O'Reilly case, exposure at powerhouses, especially during new construction, is a fundamentally different type of exposure requiring separate trials. Thus, there would be no common fact witnesses among Saccomano and any other case were there a joint trial.

The lack of commonality is even more crucial here because each Plaintiff asserts a negligence claim. The First Department has recognized that joint trials generally are precluded in negligence cases. This is because determinations of fundamental issues

2

such as the "extent of any breach of duty," are highly individualized and relevant only to the particular Plaintiff. Whether Keasbey owed Mr. Saccomano a duty of care and breached that duty, will not only involve what Keasbey knew or should have known about the risk to bystanders during that time period, but also requires an individualized factual inquiry into Keasbey's alleged conduct at any site where the Plaintiff in Saccomano may claim exposure to Mr. Saccomano from Keasbey. The evidence relevant to Keasbey will not overlap with evidence relevant to any other Plaintiff. Nor will any of the evidence in the other eight cases have any relevance to Keasbey.

It is readily apparent that the individualized proofs applicable to each Plaintiff would overwhelm any joint trial, inevitably confusing the jury and prejudicing Defendants. The prejudice Keasbey will suffer is especially severe. Keasbey is a defendant in only one action – Saccomano – a case that involves a deceased Plaintiff. Keasbey should not be forced to sit through weeks of complex and inflammatory testimony concerning eight other Plaintiffs, four of whom are living, and testimony concerning other companies' allegedly negligent conduct at other sites.

For all these reasons, and as explained further below, consolidation should be denied.

## FACTUAL BACKGROUND

The nine cases at issue are separately-filed, unrelated asbestos actions originally part of the May 2007 in extremis trial group set forth by the Honorable Helen E. Freedman, pursuant to the Case Management Order for the New York City Asbestos Litigation. Keasbey – an insulation sub-contractor – is a defendant in only Saccomano. (Affirmation of Loring I. Fenton, Esq. in Opposition to Plaintiffs' Motion for a Joint Trial, dated July 12, 2007 ("Fenton Aff.") at ¶ 3)

On or about June 4, 2007, these nine cases were assigned to this Court for trial. (Id. at ¶ 4) On or about June 25, 2007, Plaintiffs filed this motion for a joint trial. (Id.)

Justice Freedman repeatedly has stated that trial courts should not assume that she wants cases she assigns to a particular judge to be consolidated. (Id. at ¶ 6) At the December 17, 2003, designation conference, for example, Justice Freedman ruled:

> Let me make a ruling here and now: when I send cases to another judge, it is up to that judge to decide how they are to be tried, whether they are to be tried one at a time, two at a time, eight at a time, ten at a time. I am simply sending them out in a cluster. I am not sending them out as consolidated or for trial (sic) cases. It is up to that judge. He or she will make the decision. I will make the decision about cases that I keep for myself to try. I am sure that the judge will do it on a rational basis such as which defendants are in which cases, which diseases go together better and so forth.

(December 17, 2003, Designation Conference Transcript at 54-55) (emphasis supplied)[1]

The salient facts of all nine cases are discussed below. As will be readily apparent, individual issues predominate, rendering the consolidation of Saccomano with any of the other cases inappropriate.

## A.  JOSEPH SACCOMANO (Deceased) – U.S. Air Force Aircraft Mechanic; Sheet Metal Worker; Building Inspector

As an aircraft mechanic crew chief in the Air Force from 1955 to 1959, Mr. Saccomano was exposed to asbestos dust from brake linings on the airplanes when he had "to air hose off the brake linings." (Deposition of Joseph P. Saccomano, dated October 18, 23 and 30, 2006, and November 8 and 15, 2006 ("Saccomano Dep."), at 27-29)[2] Moreover, he was exposed to asbestos from the insulation of the combustion chambers of aircraft engines. (Id. at 30-31)

---

[1]  A copy of the relevant pages of the transcript of the December 17, 2003, designation conference is attached as Exhibit A to the Fenton Aff.

[2]  Relevant portions of the Saccomano Dep. are attached as Exhibit B to the Fenton Aff.

4

From 1961 or 1962 to 1983, Mr. Saccomano worked as a sheet metal worker. (See Mr. Saccomano's Chart A to his Answers to Interrogatories of Joseph Saccomano, dated September 15, 2006 ("Saccomano Answers");[3] see also Saccomano Dep. at 41-42) Id. As such, he worked at numerous sites where he allegedly was exposed to asbestos.

As an apprentice, Mr. Saccomano worked at the Phelps Dodge smeltering plant in Maspeth, Queens, where he removed concrete asbestos sheeting. (Saccomano Dep. at 41-45) He also worked with a preformed asbestos cement product by drilling into it, cutting it and screwing it down on steel, all of which created dust that he inhaled. (Id. at 46-47) Further, he allegedly was exposed from the work of insulators, who were "right next to us," applying onto the pipes a "Manville" product that they had to mix and "stuff would be flying." (Id. at 48-49)

As a mechanic at ABC Studios, Mr. Saccomano renovated the HVAC system and installed new duct work. (Id. at 50-51, 53) He had to scrape off asbestos-containing insulation from the beams and chipped off old insulation, both of which he described as "filthy, dusty, dirty, God, terrible." (Id. at 53-57) Other trades working in his vicinity created general dust in the air from insulation on the ceilings, pipes, walls and fireproofing. (Id. at 55-58, 60-61)

Moreover, Mr. Saccomano claimed he was exposed to asbestos at the AT&T Building, where he installed duct work in the equipment/boiler room and fan rooms. (Id. at 63-64) Other workers were lining the boiler with asbestos-containing block and using asbestos rope packing and gaskets on valves and pumps. (Id. at 70-73, 78-80, 82-83) Meanwhile, "carpenters, sheetrockers, spackler and insulation guys" installed drywall and

---

[3]    Relevant portions of the Saccomano Answers are attached as Exhibit C to the Fenton Aff.

sanded U.S. Gypsum joint compound." (Id. at 86-87)

For "more than two months" during the summer months of 1966 or 1967, Mr. Saccomano worked as a mechanic at the Northport Powerhouse.[4] (Id. at 110-11) He allegedly installed metal protectors over the insulation applied by the pipe coverers on pipes, pumps, containment vessels and tanks. (Id. at 113-14, 119) He testified that he was exposed to asbestos from the cutting of materials to insulate the high-temperature equipment, which included packing, gaskets and fabric, as well as from the mixing of powdered asbestos materials. (Id. at 119-23, 126, 292, 295, 297)

In addition to Northport, Mr. Saccomano worked at other powerhouses: Ravenswood, Astoria and 14th Street. He was unable to recall when he worked at these sites (id. at 133-34, 141-42, 148), but claimed that he was exposed to asbestos at all of them "[b]y virtue of the age of the powerhouse and dust conditions in the powerhouse" (id. at 150), and because "these places are not clean." (Id. at 145)

Mr. Saccomano also worked at St. Barnabas Hospital, NYU Hospital and St. Vincent's Hospital. (Id. at 157, 166, 168-69) He testified that he was possibly exposed at these sites because of the "age" of the buildings and equipment and "the asbestos in the air." (Id. at 158, 160, 166-67, 169)

In 1983, Mr. Saccomano began working for the Town of Brookhaven, as a Building Inspector for two years and then a Senior building Inspector. (Id. at 200-02, 237-38) He allegedly was exposed to asbestos from the removal of boilers because "the product contain[ed], in my belief, asbestos, as they're being dismantled that stuff is flying around, I'm breathing it in." (Id. at 210, 238, 334) Other asbestos-containing products to

---

[4]    Independent evidence will show that Northport was being constructed at that time.

6

which he was exposed were siding, flooring tiles (primarily from the scraping off of the old tiles, which he knew contained asbestos), shingles and "sheathing." (Id. at 221-24, 241-45) Mr. Saccomano voluntarily retired in 1996. (Id. at 249)

Plaintiffs originally contended that Mr. Saccomano suffered from lung cancer. (Saccomano Answers at 7) Now, they claim that Mr. Saccomano suffered from mesothelioma. (Affirmation in Support of Plaintiffs' Motion for a Joint Trial of Thomas M. Comerford, Esq., dated June 25, 2007 ("Comerford Aff.") at ¶ 5). Moreover, Mr. Saccomano testified that he was diagnosed with asbestosis in 2000, 2002 or 2003. (Saccomano Dep. at 184)

Keasbey disputes both the mesothelioma and asbestosis diagnoses. In his report dated June 7, 2007, Dr. Michael Graham, M.D., Professor of Pathology at St. Louis University ("Graham Report"), opined that "Mr. Saccomano developed a non-small carcinoma of the right lung and that the tumor is not malignant mesothelioma."[5] (Graham Report at 3) Moreover, Dr. Graham stated that Mr. Saccomano "had neither asbestosis nor objective evidence of a pulmonary asbestos burden sufficient to potentially cause asbestosis." (Id.)

Notably, both Keasbey and Plaintiff are in agreement that Mr. Saccomano suffered from emphysema. (Id. at 3; Saccomano Dep. at 270) There can be no dispute that emphysema is caused by cigarette smoke. Mr. Saccomano had a significant smoking history. (Id. at 250-51)

## B.  FRANCIS BIANCO (Deceased) – Student; U.S. Navy Shipfitter; Plumber; Truck Driver

Mr. Bianco was exposed to asbestos while attending the Thomas Edison

---

[5]    A copy of the Graham Report is attached a Exhibit D to the Fenton Aff.

7

Vocational High School. (Deposition of Francis Bianco, dated October 30, 2006 and November 1, 3, 8 and 10, 2006 ("Bianco Dep.") at 156).[6]  As a student, he worked on boilers, pumps and valves in the machine shop, which exposed him to asbestos. (Id. at 156-57)

From his early teens to about age 17, he accompanied his father, a plumber, to various unspecified sites to rip out old boilers that "were covered with asbestos." (Id. at 73)  He also was exposed to gaskets, loose asbestos, packing on valves and pipe covering during those times. (Id. at 73-88)

From 1955 to 1958, Mr. Bianco was in the U.S. Navy. (Id. at 106, 215)  During boot camp, he trained to be a shipfitter and worked on boilers, valves, pumps and covered piping. (Id. at 107-18)  He believed that his work may have exposed him to asbestos. (Id.)  Thereafter, he was a shipfitter fireman and did all types of repairs on pumps, valves, catapults and covered pipes, all of which exposed him to asbestos. (Id. at 118-42)

During the periods 1959 to 1974 or 1975, 1978 to 1980, and 1998 to 2002, Mr. Bianco worked as a plumber, working at numerous unspecified residential and "light commercial" sites. (Id. at 176-82, 243-50, 256-94, 300-02, 352-59, 376, 382-84)  As such, he allegedly was exposed to asbestos from ripping out and replacing old boilers, gaskets, packing, firebricks and pipe insulation. (Id.)

In 1963 or 1964, Mr. Bianco took plumbing classes at BOCES in Westbury. (Id. at 97)  As part of his course work, he ripped two or three boilers apart and put them back together, which allegedly exposed him to asbestos. (Id. at 97-100)

Sometime in the early 1970s to about 1975, he worked as a truck driver for

---

[6]    Relevant portions of the Bianco Dep. are attached as Exhibit E to the Fenton Aff.

Gifford Oil. (Id. at 335) He claimed that other workers in his vicinity at two pumping stations disturbed asbestos on "mechanical equipment and released stuff in the air." (Id. at 335-39)

Keasbey is not a defendant in this action. (Fenton Aff. at ¶ 25)

## C.    JAMES DIRECTOR (Deceased) – Asbestos-Core Fire Doors Worker

Starting in the late 1960s or early 1970s, Mr. Director worked at his father's company, Director Door Corporation ("DDC"), until it dissolved in 2002 or 2003. (Deposition of James Director, dated December 13, 14, 15 and 18, 2006 ("Director Dep.") at 14, 37-40, 42, 72)[7] DDC was in the business of purchasing, modifying and installing doors, including asbestos-core fire doors. (Id. at 33-34, 39-40, 47, 52, 55, 60, 64-65, 70-71)

The majority of Director's exposure to asbestos occurred while working at the DDC facility, where he and others cut or routed into the asbestos core of the fire doors to install hinges, knobs and windows. (Id. at 35, 38-39, 72-73) These modifications, which were performed daily at DDC, created "tremendous clouds" of asbestos dust, which Mr. Director inhaled. (Id. at 38-39, 73, 186-88, 239)

Mr. Director also worked at jobsites such as New York public schools, a VA hospital, Cadman Plaza Post Office, New York City libraries, Shoreham Nuclear Power Station, Creedmore Mental Hospital, Pilgrim State Mental Hospital, La Guardia College and various single-family homes. (Id. at 42-46, 48-49, 63-67, 162-63) He allegedly was exposed to asbestos not only when he and other DDC employees modified the asbestos-core fire doors at the sites (id. at 66-67, 70), but also when other trades worked with

---

[7]    Relevant portions of the Director Dep. are attached as Exhibit F to the Fenton Aff.

9

asbestos-containing wall board, joint compound and spackle in his vicinity. (E.g., id. at 47-49, 52-53, 55-56, 60, 188-89) In addition, Mr. Director installed asbestos-containing sheets on residential garage doors and boiler room doors. (Id. at 162-63, 167-68)

Keasbey is not a defendant in this action. (Fenton Aff. at ¶ 29)

**D.    KARL H. FELTEN (Living) – Mechanical Engineer**

Mr. Felten was exposed to asbestos only at Mt Sinai Hospital, where he worked as a mechanical engineer from 1953 to 1954 and from 1958 until 1996 or 1997. (Deposition of Karl H. Felten, dated October 10 and 11, 2006 ("Felten Dep.") at 49-53;[8] see also Verified Handwritten Supplement to Answers to Interrogatories for Karl Felten, ("Supplemental Felten Answers") dated October 6, 2006[9]) As such, he personally worked with asbestos-containing cement and pipe covering about once a week. (Id. at 210-17) He also removed and replaced gaskets (id. at 61-64) and firebrick. (Id. at 75, 221) Further, he was exposed to asbestos from having to go through tunnels to perform repair work where there was "a lot of vibration going on and a lot of asbestos dust in the air." (Id. at 68, 71, 88-89, 142, 221-22) Finally, he was exposed from the work performed by others on various asbestos-covered equipment. (Id. at 82-84, 217-18, 228-29, 243-45)

Keasbey is not a party to this action. (Fenton Aff. at ¶ 31)

**E.    HARVEY HELFAND (Living) – Printing Press "Cleanup Boy"; General Construction Worker**

Mr. Helfand described his first position with Rabin Typographers when he was 15 or 16 years old in approximately 1950 as a "cleanup boy." (Deposition of Harvey

---

[8]    Relevant portions of the Felten Dep. are attached as Exhibit G to the Fenton Aff.

[9]    A copy of the Supplemental Felten Answers is attached as Exhibit H to the Fenton Aff.

Helfand, dated January 22 and 29, 2007 ("Helfand Dep.") at 90-91)[10]  His duties included cleaning the dust and residue off the Linotype machines, which contained asbestos-lined pots to melt lead.  (Id. at 90-92, 94-95, 171-78, 181-83)

Additionally, Mr. Helfand performed renovations in various unspecified residential and commercial locations in 1965 to 1966 and 1992 to 1993.  (Id. at 144-57, 197-227, 245-54)  In that connection, he handled and was exposed to asbestos-containing pipe covering, boiler wraps, old ceilings, plasters, floor tiles, sheets, batting.  (Id. at 148-49, 151-56, 202-15, 219-20, 225-26, 230-36, 247-253)

Mr. Helfand also renovated several of his own residences.  (Id. at 38-51, 54-60, 237-45)  Among the asbestos-containing products that he used and was exposed to were flooring, drop ceilings, sheetrock cements, spackling compound and tape.  (Id. at 38-50, 55-57, 204-06, 240-41, 243-44)  At one residence, he had a machine shop in the basement and allegedly handled the asbestos insulation around the boiler.  (Id. at 59)

Keasbey is not a party to this action.  (Fenton Aff. at ¶ 35)

**F.    CHRISTIAN HOLINKA (Living) – Laboratory Technician**

Mr. Holinka worked at numerous sites where he claims he was exposed to asbestos as a laboratory technician: Ft. Sam Houston, Texas (2 months between 1956 to 1957); 98 General Hospital, Neubrueke, Germany (July 1957 to August 1958); Booth Memorial Hospital, Queens (3½ months in 1959); University of California at Berkeley (spring 1960 to mid-1962, and early 1964 to August 1966); Hunter College (fall 1962 to spring 1963); SUNY Stonebrook (1971 to 1974); Columbia Presbyterian Medical Center (1971 to 1974); University of Southern California (1974 to 1977); and Mt. Sinai Hospital

---

[10]    Relevant portions of the Helfand Dep. are attached as Exhibit I to the Fenton Aff.

(1977 to 1989). (Deposition of Christian Holinka, dated February 12 and 22, 2007, and March 1, 2007 ("Holinka Dep.") at 26-27, 31-32, 34, 67-68, 71, 80-82, 99-101, 103-07, 110-11, 118-22, 133, 136-38, 149-51)[11] He testified that he used and replaced asbestos Bunsen burner pads that dried out, cracked and released dust. (Id. at 27-28, 34) He also used asbestos mittens whenever he handled hot glass. (Id. at 34-38, 71) According to his interrogatory answers, Mr. Holinka also was exposed to asbestos from autoclaves. (Answers to Interrogatories of Christian Holinka, dated October 3, 2006 ("Holinka Answers") at 11)[12]

Keasbey is not a defendant in this action. (Fenton Aff. at ¶ 38)

## G.    JACK NACHT (Living) – Flooring Salesman

Mr. Nacht worked as an owner, administrator and salesman of flooring materials for Dee-Jay Carpet Company from the end of 1945 to 1997. (Deposition of Jack Nacht, dated November 21, 2006, and December 4, 2006 ("Nacht Dep.") at 61, 63-64)[13] He sold vinyl asbestos floor tiles (id. at 194), samples of which were sometimes broken to show customers their consistency and resiliency. (Id. at 144-46, 152-55, 296-97) He testified that the sample tiles also may have been dusty out of the box. (Id. at 152)

Moreover, he sometimes visited jobsites to inspect the work of his mechanics and to ensure that the site was cleaned up. (Id. at 125-32, 140-42, 214-15) He claims that he was exposed to asbestos during those visits when his mechanics cut the tiles, ripped off old flooring and cleaned up in his presence. (Id. at 155, 239-40, 294-95) The sites that he visited were "primarily" commercial: "If it was a residential job, I didn't always run

---

[11]    Relevant portions of the Holinka Dep. are attached as Exhibit J to the Fenton Aff.

[12]    Relevant portions of the Holinka Answers are attached as Exhibit K to the Fenton Aff.

[13]    Relevant portions of the Nacht Dep. are attached as Exhibit L to the Fenton Aff.

12

to check it out because tile would be sometimes a small part of the job, whereas commercial it was always a big part of the job." (Id. at 128) Moreover, when he visited residences, his focus was to inspect the aesthetics of the work, which required that the job be "[f]inished enough so that I could see it's okay." (Id. at 130)

Keasbey is not a defendant in this action. (Fenton Aff. at ¶ 41)

## H.    FREDERICK RITZER (Deceased) – Plumber/pipefitter; steamfitter

Mr. Ritzer was not deposed prior to his death but he provided answers to interrogatories. Mr. Ritzer worked as a plumber/pipefitter out of the Plumbers Union, Local 2, during unspecified points in the period 1957 to 2006 at various New York City sites, including the Exxon Building, Port Authority Bus Terminal, World Trade Center, Bellevue Hospital, HBO building, Trump projects, Parker Towers, Hunter College and Yankee Stadium. (Answers to Interrogatories of Frederick Ritzer, dated August 18, 2006 ("Ritzer Answers"), Chart A at 25)[14]  In 1966, he worked as a steamfitter for the Steamfitters UA Local at the Budweiser plant in Newark, New Jersey, where he was exposed to pipe covering, blankets, block, cement, gaskets and packing. (Id. at 12-13)

On December 1, 2006, a co-worker of Mr. Ritzer, Salvatore Desiderio, was deposed. Mr. Desiderio testified that in August 1969, Mr. Ritzer worked for him for approximately four to five weeks as a plumber during the construction of Section 3 of Co-Op City. (Deposition of Salvatore Desiderio, dated December 1, 2006 ("Desiderio Dep.") at 22-27)[15]  Mr. Ritzer worked with and was exposed to asbestos-containing rope, gaskets, valves, packing and "pipe runners." (Id. at 27-35, 48-58, 65, 104-05, 108-10,

---

[14]    Relevant portions of the Ritzer Answers are attached as Exhibit M to the Fenton Aff.

[15]    Relevant portions of the Desiderio Dep. are attached as Exhibit N to the Fenton Aff.

13

114-16)

For one day each in October and in November 1969, Mr. Desiderio saw Mr. Ritzer in Section 4 of Co-Op City. (Id. at 37-39, 41-42) Mr. Ritzer was working on waste and soil pipes in October and on cast-iron installation in November, using asbestos-containing white rope and pipe runner both times. (Id. at 39-40, 43-45)

Keasbey is not a defendant in this action. (Fenton Aff. at ¶ 45)

## I.    ROBERT M. SHEPPARD (Living) – Automobile Mechanic; Electronics Techician; Sound Technical Maintenance Engineer

Starting at age nine, Mr. Sheppard began helping his father do automobile brake work for family and friends in their garage. Deposition of Robert M. Sheppard, dated February 8, 2007 ("Sheppard Dep.") at 25-57, 68-70) [16] He testified that although he always wore a mask because he has asthma, the asbestos dust from the brakes "got everywhere; my clothes would be covered with it. I would also sweep out the garage." (Id. at 57) And, when he removed his mask, "the dust would roll down my face." (Id.) After he left his parents' residence, he continued to do brake work for himself and others until approximately 15 years ago. (Id. at 58-68)

For eight months in 1978, Mr. Sheppard worked at Star Dynamics as an Electronics Technician in Quality Control. (Id. at 88-89) His duties included drilling and shaving Bakelite baseboards, which contained asbestos. (Id. at 92-99, 114) He also worked with Bakelite boards at Aerolite for six to eight months in 1980, although he did not have to drill or shave them at that time. (Id. at 124, 126-27)

The other worksites at which he claims he was exposed to asbestos are RPM Sound Studio and A&R Studios (two years sometime after 1984) (id. at 140-43, 158,

---

[16]    Relevant portions of the Sheppard Dep. are attached as Exhibit O to the Fenton Aff.

161), where he was a Technical Maintenance Engineer. As such, he was exposed to existing asbestos-containing pipe covering that "was crumbled off at the turns," ceiling tiles that "flaked off quite a bit" and breaker boxes that contained Bakelite insulators "that were crumbling." (Id. at 143-46, 149-54, 162-64)

Finally, Mr. Sheppard claims that the pipes in the basement of his residence from 1985 to 2003 were wrapped with asbestos and "[a]t the boiler ends of those pipes, they were crumbly." (Id. at 75-77) He had a sound studio in that basement. (Id.)

Keasbey is not a defendant in this case. (Fenton Aff. at ¶ 50)

## ARGUMENT

## THE COURT SHOULD DENY CONSOLIDATION

### A.    The Applicable Standard

"[A]bsent prejudice," a motion for joint trial "may be granted in the interest of judicial economy where common issues of law or fact exist." Glussi v. Fortune Brands, Inc., 276 A.D.2d 586, 587, 714 N.Y.S.2d 516, 518 (2d Dep't 2000). Thus, the decision of whether to consolidate these cases for trial lies within the sound discretion of this Court. Dias v. Berman, 188 A.D.2d 331, 331, 591 N.Y.S.2d 163, 163 (1st Dep't 1992). The general rule governing consolidation is set forth in section 602(a) of the CPLR. That rule provides that consolidation is available as follows:

> (a) Generally. When actions involving a common question of law or fact are pending before a court, the court, upon motion, may order a joint trial of any or all the matters in issue, may order the actions consolidated, and may make such other orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

CPLR § 602(a).

As the parties seeking consolidation, Plaintiffs bear the "burden of demonstrating that the cases contain common issues of fact, making consolidation appropriate."

15

Humiston v. Grose, 144 A.D.2d 907, 908, 534 N.Y.S.2d 604, 605 (4th Dep't 1988). Consolidation is not justified when "individual issues predominate." Bender v. Underwood, 93 A.D.2d 747, 748, 461 N.Y.S.2d 301, 302 (1st Dep't 1983). In determining whether to order consolidation of asbestos actions, courts examine nine factors, including "'(1) common worksite; (2) similar occupation; (3) similar time of exposure; (4) type of disease; (5) whether plaintiffs were living or deceased; (6) status of discovery in each case; (7) whether all plaintiffs were represented by the same counsel; and (8) type of cancer alleged.'" See Malcolm v. National Gypsum Co., 995 F.2d 346, 350-51 (2d Cir. 1993) ("Malcolm Factors"); see also In re Ninth Judicial Dist. Asbestos Litig., 191 Misc. 2d 625, 628, 744 N.Y.S.2d 304, 306-307 (Sup. Ct. Monroe Co. 2002) (quoting Johnson v. Celotex Corp., 899 F.2d 1281, 1285 (2d Cir. 1990)); see also Aikman v. Atex, Inc., 224 A.D.2d 180, 180, 637 N.Y.S.2d 123, 123 (1st Dep't 1996) (Celotex factors "are an appropriate guideline in deciding" whether to consolidate cases).

The procedural and substantive requirements applicable for consolidation have not been met here. Procedurally, Plaintiffs have not submitted any competent evidence on which this Court may consider their application; instead, they rely solely on an attorney affirmation. Plaintiffs' motion also is substantively infirm. Not only will individualized proofs predominate at trial, consolidation will prejudice Keasbey severely. As such, the Court should exercise its discretion and deny Plaintiffs' motion for a joint trial in its entirety.

**B.    Plaintiffs' Motion Is Procedurally Defective**

Under the law, "a movant must . . . present affidavits or other competent evidence in support of its factual assertions." Kaiser v. J & S Realty, Inc., 173 A.D.2d 920, 921, 569 N.Y.S.2d 787, 788 (3d Dep't 1991). An attorney's affirmation that does not attach

16

evidentiary proof in admissible form is insufficient.  <u>Zuckerman v. New York City Transit Auth.</u>, 49 N.Y.2d 557, 563 (1980) (attorney affidavit without personal knowledge or supporting evidentiary proof in admissible form is unavailing).  Yet, that is just what Plaintiffs have done.  They rely on an attorney affirmation that purports to provide facts about the nine cases, but does not attach any evidence to corroborate the attorney's claims.  The attorney affirmation should be stricken.  There can be no doubt that Plaintiffs have failed to meet their burden of justifying consolidation in this case.  <u>E.g.</u>, <u>Annunziato v. City of New York</u>, 224 A.D.2d 31, 41, 647 N.Y.S.2d 850, 856 (2d Dep't 1996) ("[t]he record contains insufficient information" to justify consolidation).

C.     **Plaintiffs' Motion to Consolidate Should Be Denied on the Merits**

As discussed below, the lack of any common question of fact makes these nine cases fundamentally incompatible for joint trial.  It is clear that common questions of fact do not predominate.  In fact, other than alleged exposure to asbestos and representation by the same law firm, <u>Saccomano</u> and the other eight cases have absolutely nothing in common.

1.     **Cases Involving Living and Deceased Plaintiffs Should Not Be Consolidated**

The Court should not join for trial cases involving living and deceased Plaintiffs. Here, five of the cases involve deceased Plaintiffs, including Mr. Saccomano, while four are living.  It is well-known that jury verdicts for living plaintiffs far exceed those returned for deceased plaintiffs.  A joint trial of deceased Plaintiffs with living Plaintiffs would result in a "spillover" of sympathy.  The same jury deciding damages for the deceased Plaintiffs would hear live testimony from the living Plaintiffs – testimony the jury would not hear but for consolidation.  Keasbey, a defendant in one case involving a

deceased Plaintiff, would be unfairly prejudiced by this result. The jury hearing the claim against Keasbey would sit through inflammatory testimony by the living Plaintiffs, none of which would be relevant to <u>Saccomano</u>. Such prejudice should be avoided.

### 2.    The Medical Evidence in <u>Saccomano</u> Is <u>Significantly Different from the Other Actions</u>

Nowhere in their moving papers do Plaintiffs address the significant differences in medical evidence between <u>Saccomano</u> and the other cases. Instead, they assert only that "[a]ll nine of the plaintiffs have been injured from asbestos-related mesothelioma. Plaintiffs do not anticipate that the defendants will contest something other than asbestos caused their mesothelioma." (Comerford Aff. at ¶ 22) Plaintiffs also boldly proclaim that "Saccomano recently died from mesothelioma." (<u>Id.</u> at ¶ 8) As Plaintiffs are well-aware, Keasbey vigorously disputes that Saccomano had mesothelioma and Keasbey's experts will refute any expert testimony offered to the contrary.[17] Thus, Plaintiffs ignore the fact Saccomano's trial will raise unique medical issues and include a significant amount of fact and expert testimony having no relevance to any other case. All of this evidence is relevant <u>only</u> in <u>Saccomano</u>.

Although this issue seldom arises, when it does, courts have not hesitated to order separate trials. Just recently, in <u>Rosato v. Amchem Prods., Inc.</u>, Justice Martin Shulman refused to join the <u>Rosato</u> action with any other case, in large part because there was "a material issue of fact as to whether Rosato actually contracted mesothelioma." <u>Rosato v. Amchem Prods., Inc.</u>, No. 111735/04, at 9.[18]

---

[17]    <u>See, e.g.</u>, The Graham Report, attached to the Fenton Aff. as Exhibit D (opining to a "reasonable degree of medical certainty" that Mr. Saccomano "developed non-small carcinoma of the right lung" and that he "had neither asbestosis nor objective evidence of a pulmonary asbestos burden sufficient to potentially cause asbestosis.").

[18]    A copy of the <u>Rosato</u> decision is attached as Exhibit P to Fenton Aff.

Moreover, were Saccomano tried with any of the undisputed mesothelioma cases, the fact that Defendants in Saccomano alone have medical defenses to liability could prejudice the non-Saccomano Defendants.  Certainly, the cumulative effect of the undisputed mesothelioma diagnoses in the other cases could lead a jury to improperly conclude that Saccomano also had mesothelioma or that Keasbey somehow was being unreasonable in challenging Saccomano's expert's diagnosis, thereby unfairly prejudicing Keasbey.

Although Plaintiffs acknowledge the eight "Malcolm Factors" (Comerford Aff. at ¶¶ 18-26), they understandably omit the eighth factor: the "type of cancer alleged."  As made plain by Malcolm, the very case on which Plaintiffs rely, consolidating a lung cancer/disputed mesothelioma with eight confirmed mesothelioma cases would be inappropriate.  See Malcolm v. National Gypsum Co., 995 F.2d 346, 352 (2d Cir. 1993) (lung cancer and mesothelioma are two different types of cancer that require "distinct testimony regarding its etiology, pathology and consequences").  Other cases cited by Plaintiffs reach the same conclusion.  E.g., In re Renow (Exhibit G to Comerford Aff. at 33) (ordering separate trial of two lung cancer cases) (Kornreich, J.); Cullen v. A.O. Smith Water Prods. Co. (Exhibit L to Comerford Aff.) (ordering separate trial of Martin action because "Martin suffers from a different disease, lung cancer and was a heavy smoker for many years prior to his diagnosis, giving rise to causation issues unique to his claim") (Smith, J.); see also Rosato (Fenton Aff. Ex. P at 9) ("etiology and pathology of prostate cancer is markedly different from that of mesothelioma") (Shulman, J.)

This is particularly true here because Mr. Saccomano had a significant smoking history (see Saccomano Dep. at 250-51) and emphysema (id. at 270), raising issues of

19

alternative causation and personal responsibility unique to his case. (See e.g. Fenton Aff. Ex. D at 2-3) Indeed, Keasbey's expert will opine, based on objective medical findings, that asbestos played no role in Mr. Saccomano's development of lung cancer. (See id.) Stated otherwise, in Saccomano, not only is the nature of Mr. Saccomano's disease at issue (unlike all the other cases), in Saccomano (unlike all the other cases), there is a dispute as to whether Mr. Saccomano sustained any asbestos-related disease.

### 3.    The State of the Art Evidence Will Not Overlap

There will be substantially different state-of-the-art evidence in these cases, which allege exposure in the 1930s, 1940s, the early 1960s (before Selikoff issued his landmark study of insulators), the early 1970s (when the government first began regulating asbestos), and the 1980s (when Threshold Limit Values first dropped to almost nothing to protect against mesothelioma). There is no dispute about these being landmark dates in the state-of-the-art; Plaintiffs' own expert acknowledges as much in his book. See Barry I. Castleman, Asbestos: Medical & Legal Aspects (5th ed. 2005) at 108, 269-70, 580)[19] Nor can there be any dispute over the prejudicial effect that consolidating these cases would have. This is especially critical, where, as here, some of the asbestos-containing products at issue are unique and not normally encountered in most asbestos cases: printing press machines, bunsen burners, autoclaves, Bakelite boards and asbestos fire core doors.

### 4.    The Cases Involve Different
### Worksites and Different Occupations

Unable to demonstrate common occupations and worksites among the cases, Plaintiffs instead rely on claims of "similar worksites" and "similar occupations."

---

[19]    A copy of the relevant pages of Castleman's book is attached as Exhibit Q to Fenton Aff.

(Comerford Aff. at ¶¶ 18-20) "Similar" is not sufficient to meet their burden. Plaintiffs must demonstrate that the worksites and occupations are the same. See, e.g., Malcolm v. National Gypsum Co., 995 F.2d 346, 351 (2d Cir. 1993) (similar occupation "is significant because a worker's exposure to asbestos must depend mainly on his occupation"); In re Asbestos II Consolidated Pretrial, No. 86-C-1739, 1989 WL 56181, at *1 (N.D. Ill. May 10, 1989) (consolidation denied where exposure to asbestos did not occur "at the same time [or] at the same place"); see also Glussi, 276 A.D.2d at 586, 714 N.Y.S.2d at 518 ("[h]ere, despite the presence of some common issues of law and fact . . . the particular circumstances surrounding each plaintiff's smoking history, as well as their medical history, renders a joint trial impractical and unwieldy"); C.K.S. Ice Cream Co. v. Frusen Gladje Franchise, Inc., 172 A.D.2d 206, 208, 567 N.Y.S.2d 716, 718 (1st Dep't 1991) ("[w]here lawsuits arise out of the same transactions, but the proof with respect to each lawsuit does not overlap, the identity of facts is not sufficient to merit consolidation or a joint trial of the lawsuits"); Brown v. Brooklyn Union Gas Co., 137 A.D.2d 479, 480, 524 N.Y.S.2d 228, 228 (2d Dep't 1988) ("[because] the actions involve many dissimilar issues which may confuse the jury ... [s]eparate trials will enable the juries to focus on the factual issues presented as to each case") (citation omitted); Bender v. Underwood, 93 A.D.2d 747, 748, 461 N.Y.S.2d 301, 302-03 (1st Dep't 1983) ("[U]nder the circumstances of this case, the resulting and cumulative prejudice to [the defendant] by permitting the jury in one trial to determine the multiple claims . . . at issue here, far outweighs the benefit derived from the conduct of a joint trial. In addition to the potential for resulting prejudice, of further relevance on the issue is the possibility of confusion for the jury").

In <u>National Gypsum Co.</u>, the Court of Appeals for the Second Circuit rejected consolidation even though the facts before that Court were significantly stronger than those presented here. The Court distinguished its own case, which involved a number of powerhouse workers, from a series of asbestos cases in the Eastern District of New York also involving powerhouse workers, in which consolidation had been ordered:

> The crucial difference between the Brooklyn Navy Yard Case and Keene is that here there simply was no primary worksite. Rather there was an alleged primary type of worksite: powerhouses. Thus, instead of one locus where each plaintiff had worked for most of his career, consolidation was premised on the fact that each plaintiff had spent some part of his career at one or more powerhouses.

995 F.2d at 353. <u>National Gypsum</u> teaches that it is not enough to allege only that Plaintiffs worked at "similar" jobsites, such as "commercial" sites or "naval yards."

Yet this is exactly what Plaintiffs have done. (<u>See</u> Comerford Aff. at ¶¶ 18-20) They claim that some – but certainly not all – Plaintiffs were exposed at similar "construction sites," which they separate into two categories: commercial (Director, Felten, Helfan, Nacht, Ritzer and Saccomano) and residential (Bianco, Director, Helfand, Nacht and Saccomano) (<u>Id.</u> at ¶ 18) They concede, as they must, that there is no commonality of worksites whatsoever among <u>Saccomano</u> and the two remaining cases, <u>Holinka</u> and <u>Sheppard</u>.

The fact that Plaintiffs may have worked at "construction sites" does not, in the absence of common sites, justify consolidation. <u>See</u> <u>In re Ninth Judicial Dist. Asbestos Litig.</u>, 191 Misc. at 628, 744 N.Y.S.2d at 307. And for good reason. Commercial sites go through varying states of construction: different trades perform work on different pieces of equipment at different times; different products, often indistinguishable to the casual observer, are used by different trades in different areas of the worksites. The

22

necessary inquiry must focus on the specific work being performed by specific contractors at specific areas of each site during the time each Plaintiff was present. Accordingly, that Plaintiffs worked at "construction sites" does not mean there necessarily will be any overlap in proof.

The proof at trial must be specific to each site, and each of the dozens of commercial, residential and shipboard sites at issue here are different. If these nine cases were tried together, the jury would have to sit through days, if not weeks, of evidence that is relevant solely to one Plaintiff, then more evidence relevant only to the next Plaintiff, and so on. Given the likelihood of jury confusion that would result from the introduction of days and days of irrelevant evidence, the prejudice to Keasbey, which is only in Saccomano, would be palpable and irreparable. See, e.g., Flintkote Co. v. Allis-Chambers Corp., 73 F.R.D. 463, 465 (S.D.N.Y. 1977) (trial of each defendant, if cases were consolidated, "would be impeded by the introduction of voluminous irrelevant evidence").

Of particular significance, Mr. Saccomano allegedly was at the Northport Powerhouse during its construction and at three other powerhouses during some unknown time periods. Exposure to asbestos at a powerhouse is an additional reason that consolidation would be inappropriate here. Justice Martin Shulman's decision in O'Reilly is persuasive. That case originally was part of a cluster of four cases. In granting a separate trial for Michael O'Reilly, the court noted that "O'Reilly is the only one that was a powerhouse worker . . . . The other ones do not have that type of particular exposure." O'Reilly v. A.C.&S., Index No. 103255/02 (April 14, 2003).[20]  As

---

[20]  A copy of the O'Reilly decision is attached as Exhibit R to the Fenton Aff.

23

in O'Reilly, Mr. Saccomano was exposed to asbestos at powerhouses, at least one of which involved the construction of the powerhouse. The complexity and magnitude of powerhouse construction and exposure will necessitate the introduction of voluminous amounts of evidence concerning the widespread use of asbestos-containing products at the powerhouses at issue. None of that evidence – potentially thousands of pages of documents, not to mention the witnesses – will overlap with the proof in the other eight cases.

Indeed, there is no other case here that has a common commercial worksite with Saccomano:

- The vast majority of Mr. Director's exposure occurred at DDC, where he and others cut or routed the asbestos core of fire doors. Mr. Saccomano never worked at DDC. Although Mr. Director also worked at sites outside of DDC, Mr. Saccomano did not work at any of those sites.

- Mr. Felten worked at only one site, Mr. Sinai Hospital, where he personally handled asbestos-containing products and where he claims exposure from work done by others. Mr. Saccomano never worked at Mt. Sinai. Although he worked at three hospitals, the most Mr. Saccomano said was that it was possible that he was exposed to asbestos at those sites because of the "age" of the buildings and the "asbestos in the air."

- As a "cleanup boy" at a printing press facility, Mr. Helfand was exposed to asbestos from the lining of the Linotype machines. Mr. Saccomano never worked at any printing press facility and did not claim exposure to any Linotype machines. Moreover, Mr. Helfand was unable to testify with any specificity as to

24

the location or sorts of "commercial" sites at which he performed construction work in 1965 to 1966 and 1992 to 1993. Without such evidence, Plaintiffs simply cannot contend that Mr. Helfand's commercial construction sites were the same as those of Mr. Saccomano.

- Mr. Nacht's exposure to asbestos as a floor tile salesman resulted from his breaking the tiles to show customers the consistency and resiliency of the tiles and from visiting some unspecified commercial jobsites where his own mechanics cut up tiles, ripped off old flooring and cleaned up. There is no evidence that Mr. Saccomano ever worked at Mr. Nacht's store or at any of the unspecified commercial jobsites that he visited.

- Mr. Saccomano never worked at any sites where Mr. Ritzer allegedly was exposed to asbestos as a plumber/pipefitter or at the Budweiser plant in Newark, New Jersey, where he worked as a steamfitter sometime in 1966.

Nor is there a common residential worksite among Mr. Saccomano (a building inspector in Brookhaven from 1983 to 1996 charged with the responsibility of inspecting the work done by others and to ensure that everything was up to code) and the other four cases cited by Plaintiffs:

- As a residential plumber, Mr. Bianco allegedly was exposed to asbestos at numerous unspecified homes in various places in Long Island. Significantly, Mr. Bianco's plumbing work took place before and after, but not during the time that Mr. Saccomano was a building inspector: early 1950s to 1955, 1959 to 1974 or 1975, 1978 to 1980, and 1998 to 2002. Moreover, there is no evidence that he

25

worked in Brookhaven. Thus, there is no commonality of worksites between Mr. Bianco and Mr. Saccomano.

- Mr. Director's work at various single-family homes at unknown locations involved the installation of fire doors. At no point did Mr. Saccomano testify about observing or being exposed to asbestos from the installation of fire doors while he visited residential sites as a building inspector.

- There is no evidence that Mr. Helfand, who renovated various unspecified residences first in 1965 to 1966 and then in 1992 and 1993, ever did any work in Brookhaven or anyplace else where Mr. Saccomano was.

- When Mr. Nacht visited residential jobsites to inspect the aesthetics of the job, the work would be almost finished. There is no evidence that any of the residences visited by Mr. Nacht were in Brookhaven or that he made any of such visits while Mr. Saccomano was a building inspector. Moreover, Mr. Saccomano's exposure to floor tiles came primarily from the scraping off of old tiles, indicating that most, if not all, of his floor tile exposure occurred well before Mr. Nacht would have made his inspection visits.

Plaintiffs next argue that the "nature of each Plaintiff's asbestos exposure" was the same because each was exposed "through his work, and/or the work of others." (Comerford Aff. at ¶ 19) For obvious reasons, Plaintiffs do not explain how this is relevant to consolidation. That each Plaintiff was exposed through his work or the work of others in their proximity says nothing about whether common factual proofs will predominate. Each Plaintiff must prove exposure by his own specific actions or the specific actions of hundreds of other workers using dozens of alleged asbestos-containing

26

products at dozens of job-sites in various stages of construction, compelling the conclusion that separate issues of fact will predominate in each Plaintiff's case.

Another relevant factor is commonality of occupation. Malcolm, 995 F.2d at 351 (occupation "is significant because a worker's exposure to asbestos must depend mainly on his occupation"). This factor also weighs heavily against consolidation because there is absolutely no common occupation among Saccomano and the other cases:

| | |
|---|---|
| Saccomano: | Sheet metal worker; building inspector |
| Bianco: | Student; U.S. Navy shipfitter; residential plumber; truck driver |
| Director: | Asbestos-core fire doors worker |
| Felten: | Mechanical Engineer |
| Helfand: | Printing press "cleanup boy;" general construction worker |
| Holinka: | Laboratory technician |
| Nacht: | Flooring salesman |
| Ritzer: | Plumber/pipefitter; steamfitter |
| Sheppard: | Automobile mechanic; electronics technician; sound technical maintenance engineer |

## 5.    Negligence Claims Are Not Appropriate for Consolidation

Consolidation is especially inappropriate here because a negligence claim is being pursued against Keasbey in Saccomano and against the remaining Defendants in the other cases. To establish negligence, a plaintiff must prove: "(1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom." Solomon v. City of New York, 66 N.Y.2d 1026, 1027, 499 N.Y.S.2d 392, 392 (1985). By their very nature, claims of negligence demand individualized proofs not otherwise required in strict liability litigation. Unlike claims sounding in strict liability, which focus on whether a particular product is unreasonably dangerous, a negligence claim focuses on the reasonableness of defendant's conduct, an extremely fact-sensitive and discrete inquiry that must be made with respect to each defendant's conduct as to each individual plaintiff at each individual job site. Whether Keasbey owed a duty to

27

Saccomano and, if so, whether Keasbey breached that duty will depend on the particular facts of this case, i.e., what Keasbey actually knew about the risks associated with asbestos at the time and place of the alleged exposure and what Keasbey should have known about those risks at the time. This inquiry will focus on, among other things, the nature of Saccomano's work, the circumstances of the particular sites, whether, how closely and for how long Saccomano worked next to Keasbey workers, whether the state of medical knowledge put Keasbey on notice of a risk to bystanders, and whether Keasbey could have done anything to prevent the injury.[21] The same analysis is true with respect to all Defendants in all cases.

Courts — including the First Department — routinely reject consolidation in negligence cases because of the highly individualized inquiries that must be made as to each plaintiff on fundamental issues such as the "extent of any breach of duty." Bender, 93 A.D.2d at 748, 461 N.Y.S.2d at 302; see also DeAngelis v. New York Univ. Med. Ctr., 738 N.Y.S.2d 671, 671 (1st Dep't 2002) (plaintiffs' medical malpractice claims correctly severed given "predominance of differing facts" among cases); Soule v. Norton, 299 A.D.2d 827, 750 N.Y.S.2d 692, 694 (4th Dep't 2002) (joint trial denied in malpractice case where "individual issues predominate"); Abbondandolo v. Hitzig, 282 A.D.2d 224, 225, 724 N.Y.S.2d 26 (1st Dep't 2001) (same).

### 6.    There Is Little Overlap in Fact and Expert Witnesses

The lack of any common fact issue among the cases is demonstrated further by

---

[21]    Moreover, a central focus of the negligence case against Keasbey will be the contracts that specified the use by Keasbey of asbestos-containing products. Where a defendant, like Keasbey, is a contractor, the proof must necessarily focus on whether, under the circumstances, the specifications followed by the contractor were "so glaring and out of the ordinary as to bring home to the contractor that it was doing something which would be likely to cause injury." Ryan v. Feeney & Sheehan Bldg. Co., 239 N.Y. 43, 46, 145 N.E. 321, 322 (1924). These are fact-intensive, contract-specific inquiries that will be different for each case.

Plaintiffs' fact witness lists. Of the 42 fact witnesses Plaintiffs identify for these nine cases, <u>none</u> will testify in more than one case.[22] Plaintiffs also have identified a total of 10 medical experts, only 6 of whom are expected to testify in more than one action. Plaintiffs designated an economic expert for only two of the cases. A joint trial of these nine cases, each with their own completely separate set of facts and witnesses, would mean a jury would have to endure days of extraneous testimony and scores of irrelevant exhibits. Given the lack of common issues of fact, judicial economy actually would be hindered by consolidation. The fact that one or two medical experts may offer generic testimony about the etiology of asbestos-related illness cannot justify the prejudice that would result from a joint trial, particularly in view of the <u>unique</u> medical expert testimony that will be offered in <u>Saccomano</u>, which has nothing to do with the other cases.

### 6. The Article 16 Proof Militates Against Consolidation

Plaintiffs argue that consolidation is proper because they expect defendants to allocate responsibility to numerous non-party bankrupt entities, including Johns-Manville and Owens Corning. (Comerford Aff. at ¶¶ 5, 25, 26) This is undoubtedly correct. But Plaintiffs ignore the fact that the cases involve <u>different</u> bankrupt entities. Plaintiffs also ignore the fact that the proof related to each bankrupt entity will differ at the various job-sites and during different time periods, raising the same state-of-the-art issues and resulting prejudice discussed immediately below. Defendants will demonstrate which of the bankrupt entities' products were used at which job site and at what times. Because there are no common sites, there is no reason to infer that this proof will overlap.

---

[22]    Copies of the relevant pages of Plaintiffs' May 2007 <u>In Extremis</u> Fact Witness Lists, dated April 5, 2007, are attached as Exhibit S to the Fenton Aff.

29

7.    **Consolidation Will Not Serve the Interest of Judicial Economy**

Plaintiffs argue that consolidation of these nine unrelated cases will "effectively manag[e] the resources of the court." (Comerford Aff. at ¶ 28) However, Keasbey has identified many reasons why consolidation would <u>not</u> further the interest of judicial economy. Of the 42 remaining Defendants in the nine actions, only two defendants (Amchem and Union Carbide) are in all nine cases.[23] Keasbey is a defendant in only one action. (Fenton Aff. at ¶ 3) Although there are at least 15 Defendants remaining in <u>Saccomano</u>, there are numerous defendants in the other eight actions who have nothing to do with <u>Saccomano</u>. Keasbey would have to sit through weeks of testimony that is not relevant to the one action in which it remains. The burden that such an arrangement would place on a jury and the resulting undue prejudice to Keasbey and other Defendants could not be ameliorated by trial notebooks or other devices. Finally, as previously noted, none of Plaintiffs' 42 fact witnesses will testify in more than one case, only six of Plaintiffs' ten medical witnesses are listed in multiple cases, and the economist with testify in only two of the nine cases.

Even testimony relating to causation will not overlap because there is no common disease. As stated above, the question of whether Saccomano had mesothelioma or any asbestos-related disease is in dispute. None of the remaining testimony, from the state-of-the-art evidence, to the evidence concerning each Plaintiff's alleged damages, to the evidence concerning each Plaintiff's alleged method of exposure, to the evidence on each Defendant's defenses, is common among the nine actions.

---

[23]    A true and correct copy of Plaintiffs' Remaining Defendants List is attached as Exhibit T to the Fenton Aff.

In view of these incontrovertible facts, Plaintiffs' motivation for seeking a joint trial is clear. Plaintiffs seek to consolidate not to further the legitimate interest of judicial economy, but to benefit from the cumulative effect on the jury of hearing evidence concerning nine unrelated cases. That is the essence of unfair prejudice. See Korren, 150 Misc. 2d at 431, 568 N.Y.S.2d at 672 ("[p]resentation of the numerous plaintiffs' claims before a single jury would also tend to unfairly bolster the case against defendants in an impermissibly prejudicial manner").

Even in affirming the consolidation of cases in which judicial economy is served, appellate courts have warned that "efficiency cannot be permitted to prevail at the expense of justice. The obligation of the courts to deliver justice is paramount, and it may not be scrapped for the benefit of cheaper and more rapid dispositions." Consorti v. Armstrong World Indus., Inc., 72 F.3d 1003, 1006 (2d Cir. 1995), vacated and remanded on other grounds, 518 U.S. 1031 (1996); see also In Re Brooklyn Naval Yard Asbestos Litig., 971 F.2d 831, 853 (2d Cir. 1992) ("[t]he systematic urge to aggregate litigation must not be allowed to trump our dedication to individual justice"). Given the highly individualized nature of Plaintiffs' claims and proofs applicable to those claims, any consolidation here would not further judicial economy or any other legitimate interest, but necessarily would come at the expense of justice for Keasbey.

## D.    At Most, the Court Could Consider a Plumber Exposure Group

Based on the foregoing, it is apparent that these nine actions have nothing in common and cannot be tried together. Accordingly, Keasbey urges the Court to try each separately. Certainly, for the reasons previously discussed, Saccomano must be tried separately. However, were the Court determined to group some of the cases together, the only conceivable trial group would be the two confirmed mesothelioma cases alleging

31

exposure from plumbing work: <u>Bianco</u> and <u>Ritzer</u>.

## CONCLUSION

Based on the foregoing, Robert A. Keasbey Co. respectfully requests that the

Court deny Plaintiffs' motion for joint trial in its entirety.

Dated: New York, New York
July 17, 2007

GREENBERG TRAURIG, LLP

By: _Loring V. Fenton_
Loring V. Fenton
MetLife Building
200 Park Avenue, 15th Floor
New York, New York 10166
(212) 801-9200


Attorneys for Defendant
Robert A. Keasbey Co.

TO:    Weitz & Luxenberg PC
Attorneys for Plaintiffs
180 Maiden Lane
New York, New York 10038-4925

All Remaining Defense Counsel of Record

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------------x

In Re:  NEW YORK CITY                                            :
         ASBESTOS LITIGATION                                  :

------------------------------------------------------------------x

This Document Relates To:                                        :

| | | |
|---|---|---|
| In Re: Frank Bianco | Index No. 115546-06 | :  Part 11 (Madden, J.) |
| In Re: James Director | Index No. 115923-06 | : |
| In Re: Karl Felten | Index No. 114005-06 | : |
| In Re: Harvey Helfand | Index No. 117176-06 | :  **AFFIRMATION OF** |
| In Re: Christian Holinka | Index No. 114120-06 | :  **LORING I. FENTON IN** |
| In Re: Jack Nacht | Index No. 114274-06 | :  **OPPOSITION TO PLAINTIFFS'** |
| In Re: Frederick Ritzer | Index No. 111328-06 | :  **MOTION FOR A JOINT TRIAL** |
| In Re: Joseph Saccomano | Index No. 113299-06 | : |
| In Re: Robert Sheppard | Index No. 117513-06 | : |

------------------------------------------------------------------x

     **LORING I. FENTON**, an attorney-at-law, duly admitted to practice before the

Courts of the State of New York, affirms the following under penalties of perjury:

    1.     I am a Shareholder in the law firm of Greenberg Traurig, LLP, counsel for

defendant Robert A. Keasbey Co. ("Keasbey") in one of the above-referenced matters

and, as such, have personal knowledge of all the facts contained in this Affirmation.

    2.     Keasbey respectfully submits this memorandum of law in opposition to

Plaintiffs' motion to join Saccomano, No. 113299-06, for trial with eight unrelated

asbestos cases before this Court:  Bianco, No. 115546-06; Director, No. 115923-06;

Felten, No. 114005-06; Helfand, No. 117176-06; Holinka, No. 114120-06; Nacht, No.

114274-06; Ritzer, No. 111328-06; and Sheppard; No. 117513-06.

    3.     The nine cases at issue are separately-filed, unrelated asbestos actions

originally part of the May 2007 in extremis trial group set forth by the Honorable Helen

E. Freedman, pursuant to the Case Management Order for the New York City Asbestos Litigation. Keasbey – an insulation sub-contractor – is a defendant in only <u>Saccomano</u>.

4.    On or about June 4, 2007, these nine cases were assigned to this Court for trial. On or about June 25, 2007, Plaintiffs filed this motion for a joint trial.

5.    To date, no court has made any ruling about the compatibility of these nine cases for a joint trial.

6.    Justice Helen Freedman repeatedly has stated in your affiant's presence, including at the December 17, 2003, designation conference, that trial courts should not assume that Justice Freedman wants the cases she lists for trial with a particular judge to be consolidated. Annexed hereto as Exhibit A is a true and correct copy of the relevant pages of the transcript of the December 17, 2003, conference before Justice Freedman.

### JOSEPH SACCOMANO (Deceased) – U.S. Air Force Aircraft Mechanic; Sheet Metal Worker; Building Inspector

7.    As an aircraft mechanic crew chief in the Air Force from 1955 to 1959, Mr. Saccomano was exposed to asbestos dust from brake linings on the airplanes when he had "to air hose off the brake linings." (Deposition of Joseph P. Saccomano, dated October 18, 23 and 30, 2006, and November 8 and 15, 2006 ("Saccomano Dep."), at 27-29) Moreover, he was exposed to asbestos from the insulation of the combustion chambers of aircraft engines. (<u>Id.</u> at 30-31) A true and correct copy of the relevant pages of the Saccomano Dep. is annexed hereto as Exhibit B.

8.    From 1961 or 1962 to 1983, Mr. Saccomano worked as a sheet metal worker. (<u>See</u> Mr. Saccomano's Chart A to his Answers to Interrogatories of Joseph Saccomano, dated September 15, 2006 ("Saccomano Answers"); <u>see also</u> Saccomano Dep. at 41-42) As such, he worked at numerous sites where he allegedly was exposed to

2

asbestos. A true and correct copy of the relevant portions of the Saccomano Answers is annexed hereto as Exhibit C.

9.    As an apprentice, Mr. Saccomano worked at the Phelps Dodge smeltering plant in Maspeth, Queens, where he removed concrete asbestos sheeting. (Saccomano Dep. at 41-45) He also worked with a preformed asbestos cement product by drilling into it, cutting it and screwing it down on steel, all of which created dust that he inhaled. (Id. at 46-47) Further, he allegedly was exposed from the work of insulators, who were "right next to us," applying onto the pipes a "Manville" product that they had to mix and "stuff would be flying." (Id. at 48-49)

10.    As a mechanic at ABC Studios, Mr. Saccomano renovated the HVAC system and installed new duct work. (Id. at 50-51, 53) He had to scrape off asbestos-containing insulation from the beams and chipped off old insulation, both of which he described as "filthy, dusty, dirty, God, terrible." (Id. at 53-57) Other trades working in his vicinity created general dust in the air from insulation on the ceilings, pipes, walls and fireproofing. (Id. at 55-58, 60-61)

11.    Moreover, Mr. Saccomano claimed he was exposed to asbestos at the AT&T Building, where he installed duct work in the equipment/boiler room and fan rooms. (Id. at 63-64) Other workers were lining the boiler with asbestos-containing block and using asbestos rope packing and gaskets on valves and pumps. (Id. at 70-73, 78-80, 82-83) Meanwhile, "carpenters, sheetrockers, spackler and insulation guys" installed drywall and sanded U.S. Gypsum joint compound." (Id. at 86-87)

12.     For "more than two months" during the summer months of 1966 or 1967, Mr. Saccomano worked as a mechanic at the Northport Powerhouse.[1] (Id. at 110-11) He allegedly installed metal protectors over the insulation applied by the pipe coverers on pipes, pumps, containment vessels and tanks. (Id. at 113-14, 119) He testified that he was exposed to asbestos from the cutting of materials to insulate the high-temperature equipment, which included packing, gaskets and fabric, as well as from the mixing of powdered asbestos materials. (Id. at 119-23, 126, 292, 295, 297)

13.     In addition to Northport, Mr. Saccomano worked at other powerhouses: Ravenswood, Astoria and 14th Street. He was unable to recall when he worked at these sites (id. at 133-34, 141-42, 148), but claimed that he was exposed to asbestos at all of them "[b]y virtue of the age of the powerhouse and dust conditions in the powerhouse" (id. at 150), and because "these places are not clean." (Id. at 145)

14.     Mr. Saccomano also worked at St. Barnabas Hospital, NYU Hospital and St. Vincent's Hospital. (Id. at 157, 166, 168-69) He testified that he was possibly exposed at these sites because of the "age" of the buildings and equipment and "the asbestos in the air." (Id. at 158, 160, 166-67, 169)

15.     In 1983, Mr. Saccomano began working for the Town of Brookhaven, as a Building Inspector for two years and then a Senior building Inspector. (Id. at 200-02, 237-38) He allegedly was exposed to asbestos from the removal of boilers because "the product contain[ed], in my belief, asbestos, as they're being dismantled that stuff is flying around, I'm breathing it in." (Id. at 210, 238, 334) Other asbestos-containing products to which he was exposed were siding, flooring tiles (primarily from the scraping off of the

---

[1]    Independent evidence will show that Northport was being constructed at that time.

old tiles, which he knew contained asbestos), shingles and "sheathing." (Id. at 221-24, 241-45) Mr. Saccomano voluntarily retired in 1996. (Id. at 249)

16.     Plaintiffs originally contended that Mr. Saccomano suffered from lung cancer. (Saccomano Answers at 7) Now, they claim that Mr. Saccomano suffered from mesothelioma. (Affirmation in Support of Plaintiffs' Motion for a Joint Trial of Thomas M. Comerford, Esq., dated June 25, 2007 ("Comerford Aff.") at ¶ 5). Moreover, Mr. Saccomano testified that he was diagnosed with asbestosis in 2000, 2002 or 2003. (Saccomano Dep. at 184)

17.     Keasbey disputes both the mesothelioma and asbestosis diagnoses. In his report dated June 7, 2007, Dr. Michael Graham, M.D., Professor of Pathology at St. Louis University ("Graham Report"), opined that "Mr. Saccomano developed a non-small carcinoma of the right lung and that the tumor is not malignant mesothelioma." (Graham Report at 3) Moreover, Dr. Graham stated that Mr. Saccomano "had neither asbestosis nor objective evidence of a pulmonary asbestos burden sufficient to potentially cause asbestosis." (Id.) A true and correct copy of the Graham Report is annexed hereto as Exhibit D.

18.     Notably, both Keasbey and Plaintiff are in agreement that Mr. Saccomano suffered from emphysema. (Id. at 3; Saccomano Dep. at 270) There can be no dispute that emphysema is caused by cigarette smoke. Mr. Saccomano had a significant smoking history. (Id. at 205-51)

## FRANCIS BIANCO (Deceased) – Student; U.S. Navy Shipfitter; Plumber; Truck Driver

19.     Mr. Bianco was exposed to asbestos while attending the Thomas Edison Vocational High School. (Deposition of Francis Bianco, dated October 30, 2006, and

November 1, 3, 8 and 10, 2006 ("Bianco Dep.") at 156). As a student, he worked on boilers, pumps and valves in the machine shop, which exposed him to asbestos. (Id. at 156-57) A true and correct copy of the relevant pages of the Bianco Dep. is annexed hereto as Exhibit E.

20.    From his early teens to about age 17, he accompanied his father, a plumber, to various unspecified sites to rip out old boilers that "were covered with asbestos." (Id. at 73) He also was exposed to gaskets, loose asbestos, packing on valves and pipe covering during those times. (Id. at 73-88)

21.    From 1955 to 1958, Mr. Bianco was in the U.S. Navy. (Id. at 106, 215) During boot camp, he trained to be a shipfitter and worked on boilers, valves, pumps and covered piping. (Id. at 107-18) He believed that his work may have exposed him to asbestos. (Id.) Thereafter, he was a shipfitter fireman and did all types of repairs on pumps, valves, catapults and covered pipes, all of which exposed him to asbestos. (Id. at 118-42)

22.    During the periods 1959 to 1974 or 1975, 1978 to 1980, and 1998 to 2002, Mr. Bianco worked as a plumber, working at numerous unspecified residential and "light commercial" sites. (Id. at 176-82, 243-50, 256-94, 300-02, 352-59, 376, 382-84) As such, he allegedly was exposed to asbestos from ripping out and replacing old boilers, gaskets, packing, firebricks and pipe insulation. (Id.)

23.    In 1963 or 1964, Mr. Bianco took plumbing classes at BOCES in Westbury. (Id. at 97) As part of his course work, he ripped two or three boilers apart and put them back together, which allegedly exposed him to asbestos. (Id. at 97-100)

6

24.    Sometime in the early 1970s to about 1975, he worked as a truck driver for Gifford Oil. (Id. at 335) He claimed that other workers in his vicinity at two pumping stations disturbed asbestos on "mechanical equipment and released stuff in the air." (Id. at 335-39)

25.    Keasbey is not a defendant in the Bianco action.

## JAMES DIRECTOR (Deceased) – Asbestos-Core Fire Doors Worker

26.    Starting in the late 1960s or early 1970s, Mr. Director worked at his father's company, Director Door Corporation ("DDC"), until it dissolved in 2002 or 2003. (Deposition of James Director, dated December 13, 14, 15 and 18, 2006 ("Director Dep.") at 14, 37-40, 42, 72) DDC was in the business of purchasing, modifying and installing doors, including asbestos-core fire doors. (Id. at 33-34, 39-40, 47, 52, 55, 60, 64-65, 70-71) A true and correct copy of the relevant pages of the Director Dep. is annexed hereto as Exhibit F.

27.    The majority of Director's exposure to asbestos occurred while working at the DDC facility, where he and others cut or routed into the asbestos core of the fire doors to install hinges, knobs and windows. (Id. at 35, 38-39, 72-73) These modifications, which were performed daily at DDC, created "tremendous clouds" of asbestos dust, which Mr. Director inhaled. (Id. at 38-39, 73, 186-88, 239)

28.    Mr. Director also worked at jobsites such as New York public schools, a VA hospital, Cadman Plaza Post Office, New York City libraries, Shoreham Nuclear Power Station, Creedmore Mental Hospital, Pilgrim State Mental Hospital, La Guardia College and various single-family homes. (Id. at 42-46, 48-49, 63-67, 162-63) He allegedly was exposed to asbestos not only when he and other DDC employees modified

the asbestos-core fire doors at the sites (id. at 66-67, 70), but also when other trades worked with asbestos-containing wall board, joint compound and spackle in his vicinity. (E.g., id. at 47-49, 52-53, 55-56, 60, 188-89) In addition, Mr. Director installed asbestos-containing sheets on residential garage doors and boiler room doors. (Id. at 162-63, 167-68)

      29.     Keasbey is not a defendant in the Director action.

## KARL H. FELTEN (Living) – Mechanical Engineer

      30.     Mr. Felten was exposed to asbestos only at Mt Sinai Hospital, where he worked as a mechanical engineer from 1953 to 1954 and from 1958 until 1996 or 1997. (Deposition of Karl H. Felten, dated October 10 and 11, 2006 ("Felten Dep.") at 49-53; see also Verified Handwritten Supplement to Answers to Interrogatories for Karl Felten, ("Supplemental Felten Answers") dated October 6, 2006) As such, he personally worked with asbestos-containing cement and pipe covering about once a week. (Felten Dep. at 210-17) He also removed and replaced gaskets (id. at 61-64) and firebrick. (Id. at 75, 221) Further, he was exposed to asbestos from having to go through tunnels to perform repair work where there was "a lot of vibration going on and a lot of asbestos dust in the air." (Id. at 68, 71, 88-89, 142, 221-22) Finally, he was exposed from the work performed by others on various asbestos-covered equipment. (Id. at 82-84, 217-18, 228-29, 243-45) A true and correct copy of the relevant pages of the Felten Dep. is annexed hereto as Exhibit G; a true an correct copy of the relevant portions of the Supplemental Felten Answers is annexed hereto as Exhibit H.

      31.     Keasbey is not a defendant in the Felten action.

**HARVEY HELFAND (Living) – Printing Press "Cleanup Boy"; General Construction Worker**

32.    Mr. Helfand described his first position with Rabin Typographers when he was 15 or 16 years old in approximately 1950 as a "cleanup boy." (Deposition of Harvey Helfand, dated January 22 and 29, 2007 ("Helfand Dep.") at 90-91) His duties included cleaning the dust and residue off the Linotype machines, which contained asbestos-lined pots to melt lead. (Id. at 90-92, 94-95, 171-78, 181-83) A true and correct copy of the relevant pages of the Held Dep. is annexed hereto as Exhibit I.

33.    Additionally, Mr. Helfand performed renovations in various unspecified residential and commercial locations in 1965 to 1966 and 1992 to 1993. (Id. at 144-57, 197-227, 245-54) In that regard, he handled and was exposed to asbestos-containing pipe covering, boiler wraps, old ceilings, plasters, floor tiles, sheets, batting. (Id. at 148-49, 151-56, 202-15, 219-20, 225-26, 230-36, 247-253)

34.    Mr. Helfand also renovated several of his own residences. (Id. at 38-51, 54-60, 237-45) Among the asbestos-containing products that he used and was exposed to were flooring, drop ceilings, sheetrock cements, spackling compound and tape. (Id. at 38-50, 55-57, 204-06, 240-41, 243-44) At one residence, he had a machine shop in the basement and allegedly handled the asbestos insulation around the boiler. (Id. at 59)

35.    Keasbey is not a defendant in the Helfand action.

**CHRISTIAN HOLINKA (Living) – Laboratory Technician**

36.    Mr. Holinka worked at numerous sites where he claims he was exposed to asbestos as a laboratory technician: Ft. Sam Houston, Texas (two months between 1956 to 1957); 98 General Hospital, Neubrueke, Germany (July 1957 to August 1958); Booth Memorial Hospital, Queens (3½ months in 1959); University of California at Berkeley

9

(spring 1960 to mid-1962, and early 1964 to August 1966); Hunter College (fall 1962 to spring 1963); SUNY Stonebrook (1971 to 1974); Columbia Presbyterian Medical Center (1971 to 1974); University of Southern California (1974 to 1977); and Mt. Sinai Hospital (1977 to 1989). (Deposition of Christian Holinka, dated February 12 and 22, 2007, and March 1, 2007 ("Holinka Dep.") at 26-27, 31-32, 34, 67-68, 71, 80-82, 99-101, 103-07, 110-11, 118-22, 133, 136-38, 149-51) He testified that he used and replaced asbestos Bunsen burner pads that dried out, cracked and released dust. (Id. at 27-28, 34) He also used asbestos mittens whenever he handled hot glass. (Id. at 34-38, 71) A true and correct copy of the relevant pages of the Holinka Dep. is annexed hereto as Exhibit J.

37.    According to his interrogatory answers, Mr. Holinka also was exposed to asbestos from autoclaves. (Answers to Interrogatories of Christian Holinka, dated October 3, 2006 ("Holinka Answers") at 11) A true and correct copy of the relevant portions of the Holinka Answers is annexed hereto as Exhibit K.

38.    Keasbey is not a defendant in the Holinka action.

**JACK NACHT (Living) – Flooring Salesman**

39.    Mr. Nacht worked as an owner, administrator and salesman of flooring materials for Dee-Jay Carpet Company from the end of 1945 to 1997. (Deposition of Jack Nacht, dated November 21, 2006, and December 4, 2006 ("Nacht Dep.") at 61, 63-64) He sold vinyl asbestos floor tiles (id. at 194), samples of which were sometimes broken to show customers their consistency and resiliency. (Id. at 144-46, 152-55, 296-97) He testified that the sample tiles also may have been dusty out of the box. (Id. at 152) A true and correct copy of the relevant pages of the Nacht Dep. is annexed hereto as Exhibit L.

10

40.     Moreover, he sometimes visited jobsites to inspect the work of his mechanics and to ensure that the site was cleaned up. (Id. at 125-32, 140-42, 214-15) He claims that he was exposed to asbestos during those visits when his mechanics cut the tiles, ripped off old flooring and cleaned up in his presence. (Id. at 155, 239-40, 294-95) The sites that he visited were "primarily" commercial: "If it was a residential job, I didn't always run to check it out because tile would be sometimes a small part of the job, whereas commercial it was always a big part of the job." (Id. at 128) Moreover, when he visited residences, his focus was to inspect the aesthetics of the work, which required that the job be "[f]inished enough so that I could see it's okay." (Id. at 130)

41.     Keasbey is not a defendant in the Nacht action.

**FREDERICK RITZER (Deceased) – Plumber/pipefitter; steamfitter**

42.     Mr. Ritzer was not deposed prior to his death but he provided answers to interrogatories. Mr. Ritzer worked as a plumber/pipefitter out of the Plumbers Union, Local 2, during unspecified points in the period 1957 to 2006 at various New York City sites, including the Exxon Building, Port Authority Bus Terminal, World Trade Center, Bellevue Hospital, HBO building, Trump projects, Parker Towers, Hunter College and Yankee Stadium. (Answers to Interrogatories of Frederick Ritzer, dated August 18, 2006 ("Ritzer Answers"), Chart A at 25) In 1966, he worked as a steamfitter for the Steamfitters UA Local at the Budweiser plant in Newark, New Jersey, where he was exposed to pipe covering, blankets, block, cement, gaskets and packing. (Id. at 12-13) A true and correct copy of the relevant portions of the Ritzer Answers is annexed hereto as Exhibit M.

11

43.    On December 1, 2006, a co-worker of Mr. Ritzer, Salvatore Desiderio, was deposed. Mr. Desiderio testified that in August 1969, Mr. Ritzer worked for him for approximately four to five weeks as a plumber during the construction of Section 3 of Co-Op City. (Deposition of Salvatore Desiderio, dated December 1, 2006 ("Desiderio Dep.") at 22-27) Mr. Ritzer worked with and was exposed to asbestos-containing rope, gaskets, valves, packing and "pipe runners." (Id. at 27-35, 48-58, 65, 104-05, 108-10, 114-16) A true and correct copy of the relevant pages of the Desiderio Dep. is annexed hereto as Exhibit N.

44.    For one day each in October and in November 1969, Mr. Desiderio saw Mr. Ritzer in Section 4 of Co-Op City. (Id. at 37-39, 41-42) Mr. Ritzer was working on waste and soil pipes in October and on cast-iron installation in November, using asbestos-containing white rope and pipe runner both times. (Id. at 39-40, 43-45)

45.    Keasbey is not a defendant in the Ritzer action.

## ROBERT M. SHEPPARD (Living) – Automobile Mechanic; Electronics Techician; Sound Technical Maintenance Engineer

46.    Starting at age nine, Mr. Sheppard began helping his father do automobile brake work for family and friends in their garage. Deposition of Robert M. Sheppard, dated February 8, 2007 ("Sheppard Dep.") at 25-57, 68-70) He testified that although he always wore a mask because he has asthma, the asbestos dust from the brakes "got everywhere; my clothes would be covered with it. I would also sweep out the garage." (Id. at 57) And, when he removed his mask, "the dust would roll down my face." (Id.) After he left his parents' residence, he continued to do brake work for himself and others until approximately 15 years ago. (Id. at 58-68) A true and correct copy of the relevant pages of the Sheppard Dep. is annexed hereto as Exhibit O.

12

47.    For eight months in 1978, Mr. Sheppard worked at Star Dynamics as an Electronics Technician in Quality Control. (Id. at 88-89) His duties included drilling and shaving Bakelite baseboards, which contained asbestos. (Id. at 92-99, 114) He also worked with Bakelite boards at Aerolite for six to eight months in 1980, although he did not have to drill or shave them at that time. (Id. at 124, 126-27)

48.    The other worksites at which he claims he was exposed to asbestos are RPM Sound Studio and A&R Studios (two years sometime after 1984) (id. at 140-43, 158, 161), where he was a Technical Maintenance Engineer. As such, he was exposed to existing asbestos-containing pipe covering that "was crumbled off at the turns," ceiling tiles that "flaked off quite a bit" and breaker boxes that contained Bakelite insulators "that were crumbling." (Id. at 143-46, 149-54, 162-64)

49.    Finally, Mr. Sheppard claims that the pipes in the basement of his residence from 1985 to 2003 were wrapped with asbestos and "[a]t the boiler ends of those pipes, they were crumbly." (Id. at 75-77) He had a sound studio in that basement. (Id.)

50.    Keasbey is not a defendant in the Sheppard action.

51.    Annexed hereto as Exhibit P is a true and correct copy of Justice Martin Shulman's Decision and Order, dated June 5, 2006, in Rosato v. Amchem Prods., Inc., Index No. 111735/04.

52.    Annexed hereto as Exhibit Q is a true and correct copy of the relevant pages of Barry I. Castleman, Asbestos: Medical and Legal Aspects (5th ed. 2005).

13

53.     Annexed hereto as Exhibit R is a true and correct copy of Justice Martin Shulman's Consolidation Decision, dated April 14, 2003, in O'Reilly v. A.C.&S., Index No. 103255/02.

54.     Annexed hereto as Exhibit S is a true and correct copy of the relevant pages of Plaintiffs' May 2007 In Extremis Fact Witness Lists, dated April 5, 2007.

55.     Annexed hereto as Exhibit T is a true and correct copy of Plaintiffs' Remaining Defendants List in these nine cases, which was distributed by Plaintiffs' counsel at the last court conference in these cases.

Dated: New York, New York
       July 17, 2007

                                    Loring I. Fenton

14