SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------------X
IN RE: NEW YORK CITY ASBESTOS LITIGATION     :     NYCAL
-----------------------------------------------------------------------X     I.A.S. Part 11
This Document Relates To:                                          :     (Madden, J.)
                                                                              :
FRANK BIANCO, et al.,                                             :     Index No. 115546-06
                                                                              :
                                        Plaintiffs,                     :
                                                                              :
            -against-                                                   :
                                                                              :
A.C. & S.., et al.,                                                    :
                                                                              :
                                        Defendants.                 :
-----------------------------------------------------------------------X

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION, PURSUANT TO FRYE V. UNITED STATES, AND IN LIMINE, 1) TO PRECLUDE THE NOVEL, UNSCIENTIFIC, NOT GENERALLY-ACCEPTED, LITIGATION-BASED, PREVIOUSLY EXCLUDED ASBESTOS "DOSE RECONSTRUCTION"/"EXPOSURE ASSESSMENT" ANALYSES AND ALL TESTIMONY RELATED THERETO, AND 2) TO PRECLUDE THE CASE-SPECIFIC REPORTS AND RELATED TESTIMONY OF DRS. RABINOWITZ AND WEINBERG SPECIFICALLY AS IMPROPER**

**PRELIMINARY STATEMENT**

Many of the remaining Defendants in this action, including but not limited to American Biltrite, Inc., Georgia Pacific Co., Goodyear Tire & Rubber Company, Kaiser Gypsum, the "Lab Supply Defendants" (including ManorCare Health Services, Inc., Fisher Scientific International, Inc., Baxter Healthcare Corp., VWR International, Inc, and Univar USA, Inc.), Mannington Mills, Inc., Mansfield Plumbing Products, LLC, T H Agriculture & Nutrition, LLC ("THAN"), and Weil-McLain (hereinafter collectively referred to as the "Defendants") have hired various industrial hygienists and other experts to create works of historical fiction, not based on science and not based on evidence in

these cases. After a review of the expert reports provided to date, the Defendants 3101(d)

statements, and prior experience with the many proposed experts, it is clear that many of

the proposed experts will attempt to render opinions "reconstructing" the likely level of

asbestos exposures Plaintiffs suffered from various asbestos products.

First, the Defendants' expert testimony should be precluded because they are

**based on flawed "dose reconstruction"/"exposure assessment" methodology.** Having

been specifically excluded as "junk science" by various courts[1] — most notably by the

Hon. Louis B. York in the Colella/D'Ulisse friction trial in August, 2006[2] — and

shunned by colleagues,[3] with traditional lengthy "dose reconstructions" involving job-

site-by-job-site, product-by-product analysis (measured to the precision levels of

hundredths, thousandths, and even ten-thousandths of asbestos fibers per cubic centimeter

---

[1] Similar "reconstructions" have been offered and rejected in New York asbestos litigation. The Honorable Diane Lebedeff of the Supreme Court, 1st Department, in a mesothelioma trial, struck similar "reconstruction" testimony concluding that it "seems to be beyond ESP." See In Re: Jose Lopez, trial transcript, February 14, 2002, at 1548-1550 (attached hereto as Exhibit A). When the process used to generate these "reconstructions" is understood, "beyond ESP" is indeed the correct description.

[2] Attempts by the defendants to "water-down" their dose "reconstructions" via the guise of name-change to "exposure assessments" have been similarly rejected in New York asbestos litigation. As recently as August, 2006, the Honorable Louis B. York of the Supreme Court, 1st Department, in a mesothelioma trial, summarily granted Plaintiffs request for relief stating:

> Okay. My decision is that the motion is granted. The so-called facts relied upon by defendants in making their assessment are based on facts not in evidence or within the personal knowledge of defendants' experts starting with the level of dosage at each individual site and its duration at the venues where plaintiffs were actually employed.

Transcript of Conference/Motion Proceeding, Colella/D'Ulisse v. A.C. & S., et al., August 31, 2006, at 81-82 (see Exhibit B for full motion in limine argument at 71-82).

[3] These "reconstructions"/"exposure assessments" and/or the specific methodology utilized to derive them, have never been published in any peer-review journal. The closest these "reconstructions"/"exposure assessments" and their methodology have come to peer-review was when they were presented at a meeting of the American Industrial Hygiene Association (AIHA). See Transcript from Audiotapes of AIHA conference, June 27, 2002 (attached hereto as Exhibit C). Not surprisingly, the "reconstructions" were roundly criticized, including being deemed unscientific and based on nothing more than "guesses." Id. at 76-82. For example, Dr. Morton Corn, Professor Emeritus Johns Hopkins University—who has testified as an expert for the defense in dozens of asbestos cases—concluded in his critique of the methodology by reminding the assembled professionals that when a dose "reconstruction" is performed, "...we are in an arena to persuade. This isn't science." Id. at 76-80. Dr. Corn's comments were followed by those of Dr. Douglas Fowler, another industrial hygienist, who admonished that ascribing exposure levels to exposures that occurred 40-60 years ago amounts to no more than "...guesses, rather than estimates." Id. at 80-81.

of air ["fibers/cc"]),[4] many of the Defendants' expert reports have attempted here to backdoor the same analysis in truncated format via use of the catch-all terms "cumulative exposure" to asbestos, "retrospective exposure assessment," and "low dose exposure" terms while jettisoning completely any traces of their underlying flawed calculations. However, as discussed below, these "new" terms are still the outcome of the old flawed, criticized, and rejected methodology. The Defendants' experts should be precluded from testifying about "dose reconstruction"/"exposure assessment" on the grounds that their analysis and opinions:

1)    are unreliable, lacking in both foundation and probative value and not based on facts in evidence;

2)    are novel, unscientific, and not generally accepted;

3)    are misleading and inflammatory such that, if they have any probative value, such minimal value is outweighed by the prejudicial effect of enumerating specific, precise values to exposures occurring decades ago without utilizing any measurements, asbestos air sampling or other studies conducted at the actual job-sites;

4)    usurp the Court's and/or jury's function by determining which asbestos exposures are "attributable" to defendants and, therefore, what legal responsibilities defendants bear; and

5)    usurp the fact-finding function of the jury by relying on "facts" they have created and which are not otherwise in evidence.

Accordingly, we ask the Court to recognize the same and rule to preclude such junk science in new clothing.[5] (see § I infra).

---

[4] Asbestos is a mineral fiber. A fiber is a structure that has a length-to-diameter ("aspect") ration of at least three-to-one. Asbestos fibers are microscopic and usually measured in microns. Millions of asbestos fibers would fit on the point of a pencil. The number of asbestos fibers that would fit in a cubic centimeter is astronomical.

[5] To the extent the Court does not grant preclusion regarding dose-reconstruction testimony, Plaintiffs request the Court order the respective Defense expert(s) shall be produced for deposition forthwith; and all supporting documentation, reports, and memoranda be produced to Plaintiffs' counsel prior to such ordered deposition

Second, the case-specific testimony of Drs. Sheldon H. Rabinovitz and Kenneth S. Weinberg, in the <u>Holinka</u> matter, should be precluded. Dr. Rabinovitz's opinions regarding an employer's legal responsibilities are **beyond the scope of proper expert testimony** and should remain the Court's domain. Dr. Weinberg, on the other hand, **inaccurately bases his opinions** regarding Plaintiff Holinka's exposure **on his own personal experience working in laboratories rather than facts in the record**, and accordingly, should be precluded (<u>see</u> § II <u>infra</u>).

## BACKGROUND FACTS

**Mr. Frank Bianco's Asbestos Exposure**

Mr. Frank Bianco recently died from mesothelioma at the age of sixty-eight. Mr. Bianco was exposed to asbestos while in the <u>US Navy</u> between 1955 and 1959 as well as working as a <u>residential plumber</u> for three different employers between 1960 and 1972. In the US Navy, he served as a fireman on the USS Intrepid where he was exposed to various pumps. As a residential plumber, Mr. Bianco testified to exposure from boilers, pumps, and valves and that he bought asbestos-containing supplies from two suppliers. More specifically, he was exposed to various brands of boilers via installation and rip-out including exterior insulation and interior packing and rope; various brands of pumps during installation and repair including removal and re-application of exterior insulation; and during installation and repair of valves including asbestos packing inside and insulation on the exterior of the valve. Mr. Bianco regularly bought asbestos-containing plumbing materials, including bags of asbestos, from the same suppliers that was often delivered to work sites by the supplier.

**Mr. James Director's Asbestos Exposure**

Mr. James Director recently died from mesothelioma at the age of fifty-three. Mr. Director was exposed to asbestos-containing <u>wood fire doors and joint compound</u> from approximately 1969 through at least 1976 while working for his father's fire door installation company. Mr. Director worked doing installation at various New York City metropolitan area work-sites, including but not limited to, various New York schools, the VA Hospital in Brooklyn, La Guardia College, Kreedmore, and locations in Long Island such as Pilgrim Hill and Shoreham powerhouse. He testified to direct exposure to

various fire door company products from work in the shop and on-site as well as bystander exposure from various specified joint compounds on-site. Mr. Director testified to the amount of dust released during drilling, sawing, morticing the fire doors, sweeping up the resulting asbestos dust as well as others' sanding and sweeping of joint compound.

### Mr. Karl Felten's Asbestos Exposure

Mr. Karl Felten recently died from mesothelioma at the age of seventy-five. Mr. Felten was exposed to asbestos over a thirty-nine year period while employed as a mechanic in the boiler/heating plant at Mt. Sinai Hospital between 1958 and 1997. Mr. Felten eventually became the Director of the Plant. He testified to exposure from asbestos cement, pipecovering, sheet gaskets, various brands of boilers, air conditioning units, chillers, turbines, and pumps, all located throughout the large and extended Mt. Sinai complex. Mr. Felten testified that all of the existing asbestos-containing products remained until the 1980s when major abatement projects were undertaken.

### Mr. Harvey Helfand's Asbestos Exposure

Mr. Harvey Helfand is a seventy-one year old man currently suffering from mesothelioma. Mr. Helfand was exposed to asbestos employed as a typesetter and while involved in general construction. Mr. Helfand began his career as an apprentice in the printing industry at a typesetter located in New York City where he worked for one year in the early 1950s. He testified that he worked in the vicinity of multiple Linotype machines that required operators to mix asbestos powder with a liquid to form a paste/cream that was applied to the inside of a pot located on the machine. This paste was later, after a few days, chipped out and thrown onto the floor and the process begun

anew. Mr. Helfand was responsible for sweeping up the excess dust on the floor surrounding the Linotype machines. Between 1951 and the 1970s, Mr. Helfand was involved in general construction, personally and usually single-handedly, performing renovations to residences and some office spaces throughout the New York City area. He testified to exposure from asbestos-containing joint plaster, ceiling tile, and floor tile at these various work-sites.

**Mr. Christian Holinka's Asbestos Exposure**

Mr. Christian Holinka is a sixty-nine year old man currently suffering from mesothelioma. Mr. Holinka was exposed to asbestos doing medical laboratory and research work between 1956 and 1989. More specifically, Mr. Holinka testified to being exposed to asbestos from Bunsen burner covers, pads, and asbestos mittens. He used the products often and that when they became worn down, both the Bunsen burner pads and mittens would flake and create dust that he would breathe. Mr. Holinka worked at the following sites and locales at each site exposed to Bunsen burner covers, pads, and mittens: US Army, Germany, clinical laboratory work (1956); New York Hospital Medical Center of Queens/Booth Memorial, New York, lab technician (3 ½ months, 1959-1960); UC Berkeley, California, Dept. of Physiology research lab (1960-1962, 1964-1964); CUNY Hunter, New York, chemistry lab (1963); State University of New York, Stony Brook, New York, biological sciences (1971-1974); Columbia University, New York, Chemistry Department (1971-1974); USC, California, Biological Science Lab (1974-1977); and Mount Sinai School of Medicine, New York, Chemist (1977-1989).

**Mr. Jack Nacht's Asbestos Exposure**

Mr. Jack Nacht is an eighty-four year old man currently suffering from mesothelioma. Mr. Nacht was exposed to asbestos via his activities as owner of a retail flooring company, Dee Jay Carpet Co., between 1946 and 1977. As the owner, he frequently went to commercial and residential job-sites in Long Island and Queens to supervise the installation of asbestos-containing tiles and sheets. Mr. Nacht testified to visiting a few sites per day for an hour or so at a time, usually making it a point to visit the work-sites at the end of the job to ensure that they were satisfactorily cleaned and swept. In addition, Mr. Nacht's exposure to asbestos derived from his personally breaking various tile to show customers its composition. Mr. Nacht also testified that he was exposed, though rarely, to asbestos-containing pipe covering located near the boiler in the basement of his store sometime in the late 1940s/early 1950s.

**Mr. Frederick Ritzer's Asbestos Exposure**

Mr. Frederick Ritzer recently died from mesothelioma at age sixty-seven. Mr. Ritzer is a lifetime union plumber who worked, starting in 1957, through Local Union 2. Mr. Ritzer worked at a number of sites in the New York metropolitan area, including but not limited to: Exxon Building, Port Authority Bus Terminal, World Trade Center, Bellevue Hospital, HBO Building, Trump Projects, Parker Towers, Hunter College, and Yankee Stadium. Among other exposures, Mr. Ritzer worked with asbestos-containing plumbers' rope which was wrapped around pipe joints as hot lead was poured in to seal the joints, valves which were packed with asbestos packing, and preformed gaskets.

**Mr. Joseph Saccomano's Asbestos Exposure**

Mr. Joseph Saccomano recently died from mesothelioma at age sixty-nine. Mr. Saccomano was exposed to asbestos as a <u>sheetmetal worker</u> and as a <u>home inspector</u>. During his employ as a sheetmetal worker between 1962 and 1983, Mr. Saccomano testified to working in various powerhouses (i.e. Northport, Ravenswood, Astoria, 14th Street), hospitals (i.e. St. Barnabas, St. Vincents, Sloan Kettering), airport hangers, the Pan Am Building, ABC Studios, and the AT&T Building in New York City. Mr. Saccomano's exposure here to asbestos derived from removing and replacing old HVAC duct work which involved covering metal with insulation and working around others who were insulating equipment with asbestos, including pumps and valves. In 1983, after retiring as a sheetmetal worker, Mr. Saccomano worked for the Town of Brookhaven as a home inspector during which he was exposed to asbestos from being around workers who were taking out old boilers, tiles, roofing, and siding.

**Mr. Robert Sheppard's Asbestos Exposure**

Mr. Robert Sheppard is a forty-eight year old man currently suffering from mesothelioma. Mr. Sheppard was exposed to <u>asbestos from friction products, building electrical equipment, and working with ceiling tile</u> at various locations throughout New Jersey. More specifically, between age eight (c. 1966) and twenty-two (c. 1980) Mr. Sheppard helped his father replace brakes on the cars of numerous family members multiple times per year. Mr. Sheppard worked with Bakelite, drilling and cutting it for use in field phones and field switches at Star Dynamics in 1978, and doing the same at Aerolite in 1980, building radar and sonar units for the United States military. In approximately 1982, Mr. Sheppard began working in the recording industry. At RPM

Studios, he was exposed to asbestos from in-place pipe covering and acoustic ceiling tile between 1982 and 1983. He was additionally exposed to asbestos between 1985 and 1987 while working with or around in-place ceiling tile, in place bats on ducts, and old junction boxes.

## ARGUMENT

### POINT I

**MULTIPLE DEFENSE-ISSUED EXPERT REPORTS, AND ANY TESTIMONY RELATED THERETO, SHOULD BE PRECLUDED BECAUSE IT WILL BE BASED ON NOVEL, UNSCIENTIFIC, NOT GENERALLY-ACCEPTED, LITIGATION-BASED, PREVIOUSLY EXCLUDED "DOSE RECONSTRUCTION"/"EXPOSURE ASSESSMENT" ANALYSIS**

### A. The Dose "Reconstruction" / "Exposure Assessment" Process

Plaintiffs expect some of the Defendants' proposed experts, for litigation purposes will claim to be able to "reconstruct" or, in turn, "assess," Plaintiffs historical asbestos exposures. In the past, many of these experts have done so for each of a plaintiffs respective job-sites and with respect to a host of activities involving a variety of particular asbestos-containing products. Such formerly lengthy "dose reconstructions" / "exposure assessments" involving job-site-by-job-site, product-by-product analysis expressed in hundredths, thousandths, and even ten-thousandths of an asbestos fiber/cc precision have been soundly criticized by their peers and rejected in the courts as junk science essentially because their "reconstructions" / "assessments" consist of multiple states of guesswork, each stage fraught with its own uncertainty, and each stage being compounded by the uncertainties in other stages. This process would be difficult, even if actual asbestos air sampling and monitoring had been conducted during the times when Plaintiffs were historically performing their work. Many of the Defendants expert witnesses have professed to be able to do so without any such historic samples. We expect they will attempt to do so again.[6]

---

[6] See Expert Reports and CPLR 3101(d) Summaries as per the following defendants:

**1) American Biltrite Co.:**
-*John Spencer Expert Report RE: Jack Nacht*, April 23, 2007 at 3-4 (attached hereto as **Exhibit D**)(applying various exposure assessment studies to Plaintiff Nacht's exposure narrative);
-*John Spencer Expert Report RE: Harvey Helfand*, April 24, 2007 at 5-6 (attached hereto as **Exhibit E**)(applying various exposure assessment studies to Plaintiff Helfand's exposure narrative).

**2) Georgia Pacific.:**
-*James C. Rock Expert Report RE: Harvey Helfand*, July 12, 2007 at 9 (attached hereto as **Exhibit F**)(Mr. Rock's report is a fine example of unadulterated dose-reconstruction culminating in a mathematical/physics-like equation spanning the width of the page purportedly capturing Plaintiff Helfand's "mesothelioma risk." A close reading reveals it as just a complicated way of cloaking Mr. Rock's opinion, absent data, that Plaintiff Helfand's exposure to Georgia-Pacific products did not cause his mesothelioma);
-*William L. Dyson Expert Report RE: James Director*, July 13, 2007 at 3, 6 (attached hereto as **Exhibit G**)(Applying "cumulative exposure dose" concepts to estimate Plaintiff Director's "asbestos exposure dose" attributable to Georgia Pacific to 0.2 to 1.7 fiber year/cc).

**3) Goodyear Tire & Rubber Company:**
-*Goodyear Expert Witness List*, April 27, 2007 (attached hereto as **Exhibit H**)(Dose reconstruction language is found in the CPLR 3101(d) blurbs regarding proposed expert witnesses John W. Spencer, Frederick Boelter, Allen Feingold, Benjamin Safirstein, and Roger Maxfield).

**4) Kaiser Gypsum:**
-*Dennis C. Ertel, Jr. Expert Report RE: Harvey Helfand*, August 1, 2007 at 4 (attached hereto as **Exhibit I**)("Cummulative exposure dose" language utilized).

**5) Lab Supply Defendants:**
-*Robert C. Adams Expert Report RE: Christian Holinka*, July 18, 2007 (attached hereto as **Exhibit J**)(Mr. Adams report is another fine example of unadulterated dose-reconstruction utilizing the dose reconstruction terms and concepts of "time-weighted average (TWA)," "cumulative exposure metrics," "fiber-years/cc," and "lifetime cumulative exposure," plugging in estimated exposure times to various asbestos products, only to conclude—(surprise!)—that "there was no substantial asbestos exposure in Dr. Holinka's academic and professional career to explain the development of his pleural mesothelioma.");
-*Robert N. Sawyer Expert Report RE: Christian Holinka*, July 27, 2007 at 3 (attached hereto as **Exhibit K**)(applying the term "dose generation" to estimate fiber years and, in turn, approximate the "dose of causative risk of any asbestos related disease").

**6) Mannington Mills, Inc.:**
-*Kenneth A. Mundt Expert Report RE: Harvey Helfand*, June 6, 2007 at 10-11 (attached hereto as **Exhibit L**)(discussion of dose exposure via citation to various occupational studies);
-*Kenneth A. Mundt Expert Report RE: Jack Nacht*, June 5, 2007 at 10 (attached hereto as **Exhibit M**)(discussion of dose exposure via citation to various occupational studies);
-*Mark F. Durham Expert Report RE: Harvey Helfand*, May 31, 2007 at 8 (attached hereto as **Exhibit N**)(calculating Mr. Helfand's "cumulative exposure over the 20 years from 1963 to 1983 would have been less than 0.000025 f-y/cc" on the basis of Mr. Helfand's deposition narrative alone);
-*Mannington Mills, Inc.'s List of Expert Witnesses*, May 8, 2007 (attached hereto as **Exhibit O**)(stating that Dr. Frederick Toca will give classic dose-reconstruction testimony: "Dr. Toca will also testify as to levels of exposure dose, if any, allegedly experienced by the [plaintiffs'] exposure doses and its importance as a factor in assigning risk retrospectively; the use of industrial hygiene techniques to provide a retrospective engineering estimate of the exposure dose for a particular activity or job and threshold dose response levels for asbestos-related disease at which the risk is scientifically significant...")(emphasis added).

Accordingly, this approach having been so criticized and precluded on numerous occasions, these defense experts have adopted a backdoor approach to propound essentially the same analysis under new, often truncated, packaging. They have done so via the use of the catch-all phrases "cumulative exposure" to asbestos or "low dose" exposure. Former "dose reconstruction" reports, with pages and pages and pages of mathematical calculations attached, are now jettisoned in favor of truncated reports wherein all former calculations are subsumed under the new "cumulative" dose terms. Plaintiffs ask this Court to recognize this sleight-of-hand and rule accordingly to preclude such junk science in new clothing. In so ruling, this Court will not be alone. Recognizing the inherent degree of uncertainty in this exercise, Justice Lebedeff of the Supreme Court, 1st Department, has stated:

> I am going to strike the testimony about the fiber ccs to which Mr. Lopez was exposed. To me this seems to be beyond ESP. In order to say the number of fiber years and just to try and say it very clearly fiber years it is my understanding that that would be virtually having a fiber collection cup right next to his breathing area for all of those years and being able to count it. We have so many variables I

---

**7) Mansville Plumbing Products, LLC:**
-*Mansfield Plumbing Products Expert Witness Response RE: Francis Bianco*, August 13, 2007 (attached hereto as **Exhibit P**)(Mansfield expects to call expert witness Frederick William Boelter. No expert report has been issued at the time of these moving papers, however, this firm's prior experience with Mr. Boelter makes it extremely likely that his report and related testimony will include dose-reconstruction/exposure-assessment methodology that should be precluded).

**8) T H Agriculture & Nutrition, LLC:**
-*THAN Expert Witness List RE: James Director*, June 26, 2007 (attached hereto as **Exhibit Q**)( Dose reconstruction language is found in the CPLR 3101(d) blurbs regarding proposed expert witnesses Bruce W. Case, John E. Craighead, James D. Crapo, I. Allen Feingold, William Hughson, James Rasmuson, Victor Roggli, and Frederick Toca).

**9) Weil-McLain:**
-*Frederick Boelter Expert Report RE: Francis Bianco*, August 13, 2007 at 9 (attached hereto as **Exhibit R**)(discussing dose and risk in terms of fiber yr/cc);
-*Robert N. Sawyer Expert Report RE: Francis Bianco*, August 7, 2007 at 3, 4 (attached hereto as **Exhibit S**)(discussing dose potential/risk in terms of fibers per cubic centimeter times years (f/cc-yrs));
-*Frederick Boelter Expert Report RE: Joseph Saccomano*, August 14, 2007 at 12, 17 (attached hereto as **Exhibit T**)(discussing cumulative lifetime dose and risk in terms of fiber yr/cc and assessing, on the basis of Plaintiff's deposition narrative, Joseph Saccomano's cumulative lifetime dose no greater than 25 fiber years).

have not even established so far that somebody could have done that on a one shot basis much less to try and statistically project that into a number of years. So I am just striking the testimony.

See **Exhibit A** at 1549-1550.

Despite identical uncertainties, Defendants appear to seek to utilize such analyses. According to Defendants' proposed experts, the cumulative lifetime (exposure) dose of asbestos inhaled by Plaintiffs is derived by multiplying a number, the "cumulative time-weighted average" (TWA), by the number of years of exposure. This final figure is expressed in "fiber years" which is often rounded to the nearest one-hundredth of a fiber year.

In sum, Defendants experts "cumulative lifetime (exposure) dose is derived by adding all of the "individual TWA's" they have calculated for the varied and myriad of "activities" on each job-site wherein exposures occurred. Each "individual TWA," in turn, is the product of how much time, on an average day Defendants experts say each Plaintiff spent in activities that led to exposure, multiplied by the "concentration" of asbestos he says was generated by that activity. In sum, *the arrogance of the stated level of precision is only outweighed by the certainty with which it is stated.* The entire "dose reconstruction" / "exposure assessment" process is essentially the compounding of unreliable data and should not be countenanced by this Court.

**B. Dose "Reconstruction" / "Exposure Assessment" Has Already Been Precluded In New York County Asbestos Litigation And Elsewhere**

As noted above, this Hon. Louis B. York, in a New York County Asbestos Litigation trial held just this past year, after hearing argument on the very same request for relief as made herein, granted Plaintiffs motion. See **Exhibit B** supra. Judge York specifically rejected defendants arguments that their experts were involved in "exposure

assessment" rather than "dose reconstruction" and appropriately, denied their testimony. Ibid. at 74-77, 81-82.

Additionally, as noted above, another defendant also in a New York County Asbestos Litigation trial before Justice Lebedeff, made a similar attempt to admit this type of "reconstruction." Justice Lebedeff, after hearing the testimony, concluded that the mathematical quantification regarding asbestos exposure that are represented within a dose "reconstruction" could not be made given the numerous missing variables that cannot be accounted for. The Court questioned how such conclusions could ever be something other than an "artificial construct about which I still don't understand the mathematical basis." See **Exhibit A** at 1535. In her scathing rebuke of this junk science, Justice Lebedeff made the following comments about dose "reconstruction":

> . . . We have all of these people working in all of these places doing all of these things [with or around asbestos]. We don't know what the measurement was. We just have an absolute description of it. **How we then jump to assuming that we have a quantification of it without saying its' similar – we haven't talked about the stuff on his clothing that he's taken home and breathed. We haven't talked about anything that might relate to it. And then to go magically to one fiber year – Jeez, that's great stuff. Only where is the Wizard of Oz behind the curtain?** You have to explain to me what the mathematical basis of it is, and I have not found it inferentially obvious. I will allow you to talk to your expert. And if you can't come up with an explanation, I do believe it's my obligation to strike the testimony. Id. at 1539-1540 (emphasis added).

> . . . First I have a role and obligation to the jury to assure that the testimony that they receive first, and even before Frye, is meaningful and is not just confusing. And then second, I have an obligation post Frye to assure that it has some scientific rationale. **There is also a general obligation to assure that they jury is not presented with testimony that is just possibility in relation to the specific facts. * * * I don't understand under all of those general standards how the information, at least as I saw the line developing, doesn't run afoul of all three of them.** Id. at 1542 (emphasis added).

As demonstrated by Justice Lebedeff above, dose "reconstruction" – as applied to a single plaintiff to assess relative contributions to the development of disease among a variety of particular products – is junk science that reaches "beyond ESP."

Other Courts have likewise rejected dose "reconstruction" applied to specific individual's exposures. In 1999, another asbestos defendant, Owens-Corning, sought to admit a dose reconstruction performed by Dr. William L. Dyson before Judge Fox of the United States District Court for the Eastern District of North Carolina. As more completely set forth below, Judge Fox flatly denied the defendant's attempt to ascribe specific exposures of the plaintiff via a historical dose "reconstruction." See **Exhibit U**, Judge Fox preclusion decision, <u>Pollard v. Owens Corning</u>, February 23, 1999.

Judge Fox, not unlike Justice Lebedeff, was baffled by the attempt to ascribe specific exposure estimates to exposures that took place 30 years ago, and made the following observations:

> How could you do that [quantify particular exposures to asbestos]? I don't understand. Did you go to the Babcox and Wilcox plant? <u>Id</u>. at 209.

> You didn't observe [the plant] while it was in operation? <u>Id</u>. at 210.

> Well, I am trying to decide or [sic] not this testimony would assist the jury. And I am not sure that I agree that it does. [The witness] can certainly testify as to what his experience has been and what has been the results of various tests that occurred. But I don't see how you are going to relate to fact specific exposure at the Babcock and Wilcox plant. I mean I don't understand how, if you have got studies – industrial hygiene studies that demonstrate over a period of years that insulators generally are exposes to so many fibers, et cetera – I don't know how that relates to Mr. Hewett. It has been my observation over a period of time that workers have varying degrees of interest in their job, so to speak, and some workers will take great pride in their productivity and the amount of work they accomplish, and some, if they have the opportunity, will go outside and smoke cigarettes the whole day. In other words, you have a situation here – not only do you have the question of Mr. Hewett's individual exposure levels, which I assume exposure levels – I mean, the exposure

from one insulator to another in the same plant could vary widely." Id. at 216–217.

Although Judge Fox allowed general testimony about general levels of exposure, he precluded the individualized dose "reconstruction":

> He can't do that, because – he can testify as to what the average amount of dust is created in an occupational setting, the average amount of dust an insulator is subjected. He can testify that miners brought home "x" amount of dust when they came home. **But when it comes to how much on Mr. Hewett's clothes, nobody can testify to that. That is ridiculous. You can't determine it.** Id. at 222 (emphasis added).

> Well, I am going to let you testify, Dr. Dyson, on what your studies show on the average. **I am not going to let you attribute that evidence directly to Mr. Hewett or Ms. Pollard, because I don't think you can do that with any degree of certainty. I just don't believe it is humanly possible for that to occur. It is a very difficult area because nobody has the power to go back at this point in time and establish what the ultimate facts were.** Id. at 225 (emphasis added)

As demonstrated by Justice York, Justice Lebedeff, and Judge Fox' comments and rulings above, dose "reconstructions"/"assessments"—as applied to a single individual to assess relative contributions to the development of disease among a variety of particular products—is unreliable, junk science. Per Justice Lebedeff, these analyses are simply "beyond ESP." As such, any of Defendants expert witness testimony that includes dose "reconstructions" or "exposure assessments" as to specific levels of exposure must be precluded at trial.

## C. Dose "Reconstructions" / "Exposure Assessments" Are Novel And Do Not Satisfy Frye Or Any Other Foundational Requirement

Compounding the unreliability demonstrated above, Defendants' past expert reports containing dose reconstruction/exposure assessment methods do not use generally accepted standards and methodologies used by industrial hygienists, which, for the purposes of measuring quantities of airborne asbestos fibers, are controlling. Such dose

reconstructions/exposure assessments do not follow the required standards and methods in the field of industrial hygiene and their respective "retrospective" simulations do not meet the criteria for admissibility of scientific expert testimony under _Frye_. As a result, all testimony about them must be precluded from evidence.

The requirements for admissibility of expert testimony set forth in _Frye_ have been adopted in New York. _See_ People v. Wesley, 83 N.Y.2d 417, 611 N.Y.S.2d 97 (1994); _see also_ Collins v. Welch, 178 Misc. 2d 107, 678 N.Y.S.2d 444 (N.Y. Sup. Ct. 1998). Under this test, expert testimony based on scientific principles or procedures is admissible only if such principles or procedures have gained general acceptance in the relevant discipline. _See_ People v. Roraback, 242 A.D.2d 400, 662 N.Y.S.2d 327; People v. Wernick, 651 N.Y.S.2d 392, 394 (1996). The purpose of the _Frye_ test is to ensure a measure of the quality of scientific evidence prior to admission, so that jurors are not mislead by unreliable evidence.

Defendants past expert reports utilize hypothetical analyses and the resultant testimony is based upon pure speculation, conjecture, and the generation of "facts." It is scientifically unproven and not generally accepted by the scientific community. It has never been accepted in any published peer-reviewed article. It has never been subject to any statistical analysis to determine its variability. It has never been shown to be reproducible. It has no known error rate.

It is manifestly evident that the principles and procedures used by Defendants proposed experts, based upon their prior submissions, will be novel and unscientific. _Wherefore a Frye hearing should not even be required to demonstrate that the evidence is inadmissible and cannot meet basic evidentiary foundational requirements._

**D. Conclusions Derived From Dose "Reconstruction" / "Exposure Assessment" Analysis Are Flawed And Scientifically Unreliable**

Defendants expert testimony, if history is our guide, will have conclusory findings that are not reliable and will be, as discussed above, riddled with layers of major methodological flaws. Dr. Douglas Fowler, at the recent AIHA meeting, made this precise point in reminding the group that dose "reconstructions" do not even rise to the level of estimates. Rather, they are "guesses." "Guesses" play no role in a court of law.

Defendants' expert reports can not accurately factor in variables such as ventilation, exhaust, room size, air flow, the amount of workers working with asbestos-containing products during exposure periods, the proximity of a worker to airborne asbestos dust, re-entrainment of asbestos during movement and the existence of asbestos remaining on clothing and brought home. In view of the many variables that are not accounted for when creating a dose "reconstruction" / "exposure assessment," the results are necessarily imprecise, flawed, and unreliable. This method of analyses, by whatever label, is so far from reality, that it has no place in the courtroom.

**E. Dose "Reconstructions" / "Exposure Assessments" Invade The Fact Finding Function Of The Jury**

The Defendants' expert witnesses are not fact witnesses in this case. They will have had no contemporaneous involvement with the events that led to the Plaintiffs' exposures. As discussed above, these defense experts make up facts. For example, none of the Defendants proposed expert witnesses were present observing Plaintiffs' work activities and, since they never articulated percentages of the workday that they were engaged in such activity, these defense experts should not be permitted to make up "facts" as to that issue. These defense experts are not competent to do so nor is that the

role of a non-eyewitness in a trial. If anyone is to make that determination, it is the jury based on the actual facts admitted into evidence. Defendants' proposed experts should be precluded from making up "facts" and then relying on them for their opinions. Their analyses are flawed because the actual exposures don't match the exposures they are relying on for their exposure estimates.

## POINT II

### THE CASE-SPECIFIC REPORTS OF DRS. RABINOVITZ AND WEINBERG, AND ANY TESTIMONY RELATED THERETO, SHOULD BE PRECLUDED AS IMPROPER

#### A. Dr. Rabinovitz's Case-Specific Report Regarding Christian Holinka

The testimony of Dr. Sheldon H. Rabinovitz (Ph.D, Physiology and Pharmacology; certified Industrial Hygienist), as reflected in his case-specific report, dated July 24, 2007 (attached hereto as **Exhibit V**)("Rabinovitz Report"), should be precluded in part at trial, because its opinions on an employer's legal responsibilities are beyond the scope of proper expert testimony.

The section of his report, titled "Employer Responsibility," is rife with interpretations of statutes and regulations drawing legal conclusions, which constitute improper subjects of expert testimony. See Rabinovitz Report at 8. For example, his report states, "As demonstrated in the [Occupational Safety and Health Act of 1970], it is the employer's responsibility to provide a safe work environment for employees. While the act requires employees to comply with standards and rules that are applicable to their own actions and conduct, it is the employer who has the means to provide a safe environment." Id. Or, similarly, "Dr. Holinka's employers would have been responsible for ensuring that he was not exposed to harmful levels of asbestos." Id.

Such opinions about what the law is or means and the legal conclusions to be reached are not proper subjects of expert testimony. See Colon v. Rent-A-Center, Inc., 276 A.D.2d 58, 61-62 (1st Dept. 2000); LaPenta v. Loca-Bik Ltee Transport, 238 A.D.2d 913, 914 (4th Dept. 1997). Rather, it is the court that must decide all

questions of law and instruct the jury on the applicable law at trial. <u>Colon</u>, 276

A.D.2d at 61; 58A N.Y. Jurisprudence 2d: Evidence and Witnesses § 690 (2007 ed.).

### B. Dr. Weinberg's Case-Specific Report Regarding Christian Holinka

The testimony of Dr. Kenneth S. Weinberg (Ph.D, Biochemistry and

Pathology), as reflected in his case-specific report, dated July 30, 2007 (attached

hereto as **Exhibit W**)("Weinberg Report"), should be precluded in full as being

improper expert testimony. His expert opinions are based expressly "on my personal

experience working in various types of research and clinical laboratories," as well as

"the observations I made as an industrial hygienist and director of safety at the VA

Medical Centers In Brockton and West Roxbury, MA, and Massachusetts General

Hospital." <u>See</u> Weinberg Report at 3.

It is well-established that an expert witness' "opinion evidence must be based

on facts in the record or personally known to the witness." <u>Cassano v. Hagstrom</u>, 5

N.Y.2d 643, 646 (1959); <u>see also</u> <u>Corelli v. City of New York</u>, 88 A.D.2d 810, 824

(1st Dept. 1982). Yet the laboratories and sites that Dr. Weinberg has personal

experience and knowledge of are not the same sites as those Dr. Holinka has stated he

worked at. Moreover, Dr. Weinberg's experience with laboratories and procedures

therein occurred at much later times than Dr. Holinka's. For instance, Dr.

Weinberg's experience as a director of safety at the Brockton V.A. Medical Center

and Massachusetts General Hospital was all post-1987. <u>See</u> Weinberg Report at

"Curriculum Vitae," 2. Dr. Holinka has testified to being exposed to asbestos while

working in medical laboratories much earlier, from 1956 onwards. <u>See</u> Deposition

22

Transcript, Christian Holinka, February 12, 2007, at 33-38 (relevant pages attached hereto as **Exhibit X**).

In fact, at points, Dr. Weinberg's report appears to directly contradict Dr. Holinka's factual testimony about the circumstances of his exposures, which certainly is not the proper province of expert testimony. For example, Dr. Weinberg opines, "It was, and still is, the custom and practice in the laboratories to utilize clamps and tongs, not mittens, to handle hot glassware at the bench top." See Weinberg Report, 2. Dr. Holinka, however, testified that he did use asbestos mittens. See **Exhibit X**, 36-37.

Finally, many of Dr. Weinberg's "opinions" do not involve matters beyond the jury's "own experience, understanding and observation," for which expert testimony is needed. Corelli, 88 A.D.2d at 819; see also Kulak v. Nationwide Mut. Ins. Co., 40 N.Y.2d 140, 147-48 (1976). For instance, one "opinion" states, "It was, and still is, the custom and practice in laboratories for researchers who become more senior to be less involved in the day to day conduct of experiments...." See Weinberg Report, 3. Another opinion reads, "It was, and still is, the custom and practice for laboratory workers to maintain a clean work environment to protect themselves from exposure to potentially harmful materials and to protect their work from potential contamination." Id.

23

## CONCLUSION

As demonstrated above, Defendants proposed expert witnesses, when utilizing dose "reconstruction" or "exposure assessment" methods, will be engaging in the arts of illusion and persuasion, not science. They will attempt to recreate a plaintiff's asbestos exposure to a particular product by using assumptions, methods, and data that cannot be relied upon and are not typically relied upon by experts in industrial hygiene to conclusively determine the types of exposure the plaintiffs encountered from a particular manufacturer's asbestos-containing products. As a result, Defendants expert witness dose reconstructions and/or exposure assessments will be nothing more than an attempt to create persuasive conclusions without revealing the underlying mathematical calculations and assumptions they rely on. Science is not about persuasion. Science is about data. Defendants' proposed expert witnesses will be engaging in junk science that is not reliable or premised on logically relevant and probative data, nor premised on generally accepted underpinnings within the relevant scientific community.

Relatedly, the case-specific testimony of Drs. Sheldon Rabinovitz and Kenneth Weinberg should be precluded in the Christian Holinka case because the opinions contained within overreach the scope of what is traditionally considered proper basis for expert witness testimony into the Court's authority to discuss what the law is, and because the reports base their opinion on unrelated personal experience rather than facts in the record.

WHEREFORE, the Plaintiffs respectfully request this Honorable Court issue an order stating that 1) any of the Defendants be precluded from admitting any documentary evidence or testimony regarding dose reconstruction/exposure assessment estimates at trial, and 2) precluding the case-specific testimony of Drs. Sheldon H. Rabinovitz and Kenneth S. Weinberg, both issued in the <u>Holinka</u> matter, as improper.

Dated: New York, New York
       August 21, 2007

                                    Respectfully submitted,

                                    WEITZ & LUXENBERG, P.C.
                                    180 Maiden Lane, 17th Floor
                                    New York, New York 10038
                                    (212) 558-5500
                                    Attorneys for Plaintiffs

By: _____
                                    Thomas M. Comerford