SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------------X
IN RE: NEW YORK CITY ASBESTOS LITIGATION   :
-----------------------------------------------------------------X
This Document Relates To:   :
  :
FRANK BIANCO, et al.,   :
  :
      Plaintiffs,   :
  :
   -against-   :
  :
A.C. & S.., et al.,   :
  :
      Defendants.   :
-----------------------------------------------------------------X

NYCAL
I.A.S. Part 11
(Madden, J.)

Index No. 115546-06

**PLAINTIFFS' AFFIRMATION IN SUPPORT OF THEIR MOTION, PURSUANT TO FRYE V. UNITED STATES, AND *IN LIMINE*, 1) TO PRECLUDE THE NOVEL, UNSCIENTIFIC, NOT GENERALLY-ACCEPTED, LITIGATION-BASED, PREVIOUSLY EXCLUDED ASBESTOS "DOSE RECONSTRUCTION"/"EXPOSURE ASSESSMENT" ANALYSES AND ALL TESTIMONY RELATED THERETO, AND 2) TO PRECLUDE THE CASE-SPECIFIC REPORTS AND RELATED TESTIMONY OF DRS. RABINOVITZ AND WEINBERG SPECIFICALLY AS IMPROPER**

    Thomas Comerford, an attorney duly admitted to practice law before the Courts of the State of New York, hereby affirms the truth of the following matters pursuant to C.P.L.R. § 2106:

1.   I am an associate with the law firm of Weitz & Luxenberg, P.C., attorneys for plaintiffs Frank Bianco, James Director, Karl Felten, Harvey Helfand, Christian Holinka, Jack Nacht, Frederick Ritzer, Joseph Saccomano, and Robert Sheppard (collectively the "Plaintiffs"), and, as such, am familiar with the facts and circumstances within.

2.   This affirmation is submitted in support of Plaintiffs' Motion, pursuant to Frye v. United States, and *in limine*, to preclude the novel, unscientific, not generally accepted,



litigation-based, previously excluded asbestos "dose reconstruction" / "exposure assessment" analysis and all testimony relating thereto and to preclude the case-specific reports and related testimony thereto of Drs. Rabinovitz and Weinberg as improper.

3.     The facts and legal argument in support of this motion are set forth in Plaintiffs' accompanying memorandum of law, and for the sake of brevity, will not be restated herein.

4.     Annexed hereto as **Exhibit A**, is a true and exact copy of the relevant portions of the trial transcript from In Re: Jose Lopez, New York, Index No. 120954/2000, February 14, 2002.

5.     Annexed hereto as **Exhibit B**, is a true and exact copy of the relevant sections of the Transcript of Conference/Motion Proceedings, Colella/D'Ulisse v. A.C. & S., et al., New York, Index No. 103894/05, August 31, 2006.

6.     Annexed hereto as **Exhibit C**, is a true and exact copy of the Transcript from Audiotapes of the American Industrial Hygiene (AIHA) Conference and Expo, June 27, 2002.

7.     Annexed hereto as **Exhibit D**, is a true and exact copy of an Expert Report RE: Jack Nacht, by John Spencer, April 23, 2007.

8.     Annexed hereto as **Exhibit E**, is a true and exact copy of an Expert Report RE: Harvey Helfand, by John Spencer, April 24, 2007.

9.     Annexed hereto as **Exhibit F**, is a true and exact copy of an Expert Report RE: Harvey Helfand, by James C. Rock, July 12, 2007.

10.     Annexed hereto as **Exhibit G**, is a true and exact copy of an Expert Report RE: James Director, by William L. Dyson, July 13, 2007.



11.     Annexed hereto as **Exhibit H,** is a true and exact copy of Goodyear Expert Witness List, dated April 27, 2007.

12.     Annexed hereto as **Exhibit I,** is a true and exact copy of an Expert Report RE: Harvey Helfand, by Dennis C. Ertel, August 1, 2007.

13.     Annexed hereto as **Exhibit J,** is a true and exact copy of an Expert Report RE: Christian Holinka, by Robert C. Adams, July 18, 2007.

14.     Annexed hereto as **Exhibit K,** is a true and exact copy of an Expert Report RE: Christian Holinka, by Robert N. Sawyer, July 27, 2007.

15.     Annexed hereto as **Exhibit L,** is a true and exact copy an Expert Report RE: Harvey Helfand, by Kenneth A. Mundt, June 6, 2007.

16.     Annexed hereto as **Exhibit M,** is a true and exact copy of an Expert Report RE: Jack Nacht, by Kenneth A. Mundt, June 5, 2007.

17.     Annexed hereto as **Exhibit N,** is a true and exact copy of an Expert Report RE: Harvey Helfand, by Mark F. Durham, May 31, 2007.

18.     Annexed hereto as **Exhibit O,** is a true and exact copy of Mannington Mills, Inc.'s List of Expert Witnesses, May 8, 2007.

19.     Annexed hereto as **Exhibit P,** is a true and exact copy of Mansfield Plumbing Products Expert Witness Response RE: Francis Bianco, August 13, 2007.

20.     Annexed hereto as **Exhibit Q,** is a true and exact copy of T H Agriculture & Nutrition, LLC (THAN) Expert Witness List RE: James Director, June 26, 2007.

21      Annexed hereto as **Exhibit R,** is a true and exact copy of an Expert Report RE: Francis Bianco, by Frederick Boelter, August 13, 2007.



22.    Annexed hereto as **Exhibit S**, is a true and exact copy of an Expert Report RE: Francis Bianco, by Robert N. Sawyer, August 7, 2007.

23.    Annexed hereto as **Exhibit T**, is a true and exact copy of an Expert Report RE: Joseph Saccomano, by Frederick Boelter, August 14, 2007.

24.    Annexed hereto as **Exhibit U**, is a true and exact copy of the relevant portions of the Dr. William L. Dyson preclusion ruling by Judge James C. Fox, <u>Pollard v. Owens Corning</u>, USDC, North Carolina, February 13, 1999.

25.    Annexed hereto as **Exhibit V**, is a true and exact copy of the Expert Report RE: Christian Holinka, by Dr. Sheldon H. Rabinovitz, July 24, 2007.

26.    Annexed hereto as **Exhibit W**, is a true and exact copy of the Expert Report RE: Christian Holinka, by Dr. Kenneth S. Weinberg, July 30, 2007.

27.    Annexed hereto as **Exhibit X**, is a true and exact copy of relevant sections of the Deposition Transcript of Christian Holinka, February 12, 2007.

28.    For the reasons set forth in the accompanying memorandum of law, Plaintiffs respectfully request that any of the proposed defense experts be precluded from testifying about dose reconstruction and/or exposure assessment as it pertains to any of the Plaintiffs; that the Defendants be precluded from admitting any documentary evidence or testimony of dose reconstruction and/or exposure assessment, quantitatively or qualitatively; and that the case-specific expert reports and any testimony relating thereto of Drs. Rabinovitz and Weinberg as to the Christian Holinka case be precluded from trial.



## Certification Pursuant To 22 N.Y.C.R.R. § 130-1

29.    I hereby certify, pursuant to 22 N.Y.C.R.R. § 130-1.1-a(b), that to the best of my knowledge, information and belief, formed after an inquiry reasonable under the circumstances, the presentation of papers listed below or the contentions therein are not frivolous as defined in 22 N.Y.C.R.R. § 130-1.1-(c).

Dated: New York, New York
      August 21, 2007

                                 Respectfully submitted,

                                 WEITZ & LUXENBERG, P.C.
                                 180 Maiden Lane, 17th Floor
                                 New York, New York 10038
                                 (212) 558-5500
                                 Attorney for Plaintiffs

                                 By:_____
                                      Thomas M. Comerford

1376

```
 1
 2   SUPREME COURT OF THE STATE OF NEW YORK
     NEW YORK COUNTY: PART 8
 3   ------------------------------------X
     IN RE:   NEW YORK CITY ASBESTOS LITIGATION,
 4                                          Index No.
                                            40000/88
 5
 6   THIS DOCUMENT APPLIES TO JOSE LOPEZ   120954/2000
 7   ------------------------------------X
                    60 Centre Street
 8                  New York, New York 10007
                    February 14, 2002
 9
10   B E F O R E: HONORABLE DIANE A. LEBEDEFF, Justice

     A P P E A R A N C E S:
11
        WEITZ & LUXENBERG, ESQS.
12           Attorneys for Plaintiff
             180 Maiden Lane
13           New York, New York 10038
        BY:  ROBERT GORDON, ESQ.
14           RICHARD MEADOW, ESQ.

15
        DRINKER, BIDDLE & SHANLEY, ESQS.
16           Attorneys for Honeywell and Allied Signal
             500 Campus Drive
17           Florham Park, New Jersey 07932
             BY:  MICHAEL R. CLARKE, ESQ.
18                    -and-
        WILCOX, SAVAGE, ESQS.
19              One Commercial Plaza
                Norfolk, Virginia 23510
20        BY:  BRUCE T. BISHOP, ESQ.

21

22

23

24

25
                         BURTON FERSTANDIG
26                       JOAN DONNELLY
                         Official Court Reporters
```

BURTON FERSTANDIG - OFFICIAL COURT REPORTER

1534

```
 1              C. Blake - by Defts. - Direct
 2    million of them in a cubic meter of air -- would
 3    have one fiber in it, just to give you a feeling
 4    for how many are out there.
 5              And I said you could breathe as much
 6    as ten cubic meters of air.  Under that
 7    measurement in a day, you can breathe that many
 8    fibers.
 9        Q.    Then once you've measured -- let's say
10    you have one fiber per cc.; one fiber per cubic
11    centimeter.
12              How does that then translate into
13    fiber years?  Does fiber years relate to dose,
14    cumulative dose?  Let me ask you that, first of
15    all.
16        A.    It does.  It is --
17        Q.    So the concept of fiber years is the
18    cumulative dose of a particular worker; for
19    example, a brake worker or auto mechanic, right?
20        A.    Or any asbestos exposure.
21        Q.    In terms of measuring cumulative exposure
22    in fiber years, how do you get from the fiber
23    year dose number -- how do you get there from the
24    fibers per cc. number?
25        A.    Again, we've determined what is in all
26    the air that was breathed during the day and
```

Joan Donnelly, RPR, CRR, Official Court Reporter

1535

C. Blake - by Defts. - Direct

1   we've divided that down, so the number is simple

2   to work with, to fibers per cc.  That's the

3   average for the day.

4           Then we figure the number of days

5   worked and the number of years worked times the

6   average.

7           It's like if you drive ten miles an

8   hour all day, your average would be ten miles an

9   hour.

10          THE COURT:  Okay.  Why don't we take

11      a five minute break and let the jury

12      stretch their legs.

13          (Whereupon, the sworn jurors were

14      excused from the courtroom.)

15          MR. MEADOW:  Judge, I'm wondering

16  when it's going to relate to anything in

17  this case?

18          THE COURT:  What I don't understand

19  is when it's going to become anything

20  other than artificial construct about

21  which I still don't understand the

22  mathematical basis.

23          And I have an obligation to protect

24  the jury from junk science, so --

25          MR. MEADOW:  I don't see how it can

Joan Donnelly, RPR, CRR, Official Court Reporter

1536

C. Blake - by Defts. - Direct

1   become relevant to this case because he

2   said he vaguely recalls what Mr. Lopez

3   did.

4       So, how can it possibly relate back

5   to whatever this theoretical

6   pontification we've been listening to for

7   a half-hour?

8       THE COURT:  I can understand more or

9   less.  I can't understand talking -- and

10  when it does, it relates to --

11      MR. CLARKE:  We're talking about the

12  concept of dose and what Mr. Lopez or --

13  hypothetically what his dose may have

14  been during the course of his career as

15  an automobile mechanic.

16      MR. GORDON:  I don't think you can

17  ever get to that.

18      THE COURT:  We've had doctors here

19  and all sorts of experts here, and none

20  have talked about fiber years.

21      So, you have to tell me what this

22  means; what this is mathematically.

23      MR. CLARKE:  It has to do with his

24  exposure, your Honor.

25      MR. GORDON:  There was no report

Joan Donnelly, RPR, CRR, Official Court Reporter

1537

C. Blake - by Defts. - Direct

about Mr. Lopez.  What we were told in

that room very clearly was he was going

to restrict it to reviewing the

literature.

THE COURT:  "That room," also known

as my robing room.

MR. GORDON:  For the record, the

robing room.  I was indicating towards

the robing room -- and that he was going

to review the literature.

If he wants to explain the concepts

of Plato, he wants to explain the

concepts of Rohl, fine.

Now he's trying to take a step that

we did not do with Dr. Longo that we did

not do for the very reasons they objected

to.

He can talk about what the

literature has indicated.  He's trying to

jump from that without giving a report

and without giving an adequate basis to

try to say this guy, Mr. Lopez, could not

have had exposure to asbestos at levels

that were dangerous.

He's not a doctor.  He can simply

Joan Donnelly, RPR, CRR, Official Court Reporter

1538

1    C. Blake - by Defts. - Direct

2    talk about what the literature says.

3    That's what we were told he was going to

4    talk about.

5         MR. CLARKE:  That's not correct,

6    your Honor.

7         He's an industrial scientist, and he

8    measures exposures.  So, we're simply

9    trying to talk about what his exposures

10   may have been or dose; not in a medical

11   sense but his cumulative exposure as an

12   auto mechanic may have been based on the

13   brake repair work he did.

14        THE COURT:  Okay, but I have an

15   obligation to insure that that may at

16   least have some basis.

17        And so far, we're talking about --

18   now, let me go back to the example of

19   pack years.  Pack years is very simple.

20   Over the course of 24 hours, you smoke 20

21   cigarettes for 40 years.  We call that 40

22   pack years.

23        MR. CLARKE:  It's a similar concept,

24   your Honor.

25        THE COURT:  I know it's a similar

26   concept, but what does it relate to?

Joan Donnelly, RPR, CRR, Official Court Reporter

1539

C. Blake - by Defts. - Direct

1  We've got brake dust.  Okay.  You heard

2  the additions to the hypothetical.  We

3  have all of these people working in all

4  of these places doing all of these

5  things.

6      We don't know what the measurement

7  was.  We just have an absolute

8  description of it.

9      How we then jump to assuming that we

10  have a quantification of it without

11  saying it's similar -- we haven't talked

12  about the stuff on his clothing that he's

13  taken home and breathed.  We haven't

14  talked about anything that might relate

15  to it.

16      And then to go magically to one

17  fiber year -- Jeez, that's great stuff.

18  Only where is the Wizard of Oz behind the

19  curtain?

20      You have to explain to me what the

21  mathematical basis of it is, and I have

22  not found it inferentially obvious.

23      I will allow you to talk to your

24  expert.  And if you can't come up with an

25  explanation, I do believe it's my

Joan Donnelly, RPR, CRR, Official Court Reporter

1540

C. Blake - by Defts. - Direct

obligation to strike the testimony.

MR. GORDON:  Judge, that's my request.

MR. CLARKE:  Let me have five minutes and then we'll make sure the witness is clear.

THE COURT:  Okay.  I don't mind more or less.  I do mind quantifying it in a way that can't be followed.

MR. CLARKE:  Understood.

MR. GORDON:  I'm sorry for being slow getting up here with counsel.  We don't want to look obstreperous in front of the jury, but I don't think it's appropriate.

MR. MEADOW:  Judge, I don't like to normally interrupt anybody's direct.

(Whereupon, there was a short recess taken at this time.)


(CONTINUED ON FOLLOWING PAGE)

1541

Blake - Defendant - Direct/Clarke

1  (Whereupon, after the recess the trial

3  resumes.)

4        MR. GORDON:  We have a motion to strike the

5  testimony as not being reliable upon which the jury

6  could draw any reasonable inferences.  Everything

7  relating to Mr. Lopez in his estimation of .3 to .7

8  fibers, a number, by the way, which didn't change at all

9  with the addition of any of the additional hypothetical

10 issues such as 13 co-workers doing the brake jobs every

11 day, and this is also in addition to being without any

12 basis that I can understand scientifically, something

13 that is very much outside the scope of the -- of what

14 was told to us in the robing room as well as what was

15 written in the expert disclosures.  Nothing was to deal

16 specifically with Mr. Lopez.

17       I believe they are trying to get in things

18 through the back door from the study which was

19 withdrawn.  This witness was supposed to, in my

20 understanding, talk about what the literature has shown

21 about brake dust exposure from asbestos and levels.

22 Going over Rohl and Plato and et cetera, trying to use

23 the witness in an improper way without a scientific

24 basis.

25       MR. CLARKE:  Judge, we will attempt to

26 establish the issue of -- we will review the industrial

1542

Blake - Defendant - Direct/Clarke

hygiene literature for this witness to establish

objective exposures or potential exposures and the issue

of time-weighted average that he has been trying to

testify about, as well as the issue of dose, in terms of

cumulative exposure.

THE COURT:  But let me go back to several

points.  First I have a role and obligation to the jury

to assure that the testimony that they receive first,

and even before Frye is meaningful and is not just

confusing.

And then second, I have an obligation post

Frye to assure that it has some scientific rationale.

There is also a general obligation to assure that the

jury is not presented with testimony that is just

possibility in relation to the specific facts.

MR. CLARKE:  I understand that, your Honor.

THE COURT:  I don't understand under all of

those general standards how the information, at least as

I saw the line developing, doesn't run afoul of all

three of them.

MR. CLARKE:  Your Honor, it went ahead too

quickly without establishing the basis of this witness's

knowledge of essentially industrial hygiene with respect

to automobile auto mechanic exposure with brakes.  The

support in the literature, which we should go through,

1543

Blake - Defendant - Direct/Clarke

1   obviously I skipped that which formed the basis of his

2   opinion in terms of brake mechanic exposure.

3        THE COURT:  Well, maybe we ought to back up

4   then and I will allow a voir dire on his qualifications

5   as to brake mechanics.  Would that help any?

6        At the moment I am not feeling at all secure

7   in allowing this line of testimony to proceed.

8        MR. CLARKE:  Judge, this is industrial hygiene

9   testimony.  He will review the industrial hygiene

10  literature and discuss the exposure levels.

11       MR. GORDON:  Your Honor, that's exactly what

12  we were told he was going to do and that's not what we

13  heard here today.  We heard about Mr. Lopez and

14  hypotheticals and we have not -- and we heard the name

15  Plato, but it is well beyond the scope.  We would like

16  to voir dire.

17       In addition, we would like at this point when

18  the jury returns for there to be an instruction, at the

19  very least, that everything with regard to and the -- to

20  anything about Mr. Lopez should be struck.  I would like

21  to move and have Mr. Meadow begin some cross examination

22  so you can see how slim this basis is for this witness.

23       THE COURT:  Okay.  Yesterday when we discussed

24  this, and remember all of this comes out of a background

25  that there was going to be a study, and I don't know how

1544

Blake - Defendant - Direct/Clarke

much of it is on the record, that there would be a study

introduced and we would have videotapes introduced and

none of which were ever served on the plaintiff until --

MR. GORDON:  Never and still has not been.

THE COURT:  Even though I instructed it to be

served, even though they would not be offered.

MR. GORDON:  But the defendants withdrew the

report and, therefore, said they would not supply the

videotapes.  It doesn't mean this witness -- well, this

witness is forming his basis for relying on it.  When he

was specifically asked what are you relying upon as an

industrial hygienist, the first thing he said was my air

sampling and published literature and medical literature

and epidemiological studies.

MR. CLARKE:  He is not talking about his own

samples.  He is talking about that in terms of relying

on it but he is not testifying about it in this case.

He is testifying about industrial hygiene and the basis

for his industrial hygiene positions in terms of

exposure to brake mechanics.

MR. GORDON:  This man has no basis to

testify.  Mr. Lopez has .3 to .7 fiber years exposure

because he didn't change the estimate one iota with the

addition of 13 co-workers, with the addition of taking

it home on his work clothes and with the addition of the

1545

Blake - Defendant - Direct/Clarke

1  ventilation having no ventilation. We know from the

2  studies all of those things matter. I think you will

3  see from Mr. Meadows voir dire that there is just no

4  basis for that.

5      Nothing should relate to this particular

6  plaintiff from this particular witness.

7      THE COURT: Well, there are numerous points in

8  the study that was presented that he was going to

9  testify about. Well, including the exhaust filters

10  started jamming up after twenty minutes of doing only

11  one. Apparent brake grinding or blowing of both.

12      MR. CLARKE: Not talking about the studies.

13  Simply talking about the general issue of industrial

14  hygiene.

15      MR. GORDON: More general issues of industrial

16  hygiene --

17      THE COURT: Wait, plus what is the fiber years

18  correspond to. I have not heard about any scientific

19  things that talks about mesothelioma and fiber years.

20  Talks about fiber size and talks about threshold.

21      MR. CLARKE: Judge, he is not a medical doctor

22  to talk about mesothelioma. He is not qualified to

23  discuss those causations. He is qualified to talk about

24  exposure issues from the conduct or activities of the

25  auto mechanics who specifically do brake work and what

1546

Blake - Defendant - Direct/Clarke

1   type of exposures they may experience and how that

2   exposure translates to the doses received over the

3   course of a career as an auto mechanic.

4       MR. GORDON:  He is saying all garage mechanics

5   no matter how long they work and no matter how many

6   brake jobs they do and how many co-workers have point --

7       MR. CLARKE:  That's not what he is saying.

8       MR. GORDON:  We have no basis for it.

9       THE COURT:  I don't see how this adds

10  anything.  What does it say about the issue of our case

11  and what if any other evidence does it relate to.  You

12  just told me at least this is what I make out of your

13  comments, that we will not relate fiber years to

14  mesothelioma and no other witness has related fiber

15  years to mesothelioma.

16      MR. CLARKE:  No.

17      THE COURT:  So even if we knew what it was --

18      MR. CLARKE:  I didn't say that.

19      THE COURT:  Which I still don't understand.

20  Nor how are we deriving it as a hard figure based on

21  facts that no one else has found quite so clear cut.  I

22  mean after all, this witness is saying that he knows

23  enough about Mr. Lopez's condition that he can take the

24  equivalent of one of these air intake valves with the

25  filter and tell us how many filters would have come down

1547

Blake - Defendant - Direct/Clarke

on that filter and for how many years that would have

been true.  That is the only thing I can make out of his

testimony.  And that I find beyond audacious.

So unless you have something sensible to say

to me I am going to strike the testimony and we will

proceed.

MR. BISHOP:  Your Honor, if I might respond

briefly.  You asked about the relationship between fiber

years and medical issues of the case.  You might recall

Dr. Churg testified with respect to chrysotile, it was

his opinion that the threshold for adducing disease of

any kind from chrysotile exposure was in the range based

cross examination as well in the range of 50 to a

hundred fiber years.  In fiber years is a recognized

scientific concept.  It is in many of the industrial

hygiene articles as well as the medical literature that

fiber years represents the cumulative asbestos exposure

of an individual to asbestos.  It is calculated on the

basis of your average exposure to asbestos times the

number of years that you are exposed.

MR. GORDON:  That is fiber years.  And fiber

ccs years are different things, first of all.  Second of

all, Dr. Churg, that is their witness.  They are trying

to bolster by saying we had another witness testify

about that which first of all would make his testimony

1548

Blake - Defendant - Direct/Clarke

1  cumulative.

2          The plaintiff's position is no safe level

3  exposure, which is also the U.S. Federal Government's

4  opinion, however, your Honor's point is exactly right.

5  You take what he is trying to do is say I have measured

6  this air filter on Mr. Lopez and this is what we find.

7  It is not even close to it and no basis for it

8  whatsoever.  And the fact that Churg says there is an

9  idea of fiber years now that makes all of this

10  admissible, that's the best they can say.  I don't think

11  it makes it even close.  His testimony should be struck,

12  your Honor.

13          MR. BISHOP:  Your Honor, I would respond --

14          THE COURT:  I know, but I am not saying

15  ideologically that the concept has no relevance but to

16  say we can quantify it is mind boggling.  And the only

17  basis on which we can have a quantification is the study

18  which has been withdrawn, and which I pointed out to

19  you, I believe it was off the record, unfortunately had

20  massive problems in terms of the collection of the data

21  and a lack of accountability.  That's why it was

22  withdrawn.  And as well as it not having been mentioned

23  in any of the reports or any of the videotapes or a copy

24  of the study have not been given to plaintiff before

25  their expert was on the stand, or even up until the time

1549

Blake - Defendant - Direct/Clarke

1         

2 that we have discussed the matter.

3          Okay, we can bring in the jury.

4          MR. MEADOW: Judge --

5          MR. CLARKE: Judge, before we bring in the

6 jury, can I know what your ruling will be?

7          THE COURT: I told you I will strike the

8 testimony about the number of fiber years relating to

9 Mr. Lopez. You have not finished with the witness. I

10 am not telling you to sit down.

11          MR. MEADOW: Then I have a motion to strike

12 the witness in its entirety. The testimony now becomes

13 cumulative to Dr. Crapo.

14          THE COURT: All right, bring the jury in.

15          (Whereupon, jury enters the courtroom.).

16          THE COURT: Thank you. You can sit down. Let

17 me read the juror's note.

18          "Juror number one: Judge Lebedeff, thank you

19 for having the witness clarify fibers per cc. I am

20 still confused and would appreciate further detail. It

21 would also be very helpful for you to continue to

22 paraphrase the responses, since you seem to be able to

23 get to the heart of the matter.

24          "Thank you."

25          I will have this marked as a court exhibit. I

26 am going to strike the testimony about the fiber ccs to

1550

Blake - Defendant - Direct/Clarke

1  which Mr. Lopez was exposed.  To me this seems to be

2  beyond ESP.  In order to say the number of fiber years

3  and just to try and say it very clearly fiber years it

4  is my understanding that that would be virtually having

5  a fiber collection cup right next to his breathing area

6  for all of those years and being able to count it.

7  We have so many variables I have not even

8  established so far that somebody could have done that on

9  a one shot basis much less to try and statistically

10 project that into a number of years.  So I am just

11 striking the testimony.  I don't think it is of any

12 assistance to you.

13 (Whereupon, the note from the juror is marked

14 as Court's Exhibit III.)

15 THE COURT:  Now if you can just put the

16 overhead up because I had difficulty with the overhead

17 that was indeterminative of time but related to fiber

18 ccs.  If you can just put that down.

19 MR. CLARKE:  Sure.

20 THE COURT:  Now, my ruling means I am not

21 saying that these factors might give you more or less

22 exposure, just to whatever extent it would lead to an

23 absolute number in this case cannot be established.

24 Okay, you may proceed.

25 DIRECT EXAMINATION (Continued)

BURTON FERSTANDIG -  OFFICIAL COURT REPORTER

```
1
2   SUPREME COURT OF THE STATE OF NEW YORK
    NEW YORK COUNTY : CIVIL TERM : PART 2
3   -----------------------------------------------
    RODOLFO COLELLA and MARIA COLELLA,
4
                              Plaintiffs,
5                                               Index #
        - against -                            103894/05
6
    A.C.&S., et al.,
7
                              Defendants.
8   -----------------------------------------------
    ALFRED D'ULISSE and MARGARET D'ULISSE,
9
                              Plaintiffs,
10                                              Index #
        - against -                            113838/04
11
    A.C.&S., et als.,
12
                              Defendants.
13  -----------------------------------------------
    TRANSCRIPT OF CONFERENCE/MOTION PROCEEDINGS
14
                    Place:  New York Supreme Court
15                          71 Thomas Street
                            New York, New York
16
                    Date:   August 31, 2006
17
    B E F O R E:
18
            HONORABLE LOUIS B. YORK, Justice
19

20          (Appearances on Appearance Page)

21

22
23
            DANIEL J. CARONE, C.S.R., C.M.
24
                Senior Court Reporter
25              60 Centre Street - Room 420
                New York, New York  10007
26              Phone: (646) 386-3692
```

2

1

2   A P P E A R A N C E S:

3       FOR THE PLAINTIFF:

4           WEITZ & LUXENBERG, P.C.
            180 Maiden Lane
5           New York, New York 10038
                BY:  JERRY KRISTAL, ESQ., (and)
6                    ADAM R. COOPER, ESQ.

7       FOR THE DEFENANTS FORD MOTOR COMAPNY
        AND GENERAL MOTORS CORPORATION:
8
            AARONSON, RAPPAPORT, FEINSTEIN & DEUTSCH, LLP
9           757 Third Avenue
            New York, New York 10017
10              BY:  JAY A. RAPPAPORT, ESQ., (and)
                     ROBERT S. DEUTSCH, ESQ.,
11
        FOR THE DEFENDANTS CHRYSLER CORPORATION:
12
            LYNCH DASKAL EMERY, LLP
13          264 West 40th Street
            New York, New York 10018
14              BY:  JAMES R. LYNCH, ESQ., (and)
                     SCOTT R. EMERY, ESQ.
15
        FOR THE DEFNENDANT PNEUMO ABEX, LLC:
16
            SMITH ABBOT, LLP
17          Three New York Plaza
            New York, New York 10004
18              BY:  CHRISTOPHER P. HANNAN, ESQ.

19          KELLY JASONS McGOWAN SPINELLI & HANNA, LLP
            Centre Square West
20          1500 Market Street - Suite 1500
            Philadelphia, Pennsylvania 19102
21              BY:  TIMOTHY McGOWAN, ESQ. (pro hac vice)

22  A L S O    P R E S E N T:

23          WILLIAM HILL, ESQ.

24

25

26

71

1        — Conference/Motion Proceedings —

2    insulation that D'Ulisse used may have contained amosite

3    is admissible since at least the admissible evidence shows

4    that plaintiff worked with block insulation, but only if

5    Dr. Lee can convincingly establish that he relies on

6    information or authorities routinely relied on by experts

7    in the field of materials characterization which analyze

8    the constituent components of the materials and is based

9    on evidence in the record.  This will be determined by an

10   examination of Dr. Lee out of the presence of the jury

11   before he testifies.

12        All right.  What's next?

13        MR. KRISTAL:  Your Honor, we have our dose

14   reconstruction argument and this goes to a Dr. Redinger

15   and a Dr. Toca and also to the extent that Dr. Corn's late

16   supplied report relates to it and it's been argued in

17   other cases.

18        What the defendants tried to do is take sample

19   measurements from totally different scenarios, take

20   average exposures from other scenarios and extrapolate

21   backwards to what the types of exposures were that

22   Mr. D'Ulisse and Mr. Colella had.

23        For example, both of the experts and Dr. Corn,

24   Redinger, Toca and Corn rely on an article that was

25   written by a Dr. Paustenbach, P A U S T E N B A C H.

26   Dr. Paustenbach is another, he's a former Exponent

72

- Conference/Motion Proceedings -

1    consultant who was paid all this money by Ford, GM and

2    Chrysler to do this research, and he comes up with an

3    average exposure to brakes and clutches, a .04 fibers per

4    cubic centimeter.

5          The way he gets to that number is, he takes

6    hundreds of samples, most of them when there were dust

7    control measures in place, and he averages them out and he

8    says that those are the typical exposures that brake

9    mechanics and people working with friction products would

10   have.

11          Of course Mr. D'Ulisse and Mr. Colella didn't

12   have any dust control measures in place.  Mr. D'Ulisse at

13   one point mentioned some sort of exhaust on a grinding

14   machine, but when there were samples where the sample --

15   the air is being sampled and the dust is being controlled

16   by wetting the brakes with special solvents and special

17   vacuums are being used and special measures are being used

18   to reduce the dust by these very high efficiency exhaust

19   vacuums.  Those measurements, of course, are going to be

20   low measurements because they had controls in place.

21          When you then try to say, "Ah hah!

22   Mr. Colella's exposure must have been similar to those,"

23   it's ridiculous because Mr. Colella didn't have any of

24   those measures in place.  Mr. Colella was blowing out

25   brakes with compressed air.  He was grinding on brakes.

73

- Conference/Motion Proceedings -

1   There was no wetting down of the dust.

2       So to take falsely low samples and extrapolate

3   backwards to a precision of hundreds of fibers per cubic

4   centimeter is something that's beyond science, and I think

5   there was a quote from Judge Lebedeff where she said it

6   was, you know, junk science and something that shouldn't

7   be considered.  I think her quote is it's beyond ESP, and

8   it is, because there was nobody there at the time

9   measuring what their particular exposures were.

10      THE COURT:  Opposition?

11      MR. DEUTSCH:  Briefly, just on one point, Your

12  Honor, again directed towards the adequacy of the papers

13  in support of the motion.

14      I'll let other counsel argue the substantive

15  portion of the motion, but we have a group of scientists,

16  all with, I believe, doctorates in their requisite field

17  who have offered an opinion about the scientific validity

18  of what they have done.

19      Plaintiff, through an attorney's affirmation,

20  can't challenge the legitimacy of the science.  Plaintiff

21  doesn't have -- the plaintiffs' attorneys don't have the

22  expertise to put into question the legitimacy of the

23  science.  If they want to put in question the legitimacy

24  of the science, what was required as a matter of law was

25  some sort of affidavit from a scientist suggesting that

74

1          - Conference/Motion Proceedings -

2    the scientific approach undertaken by the defense

3    witnesses is somehow lacking.

4          To allow a plaintiff's attorney to challenge a

5    scientist doesn't rise to the legal adequacy, and I would

6    leave the substantive motions about what they did and why

7    what we did was different than what Judge Lebedeff was

8    addressing for other counsel.

9          MR. HANNAN:  Your Honor, Christopher Hannan on

10   behalf of Pneumo Abex.

11          Your Honor, the plaintiffs mischaracterize the

12   methodology that's been adopted by Dr. Redinger and

13   Dr. Toca in this case.  Plaintiffs would have you believe

14   this is a dose reconstruction analysis that these experts

15   are engaging in.  I submit to you that is not the case at

16   all.

17          The methodology that's been used by Redinger and

18   Toca in this case is what is known as exposure assessment.

19   It is a recognized body of literature within industrial

20   hygiene.  Plaintiffs have not made a prima facie showing

21   that exposure assessment is in any way novel and if they

22   had, Your Honor, I think we have shown through our papers

23   and through the testimony provided by Dr. Redinger in his

24   recent deposition that exposure assessment is generally

25   accepted in the field of industrial hygiene.

26          Contrary to plaintiffs' assertions, we will not

75

1                   - Conference/Motion Proceedings -

2    have our experts testify about specific number of fiber.

3    That's an argument that is raised in the dose

4    reconstruction analysis that was the subject of Judge

5    Lebedeff's ruling.  In fact, in the case of Judge

6    Lebedeff's ruling, she did not exclude the testimony of

7    the industrial hygienist in that case.  Rather, she

8    considered the testimony entirely.

9        What she did was, she, and I'll quote, "My

10   ruling means I am not saying that these factors might give

11   you more or less exposure, just to whatever extent it

12   would lead to an absolute number in this case cannot be

13   established."

14       What that means is, Judge, the industrial

15   hygienist may not give you a specific calculation as to

16   the precise fibers per cc that Mr. Colella or Mr. D'Ulisse

17   may have experienced at any point during their working

18   careers, but it does not mean they cannot offer an opinion

19   about whether those exposures were in excess of

20   permissible exposure limits by O.S.H.A. or N.I.O.S.H.

21       In fact, the other basis for the plaintiffs'

22   motion is some minutes from the American Industrial

23   Hygiene Association conference in 2002.  And plaintiffs

24   point to that in support of their motion suggesting that

25   the study of exposure assessment has been roundly

26   criticized, that it's not generally accepted.  It's quite

76

- Conference/Motion Proceedings -

1
2    contrary, Your Honor.

3        If you look at conference minutes, it's clear

4    that there's this distinction between dose reconstruction,

5    something that we are not engaging in here, and the

6    science of exposure assessment.  While we concede the fact

7    that dose reconstruction was criticized at the conference

8    by certain of the speakers, those same speaker, including

9    Dr. Corn and others, stated affirmatively that exposure

10   assessment is "A superb scientific method that is

11   generally accepted within industrial hygiene studies."

12       Again, they missed the boat.  They are arguing

13   that our experts are going to attempt to ascribe certain

14   fibers per cc to these plaintiffs' exposures looking back

15   retroactively.  They are not attempting to do that.  What

16   they are attempting to do is draw an analogy of studies,

17   actual hands on studies, that are conducted in garage

18   settings similar to the exposures experienced by these

19   plaintiffs and inform you of their opinions about whether

20   or not these plaintiffs, based upon what we know about

21   them, based upon their own testimony, would have

22   experienced exposures in excess of permissible limits.

23   Not specifically this exposure was .03 cc's based upon

24   what I know of the plaintiffs' testimony, but rather than

25   generally speaking, exposure assessment science tells us

26   what we know about brake mechanics and work they do based

77

1    — Conference/Motion Proceedings —

2    upon actual studies where people have gone in garages and

3    taken their samples we know that the exposure that

4    Mr. Colella and Mr. D'Ulisse experienced was not in excess

5    of the PELs that have been established by the EPA.

6        Furthermore, I submit to you that the arguments

7    that Mr. Kristal has put forth before, that is the Hasback

8    study was funded by the Big Three, goes merely to its

9    weight, not its admissibility.  These are all arguments

10    that are a proper for subject of cross-examination.  They

11    have nothing at all to do with the final issue and

12    therefore these witnesses should not be precluded from

13    offering opinions as set forth in their reports.

14        MR. KRISTAL:  May I briefly?

15        Two things:  First of all, whether an exposure

16    was or wasn't above a permissible O.S.H.A. limit is

17    completely irrelevant.  It has nothing to do with failure

18    to warn or not, unless the defendants are saying anything

19    below it, a permissible O.S.H.A. limit, doesn't increase

20    the risk of cancer.  That's totally not true and I don't

21    think any of their experts are saying that.

22        Secondly, to say that we are not putting numbers

23    on this, we are just going to characterize it as above or

24    below the O.S.H.A. standard is, by definition, putting

25    numbers on it.  The current O.S.H.A. standard is .15 cc.

26    So if somebody comes in and says Mr. Colella's exposure

78

- Conference/Motion Proceedings -

1

2    was below the current O.S.H.A. standard, by definition

3    they are saying it's below .15 fibers per cc.

4            The final thing is, there were a lot of

5    N.I.O.S.H., National Institute of Occupational Safety and

6    Health studies that were done closer in time to

7    Mr. Colella and Mr. D'Ulisse's exposure where there were

8    no controls in place that showed very high exposures to

9    exposure to asbestos.  So in picking and choosing samples

10   that are not representative of the actual exposures and

11   saying this person's exposure is based on those samples,

12   it's just inappropriate.

13           Dr. Corn himself at this meeting that Mr. Hannan

14   just references said, "When a dose reconstruction is

15   performed, we are in an arena to persuade.  This isn't

16   science."

17           So we don't need to come in with an affidavit of

18   one of our experts when their own expert has testified at

19   this hearing that that's what dose reconstructions are all

20   about.

21           MR. DEUTSCH:  Your Honor, just on the last

22   comment, Mr. Kristal quoting Dr. Corn.  Attached to my

23   opposition papers is an affidavit from Dr. Corn stating

24   affirmatively that Mr. Kristal's representation is not an

25   accurate one of what his statement was.

26           MR. KRISTAL:  I'm just quoting the transcript.

79

- Conference/Motion Proceedings -

1
2        THE COURT:  I read Dr. Corn's statement.  I did

3    from -- yeah, from the transcript.  He did say this is not

4    science.

5        MR. DEUTSCH:  That wasn't the transcript.

6        MR. HANNAN:  Judge, he's talking about dose

7    reconstruction.  Again if I didn't make my point earlier,

8    I apologize.  There's a difference between dose

9    reconstruction, which is what Dr. Corn is referring to,

10   and his statement that Mr. Kristal just read and exposure

11   assessment.  It's clear from the transcript at the

12   conference that these are two different areas within

13   industrial hygiene.

14       Now, if I could just have one moment, please.

15       MR. DEUTSCH:  While he's looking, Your Honor, I

16   would note that Dr. Corn, while Mr. Kristal quotes

17   something that was made in a conference, Dr. Corn has

18   executed an affidavit under oath where he affirmatively

19   states that what was done in this case is, in fact, good

20   science and commonly done.

21       So on the one hand we have a comment not under

22   oath at a conference referencing a different matter of

23   science than is before us.  In his opposition we have a

24   sworn affidavit addressing the issue that is before us

25   where Dr. Corn, Mr. Kristal himself holds up as one of the

26   world's authorities on this subject.

80

- Conference/Motion Proceedings -

1

2     MR. KRISTAL:  Why would you say that?

3     MR. DEUTSCH:  That's how you phrased him in your

4  affirmation in support of your motion.  If I misspoke, I

5  take it back, but that is my recall.

6     Nonetheless, Mr. Corn has stated under oath that

7  the science undertaken in this case is, in fact, valid

8  science.  So I think if one is going to weigh an unsworn

9  at conference statement about something in relation to

10  their sworn statement about what we are talking about, I

11  think the defense's position necessarily has to win out.

12     MR. HANNAN:  Two other minor points, whether

13  there were controls in place, ventilation, et cetera,

14  methods in the Hasback study is the subject of

15  cross-examination.  If there are N.I.O.S.H. studies that

16  were closer in time to the plaintiffs' exposure in this

17  case, that indicates greater levels of exposure that

18  Mr. Kristal would be permitted to ask about isn't on

19  cross-examination.  It's absolutely relevant, but it's not

20  a basis for preclusion.

21     I'd also like to point Your Honor, to a section

22  of the minutes from the 2002 conference.  This was by

23  moderator Frederick Bobolter, B O B O L T E R, certified

24  industrial hygienist and licensed professional engineer.

25  He explained that exposure assessment is simply, "An

26  examination of past activity's potential for injury, for

81

1    - Conference/Motion Proceedings -

2    disease attribution." And he observed that, "Techniques

3    are generally accepted by the scientific community."

4        Again, there's a clear distinction between dose

5    reconstruction, something we are not engaging in here, and

6    exposure assessment.

7        THE COURT:  Are we finished?

8        MR. KRISTAL:  Just so I'm clear, are the

9    defendants --

10       THE COURT:  This is the last comment.

11       MR. DEUTSCH:  Guess not.

12       THE COURT:  It's his motion.  I'm letting him

13   have the last comment.  That will be it.

14       MR. KRISTAL:  Is Dr. Corn not offering a dose

15   reconstruction in terms of specific fiber levels?

16       MR. DEUTSCH:  I think he's doing exactly what

17   the co-defendants are suggesting is being done.

18       MR. KRISTAL:  Okay.  That's not what his report

19   says.  I'm glad to have clarified that.

20       THE COURT:  Okay.  My decision is that the

21   motion is granted.

22       The so-called facts relied upon by defendants in

23   making their assessment are based on facts not in evidence

24   or within the personal knowledge of defendants' experts

25   starting with the level of dosage at each individual site

26   and its duration at the venues where plaintiffs were

82

1          - Conference/Motion Proceedings -

2   actually employed.

3          What's next?

4          MR. KRISTAL:  I think that's all of our motions,

5   Your Honor.  I think that's correct, and I don't -- I

6   think that's it.

7          MR. DEUTSCH:  There were a couple of things for

8   the defendants respectively.  Some of them we have

9   covered, some of them we haven't.

10         There are outstanding depositions remaining even

11  at this late date of family members of the plaintiff that

12  have been agreed to and for logistical issues haven't yet

13  taken place.  I just would like some commitment from the

14  plaintiffs to when that is going to take place, when those

15  people are going to be produced for deposition.

16         That's the first issue, Your Honor.

17         THE COURT:  Well, I'll ask you to respond,

18  please.

19         MR. KRISTAL:  Clearly before they testify and

20  you raised this with me a couple of days ago in Detroit.

21  Michael Roberts is handling this.  The widows -- not the

22  widows, the soon to be widows, but the wives who will be

23  testifying will be produced for deposition.  The Special

24  Master said it should be before they testify obviously.

25  It's just a couple of days before they testify.  So

26  Michael will set that up.  If it's not next week, it will

## In The Matter Of:

*AMERICAN INDUSTRIAL HYGEINE CONFERENCE*
*& EXPO 2002, et al.*

---

*TRANSCRIPT FROM AUDIOTAPES*
*June 27, 2002*

---

*BROWN REPORTING, INC.*
*ATLANTA, AUGUSTA, MACON, ROME & SAVANNAH*
*1740 PEACHTREE STREET, N.W.*
*ATLANTA, GA  USA  30309*
*(404) 876-8979  or  (800) 637-0293*

---

*Original File 0627TAPE.ASC, 92 Pages*
*Min-U-Script® File ID: 3177316588*

**Word Index included with this Min-U-Script®**

AMERICAN INDUSTRIAL HYGIENE CONFERENCE
& EXPO 2002, et al.

TRANSCRIPT FROM AUDIOTAPES
June 27, 2002

Page 1

[1] AMERICAN INDUSTRIAL HYGIENE CONFERENCE & EXPO 2002

[2]

[3]

[4]    Asbestos Exposure Dose Reconstructions

[5]

[6]

[7]        Forum 244

[8]

[9]

[10]      Code Number AIHce-02-Forum 244

[11]

[12]

[13] SPEAKERS:

[14]

[15] Fred Boelter

[16] Doug Fowler

[17] John Spencer

[18] Jim Rasmuson

[19] Bill Dyson

[20]

[21]

[22]     Transcript from audiotapes

[23]

          BROWN REPORTING, INC.
[24]    1740 Peachtree Street, N.W.
          Atlanta, Georgia  30309
[25]        (404) 876-8979

Page 2

[1]    SPEAKER: The AIHA and ACGIH presents
[2] Asbestos Exposure Dose Reconstructions, recorded live
[3] at the American Industrial Hygiene Conference and
[4] Expo 2002.
[5]    SPEAKER: This is the Asbestos Exposure
[6] Dose Reconstruction Forum 244. We have five people
[7] here today. One person, unfortunately, was not able
[8] to make it.
[9]    I would like to introduce everyone at the
[10] beginning. This session, by the way, is sponsored by
[11] the Risk Assessment Committee of AIHA, and in the
[12] back of the room there is a handout that is available
[13] for the risk symposium that is going to be sponsored
[14] by the Risk Assessment Committee as part of the PCIH
[15] this September in Cincinnati, so please pick up a
[16] brochure.
[17]    I think there is an AV person outside.
[18] Are there any questions?
[19]    (Technical difficulties.)
[20] I hope you enjoyed your computer class
[21] this morning.
[22]    FRED BOELTER: The speakers today are —
[23] Larry Birkner was unfortunately unable to join us.
[24] Larry is a Certified Industrial Hygienist and
[25] Certified Safety Professional.

Page 3

[1]    I am a — I am Fred Boelter, and I am a
[2] Certified Industrial Hygienist and a Licensed
[3] Professional Engineer. I have been in the
[4] occupational arena since 1973 and have been in the
[5] consulting field of my own since 1985.
[6]    Bill Dyson is a Ph.D. and Certified
[7] Industrial Hygienist with Workplace Group. He has an
[8] undergraduate in chemical engineering and a masters
[9] and doctoral degrees in environmental health
[10] engineering. He is also the Past President of the
[11] American Academy of Industrial Hygiene and has been
[12] an officer with the AIHA.
[13]    Doug Fowler is a Ph.D. and Certified
[14] Industrial Hygienist with Fowler Associates. He's a
[15] lecturer for several courses in industrial hygiene at
[16] Berkeley. He is also a former program manager with
[17] the Stamford Research Institute. He has been a peer
[18] reviewer of a number of articles in the Journal of
[19] the American Industrial Hygiene Association.
[20]    Jim Rasmuson is a Ph.D. Certified
[21] Industrial Hygienist and Diplomat of the American
[22] Board of Toxicology. He has a Ph.D. in analytical
[23] chemistry and is certified in both the chemical
[24] aspects as well as comprehensive practice of
[25] industrial hygiene.

Page 4

[1]    He has authored a number of papers,
[2] including an award winning study on Pathways of Lead
[3] Uptake in Kazakhstan Infants and Children.
[4]    John Spencer is a Certified Industrial
[5] Hygienist, Certified Safety Professional, Registered
[6] Sanitarian. He is President of Environmental
[7] Profiles in Baltimore and has been a team leader for
[8] NIOSH as well as a hygienist for the Coast Guard.
[9]    I want to give a quick overview of dose
[10] reconstruction. Dose reconstruction is a science
[11] based on an exposure assessment. It's fundamental
[12] application is in source pathway receiptor analysis,
[13] patent transport as some might know it. Its
[14] applications are in risk assessment, accidental
[15] releases or disturbances, epidemiologic studies and
[16] disease attribution.
[17]    Dose reconstruction is an examination of
[18] past activity potential for injury or disease
[19] attribution. It is also an examination of the risk
[20] presented by a recent unanticipated exposure.
[21]    Techniques are generally accepted by the
[22] scientific community and it is reproducible within an
[23] acceptable degree of scientific certainty. The
[24] process is one which is intended to correlate the
[25] dose with epidemiologic information and standards.



**Page 5**

An exposure assessment is the estimation and measuring of exposures and it is a fundamental part of industrial hygiene and it has been around for more than 60 years. It has been defined and laid out in a number of studies over the past 20 years.

The National Academy of Sciences' four-step paradigm, which includes hazard, slope factors, exposure assessment, and risk assessment, was published in 1983 and is known as the Red Book.

U.S. EPA Risk Assessment Guidelines for Superfund was published in 1985 and contains essentially the same process.

The U.S. EPA exposure factors also in 1989 contain information that is useful in a dose reconstruction, as does the Agency for Toxic Substances Disease Registry, the ATSDR, '92, the U.S. EPA Guidelines for Exposure Assessment in '92, as well as the ASTM Rebecca Guidelines of 1985.

In reconstructing a dose, we need an exposure assessment. Exposure assessment is based on estimates of concentration, work activity duration, employment duration, as well as information that is based on memory, hard data, experience, extrapolations, interpolations, interpretations, reconciliation, judgment, logic. A reconstructed

**Page 6**

dose is an estimated range.

Ultimately when we do a dose reconstruction, looking at the result, it has to make sense. Clearly if the dose that is calculated is too high or too low, from what we know as industrial hygienists to be a reasonable range, we have to go back and take a look at the assumptions or the estimates that were used in reconstructing that dose.

A simplified dose calculation is concentration times time equals dose. We have an exposure, we have a duration of that exposure, that equal to the dose.

The concentration is going to be based on the activity being performed, the source of the contaminant, the controls that are in use, as well as the proximity of the individual to the source.

Time is going to be based on the duration the task as well as the length of employment.

In reporting dose related to asbestos specifically, the dose is reported in the term that called fiber years per mil, or frequently known as fiber years. It is typically reported as a range of likely doses. It may be a probability distribution, and it may be compared against some reference. What will follow in this forum are the

**Page 7**

[1] techniques used by six professional industrial
[2] hygienists who practice in different parts of the
[3] country, and the dose reconstructions are performed
[4] in essentially the same way: Build a timeline,
[5] reconcile the information, judge the information,
[6] select empirical data for use, generate missing data,
[7] if possible, and then ultimately analogize in the
[8] absence of directly applicable data, and from this
[9] process, we calculated a range of likely doses.
[10] What I would like to do is to have Doug
[11] Fowler do the first presentation as is the order in
[12] the announcement.
[13] DOUG FOWLER: Thanks very much, Fred.
[14] This is a distinguished audience here today. One of
[15] my former colleagues, Dr. Roy Balzer is here,
[16] Dr. Jack Peterson, Mr. Allen Rogers, Mike Williams,
[17] Barbara Cohrssen, many people who are my peers in
[18] age, at least, some of whom were my bosses from time
[19] to time, and it is a great honor to be presenting
[20] this material to you.
[21] The work I will describe was done on
[22] behalf of attorneys for a Plaintiff in the asbestos
[23] litigation. The question was really whether a
[24] particular kind of exposure was "significant" or
[25] "substantial," and those are words which have special

**Page 8**

[1] legal meaning, I am told. They may have special
[2] industrial hygiene meaning as well.
[3] This was a unique — this stuff is way too
[4] complicated for me, I am an old person here.
[5] What was the purpose of the evaluation?
[6] Basically the Plaintiff had mesothelioma, and the
[7] presumption is that a person who has mesothelioma and
[8] who had asbestos exposure developed the mesothelioma
[9] as a consequence of that asbestos exposure.
[10] This fellow had had a relatively brief and
[11] relatively light history of exposure to asbestos.
[12] And I will go into that in a bit. But the specific
[13] question was whether the product manufactured by one
[14] of the Defendants, who was a gasket manufacturer,
[15] could have given rise to exposures to asbestos that
[16] were significant or substantial.
[17] Now as I am sure most of you are aware,
[18] ordinary exposures in handling of gaskets in the
[19] normal course of work with gaskets are relatively
[20] trivial; however, in this case, the gaskets were
[21] stacked and he band sawed those gaskets over a period
[22] of a day or so each time he did this activity. And
[23] so the Plaintiff's lawyers contended that this
[24] operation contributed in some meaningful way to this
[25] man's disease.