81

1  exposure that we have is the recollection of the

2  individual as prompted by an attorney.  And it is

3  clear that we cannot have the same kind of certainty

4  that we have with regard to measurements that we made

5  yesterday when we are talking about our guesses, and

6  they are guesses, rather than estimates, of what the

7  exposures were 40, 50, 60 years ago.

8          So, yes, your comments are entirely apt,

9  Dr. Corn, and I agree with them.

10         Now, having said that, I will say that

11 this technology that has been shown to us by the

12 other panelists here, the Monte Carlo methods, are

13 very useful in giving figures of merit from which one

14 can make reasonable assumptions about relative risks.

15 You just have to be awfully careful not to have too

16 many significant figures, and with asbestos

17 measurement, maybe one significant figure is about --

18 maybe two, sometimes, is about all you can hope for.

19 But I agree.  But, these techniques will help to

20 focus and to make the argument more pointed.

21         BILL DYSON:  I would certainly agree with

22 what you said, Mort, but I would point out that what

23 the opposite argument is is that every exposure is

24 significant and every exposure is contributory, and

25 that just isn't the case always, and we have to have

82

1    some type of methodology for sorting that out, and

2    the methodologies that have been presented here, at

3    least, are useful in getting us into the appropriate

4    ball game of sorting that out.

5              MORT CORN:  What worries me is the

6    difference in the methodologies.  It might be best if

7    we could set a standard for ourselves that where this

8    type of analysis is involved in a case, Plaintiffs

9    and defense experts must agree.  I think for the

10   credibility of our field, if there could be one

11   assessment that both experts agree on, it would be

12   marvelous.

13             JIM RASMUSON:  All models are wrong.  Some

14   are useful, and I think when we can show many orders

15   of magnitude of differences, and I think as Dr. Corn

16   said, when we can be inclusive of both Plaintiff

17   experts and experts for the defense, to the extent

18   possible, I think all of that is going to help, but I

19   think, as I indicated in the talk, recognizing the

20   limitations of the methodology is just as important

21   as recognizing the strengths of the methodology.

22             (This concludes side 1.  Please turn the

23        tape over for a continuation of the

24        presentation.)

25             ALLEN ROGERS:  -- interesting in along as

83

1    what Mort said was that this great complicated Monte

2    Carlo and computer analysis really produces a number

3    which is very similar to cumulative exposure, very

4    similar if you just took the mean of the results

5    presented in the historical papers and then did your

6    proportion of time.  I am sorry to go to all the

7    computer buffs and I am sorry to dispose of my son

8    who studied computer science at the university,

9    however, you get nothing -- it goes to another factor

10   that you really are getting not much out of a very

11   small number.

12          It is interesting to see most of the

13   information provided today related to about three, if

14   not at the most four scientific papers in the

15   international literature.

16          The stuff on the laggers was all Balzer

17   and Cooper.  And everything that has been done and

18   through the courts, as far as I see, relies on some

19   short 10-minute samples done a number of times in one

20   particular work location.

21          And the same on many of the other types of

22   studies.  The Harries study, you know, I have read

23   his thesis and everything else, but it is very small

24   amounts of numbers that people are making these

25   massive extrapolation to many millions of work --

84

1    potentially many millions of workers based on some

2    very short periods of exposure information.

3            The data that you plug into these models

4    and calculations is so limited that it makes the

5    variability in the final extrapolation near

6    impossible to determine its accuracy.

7            Thank you.

8            FRED BOELTER:  I think your point is well

9    taken on that, and frankly there isn't that much data

10   out there historically pre 1970.  There is a number

11   of reasons for that, it wasn't required to be

12   collected and it wasn't available, so there are a few

13   number of places to go to gather that information.

14           Your earlier point about using the mean

15   value is well taken.  But my view on doing this type

16   of a dose reconstruction is really similar to a risk

17   process using a tiered system.  In a tier one

18   analysis we can use default values, such as the

19   means, and determine whether that seems adequate to

20   answer the question that has been posed.

21           If that analysis on a tier one is not

22   sufficient, and we go to a tier two where we look at

23   more specific information, that might relate to the

24   activity or the event of interest.  Absent that, we

25   can go to a tier three analysis and go through all

1    this process clearly.

2            This level of taking the work history and

3    a timeline and slicing up individual sections to

4    ultimately calculate a dose associated with each

5    event can't be done on (audiotape difficulties) and

6    trying to analogize it to the situation that we are

7    confronted with evaluating to ultimately opine about

8    the significance.  It has its application not only in

9    litigation but also in nonlitigation, and it is a

10   fundamental process, as Dr. Corn pointed out, in

11   performing an epidemiologic study, but it is a

12   technique where when necessary we can get into the

13   information and try in some way to compile a

14   numerical value associated with a dose, a historic

15   dose, to determine its significance, generally in

16   comparison to something else.

17            (Audiotape difficulties)

18            JIM RASMUSON:  The industrial hygienist

19   cannot be air monitoring every situation at all

20   times.  An industrial hygienist by instinct uses

21   these techniques to try to prioritize exposures in

22   the workplace.

23            I think what we are trying to present here

24   is simply a formalized approach (audiotape

25   difficulties) only several, three or four literature

86

1   articles were the basis for this, literally thousands

2   in our database.  As Dr. Boelter mentioned, it is

3   just a matter of time and for reasons of simplicity

4   (audiotape difficulties) at the time is almost beside

5   the point because what we are talking about is the

6   exposure assessment process, which really deals with

7   current exposures, future exposures.  It is the

8   basis, for example, setting priorities for cleaning

9   up Superfund sites and so on, and if industrial

10  hygienists don't become more conscious of what they

11  are doing relative to exposure assessment, I think

12  the field will likewise suffer in the same manner as

13  if we try to attach too much significance to the work

14  we do as well.

15      FRED BOELTER:  Thank you.  I actually took

16  the comment about the literature as being the

17  published literature as opposed to the tremendous

18  amount of information that is available, the

19  unpublished literature.

20      JIM RASMUSON:  That is right.  And, of

21  course, there is a tremendous database of unpublished

22  literature that most of us have access to as well.

23      FRED BOELTER:  There was another question?

24      MIKE MILLER:  Mike Miller from the Navy

25  Environmental Health Center in Norfolk, Virginia.

87

1          . . I attended this session because we

2     frequently get inquiries from the Veterans ·

3     Administration about veterans who are filing

4     service-connected disability claims, and the question

5     goes sort of like this person was a fireman

6     apprentice on the USS whatever from the period of

7     1940 to 1942, can you comment on his exposures. And,

8     of course the answer to that is no.

9          So I was fascinated to see that you

10    somehow have attached some numbers to those exposures

11    and I am just curious as to, for instance, the

12    boiler, Navy boiler tender exposure of .1 fibers per

13    cc, where that number came from, because I am pretty

14    sure that at least within the Navy that data doesn't

15    exist and it was never collected.

16         You know, I am an industrial hygienist but

17    I am also the son of a World War II Navy veteran who

18    died way too young of lung cancer, so my sympathies

19    are, indeed, with these veterans who deserve every

20    penny if it is, indeed, a service-connected

21    disability, and I would love to be able to answer

22    these questions with some degree of certainty and

23    science, as Dr. Corn pointed out, but it just occurs

24    to me that the models are based on certain

25    assumptions being plugged in at the front end and,

88

1   not being a lawyer, but my supposition would be that

2   the assumptions are nothing more than speculation, so

3   the result at the other end of the equation can be

4   nothing more than speculation.

5        I am wondering what kind of legal veracity

6   it has in a courtroom or when filing a claim?

7        BILL DYSON:  Well, obviously I do have a

8   basis for that number.  There were a series of

9   studies done in the James River Reserve Fleet by

10  Illinois Institute of Technology that gave us a range

11  of numbers that went from .00X up through .3, and

12  don't get hung up on the fact that I am using a

13  single point estimate for this, that was just for

14  illustrative purposes.  There are also a large series

15  of studies that have been done on commercial ships,

16  actual measurements that have been made, various

17  activities on commercial ships by several of the oil

18  companies; for example, and furthermore, there is

19  actual testimony before a congressional committee by

20  a representative of the Navy who used that very same

21  number, 0.1, saying that people had not been exposed

22  above that number.

23       So these numbers come from a wide variety

24  of sources, they are not pulled out of the air at

25  all.

89

1  JOHN SPENCER:  I will also add I was

2  formally with the U.S. Coast Guard as their

3  industrial hygienist and we had a small shipyard

4  facility, albeit not the naval size shipyards, but my

5  role was also working with the medical people and the

6  occupational medical monitoring program, and then

7  also their workers' comp related issues, and we had a

8  lot of data in the Coast Guard, and I know the Navy,

9  I have done foyer requests from the Navy and gotten

10  similar data on various specific activities based --

11  and looking at trades and activities as to what the

12  levels of exposure were when they were doing some of

13  the activities that we had described here, removing

14  pipe insulation or working on boilers.

15  That data is out there, and I used it when

16  I was with the Coast Guard in determining the levels,

17  the overall dose and levels of exposure for Coast

18  Guard employees.

19  DOUG FOWLER:  There is similar information

20  available from Pudget Sound Naval Shipyard and Mare

21  Island Naval Shipyard, but that information is

22  typically for shipyard tasks as opposed to shipboard

23  tasks, and we don't know very much about what typical

24  exposures were in engine rooms, boiler rooms, and

25  other machinery spaces aboard ship.

90

1      There have been a few pieces of
2  information as studied by Jones at Illinois Institute
3  of Technology Research Institute is about the only
4  one, and as I recall, they did one measurement -- I
5  will take it back -- three measurements in a boiler
6  room of a merchant ship underway.
7      You know, we are talking about three
8  numbers, and that is what we have to base it on
9  because that is all we have.
10      So there is a real paucity of information
11  with regard to conditions aboard ships while underway
12  and especially with regard to conditions in boiler
13  rooms while firing or receiving fire, and that kind
14  of information is just simply not known.  But there
15  is a lot of information about shipyard activities.
16      FRED BOELTER:  The other thing to remember
17  is when doing a dose reconstruction, often we are
18  working with the information that people say that
19  they did and drawing analogies from that, so it is
20  not a job description of strictly a machinist mate,
21  it is the descriptions of that individual saying what
22  they did while they were performing their activities.
23      I am unfortunately going to have to call
24  the end of this session and we will be around if you
25  have questions.  Feel free to come up and speak with



23 April 2007

513 Frederick Road
Baltimore, MD 21228 Mr. John Kurowski, Esquire
(410) 744-0780 Kurowski, Bailey & Shultz LLC
FAX (410) 744-2763 24 Bronze Pointe
Swansea, IL 62226

cnbsvc@epservices.com  **RE: *Jack Nacht v. American Biltrite, Inc.***
www.epservices.com  ***EPI Project No. 27160***
***Summary Report***

Dear Mr. Kurowski:

This summary report has been prepared at your request as a synopsis of my opinions regarding Mr. Jack Nacht's' alleged asbestos exposure from selling floor tiles manufactured by American Biltrite, Inc. under the name Amtico. This report is based on the information provided to me in the deposition testimonies. According to these testimonies, Mr. Nacht smoked one pack of cigarettes per day from 1942 until 1960, and was diagnosed with mesothelioma in August 2006.

I have been an industrial hygienist for more than 29 years. Currently, I am President of Environmental Profiles, Inc. in Baltimore, Maryland. Formerly, I was with the National Institute for Occupational Safety and Health and led a group of industrial hygienists conducting research for the National Occupational Exposure Survey. As an industrial hygienist for the United States Coast Guard, I conducted thousands of exposure assessments of a wide range of products, including numerous asbestos-containing materials. My responsibilities also included the management of the occupational medical monitoring program for the 5th Coast Guard District. I was President of the Chesapeake Section of the American Industrial Hygiene Association (AIHA) and was a member of the national AIHA Product Health and Safety Committee and the Emergency Response Planning Committee. I have also authored the *Health and Safety Audits Manual*, published by Government Institutes, and the *AIHA Hazard Communication Guide*, published by the AIHA. The American Board of Industrial Hygiene certifies me as an industrial hygienist and the Board of Certified Safety Professionals certifies me as a safety professional.

As a certified industrial hygienist, I rely upon the following basic tools in order to conduct an exposure assessment of personal occupational exposures such as Mr. Nacht's:

1.  a characterization of the workplace environment;
2.  a characterization of the job and tasks (including frequency and duration of exposures);
3.  a characterization of the products (including the degree of friability and encapsulation);

Jack Nacht v. American Biltrite
EPI Project 27160
Summary Report
23 April 2007
Page 2

4.   a characterization of the relevant safety and health regulations and the associated exposure limits;

5.   an appropriate association of tasks, environment, job descriptions and chemical agents with the individual exposures being evaluated; and use of the accepted air sampling and analytical techniques for occupational exposure to asbestos.

### Friable and Non-Friable Asbestos Exposure

"Friable asbestos materials" is defined in Appendix C of the EPA National Emission Standards of Hazardous Air Pollutants (NESHAPS) Asbestos Regulations (40 CFR 61, Subpart M) as any materials containing more than one percent asbestos by weight that can be crumbled, pulverized, or reduced to powder by hand pressure when dry. Friable materials are more likely to release fibers when disturbed or damaged than non-friable materials. Some examples of friable asbestos products that were commonly utilized in past industrial practices include spray-fireproofing, thermal insulation, and joint compound. Exposures to friable asbestos-containing materials that have been pulverized or manipulated are typically associated with asbestos-related illnesses.

Non-friable materials, such as floor tile, are encapsulated products, with asbestos fibers bound into a matrix material, a process that significantly reduces or eliminates the potential for release of fibers. Many non-friable products are currently sold in U.S. commerce. The U.S. Environmental Protection Agency (EPA) did not ban these asbestos-containing products for sale when friable forms of asbestos products were removed from the marketplace. Additionally, various researchers have reported that encapsulated products provide opportunity for "no release, certainly no significant release, of asbestos fiber in either worker areas or general air." Some commonly used non-friable products include gaskets, packing, brake linings, caulk, roofing materials, and siding.

### Occupational Exposure Regulations and Guidelines

Occupational exposure limits, including the American Conference of Governmental Industrial Hygienists (ACGIH) TLV, changed historically from more than 30 f/cc of air to today's limits of 0.1 f/cc. The OSHA Permissible Exposure Limits (PEL) also changed from 12f/cc to 0.1 f/cc. Both the TLV and PEL are based on an eight-hour, time-weighted average.

### Plaintiff's Work History

According to his deposition testimony, Mr. Nacht enlisted in the Army in 1941, where he was initially an aviation cadet, learning how to fly planes. Mr. Nacht stated that he did not perform repairs on the planes; however, he was around others who did. In 1945, Mr. Nacht was honorably discharged from the Army with a rank of Captain. After returning from the Army in 1945, Mr. Nacht testified that he worked for American Airlines for one week, and then quit because he "couldn't handle it."



Jack Nacht v. American Biltrite
EPI Project 27160
Summary Report
23 April 2007
Page 3

In 1945, Mr. Nacht started a company named Dee-Jay Carpet, which became Dee-Jay Incorporated in 1946. Mr. Nacht further testified that the company started as a carpet cleaning business, and later started selling carpet and tile. After beginning to sell carpet and tile, the company still cleaned carpet, but Mr. Nacht was not involved in the cleaning any longer. Mr. Nacht testified that 50 percent of the time, he personally went into the field to take measurements for carpet and tile, although he never installed either product. Mr. Nacht further testified that 60 percent of Dee-Jay's business involved carpet. Mr. Nacht owned Dee-Jay Inc. until 1997 when he stopped working.

### *Friable Materials*
Mr. Nacht does not claim that he worked with friable, asbestos-containing materials, such as joint compound, pipe insulation or cement. These materials are causally linked with asbestos-related diseases, such as mesothelioma. Floor tile is not friable.

### *Plaintiff's Alleged Exposure to American Biltrite Products*
According to his testimony, Amtico was one of several brands of tile Mr. Nacht ordered and sold while he owned Dee-Jay Carpet from 1946 until 1997. Mr. Nacht also testified that Amtico manufactured vinyl asbestos tile, asphalt tile and other kinds of tile. Mr. Nacht recalled first selling vinyl asbestos tile in the late 1950s or early 1960s, and reported he didn't know exactly when he first started selling Amtico. Although Mr. Nacht recalled Amtico, he could not recall specific patterns or styles related to Amtico, yet he stated further in testimony that he recalled Amtico "brick-effect" tile that he believed was asbestos because it was referred to as vinyl asbestos tile.

Mr. Nacht never installed or removed floor tile. He stated that he broke tile over his knee two or three times a day to show the color depth of the tile to customers. He did not indicate how many of these tiles he believed were asbestos-containing, nor did he testify as to how many of those alleged tiles were Amtico brand. Mr. Nacht testified he was present when his workers cleaned up areas after an installation was complete with a broom and dustpan, a process that he claimed took an hour for larger jobs. Mr. Nacht testified that 60 percent of the jobs performed by his company, Dee-Jay Inc., involved carpet, not tile. There was no testimony to how often Amtico asbestos-containing tiles were used on jobs he was present for during clean up. Mr. Nacht had no formal training on installing vinyl floor tile.

Based on a review of available literature and the following exposure assessment studies, the asbestos-containing floor tiles allegedly sold by Mr. Nacht would not have presented any airborne asbestos fiber exposures that exceeded even today's occupational health standards. Several exposure assessment studies of floor tile have documented airborne asbestos exposure during the installation of vinyl tile and support this conclusion, including one conducted by EPI.

For example, Walcott and Warrick (1979) monitored the installation of vinyl asbestos floor tile in a home. They found eight-hour time weighted average (TWA) fiber concentrations during installation that ranged from 0.008 to 0.027 fibers per cubic

Jack Nacht v. American Biltrite
EPI Project 27160
Summary Report
23 April 2007
Page 4

centimeter (f/cc) by phase contrast microscopy (PCM). The authors of this study concluded that these concentrations were "substantially below the allowed OSHA limit." R. Walcott and J. Warrick (1979) also monitored the removal of vinyl asbestos floor tile in a home. They found eight-hour TWA fiber concentrations during removal that ranged from 0.006 to 0.015 f/cc by PCM.

Another study concluded by the Department of the Navy (1979) evaluated workers' airborne asbestos exposure during the installation of Flintkote vinyl asbestos floor tile. The study found that "all results [were] well below Threshold Limit Values (TLV)" set by "Occupational Safety and Health Administration (OSHA)" in 1976. They concluded, "the operation of laying and cutting the vinyl-asbestos tile should constitute no potential health hazards to workers."

EPI conducted an assessment of floor tile installation and clean-up using asbestos-containing floor tiles manufactured by American Biltrite, Inc. During the six hour and 51 minute study, 161 linear feet of floor tile was cut using the following techniques:

- Guillotine cutter
- Utility knife
- Scribe score and snap break
- Shears (heat and cut; no heat and cut)
- Linoleum knife

Results of the EPI study showed that no asbestos fibers were detected for the worker and his helper during the tile cutting, installation and subsequent clean up. Based on the air sample analyses by NIOSH 7402, the measured airborne asbestos concentration are below the detection limits for the worker and helper of <0.00044 and <0.00045 f/cc, respectively. Area samples were also collected during the cutting, installation and clean up of Amtico asbestos-containing tile. All samples were below the limit of detection when analyzed by NIOSH 7402 (TEM).

These studies were based on workers actually installing, removing and cleaning up floor tile, which Mr. Nacht never did. The conclusions showed that workers would not have been exposed to asbestos-containing fibers in excess of today's standards during the installation, removal or clean-up of vinyl asbestos tile. Mr. Nacht's exposure to asbestos from Amtico tile, if any, would be irrelevant.

*Ambient Asbestos Concentrations*
Various researchers have also evaluated the ambient airborne levels of asbestos in our living environments, separate from the workplace. It is evident from the reported results that the airborne asbestos fiber concentrations were dependant upon geographic location. Asbestos fiber concentrations were higher in urban environments, as well as in locations that had geologic asbestos mineral formations. In urban settings, researchers have found ambient fiber concentrations of 0.2 f/cc and greater.

04/25/2007 11:03 FAX  1212490●          GORDON & SILBER          ●                    ☑012/014

Jack Nacht v. American Biltrite
EM Project 27162
Summary Report
23 April 2007
Page 5

Researchers have conducted autopsies of individuals without asbestos-related diseases not occupationally exposed to asbestos, yet exposed to asbestos through their ambient environment. In a study conducted by Langer and Nolan, lung specimens were collected from 3,000 people between 1966 and 1968. The range of asbestos fibers detected in the lung tissue was reported at less than 580,000 to 15,740,000 asbestos fibers per gram of dry lung tissue. Moreover, in 1971, Drs. Langer, Selikoff and Sastre reported that chrysotile asbestos was present in 24 of 28 consecutive non-occupationally exposed New York City autopsy cases. This clearly demonstrates that asbestos was present in the general environment, resulting in exposures for individuals not occupationally exposed to asbestos.

EPA asbestos regulations for schools, known as the Asbestos Hazard Emergency Response Act (AHERA), allows for up to as many as 70 asbestos structures per square millimeter (s/mm$^2$) or 6,503,213 asbestos structures per square foot collected on air sample filters following an abatement action. This reflects an allowance for the presence of some asbestos in the school environment following an asbestos abatement activity.

Conclusions
According to his own testimony, Mr. Nacht never installed or removed floor tile, including tile identified as Amtico; he only handled the tile when showing customers samples that came out of a box. During the process of showing a sample tile to a customer, Mr. Nacht testified he broke two to three tiles a day over his knee to demonstrate the color depth of the tile. He did not indicate how often he showed customers an Amtico tile compared to other brands of tile. Mr. Nacht also testified that he was present at the end of floor tile installation while others were sweeping up debris. Mr. Nacht stated that it took up to one hour to clean larger jobsites, and stated that only 40 percent of the jobs involved floor tile. He did not state how many of those jobs involved Amtico tile, nor did he indicate how often he observed his workers cleaning up after tile installation.

Studies conducted on personnel actually installing and removing floor tile and cleaning up debris after floor tile installation produced concentrations well below today's stringent standards regarding asbestos. Therefore, Mr. Nacht's alleged encounters with American Biltrite-manufactured Amtico tiles would likely have presented him with little or no exposure to asbestos.

I base this conclusion on my more than 29 years experience as an industrial hygienist and safety professional. My experience has included health hazard evaluations and audits of multiple operations within industrial, academic, commercial, and residential facilities. My experience has also included the development of exposure assessment strategies, and training of employees who worked in numerous industrial operations. I also base my opinion upon portions of scientific literature and exposure assessments of encapsulated materials. Furthermore, I have completed studies on American Biltrite floor tile and floor tiles similar to those manufactured by American Biltrite, Inc. completed by others.



Jack Nacht v. American Biltrite
EPI Project 27160
Summary Report
23 April 2007
Page 6

For the purposes of this report, I have reviewed numerous documents, articles, studies and publications, which include but are not limited to the following:

1. Deposition of Jack Nacht, taken 21 November 2006

2. Deposition of Jack Nacht, taken 4 December 2006

3. Deposition of Jack Nacht, taken 7 February 2007

4. Plaintiff's Answers to Interrogatories

5. Various occupational safety and health publication and articles developed by governmental agencies, professional and trade associations, voluntary consensus standards organizations, and researchers.

6. Code of Federal Regulations, 29 CFR Part 1910 and Part 1926.

7. American Conference of Governmental Industrial Hygienists, Documentation of Threshold Limit Values, 1946 to present.

8. Environmental Profiles, Inc. Report of Findings: Evaluation of Airborne Asbestos Exposure to Workers During Handling, Installation and Clean-up of Amtico Floor Tile Manufactured by American Biltrite Inc., 12 January 2007.

9. Boelter, F. and Spencer J. Installation 1970 Vintage Congoleum Vinyl Asbestos Tile Isolation Test Chamber. 20 June 2002.

10. Boelter, F. and Spencer J. Complete Removal 1970 Vintage Congoleum Vinyl Asbestos Tile Residential Bathroom. 27 June 2002.

11. Boelter F. and Spencer J. Partial Installation 1970 Vintage Congoleum Vinyl Asbestos Tile Residential Bathroom. 25 June 2002.

12. Boelter F. and Spencer J. Partial Installation 1970 Vintage Congoleum Vinyl Asbestos Tile Residential Bathroom. 24 June 2002.

13. Boelter & Yates Environmental Engineers and Scientists. Asbestos Content of Floor Tiles Congoleum Litigation Related. 17 July 1998.

14. Walcott, R. and Warrick, J. 1979. *Monitoring for Airborne Asbestos Fibers: Vinyl Asbestos Floor Tile.* December 1979.

15. Osborne, JE. 1979. Industrial Hygiene Survey of Airborne Asbestos Concentrations from Vinyl-Asbestos tile Operations. *Department of the Navy* 23 May 1979.

16. Wendlick, Joseph D. CIH. Ambient Asbestos Fiber Levels at Selected Sites in Philadelphia, Pennsylvania. November 1984.

17. Langer, Arthur M. and R.P. Nolan. 1994. "Chrysotile Biopersistence in the Lungs of Persons in the General Population and Exposed Workers." *Environmental Health Perspective.* 102 (Supplement 5): 235-239.

18. Langer, Arthur M. and R.P. Nolan. 1994. "Chrysotile Asbestos in the lung of persons in New York," Arc. Environ. Health. 22:348-361

04/25/2007  11:03 FAX  1212490████    GORDON & SILBER    ████    ☑014/014

Jack Nacht v. American Biltrite
EPI Project 27160
Summary Report
23 April 2007
Page 7

19. Andrion, A., D. Bellis, E. Bertoldo and F. Mollo. 1984. "Coated and Uncoated Lung Mineral Fibers in Subjects With and Without Pleural Plaques at Autopsy," *Path. Res. Pract.* 178:611-616.

20. Selikoff, Irving J. 1970. "Partnership for Prevention – The Installation Industry Hygiene Research Program," *Industrial Medicine.* 39:162-166.

21. Federal Register, U.S. Environmental Protection Agency, 40 CFR, Parts 763, Asbestos: Manufacturing, Importation, Processing and Distribution in Commerce Prohibitions; Final Rule; July 12, 1989.

22. Federal Register, U.S. Environmental Protection Agency, 40 CFR, Parts 61, NESHAP Revision; Final Rule; November 20, 1990.

23. Federal Register, Occupational Safety and Health Administration 29 CFR 1910, 1915, and 1926, Occupational Exposure to Asbestos; Corrections.

24. U.S. Environmental Protection Agency (EPA). 1982. Analysis of Fiber Release from Certain Asbestos Products, draft Final Report. December 1982.

25. Corrosion Proof Fittings v. The EPA 947 F. 2d 1201 (5th Cir. 1991).

This report is based on the information available to me at this time. Should additional information become available, I reserve the right to determine the impact, if any, of the new information on my opinions and conclusions, and to revise my opinions and conclusions if necessary.

Sincerely,

*John W Spencer / JWB*

John W. Spencer, CIH, CSP
President

JWS/amb

04/25/2007 10:53 FAX 1212490002          GORDON & SILBER                                ☑ 007/018

 **EPI**    24 April 2007

2:3 Frederick Road
Baltimore, MD 21228

(410) 744-0700
fax (410) 744-2003

email@episervices.com
www.episervices.com

Mr. John Kurowski, Esquire
Kurowski, Bailey & Shultz
24 Bronze Pointe
Swansea, IL 62226

**RE:** *Harvey Helfand v. American Biltrite, Inc.*
*EPI Project No. 27161*
*Summary Report*

Dear Mr. Kurowski:

This summary report has been prepared at your request as a synopsis of my opinions regarding Mr. Harvey Helfand's alleged asbestos exposure from floor tiles manufactured by American Biltrite, Inc. under the name 'Amtico.' Mr. Helfand's exposure allegedly occurred during home renovation projects that he completed from 1950 until 1998 at his various residences. According to the deposition testimonies, Mr. Helfand, born 8 November 1935, was diagnosed with mesothelioma on 11 October 2006. He allegedly smoked one pack of cigarettes per day from the 1950s through the 1970s.

I have been an industrial hygienist for more than 29 years. Currently, I am President of Environmental Profiles, Inc. in Baltimore, Maryland. Formerly, I was with the National Institute for Occupational Safety and Health and led a group of industrial hygienists conducting research for the National Occupational Exposure Survey. As an industrial hygienist for the United States Coast Guard, I conducted thousands of exposure assessments of a wide range of products, including numerous asbestos-containing materials. My responsibilities also included the management of the occupational medical monitoring program for the 5th Coast Guard District. I was President of the Chesapeake Section of the American Industrial Hygiene Association (AIHA) and was a member of the national AIHA Product Health and Safety Committee and the Emergency Response Planning Committee. I have also authored the *Health and Safety Audits Manual*, published by Government Institutes, and the *AIHA Hazard Communication Guide*, published by the AIHA. The American Board of Industrial Hygiene certifies me as an industrial hygienist and the Board of Certified Safety Professionals certifies me as a safety professional.

As a certified industrial hygienist, I rely upon the following basic tools in order to conduct an exposure assessment of personal occupational exposures such as Mr. Helfand's:

1. a characterization of the workplace environment;
2. a characterization of the job and tasks (including frequency and duration of exposures);

Helfand, Harvey v. American Biltrite
EPI Project 27159
Summary Report
24 April 2007
Page 2

3.  a characterization of the products (including degree of friability and encapsulation);

4.  a characterization of the relevant safety and health regulations and the associated exposure limits;

5.  an appropriate association of tasks, environment, job descriptions and chemical agents with the individual exposures being evaluated; and

6.  use of the accepted air sampling and analytical techniques for occupational exposure to asbestos.

*Friable Asbestos Exposure*
"Friable asbestos materials" is defined in Appendix C of the EPA National Emission Standards of Hazardous Air Pollutants (NESHAPS) Asbestos Regulations (40 CFR 61, Subpart M) as any materials containing more than one percent asbestos by weight that can be crumbled, pulverized, or reduced to powder by hand pressure when dry. Friable materials are more likely to release fibers when disturbed or damaged than non-friable materials. Some examples of friable asbestos products that were commonly utilized in past industrial practices include spray fireproofing, thermal insulation, and joint compound.

Non-friable materials are encapsulated products, with asbestos fibers bound into a matrix material, a process that significantly reduces or eliminates the potential for release of fibers. Many non-friable products are currently sold in U.S. commerce. The U.S. Environmental Protection Agency (EPA) did not ban these asbestos-containing products for sale when friable forms of asbestos products were removed from the marketplace. Additionally, various researchers have reported that encapsulated products provide opportunity for "no release, certainly no significant release, of asbestos fiber in either worker areas or general air." Some commonly used non-friable products include gaskets, packing, brake linings, caulk, roofing materials, floor tile, and siding.

*Occupational Exposure Regulations and Guidelines*
Occupational exposure limits, including the American Conference of Governmental Industrial Hygienists (ACGIH) TLV, changed historically from more than 30 f/cc of air to today's limits of 0.1 f/cc. The OSHA Permissible Exposure Limits (PEL) also changed from 12f/cc to 0.1 f/cc. Both the TLV and PEL are based on an eight-hour, time-weighted average.

*Plaintiff's Work History*
According to the materials I have reviewed, Mr. Helfand worked part-time during high school at Rabin Typographers. He referred to himself as a "flunky," who performed cleaning duties, picked up lead, and typed on occasion. Mr. Helfand indicated that he worked at this job for five hours per day during the school week, and full-time during holidays and summer break. Mr. Helfand believed he was exposed to asbestos from cleaning lead pots that he alleged were lined with asbestos.

04/25/2007 10:59 FAX 12124900●●    GORDON & SILBER    ●●    ⊘ 009/016

Helfand, Harvey v. American Biltrite
EPI Project 27159
Summary Report
24 April 2007
Page 3

Mr. Helfand then attended the New York School of Printing, a vocational school where he received training in mechanical repair. After Mr. Helfand received this training, he began a career in the printing business, which is summarized in the table below:

| Approximate Dates | Employer | Title/Position | Alleged Exposure |
|---|---|---|---|
| 1952-1956 | United Offset | 'Flunky,' Helper (serviced and cleaned the machines) | None |
| 1956-1963 | Ramapo Litho Company | Pressman | None |
| ? 3-4 years | Muree Press | Foreman | None |
| ? 2 years | Service Offset | Foreman | None |
| ? 6 mos | Ross Printing | Pressman | None |
| 6 mos | Triple M | Pressman, Foreman | None |
| 1970-1992 | H&H Multicolor Self-employed | Manager | None |
| Early 1990s-2006 | Spectrum Printing | Production person | None |

Mr. Helfand also completed a number of home-renovation projects at his various residences from 1958 until 1998. Prior to performing these renovations, he allegedly helped his father work on a boiler as a child and construct a basement apartment when he was 15 years old. His home renovations reportedly included reinsulating the back of his house, performing minor repairs to a rental property from 1960 to 1963, renovating a basement in 1965, remodeling from 1965 until 1967, and installing a kitchen in the early 1980s. While completing these various remodels, Mr. Helfand performed work involving drywall, electric, ceiling tiles, flooring, insulation, boilers, pipes, plumbing, and paint. Furthermore, he estimated that 70% of his work occurred at the printing facilities, and 30% of the work was home improvement.

*Plaintiff's Exposure to Friable Asbestos Products*
Mr. Helfand claimed exposure to friable asbestos materials from his home renovation projects and his part-time employment at Rabin Typographers. He claimed exposures to asbestos cement, pipe insulation, joint compound, and ceiling tiles.

At Rabin, where Mr. Helfand worked part-time in high school, Mr. Helfand was allegedly present while asbestos cement was 'chipped out' of and reapplied to the lead pots. He stated that the outsides of the pots were covered with asbestos cement for insulation purposes and the cement sometimes had to be removed and reapplied. He claimed that the removal process created a lot of dust, which he was responsible for cleaning up. Mr. Helfand also reported that the new cement to be applied might have been mixed from a powdered form. If this material was asbestos-containing, Mr. Helfand's presence during the removal and application of the asbestos cement could have exposed him to respirable asbestos fibers.

During the course of his residential renovations, Mr. Helfand reportedly installed and removed pipe covering and 'boiler wrap.' He described the 'boiler wrap' and pipe covering as white or beige and similar to "a cast on your foot." He indicated that he ripped this material out when removing boilers. Mr. Helfand further indicated that his

04/25/2007 10:53 FAX  12124900⬤          GORDON & SILBER          ⬤          ☒010/016

Helfand, Harvey v. American Biltrite
EPI Project 27159
Summary Report
24 April 2007
Page 4

first exposure to asbestos occurred when he insulated a four-inch pipe associated with the boiler in his childhood home. He wrapped the pipe using insulation that was formed in two halves, which strapped together. Mr. Helfand stated that he completed a 'blow out' of the boiler as well. A study by Balzer et. al. titled, "Dust Producing Potential of Construction Materials," reported that mean personal exposures during insulation removal ranged from 13.4 f/cc to 268.4 f/cc, and mean personal exposures during insulation installation ranged from 6.5 to 113.9 f/cc, when analyzed by phase contrast microscopy. If the insulation associated with the boilers and piping did contain asbestos, Mr. Helfand's execution of the abovementioned tasks could have exposed him to airborne concentrations of asbestos in excess of today's occupational standards.

Mr. Helfand reported considerable exposure to asbestos-containing joint compound associated with drywall installation and removal. He believed that he was exposed to asbestos from the removal of these materials during the reinsulation of the back of his house and the renovation of his kitchen in the early 1980s. Mr. Helfand believed he was exposed to asbestos from the installation of these materials during the renovation of his mother's basement in 1958, and his basement in 1965. During this project, which lasted six months, Mr. Helfand installed sheetrock, taped it, and then applied from three to six coats of joint compound. He further reported that he performed many small patching jobs using joint compound throughout the years.

Mr. Helfand identified four manufacturers of joint compound who are historically known to have manufactured joint compound that contained asbestos. He described the various products as powdered form, which he initially used, and ready-mix that he eventually switched to using all of the time. Mr. Helfand indicated that he mixed the powdered joint compound with water using a small spatula or shovel to prepare it for application. He applied five to six coats of the joint compound on each drywall seam, using various-sized knives, in order to make the seam completely smooth. After application, Mr. Helfand reported, he let the product dry and then sanded it for ten to 15 minutes per seam, a process that he described as very dusty. Mr. Helfand claimed that he performed the drywall operations in rooms with no ventilation, and he wore no mask or respirator.

A study by Fischbein, et al, titled "Drywall Construction and Asbestos Exposure," evaluated drywall workers' exposures to airborne asbestos during an array of drywall tasks. The study reported personal exposures during dry mixing ranging from 35.4 to 59.0 f/cc with a mean of 47.2 f/cc. The study reported personal exposures during hand sanding ranging from 1.3 to 16.9 f/cc with a mean of 5.3 f/cc. 15 minutes after sweeping the floor, the area concentration within ten to fifty feet was 41.4 f/cc. From this data, it is shown that Mr. Helfand's completion of drywall work over the years could have exposed him to high levels of respirable asbestos.

Finally, Mr. Helfand claimed exposure to asbestos from the cutting, installation and removal of ceiling tiles during his home renovations. He stated:

04/25/2007 11:00 FAX 12124900      GORDON & SILBER          ☑ 011/016

Helfand, Harvey v. American Biltrite
EPI Project 27159
Summary Report
24 April 2007
Page 5

> "I was always exposed to...old ceiling. You know, the Celotex ceilings. Armstrong.
> Not only did I put up myself, but the stuff that was there that we ripped down, so I know
> that...In fact, when you rip it down, you know, it gets dusty, dirty...I guess that what just
> did me in."

He described the ceiling tiles that he removed and installed as "acoustical." A study by
William McKinnery, titled "Evaluation of Airborne Asbestos Fiber Levels During
Cutting Of Vinyl Asbestos Flooring Tile and Asbestos-Containing Ceiling Tile
Operations," reported personal exposure levels when cutting asbestos-containing ceiling
tile ranging from 0.14 to 0.37 f/cc, with a mean of 0.25 f/cc, when analyzed by phase
contrast microscopy.

### Plaintiff's Alleged Exposure to American Biltrite Products

Mr. Helfand reportedly installed Amtico floor tile when he renovated the kitchen of his
home in the early 1980s. He described the floor tile as 12 inch by 12 inch. Mr. Helfand
indicated that he cut the tile by scoring it and snapping it, sometimes using heat to
facilitate the process. He first applied a 'film' to the back of the tile and then laid it
down, beginning in the center of a room and continuing to the edges. Mr. Helfand could
not identify any model, style, or color of the alleged Amtico tile he used. His testimony
was unclear as to whether and when he may have used Amtico tile on other occasions.

Mr. Helfand further claimed that he might have removed floor tile manufactured by
American Biltrite, although he could not identify the manufacturer of the tile that he
removed. He described the removal process using an ice scraper.   If the floor did not
get clean, he reported, he would resurface the floor before laying new tile. Mr. Helfand
further testified that tiles sometimes broke, but more often they "pop[ped] up" as full tiles
when he tried to remove them.

Based on a review of available literature and the following exposure assessment studies,
if Amtico tiles allegedly used by Mr. Helfand did contain asbestos, his work with them
would not have presented any airborne asbestos fiber exposures that exceeded even
today's strict occupational health standards. Several exposure assessment studies of floor
tile have documented airborne asbestos exposure during the installation of vinyl asbestos
tile and support this conclusion, including one conducted by EPI.

For example, Walcott and Warrick (1979) monitored the installation of vinyl asbestos
floor tile in a home. They found eight-hour time weighted average (TWA) fiber
concentrations during installation that ranged from 0.008 to 0.027 fibers per cubic
centimeter (f/cc) by phase contrast microscopy (PCM). The authors of this study
concluded that these concentrations were "substantially below the allowed OSHA limit."
R. Walcott and J. Warrick (1979) also monitored the removal of vinyl asbestos floor tile
in a home. They found eight-hour TWA fiber concentrations during removal that ranged
from 0.006 to 0.015 f/cc by PCM.

Helfand, Harvey v. American Biltrite
EPI Project 27159
Summary Report
24 April 2007
Page 6

The previously referenced McKinnery study reported personal exposure levels when cutting vinyl asbestos floor tile ranging from below the limit of detection (0.02 f/cc) to 0.04 f/cc, well below the occupational health standards.

Another study, conducted by the Department of the Navy (1979), evaluated workers' airborne asbestos exposure during the installation of Flintkote vinyl asbestos floor tile. The study found that "all results [were] well below Threshold Limit Values (TLVs)" set by Occupational Safety and Health Administration (OSHA) in 1976. They concluded, "the operation of laying and cutting the vinyl-asbestos tile should constitute no potential health hazards to workers."

EPI conducted an assessment of floor tile installation and clean-up using asbestos-containing floor tiles manufactured by American Biltrite, Inc. During the six hour and 51 minute study, 161 linear feet of floor tile was cut using the following techniques:

- Guillotine cutter
- Utility knife
- Scribe score and snap break
- Shears (heat and cut; no heat and cut)
- Linoleum knife.

Results of the EPI study showed that no asbestos fibers were detected for the worker and his helper during the tile cutting, installation and subsequent clean-up. Based on the air sample analyses by NIOSH 7402, the measured airborne asbestos concentration were below the detection limits for the worker and helper of <0.00044 and <0.00045 f/cc, respectively.

These studies were based on workers actually installing and removing floor tile. The conclusions show that workers would not have been exposed to asbestos-containing fibers in excess of today's standards during the installation or removal of vinyl asbestos tile.

### Ambient Asbestos Concentrations

Various researchers have also evaluated the ambient airborne levels of asbestos in our living environments, separate from the workplace. It is evident from the reported results that the airborne asbestos fiber concentrations were dependant upon geographic location. Asbestos fiber concentrations were higher in urban environments, as well as in locations that had geologic asbestos mineral formations. In urban settings, researchers have found ambient fiber concentrations of 0.2 f/cc and greater.

Researchers have conducted autopsies of individuals without asbestos-related diseases not occupationally exposed to asbestos, yet exposed to asbestos through their ambient environment. In a study conducted by Langer and Nolan, lung specimens were collected from 3,000 people between 1966 and 1968. The range of asbestos fibers detected in the

Helfand, Harvey v. American Biltrite
EPI Project 27159
Summary Report
24 April 2007
Page 7

lung tissue was reported at less than 580,000 to 15,740,000 asbestos fibers per gram of
dry lung tissue. Moreover, in 1971, Drs. Langer, Selikoff and Sastre reported that
chrysotile asbestos was present in 24 of 28 consecutive non-occupationally exposed New
York City autopsy cases. This clearly demonstrates that asbestos was present in the
general environment, resulting in exposures for individuals not occupationally exposed to
asbestos.

EPA asbestos regulations for schools, known as the Asbestos Hazard Emergency
Response Act (AHERA), allows for up to as many as 70 asbestos structures per square
millimeter (s/mm$^2$) or 6,503,213 asbestos structures per square foot collected on air
sample filters following an abatement action. This reflects an allowance for the presence
of some asbestos in the school environment following an asbestos abatement activity.

*Conclusions*
According to the plaintiff's deposition, Mr. Helfand removed and installed friable
asbestos-containing insulation associated with boilers during the course of his home
repairs. He claimed exposure from the removal and installation of asbestos cement on
lead crucibles at Rabin Typographers that occurred in his presence. Mr. Helfand also
allegedly mixed, applied, and sanded asbestos-containing joint compound in association
with several projects involving drywall work. His presence during these activities and his
personal mixing and application of the asbestos cement and joint compound could have
exposed him to levels of respirable asbestos in excess of today's occupational exposure
limits. Friable materials are typically associated with asbestos-related diseases, such as
mesothelioma.

Mr. Helfand testified that he cut and installed floor tile manufactured by American
Biltrite under the name 'Amtico,' while performing home remodeling of his kitchen in
the early 1980s. He may have installed the removed Amtico on other occasions as well.
Mr. Helfand offered no description of the product other than its size, and there was no
indication that the alleged Amtico floor tile contained asbestos. Even if the alleged
Amtico tile did contain asbestos, Mr. Helfand's infrequent encounters with American
Biltrite-manufactured Amtico tiles would have presented him with little or no exposure to
asbestos.

I base this conclusion on my more than 29 years experience as an industrial hygienist and
safety professional. My experience has included health hazard evaluations and audits of
multiple operations within industrial, academic, commercial, and residential facilities.
My experience has also included the development of exposure assessment strategies, and
training of employees who worked in numerous industrial operations. I also base my
opinion upon portions of scientific literature and exposure assessments of encapsulated
materials I have completed on American Biltrite floor tile and floor tiles similar to those
manufactured by American Biltrite, Inc. completed by others.

04/25/2007 11:00 FAX 1212490●      GORDON & SILBER    ●      ☒014/016

Helfand, Harvey v. American Biltrite
EPI Project 27159
Summary Report
24 April 2007
Page 8

For the purposes of this report, I have reviewed numerous documents, articles, studies and publications, which include but are not limited to the following:

1. Deposition of Harvey Helfand, taken 5 through 9 October 2006

2. Plaintiff's Fact Sheet

3. Various occupational safety and health publication and articles developed by governmental agencies, professional and trade associations, voluntary consensus standards organizations, and researchers.

4. Code of Federal Regulations, 29 CFR Part 1910 and Part 1926.

5. American Conference of Governmental Industrial Hygienists. Documentation of Threshold Limit Values. 1946 to present.

6. Environmental Profiles, Inc. Report of Findings: Evaluation of Airborne Asbestos Exposure to Workers During Handling, Installation and Clean-up of Amtico Floor Tile Manufactured by American Biltrite Inc., 12 January 2007.

7. Boelter, F. and Spencer J. Installation 1970 Vintage Congoleum Vinyl Asbestos Tile Isolation Test Chamber. 20 June 2002.

8. Boelter, F. and Spencer J. Complete Removal 1970 Vintage Congoleum Vinyl Asbestos Tile Residential Bathroom. 27 June 2002.

9. Boelter F. and Spencer J. Partial Installation 1970 Vintage Congoleum Vinyl Asbestos Tile Residential Bathroom. 25 June 2002.

10. Boelter F. and Spencer J. Partial Installation 1970 Vintage Congoleum Vinyl Asbestos Tile Residential Bathroom. 24 June 2002.

11. Boelter & Yates Environmental Engineers and Scientists. Asbestos Content of Floor Tiles Congoleum Litigation Related. 17 July 1998.

12. Walcott, R. and Warrick, J. 1979. *Monitoring for Airborne Asbestos Fibers: Vinyl Asbestos Floor Tile.* December 1979.

13. Osborne, JE. 1979. Industrial Hygiene Survey of Airborne Asbestos Concentrations from Vinyl-Asbestos tile Operations. *Department of the Navy* 23 May 1979.

14. Wendlick, Joseph D. CIH. Ambient Asbestos Fiber Levels at Selected Sites in Philadelphia, Pennsylvania. November 1984.

15. Langer, Arthur M. and R.P. Nolan. 1994. "Chrysotile Biopersistence in the Lungs of Persons in the General Population and Exposed Workers." *Environmental Health Perspective.* 102 (Supplement 5): 235-239.

16. Langer, Arthur M. and R.P. Nolan. 1994. "Chrysotile Asbestos in the lung of persons in New York," Arc. Environ. Health. 22:348-361

04/25/2007 11.00 FAX 1212490⬤    GORDON & SILBER    ⬤    ☑015/016

Heiland, Harvey v. American Biltrite
EPI Project 27159
Summary Report
24 April 2007
Page 9

17. Andrion, A., D. Bellis, E. Bertoldo and F. Mollo. 1984. "Coated and Uncoated Lung Mineral Fibers in Subjects With and Without Pleural Plaques at Autopsy," *Path. Res. Pract.* 178:611-616.

18. Selikoff, Irving J. 1970. "Partnership for Prevention – The Installation Industry Hygiene Research Program," *Industrial Medicine.* 39:162-166.

19. Federal Register, U.S. Environmental Protection Agency, 40 CFR, Parts 763, Asbestos: Manufacturing, Importation, Processing and Distribution in Commerce Prohibitions; Final Rule; July 12, 1989.

20. Federal Register, U.S. Environmental Protection Agency. 40 CFR. Parts 61, NESHAP Revision: Final Rule: November 20, 1990.

21. Federal Register, Occupational Safety and Health Administration 29 CFR 1910, 1915, and 1926. Occupational Exposure to Asbestos; Corrections.

22. U.S. Environmental Protection Agency (EPA). 1982. Analysis of Fiber Release from Certain Asbestos Products. draft Final Report. December 1982.

23. Corrosion Proof Fittings v. The EPA 947 F. 2d 1201 (5th Cir. 1991).

24. Fleischer, Walter E., et.al. "A Health Survey of Pipe Covering Operations in Constructing Naval Vessels." Journal of Industrial Hygiene and Toxicology. Vol. 28, No. 1. Copyright 1946

25. Fischbein, et al. "Drywall Construction and Asbestos Exposure," *American Industrial Hygiene Association Journal.* Vol. 40, May 1979.

26. National Gypsum Company. "Release of Air Contaminants in Mixing and Sanding Joint Treatment Products," 3 July 1973.

27. Gypsum Association. "Evaluation of Exposure to Asbestos During Mixing and Sanding of Joint Compounds," 19 November 1973.

28. Balzer, J.L. and Cooper, W.C., "The Work Environment of Insulating Workers," *American Industrial Hygiene Association Journal.* May-June 1968.

29. Balzer, J.L.; Powler, D.F.; and Cooper, W.C. "Dust-Producing Potential of Construction Materials." Safety and Health in Shipbuilding and Ship Repairing, ILO, Geneva, 1972.

30. McKinnery, William. "Evaluation of Airborne Asbestos Fiber Levels During Cutting of Vinyl Asbestos Floor Tile and Asbestos-Containing Ceiling Tile Operations."

This report is based on the information available to me at this time. Should additional information become available, I reserve the right to determine the impact, if any, of the

04/25/2007 11:00 FAX 12124300●          GORDON & SILBER          ●          ☑ 016/016

Helland, Harvey v. American Biltrite
EPI Project 27159
Summary Report
24 April 2007
Page 10

new information on my opinions and conclusions, and to revise my opinions and conclusions if necessary.

Sincerely,

*John W. Spencer / JWB*

John W. Spencer, CIH, CSP
President

JWS/kch

**James C. Rock, PhD, PE, CIH**
**TUPE, Inc.**
**2514 Oak Circle, Bryan, TX 77802-2008**
**Phone 979.776.8973**

12 July 2007

Gregg J Borri, Esq
Gregg J Borri Law Offices
61 Broadway, Suite 2125
New York, NY 10006

      Re: Harvey Helfand, Index No.117176/06;  in Re: New York City Asbestos Litigation, Supreme Court of the State of New York, All Counties within New York State.

Dear Mr Borri:

This letter serves as my report on the referenced matter.  The purpose of my review was to assess Mr Harvey Helfand's asbestos exposure-dose in relation to his alleged asbestos-related mesothelioma.  My focus has been on exposures potentially attributable to dust from Georgia-Pacific (GP) joint compound products, and whether they put him at risk for mesothelioma.

You provided the following documents:

1.     Plaintiff's Responses to Defendant's 4th Amended Interrogatories and RFP, 17 Nov 2006
2.     Deposition of Harvey Helfand, Volume I, 22 Jan 2007 w outline
3.     Deposition of Harvey Helfand, Volume II, 29 Jan 2007 w outline
4.     Deposition of Harvey Helfand, Volume III, 9 Mar 2007 w outline
5.     Video Deposition of Harvey Helfand, 11 May 2007 w outline
6.     SS records for Harvey Helfand, received 10 July 2007 via email

Harvey Helfand was born on 8 November 1935.  He lived most of his life in Brooklyn, NY; he moved in 1998 to his present home in New Jersey.  He married Leona in 1958 and he has 3 grown daughters.  Mr Helfand was a member of the Printers Union Local 51 and the Amalgamated Lithographers Union Local 1, from the mid 1950s to the mid 1970s. He started smoking at age 15 (1950) and quit in the mid 1970s. He smoked Chesterfield, Parliament, and Kent cigarettes.[1]  He was diagnosed with mesothelioma in October 2006.

**Asbestos Health Effects**

The industrial hygiene hierarchy of controls for chemical hazards favors substitution of less hazardous chemicals whenever possible, and requires an industrial hygienist to be familiar with relevant chemical and toxic mechanisms for asbestos and its proposed substitute.  From *chemistry* the amphiboles are solid crystalline needles that are rich in iron, aluminum, calcium and sodium silicates while pure chrysotile is formed as a hollow scroll rolled from magnesium

---

[1] *Deposition of Harvey Helfand, Vol 1, 1/22/07, pp 8-9; Vol 2, 1/29/07, pp161-2.*

JC Rock//Helfand report.wpd//
                                                        1

silicate sheets.[2] From *biochemistry*, chrysotile apparently has a tolerable positive surface charge in physiological solutions, whereas the amphiboles are negatively charged and apparently mutagenic both by direct contact and indirectly by producing reactive oxygen (ROS) and reactive nitrogen species (RNS) in body fluids.[3, 4, 5] This recent evidence confirms early metal toxicity postulated by W E Cooke when he described and named asbestosis; he noted black inclusions at weak spots in raw asbestos fibers; he saw that finished fibers were free from these spots which were concentrated in textile factory dust and in asbestotic lungs; he identified the spots as iron oxide; and he linked iron to asbestosis that was more prevalent among raw fiber workers than among those exposed only to dust from finished fibers.[6] From early animal *toxicology*[7] and subsequent human *epidemiology*, the shape of fibers is important: solid amphibole fibers are more potent than hollow chrysotile fibers, and fibers smaller than 0.25 μm diameter and longer than 20 μm have the most potency.[8] From *microscopic pathology*, long silky chrysotile fibers do not penetrate the deep lungs as easily as long straight amphibole fibers. Those chrysotile fibers that get there are cleared in days to weeks while amphiboles and some long chrysotile (>20 μm) remain for decades.[9] An industrial hygienist seeks an asbestos substitute that does not contain iron, aluminum, or calcium silicates, does not have thin fibrils between 20 and 100 μm long, and produces neither toxic surface charge polarity nor reactive chemicals in body fluids. Pure short-fiber chrysotile has these properties.

## State-of-the-art for Drywall Manufacturers

There is reasonable scientific certainty that career drywall tapers are not at risk of mesothelioma.[10] Joint compound dust fails to elevate mesothelioma risk for full-time drywall finishers because the chrysotile fibers in joint compound were too short (most were < 5 μm),[11]

[2]Rosato, D.V. "Asbestos Its Industrial Application." Rheinholt Publishing Co. NY (1959), Table 2.1, from: Encyclopedia of Chemical Technology, Vol 2, New York & London, Interscience Publisher, (1948).

[3]Wu, J. W. Liu, K. Koenig, S. Idell and V. C. Broaddus: "Vitronectin Adsorption to Chrysotile Asbestos Increases Fiber Phagocytosis and Toxicity for Mesothelial Cells." Am J Physiol - Lung Cell Mol Physiol 279:916-923 (2000).

[4]Maples, K.R., and N.F. Johnson: "Fiber-induced Hydroxyl Radical Formation: Correlation with Mesothelioma Induction in Rats and Humans." Carcinogenesis 13(11): 2035-2039 (1992).
Upadhyay, D., and D.W. Kamp: "MINIREVIEW Asbestos-Induced Pulmonary Toxicity:  Role of DNA Damage and Apoptosis" Exp Biol Med 228:650–659 (2003).

[5]Kamp, D.W., V. Panduri, S.A. Weitzman and N. Chandel:  "Asbestos-induced Alveolar Epithelial Cell Apoptosis: Role of Mitochondrial Dysfunction Caused by Iron-derived Free Radicals." Mol and Cell Biochemistry 234/235:  153–160 (2002).

[6]Cooke, W.E.: "Pulmonary Asbestosis." Br J Medicine p 1024-1025 (1927).

[7]Gardner, L.U.: Industrial Medicine, (1940) Vol 9 p 45 mentioned in 1958 edition of Patty's Ind Hyg & Tox 2nd ed.
Stanton, M.F. and C. Wrench:  "Mechanisms of Mesothelioma Induction with Asbestos and Fibrous Glass." J National Cancer Institute 48(3):797-821 (Mar 1972).

[8]Hodgson, J.T. and A. Darnton: "The Quantitative Risks of Mesothelioma and Lung Cancer in Relation to Asbestos Exposure." Ann Occup Hyg 44(8):565-601 (2000).

[9]Roggli, V.L., T.D. Oury & T.A Sporn:  Pathology of Asbestos-Associated Diseases, 2nd Ed. 2004; Sprinter-Verlag, NY
Bernstein, DM, JA Hoskins: "The Health Effects of Chrysotile: Current Perspective based upon Recent Data." Regul Tox Pharmacology 45:252-264 (2006).
Yarbourogh CM. "Chrysotile as a Cause of Mesothelioma: An Assessment Based on Epidemiology" Critical Reviews in Toxicology 36:165–187 (2006).

[10]Roggli, V.L., A. Sharma, K.J. Butnor, T. Sporn and R.T. Vollmer: "Malignant Mesothelioma and Occupational Exposure to Asbestos: A Clinicopathologic Correlation of 1445 Cases." Ultrastructural Pathology 26: 55-65 (2002).  Top left, pg 56.

[11]RoC: Asbestos CAS # 1332-21-4, 8th Report on Carcinogens, shows that NIEHS and OSHA knew that Grade 7 (length < 3 μm) chrysotile was used in coatings and adhesives <http://ntp-server.niehs.nih.gov/htdocs/8_RoC/KC/Asbestos.html>.
Rohl, A.N., A.M. Langer, I.J. Selikoff & W.J. Nicholson: "Exposure to Asbestos in the Use of Consumer Spackling, Patching, and Taping Compounds." Science 189:551-553 (15 Aug 75).  The longest fiber in air samples was shorter than 3 μm.

had a non-potent chemical composition and a distinct silky morphology. It follows that part-time joint compound users and bystanders, with lower intensities and shorter durations, have lower mesothelioma risk, if any, than the unmeasurable risk of full-time drywall tapers.

After WW II, joint compound and drywall technology replaced wet plaster in the building industry. This eliminated raw asbestos and reduced the quantity of asbestos-containing "muds" used on construction sites by a factor of 15 to 200, dramatically reducing occupational exposures. Between 1950 and 1980 there were occasional reports of dust concentrations during specific short tasks such as mixing, sanding or sweeping dust from joint compound. Verma and Middleton reviewed prior literature and quantified asbestos exposure intensity for full time drywall workers, in terms of 8-hour time-weighted average (TWA) measurements, taken at residential and commercial job sites.[12] They reported that tapers' exposure intensity was 4.5 [f/mL] when dry mix joint compound was used and 2.1 [f/mL] when premix was used. These intensities are within the OSHA permissible exposure limit (PEL) that applied until June 1976. A 40-year drywall finisher retiring at the end of 1978 had a lifetime exposure-dose less than 20% of that allowed by contemporary occupational exposure limits throughout his career.

**Dose Response for Mesothelioma**

*Dose Response* quantifies a key principle of healthy living, moderation in all things. A foundational axiom for that principle – that all substances are toxic in sufficient doses and tolerated or beneficial in small doses – is traced to Paracelseus' 1567 manuscript in the popular book, *The Dose Makes the Poison*.[13]  As translated, Paracelseus wrote:

> What is it that is not a poison? All things are poison and nothing is without poison. It is the dose only that makes a thing not a poison.

Ottoboni notes that dose response data show decreasing latencies[14] and increasing incidence rates in exposed populations with increasing doses. She defines a practical threshold dose for carcinogens as one associated with a latency longer than the average life span of the exposed population or with an incidence rate lower than the size of the exposed population. Asbestos associated mesothelioma latency has been reported to average 48.7 years, in a range of {14, 72} years. There is wide variability in latency due to fiber type, intensity and exposure duration.[15]

Mesothelioma is well established as an occupational disease with a clear dose-response when it occurs in workers with long-term inhalation of high levels of amphibole asbestos fibers that are

---

Fischbein, A., A.M. Langer, Y. Suzuki and I.J. Selikoff: "Carcinoma of the Lung in a Drywall Taping Worker, Report of a Case." Toxicology Letters, 2:231-232 (1978). Figure 4 is a TEM photo of debris from the diseased lung showing that all fibers were shorter than 1 µm and that there were many fragments of sheet silicates including clay and mica.

[12]Verma, D.K., and C.G. Middleton: "Occupational Exposure to Asbestos in the Drywall Taping Process," AIHAJ 41(4): 264-269 (1980).

[13]Ottoboni, M.A: "The Dose makes the Poison – A Plain Language Guide to Toxicology, 2nd Ed." (1991) Van Nostrand Reinhold, NY.

[14]Latency is the delay between the start of exposure and symptoms. For mesothelioma risk estimates, the effective latency is 10 years shorter than the number of years since the start of exposure in each engagement.

[15]Pistolesi, M., and J. Rusthoven: "Malignant Pleural Mesothelioma – Update, Current Management, and Newer Therapeutic Strategies." Chest 126:1318-1329 (2004).



longer than 10 μm with diameters smaller than 0.4 μm.[16]  Cohorts exposed to serpentine asbestos show no elevation of mesothelioma incidence rates at exposure-doses up to 1000 [f yr/mL].[17]  In cohorts with exposure to mixed fiber types, lung fiber burdens show that mesothelioma incidence rates correlate well with long fiber amphibole exposure-doses.[18]  The mesothelioma incidence rates are highest in cohorts with the highest amphibole exposure-doses and are lowest in those with exposure-doses near those associated with lifetime background fiber levels.[19]

The cohort of 17,800 union insulators in the US and Canada is the largest asbestos-exposed cohort with elevated mesothelioma rates.  Insulators' lifetime average (LTA) exposure intensity was in the range, {4, 12} [f/mL], putting their 50-year lifetime exposure-doses in the range, {200, 600} [f yr/mL].[20]  EPA estimated typical exposure-doses among asbestos mesothelioma cases to have been 375 [f yr/mL],[21] well within Dr Selikoff's earlier estimate.

In 1970, 80% of all diagnosed Canadian mesothelioma cases, and 98% of the cases diagnosed in women, had no plausible asbestos exposures.[22]  In 2001, the ACGIH TLV committee concluded that at least 15% of mesothelioma cases were idiopathic.[23]  By 2004, Roggli et al[24] reported: "In our own studies, approximately 11% of mesotheliomas have a lung asbestos content indistinguishable from background, and perhaps 10 to 20% of all cases are not the result of asbestos exposure."  The authors noted that the predominant fiber type identified in patients with mesothelioma is commercial amphibole, and that in the United States amosite is ~ 20x more likely than crocidolite.  Data published in 2006 suggest that the proportion of mesothelioma cases with asbestos exposure continues to fall and that mesothelioma was idiopathic (not asbestos

[16]Berman, D.W. and K.S. Crump: "Final Draft, Technical Support Document for a Protocol to Assess Asbestos-Related Risk," prepared for EPA Office of Solid Waste and Emergency Response, (Oct 2003) EPA # 9345.4-06.
  Hodgson, J., and A. Darnton: "The Quantitative Risks of Mesothelioma and Lung Cancer in Relation to Asbestos Exposure." Ann Occup Hyg 44(8):565-601 (2000).
  Lanphear, B.P., and C.R. Buncher: "Latent Period for Malignant Mesothelioma of Occupational Origin." J Occ Med 34(7): 718-721 (1992).
  Price, B., and A. Ware: "Mesothelioma: Risk Apportionment Among Asbestos Exposure Sources." Risk Analysis 25(4):937-943 (Aug 2005).
  Yarborough CM. "Chrysotile as a Cause of Mesothelioma: An Assessment Based on Epidemiology" Critical Reviews in Toxicology 36:165–187 (2006).
  And other papers referenced in the cited publications.

[17]Documentation of the TLVs and BEIs. ACGIH, Cincinnati, OH (2001).
  Liddell, F.D., A.D. McDonald and J.C. McDonald: "Dust Exposure and Lung Cancer in Quebec Chrysotile Miners and Millers." Ann Occup Hyg 42(1):7-20 (1998).

[18]Ross, M.: "The Geologic Occurrences and Health Hazards of Amphibole and Serpentine Asbestos." In Reviews in Mineralogy, Volume 9A: Amphiboles and Other Hydrous Pyriboles–Mineralogy (Ed. D. R. Veblen). Washington, DC: Mineralogical Society of America, pp. 279-323 (1981).

[19]Dunnigan, Jacques: "Linking Chrysotile Asbestos with Mesothelioma" Am J Ind Med 14: 205-209 (1988).

[20]Selikoff, I.J., E.C. Hammond and H. Seidman: "Mortality Experience of Insulation Workers in the United States and Canada, 1943-1976." Ann NY Acad. Sci 330:91-116 (1979).

[21]US EPA Integrated Risk Information System, ASBESTOS (CASRN 1332-21-4),http://www.epa.gov/iris/subst/0371.htm, section II.C .2 "Dose Response Data for Carcinogenicity, Inhalation Exposure."  last revised: 1 Jul 1993.

[22]McDonald, A.D., A. Harper, O.A. ElAttar, and J.C. McDonald:  "Epidemiology of Primary Malignant Mesothelioma Tumors in Canada." Cancer 26(4): 914-919 (Oct 1970).

[23]Documentation of the TLVs and BEIs. Asbestos TLV (2001) ACGIH, Cincinnati, OH.

[24]Roggli, V.L., T.D. Oury & T.A Sporn:  Pathology of Asbestos-Associated Diseases, 2nd Ed. 2004; Sprinter-Verlag, NY; pp 108, 325.

related) in ~ 13% of male and ~ 60% of female patients.[25]  In studies of neighborhood and carry-home exposures, living near an asbestos plant carries higher risk than living with an asbestos worker.[26]

People with ambient exposures have exposure-doses below the threshold for mesothelioma. Because women in the US seldom worked with asbestos, the fact that there has been no increase in mesothelioma incidence in women during the period of rapid increase among men (1977-2004), shows that a threshold exists and that it is above the mid 20th century urban exposure-doses.[27]  Although this threshold exposure intensity for primarily chrysotile exposure is unknowable, it clearly lies below the range of intensities observed in insulators.  That puts it in the range, {0.2, 2} [f/mL], with 50-year exposure-doses in the range, {10, 100} [f yr/mL].

It is important for an industrial hygienist to understand that mesothelioma is a disease whose risk increases in populations with high occupational exposures to long, thin amphibole fibers and that its risk is greater than zero in populations with no occupational exposure to asbestos.  For individuals or groups with low exposure-doses, it is not possible to "say with certainty that the cancer would not have occurred if the person had not been exposed to the carcinogen." [28]  In other words, it is impossible to say with reasonable scientific certainty that a near threshold exposure-dose is associated with mesothelioma.  Further, because no more than 10-20 % of the most exposed populations contract the disease,[29] the best anyone can do is to provide a probability that the disease in any circumstance is asbestos-related, based on the work history and the estimated exposure pattern.  The term *risk* quantifies that probability and is central to selection of industrial hygiene exposure control measures.

### Mr Helfand's Work History

The following sequence represents a partial record of Mr Helfand's work history.  It is based on Mr Helfand's testimony with dates refined from review of his social security records.  There is no attempt to capture all of the short engagements shown in his social security records.

Rabin Typesetting, 1952 (SS records show ~ 1 mo, while in High School).
United Offset printing,[30] 1953 - 1957  (learned press maintenance on night shift)

---

[25]Roggli, VL.: "The Role of Analytical SEM in the Determination of Causation in Malignant Mesothelioma." Ultrastructural Pathology 30:31–35 (2006).

[26]Magnani, C., P Dalmasso, A Biggeri, C Ivaldi, D Mirabelli, B Terracini. "Increased Risk of Malignant Mesothelioma of the Pleura after Residential or Domestic Exposure to Asbestos: A Case-Control Study in Casale Monferrato, Italy." Environ Health Perspectives 109(9):915-919 (Sep 2001).

[27]Price, B.: "Analysis of Current Trends in United States Mesothelioma Incidence." Am J Epidemiol 145(3):211-218 (1997).

[28]Cember, Herman: Introduction to Health Physics, 3rd ed, McGraw-Hill NY, pp 233-237(1996).

[29]Talcott, J.A., W.A.Thurber, A.F. Kantor, E.A. Gaensler, J.F. Danahy, K.H Antman, and F.P. Li. "Asbestos-Associated Diseases in a Cohort of Cigarette-Filter Workers."  New England Journal of Medicine pp 1220-1223 (1989)
Talcott et al found 5 of 28 former crocidolite filter workers died of mesothelioma, ~18% ... all had diagnosed asbestos related disease ... workplace exposure intensity was reported to be ~ 80 f/mL of crocidolite, whose use ceased in 1971.  The kent micronite filters were manufactured with a uniquely dusty dry process that deposited blended crocidolite, cotton, acetate fibers on crepe paper and rolled it to prepare the filter.

[30]Deposition of Harvey Helfand, Vol III, 3/09/07, p 280.

Ramapo as a pressman,[31] 1957-1961, 1971 (~ 1 mo)
Fenway Press,[32] 1961 (~ 4mo)
Knight Litho or Muree Press,[33] 1961-1966
Majestic Graphic Press,[34] 1966  (~4 mo)
Lorsten Press aka Service Offset,[35] 1966-1967
Marshall Typography,[36] 1967 (1- 2 mo)
Deblin Manufacturing,[37] 1967 (~ 1 mo), brother's die extrusion company
Jarrett Press Inc,[38] 1968 (~ 4 mo)
Ross Printing Co,[39] 1968 (~ 5 mo)
Triple M Printing,[40] 1969-70 (~ 6 mo as foreman)
Lithocraft Corp,[41] 1970 (~7 mo)
Self Employment, 1971-1972
H&H Multicolor Corp, 1973-1991 (maintained his own presses)
Park Lane Litho, 1992 (~ 2 mo)
Spectrum Printing & Lithography,[42] 1993- 2005 (time off in winter 97-98)
Colahan Saunders Corp, 1997 (~5 wk, overhauled an old press for them)
30% home improvement off the books ( > 50 projects) and 70% printing and press repair[43]
80% of home improvement projects included joint compound.[44]
Mr Helfand started flying in 1979 and did much of the maintenance on his Piper Dakota.[45]

**Discussion of Potential Asbestos Exposure**

Mr Helfand smoked cigarettes at 1 ppd from age 15 to ~ age 45 (approximately 1950 - 1980), shifting to filtered cigarettes when they became available.[46] He testified that he smoked Kent filtered cigarettes during the 1950s and that he remembered the phrase, Micronite filter.  For 5 to 6 years, these filters each contained ~10 mg of long-fiber crocidolite asbestos, upwards of 80 billion fibers with diameters $< 0.1$ $\mu$m.   It has been estimated that a 1 ppd smoker inhaled 131

---

[31]*Deposition of Harvey Helfand, Vol III, 3/09/07, p 280, 294*

[32]*Deposition of Harvey Helfand, Vol III, 3/09/07, p 287*

[33]*Deposition of Harvey Helfand, Vol III, 3/09/07, p 289-90*

[34]*Deposition of Harvey Helfand, Vol III, 3/09/07, p 291*

[35]*Deposition of Harvey Helfand, Vol III, 3/09/07, p 291-292*

[36]*Deposition of Harvey Helfand, Vol III, 3/09/07, p 292*

[37]*Deposition of Harvey Helfand, Vol III, 3/09/07, p 293*

[38]*Deposition of Harvey Helfand, Vol III, 3/09/07, p 293*

[39]*Deposition of Harvey Helfand, Vol III, 3/09/07, p 295-297*

[40]*Deposition of Harvey Helfand, Vol III, 3/09/07, p 297-298*

[41]*Deposition of Harvey Helfand, Vol III, 3/09/07, p 299-300*

[42]*Deposition of Harvey Helfand, Vol III, 3/09/07, p 267-272, 278*

[43]*Deposition of Harvey Helfand, Vol III, 3/09/07, p 350-52*

[44]*Deposition of Harvey Helfand, Vol III, 3/09/07, p 374*

[45]*Deposition of Harvey Helfand, Vol III, 3/09/07, p 389-394*

[46]*Deposition of Harvey Helfand, Vol II, 1/29/07, p 161-2.*



million NIOSH fibers per year.[47]  Smoker exposure has been established by quantifying long crocidolite fibers in the lungs and lymph nodes of a Kent smoker who died of mesothelioma with no other known asbestos exposure.[48]  Mr Helfand's testimony supports the conclusion that he inhaled many hundreds of millions of crocidolite fibers while smoking Kent cigarettes, a substantial and sufficient contributing factor to his risk of mesothelioma.

Mr Helfand's career in the printing business started as a 15-year old, when he worked part-time at Rabin Typographers.  SS records suggest ~ 1 month part-time, but he testified to 5 or more hours per day for nearly a year.  Mr Helfand claims asbestos dust from insulation on pots and while cutting flooring.[49] He stated that he regularly cleaned the Linotype machine; he recalled lead melted in gas fired pots that he thinks were lined with asbestos, pots he cleaned.[50]  When type alloy is melted, the tin and antimony tend to oxidize to a white powder that is removed from each batch and replaced with fresh metal.  The pots must be cleaned to remove the undesired oxide powders, and this was likely part of his daily job.   The pot lining had to be changed occasionally, but said he did not do that job, he watched others as they smoothed the paste on the outside of the pot with a spatula.[51]

After he graduated from the New York School of Printing in 1953 at approximately age 18, he worked full time for numerous printing companies, including an 18- to 22-yr period (1970 or 1973 to 1992) when he ran his own company, H&H Multicolor.  Mr Helfand says that if he was exposed to asbestos, it was from the clutches and brakes on the presses.[52]

Mr Helfand testified that during lapses in his regular employment he did part-time residential renovations and most involved tearing out old materials prior to the new construction.[53]  Over the course of his career, he spent 70% of his working hours at printing related jobs and 30% in renovation and he estimated that he completed about 50 projects between 1955 and 2005.[54]  He noted that 80% of his home renovation projects involved some joint compound.[55]  He recalled two periods dedicated to residential projects: 2 consecutive years between 1967-1969,[56] and 6 months during the late 1990s.[57]  His Social Security records show that he had some income from

[47]Longo, W.E., M.W. Rigler and J. Slade: "Crocidolite Asbestos Fibers in Smoke from Original Kent Cigarettes." Cancer Research 55: 2232-2235 (1jun95).

[48]Dodson, R.F., and S.P. Hammar: "Pleural Mesothelioma in a Woman Whose Documented Past Exposure to Asbestos was From Smoking Asbestos-Containing Filtered Cigarettes: The Comparative Value of Analytical Transmission Electron Microscopic Analysis of Lung and Lymph-Node Tissue." Inhalation Toxicology 18:679–684 (2006).

[49]Deposition of Harvey Helfand, Vol III, 3/09/07, pp 397-408.

[50]Deposition of Harvey Helfand, Vol I, 1/22/07, pp 90-96.  [Note that the melting point of lead is 327.5 °C (600.65 K, 621.5 °F), and the melting point of alloys used in linotype machines was lower, as low as the lead-tin eutectic alloy (62% tin, 38% lead), 183 °C. Other alloys with lead, tin and antimony had intermediate melting points. Lead and these alloys are commonly melted in cast iron pots.  The purpose of the alleged asbestos lining is not clear.  Nevertheless, an asbestos exposure will be assigned in dose reconstruction to avoid underestimating lifetime asbestos exposure.]

[51]Deposition of Harvey Helfand, Vol II, 1/29/07, p 189.

[52]Deposition of Harvey Helfand, Vol III, 3/09/07, p 273.

[53]Deposition of Harvey Helfand, Vol II, 1/29/07, p 152 is but one example of this repeated testimony.

[54]Deposition of Harvey Helfand, Vol III, 3/9/07 pp 351-352, 378.

[55]Deposition of Harvey Helfand, Vol III, 3/09/07, p 374.

[56]Deposition of Harvey Helfand, Vol II, 1/29/07, pp 197-201.

[57]Deposition of Harvey Helfand, Vol II, 1/29/07, pp 199-200.



7 employers during 10 quarters of the 3-year period between 1967 and 1969, and show a reduction in reported income during the 1997-98 period. It was during these periods that he had time to complete two to three projects per year.[58] In fact, he testified that he completed two basements with bathrooms during the 1967-69 period, using both sheetrock and paneling; he does not know which brand of joint compound he used on either of these 2-month projects.[59] Mr Helfand recalled using Bestwall, US Gypsum, Kaiser, and Georgia-Pacific drymix joint compounds, shifting to premix Bestwall, US Gypsum and Kaiser when they became available.[60] He stated that he used GP dry mix 4-5x a year, beginning in 1953 to 1955,[61] and that he switched to readymix as soon as GP introduced it to the market. GP did not sell joint compound until after it acquired Bestwall in 1965, and did not drop the Bestwall label until the late 1960s, so he did not see the GP joint compound label in the early 1950s; further, Bestwall was not organized as a company and did not manufacture joint compound until 1956, so he did not see Bestwall during the period 1953-55.[62]

Mr Helfand's Answers to Interrogatories stated that he was unaware of any non-occupational exposure to asbestos.[63] Nevertheless, he detailed non-occupational asbestos exposure while renovating/repairing his family's homes.

1) 9802 Foster Ave (childhood home, 1935- early 1950s) – Helfand testified that he and his brother handled the asbestos cement around the boiler as well as the associated pipecovering when they worked on the boiler.[64]

2) 634 Schenectady Ave (early 1950s to 1958) – Young Helfand helped his father put an apartment in the basement, using Kentile flooring, sheetrock and plaster. The basement was ~15'x35' and the project took about 6 months.[65] He named USG plaster as the compound.[66]

3) 227 E 86th St, Brooklyn (1958-1960) – He claimed no asbestos exposure.

4) 1127 E 83rd St (1960-1963) – He claimed no asbestos exposure during minor maintenance he performed for his elderly landlords.

5) 1151 E 82nd St (1963-1998) – Helfand testified that he could have been exposed to asbestos from products he used in the basement renovation, extra bathroom, and reinsulation of the back wall.[67] The basement (15' x 20') project took 6 months of sporadic time in the mid 1960s; he wired it for electricity, put up walls, and added a bathroom. He used Celotex drop ceilings,

[58] Deposition of Harvey Helfand, Vol II, 1/29/07, pp 199-202.

[59] Deposition of Harvey Helfand, Vol III, 3/09/07, pp 349-351.

[60] Deposition of Harvey Helfand, Vol III, 3/09/07, p 337.

[61] Deposition of Harvey Helfand, Vol III, 3/09/07, pp 329-330, 336.

[62] GP Response to Master Interrogatories, 3rd Judicial Circuit, Madison County, IL; Affidavit of O.E. Burch 14 Jan 03.

[63] Plaintiff's Responses to Defendant's 4th Amended Interrogatories and RFP, 17 Nov 2006, p 13, sec 20A.

[64] Deposition of Harvey Helfand, Vol I, 1/22/07, pp 58-59; Vol III, 3/09/07, p 396.

[65] Deposition of Harvey Helfand, Vol I, 1/22/07, pp 54-57; Vol II, 1/29/07, pp 240-245.

[66] Deposition of Harvey Helfand, Vol I, 1/22/07, p 43.

[67] Deposition of Harvey Helfand, Vol I, 1/22/07, pp 38-47; Vol II, 1/29/07, pp 237-239..



Kentile floor tiles, and US Gypsum joint compound packaged as ready mix paste.[68] Reinsulation of the back wall occurred in the mid 1970s and he claimed asbestos exposure to sheetrock and spackling compound.[69] He remodeled the kitchen in 1985 (15 years before he moved),[70] long after manufacturers removed asbestos from their joint compound formulations.

### Estimating Exposure-dose and Mesothelioma Risk

A lifetime exposure-dose estimate is the product of duration and intensity.[71]

*Duration* is in working years [1 year = 50 weeks = 250 days = 2000 hours].
*Intensity* is the breathing-zone average concentration in [fibers/mL = f/mL].
*Exposure-dose* units are [(fiber/mL) *(years) = f yr/mL].

The *mesothelioma risk* [mesothelioma cases per million people exposed] from asbestos exposure has been shown[72] to be proportional to intensity of exposure (*in*), to potency for each fiber type (*km*) and to the difference between the positive definite cube of latency minus ten years (*la* - 10)³, and the positive definite cube of latency minus duration minus 10 years (*la* - *du* - 10)³. The unit step function in the equation assures positive risk for all realistic values of input parameters.[73]

$$risk[in, du, la, km] = \frac{in \quad km}{10,000}((la-10)^3 U[la-10] - (la-du-10)^3 U[la-du-ao])$$

The duration, exposure-dose and mesothelioma risk for key portions of Mr Helfand's lifetime asbestos exposure history are displayed in Table 1,[74] dramatically illustrating the deminimus nature of his alleged exposure to asbestos-containing joint compound. Testimony identified joint compounds from Bestwall, GP, Kaiser and USG without assigning proportions. GP joint compound was not available for purchase prior to the late 1960s, so the home renovation projects in the 1950s could not have used GP joint compound. Only after the mid '60s and ending not later than 1978, could Mr Helfand have used GP joint compound with asbestos, about 25% of the 50 years he said he worked in residential renovation, and about 50% of the years when short fiber chrysotile asbestos was part of the joint compound formulations from all vendors. It follows that, of the asbestos associated with joint compound, no more than 8 to 12% was GP, and 88 to 92% was from the other named brands.[75] Because Mr Helfand was not able to enumerate all of his projects and assign a brand to each, the total dose associated with his joint compound use is estimated in Table 1. Each named defendant is responsible for less.

---

[68]*Deposition of Harvey Helfand, Vol III, 3/09/07, pp 369-370.*

[69]*Video Deposition of Harvey Helfand, 3/11/07, p 45.*

[70]*Deposition of Harvey Helfand, 1/22/07, pp 47-48.*

[71]*Seidman H., I.J. Selikoff, S.K. Gelb: "Mortality Experience of Amosite Asbestos Factory Workers: Dose-response Relationships 5 to 40 Years after Onset of Short-term Work Exposure." Am J Ind Med 10:479-514 (1986).*

[72]*Peto, Seidman and Selikoff: "Mesothelioma Mortality in Asbestos Workers Implications for Models of Carcinogenesis and Risk Assessment." Br J Cancer 45:124-135 (1982).*
*Peto, J., R. Doll, C. Hermon, W. Binns, R. Clayton and T. Goffe: "Relationship of Mortality to Measures of Environmental Asbestos Pollution in an Asbestos Textile Factory." Ann Occ Hyg 29(3):305-355 (1985).*
*Hodgson and Darnton (2000), Berman and Crump (2003), Price and Ware (2005).*

[73]*The Unit Step Function, U[x] = 0 for x < 0 and 1 for x > 0.*

[74]*Note that when two entries sit atop one another in the table, that represents the range estimated for that entry.*

[75]*GP fraction = (frac of yrs) (frac of projects) )(GP frac of brands) = 0.5  0.8 (0.2, 0.3) = {0.08, 0.12}*

Table 1: Duration, Exposure-dose and Mesothelioma Risk

| Source [Units] | Dur [years] | DurRange [years] | ExpDos [f*yr/mL] | EDRange [f*yr/mL] | MesoRisk [#/Million] | MRRange [#/Million] |
|---|---|---|---|---|---|---|
| US Gypsum | 0.006 | 0.003 0.012 | 0.018 | 0.0063 0.054 | 0.0017 | 0.00016 0.019 |
| All Joint Compound | 0.081 | 0.025 0.27 | 0.16 | 0.034 0.77 | 0.024 | 0.002 0.3 |
| Childhood | 0.016 | 0.008 0.032 | 0.01 | 0.0029 0.035 | 0.051 | 0.0021 1.2 |
| Environmental | 71. | 71. 71. | 2.8 | 0.89 9. | 2.8 | 0.28 28. |
| Partial Occupational | 67. | 64. 70. | 11. | 5.2 22. | 23. | 1.7 310. |
| Kent Cigarettes | 2.8 | 2. 4. | 0.2 | 0.1 0.4 | 30. | 5.8 150. |
| Lifetime Total | 71. | 71. 71. | 14. | 6.2 32. | 62. | 7.8 490. |

Table 2 compares the joint compound exposure estimates with recognized exposure benchmarks. Mr Helfand's duration attributed to GP was deminimus compared either to a nominal 40-year career, or to his own 50-year career. His total joint compound exposure-dose was very small compared with the non-potent exposure-dose experienced by many middle 20th century urban residents, and an even smaller fraction of the 375 [f yr/mL] typical exposure-dose among asbestos-associated mesotheliomas. His overstated joint compound attributable exposure is so small that the mesothelioma risk model predicts only one attributable mesothelioma case among 41 million people with his exposure, in a range of {3.3, 510.} million people. That case would not be distinguishable from the 410 idiopathic cases, in a range of {33, 5100} cases, expected in the same population. No more than {8%, 16%} of that risk is reasonably attributed to GP.

Table 2: Estimated Effect Relative to Exposure and Risk Benchmarks

| All Joint Compound | Ratio | Range | RefQuantity |
|---|---|---|---|
| Duration as Fraction of 40 yr Career | 0.002 | 0.00062 0.0067 | 40 yr |
| Fraction of Typical Mesothelioma Exposure Dose | 0.00043 | 0.00009 0.002 | 375 f yr/mL |
| Fraction of Idiopathic Meso Rate | 0.0024 | 0.0002 0.03 | 10 /Million |
| Population So Exposed for 1 Extra Mesothelioma | 41. million | 3.3 million 510. million | 1 meso |
| Number Idiopathic Mesos in this Population | 410. | 33. 5100. | – – – |



## Summary of Quantitative Risk Factors

Mr. Helfand's exposure-dose to chrysotile fibers in dust from all brands of joint compound is negligible when compared with mesothelioma-free chrysotile-exposed cohorts:
- career chrysotile workers (intensities to 20 f/mL) had exposure-doses to 1000 [f yr/mL];
- career tapers (intensities up to 4.5 f/mL) had exposure-doses to 225 [f yr/mL];
- 20th century urban residents had environmental exposure-doses to [10 f yr/mL] or more;
- his estimated joint compound associated mesothelioma risk is deminimus compared with the idiopathic background rate of 10 per million men in the United States;
- his GP attributable exposure dose and mesothelioma risk, if any, are inconsequential.

## Summary of Qualitative[76] Risk Factors

It is more likely than not that Mr. Helfand's exposure to chrysotile fibers in dust from joint compounds did not put him in a cohort with risk of mesothelioma because:
- the short fibers in joint compound are not potent for mesothelioma in humans;
- there is no report of excess mesothelioma in any cohort of full-time drywall tapers;
- an occasional user is at much lower risk than the deminimus risk of full-time tapers;
- his attributable joint compound exposure-dose and mesothelioma risk are negligible.

## Conclusions

Based on case-specific materials, peer reviewed reports and, to a reasonable degree of scientific certainty, I conclude that:

    1. Mr. Helfand's attributable lifetime exposure-dose to asbestos fibers from all wall finishing compounds was much smaller than the natural background exposure-dose to asbestos fibers experienced by many urban residents during his lifetime.

    2. His infrequent and remarkably small exposures to asbestos fibers from joint compound dust put him in a cohort where the attributable asbestos-associated mesothelioma risk is negligible -- vanishingly smaller than the observed idiopathic rate for men in the USA.

    3. It is far more likely than not that Mr. Helfand's even smaller asbestos exposure-dose attributed to Georgia-Pacific, if any, did not put him in a cohort with elevated risk of mesothelioma.

I reserve the right to amend or supplement this report if additional case-specific information becomes available for my review. Please let me know if I can be of further assistance.

Very truly yours,

James C. Rock, PhD, PE, CIH

Attachment:   Appendix A. Representative Lifetime Exposure-Doses

---

[76]Qualitative here means interpreting the present case in terms of non-mathematical trends apparent from epidemiology; it contrasts with quantitative estimates of rates and risk that lie at the core of modern industrial hygiene.



### Appendix A. Representative Lifetime Exposure-Doses

| | Reference | Standard [77] [fiber/mL] | Concentration [fiber/mL] | Lifetime Exposure-Dose [fiber years/mL] |
|---|---|---|---|---|
| **Mixed Fiber Exposures** | 1951-1971 TLV [78] | 30 | | 1500* |
| | Dec 1971 PEL | 5 | | 250* |
| | Jul 1976 PEL | 2 | | 100* |
| | high urban background, 20th century [79] | | 0.03 | 10.** |
| | Aug 1994 - current PEL | 0.1 | | 5* |
| **With Meso** | Mt Sinai insulators, elevated meso risk [80] | | 4-12 | 200-600* |
| | EPA 1991 Summary of meso cases [81] | | 7.5* | 375 |
| **Chrysotile Exposures Meso rates not elevated** | Quebec Miner/Miller Cohort [82] | | ~ 20 | 1000 |
| | full time drywaller [83] | | 2.1 - 4.5 | 105 - 225* |
| | high natural background [84] | | 0.01 | 3.4** |
| | low natural background/indoor | | < 0.001 | < 0.34** |
| | | | | |
| *Based on a 50-yr working life time,    **Based on an 80-year life time | | | | |

Note: Micronite filter workers with mesothelioma had worked for 0.7 to 4 years with crocidolite fibers at a concentration of 80 f/mL, and had exposure doses in the range 56 to 320 f yr/mL with latencies in the range of 20 to 30 years.[85]

---

[77] Martonik, J.F., E. Nash and E. Grossman: "The History of OSHA's Asbestos Rulemakings and some Distinctive Approaches That They Introduced for Regulating Occupational Exposure to Toxic Substances." AIHAJ 62:208-217 (2001).

[78] OSHA PEL for Asbestos is found in "The Asbestos Standard for General Industry." 29 CFR 1910.1001(k)(7).

[79] International Programme on Chemical Safety, Environmental Health Criteria 53, "ASBESTOS AND OTHER NATURAL MINERAL FIBRES" Published under the joint sponsorship of the United Nations Environment Programme, the International Labour Organisation, and the World Health Organization World Health Organization Geneva, 1986. Section 1.1.3

[80] Selikoff, I.J., E.C. Hammond and H. Seidman: "Mortality Experience of Insulation Workers in the United States and Canada, 1943-1976." Ann. N.Y. Acad. Sci. 330:91-116 (1979).

[81] US EPA Integrated Risk Information System, ASBESTOS (CASRN 1332-21-4),http://www.epa.gov/iris/subst/0371.htm, section II.C .2 "Dose Response Data for Carcinogenicity, Inhalation Exposure." Carcinogenicity Assessment last revised: 1Jul93.

[82] Liddell, F.D., A.D. McDonald and J.C. McDonald: "Dust Exposure and Lung Cancer in Quebec Chrysotile Miners and Millers." Ann Occup Hyg 42(1):7-20 (1998).

[83] Verma, D.K., and C.G. Middleton: "Occupational Exposure to Asbestos in the Drywall Taping Process." AIHAJ 41(4): 264-269 (1980).

[84] Klein, Cornelius: "Asbestos: Mineralogy and Misunderstanding." Twelfth Annual New Mexico Mineral Symposium, NM Institute of Mining and Technology, Soccoro, NM (9-10 Nov 1991).

[85] Talcott, J.A., W.A.Thurber, A.F. Kantor, E.A. Gaensler, J.F. Danahy, K.H Antman, and F.P. Li. "Asbestos-Associated Diseases in a Cohort of Cigarette-Filter Workers." New England Journal of Medicine pp 1220-1223 (1989)..