**EXHIBIT U**

*Dyson*

1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NORTH CAROLINA

RALEIGH DIVISION

| | | |
|---|---|---|
| JOY WATSON POLLARD AND, | ) | |
| GARY ALLEN POLLARD, | ) | |
| | ) | |
| PLAINTIFFS, | ) | |
| | ) | 5:98-CV-00422 |
| V. | ) | |
| | ) | |
| OWENS-CORNING | ) | |
| | ) | |
| DEFENDANT. | ) | |

TRIAL BEFORE
THE HONORABLE JAMES C. FOX
UNITED STATES DISTRICT JUDGE
AND A JURY

AT WILMINGTON                    FEBRUARY 23, 1999

FOR THE PLAINTIFFS:

WILLIAM M. CONNELLY, ESQUIRE
POST OFFICE BOX 1137
CHARLESTON, SOUTH CAROLINA   29408

E. SPENCER PARRIS, ESQUIRE
4000 WESTCHASE BLVD
SUITE 500
RALEIGH, NORTH CAROLINA   27607

FOR THE DEFENDANT:

JAMES CROSBY, ESQUIRE
JAMES B. PRESSLY, ESQUIRE
POST OFFICE BOX 2048
GREENVILLE, SOUTH CAROLINA   29602

VOLUME 1 OF 2
PAGES 1 THROUGH 227

(PROCEEDING RECORDED BY STENOMASK; TRANSCRIPT PRODUCED FROM
DICTATION)

**JO B. BUSH**
P. O. Box 28163   Raleigh, NC   27611
(919) 876-4571

227

```
1                    C E R T I F I C A T E

2             I, JO B. BUSH, DO HEREBY CERTIFY THAT THE

3        PRECEDING PAGES REPRESENT A TRUE AND

4        ACCURATE TRANSCRIPT OF THE PROCEEDINGS HELD

5        IN THE ABOVE-CAPTIONED MATTER.


6        _____

7        JO B. BUSH, CVR
8        OFFICIAL REPORTER
9        UNITED STATES DISTRICT COURT
10       EASTERN DISTRICT OF NORTH CAROLINA
```

JO B. BUSH, CVR                           (919) 876-4571
Post Office Box 28163
Raleigh, North Carolina  27611

208

1   BY STEP ON HOW YOU PUT THE GENERAL INFORMATION TOGETHER AND

2   THEN HOW YOU PREPARED THIS ASSESSMENT?

3   A   OKAY.

4        MR. CONNELLY:           JUDGE, I HAVE AN OBJECTION TO

5   THE FOUNDATION THAT HE IS ABLE TO RECREATE THIS EXPOSURE IN A

6   HOUSE SOME 30 YEARS AGO.  I DON'T THINK THERE HAS BEEN A

7   PROPER FOUNDATION.

8        THE COURT:           LET ME SEE YOU GENTLEMEN JUST A

9   MOMENT.

10       B E N C H    C O N F E R E N C E

11       THE COURT:           I, OF COURSE, HAVEN'T READ HIS

12  DEPOSITION, SO I DON'T KNOW WHAT HIS TESTIMONY IS GOING TO

13  BE.  CAN YOU GIVE ME---

14       MR. CONNELLY:           JUDGE, I DON'T THINK ANYBODY

15  CAN AT THIS POINT.  HE IS GOING TO TELL US WHAT HAPPENED;

16  EXPOSURES THAT LITTLE GIRL HAD 30 YEARS AGO.  THAT IS WHAT HE

17  IS ABOUT TO DO.

18       THE COURT:    .        WELL, I KIND OF AGREE WITH YOU.

19       MR. CONNELLY:           I HAVE GOT A PROBLEM WITH THAT.

20       MR. PRESSLY:           IF YOU WANT TO KNOW--DO YOU

21  WANT TO JUST TAKE A BREAK AND LET YOUR HONOR LOOK AT THE

22  REPORT AND THEN WE CAN START IN THE MORNING, BECAUSE WE ARE

23  NOT GOING TO GET THROUGH THIS AFTERNOON ANYWAY.  THIS IS A

24  LOGICAL BREAKING POINT.

25       THE COURT:           ALL RIGHT.  WE WILL STOP.  I

209

1    MAY ASK HIM SOME QUESTIONS HERE AND SEE WHERE WE ARE GOING.

2            MR. PRESSLY:            THAT WILL BE FINE.

3            (BENCH CONFERENCE TERMINATED.)

4            THE COURT:            MEMBERS OF THE JURY, WE ARE

5    GOING TO STOP FOR TODAY.  WE WILL START UP TOMORROW MORNING

6    AT 9:00 O'CLOCK.  AS I SAY, OUR BEST INFORMATION NOW IS THAT

7    EVERYTHING IS GOING TO BE 37 DEGREES AND RAINING.  SO TAKE

8    YOUR TIME.  IF YOU RUN INTO HAZARDS, YOU CALL TOMORROW AND

9    LET US KNOW WHAT THE SITUATION IS.  I DON'T WANT ANYBODY TO

10   TAKE ANY CHANCES.  MS. ENYART WILL GIVE YOU HER NUMBER.

11           REMEMBER THE USUAL ADMONITIONS ABOUT READING ABOUT THE

12   CASE OR ABOUT ASBESTOS.  DON'T LET ANYONE TALK TO YOU ABOUT

13   THE CASE.  EVERYONE PLEASE REMAIN SEATED WHILE THE JURY

14   LEAVES FOR ITS EVENING RECESS.

15           (JURY EXITS AT 4:22 P.M.)

16           (PROCEEDING HELD IN ABSENCE OF THE JURY.)

17           THE COURT:            DR. DYSON, TELL ME, DID YOU

18   ATTEMPT TO RECREATE THE EXPOSURE OF MS. POLLARD?

19           THE WITNESS:            WHAT I DID, YOUR HONOR, IS I

20   TRIED TO ESTIMATE THE EXPOSURE THAT SHE MIGHT HAVE HAD FROM

21   BEING AROUND HER GRANDFATHER.

22           THE COURT:            HOW COULD YOU DO THAT?  I DON'T

23   UNDERSTAND.  DID YOU GO TO THE BABCOCK AND WILCOX PLANT?

24           THE WITNESS:            I HAVE NOT BEEN IN IT, BUT I

25   HAVE BEEN OUTSIDE OF IT.

210

1        THE COURT:            YOU DIDN'T OBSERVE IT WHILE IT

2   WAS IN OPERATION?

3        THE WITNESS:          NO, SIR

4        THE COURT:            YOU DON'T HAVE ANY IDEA HOW

5   MUCH ASBESTOS FIBER HE CARRIED?

6        THE WITNESS:          WELL, YOUR HONOR, THERE ARE

7   SOME MEASUREMENTS THAT GIVE US INFORMATION THAT WOULD ALLOW

8   US TO ESTIMATE THAT.

9        THE COURT:            WHAT KIND OF INFORMATION IS

10  THAT?

11       THE WITNESS:          FOR EXAMPLE, WE KNOW AS A

12  BENCHMARK FOR THIS WHAT EXPOSURE OF INSULATORS WHO WORK WITH

13  ASBESTOS MATERIALS EIGHT HOURS A DAY, 40 HOURS A WEEK, WAS.

14  WE ALSO HAVE---

15       THE COURT:            EXCUSE ME, HOW COULD YOU KNOW

16  THAT?

17       THE WITNESS:          THERE WERE QUITE A NUMBER OF

18  MEASUREMENTS MADE IN THE LATE 1960'S OF THAT THAT WERE

19  PUBLISHED.

20       THE COURT:            WHAT WAS THE MEAN DEVIATION

21  FROM THE NORM?

22       THE WITNESS:          THE MEAN WAS ABOUT 2.5.

23       THE COURT:            WHAT WAS THE MEAN DEVIATION

24  FROM THE MEAN?

25       THE WITNESS:          I AM NOT SURE WHAT THE MEAN---

JO B. BUSH, CVR                              (919) 876-4571
Post Office Box 28163
Raleigh, North Carolina  27611

211

1     THE COURT:              WELL, HOW MUCH DEVIATION--WHAT

2  IS THE AVERAGE DEVIATION FROM THE AVERAGE?  IN OTHER WORDS,

3  YOU HAVE GOT AN EXPOSURE.  YOU HAVE GOT SOME PLACES THAT ARE

4  MORE DUSTY THAN OTHERS?

5     THE WITNESS:            YES; YES.  THAT IS CORRECT.

6  BUT WE ARE TALKING ABOUT AN AVERAGE OVER A LONG PERIOD OF

7  TIME.  SO SOME DAYS THE EXPOSURE WOULD BE HIGHER AND SOME

8  DAYS THE EXPOSURE WOULD BE LOWER.

9     THE COURT:              I REALIZE THAT.  ISN'T THAT

10  ALSO TRUE FROM JOB TO JOB?

11     THE WITNESS:           WELL, IT IS, BUT LET ME EXPLAIN

12  HOW I GET FROM THE INSULATOR TO OTHER JOBS.

13     THE COURT:             ALL RIGHT.

14     THE WITNESS:           IF WE TAKE THE NUMBER FROM THE

15  INSULATOR, AND THAT IS A RESULT OF ABOUT SIX DIFFERENT

16  STUDIES THAT HAVE BEEN PUBLISHED, AND IT COMES FROM MT.

17  SINAI, WHICH WAS DEEPLY INVOLVED IN THAT ANALYSIS THAT DR.

18  NICHOLSON MADE, IN REVIEWING THE SIX DAYS--AND I CONCUR WITH

19  HIS ASSESSMENT THAT THE AVERAGE EXPOSURE OF INSULATORS DURING

20  THAT PERIOD OF TIME WAS ABOUT TWO AND A HALF TO THREE FIBERS

21  PER MILLIMETER.

22     THE COURT:             WHAT PERIOD OF TIME?

23     THE WITNESS:           THE LATE SIXTIES IS WHEN WE ARE

24  TALKING ABOUT THESE MEASUREMENTS WERE MADE, FROM AROUND 1966

25  THROUGH 1971.

212

```
 1        THE COURT:              WHERE WERE THEY MADE?

 2        THE WITNESS:            WHERE WERE THEY MADE?  THEY

 3  WERE MADE ON INSULATORS IN THE NEW YORK UNION AND ASBESTOS

 4  WORKERS, AND ALSO IN THE SAN FRANCISCO AREA, AND A COUPLE OF

 5  OTHER LOCATIONS.  BUT FROM THAT WE HAVE TO ASK OURSELVES WHAT

 6  THE EXPOSURE OF THE ANCILLARY TRADES PEOPLE WOULD BE.  AND

 7  THERE ARE TWO WAYS THAT WE HAVE SOMEWHAT OF A FIX ON THAT,

 8  AND THAT IS THERE HAVE BEEN A NUMBER OF STUDIES THAT HAVE

 9  SHOWN INCIDENTS OF ABNORMALITIES OF X-RAYS BY TRADE.

10        ONE THAT WAS PUBLISHED IN THE (INAUDIBLE) NAVAL

11  SHIPYARD WHERE INSULATORS HAD ABOUT A 20 PERCENT ABNORMALITY

12  IN THEIR X-RAYS, AND ALL THE OTHER TRADES HAD TWO PERCENT OR

13  LESS, TYPICALLY ONE PERCENT OR LESS.  AND THEN THE SECOND

14  THING IS IS THAT A PATHOLOGIST AT DUKE HAS LOOKED AT THE

15  FIBER BURDEN IN PEOPLE'S LUNGS BY TRADE, AND WHEREAS HE FOUND

16  FOR INSULATORS THE FIBER BURDEN IS SOMETHING IN THE ORDER OF

17  200,000 FIBERS PER GRAM OF DRY LUNG TISSUE, THAT OF OTHER

18  TRADES WAS 20,000 OR LESS FIBERS PER GRAM OF DRY LUNG TISSUE.

19        SO TAKING THOSE MEASUREMENTS, IT SUGGESTS THAT THE

20  VAST MAJORITY OF OTHER TRADES HAVE PROBABLY ONE-TENTH OF

21  EXPOSURE OF THE INSULATORS HERE, PROBABLY THE MAXIMUM

22  WORST CASE EXPOSURE TRADE.  AND SO THAT IS WHAT I ASSUMED FOR

23  MR. HEWETT IN THIS CASE.  THERE IS ANOTHER WAY OF GOING ABOUT

24  THIS AS WELL.

25        THE COURT:              WELL, I HAVE A LOT OF QUESTIONS
```

213

1   ABOUT THIS, REALLY.  YOU HAVE GOT A PARTICULAR INDIVIDUAL,

2   MR. HEWETT, AND I AM NOT CONFINING--I MENTIONED THIS TO

3   EVERYBODY WHO HAS TESTIFIED HERE, AND NOBODY REALLY KNOWS

4   WHAT KIND OF DUST HE CARRIED HOME.

5        THE WITNESS:        WELL, YOUR HONOR, THIS COURT

6   ULTIMATELY HAS TO MAKE AN EXPOSURE ASSESSMENT HERE.  AND YOU

7   CAN DO IT ONE OF SEVERAL WAYS.  YOU CAN DO WHAT I WOULD

8   DESCRIBE AS A EVER-NEVER APPROACH, WERE THEY EVER EXPOSED OR

9   WERE THEY NEVER EXPOSED.  AND THAT--I MEAN, THE JURY WILL

10  DRAW THAT.

11       THE COURT:        IT IS NO QUESTION THAT THE

12  TESTIMONY IS THAT SHE WAS EXPOSED.  NOBODY KNOWS THE EXTENT

13  TO WHICH SHE WAS EXPOSED.  THERE HAS BEEN TESTIMONY FROM SOME

14  PHYSICIANS THAT A VERY SMALL AMOUNT OF EXPOSURE COULD RESULT

15  IN MESOTHELIOMA.

16       THE WITNESS:        BUT THE ELEMENT HERE THAT WE

17  ARE TALKING ABOUT, DOSAGE, AND THE DOSAGE IS THE RESULT OF

18  TWO PARTS---

19       THE COURT:        I UNDERSTAND EXPOSURE---

20       THE WITNESS:        THE EXPOSURE LEVEL AND THE

21  DURATION.  AND IN THIS CASE, THE DURATION IS THE LIMITING

22  FACTOR, IF YOU WILL.  WE DON'T HAVE A LONG DURATION HERE OF

23  EXPOSURE THAT THIS HAPPENED.  AND MY UNDERSTANDING FROM THE

24  TESTIMONY AT LEAST IS THAT MR. HEWETT WOULD BLOW OFF HIS

25  CLOTHES BEFORE HE LEFT WORK EACH DAY BY USING AN AIR HOSE.

214

1    THAT WAS CERTAINLY THE TESTIMONY OF HIS CO-WORKERS.

2        SO I ATTRIBUTED THE EXPOSURES ON HIS CLOTHES AS ONE

3    THING RELATIVE TO WHAT MS. POLLARD WAS EXPOSED TO IS ANOTHER.

4    BUT I ASSUMED FOR THESE PURPOSES THAT MS. POLLARD FOR THE

5    TIME SHE WAS AROUND HER GRANDFATHER WAS EXPOSED TO THE SAME

6    LEVEL THAT I ATTRIBUTE TO HIM AT THE BABCOCK AND WILCOX

7    PLANT.

8        MY UNDERSTANDING IS IS THAT HE DID NOT DEVELOP AN

9    ASBESTOS RELATED DISEASE, AND SO THEREFORE THAT GIVES US A

10   FIX ON HIS EXPOSURE AS WELL. THERE IS ANOTHER WAY OF GOING

11   ABOUT IT, IF I MAY EXPLAIN THIS TO YOU?

12       THE COURT:    SURE.

13       THE WITNESS:    THERE HAVE BEEN TO MY KNOWLEDGE

14   ONE SET OF MEASUREMENTS MADE IN HOMES THROUGHOUT THE ENTIRE

15   HISTORY OF ASBESTOS ISSUE. THESE WERE MADE IN THE HOMES OF

16   MINERS.  THEY WERE MADE IN A UNIT OF MEASUREMENT CALLED

17   NANOGRAMS PER CUBIC METER.  THE NATIONAL RESEARCH COUNCIL

18   GAVE US A CONVERSION FACTOR BETWEEN THE NANOGRAMS PER CUBIC

19   METER AND FIBERS PER CC.  AND IF YOU TAKE THE MEASUREMENTS

20   THAT WERE MADE IN THE HOMES OF THESE MINERS AND CONVERT THEM

21   THAT WAY, 100 PERCENT OF THE HOMES WERE LESS THAN 0.2 OF

22   FIBERS PER MILLIMETER, AND 50 PERCENT OF THE HOMES WERE LESS

23   THAN APPROXIMATELY 0.07 PARTICLES PER MILLIMETER.

24       AGAIN, LOOKING AT A MAXIMUM WORSE CASE SITUATION, I

25   ATTRIBUTE TO HER THE UPPER END OF THAT BOUNDARY, WHICH WAS

215

1  0.25 THAT I THINK MR. HEWETT WOULD HAVE BEEN EXPOSED TO AND

2  THE UPPER WORSE CASE OF THE MEASUREMENTS BEING MADE IN HOMES.

3       THE COURT:            WERE THESE MINERS OF ASBESTOS?

4       THE WITNESS:          YES, WHOM YOU WOULD EXPECT TO

5  HAVE FAR GREATER EXPOSURE IN TERMS OF THEIR CLOTHING THAN MR.

6  HEWETT WOULD.

7       THE COURT:            GOT MORE EXPOSURE THAN

8  INSULATORS WOULD?

9       THE WITNESS:          I DEFINITELY BELIEVE SO.  IN

10 THIS CASE I WOULD EXPECT THAT THEY WOULD HAVE BLOWN THEIR

11 CLOTHES OFF AS WELL, IF THEY HAD THE CHANCE.

12      THE COURT:            YOU WANT TO ASK SOME QUESTIONS?

13      MR. CONNELLY:         I WOULD LIKE TO, JUDGE, IF I

14 MAY?

15      THE COURT:            SURE.

16           V O I R   D I R E  4:37 P.M.

17 BY MR. CONNELLY:

18 Q  DOCTOR, YOU HAVE VOICED OPINIONS THAT HOUSEHOLD EXPOSURES

19 ESPECIALLY AND SPECIFICALLY IN THE CASE OF THE NELLIE

20 JORDAN---

21      MR. PRESSLY:          (INTERPOSING) YOUR HONOR, IF I

22 MAY?  THIS IS GOING TO TAKE THE FORM OF A (INAUDIBLE) HERE.

23 I BELIEVE THE ISSUE IS THE METHODOLOGY THAT IS BEING

24 ADDRESSED, NOT SPECIFIC TESTIMONY IN THIS CASE OR THAT CASE.

25 IF MR. CONNELLY, AND I THINK THE COURT, IF IT IS GOING DOWN

216

1    THAT ROAD, WHICH IS WHAT IS THE METHODOLOGY THAT IS USED IN

2    THIS TYPE OF STUDY, AND WHAT IS THE VALIDITY OF IT.

3         I DON'T THINK THIS SHOULD BE KIND OF OPEN SEASON FOR

4    CROSS-EXAMINATION WITHOUT THE JURY BEING PRESENT.

5         MR. CONNELLY:          JUDGE, I MEAN--

6         MR. PRESSLY:          (INTERPOSING) MY UNDERSTANDING

7    IS THAT THAT IS WHAT WE ARE GOING DOWN THE ROAD, IS WE ARE

8    TRYING TO---

9         THE COURT:          WELL, I AM TRYING TO DECIDE OR

10   NOT THIS TESTIMONY WOULD ASSIST THE JURY, AND I AM NOT SURE

11   THAT I AGREE THAT IT DOES.  HE CAN CERTAINLY TESTIFY AS TO

12   WHAT HIS EXPERIENCE HAS BEEN AND WHAT HAS BEEN THE RESULTS OF

13   VARIOUS TESTS THAT OCCURRED.  BUT I DON'T SEE HOW YOU ARE

14   GOING TO RELATE TO FACT SPECIFIC EXPOSURE AT THE BABCOCK AND

15   WILCOX PLANT.

16        I MEAN, I DON'T UNDERSTAND HOW, IF YOU HAVE GOT

17   STUDIES--INDUSTRIAL HYGIENE STUDIES THAT DEMONSTRATE OVER A

18   PERIOD OF YEARS THAT INSULATORS GENERALLY ARE EXPOSED TO

19   SO MANY FIBERS, ET CETERA--I DON'T KNOW HOW THAT RELATES TO

20   MR. HEWETT.  IT HAS BEEN MY OBSERVATION OVER A PERIOD OF TIME

21   THAT WORKERS HAVE VARYING DEGREES OF INTEREST IN THEIR JOB,

22   SO TO SPEAK, AND SOME WORKERS WILL TAKE GREAT PRIDE IN THEIR

23   PRODUCTIVITY AND THE AMOUNT OF WORK THEY ACCOMPLISH, AND

24   SOME, IF THEY HAVE THE OPPORTUNITY, WILL GO OUTSIDE AND SMOKE

25   A CIGARETTE THE WHOLE DAY.

JO B. BUSH, CVR
Post Office Box 28163                    (919) 876-4571
Raleigh, North Carolina  27611

217

1       IN OTHER WORDS, YOU HAVE GOT A SITUATION HERE--NOT

2   ONLY DO YOU HAVE THE QUESTION OF MR. HEWETT'S INDIVIDUAL

3   EXPOSURE LEVELS, WHICH I ASSUME EXPOSURE LEVELS--I MEAN, THE

4   EXPOSURE FROM ONE INSULATOR TO ANOTHER IN THE SAME PLANT

5   COULD WIDELY VARY.

6       MR. PRESSLY:        I THINK WHAT HE IS TELLING YOUR

7   HONOR IS THERE ARE SEVERAL STUDIES DONE BY THE SAME GROUP THE

8   COURT HAS BEEN HEARING ABOUT ALL DAY.   THE DUKE STUDY THAT

9   WAS DONE EXTRAPOLATING ON THE FIBER BURDENS; THE ONES THAT WE

10  ARE TALKING ABOUT THAT WERE DONE ON INSULATORS AND IN PLANT

11  SETTINGS IN NEW JERSEY, AND THESE ARE ALL THE SAME TYPES OF

12  STUDIES, DONE BY DR. SELICOFF AND DR. NICHOLSON AT MT.

13  SINAI.  THE PURPOSE OF THOSE STUDIES WAS TO TAKE AN

14  OCCUPATIONAL SETTING, WHICH IS WHAT MR. HEWETT WAS IN, IN

15  VARIOUS PLACES AND TAKE THE BASIC INFORMATION AND COME UP

16  WITH WHAT THEY BELIEVE THE EXPOSURE LEVELS WERE.

17      THIS HAS BEEN GOING ON, AND THAT IS WHY MR. CONNELLY

18  RAISED THIS.  THE EARLIER STUDIES WE HAVE GOT OF THIS, OF

19  COURSE, FLEISHER DRINKER IN 1933, '46; THEN WE HAVE GOT FALLS

20  AND COOPER DID IT IN THE SIXTIES--THESE ARE ALL THESE TYPES

21  OF STUDIES, YOUR HONOR.  AND ADMITTEDLY, THE ONLY WAY YOU

22  KNOW WHAT ANY WORKER'S EXPOSURE IS IS TO HAVE HIM WITH A

23  MONITOR ON HIM AT ALL TIMES.

24      THE COURT:          SURE.

25      MR. PRESSLY:        BUT THE ONLY WAY YOU CAN WORK

218

1  FROM A SITUATION OF LOOKING AT THE WORKPLACE AND WHAT IS

2  THERE IS TO TAKE THE EXPOSURES YOU CAN MEASURE AND BASICALLY

3  LOOK AT THE WAY THAT TRADE OPERATES; WHAT THEY GENERALLY

4  WORK, WHICH WOULD INCLUDE BOILERMAKERS AND OTHERS, AND SAY,

5  LOOK, THIS IS THE GENERAL EXPOSURE.

6       THE COURT:          I DON'T HAVE ANY PROBLEM WITH

7  HIS TESTIFYING AS TO WHAT THE STUDIES SHOW, THE GENERAL

8  EXPOSURE.  NOW, I DON'T KNOW IF YOU HAVE SOMEONE ELSE COMING

9  TO TESTIFY OR NOT CONCERNING WHETHER THE AMOUNT OF EXPOSURE

10 WOULD BE--THE AVERAGE IN THIS SITUATION WOULD CAUSE A

11 DISEASE OR NOT.  HE IS NOT EQUIPPED TO EXPRESS WHETHER OR NOT

12 HER DISEASE WAS CAUSED BY ASBESTOS.

13      MR. PRESSLY:          NO, SIR.

14      THE WITNESS:          IF I MAY, YOUR HONOR?  WHAT I

15 AM EQUIPPED TO DO IS TO TELL YOU THE CUMULATIVE LIFETIME

16 DOSAGE THAT HAS BEEN--THE LOWEST CUMULATIVE LIFETIME DOSAGE

17 THAT HAS BEEN ASSOCIATED WITH MESOTHELIOMA IN THE SCIENTIFIC

18 OBSERVATION.

19      THE COURT:          BASED ON WHAT YOU HAVE READ AND

20 STUDIED?

21      THE WITNESS:          AND UNDERSTAND THAT INDUSTRIAL

22 HYGIENISTS HAVE TO DO THIS BECAUSE WE TRY TO ESTABLISH

23 PERMISSIBLE EXPOSURE LIMITS FOR MATERIALS IN WORKPLACES SUCH

24 AS THE OSHA, PTL AND PLV (PHONETIC).  SO WE HAVE TO DO THAT

25 TYPE OF THING.

219

1       THE COURT:              MR. CONNELLY, ANY OTHER

2  OBSERVATIONS?

3       MR. CONNELLY:           JUDGE, IT IS NOT A FACTORY

4  SETTING.  BUT HE IS TAKING A LEAP OF FAITH, AND HE IS SAYING,

5  LIKE A MEDICAL DOCTOR, WHETHER HE WANTS TO SAY IT OR NOT,

6  DOES SHE OR DOES SHE NOT HAVE ENOUGH EXPOSURE TO CAUSE

7  SOMETHING.  HE WASN'T AROUND 30 YEARS AGO.  THIS GENTLEMAN

8  WASN'T AROUND DURING THE TIME THAT ALL THIS STUFF WAS GOING

9  ON EITHER.  HE ONLY JUST STARTED IN '79 IN INDUSTRIAL

10 HYGIENE.

11      THE COURT:              OF COURSE THE SAME THING IS

12 TRUE OF THE DOCTOR.

13      MR. CONNELLY:           JUDGE, I WORKED CONSTRUCTION;

14 PUT MYSELF THROUGH COLLEGE, AND IT GETS TO THE POINT THAT

15 CONSTRUCTION WORKERS ARE KNOWN TO DRINK BEER.  AND I AM A

16 COLLEGE STUDENT; I AM OUT THERE, AND SOMEHOW I WASN'T

17 DRINKING THAT MUCH.  I WAS DRINKING IN COLLEGE, BUT I WASN'T

18 DRINKING THAT MUCH.  HE IS GOING TO COME IN HERE AND

19 BASICALLY TELL THE JURY THE PROBABILITY OF HOW MANY BEERS

20 BILL CONNELLY HAD IN THE SUMMER OF CONSTRUCTION---

21      THE COURT:              I THINK I READ THE BOOK ON

22 THAT.

23      MR. CONNELLY:           AND THAT IS THE SAME THING,

24 JUDGE.  YOU CAN HAVE A LOT OF FANCY WORDS AND A LOT OF FANCY

25 THIS AND A LOT OF FANCY THAT.  HE IS COMING IN TO TELL US HOW

JO B. BUSH, CVR
Post Office Box 28163                (919) 876-4571
Raleigh, North Carolina  27611

220

1    DIRTY THIS GUY'S CLOTHES WERE 30 YEARS AGO, AND I DON'T KNOW

2    HOW THE HECK HE CAN DO THAT.

3         THE COURT:              I DON'T KNOW HOW HE CAN EITHER.

4    I DON'T KNOW HOW REALLY THAT YOUR DR. HAMMAR, THE PATHOLO-

5    GIST, AND HE HAS TESTIFIED THAT PATHOLOGY IS THE WAY TO

6    DETERMINE THE CAUSE OF DISEASE, AND YET HE HAS RELATED THE

7    CAUSE OF THE DISEASE BASED ON CLINICAL HISTORY.

8         MR. PRESSLY:              DR. HAMMAR JUST TESTIFIED THAT

9    HE USES THIS EXACT TYPE OF THING.

10        THE COURT:              HE DID SAY THAT. I WAS

11   INTERESTED IN THE FACT THAT HE DID REFER TO THIS.

12        MR. PRESSLY:              HE REFERRED TO IT TWICE IN HIS

13   TESTIMONY.

14        MR. CROSBY:              DR. CRAPO HAS ALREADY SAID FROM

15   A MEDICAL PERSPECTIVE WHAT THE BASELINE FIBER IS. SO IF THIS

16   LINK IS THERE, IT IS THERE. IF THE LINK ISN'T THERE, IT

17   ISN'T THERE.

18        THE COURT:              PARDON ME. I HAD FORGOTTEN

19   WHAT DR. CRAPO SAID. BUT I AM SURE---

20        MR. CONNELLY:              JUDGE, THAT IS WHY I STARTED

21   OFF WITH MY QUESTION OF THIS WITNESS. HE TESTIFIED IN

22   ANOTHER CASE IN WHICH OWENS-CORNING'S EXPOSURE WAS IN

23   ANOTHER SETTING, AND HE WAS CALLED BY OWENS-CORNING, AND THIS

24   CASE JUST HAPPENED IN '98, LAST YEAR. HE HAS TESTIFIED,

25   WELL, NO, I THINK THE EXPOSURE TO OWENS-CORNING, DIRECT

221

1    EXPOSURE TO THIS MAN WAS NOT THE CAUSE OF MESOTHELIOMA, BUT

2    THE EXPOSURE WAS THE HOUSEHOLD EXPOSURE WHERE TWO OF THE

3    RELATIVES CAME HOME AND WERE USING THE ASBESTOS CONTAINING

4    PRODUCTS.

5         SO MY POINT IS THIS KIND OF METHODOLOGY YOU CAN USE

6    IT FOR WHATEVER YOU WANT TO USE IT FOR.  AND THAT IS WHAT HE

7    IS DOING HERE TODAY.  TODAY IT SERVES OWENS-CORNING'S

8    PURPOSES NOT TO HAVE HOUSEHOLD EXPOSURE CAUSE IT, AND YET IN

9    THIS CASE NOT GIVE THE COURT A TRANSCRIPT TO TAKE HOME AND

10   REVIEW.

11        THE COURT:             I CAN TELL YOU, I AM NOT GOING

12   TO READ IT AT HOME.

13        MR. CONNELLY:          OKAY.  MR. JORDAN TESTIFIED HE

14   HAD EXPOSURE FROM ASBESTOS CONTAINING MATERIAL THAT WERE ON

15   HIS RELATIVE'S WORK CLOTHES WHEN THEY CAME HOME FROM WORK.

16   "YES, I DID."  HIS FATHER AND BROTHER--"DO YOU BELIEVE THAT

17   SUCH EXPOSURE WAS A SIGNIFICANT CONTRIBUTING FACTOR IN THE

18   CAUSATION OF HIS MESOTHELIOMA?"  AND THIS SAME GENTLEMEN SAID

19   UNDER OATH, "MY BELIEF IN THIS CASE IS THAT IT WAS THE MOST

20   SIGNIFICANT CONTRIBUTING FACTOR."

21        THE COURT:             LET ME GET IT STRAIGHT NOW.  I

22   THINK I AM GOING TO DO THIS:  I AM GOING TO LET HIM TESTIFY

23   AS TO WHAT THE STUDIES HAVE SHOWN.  I WILL NOT LET HIM

24   EXPRESS AN OPINION AS TO WHETHER THAT EXPOSURE DID OR DID NOT

25   CAUSE MESOTHELIOMA IN MS. POLLARD.  HE IS NOT A MEDICAL

JO B. BUSH, CVR
Post Office Box 28163                        (919) 876-4571
Raleigh, North Carolina  27611

222

1   DOCTOR, AND I DON'T THINK HE IS QUALIFIED--I THINK HE IS

2   PROBABLY QUALIFIED TO TESTIFY WHAT THE AVERAGE AMOUNT OF

3   DUST IS CREATED IN INSULATING OBSERVATIONS, AND POSSIBLY,

4   BASED ON HIS MINER STUDY, AS TO HOW MUCH DUST IS TAKEN HOME.

5        BUT I DON'T THINK HE IS QUALIFIED TO EXPRESS AN

6   OPINION ON THE CAUSATION OF MS. POLLARD'S DISEASE.

7        THE WITNESS:-        THAT IS FINE, YOUR HONOR.

8        THE COURT:        THAT IS THE WAY I SEE IT.

9        MR. CONNELLY:        JUST SO I CAN BE CLEAR--HE IS

10  GOING TO BE ABLE TO TESTIFY AS TO HOW MUCH DUST WAS ON HER

11  GRANDFATHER'S CLOTHES?

12        THE COURT:        WHAT THE AVERAGE GUY CARRIES

13  HOME. HE CAN'T SAY HOW MUCH WAS ON MR. POLLARD'S (SIC)

14        MR. CONNELLY:        OKAY. THEN THERE WON'T BE ANY

15  QUESTIONS ON THAT.

16        THE COURT:        HE CAN'T DO THAT BECAUSE--HE

17  CAN TESTIFY AS TO WHAT THE AVERAGE AMOUNT OF DUST IS CREATED

18  IN AN OCCUPATIONAL SETTING, THE AVERAGE AMOUNT OF DUST AN

19  INSULATOR IS SUBJECTED. HE CAN TESTIFY THAT MINERS BROUGHT

20  HOME "X" AMOUNT OF DUST WHEN THEY CAME HOME. BUT WHEN IT

21  COMES TO HOW MUCH ON MR. HEWETT'S CLOTHES, NOBODY CAN

22  TESTIFY TO THAT. THAT IS RIDICULOUS. YOU CAN'T DETERMINE

23  IT.

24        MR. CONNELLY:        JUDGE, MAY I ALSO--THE WITNESS

25  HAS NOW TOLD THE COURT HE HAS A COUPLE OF ARTICLES THAT

223

1   SUPPORT THE MINERS AND THEIR CLOTHING AT HOME.   CAN I

2   REQUEST THAT WE GET A COPY OF THAT?

3           MR. CROSBY:          I AM SURE YOU HAVE GOT IT.

4           MR. CONNELLY:          IF WE COULD JUST GET THOSE?   I

5   THINK THAT IS WHAT HE TOLD THE COURT HE WAS RELYING ON, MINER

6   STUFF.

7           THE COURT:          THAT IS WHAT I UNDERSTOOD.

8           MR. CONNELLY:          IF WE COULD JUST HAVE THAT HERE

9   TOMORROW?

10          THE WITNESS:          YOUR HONOR, WILL I BE ABLE TO

11  DO THE DOSAGE CALCULATION BASED ON AVERAGE EXPOSURE?

12          THE COURT:          ON AN AVERAGE EXPOSURE, YOU CAN

13  SAY WHAT THAT AVERAGE INSULATOR WAS EXPOSED TO.

14          THE WITNESS:          BUT THE DOSAGE IS TO COUPLE

15  THAT EXPOSURE LEVEL, THE AVERAGE EXPOSURE LEVEL FROM MINERS

16  AND FROM THE MINER'S HOMES AND SO FORTH.   WE HAVE DONE

17  EXPOSURE TIME.

18          THE COURT:          YOU CAN DO THAT AS LONG AS YOU

19  ARE TALKING IN GENERAL TERMS AS TO WHAT YOUR STUDY SHOWS AND

20  WHAT THE RESULT IS, THAT IS FINE.   WHETHER OR NOT THEY ARE

21  RELEVANT--AND I UNDERSTAND MR. CROSBY'S POINT IS THAT IT

22  BECOMES RELEVANT WHEN YOU HEAR DR. CRAPO'S TESTIMONY.   I WILL

23  ACCEPT THAT.   OF COURSE, ONE OF THE PROBLEMS IS--AND THIS IS

24  NOT UNIQUE TO MS. POLLARD'S CASE.   IT IS JUST TRUE AS TO ALL

25  HISTORICALLY.


JO B. BUSH, CVR
Post Office Box 28163
                                    (919) 876-4571

224

1       CONDUCT BY PEOPLE--I GUESS THAT IT IS A PROBLEM THAT

2   IS ATTRIBUTABLE TO THE LATENCY OF THE DISEASE, IN A SENSE.   I

3   COULD READILY SEE HOW SOMEBODY WHEN, BECAUSE OF A LATENCY,

4   YOU CAN HAVE A WHOLE LOT OF STUDIES, AND I GUESS THAT IS WHAT

5   HAS HAPPENED, THEY SAID THERE WAS NO HOOK-UP BETWEEN ASBESTOS

6   AND DISEASE.   THEN AFTER THEY REALIZED THERE WAS A LATENCY,

7   THEN THE CONNECTION BECAME READILY APPARENT.

8       IN OTHER WORDS, EARLY STUDIES WOULD TEND TO REALLY

9   PROVE A FALLACY, IF YOU WILL.   IN OTHER WORDS, IF YOU TOOK

10  STUDIES THAT WERE MADE A YEAR LATER AND SAID, HECK, IT

11  DOESN'T CAUSE ANYTHING, BUT IF YOU GET 30 YEARS AS WE KNOW

12  NOW, THEN IT DOES.   AND BOTH YOU AND THE DEFENDANTS ARE TRY-

13  ING TO PRESENT THE CASE FROM--IN AN HISTORICAL CONTEXT   I

14  THINK THE PLAINTIFFS HAVE GOT THE UPPER HAND IN THAT

15  SITUATION IN THE SENSE THAT YOU HAVE GOT THAT HINDSIGHT DOES

16  EXIST.

17      IN OTHER WORDS, THE CONDUCT THAT THE CORPORATION

18  ENGAGED IN--THERE IS NO SUCH THING AS A CORPORATION ENGAGING

19  IN CONDUCT, BUT WHATEVER THE PEOPLE ASSOCIATED WITH THE

20  COMPANY, THEIR CONDUCT WAS WITHOUT THE BENEFIT OF HINDSIGHT.

21  THEY MAY HAVE LACKED FORESIGHT--LACKED THE FORESIGHT THAT

22  THEY WOULD HAVE LIKED TO HAVE HAD.   ONE OF THE OTHER

23  PROBLEMS IS YOU HAVE GOT--WHEN YOU ARE DEALING WITH HUMAN

24  CONDUCT, IT IS VERY DIFFICULT TO ATTRIBUTE FAULT OTHER THAN

25  IN AN OVERALL CLOUDY CONCEPT.

225

1        YOU GUYS DON'T REMEMBER THIS, BUT ADMIRAL KIMBALL AND

2   (INAUDIBLE) AT PEARL HARBOR--AT THE TIME THAT FIASCO

3   OCCURRED, EVERYBODY THOUGHT TO COURT MARTIAL THOSE TWO GEN-

4   TLEMEN, AS I RECALL; SAID THEY WERE TO BLAME, BUT THEN HIS-

5   TORY HAS PROVED THAT THAT WASN'T THE CASE AT ALL.  I DON'T

6   KNOW WHAT THAT HAS TO DO HERE OTHER THAN HISTORY IS A BIG

7   PART IN THIS PARTICULAR TYPE OF LAWSUIT.

8        WELL, I AM GOING TO LET YOU TESTIFY, DR. DYSON, ON

9   WHAT YOUR STUDIES SHOW ON THE AVERAGE.  I'M NOT GOING TO LET

10  YOU ATTRIBUTE THAT EVIDENCE DIRECTLY TO MR. HEWETT OR TO MS.

11  POLLARD, BECAUSE I DON'T THINK YOU CAN DO THAT WITH ANY

12  DEGREE OF CERTAINTY.  I JUST DON'T BELIEVE IT IS HUMANLY

13  POSSIBLE FOR THAT TO OCCUR.  IT IS A VERY DIFFICULT AREA

14  BECAUSE NOBODY HAS THE POWER TO GO BACK AT THIS POINT IN TIME

15  AND ESTABLISH WHAT THE ULTIMATE FACTS ACTUALLY WERE.

16        HAVING SAID THAT, I CONCLUDE BY SAYING THAT I THINK

17  THAT THIS KIND OF LITIGATION REALLY DOES NOT LEND ITSELF TO

18  PIECE MEAL RESOLUTION, I DON'T THINK.  ONE OF MY PROBLEMS

19  WITH THAT--IT HAS NOTHING TO DO WITH YOU ALL, BUT AS AN

20  ASIDE,  WHEN I LOOK AT SOME OF THE MASSIVE TOXIC TORT

21  CASES WHERE PUNITIVE DAMAGES HAVE ULTIMATELY BANKRUPTED THE

22  DEFENDANT, AND WHERE THERE ARE STILL PEOPLE WHO DESERVE COM-

23  PENSATORY DAMAGES, IT GIVES RISE TO MY MIND TO THE THOUGHT

24  THAT MAYBE THE PUNITIVES SHOULD BE PLACED IN TRUST UNTIL THE

25  COMPENSATORY FOLKS HAD THEIR DAY IN COURT, BECAUSE THEY HAVE

226

1    EXHAUSTED THE FUNDS THAT SHOULD HAVE BEEN THERE TO HELP

2    PEOPLE WHO ARE HURT, IN MY VIEW.

3          THAT DOESN'T MEAN THE DEFENDANT SHOULD PAY.  I AM NOT

4    ARGUING AGAINST THE IMPOSITION OF THE AWARD.  BUT I AM JUST

5    SAYING THAT THE APPLICATION OF THOSE FUNDS, I THINK- JUSTICE

6    SHOULD HAVE BEEN FOR THE PEOPLE WHO WERE HURT.

7          MR. CONNELLY:          JUDGE, WE PUSHED GEORGENE

8    (PHONETIC).  THE SUPREME COURT SAID SOMETHING DIFFERENT.

9          THE COURT:          WELL, I AM NOT IN THIS

10   MATERIAL AN AWFUL LOT, BUT MAYBE I WILL BE BETTER PREPARED TO

11   TRY THE DOVE CASE.  WELL, WE WILL TAKE A RECESS UNTIL 9:00

12   A.M.  I THINK THAT DR. DYSON CAN TESTIFY AS TO THE RESULTS OF

13   STUDIES GENERICALLY AND WHAT AN INSULATOR'S AVERAGE CARRY IS,

14   WHAT THE MINERS BROUGHT HOME AND THAT SORT OF THING.

15         BUT THE HOOK-UP WOULD HAVE TO BE THROUGH YOUR

16   PHYSICIANS, IT SEEMS TO ME, MR. CROSBY.  TAKE A RECESS UNTIL

17   9:00 O'CLOCK.

18         (PROCEEDING RECESSED AT 4:50 P.M.)

**EXHIBIT V**



July 24, 2007

Kristy Kulina Lyons
Hoagland, Longo, Moran, Dunst & Doukas, LLP
40 Paterson Street, PO Box 480
New Brunswick, NJ 08903

Carol Tempesta, Esq.
Marks, O'Neill, O'Brein & Courtney, PC
530 Saw Mill River Road
Elmsford, NY 10523

Gregory A. Dadika, Esq.
Reed Smith, LLP
Princeton Forrestal Village
136 Main Street, Suite 250
Princeton, NJ 08540-7839

Timothy Fraser, Esq.
Drinker, Biddle & Reath , LLP
500 Campus Drive
Florham Park, NJ 07932-1047

Re:    **Christian Holinka v. A.W. Chesterton, et al.**

Dear Ms. Lyons, Ms. Tempesta, Mr. Dadika, and Mr. Fraser:

     I have been asked to review materials for the above referenced case, and to provide an expert opinion regarding Dr. Christian. Holinka's alleged exposure to asbestos from handling certain pieces of laboratory equipment throughout his career. Dr. Holinka believed that he was exposed to harmful levels of asbestos from various asbestos containing products including asbestos mittens and Bunsen burner support pads. The materials that I have reviewed include the following:

- Plaintiff's Answers to Interrogatories;

**New York**
125 Baylis Road, Suite 120
Melville, New York 11747
Tel: 631.756.2204 • Fax: 631.756.2213

**Maryland**
22 Cessna Court
Gaithersburg, Maryland 20879
Tel: 301.519.6880 • Fax: 301.519.2105
www.somaonline.com

**Delaware**
1 Innovation Way, Suite 400
Newark, Delaware 19711
Tel: 302.369.0171 • Fax: 302.369.0170



Ms. Kristy Kulina Lyons, Ms. Carol Tempesta, Mr. Gregory A. Dadika, and Mr. Timothy Fraser
July 24, 2007
Page 2

- Plaintiff's Social Security Records; and

- Depositions of Christian Holinka dated February 12, 2007, February 22, 2007 and March 1, 2007.

## DESCRIPTION OF EVENTS

Dr. Holinka was born on July 7, 1937 in Schweidnitz, Germany, emigrated to the U.S. in October 1956 after finish boarding school in Oldenburg, Germany, and currently lives in Manhattan, where he has resided since 1977. Shortly after moving to the U.S., Dr. Holinka worked as an elevator operator at the Commodore Hotel in New York.

Dr. Holinka served in the U.S. Army from November 1956 through August 1959, when he received an honorable discharge. He completed basic training at Fort Dix, New Jersey. After basic training he was stationed at Fort Sam in Houston, TX for about 2 months where he received training as a medical laboratory technician. He stated that it was "likely" he was exposed to asbestos during that time from the use of Bunsen burner pads. He testified that during his training, perhaps two hours per day was spent in the classroom and the remainder of the day was spent in the laboratory. He said that "relatively little" of his time was spent working with Bunsen burners and that he spent approximately three months in the classroom and six weeks in pathology. In the classroom there were about 25 workstations, while in pathology there were no Bunsen burners.

Dr. Holinka was then stationed at the 98th General Hospital in Neubruecke, Germany from July 1957 until July/August 1959. He stated that he worked in all branches of the clinical medical laboratory including bacteriology, biochemistry, hematology and pathology. He said that he was exposed to asbestos while working in the laboratories from Bunsen burner pads and mittens, which he said he would use on a daily basis. He did not know of any asbestos exposures that he may have had during that time. Dr. Holinka testified that it would not there were any insulated pipes in the various barracks in which he slept while in the

After being honorably discharged from the Army, he lived in Queens for approximately four months and worked at Booth Memorial Hospital as a lab He stated that his duties included clinical chemistry and analysis of blood seru Dr. Holinka stated that he believed he used asbestos Bunsen burner pads and mitten stified that the asbestos on the pads "gradually becomes brittle due to the high the air really and one would expect that dust particles would be generated ater of the pads would become brittle and they would then have to dispose of he pads would have to be replaced "very frequently" depending upon the freq then said "certainly every few days you would replace it." He stated that there burners in the lab.

Ms. Kristy Kulina Lyons, Ms. Carol Tempesta, Mr. Gregory A. Dadika, and Mr. Timothy Fraser
July 24, 2007
Page 3

Dr. Holinka then moved to California where he attended U.C. Berkeley for two and one-half years and received a BA in French literature with a minor in physiology in 1962. He stated that while in college he believed that he was exposed to asbestos from using Bunsen burner pads and mittens while he worked part-time in the research lab. He said that there were two rooms in the lab, each about 400 – 600 square feet in size, and that each room had "about" two Bunsen burners. With regard to mittens, he said he would use them "several times a week." He testified that he worked between 12 and 20 hours a week in the research lab. Dr. Holinka stated that he also took "about a half a dozen" other lab courses in college that he believed may have involved asbestos exposures. He said that each workbench in the lab would have a Bunsen burner and pad.

After graduating from Berkeley, Dr. Holinka moved to New York and went to Hunter College in the fall of 1962, pursuing a Biology degree. He remained at Hunter through the spring of 1963. He stated that during that time he was exposed to asbestos from Bunsen burner pads in one chemistry lab class. He said the class lasted one semester and met once a week for three hours. In the fall of 1963, Dr. Holinka attended McGill University in Montreal for one semester. He stated that he took "mainly lecture courses and one laboratory course." He did not believe he was exposed to any asbestos during that time.

Dr. Holinka then returned to Berkeley working at the research lab again on a full-time basis. He said he worked there until approximately August of 1964 and felt he was again exposed to asbestos from the Bunsen burner pads and mittens. He did not know the manufacturer or supplier of those items. Dr. Holinka was subsequently accepted as a graduate student in physiology at Berkeley. He stated that he took courses and conducted research on a full time basis until 1966 and did not do any outside work during that time. He again felt he was exposed to asbestos from Bunsen burner pads and mittens which were located in the Life Sciences building, although not in the laboratory in which he studied. He estimated that the laboratory had six to eight burners. In 1966 he received a graduate degree in physiology and then enrolled in graduate school studying comparative literature. He graduated from that program in 1968. Dr. Holinka stated that he did not feel he was exposed to asbestos during that period of time. From 1968 until 1971, Dr. Holinka was a teaching assistant at Berkeley teaching French. Again, he did not feel he was exposed to any asbestos during that time frame.

Dr. Holinka was then accepted as a graduate student in the sciences at SUNY Stony Brook and received his PhD in 1974. While in school he worked part-time at Columbia University Presbyterian Medical Center in clinical chemistry. He worked there two days a week, from midnight to 9:00 A.M. Dr. Holinka testified he was exposed to asbestos from using Bunsen burner pads and mittens at both the work. He stated that, at school, he worked in the anatomy department where they had burners in the lab. When asked if he could recall how often he would have to get a new one he stated "about no more than once a month." With regard to the mittens, he would use them once every two days. He stated that he was not certain who manufactured either the pads or gloves/mittens.

Ms. Kristy Kulina Lyons, Ms. Carol Tempesta, Mr. Gregory A. Dadika, and Mr. Timothy Fraser
July 24, 2007
Page 4

After receiving his Ph.D., Dr. Holinka then became a post-doctoral fellow at USC doing biological research and teaching. He stated that 90 percent of his time was spent doing research in the Gerontology building. He said there were four labs, ranging from 400 to 800 square feet in size, and each room had two to five Bunsen burners. In August 1977, Dr. Holinka went to work for Mount Sinai, initially as an instructor and then as an assistant professor in obstetrics, gynecology and reproductive science. He stated that he primarily conducted research in three different rooms. He felt that he was exposed to asbestos from Bunsen burner pads and mittens. He stated that he would have to change the pads "about once every two months" and said there were between two and five burners in each room. He estimated that he used mittens once a day at Mt. Sinai. Dr. Holinka remained at Mt. Sinai until July 1989.

Dr. Holinka then went to work for Organon, Inc. and from 1989 until 1992 he was the Director of Reproductive Medicine. He did not feel he was exposed to any asbestos during that time. In 1992 he then went to work for Johnson & Johnson as Assistant Director of Endocrinology and Metabolism. He stated that he had no reason to believe that he was exposed to any asbestos while working there. In 1996 he went to work for Kyowa Hakko Kogio as Director of Pharmaceutical Development and remained there for about nine months. He then became a full-time consultant; his clients included Johnson & Johnson and others.

According to his answers to interrogatories, Dr. Holinka is a lifelong non-smoker and no one in his household ever smoked. Dr. Holinka testified, however, that his ex-wife did briefly smoke for about a year and a half sometime between 1970, when they got married, and 1974-5 when she moved back to Germany. In July 2006, while on vacation in Germany, Dr. Holinka began experiencing shortness of breath and went to an internist. He subsequently had an x-ray taken which reportedly revealed that his right lung was substantially collapsed. After returning to the U.S. he had a pleural effusion drained, and tests on the fluid were negative. A biopsy of several lesions, however, revealed the presence of "bipolar mesothelioma." Dr. Holinka has since undergone chemotherapy treatments.

## EXPERT OPINION

I have concluded with a reasonable degree of scientific [illegible] that Dr. Holinka was not exposed to harmful levels of asbestos from the presence and [illegible] n burner pads and gloves/mittens, which would cause or contribute to his claim [illegible] lated disease. The normal use of asbestos containing gloves/mittens and the Bu[illegible] gauze with an asbestos center, would not emit levels of asbestos during norm[illegible] or exacerbate Dr. Holinka's diagnosis of mesothelioma. These produ[illegible] ntly by Dr. Holinka for limited periods of time in laboratories, which have g[illegible] ventilation.

The asbestos used in such laboratory gloves/mittens as described [illegible] ka is woven and maintains its integrity. I have personally condu[illegible] a test [illegible] ployee wearing asbestos gloves/mittens when repeatedly unloadin[illegible] from ov[illegible] production line and no