Ms. Kristy Kulina Lyons, Ms. Carol Tempesta, Mr. Gregory A. Dadika, and Mr. Timothy Fraser
July 24, 2007
Page 5

measurable levels of asbestos were found based on the limits of detection of the method. Other
such tests have also been conducted with similar results. Other tests have been conducted on
gloves/mittens finding higher levels of exposure, but these studies were conducted in sealed
small volume chambers, did not include background sample checks, did not determine if other
sources of asbestos were in the test area, used only phase contrast microscopy (PCM) analyses
and heated the gloves/mittens in a manner to which the gloves/mittens are not normally
subjected.

The asbestos contained in the center of wire gauge is used to hold containers heated by
Bunsen burners. Dr. Holinka testified that they were routinely replaced. Further, the
temperatures to which the asbestos would be subjected would cause the asbestos to be
transformed into forsterite as it degrades and possibly separates from the pad. Based on the
routine changing of the pads, the bonding of the asbestos in the pad, the limited use of the pads,
the ventilation in the laboratories, and the conversion of asbestos in the pad to forsterite as the
pads deteriorate, he would not have been exposed to harmful levels of asbestos.

Furthermore, the type of asbestos used in such gloves/mittens and Bunsen burner pads is
chrysotile which is more soluble in the lungs and is removed from the lungs by physiologic
actions, and thus, has a lower propensity for causing pulmonary disease than some other forms of
asbestos. In addition, valid epidemiology studies have shown that chrysotile has little or no
potential for causing an increase in the risk of getting mesothelioma.[1,2] The asbestos dose that
Dr. Holinka potentially could have received from wearing asbestos gloves/mittens is
insignificant compared to the amount required to develop an asbestos-related disease.

This opinion is based on my education and over 35 years of experience as an industrial
hygienist and toxicologist. My experience includes evaluation of health hazards in vehicle repair
facilities, foundries, building maintenance, steel mills, manufacturing facilities and shipyards. It
also includes evaluations of pneumoconiosis-producing dusts, such as asbestos. As a consultant
and former manager of health and safety for the U.S. Environmental Protection Agency, I have
evaluated buildings and industrial environments to determine asbestos hazards from
asbestos-containing materials (ACMs) used as insulation materials, fireproofing materials, and
decorative building materials. I have collected over 1,000 asbestos air samples in a
variety of situations.

I have specifically collected air samples while various being handled, used
and removed, which included: transit and other encapsulated insulation
materials for furnaces, and other equipment in foundries and s as well as
thermal insulation used in pipe covering.

Based on over 35 years of experience in the industrial hygiene field of
the literature regarding the health hazards of asbestos, I am familiar with the
conclusions of researchers in the field of occupational health regarding hazards
and of the practices of occupational health professionals with respect workers
from harmful asbestos products. The following dis on sets for s for my opinions.



Ms. Kristy Kulina Lyons, Ms. Carol Tempesta, Mr. Gregory A. Dadika, and Mr. Timothy Fraser
July 24, 2007
Page 6

## ANALYSIS

### Asbestos Containing Gloves and Bunsen Burner Pads

Asbestos fibers have been used for many years in manufacturing woven textiles including asbestos gloves/mittens used to provide protection from heat. Asbestos gloves/mittens have been used in the past in most laboratories where heated operations such as the use of ovens were involved. I used asbestos gloves and mittens for about ten years in the analytical laboratory of the Occupational and Environmental Health Department of Wayne State University College of Medicine where I was a part time chemist and also where I attended graduate school.

The normal use of such gloves/mittens in handling heated materials would not result in harmful emissions of asbestos fibers as the fibers are embedded in the matrix of the gloves/mittens and the minimal intermittent use would not degrade the materials. As mentioned, I have conducted an air sampling survey of an employee where I obtained a breathing zone air sample which was analyzed for asbestos using an OSHA approved light microscope analysis. The sample was taken while the employee was continuously unloading hot windshield glass from a Lehr bending furnace. The results of the analysis demonstrated that the employee was not exposed to any asbestos from the use of the gloves/mittens based on the limit of detection for the method. A test to determine asbestos emissions from asbestos containing protective equipment has been conducted by the National Institute for Occupational Safety and Health (NIOSH) where the results of placing an air sampling cassette within the breathing zone of an asbestos hood used by firefighter did not show that the wearer of the hood was exposed to harmful levels of asbestos.

Asbestos pads have been used for many years in laboratory settings to protect beakers and other glassware from the intense heat of the flame from Bunsen burners, which can reach to approximately 1500°C. The pads consisted of a wire screen which was coated with chrysotile asbestos pad in the center. At temperatures above 500°C, the chrysotile begins to be transformed into an amorphous mineral called forsterite, which is fibrous. Forsterite is chemically similar to chrysotile, but without attached water molecules, the "water of hydration." This water loss occurs quickly and completely at temperatures of around 700°C to 800°C. When fibrous chrysotile loses these water molecules, it loses its flexible fibrotic nature. Indeed, Dr. Holinka testified that the burner pads that he used became brittle due to the high heat," which is consistent with the chrysotile fibers decomposing into forsterite. Further, he mentioned that when the pads deteriorated, they were replaced and not have been exposed to harmful levels of asbestos from handling and disp

### Knowledge of asbestos hazards in the past

While excessive exposure to asbestos was known to cause a fibrosing disease early in the last century, it was not identified as a confirmed human carcer until some time in the

Ms. Kristy Kulina Lyons, Ms. Carol Tempesta, Mr. Gregory A. Dadika, and Mr. Timothy Fraser
July 24, 2007
Page 7

late seventies or even the early nineteen eighties. Further, high exposures such as those associated with working with large amounts of raw asbestos were thought to be required to cause lung disease. Based on that knowledge, the federal government set an exposure limit of 5 million particles per cubic foot (mppcf) in 1938 which is roughly equivalent to 30 fibers per cubic centimeter or three hundred times the current federal limit. The 5 mppcf limit remained in effect as the federal limit until the early 1970s.

Employees working with finished asbestos products were not thought to be at risk of developing any asbestos related disease. In the mid 1940s, a study was conducted of insulators and the results indicated that insulators were not at risk of developing an asbestos related disease. When epidemiological studies first suggested that asbestos was a carcinogen in the mid 1950s, it was thought that high exposure would be necessary to cause cancer and that some scarring of the lungs would also have to occur. It was not until the mid 1960s when a study of insulators suggested that they were at risk of developing not only a fibrotic lung disease, but also cancer. A study in South Africa in 1960 suggested that exposure to amphibole asbestos caused mesothelioma, but most insulation in the United States was chrysotile. While Selikoff's articles in the mid 1960s saw an increase in cancer in the insulation workers that they were observing, the occupational health community did not conclude that asbestos was a carcinogen. There were also other studies such as the Braun study suggesting that exposure to asbestos did not cause cancer. Selikoff's work did stimulate discussions regarding the carcinogenicity of asbestos and additional studies were undertaken to confirm or deny the conclusions that Selikoff had drawn.

In 1972, the Occupational Safety and Health Administration (OSHA) promulgated their first complete chemical standard which was for asbestos. While they discussed the carcinogenicity of asbestos, they did not regulate as a carcinogen. In fact, they did not regulate asbestos as a carcinogen until 1985 when they attempted to set an emergency standard for asbestos. The National Institute for Occupational Safety and Health (NIOSH) also did not suggest regulating asbestos as a carcinogen in their Criteria Document on asbestos although they did discuss the carcinogenicity of asbestos. NIOSH did not recommend regulating asbestos as a carcinogen until 1976 when additional studies had been conducted providing additional support for the conclusion that asbestos was carcinogenic. As mentioned, within the next few years after that, the occupational health community recognized that asbestos was a known human carcinogen. Most of Dr. Holinka's work in the routine analysis of chemical samples when he might have routinely worn asbestos gloves/mittens and used asbestos paper pads occurred prior to the early 1970s at around the time of the promulgation of the first OSHA asbestos standard.

**The Occupational Safety and Health Administration Act and the Hazard Communication Standard**

OSHA was created by the Williams-Steiger Occupational Safety and Health Act of 1970 (84 Stat. 1590, et seq., 29 U.S.C., et seq.). The goal was to assure so far as possible every working man and woman in the Nation, have safe and healthful working conditions and to preserve our human resources. The Act requires, in part, that every employer covered under the Act furnish to his employees "employment and a place of employment which is free from

Ms. Kristy Kulina Lyons, Ms. Carol Tempesta, Mr. Gregory A. Dadika, and Mr. Timothy Fraser
July 24, 2007
Page 8

recognized hazards that are causing or are likely to cause death or serious physical harm." The Act gave the Department of Labor the authority to create standards, conduct inspections, issue citations and propose penalties for alleged violations. OSHA is the agency in the Department of Labor to which the legislation assigns the responsibility for carrying out the aforementioned act.

**Employer Responsibility**

As described in the aforementioned act, it is the employer's responsibility to provide a safe work environment for employees. While the act requires employees to comply with standards and rules that are applicable to their own actions and conduct, it is the employer who has the means to provide a safe environment. Under law, the employer is even empowered to discipline employees who do not comply with health and safety requirements of the employer. When OSHA conducts an inspection and observes an employee not following the regulations, it is the employer who is cited, not the employee. Employees have the right to notify OSHA of alleged violations in their workplace and not have any reprisals against them by the employer.

Only the employer has the ability to ensure that employees work in a safe and healthful environment. The employer is the only entity that can:

- Control what materials are purchased to be used in the facility, including both production and non-production materials;

- Control the ventilation conditions in the building and selection of the building itself;

- Provide and install engineering equipment to protect workers;

- Set work rates and work practices;

- Provide for training of employees in hazard recognition and safe work practices;

- Monitor the "environment" to determine if employees are exposed to levels of chemicals, which might be harmful.

Even prior to the formation of OSHA, companies were required to provide safe and healthful working conditions which are also consistent with industrial hygiene. Dr. Holinka worked at hospitals and from 1977 until 1989 worked at the same time Dr. Selikoff did his research on asbestos. Thus, Dr. Holinka's employers knew or should have known of the hazards associated with asbestos to the extent that those hazards were known to the national health and safety community during the various time periods that he worked. A number of states had an asbestos exposure limit well before OSHA promulgated the standard, which was 5 mppcf as discussed earlier. Thus, Dr. Holinka's employers were then responsible for ensuring that he was not exposed to harmful levels of asbestos.

Ms. Kristy Kulina Lyons, Ms. Carol Tempesta, Mr. Gregory A. Dadika, and Mr. Timothy Fraser
July 24, 2007
Page 9

## CONCLUSIONS

Dr. Holinka was not exposed to harmful levels of asbestos from the presence and use of asbestos containing gloves/mittens and Bunsen burner pads during his career. The reasons that Dr. Holinka's diagnosis of mesothelioma would not have been caused or exacerbated by possibly working with asbestos containing gloves/mittens and Bunsen burner pads are as follows:

- Studies conducted on asbestos exposure associated with the use of asbestos gloves/mittens have shown that users are not exposed to harmful levels of asbestos;

- The form of asbestos used in both the mittens and the Bunsen burner pads would have been chrysotile and valid epidemiology studies have shown that chrysotile has little or no potential for causing an increase in the risk of developing mesothelioma;

- The use or handling of asbestos mittens and Bunsen burner pads is intermittent and generally for short periods of time;

- Dr. Holinka did not work in laboratory continuously and only worked in routine analytical determinations of biological specimens for a limited period of time;

- Laboratories usually have one pass ventilation, thus diluting any fibers emitted into the air;

- Asbestos gloves/mittens are woven products and the asbestos is contained within the fabric of the glove; and

- The intense heat from the Bunsen burners would have converted the chrysotile fibers in the pads to non-asbestos forsterite.

If you have any questions, please do not hesitate to contact me at 6880.

Sincerely,

Sheldon H. Rabinovitz, PhD, CIH
Certified Industrial Hygienist & Toxicologist

SHR/jps

Ms. Kristy Kulina Lyons, Ms. Carol Tempesta, Mr. Gregory A. Dadika, and Mr. Timothy Fraser
July 24, 2007
Page 10

## REFERENCES

[1]  Liddell, F.D.K., McDonald A.D., and McDonald, J.C. "The 1891-1920 Birth Cohort of Health of Quebec Chrysotile Mines and Millers: Development from 1904 and Mortality to 1992," Annals of Occupational Hygiene, 41 (1): 13-36, 1997.

[2]  McDonald, A.D., J.S. Fry, A.J. Woolley and J.C. Mc Donald. "Dust Exposure and Mortality in an American Chrysotile Asbestos Friction Products Plant," British Journal of Industrial Medicine, 41, 151-157, 1984.

[3]  Langer, Arthur M. "Reduction of the biological potential of chrysotile asbestos arising form conditions of service on brake pads," Regulatory Toxicology and Pharmacology, 38: 71-77, 2003.



**EXHIBIT B**

# CURRICULUM VITAE

## SHELDON H. RABINOVITZ, Ph.D., C.I.H.

**Work History:**
**1989-Present**

Vice President; Senior Certified Industrial Hygienist and Toxicologist
Sandler Occupational Medicine Associates, Inc. (SOMA)
Gaithersburg, MD

- Senior scientist and principal conducting and managing many SOMA industrial hygiene and toxicology projects, including: indoor air quality evaluations; lead, asbestos and fungal exposure and remediation projects; chemical risk assessments and recommended controls; worker right-to-know; hazardous waste evaluation and remediation projects; comprehensive industrial hygiene sampling surveys, audits and respirator programs including selection, fit testing and program design; in-plant evaluations to identify, quantify and control health hazards; and the provision of expert witness services. Expert witness services include product liability, workers' compensation, and exposure modeling. Clients include large and small manufacturers, various governmental agencies, service providers, hospitals, and other companies.

- Provides of occupational health training to governmental agencies and private companies. Prepares Material Safety Data Sheets (MSDSs) and warning labels for products. Periodically assists governmental agencies in support of their occupational health programs, such as assisting the National Institute for Safety and Health (NIOSH) in respiratory protection research. Identifies exposure profiles using reconstruction and other evaluation methods for epidemiology studies.

- A principal architect of the SOMA environmental testing chamber. Evaluates exposures associated with the use of products by workers and consumers, both under normal use conditions and from accidental situations.

**1989-1992**

Expert Consultant (part-time)
Environmental Protection Agency (EPA)
Washington, D.C.

- Assisted the Agency in protecting the health of its employees. Specific projects included design and management of asbestos remediation projects throughout the Agency, preparation of health and safety guidelines for EPA asbestos inspectors, and the conduct of studies to determine potential exposure of EPA employees to various contaminents.

**1987-1989**

Manager, Industrial Hygiene and Safety
Environmental Protection Agency (EPA)
Washington, D.C.

Sheldon H. Rabinovitz, Ph.D., C.I.H.
Page 2

- Developed and implemented industrial hygiene and safety programs to protect the health and safety of all EPA employees. Such programs include laboratory chemical evaluations, indoor air pollution surveys, evaluations of health and safety concerns at hazardous waste sites, recommendations for protecting EPA inspectors at manufacturing sites, service industries, and building renovations, and demolitions involving asbestos.

- Participated in EPA research programs involving hazardous waste activities, including sampling procedures and use of personal protective equipment.

- Participated in the development of training modules for EPA employees as part of the overall health and safety program.

- Performed audits to determine compliance of various EPA facilities to applicable standards.

- Participated in EPA Asbestos Action and Hazardous Waste committees.

1984-1987   **Senior Scientist**
National Institute for Occupational Safety and Health
Cincinnati, OH

- Reviewed and assisted in preparation of criteria documents, current intelligence bulletins relating to occupational safety and health conditions, and other NIOSH informational publications for accuracy and provided additional input where applicable.

- Served on committees to establish NIOSH priorities, needs and policies.

- Reviewed technical materials from an industrial hygiene, safety, and toxicological standpoint. This included NIOSH documents on the following subjects: asbestos, silica, noise, low frequency radiation, hazardous waste, carbon monoxide, isocyanates, radon, welding fumes, solvents (including benzene) and other hydrocarbon vapors.

- Assisted in the preparation of NIOSH position papers and interacted with other federal agencies to coordinate government occupational health and safety policies.

- Served as a resource expert for inquiries to the Center for Disease Control on asbestos and several other topics.

- Chairman of NIOSH Respiratory Protection Committee, which prepared

Sheldon H. Rabinovitz, Ph.D., C.I.H.
Page 3

revised Respirator Decision Logic, published through NIOSH in 1987.

- Chairman of an interagency work group which included NIOSH, EPA, Occupational Safety and Health Administration (OSHA) and the U.S. Coast Guard and completed a comprehensive manual entitled "Occupational Safety and Health Guidance Manual or Hazardous Waste Site Activities."

- Prepared a hazard alert on the effects of acute exposures to certain halogenated solvents.

**1984-1989**     **Private Consultant**

- Performed expert witness services including product liability and warning labels, indoor air pollution, and workers' compensation.

- Conducted facility walkthroughs as well as chemical and physical agent sampling surveys to identify and correct health and safety hazards in both occupational and residential settings.

**1978-1984**     Manager, Industrial Hygiene Services,
Science Applications International Corporation (fka: JRB Associates)
McLean, VA

- Managed all SAIC commercial industrial hygiene and indoor air pollution projects. Project sizes ranged from the OSHA Louisiana Small Business Health and Safety Consultation Program and a comprehensive survey of a major oil refinery to office air quality studies. These projects involved work in a wide range of industries including: chemical; foundry; glass; pharmaceutical; textile; printing; aerospace; assembly; ship building and repair; paint; and others. Hazard evaluations included both ionizing and nonionizing radiation, chemical exposures, lasers, heat stress, confined space hazards, eye protection, explosions, and fire.

- Prepared proposals, marketing strategy, and advertising material. Determined cost of all projects and assumed responsibility for product delivery within budget. Hired and trained personnel.

- Organized and managed an instrument laboratory and assisted in obtaining American Industrial Hygiene Association (AIHA) accreditation for the company's trace chemistry laboratory.

- Prepared sampling strategies, position papers, and corporate policies; reviewed company reports and criteria documents for the Consumers

Sheldon H. Rabinovitz, Ph.D., C.I.H.
Page 4

Product Safety Commission (CPSC), EPA, Office of Toxic Substances, NIOSH and private companies.

- Conducted investigations, case reviews, and industrial hygiene surveys in preparation to provide expert witness services.

1973-1978      **Industrial Hygienist (1973-1974)**
**Senior Industrial Hygienist (1974-1978)**
Ford Motor Company
Dearborn, MI

- Supervised up to six industrial hygienists and was responsible for the provision of industrial hygiene services to one-half of the company's North American Operations, including approximately 50 plants, each employing up to 5,000 people.

- Reviewed all chemicals used in maintenance operations, as well as some production materials, from a toxicological standpoint to provide warning labels and recommended personal protection and engineering controls based on intended use.

- Conducted comprehensive industrial hygiene surveys to appraise management of health hazards and degree of OSHA compliance before recommending solutions to ensure a healthful working environment. Surveys were often conducted with the assistance of local safety engineers to identify all safety and health hazards.

- Prepared and conducted training seminars for company safety engineers and union health and safety representatives regarding the recognition and measurement of certain industrial hygiene hazards; also prepared and conducted training programs to fulfill OSHA training requirements.

- Provided expert witness services to the Office of General Council.

- Assisted in providing corporate guidelines for compliance with OSHA standards.

1972-1973      **Industrial Hygienist and Toxicologist**
BASF Wyandotte Corporation
Wyandotte, MI

- Conducted comprehensive industrial hygiene surveys including analysis of heavy metals, acids and bases, and spectrophotometric analysis of solvent vapors and isocyanates.

- Informed management of identified health hazards and recommended

Sheldon H. Rabinovitz, Ph.D., C.I.H.
Page 5

corrective actions.

- Provided industrial hygiene consultative services for company clients.

- Performed toxicological evaluation of in-plant chemicals and prepared recommendations for the safe use of company products by customers.

**1970-1972**    Chemist (part-time)
IHI-Kemron (fka: Environmental Health Laboratories)
Farmington, MI

- Performed quantitative analysis of water, air and biological samples.

**1964-1967**    Chemist (part-time)
Department of Occupational and Environmental Health
College of Medicine
Wayne State University
Detroit, MI

- Performed routine quantitative calorimetric analyses of biological specimens and air samples for heavy metals. Assisted on research projects to develop new analytical methods.

**Certifications:**    Certified Industrial Hygienist, 1974, #853
Certified Asbestos Inspector (EPA AHERA Regulation) Jan., 1989
Certified Asbestos Management Planner (EPA AHERA Regulation), January, 1989

**Education:**    Ph.D., Physiology and Pharmacology, 1972
Wayne State University College of Medicine, Detroit, MI
Major: Toxicology

M.S., Occupational and Environmental Health, 1969
Wayne State University College of Medicine, Detroit, MI
Major: Industrial Hygiene

B.S., Chemistry, 1966,
Wayne State University, Detroit, MI
Major: Analytical Chemistry

**Short Courses:**    - Industrial Ventilation Conference, Michigan State University, Lansing, MI, 1973

Sheldon H. Rabinovitz, Ph.D., C.I.H.
Page 6

      - Noise Control Engineering, Institute of Noise Control, Bethlehem, PA,
        Certificate Number 385, 1973
      - Principles and Practices of Industrial Toxicology, College of Medicine, Wayne
        State University, Detroit, MI, 1976 (36 hours of continuing medical education)
      - Hazardous Waste Remedial Action Course, Environmental Protection Agency,
        Cincinnati, Ohio, 1987 (40 hours)

**Awards:**

- Public Health Service Fellowship, 1967-1971

- NIOSH Special Service Award, 1985

- U.S. EPA Assistant Administrator's Award, 1988

**Teaching:**

**1985-1995**      NIOSH Respirator Protection Course, Course Development and Instruction

**1996-2000**      University of Maryland, College Park, Maryland, Biosystems Responses to
                    Environmental Stimuli, Course #484, Develop and Provide lecture on
                    Toxicological Aspects of Environmental Stimuli

**1978-1982**      George Washington University, Washington, D.C., Environmental Health
                    Graduate Program, Guest Lecturer

**1977**      Michigan Department of Public Health, Detroit, MI, Workplace Monitoring
                    Seminar, Guest Lecturer

**1975-1978**      Henry Ford Community College, Dearborn, MI, Instructor

- Developed and taught courses including noise control, industrial toxicology,
and air pollution.

**1973-2000**      Wayne State University College of Medicine, Department of Occupational and
                    Environmental Health, Detroit, MI, Guest Lecturer

**1981-1982**      Northern Virginia Community College, Alexandria, VA, Instructor

**Professional Societies and Memberships:**

American Academy of Industrial Hygiene, member

American Conference of Governmental Industrial Hygienists, member

American Industrial Hygiene Association (AIHA), full member

Sheldon H. Rabinovitz, Ph.D., C.I.H.
Page 7

AIHA, Invited panel member of mycotoxin workshop, March 1998

AIHA, Baltimore-Washington Local section, member

AIHA Respirator Protection Committee, corresponding member

AIHA Respirator training subcommittee of Respiratory Protection Committee,
former chairman

AIHA Indoor air quality committee, member

AIHA Biological Environmental Exposure Level (BEEL) project team, member

AIHA Biological Monitoring Committee (BMC), member

AIHA IAQ Committee, Subcommittee on Review of Health Hazards from
Exposure to Mycotoxin Fungi in Indoor Environments, member

AIHA Respirator Committee, Hazardous Waste Subcommittee, former chairman


Henry Ford Community College Advisory Industrial Health and Safety Council,
former member

Michigan Industrial Hygiene Association, former member

Michigan Industrial Hygiene Society, Board of Directors 1975-1977

Mid-Maryland American Lung Association, former board member

Motor Vehicles Manufacturer Association ad hoc Committee to review the
NIOSH Sulfuric Acid Criteria Documents, former chairman

Motor Vehicles Manufacturer Association ad hoc Committee for NIOSH Criteria
Documents on Beryllium, Benzene and Chromates, former member

Sigma Xi, scientific research society, former member

Sheldon H. Rabinovitz, Ph.D., C.I.H.
Page 8

## Publications and Presentations:

Keane, L. and Rabinovitz, S.H. Draft Report, "Strategies for Setting Standards for Short-Term High-Level Exposures," Contract Number DAMD 17-79-C-9159 for the United States Army, 1980.

Ludington, J.A., Rabinovitz, S.H. and Mahar, H. "Determination of Organic and Inorganic Mercury Emissions, Employee Exposures, and Waste Stream Concentrations During Use of Methyl Mercury Hydroxide as a Denaturing Agent," presented at the American Industrial Hygiene Conference, Cincinnati, 1982.

NIOSH Respiratory Protection Committee, Sheldon H. Rabinovitz, Chairman. NIOSH Respirator Decision Logic, DHHS (NIOSH) Publication Number 87-108, 1987.

Piper, Stephen and Rabinovitz, Sheldon, "Quantification of Asbestos Airborne Emissions Associated with Renovation Projects," ECON, Environmental Contractor, February, 1990.

Rabinovitz, S.H., "Interpreting Health Standards to Identify The Most Cost-Effective Protection," Asbestos Abatement Report, Editorial Analysis, March 1992.

Rabinovitz, S.H. "Health Effects of Carbon Monoxide," Contract Number `CPSC-C-79-1052 for the Consumer Products Safety Commission, 1980.

Rabinovitz, S.H., Kleiner, G., Weitzman, D. and Wiltshire, G. Occupational Safety and Health Guidance Manual for Hazardous Waste Site Activities, DHHS (NIOSH) Publication No. 85-115, 1985.

Rabinovitz, S.H. "Mercury in the Brains of Gerbils Chronically Exposed to Mercury Vapor and to Mercuric Nitrate," (update of doctoral thesis), presented at the American Industrial Hygiene Conference, Miami, 1974.

Rabinovitz, Sheldon and Weitzman, David, et al. Health and Safety Guidelines for EPA Asbestos Inspectors, (revised), Office of Administration and Resource Management, U.S. EPA, 1991.

Contributing Author: Respiratory Protection: A Manual and Guideline, 3rd Edition, American Industrial Hygiene Association, June, 1991.

Contributing Author: Respiratory Protection in Hazardous Chemicals Desk Reference by Sax, I.R. and Lewis, R.J., Van Nostrand Reinhold Company, New York, 1987.

Sheldon H. Rabinovitz, Ph.D., C.I.H.
Page 9

Contributing Author: NIOSH. Criteria for Recommended Standard Welding Brazing and Thermal Cutting, U.S. Dept. of Health and Human Services, Pub. No. 88-110, 1988,

Contributing Author: NIOSH. A Recommended Standard for Occupational Exposure to Radon Progeny in Underground Mines, U.S. Department of Health and Human Services, 1987,

Contributing Author: NIOSH. Recommendations for Control of Occupational Safety and Health Hazards...Foundries, U.S. Department of Health and Human Services, Pub. No. 85-116, 1985.

Contributing Author: NIOSH. Pocket Guide to Chemical Hazards, U.S. Department of Health and Human Services, fifth printing, Pub. No. 85-114, 1985.

Co-Author. "OSHA-Required Employee Training under the Coke-Oven Emissions Standard," presented at the American Public Health Association Conference, Washington, D.C., 1977.

Forum on a Critical Review of Health Hazards from Exposure to Mycotoxic Fungi in Indoor Environments presented at the American Industrial Hygiene conference, Orlando, Florida, 2000 (panel speaker).

Occupational Safety and Health Administration, presented testimony and responded to questions on behalf of the Workplace Health and Safety Council at the OSHA hearings for their proposed Standard on Indoor Air Quality (29 CFR Parts 1910, 1915, 1926 and 1928).

United States Congress, presented testimony and responded to questions at a congressional hearing on H.R. 2919 entitled the "Indoor Air Act of 1993" on November 1, 1993, on behalf of the National Association of Manufacturers.

**EXHIBIT W**

**Safdoc Systems, LLC.**
Kenneth S. Weinberg, Ph.D.
20 Thompson Court
Stoughton, MA 02072
Phone/Fax: (781) 341-3893

e-mail: SafdocSys@aol.com                    web:www.SAFDOCSYSTEMS.com

July 30, 2007

Kristy Kulina Lyons
Hoagland, Longo, Moran, Dunst & Doukas, LLP
40 Paterson Street, P.O. Box 480
New Brunswick, NJ 08903

Carol Tempesta, Esq.
Marks, O'Neill, O'Brien & Courtney, PC
530 Saw Mill River Road
Elmsford, NY 10523

Gregory A. Dadika, Esq.
Reed Smith, LLP
Princeton Forrestal Village
136 Main Street, Suite 250
Princeton, NJ 08540-7839

Timothy Fraser, Esq.
Drinker Biddle & Reath LLP
500 Campus Drive
Florham Park, NJ 07932-1047

Re: Holinka v. A.W. Chesterton et al.

Dear Counselors:

Thank you for allowing me to review the above referenced matter. Below is a statement
of my qualifications, as well as my opinions regarding this matter, and the bases for these
opinions.

**Summary of Qualifications**

I am Kenneth S. Weinberg, Ph.D., the President and Principal Consultant of Safdoc
Systems, LLC, located in Stoughton, MA. I earned a Master of Science in Environmental
Health and Radiation Health Physics from the University of Pittsburgh Graduate School
of Public Health in 1970. I also earned a Ph.D. in Biochemistry and Pathology in 1979
from Boston University, Graduate School of Medical and Dental Sciences. I have worked



as an independent consultant specializing in environmental health, safety and toxicology since 2000. A copy of my CV and Publications are attached.

In addition to the aforementioned educational credentials, I worked in both clinical and research laboratories, spanning a course of over twenty years. I started my career as a research technician in a college chemistry laboratory, which was followed by a stint as the night technician in a clinical microbiology laboratory at Children's Hospital, in Boston, MA. This occurred while I was an undergraduate. At the same time, I also worked and volunteered as a technician in the clinical pathology laboratory at what is now Brigham and Women's Hospital in Boston. Following this, I performed laboratory research in radiation and environmental health physics at the University of Pittsburgh Graduate School of Public Health. This was followed by work as a technician in a research pathology laboratory at Boston University School of Medicine. At the end of that period, I returned to Graduate School for my doctorate, and worked in a pathology laboratory both as a technician and graduate student at BU School of Medicine. Following the awarding of my doctorate, I held positions as a Postdoctoral Fellow, Assistant Professor of Medicine and Research Scientist at various institutions in the Boston area, including Tufts New England Medical Center, and the Dana Farber Cancer Institute. Each of these positions involved both laboratory research and increasing responsibility for leadership in the laboratory. Later on, I worked as the director of a commercial environmental laboratory that included a number of subgroups within the laboratory, including analytical and basic chemistry groups, which also involved the analysis of soil samples. Finally, I took on the roll of Industrial Hygienist at the Brockton/West Roxbury V.A. Medical Center, and then as Director of Safety at Massachusetts General Hospital. In these latter two positions, I played a daily role in the issues surrounding environmental health and safety in the clinical and research laboratories at each of these respective facilities. At Massachusetts General Hospital, in particular, I spent several hours each week observing work practices and procedures in both the clinical and research laboratories to better assist practitioners in achieving a safe working environment.

### Statement of Opinions

I hold the following opinions to a reasonable degree of laboratory certainty:

1. Asbestos heating pads for Bunsen burners were durable and were not routinely or frequently disposed of and they did not, even after extensive use, display signs of aging through the appearance of white dust or powder.
2. Asbestos heat resistant mittens typically were durable, did not significantly degrade when used in typical laboratory circumstances, such as handling hot glassware, and, thus, were not routinely or frequently disposed of .
3. It was, and still is, the custom and practice in the laboratories to utilize clamps and tongs, not mittens, to handle hot glassware at the bench top.
4. It was , and still is, the custom and practice in laboratories to use either heating baths or heating mantles to heat materials in flasks or beakers. The latter were



particularly common in chemistry laboratories. Efforts were made to limit, to the extent possible, the wide use of Bunsen burners.

5. It was, and still is, the custom and practice in laboratories for researchers who become more senior to be less involved in the day to day conduct of experiments and to be more involved in planning, analysis and review of experimental data, as well as in the preparation of manuscripts for publication.

6. It was, and still is, the custom and practice for laboratory workers to maintain a clean work environment to protect themselves from exposure to potentially harmful materials and to protect their work from potential contamination.

7. Based on the methods sections included in Dr. Holinka's publications that were provided to me, including those produced prior to 1989, it does not appear that heating of chemicals or materials played a significant role in the research conducted.

## Bases of Opinion

My statements and opinions are based on my personal experience working in various types of research and clinical laboratories, as well as undergraduate student laboratories. I also base my opinions on the observations I made as an industrial hygienist and director of safety at the VA Medical Centers in Brockton and West Roxbury, MA, and Massachusetts General Hospital, Respectively.

I also considered the following information when formulating my opinions:

1. Asbestos is a durable material capable of withstanding high amounts of heat for long periods of time. Asbestos is the best heat retardant material known to man.

2. Asbestos heat resistant mittens were clumsy and not appropriate for the care that must be taken when handling equipment, such as test tubes, beakers, or crucibles.

3. Clamps and tongs were, and still are, typically used to handle test tubes, beakers or crucibles that have been heated

4. The primary use of asbestos heat resistant mittens in the laboratory was to remove hot objects from autoclaves, drying ovens, and kilns.

5. In the course of work in the chemistry lab or other labs where heating of substances are necessary, it was, and still is more common to see the use of heating mantles, that is long trays that can contain and hold the beakers or flasks that need to be heated. These heating mantles were typically placed inside of fume hoods to reduce emissions of gases and any potential harmful materials into the general air of the laboratory. Heating mantles were used because the practice of heating chemicals with open flames is potentially hazardous; the goal of the laboratory is to limit the use as well as location of open flames to the greatest extent possible.

6. Culture media was, and still is, generally heated in warming baths, not over Bunsen burner flames.

7. The heat from Bunsen burners is difficult to control, and as a result, this method for heating is not optimal and may result in the destruction of important chemicals. In addition, heating chemicals using Bunsen burners can be dangerous

as it may lead to rapid release of hazardous materials, and may put workers at risk of exposure to fire or explosions.

If you have any questions, please do not hesitate to contact me.

Respectfully submitted,

Kenneth S. Weinberg, M.Sc., Ph.D., RPIH

# Curriculum Vitae

## Part I. General Information

Name:                Kenneth S. Weinberg, Ph.D.

Home Address:        20 Thompson Court
                     Stoughton, MA. 02072
Telephone:           781-341-4267

Office Telephone     781-341-3893

E-mail:              SafdocSys@aol.com           Fax: 781-341-3893

Place of Birth:      Brookline, MA.

## Education

1979  Ph.D.  Boston University Graduate School of Arts and Sciences, Division
             of Medical and Dental Sciences (Biochemistry and Pathology)

1970  M.Sc.  University of Pittsburgh Graduate School of Public Health,
             (Environmental Health and Radiation Health Physics)

1969  A.B.   Boston University, Boston, MA. (Biology)

## Postdoctoral Training

1984-1986    Research Associate in Medicine and Pathology, Dana-Farber
             Cancer Institute and Harvard Medical School, Boston, MA.

1982-1983    Assistant Professor of Medicine, Member Special and Scientific
             Research Staff, Tufts University School of Medicine and New
             England Medical Center Hospital, Boston, MA.

1981-1982    Parker B. Francis Foundation Fellow in Pulmonary Medicine,
             New England Medical Center Hospital, Boston, MA.

## Postdoctoral Training(cont'd)

1978- 1981    National Institutes of Health Postdoctoral Fellow, New England Medical Center Hospital, Boston, MA.

1973-1978    Research Assistant, Pulmonary Pathology, Mallory Institute of Pathology/Boston University School of Medicine, Boston, MA.

1971-1973    Research technician, Atherosclerosis Research, Boston University School of Medicine, Boston, MA.

1970-1971    Licensed Nursing Home Administrator, Alliance Medical Inns, Inc. Stratford, CT.

## Professional Experience

2000 -    Independent Consultant , Safdoc Systems, LLC., Stoughton, MA

1990-2000    Director of Safety, Massachusetts General Hospital, Boston, MA.

1989-1990    Acting Director of Safety, Massachusetts General Hospital, Boston, MA.

1988-1989    Assistant Safety Officer, Massachusetts General Hospital, Boston, MA.

1987-1988    Industrial Hygienist, V.A. Medical Center, Brockton/West Roxbury, MA.

1987    Manager, Toxikon Environmental Laboratory, Woburn, MA.

## Licensure/Certification

June, 1997    Certified Healthcare Environmental Manager
April, 1998    Registered Professional Industrial Hygienist
Dec., 2000    National Registry of Safety Professionals
May, 2002    Certified Toxics Use Reduction Planner

## Awards/Honors

June, 2001    Safety Professional of the Year, Health Care Division, American Society of Safety Engineers

## Professional Societies

American Society of Safety Engineers, Professional Member
American Society of Safety Engineers, Massachusetts Chapter
Massachusetts Safety Council
American Industrial Hygiene Association
American Industrial Hygiene Association, New England Chapter
American Conference of Governmental Industrial Hygienists
American Chemical Society
American Chemical Society Division of Health and Safety
National Fire Protection Association
Affiliated Harvard Hospitals Health and Safety Committee
Toxics Use Reduction Planners Association
American Biological Safety Association
National Association of Safety Professionals

## Editorial/Advisory Boards

| | |
|---|---|
| 2005 | Editorial Advisory Board, Medical Environmental Weekly, HcPro |
| 2005 | Editorial Advisory , Safety Talks, Bongarde Publications |
| 2002- | Advisory Board, National Toxic Mold Coalition |
| 2001-2002 | Science Advisory Panel, Massachusetts Department of Environmental Protection, "Review and Recommendations for DEP's Interim risk evaluation Guidance Document for Solid Waste Facility Site Assessment and  Permitting." |
| 2001- | Boston University Biology Department Alumni Advisory Council |
| 2001- | Advisory Board, Briefings on Hospital Safety |
| 2000- 2001 | Editorial Board, J. Healthcare Safety Compliance and Infection Control |
| 1996-1998 | American Society of Safety Engineers, Administrator, Health Care Division |
| 1996- | Bureau of National Affairs Editorial Advisory Board for Healthcare Facilities Guide |
| 1996 | Member, Toxic Use Reduction Task Force, Chair, Committee on Education and Training |



## Editorial/Advisory Boards (cont'd)

1995          American Society of Safety Engineers, Assistant Administrator
              Health Care Division

1994-1995   Hospital Mercury Task Force, Source Identification Committee

1994-1997   Member, Boston Chamber of Commerce, Committee on Energy
              And Environment

1994-         Advisory Board, Massachusetts Safety Council, Health and Safety
              Institute

1994          American Society of Safety Engineers, Secretary, Health Care
              Division

1991-         Member Board of Directors, Massachusetts Safety Council

## Continuing Education

Internal Auditing of an Environmental Management System, March 2007,
Sponsored by UMass Lowell, Toxics Use Reduction Institute

Auditing an Environmental Management System, March, 2006 Sponsored by
UMass Lowell Toxics Use Reduction Institute

Hazard Control Technologies in Healthcare: Collaborative strategies for the next
Millennium, August, 1999

Annual refresher in Hazardous Waste operations and emergency response

OSHA Training Program in Ergonomics, New Hampshire, March, 1998

NIOSH Respirator Training Course

Respirator Training and Refresher Course, July 1997

Ninth Annual Toxicology Symposium: Practical Application of Risk Assessment
for the Industrial Hygienist, American Industrial Hygiene Association, 1994

Seminar in Effective Communications for Health and Safety Professionals,
ASSE, New Orleans, LA, 1997



**Continuing Education (cont'd)**

Frontline Leadership: Techniques for the Modern Manager, Massachusetts General Hospital, 1993

Research Laboratory Safety Seminars, Howard Hughes Research Institute, Bethesda, MD. 1991

Professional Safety Management Seminar, Massachusetts Safety Council, 1992 Environmental Pollution: Strategies for Reduction and Control, Silver City, MD. 1992

Indoor Air Quality Update '89, Washington, DC.

EPA Asbestos Training Course for Supervisors and Monitors

Training Program in Hazard Communication, Veteran's Administration

Industrial Hygiene Course, Harvard University School of Public Health

Cytogenetics, Manhattan College of Mt. St. Vincent, 1984

Postdoctoral course in Pulmonary Pathology, University of Vermont, 1979

**Part II. Research, Teaching and Clinical Contributions**

| | |
|---|---|
| 2007 - | Adjunct Professor, Department of Biology, Massasoit Community College, Brockton, MA |
| 2002 | Adjunct Faculty, Roger Williams University, Metropolitan College, Providence , RI . Course: "Hazardous Materials Safety Management" |
| 2001 | Revised "2001 TURA Reporting Package Chemical List", Department of Environmental Protection, May 2002" under contract With Toxics Use Reduction Institute, University of Massachusetts, Lowell |
| 1992 | Lecturer, Massachusetts Safety Council, Health and Safety Institute |
| 1983-1985 | Lecturer, General Pathology, Northeastern University, College of Pharmacy and Allied Health Professions |
| 1981 | Lecturer, General Pathology, Sergeant College, Boston University |



FROM :Safdoc Systems LLC          FAX NO. :7813413893          Jul. 30 2007 02:11PM  P1

**From: Safdoc Systems, L.L.C.**
Kenneth S. Weinberg, M.Sc., Ph.D.
Consultant in Environmental Health and Safety & Toxicology
20 Thompson Court
Stoughton, MA 02072
Phone/Fax: (781) 341- 3893

July 30, 2007

Total number of pages, including this page  5
Please contact me if all pages are not received.

To:  Kristy Lyons          Fax: (732)-545-4579

Dear Ms. Lyons:

Attached please find my report regarding Holinka v. Chesterton et al.

Sincerely,

Kenneth S. Weinberg, M.Sc., Ph.D., RPIH

**EXHIBIT X**

Christian Holinka

Holinka v. Asbestos
February 12, 2007

**Page 1**

1
2  SUPREME COURT
3  ALL COUNTIES WITHIN THE STATE OF NEW YORK
4
5  IN RE:  NEW YORK CITY ASBESTOS LITIGATION
6
7
8
9          DEPOSITION UNDER ORAL
10            EXAMINATION OF
11          CHRISTIAN HOLINKA
12
13
14
15
16  This Document Applies To:
17  CHRISTIAN HOLINKA
18  INDEX NO.:  114120-06
19
20
21
22    PRIORITY ONE COURT REPORTING SERVICES, INC.
23          899 Manor Road
24      Staten Island, New York  10314
25          (718) 983-1234

**Page 2**

1
2      Transcript of the deposition of the Plaintiff,
3  called for Oral Examination in the above-captioned
4  matter, said deposition being taken pursuant to
5  Federal Rules of Civil Procedure by and before
6  CHERYL F. BAREN, a Notary Public and Shorthand
7  Reporter, at the Offices of Weitz & Luxenberg, 180
8  Maiden Lane, New York, New York, on Monday, February
9  12, 2007, commencing at approximately 11:00 in the
10  forenoon.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1
2  A P P E A R A N C E S :
3
4    WEITZ & LUXENBERG, P.C.
        Attorneys for Plaintiff
5        180 Maiden Lane, 17th Floor
         New York, New York  10038
6    BY:  BENJAMIN DARCHE, ESQ.
7
8    PEHLIVANIAN, BRAATEN & PASCARELLA, LLC.
        Attorneys for Defendant Ingersoll Rand Co.
9        2430 Route 34
         Manasquan, New Jersey  08736
10   BY:  KATE McCLINTOCK, ESQ.
11
12   LEADER & BERKON, LLP
        Attorneys for DuPont
13       630 Third Avenue, 17th Floor
         New York, New York  10017
14   BY:  JUDITH A. JOSEPH JENKINS, ESQ.
15
16   DARGER & ERRANTE, LLP
        Attorneys for Defendant Lennox
17       116 East 27th Street, 12th Floor
         New York, New York  10016
18   BY:  CRAIG GLANTZ, ESQ.
19
20   WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, LLP
        Attorneys for Defendant A.W. Chesterton
21       150 East 42nd Street
         New York, New York  10017
22   BY:  TODD DESIMONE, ESQ.
23
24
25

**Page 4**

1
2  DRINKER, BIDDLE & REATH, LLP
        Attorneys for Defendant Baxter
3        500 Campus Drive
         Florham Park, New Jersey 07932
4  BY:  TIM FRASER, ESQ.
5
6  HOAGLAND, LONGO, MORAN, DUNST & DOUKAS, LLP
        Attorneys for Defendant Fisher Scientific
7        40 Paterson Street
         P.O. Box 480
8        New Brunswick, New Jersey  08903
   BY:  KRISTY KULINA LYONS, ESQ.
9
10
11  ANDERSON, KILL & OLICK, P.C.
        Attorneys for Defendants
12      Amchem and Certainteed
        1251 Avenue of the Americas
        New York, New York  10020-1182
13  BY:  CRAIG BLAU, ESQ.
14
15  DRINKER, BIDDLE & REATH, LLP
        Attorneys for Defendants VWR, Univer
16      500 Campus Drive
        Florham Park, New Jersey 07932
17  BY:  DAVID F. ABERNETHY, ESQ.
18
19  MALABY, CARLISLE & BRADLEY, LLC
        Attorneys for Defendants Adience, CBS,
20      and Kewannee Scientific
        150 Broadway
        New York, New York  10038
21  BY:  CORI LEAVITT, ESQ.
        KOO LEE, ESQ.
22
23
24
25



Holinka v. Asbestos
February 12, 2007

Christian Holinka

Page 33

Christian Holinka    33

1
2    Q    Can you tell me what type of work you did
3    as a Private First Class from approximately July '57
4    to 1958?
5    A    Yes. I worked in all branches of a
6    clinical medical laboratory including bacteriology,
7    biochemistry and hematology. And I should say
8    pathology also.
9        MR. DARCHE: Could we take a two minute
10    break, please?
11    MS. LEAVITT: Sure.
12    (Whereupon, at 11:43 A.M., a short recess
13    was taken)
14    (Back on the record at 11:55 A.M.)
15    Q    Mr. Holinka, I just want to go backwards
16    for a minute and then we will come back to the
17    hospital.
18        When you were at Fort Sam for those two
19    months, do you know who supplied the Bunsen burners to
20    Fort Sam?
21    A    No, I don't.
22    Q    Do you know who supplied the incubators to
23    Fort Sam?
24    A    No, I don't.
25    Q    While working as a Private First Class at

Page 34

Christian Holinka    34

1
2    the General Hospital, were you exposed to asbestos in
3    any way?
4    A    Yes.
5    Q    Can you tell me how you believe you were
6    exposed to asbestos while working as a Private First
7    Class at 98 General Hospital?
8    A    Yes. Bunsen burner pads, mittens to shield
9    from heat. Whenever you had shield glass work, you
10    put on those mittens and eventually with use because
11    of the heat and otherwise they became brittle and to
12    my knowledge they contained asbestos as an insulator.
13    MS. LEAVITT: Can you read that back,
14    please.
15    (Whereupon, at this time, the requested
16    portion was read back by the reporter)
17    Q    Why do you believe you were exposed to
18    asbestos from the Bunsen burner pads?
19    A    You handled them regularly, you replaced
20    them. As they were exposed to heat, the center part
21    decomposed, became brittle and you had to dispose of
22    the pad and replace it with a new unit.
23    Q    And earlier you told us that you worked in
24    all branches of the clinical medical lab including
25    biochemistry, hematology, pathology and some other

Page 35

Christian Holinka    35

1
2    areas. Can you tell me when you were working with the
3    Bunsen burner pads what type of work you were doing?
4    A    In chemistry you would make solutions, you
5    would put them on the Bunsen burner pad to heat them
6    to dissolve your ingredients. In bacteriology you
7    would make agar for bacterial cultures that needed to
8    be heated in. In histology you also made solutions
9    that needed to be heated for the dye to dissolve.
10    Many dyes dissolve only at a certain temperature.
11    Q    About how much of your time was spent
12    handling or disposing of Bunsen burner pads?
13    MR. DARCHE: You can answer if you know.
14    A    I don't know. It is so routine, I don't
15    want to elaborate too much, it is so routine that
16    whenever you needed to replace it, you did so.
17    Q    How long did it take on average to replace
18    a Bunsen burner pad?
19    A    I don't know. It depends on its use. If
20    it's used less frequent I'd say once a week,
21    estimated. If it is used very frequent, probably more
22    frequently.
23    Q    In order to dispose of a pad, would that
24    take seconds, minutes, hours?
25    A    Seconds.

Page 36

Christian Holinka    36

1
2    Q    And would the only reason you would have to
3    handle a Bunsen burner pad would be to dispose of it?
4    A    To manually handle it, yes.
5    Q    Do you know the manufacturer of the Bunsen
6    burners that you worked with while working as a
7    Private First Class at 98 General Hospital?
8    A    No.
9    Q    Do you know who supplied the Bunsen burners
10    to the hospital?
11    A    I don't.
12    Q    Do you know who manufactured the pads that
13    were on the Bunsen burners at General Hospital when
14    you were a Private First Class?
15    A    I don't.
16    Q    Do you know who supplied the pads?
17    A    I don't.
18    Q    Can you tell me why you believe you were
19    exposed to asbestos from mittens at 98 General
20    Hospital while working as a Private First Class?
21    A    By frequently using them.
22    Q    Did you have to use the mittens at any time
23    other than when shielding from glass work?
24    A    No.
25    Q    How often would you have to shield from

9 (Pages 33 to 36)

b048b916-a47b-4600-8755-886027942l48

Christian Holinka

Holinka v. Asbestos
February 12, 2007

Page 37

1          Christian Holinka    37
2  glass work?
3      A    Frequently, certainly daily.
4      Q    And would that take seconds, minutes or
5  hours?
6      A    Minutes.
7      Q    Do you know who manufactured the mittens
8  that you used while working as a Private First Class
9  at the hospital?
10     A    I don't.
11     Q    Do you know who supplied the mittens to the
12 hospital?
13     A    I don't.
14     Q    Do you recall the name of any co-workers
15 that worked with you while you were a Private First
16 Class at the hospital?
17     A    I don't.
18     Q    While working as a specialist starting in
19 1958 until 1959, July or August of 1959, were you
20 exposed to asbestos in any way?
21     A    The work was exactly the same as
22 previously, so if you want me to specifically answer
23 to the best of my knowledge, yes.
24     Q    Was there any difference between the work
25 that you did as a specialist and the work that you did

Page 38

1          Christian Holinka    38
2  as a Private First Class?
3      A    No.
4      Q    The only difference was the title changed?
5      A    Yes.
6      Q    So, all of the questions that I just asked
7  you about Bunsen burners, the Bunsen burner pads and
8  the mittens would all --
9          MS. LEAVITT:  Strike that.
10     Q    Would all of your answers with respect to
11 the Bunsen burners, the Bunsen burner pads and the
12 mittens while you were working as a Private First
13 Class at 98 General Hospital apply to the time that
14 you also worked as a specialist?
15     A    Yes, that's correct.
16     Q    Do you recall the names of any co-workers
17 that you worked with when you were a specialist?
18     A    I don't.
19     Q    Did you work in one laboratory or was there
20 more than one laboratory at General Hospital?
21     A    It was one laboratory consisting of
22 different divisions.
23     Q    Were you in any particular division?
24     A    Most of my work was in biochemistry, in
25 bacteriology and in histology, pathology.

Page 39

1          Christian Holinka    39
2      Q    Where was the laboratory located in the
3  hospital?
4      A    One of the wings of the hospital.
5      Q    Was there any ongoing renovation while you
6  worked at the hospital?
7      A    Not to my knowledge.
8      Q    Were you exposed to any chemicals and fumes
9  while working in the laboratory at the hospital?
10         MR. DARCHE:  I am going to object to the
11 form of the question.
12         But you can answer.
13     A    I used chemicals all the time for
14 solutions, making solutions, making dyes with the
15 necessary caution.
16     Q    Would you have inhaled any of the fumes
17 from these chemicals?
18         MR. DARCHE:  Objection.
19         You can answer.
20         THE WITNESS:  I can answer?
21         MR. DARCHE:  Yes, you can answer.
22     A    Minimally because we were very careful.
23     Q    And what types of precautions did you take?
24     A    With strong fumes of acids you did it under
25 a sterile hood which would suck up the fumes, so to

Page 40

1          Christian Holinka    40
2  speak.
3      Q    And what about with fumes that were not
4  quite as strong?
5      A    I work at the bench.
6      Q    Did you wear any type of mask or respirator
7  when you were working at the bench?
8      A    For bacterial cultures, certainly, yes.
9      Q    What about for non-bacterial cultures?
10     A    Generally no.
11     Q    When others were working nearby with strong
12 fumes such as acids, would you wear any type of mask
13 or respirator?
14     A    No.
15     Q    Other than acids what would you classify as
16 strong fumes?
17         MR. DARCHE:  Objection to the form.
18         You can answer.
19     A    Organic solvents, for example, alcohol or
20 toluene, a whole number of.
21     Q    Were acids used by yourself on a daily
22 basis?
23     A    No.
24     Q    Were they used by others in the laboratory
25 on a daily basis?

10 (Pages 37 to 40)

b048b916-a47b-4600-8755-886027942f48

**[Rabinovitz Report Point Caption]**

   ___.   The testimony of Dr. Sheldon H. Rabinovitz (Ph.D, Physiology and Pharmacology; certified Industrial Hygeniest), as reflected in his report, dated July 24, 2007 (a copy of which is appended at Exhibit ___ ) ("Rabinowitz Report"), should be precluded in part at trial, because its opinions on an employer's legal responsibilities are beyond the scope of proper expert testimony.

   ___.   The section of his report, titled "Employer Responsibility" is rife with interpretations of statutes and regulations and draws legal conclusions, which constitute improper subjects of expert testimony. Rabinovitz Report at p. 8.

   ___.   For example, his report states, "As described in the [Occupational Safety and Health Act of 1970], it is the employer's responsibility to provide a safe work environment for employees. While the act requires employees to comply with standards and rules that are applicable to their own actions and conduct, it is the employer who has the means to provide a safe environment." Id. Or, "Dr. Holinka's employers would have been responsible for ensuring that he was not exposed to harmful levels of asbestos." Id.

   ___.   Such opinions about what the law is or means and the legal conclusions to be reached are not proper subjects of expert testimony. See Colon v. Rent-A-Center, Inc., 276 A.D.2d 58, 61-62 (1st Dep't 2000); LaPenta v. Loca-Bik Ltee Transport, 238 A.D.2d 913, 914 (4th Dep't 1997). Rather, the court must decide all questions of law and instruct the jury on the applicable law at trial. Colon, 276 A.D.2d at 61; 58A N.Y. Jurisprudence 2d: Evidence and Witnesses §690 (2007 ed.)

**[Dr. Weinberg Report Point Caption]**

_____.    The testimony of Dr. Kenneth S. Weinberg (Ph.D, Biochemistry and Pathology), as reflected in his report, dated July 30, 2007 (a copy of which is appended at Exhibit ____) ("Weinberg Report"), should be precluded in full as being improper expert testimony.

_____.    His expert opinions are based expressly "on my personal experience working in various types of research and clinical laboratories," as well as "the observations I made as an industrial hygienist and director of safety at the VA Medical Centers In Brockton and West Roxbury, MA, and Massachusetts General Hospital."   Weinberg Report at p. 3.

_____.    It is well-established that an expert witness' "opinion evidence must be based on facts in the record or personally known to the witness." Cassano v. Hagstrom, 5 N.Y.2d 643, 646 (1959); see also Corelli v. City of New York, 88 A.D.2d 810, 824 (1st Dep't 1982).   Yet the laboratories and sites that Dr. Weinberg has personal experience and knowledge of are not the same sites as those Dr. Holinka has stated he worked at.   Moreover, Dr. Weinberg's experience with laboratories and procedures therein occurred at much later times than Dr. Holinka's.   For instance, Dr. Weinberg's experience as a director of safety at the Brockton V.A. Medical Center and Massachusetts General Hospital was all post-1987.   Weinberg Report at "Curriculum Vitae," p. 2.   Dr. Holinka has testified to being exposed to asbestos while working in medical laboratories much earlier, from 1956 onwards.   See Transcript of the Deposition of Christian Holinka, on February 12, 2007, at pp. 33-38 (copies of which are appended at Exhibit ____).

_____.    At points, Dr. Weinberg's report appears directly contradict Dr. Holinka's factual testimony about the circumstances of his exposures, which certainly is not the proper province of expert testimony.   For example, he opines, "It was, and still is, the custom and practice in the laboratories to utilize clamps and tongs, not mittens, to handle hot glassware at the bench top."

Weinberg Report at p. 2.   Dr. Holinda testified that he did use asbestos mittens.   <u>See</u> Holinka

Deposition, Exh. ___ at pp. 36-37.

     ___.   Finally, many of Dr. Weinberg's "opinions" do not involve matters beyond the [the

jury's] "own experience, understanding and observation," for which expert testimony is needed.

<u>Corelli</u>, 88 A.D.2d at 810; <u>see also</u> <u>Kulak v. Nationwide Mut. Ins. Co.</u>, 40 N.Y.2d 140, 147-48

(1976).   For instance, one "opinion" states, "It was, and still is, the custom and practice in

laboratories for researchers who become more senior to be less involved in the day to day

conduct of experiments . . . ."   Weinberg Report at p. 3.   Another reads, "It was, and still is, the

custom and practice for laboratory workers to maintain a clean work environment to protect

themselves from exposure to potentially harmful materials and to protect their work from

potential contamination."   <u>Id.</u>

 

**May 2007 Remaining Defendants Master Service Rider**                As of 6/12/07

NANCY MCDONALD, ESQ.
McELROY, DEUTCH & MULVANEY
1300 MOUNT KEMBEL AVENUE
MORRISTOWN, NJ  07962-2075
PHONE # (973) 993-8100/ 8703
FAX # (973) 425-0161
NMCDONALD@MDMC-LAW.COM
**COUNSEL FOR A.O. SMITH WATER PRODUCTS CO.**

LAWRENCE MCGIVNEY, ESQ.
MONAKEE GRIFFIN, ESQ.
MCGIVNEY& KLUGER, P.C.
80 BROAD ST., 23RD FLOOR
NEW YORK, NY 10004
PHONE  212 509-3456
FAX  212 509-4420
LMCGIVNEY@MCGIVNEYANDKLUGER.COM
**COUNSEL FOR ALGOMA HARDWOODS, INC., Individually and
as successor In Interest to ALGOMA PLYWOOD & VENEER CO.,
HERCULES CHEMICAL COMPANY INC.**

THUY T. BUI, ESQ.
TIMOTHY FRASER, ESQ.
DRINKLE BIDDLE & REATH, LLP
140 BROADWAY, 39TH FLOOR
NEW YORK, NY 10005
PHONE # (212) 248-3140
FAX # (212) 248-3141
THUY.BUI@DBR.COM
**COUNSEL FOR BAXTER HEALTHCARE CORPORATION, Individually
and as successor In Interest to AMERICAN SUPPLY CORP. and HOSPITAL SUPPLY CORP.
and AMERICAN SCIENTIFIC PRODUCTS., BAXTER INTERNATIONAL INC., Individually
and as successor In Interest to AMERICAN HOSPITAL SUPPLY CORP., and
AMERICAN SCIENTIFIC PRODUCTS., and VWR INTERNATIONAL, INC.**

YVETTE HARMON, ESQ.
PHILIP GOLDSTEIN, ESQ.
MCGUIRE WOODS LLP
1345 AVENUE OF THE AMERICAS, 7TH FLOOR
NEW YORK, NY 10105
PHONE # (212) 548-2100
FAX # (212) 715-2315
YHARMON@MCGUIREWOODS.COM
**COUNSEL FOR AMERICAN STANDARD, INC., AND BELL & GOSSETT CO.**

JUDITH YAVITZ, ESQ.
ANDERSON, KILL, OLICK & OSHINSKY
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020-1000
PHONE # (212) 278-1000
FAX # (212) 278-1733
JYAVITZ@ANDERSONKILL.COM
**COUNSEL FOR AMCHEM PRODUCTS, INC., n/k/a RHONE POULENC AG CO.
n/k/a BAYER CROPSCIENCE INC., CERTAINTEED CORPORATION,  and UNION CARBIDE CORP.**

ARTHUR G. COHEN, ESQ.
GORDON & SILBER, P.C.
355 LEXINGTON AVENUE
NEW YORK, NY 10017
PHONE # (212) 834-0600
FAX# (212) 490-0035
ACOHEN@GORDON-SILBER.COM
**COUNSEL FOR AMERICAN BILTRITE COMPANY, AMERICAN BILTRITE, INC., Individually
and as successor to AMTICO FLOORS AND AMTICO, a division of AMERICAN BILTRITE**

JULIE EVANS, ESQ.
WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER
150 EAST 42ND  STREET
NEW YORK, NY  10017-5639
PHONE # (212) 490-3000
FAX # (212) 490-3038
JULIE.EVANS@WILSONELSER.COM
**COUNSEL FOR A.W. CHESTERTON CO.**



As of 6/12/07

SUZANNE HALBARDIER, ESQ.
ROBERT GORIS, ESQ.
BARRY, MCTIERNAN & MOORE
2 RECTOR STREET, 14TH FLOOR
NEW YORK, NY 10006
PHONE # (212) 608-8999
FAX # (212) 608-8902
SHALBARDIER@BMMFIRM.COM
**COUNSEL FOR BLACKMAN PLUMBING SUPPLY COMPANY, INC., DOMCO PRODUCTS
TEXAS, LP, individually and as successor to AZROCK INDUSTRIES, INC.**

ANNA DILONARDO, ESQ.
WEINER LESNIAK, LLP
888 VETERAN'S MEMORIAL HIGHWAY, SUITE 540
HAUPPAUGE, NY 11788
PHONE # (631) 232-6130
FAX # (631) 232-6184
ADILONARDO@WEINERLESNIAK.COM
**COUNSEL FOR BORG-WARNER CORP., n/k/a BURNS INTERNATIONAL SERVICES CORP.**

JOHN J. FANNING, ESQ.
ROSA LEE, ESQ.
CULLEN & DYKMAN
177 MONTAGUE STREET
BROOKLYN, NY 11201
PHONE # (718) 855-9000
FAX # (718) 935-1509
JFANNING@CULLENANDDYKMAN.COM
**COUNSEL FOR GOULDS PUMPS, INC.**

FRANK A CECERE, ESQ.
AHMUTY, DEMERS & MCMANUS
200 I.U. WILLETS ROAD
ALBERTSON, NY 11507
PHONE # (516) 294-5433
FAX # (516) 625-4712
FRANK.CECERE@ADMLAW.COM
**COUNSEL FOR CARRIER CORP., as successor in interest to BRYANT HEATING & COOLING SYSTEMS**

GREG A. DADIKA, ESQ.
REED SMITH LLP
136 MAIN STREET, SUITE 250
PRINCETON FORRESTAL VILLAGE
PRINCETON, NJ 08540
PHONE (609) 987-0050
FAX # (609) 951-0824
GDADIKA@REEDSMITH.COM
**COUNSEL FOR CENTRAL SCIENTIFIC COMPANY, a division of CENCO INCORPORATED;
CENTRAL SCIENTIFIC COMPANY, a division of CENCO INSTRUMENTS CORPORATION**

CORI L. LEAVITT, ESQ.
WILLIAM BRADLEY, ESQ.
JOSEPH CARLISLE, ESQ.
MARY ELLEN CONNOR, ESQ.
MALABY, CARLISLE & BRADLEY LLC
150 BROADWAY
NEW YORK, NY 10038
PHONE # (212) 791-0285
FAX # (212) 791-0286
WBRADLEY@MCBLLC.ORG
**COUNSEL FOR CBS CORPORATION, a Delaware Corp., f/k/a VIACOM INC., successor by
merger to CBS CORPORATION, a Pennsylvania Corp., f/k/a WESTINGHOUSE ELECTRIC CORP.,
CLEAVER BROOKS CO., MORSE/DIESEL, INC., SUPERIOR BOILER WORKS, INC., AND WEIL-MCLAIN,
a division of THE MARLEY CO.**

ANDREW CZEREPAK, ESQ.
CONSOLIDATED EDISON
FOUR IRVING PLACE
NEW YORK, NY 10003
PHONE # (212) 460-2164/ 2158
FAX # (212) 780-6483
CZEREPARK@CONED.COM
**COUNSEL FOR CONSOLIDATED EDISON COMPANY OF NEW YORK, INC.**

As of 6/12/07

ANGELA DiGIGLIO, ESQ.
KIRSTEN A. KNEIS, ESQ.
MICHAEL WALLER, ESQ.
KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP
ONE NEWARK CENTER, 10TH FLOOR
NEWARK, NJ 07102
PHONE # (973) 848-4000
FAX # (973) 848-4001
KIRSTEN.KNEIS@KLGATES.COM
**COUNSEL FOR CRANE CO., AND SQUARE D**

JAMES P. CONNORS, ESQ.
JONES HIRSCH CONNORS & BULL P.C.
1 BATTERY PARK PLAZA, 28TH FLOOR
NEW YORK, NY 10004
PHONE # (212) 527-1350
FAX # (212) 527-1680
JCONNORS@JHCB.COM
**COUNSEL FOR ECR INTERNATIONAL CORP., f/k/a DUNKIRK RADIATOR CORP.**

KEN ROBERTS, ESQ.
WOLF, BLOCK, SCHORR & SOLIS-COHEN, LLP
250 PARK AVENUENEW YORK, NY 10177
PHONE # (212) 986-1116
FAX # (212) 986-0604
KROBERTS@WOLFBLOCK.COM
**COUNSEL OF FEDERAL PUMP CORPORATION**

MARC S. GAFFREY, ESQ.
HOAGLAND, LONGO, MORAN, DUNST & DOUKAS
40 PATTERSON STREET
P.O. BOX 480
NEW BRUNSWICK, NJ 08903
PHONE # (732) 545-4717
FAX # (732) 545-4579
MGAFFREY@HOAGLANDLONGO.COM
**COUNSEL FOR FISCHER SCIENTIFIC INTERNATIONAL INC., MANNINGTON MILLS, INC.,
and MANNINGTON CARPETS, INC.**

GREGG BORRI, ESQ.
LAW OFFICES OF GREGG J. BORRI, ESQ.
61 BROADWAY, SUITE 2125
NEW YORK, NY 10006
PHONE # (212) 980-8866
FAX # (212) 208-0969
GBORRI@BORRI.COM
**COUNSEL FOR GEORGIA PACIFIC CO.**

PATRICK J. DWYER, ESQ.
SMITH, STRATTON, WISE, HEHER & BRENNAN
2 RESEARCH WAY
PRINCETON, NEW JERSEY 08540
PHONE # (609) 924-6000 or 6683FAX # (609) 987-6651
PDWYER@SMITHSTRATTON.COM
**COUNSEL FOR GOODRICH CORPORATION, f/k/a THE B.F. GOODRICH COMPANY,
Individually, and as successor in interest to THE CLEVELAND PNEUMATIC COMPANY,
a Division of the PNEUMO ABEX CORP., a wholly owned subsidiary of ABEX, INC.**

SCOTT R. EMERY, ESQ.
LYNCH DASKAL EMERY LLP
264 WEST 40TH STREET
NEW YORK, NEW YORK 10018
PHONE # (212) 302-2400
FAX # (212) 302-2210
EMERY@LAWLYNCH.COM
**COUNSEL FOR GOODYEAR CANADA, INC., AND GOODYEAR TIRE & RUBBER CO.**

DANIEL J. MCNAMARE, ESQ
DeCICCO, GIBBONS & McNAMARA, P.C.
14 EAST 38TH STREET, 5TH FLOOR
NEW YORK, NY 10016
PHONE # (212) 447-1222
FAX # (212) 689-0153
DMCNAMARE@DGMLAW.COM
**COUNSEL FOR KAISER GYPSUM COMPANY, INC.**



As of 6/12/07

CYNTHIA WEISS ANTONUCCI, ESQ.
HARRIS, BEACH LLP
100 WALL STREET
NEW YORK, NY 10005
PHONE # (212) 687-0100
FAX # (212) 687-0659
CANTONUCCI@HARRISBEACH.COM
**COUNSEL FOR KENTILE FLOORS, INC.**

ELISA M. PUGLIESE, ESQ
KEYSPAN
LEGAL DEPARTMENT
175 EAST OLD COUNTRY ROAD
HICKVILLE, NEW YORK 11801
PHONE # (516) 545-4161
FAX # (516) 545-5029
EPUGLIESE@KEYSPANENERGY.COM
**COUNSEL FOR KEYSPAN GENERATION LLC, f/k/a LONG ISLAND POWER AUTHORITY**

KEVIN L. KELLY, ESQ.
BRADLEY J. LEVIEN, ESQ.
MINTZER, SAROWITZ, ZERIS, LEDVA & MEYERS
39 BROADWAY, SUITE 950
NEW YORK, NY 10006
PHONE # (212) 968-8300
FAX # (212) 968-9840
BLEVIEN@DEFENSECOUNSEL.COM
**COUNSEL FOR MANSFIELD PLUMBING PRODUCTS, LLC.**

FRANCIS F. QUINN, ESQ.
TIM McHUGH, ESQ.
LAVIN, O'NEIL RICCI, CEDRONE & DISIPIO
420 LEXINGTON AVENUE, SUITE 2900
GRAYBAR BUILDING
NEW YORK, NY 10170
PHONE # (212) 319-6898
FAX # (212) 319-6932
TMCHUGH@LAVIN-LAW.COM
**COUNSEL FOR 3M**

MICHAEL A. CERUSSI, ESQ.
THOMAS M. CRISPI, ESQ.
CERUSSI & SPRING
ONE NORTH LEXINGTON AVENUE
WHITE PLAINS, NY 10601
PHONE # (914) 948-1200
FAX # (914-948-1579
MCERUSSI@CERUSSILAW.COM
**CO-COUNSEL FOR 3M**

ART BROMBERG, ESQ.
WEINER LESNIAK LLP
629 PARSIPPANY ROAD
P.O. BOX 438
PARSIPPANY, NJ 07054-0438
PHONE # (973) 403-1100
FAX # (973) 403-0010
ABROMBERG@WEINERLESNIAK.COM
**COUNSEL FOR PEERLESS INDUSTRIES, INC.**

ANNA DILONARDO, ESQ.
WEINER LESNIAK, LLP
888 VETERAN'S MEMORIAL HIGHWAY, SUITE 540
HAUPPAUGE, NY 11788
PHONE # (631) 232-6130
FAX # (631) 232-6184
ADILONARDO@WEINERLESNIAK.COM
**COUNSEL FOR ROBERT A. KEASBEY CO.**



As of 6/12/07

LORING FENTON, ESQ.
GREENBERG TRAURIG, LLP
MET LIFE BUILDING
200 PARK AVENUE
NEW YORK, NY 10166
PHONE # (212) 801-9200
FAX # (212) 801-6400
FENTONL@GTLAW.COM
**TRIAL COUNSEL FOR ROBERT A. KEASBEY CO.**

ZACHARY W. CARTER, ESQ.
DORSEY & WHITNEY LLP
250 PARK AVENUE
NEW YORK, NY 10177-1500
PHONE # (212) 415-9345
FAX # (212) 953-7201
CARTER.ZACHARY@DORSEY.COM
**TRIAL COUNSEL FOR ROBERT A. KEASBEY CO.**

JENNIFER DARGER, ESQ.
VINCENT A. ERRANTE, JR., ESQ.
DARGER & ERRANTE LLP
116 EAST 27TH STREET, 12TH FLOOR
NEW YORK, NY 10016
PHONE # (212) 452-5300/5303
FAX # (212) 452-5301
JDARGER@DARGERRANTE.COM
**COUNSEL FOR PHILIPS ELECTRONICS NORTH AMERICA CORP.,**
**Individually and as successor-in-Interest to T H AGRICULTURE & NUTRITION, L.L.C. and**
**TH AGRICULTURE and NUTRITION COMPANY**

**MARC S. GAFFREY, ESQ.**
**HOAGLAND, LONGO, MORAN, ONST & DOUKAS**
**48 PATTERSON STREET**
**P.O. BOX 480**
**NEW BRUNSWICK, NJ 08903**
**PHONE # (732) 545-4717**
**FAX # (732) 545-4579**
**MGAFFREY@OHOAGLANDANDLONGO.COM**
**COUNSEL FOR YORK INTERNATIONAL CORP.**

**DRESSER-RAND COMPANY, as successor in interest to MURRAY TURBINES**
1200 WEST SAM HOUSTON PKWY, N.
HOUSTON, TX 77043
PHONE # (713) 467-2221
FAX # (713) 935-3490

**HEIDELBERG USA, INC., as successor in interest TO HARRIS CORPORATION,**
**and as successor to HARRIS-SEYBOLD-POTTER COMPANY and**
**PREMIER-POTTER COMPANY**
3391 TOWN POINT DRIVE
SUITE 400
KENNESAW, GA 30144

YORK INTERNATIONAL CORP.
631 SOUTH RICHLAND AVENUE
YORK, PENNSYLVANIA 17403
PHONE # (414) 524-1200
FAX # (414) 524-5520

*Index No.*    **115546**       *Year 20*06        800.222.0510 www.sslegal.com

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

**IN RE:  NEW YORK CITY ASBESTOS LITIGATION**

This Document Relates To:

**FRANK BIANCO, et al.,**

.

**Plaintiffs,**

**- against -**

**A.C. and S., et al.,**

**Defendants.**

**PLAINTIFFS' ORDER TO SHOW CAUSE and AFFIRMATION IN SUPPORT OF THEIR MOTION, PURSUANT TO FRYE V. UNITED STATES, AND *IN LIMINE*, 1) TO PRECLUDE THE NOVEL, UNSCIENTIFIC,  NOT GENERALLY-ACCEPTED, LITIGATION-BASED, PREVIOUSLY EXCLUDED ASBESTOS "DOSE RECONSTRUCTION"/"EXPOSURE ASSESSMENT" ANALYSES AND ALL TESTIMONY RELATED THERETO, AND 2) TO PRECLUDE THE CASE-SPECIFIC REPORTS AND RELATED TESTIMONY OF DRS. RABINOVITZ AND WEINBERG SPECIFICALLY AS IMPROPER**

**WEITZ & LUXENBERG, P.C.**

*Attorneys for*    **Plaintiffs**

180 Maiden Lane
New York, NY 10038
(212) 558-5500

*Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information and belief and reasonable inquiry, the contentions contained in the annexed document are not frivolous.*

*Dated:*...................................    Signature.............................................................................................

Print Signer's Name.......................................................................

*Service of a copy of the within*   .                                *is hereby admitted.*

*Dated:*

.............................................................................

*Attorney(s) for*

*PLEASE TAKE NOTICE*   .

☐ *that the within is a (certified) true copy of a*
NOTICE OF   *entered in the office of the clerk of the within named Court on*                          20
ENTRY

☐ *that an Order of which the within is a true copy will be presented for settlement to the*
NOTICE OF   *Hon.*                        *one of the judges of the within named Court,*
SETTLEMENT   *at*
*on*                          20        *, at*               *M.*

*Dated:*

**WEITZ & LUXENBERG, P.C.**

*Attorneys for*

180 Maiden Lane
New York, NY 10038

*To:*