SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------- x
                                     :
In Re: NEW YORK CITY ASBESTOS LITIGATION   :  Hon. Joan Madden
                                     :  (Part 11)
------------------------------------------------------------- x
This Document Relates To:                 : Index No. 114120-06
                                     :
CHRISTIAN HOLINKA,                :
                                     :
    Plaintiff                       :
                                     :
   -against-                     :
                                   :
A.W. CHESTERTON COMPANY, et al.,     :
                                   :
    Defendants.                    :
------------------------------------------------------------- x

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT MANORCARE
HEALTH SERVICES INC.'S MOTION *IN LIMINE* TO EXCLUDE ANY EVIDENCE
OR TESTIMONY SEEKING TO IMPOSE LIABILITY FOR PRODUCTS SUPPLIED
AFTER JULY 31, 1976**

Defendant ManorCare Health Services Inc. ("ManorCare"), by and through its attorneys,

Reed Smith, LLP, pursuant to the July 27, 2007 Order of the Honorable Justice Joan Madden,

J.S.C., hereby submits this memorandum of law in support of its motion *in limine* precluding

Plaintiff Christian F. Holinka ("Plaintiff") from offering any evidence at trial against ManorCare

that in any way seeks to impose liability upon ManorCare for laboratory products supplied by

after July 31, 1976.

## PRELIMINARY STATEMENT & RELEVANT FACTS

On or about July 31, 1976, Cenco, Inc. ("Cenco") entered into an Acquisition Agreement

(the "Acquisition Agreement") with Central Scientific Company, Inc. ("CSCI"). (*See*

Affirmation of Greg A. Dadika, Esq. ("Dadika Aff."), Exh. A). Pursuant to the Acquisition

Agreement, Cenco sold to CSCI all of the assets of Central Scientific Company Division

("CSCD"), which was a division of Cenco responsible for sales of laboratory equipment within the United States. (*See* Dadika Aff., Exh. A., p.1). The asset sale included all the business and property of CSCD including the trade name, goodwill, inventory, and entire product line of laboratory equipment previously sold by Cenco through CSCD (the "Asset Purchase"). (*See id.* at pp. 1, 7-9). Contemporaneous with the Asset Purchase, Cenco licensed to CSCI the right to use the "Cenco" trade name in the marketing and sale of all laboratory equipment. (*See* Dadika Aff., Exh. C).

Over six years *after* Cenco sold CSCD to CSCI, ManorCare merged with Cenco on September 1, 1982 (the "Merger").[1] (*See* Dadika Aff., Exh. B). As such, at the time of the ManorCare-Cenco merger, the surviving corporate entity known as "Cenco, Inc." had not been selling laboratory equipment in the United States for over six years.

Accordingly, Plaintiff's theory of successor liability against ManorCare simply cannot be applicable to any products sold under the "Cenco" name after July 31, 1976. As a result of the Asset Purchase, any such laboratory products sold after this date would necessarily have been supplied by CSCI, not Cenco. Since ManorCare has no corporate relationship with CSCI, it cannot legally be responsible for any torts associated with products supplied or sold by CSCI. Accordingly, this Court should grant ManorCare's motion *in limine* and preclude Plaintiff from arguing or introducing evidence at trial that ManorCare is in any way liable for the sales of laboratory products after July 31, 1976.

---

[1]    At the time of the Merger, ManorCare Health Services, Inc. was known as Manor Healthcare Corp. Manor Healthcare Corp. changed its name to ManorCare Health Services, Inc. on January 16, 1997. (*See* Dadika Aff., Exh.D).

## LEGAL ARGUMENT

**I.  THIS COURT SHOULD PRECLUDE PLAINTIFF FROM INTRODUCING EVIDENCE THAT MANORCARE IS LIABLE FOR ANY SALES OF LABORATORY PRODUCTS AFTER JULY 31, 1976 BECAUSE SUCH EVIDENCE HAS ABSOLUTELY NO PROBATIVE VALUE AND IS HIGHLY PREJUDICIAL TO MANORCARE**

When the probative value of evidence is slight and its illegitimate emotional appeal on the jury is great, the evidence should be excluded. *See* Richard T. Farrell, Prince, Richardson on Evidence § 4-206, at p. 145 (11ᵗʰ ed. 1995) (citing *People v. Singer*, 300 N.Y. 120, 89 N.E.2d 710 (1949); *Allen v. Stokes*, 260 A.D. 600, 23 N.Y.S.2d 443 (1ˢᵗ Dept. 1940); *see also Minichiello v. Supper Club*, 296 A.D.2d 350, 352, 745 N.Y.S.2d 24, 25 (1ˢᵗ Dept. 2002); *Stevens v. Amar Atwal, M.D.*, 30 A.D.3d 993, 994, 817 N.Y.S.2d 469, 471 (4ᵗʰ Dept.); *U.W. Marx, Inc. v. Bonded Concrete, Inc.*, 7 A.D.3d 856, 859, 776 N.Y.S.2d 617, 620 (3d Dept. 2004). Here, Plaintiff's successor liability claims against ManorCare are wholly inapplicable to any injuries arising out of products sold after July 31, 1976. As such, any evidence against ManorCare concerning products sold after that date has absolutely *no* probative value, is highly prejudicial to ManorCare and should be excluded at trial.

### A.  ManorCare Is Not The Successor In Interest to CSCI and, Thus, Cannot Be Liable for Injuries Allegedly Caused by Products Sold by CSCI

In order to establish a claim of successor liability under New York law, a Plaintiff must prove that: (1) the successor corporation expressly or impliedly assumed the predecessor's tort liability; (2) there was a consolidation or merger of seller and purchaser; (3) the purchasing corporation was a mere continuation of the selling corporation; or (4) the transaction is entered into fraudulently to escape such obligations. *Schumacher v. Richards Shear Co.*, 59 N.Y.2d 239, 244 (1983).

Here, ManorCare cannot be liable as a successor to Cenco for damages caused by laboratory products sold after July 31, 1976 because, pursuant to the Asset Purchase, Cenco sold its entire laboratory equipment division (CSCD) to CSCI on that date. As such, ManorCare's merger with Cenco in 1982 could not have included the CSCD liabilities after July 31, 1976.

Similarly, ManorCare cannot be liable for products sold after July 31, 1976 because Plaintiff cannot establish that ManorCare is a successor to *CSCI*, which is an entity entirely unrelated to either Cenco or ManorCare. The record is completely devoid of any indicia of evidence that ManorCare had *any* relationship with CSCI whatsoever, much less a predecessor-successor relationship. Under New York law, ManorCare simply cannot be responsible for any damages caused by laboratory equipment sold after July 31, 1976, which would necessarily have been sold by CSCI. Accordingly, ManorCare respectfully requests that this Court preclude Plaintiff at trial from offering any evidence or testimony that in any way seeks to hold ManorCare liable for products sold after July 31, 1976.

## CONCLUSION

For all of the foregoing reasons, Defendant ManorCare Health Services, Inc. respectfully requests that the Court preclude Plaintiff from offering any evidence at trial that seeks to hold ManorCare liable for the sale or supply of laboratory products sold after July 31, 1976.

Dated: New York, New York
      August 21, 2007

                              Greg A. Dadika
                              **REED SMITH LLP**
                              Princeton Forrestal Village
                              136 Main Street, Suite 250
                              Princeton, New Jersey 0850
                              (609) 987-0050
                              Attorneys for Defendant
                              ManorCare Health Services, Inc.

- 4 -

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------- x
                       :

In Re: NEW YORK CITY ASBESTOS LITIGATION   :   Hon. Joan Madden

                       :   (Part 11)

-------------------------------------------------------------- x

CHRISTIAN HOLINKA,                 :     Index No. 114120-06

                       :

      Plaintiff                  :   **AFFIRMATION OF GREG A.**

                       :  **DADIKA, ESQ. IN SUPPORT OF**

   -against-                :  **MANORCARE HEALTH**

                       :  **SERVICES INC.'S *IN LIMINE***

A.W. CHESTERTON COMPANY, et al.,     :  **MOTION TO EXCLUDE**

                       :  **EVIDENCE AGAINST**

   Defendants.               :  **MANORCARE RELATING TO**

                       :  **PRODUCTS SOLD AFTER**

                       :  **JULY 31, 1976**

-------------------------------------------------------------- x

      I, GREG A. DADIKA, being duly admitted to the bar of the State of New York and

licensed to practice law before the Courts of this State, declare, under penalty of perjury, the

following in support of Manor Care Health Services, Inc.'s Motion *In Limine* to Exclude All

Evidence Relating to Products Manufactured After July 31, 1976:

      1.     Attached hereto as **Exhibit A** is a true and correct copy of the Acquisition

Agreement between Cenco, Inc. and Central Scientific Company, Inc. dated July 31, 1976.

      2.     Attached hereto as **Exhibit B** is a true and correct copy of the Certificate of

Merger between Manor Care and Cenco, Inc. filed on September 1, 1982.

      3.     Attached hereto as **Exhibit C** is a true and correct copy of the license agreement

between Cenco and Central Scientific Company, Inc. dated August 27, 1976.

      4.     Attached hereto as **Exhibit D** is a true and correct copy of the Certificate of

Amendment of the Certificate of Incorporation of Manor Healthcare Corporation by which

Manor Healthcare Corporation changed its name to ManorCare Health Services, Inc. filed on

January 16, 1997.

**WHEREFORE**, Defendants respectfully request that the relief requested in their instant application be granted in its entirety.

Greg A. Dadika
**REED SMITH LLP**
Princeton Forrestal Village
136 Main Street, Suite 250
Princeton, New Jersey 0850
(609) 987-0050
Attorneys for Defendant
ManorCare Health Services, Inc.

ACQUISITION AGREEMENT

between

CENCO INCORPORATED

and

CENTRAL SCIENTIFIC COMPANY, INC.

July 31, 1976

ACQUISITION AGREEMENT

This Acquisition Agreement made and entered into as
of this 31st day of July, 1976, by and between Central
Scientific Company, Inc., a Maryland corporation (hereinafter
referred to as "the New Corporation"), and Cenco Incorporated,
a Delaware corporation (hereinafter referred to as "Cenco");

WITNESSETH:

WHEREAS, the New Corporation desires to acquire and
Cenco desires to sell substantially all of the United States
property and business (including inventory, accounts
receivable, fixed assets, patents, goodwill and related
items) of the Central Scientific Company Division of Cenco
(hereinafter referred to as "the Central Scientific Division"),
in exchange for (a) cash, promissory notes, and preferred
stock of the New Corporation and (b) the assumption of certain
liabilities and obligations of the Central Scientific
Division as hereinafter specifically set forth, upon the
terms and subject to the conditions herein set forth;

NOW THEREFORE, in consideration of their respective
promises and undertakings hereunder, the parties hereto,
each intending to be legally bound hereby, do covenant and
agree respectively as follows:

ARTICLE I

Definitions

Section 1.01.  Certain Terms Defined.  The terms defined
in this Section 1.01 shall, for all purposes of this Agreement,
have the meanings herein specified, unless the context
expressly or by necessary implication otherwise requires:

- 2 -

(a)  "Agreement" or "this Agreement" shall mean this instrument as originally executed and delivered, or, if amended or supplemented, as so amended or supplemented;

(b)  "Assets to be Acquired" shall mean the United States assets of the Central Scientific Division to be acquired by the New Corporation pursuant to Section 2.01;

(c)  "Assumed Liabilities" shall mean the liabilities of the Central Scientific Division to be assumed by the New Corporation pursuant to Section 2.02;

(d)  "Closing" and "Closing Date" shall have the respective meanings specified in Section 2.04;

(e)  "Permitted Liens" shall mean as of any given time (1) obligations and duties of the Central Scientific Division not interfering with the ordinary conduct of its business, as tenant or subtenant under any leases of real or personal property wherever situated, and (2) the liens listed in any of the Schedules referred to in this Agreement and heretofore delivered by Cenco to the New Corporation;

(f)  "Person" shall include an individual, corporation, partnership, unincorporated organization, voluntary association, joint stock company, business trust, or government or any agency or political sub-division thereof;

(g)  "8 1/2% Promissory Note" shall mean a promissory note to be issued by the New Corporation to Cenco for the Assets to be Acquired in the principal amount of $2,550,000 (subject to adjustment as set forth in Section 2.01(c)) and having the following terms:

-3-

the principal shall be repayable as follows:  $250,000
on July 31, 1977; $375,000 on February 28, 1979;
$350,000 on February 29, 1980; $300,000 on June 30, 1981;
and $1,275,000 on June 30, 1982.  Interest shall be
payable quarterly on the first day of each calendar quar-
ter at the rate of eight and one-half percent per annum
on all unpaid principal balances.  The unpaid principal
shall be subordinate to the long-term indebtedness to the
primary institutional lender of the New Corporation and
shall be secured by a second lien on the assets of the
New Corporation.  A default under the New Note shall be
an event of default under this promissory note.  The
rights of Cenco and the security in connection with the
indebtedness evidenced by this promissory note are more
fully set forth in the loan agreement attached as
Exhibit B hereto.  The promissory note evidencing this
indebtedness shall be in substantially the form set in
Exhibit B-1 hereto.

(h)  "New Note" shall mean a promissory note
which may be issued by the New Corporation if required by
Section 2.01(c)(4) for the purpose of determining the
Actual Consideration and having the following terms:
the principal shall be repayable up to the face amount
of the promissory note as follows:  $75,000 on
November 1, 1976; $75,000 on each of January 1,
April 1, July 1 and October 1 of the 1977
and 1978 calendar years; and the remainder,
if any, on January 1, 1979.  Interest shall

- 4 -

be payable quarterly on the first day of each calendar quarter at the rate of seven percent per annum on all unpaid principal balances. The unpaid principal shall be subordinate to the long-term indebtedness to the primary lender of the New Corporation. A default under the 8 1/2% Promissory Note shall be an event of default under this promissory note. The promissory note evidencing this indebtedness shall be in substantially the form set forth in Exhibit B-2 hereto.

(i) "$8.50 Preferred Stock" shall mean a class of 17,000 shares of preferred stock to be issued at a value of $100 per share by the New Corporation to Cenco for the Assets to be Acquired having the following terms: Each share will pay a cumulative annual cash dividend of $8.50 payable quarterly on the first day of each calendar quarter and will have liquidation and redemption values of $100 per share plus accrued and unpaid dividends, if any. 2,000 shares will be redeemed on February 28, 1979; 8,000 shares will be redeemed on February 29, 1980; 5,750 shares will be redeemed on February 28, 1981; and 1,250 shares will be redeemed on June 30, 1981. While outstanding, the series will have preference as to dividend payments, redemption payments and liquidation payments over any other series of preferred stock or any other class of equity securities (as defined in Section 3a (11) of the Securities Exchange Act of 1934) issued or to be issued by the New Corporation. The holders of this series of preferred stock shall have the option to elect a majority of the board of directors of the New Corporation at any time that the New Corporation is in arrears for more than thirty days in the payment of dividends or amounts due at the specified redemption dates on this series of preferred stock. This right shall continue for the period of the said

- 5 -

certificate evidencing this series of preferred stock
shall be in substantially the form set forth in Exhibit
C hereto;

(j)  "The Central Scientific Division" shall mean
the United States business of the Central Scientific
Division of Cenco which is engaged in the manufacture
and distribution of scientific educational products
and selected industrial laboratory equipment from
facilities principally located in Chicago, Illinois
with branch or regional offices and/or stocking
warehouses located in Mountainside, New Jersey, Tulsa,
Oklahoma and San Jose, California;

(k)  "Inventory" shall mean all of the material
and products used in the regular course of the business
of the Central Scientific Division.  This shall cover
the following 3 categories of material (raw material,
work-in-process and finished goods), which are further
defined as follows:

(1)  "Raw Material Inventory" shall mean all raw
material used in the production of finished
goods of the Central Scientific Division's
product line.  Included in this group are
the following items which are illustrative
but not inclusive; (bulk biologicals, bulk
chemicals, sheet metal-sheets & rolls, bar
stock, castings and forgings, electrical
cables and fittings, hydraulic oil and other
petrochemicals, and fasteners).  Raw material
also includes items designated as "P" numbers
which would normally be defined as semi-
finished stock.  These include components,
parts, and sub-assemblies.

(2) "Work-In-Process Inventory" shall mean all
items being worked on under open shop orders.
There are two broad categories of work-in-
process. The first concerns the conversion of
raw material into components (designated by
"P" numbers) which normally revert to raw
material upon completion of the work process.
The second category involves items which upon
completion are transferred into finished goods.

(3) "Finished Goods Inventory" shall mean all
items and products which are complete for
sale, whether purchased or manufactured by
the Central Scientific Division.

(1) "Gross Receivables" shall mean all Accounts
Receivable relating to the Central Scientific Division
(exclusive of receivables due and owing from Cenco or
any subsidiary or division thereof and without regard
to any reserve for doubtful accounts) included in the
audited consolidated financial statements of Cenco
(1) as of April 30, 1976 and (2) extended to the Closing
Date.

(n) "Non-Saleable Inventory" shall mean all
inventory which is damaged or out-dated.

    a. Damaged inventory consists of items
which in open stock are obviously
broken or physically deteriorated (other
than bulk biologicals) and box items
in which cases are crushed or otherwise
deteriorated.

    b. Out-dated inventory consists of items
which have an expiration date which
date is passed, or which have physically
deteriorated so as to be non-useable
for their intended purposes because of
time in inventory.

Also included in "non-saleable inventory" are items which
were manufactured for discontinued operations (other

-7-

than the Central Scientific Division or are discontinued products such as Standard X-Ray and Balers).

(n)  "Inventory Cost" shall have the meanings specified in Exhibit D hereto.

### ARTICLE II

Agreements to Transfer and Acquire; Assets Not to be
Transferred; Determination and Payment of Esti-
mated and Actual Consideration; Guarantee
of Gross Receivables; Assumption of
Liabilities; Closing

Section 2.01

(a)  Agreement to Transfer Certain Assets.  On the Closing Date, Cenco shall convey, transfer, assign and deliver to the New Corporation, and the New Corporation shall acquire and accept, the following assets and properties (exclusive of the assets and properties set forth in Section 2.01(b) of this Agreement):

(1)  all machinery, equipment, furniture, fixtures, leasehold improvements under assigned leases and similar items identified on Exhibit A which, on the Closing Date, are located at

(1)  that portion of Cenco's Chicago, Illinois facility which houses the Central Scientific Division's manufacturing, warehousing and admini-strative operations (hereinafter referred to as "the Chicago Facility"),

(2)  the Mountainside, New Jersey and Tulsa, Oklahoma stocking warehouses and sales offices, except for any equipment, furniture, and items located on that portion of the New Jersey premises to be leased to Soiltest, Inc. pursuant the lease agreement of even date between Cenco

-8-

and the New Corporation (hereinafter referred
to as "the Soiltest Offices"), and

(3) the San Jose, California sales office;

(2) all Inventory as defined in Section 1.01(k),
except Non-Saleable Inventory as defined in
Section 1.01(m), and office supplies which, on
the Closing Date, are located at the Chicago
Facility, the Mountainside, New Jersey and Tulsa,
Oklahoma stocking warehouses, and the San Jose,
California sales office except for those supplies
located at the Soiltest Offices;

(3) except as provided in Section 2.01(b)(5), all
books and records of the Central Scientific Divi-
sion which relate to the assets and properties
being sold hereunder and as specified in Exhibit D-1
hereto;

(4) all Cenco's right, title and interest in, to and
under all purchase orders from suppliers, leases
of real and personal property, distribution and
similar agreements, licenses and permits, sales
contracts and orders from customers, union con-
tracts, and other agreements to which Cenco is
party which are set forth in the Schedules to this
Agreement, which relate to the business of the
Central Scientific Division;

(5) the right to use the name "Cenco" on scientific
educational products and industrial laboratory
equipment presently manufactured and sold by the
Central Scientific Division and to be manufactured
and sold by the New Corporation for five years af-
ter the Closing Date pursuant to a license agree-
ment in the form attached as Exhibit D-2 hereto;

-9-

(6)  patents, trademarks, copyrights, (and related
     intangible assets) and any licenses or assign-
     ments thereof relating to the business of the
     Central Scientific Division to the extent and
     in the manner set forth in Exhibit E hereto.

(7)  all tangible and intangible assets which are
     prepaid expenses if and to the extent such prepaid
     expenses exceed accrued expenses pursuant to Sec-
     tion 2.03(e);

(8)  the business of the Central Scientific Division
     and the goodwill thereof;

(9)  the Gross Receivables of the Central Scientific
     Division as defined in Section 1.01(1) arising
     in the ordinary course of business including
     payment therefor which is in the U.S. mails
     and not received by midnight on the day prior to
     the Closing Date; and

(10) all computer programs used in the business of the
     Central Scientific Division and owned by the Central
     Scientific Division.

The assets, properties, rights and interests which under
the above provisions of this Section 2.01(a) are to be sold,
transferred, assigned and conveyed to the New Corporation on
the Closing Date are hereinafter sometimes collectively
referred to as the "Assets to be Acquired."

(b)  Assets Not to be Transferred.  There shall be ex-
cluded from the Assets to be Acquired and not sold, trans-
ferred, assigned and conveyed to the New Corporation on the
Closing Date the following assets and properties of the
Central Scientific Division:

9A

(1)  cash on hand, in banks;

(2)  all checks, notes and other evidences of
     indebtedness (excluding Gross Receivables);

(3)  all claims for tax refunds or other tax
     benefits and claims arising under insurance
     policies naming Cenco as the beneficiary which
     do not relate to the Assets to be Acquired;

-10-

(4)  all tangible and intangible assets which are
     prepaid expenses and with respect to which
     Cenco receives no allowance pursuant to
     Section 2.03(e);

(5)  books and records of the Central Scientific
     Division which relate to the Assets to be
     Acquired except as provided in Section 2.01(a)(3);

(6)  the following books and records:  (i) the corporate
     minute and stock books (and other books and records
     relating to the organization and capitalization) of
     Cenco, (ii) the general ledger and tax books and
     records of Cenco relating to the Central Scientific
     Division; and (iii) such other documents and records
     of Cenco as relate to the property and assets of
     Cenco which are not transferred or sold to the
     New Corporation pursuant to this Agreement;

(7)  Non-Saleable Inventory as defined in Section 1.01(m);
     and

(8)  all other assets of Cenco which are not being trans-
     ferred to the New Corporation pursuant to this
     Agreement.

(c)  Agreement to Acquire; Determination and Payment
of Estimated and Actual Consideration; Guarantee of Gross
Receivables.  On the Closing Date, the New Corporation shall
acquire the Assets to be Acquired in exchange for the payment
by the New Corporation to Cenco of the Estimated Consideration
which shall be $9,000,000 subject to adjustment as hereinafter
provided in Section 2.01(c)(1).  At the Closing, the New
Corporation shall pay to Cenco the Estimated Consideration
as provided in Section 2.01(c)(2) below.  Within sixty

- 11 -

days after the Closing Date, the Actual Consideration
for the Assets to be Acquired shall be determined by
the parties hereto as hereinafter provided in Section
2.01(c)(3).  If the Actual Consideration differs from
the Estimated Consideration, the difference shall be
paid or repaid, as the case may be, as hereinafter
provided in Section 2.01(c)(4).

    (1)  <u>Determination of Estimated Consideration</u>.
the Estimated Consideration for the Assets to
be Acquired shall be $9,000,000 subject to
adjustment as follows:

    a.  If Inventory as defined in Section 1.01(k)
at April 30, 1976, when valued at Inventory
Cost as defined in Section 1.01(n),
is less than $11,000,000, 50% of the
difference between $11,000,000 and the
value of the said Inventory at April 30,
1976 shall be subtracted from the Estimated
Consideration,

    b.  If Gross Receivables as defined in Section
1.01(1) at April 30, 1976 are less than
$3,700,000, 80% of the difference between
$3,700,000 and the amount of the said
Gross Receivables at April 30, 1976 shall
be subtracted from the Estimated Con-
sideration.

    c.  If Gross Receivables as defined in Section
1.01(1) at April 30, 1976 are more than
$3,700,000, 80% of the difference between
$3,700,000 and the amount of the said Gross
Receivables at April 30, 1976 shall be
added to the Estimated Consideration.

- 12 -

For the purposes of Section 2.01(c)(1)a,
Non-Saleable Inventory will be excluded
from the above-mentioned valuation of
Inventory.  Cenco shall retain title to
such Non-Saleable Inventory and to any other
items of Inventory valued at zero value
as hereinabove provided.

(2)  Payment of Estimated Consideration.  The
Estimated Consideration determined as here-
inabove provided in Section 2.01(c)(1) shall
be paid to Cenco by the New Corporation
at the Closing in the following forms and
amounts:

a.  The New Corporation shall deliver to Cenco
    at the Closing a certified check payable
    to Cenco in the amount of $4,750,000;

b.  The New Corporation shall deliver to
    Cenco at the Closing duly executed
    certificates representing 17,000 shares
    of the $8.50 Preferred Stock of the New
    Corporation as described in Exhibit C
    hereto;

c.  The New Corporation shall execute and deliver
    to Cenco at the Closing an 8 1/2% Promissory
    Note of the New Corporation in the form of
    Exhibit B-1 hereto in a principal amount
    of $2,550,000 subject, however, to
    adjustment as provided in Section 2.01(c)(1);

- 13 -

Cenco agrees that it will not negotiate, assign,
transfer, pledge or otherwise dispose of or
encumber the 8 1/2% Promissory Note of
the New Corporation referred to above pending
determination of the Actual Consideration, as
hereinafter provided in Section 2.01(c)(3),
and payment or repayment, as the case may be,
of the difference between the Estimated
Consideration and the Actual Consideration,
as hereinafter provided in Section 2.01(c)(4).

(3)  Determination of Actual Consideration.  Within
ninety days after the Closing Date, the parties
hereto shall determine the Actual Consideration
to be paid by the New Corporation to Cenco
for the Assets to be Acquired as follows:

   a.  Within ninety days after the Closing Date,
       the parties hereto shall determine the
       calculated book value of the Raw
       Material Inventory and the Finished Goods
       Inventory (reflecting receipts of Raw
       Material Inventory and Finished Goods
       Inventory less sales of Finished Goods
       Inventory at cost) of the Central Scientific
       Division between April 30, 1976 and the
       Closing Date.  The difference between (1)
       the dollar figure calculated in accordance
       with the preceeding sentence and (2) the
       sum of the value for Raw Material Inventory
       and Finished Goods Inventory (less Non-
       Saleable Inventory) determined on the basis
       of Inventory Cost as of April 30, 1976

- 14 -

shall be added or deducted, as appropriate,
from the Estimated Consideration for the
purpose of determining the Actual Con-
sideration.

b.  Within ninety days after the Closing Date,
the parties shall prepare a list of all
Gross Receivables of the Central Scientific
Division as of the close of business on the
Closing Date.  This list shall include the
name of and the gross amount owed to Cenco
as of the close of business on the Closing
Date by each customer of the Central
Scientific Division and the total amount
owed to Cenco by all such customers
together.  If the Gross Receivables of the
Central Scientific Division as of the close
of business on April 30, 1976 are less
than the Gross Receivables of the Central
Scientific Division as of the close of
business on the Closing Date, 80% of
such difference shall be added to the
total amount of the Estimated Consideration
in determining the Actual Consideration.
If the Gross Receivables of the Central
Scientific Division as of the close of
business on April 30, 1976 exceed the Gross
Receivables of the Central Scientific
Division as of the close of business on the
Closing Date, 80% of such excess shall be
subtracted from the total amount of the
Estimated Consideration in determining
the Actual Consideration.

- 15 -

(4)  Payment of the Actual Consideration.  If the
Actual Consideration (being the total amount of
the Estimated Consideration adjusted as
hereinabove provided in Section 2.01(c)(3))
exceeds the Estimated Consideration (determined
as hereinabove provided in Section 2.01(c)(1)),
an amount equal to such excess shall be paid
by the New Corporation to Cenco by the New
Corporation executing and delivering to
Cenco the New Note in the form set forth in
Exhibit B-2 hereto with a principal amount
equal to said balance.  If issued, the New
Note shall be dated as of and bear interest
from the Closing Date.

If the Estimated Consideration exceeds the Actual
Consideration, an amount equal to such excess shall
be repaid by Cenco to the New Corporation by Cenco
cancelling and returning to the New Corporation the
8 1/2% Promissory Note received by Cenco at the
Closing pursuant to Section 2.01(c)(2)c above
(hereinafter referred to as the "Closing Note")
in exchange for a new 8 1/2% Promissory Note of the
New Corporation on the same terms except for
principal amount as the Closing Note (hereinafter
referred to as the "Second Note") with a principal
amount equal to the principal amount of the Closing
Note minus the excess of the Estimated Consideration
over the Actual Consideration.  The Second Note
shall be dated as of and bear interest from the
Closing Date and shall have the same date of
maturity and provide for repayment on the same dates
and in the same proportionate amounts as the Closing Note.

- 16 -

(d)  Cenco's Guaranty Concerning Gross Receivables
and Related Provisions.  Cenco guarantees that at least
80% of the total amount of the Gross Receivables of the
Central Scientific Division outstanding as of the close
of business on the Closing Date (hereinafter referred
to as the "Guaranteed Receivables") will be paid within
one year after the Closing Date.  If the New Corporation
collects less than 80% of the total amount of the
Guaranteed Receivables within one year after the Closing
Date, it may elect to collect from Cenco the difference
between (i) 80% of the total amount of the Guaranteed
Receivables minus (ii) the total amount collected by
the New Corporation on the Guaranteed Receivables during
the one-year period (hereinafter referred to as the
" Collection Period") ending at the close of business
on the first anniversary of the Closing Date as here-
inafter provided in this Section 2.01(d).  Within thirty
days after the end of each consecutive calendar month
commencing with the month immediately following the
Closing Date and ending with the month immediately
preceding  the first anniversary of the Closing Date,
the New Corporation shall deliver to Cenco a cumulative
report listing all collections made by the New Corporation
on the Guaranteed Receivables after the Closing Date.

The New Corporation may elect to collect the amount
due from Cenco under its guaranty set forth above as
follows:

(1)  Within thirty days after the first anniversary
of the Closing Date, the New Corporation
shall notify Cenco in writing that it elects
to collect from Cenco the amount due from
Cenco under its guaranty set forth in this
Section 2.01(d).

- 17 -

(2)  Within thirty days after the first anniversary
     of the Closing Date, the New Corporation shall
     deliver to Cenco (A) a list of all amounts
     collected by the New Corporation on the
     Guaranteed Receivables during the Collection
     Period, (B) an executed form of assignment
     (with warranty of title free and clear of liens
     and encumbrances) acceptable to counsel for
     Cenco reassigning to Cenco all of the New
     Corporation's right, title and interest in
     and to all of the Guaranteed Receivables which
     are not (or to the extent they are not)
     referred to in the aforesaid list as having
     been collected by the New Corporation during
     the Collection Period, (C) such evidence
     as counsel for Cenco may reasonably request
     evidencing the release of any lien or encumbrance
     affecting any of the Guaranteed Receivables
     so reassigned, and (D) delivering to Cenco
     all records relating to the Guaranteed
     Receivables which have been reassigned.

(3)  Within thirty days following receipt of the
     items enumerated in the preceding subparagraph
     (2), Cenco shall deliver to the New Corporation
     a certified check payable to the New Corporation
     in an amount equal to the amount by which
     80% of the Guaranteed Receivables exceeds the
     actual amount collected thereon during the
     Collection Period.

(4)  After the New Corporation and Cenco deliver the
     items referred to in Section 2.01(d)(2) and
     (3) above, the New Corporation shall have no

- 18 -

further interest in any of the Guaranteed
Receivables which remain uncollected (in whole
or in part) at the end of the Collection
Period, and any payments received on such
Guaranteed Receivables by the New Corporation
after the end of the Collection Period shall
be promptly paid to Cenco without demand or
notice of any kind.

If the New Corporation does not elect, pursuant
to the foregoing procedure, to collect from Cenco
the amount due from Cenco under its guaranty set
forth above, said guaranty shall become null and
void.

In connection with the collection of the Guaranteed
Receivables, the New Corporation agrees as follows:

(1) It will diligently pursue the collection
of the Guaranteed Receivables using all
reasonable commercial procedures.

(2) It will not, without the written consent of
Cenco, compromise, adjust or waive collection
as to any of the Guaranteed Receivables to
the extent of more than $2,500 on any one
invoice or $75,000 in the aggregate as to all
Guaranteed Receivables. The procedure pursuant
to which the New Corporation can adjust payments
due on the Guaranteed Receivables in excess
of these maximum amounts is set forth in a
supplementary letter of even date herewith.

(3) Cenco shall have the right, during normal
business hours, through its representatives,
accountants and agents to monitor the collection
of the Guaranteed Receivables by New Corporation.

- 19 -

(4)  Absent a designation by a customer as to the
application of any funds received by New
Corporation to a specific outstanding
receivable or the amount of any check received
from any such customer being in an amount
exactly equalling an outstanding invoice so
as to be considered a designation of payment
to said invoice, all moneys received by New
Corporation from a customer shall be applied
to the oldest outstanding accounts receivable.
Any breach by the New Corporation of subparagraph
1 through 4 above will not relieve Cenco of its
guarantee hereunder; provided however, that
Cenco shall retain any rights which it may have
to set-off or counterclaim.

Section 2.02  Assumption of Liabilities.  At the Closing,
the New Corporation shall by appropriate written instrument
or instruments assume and agree to pay, perform and discharge
the following (and only the following) liabilities of Cenco:

(a)  all liabilities and obligations of Cenco
arising after the date of the Closing under all purchase
orders, leases of real and personal property, distribution
and similar agreements, sales contracts and orders from
customers, and other agreements the rights under which
are transferred from Cenco to the New Corporation
pursuant to Section 2.01(a)(4);

(b)  all responsibility of Cenco with respect to
goods returned by customers of the Central Scientific
Division after the date of the Closing;

(c)  all obligations of Cenco to pay for goods and
supplies which at the date of the Closing have been
ordered by the Central Scientific Division from suppliers
but which have not, at that date, been received; and

(d)  warranty claims on products sold by the Central
Scientific Division prior to the Closing in an amount

- 19a -

not to exceed $15,000 in the aggregate based on the direct
cost of labor and the cost of replacement parts used in
the repair of products under warranty.

- 20 -

Section 2.03.  <u>Action to be Taken at and after the</u>
<u>Closing.</u>

    (a)  At the Closing, Cenco shall deliver to the
New Corporation:

        (1)  Such deeds, bills of sale with covenants of
general warranty of title, assignments,
endorsements, consents and other good and
sufficient instruments of transfer and con-
veyance as, in the opinion of Reed, Smith, Shaw &
McClay, counsel for the New Corporation, shall
be appropriate to vest in the New Corporation
good title and all the right, title and in-
terest of Cenco to all properties and assets
included in the Assets to be Acquired, subject,
however, to no mortgage, lien or encumbrance
except Permitted Liens on the Assets to be
Acquired and as set forth in the Schedule of
Liens attached hereto;

        (2)  actual possession and operating control of
the Assets to be Acquired;

        (3)  Cenco's books, records and files relating
to the Central Scientific Division referred to
in Section 2.01(a)(3) together with all other
data in its possession or subject to its
control relating to the property, assets,
liabilities, business and operations of the
Central Scientific Division (with the same
to be retained by the New Corporation at
their present locations in accordance with its
usual business practice subject to access
thereto by Cenco at all reasonable times during
normal business hours upon reasonable notice).
Cenco, moreover, shall have the right to the

- 21 -

return of such books, records, files and data
at such time or times as the New Corporation
determines that these documents in whole or in
part are no longer required in the business
of the New Corporation).

(b)  The cost of all stamp, transfer, sales or other
taxes, federal, state or municipal, imposed in respect
of any and all transfers and conveyances made pursuant
to this Agreement shall be borne by Cenco.

(c)  Without limiting any provision of this
Agreement, effective as at the Closing Date, Cenco shall
by appropriate instrument constitute and appoint the
New Corporation the true and lawful attorney of Cenco
with full power of substitution, in the name of Cenco
or in the name of the New Corporation, (i) to collect
for the account of the New Corporation all receivables
of any character and any other items to be assigned and
transferred to the New Corporation as provided in this
Agreement; (ii) to institute and prosecute all
proceedings which the New Corporation may deem proper
in order to collect, assert or enforce any claim,
right or title of any kind in or to the Assets to be
Acquired, to defend or compromise any and all actions,
suits or proceedings in respect of any of such Assets
to be Acquired, and to do all such acts and things in
relation thereto as the New Corporation shall deem
advisable; and (iii) to take all action which the
New Corporation may deem proper in order to provide
for the New Corporation the benefits under any property
or asset where any required consent of another party
to this Agreement or to any assignment effected hereby or

- 22 -

pursuant to the terms hereof shall not have been
obtained.  Cenco acknowledges that the foregoing powers
are coupled with an interest and shall be irrevocable
by Cenco and not be revoked by its subsequent dissolution
or in any manner or for any reason.  If the rights of
Cenco will be adversely affected by any action which the
New Corporation proposes to take pursuant to the power
of attorney granted by this subparagraph, the New
Corporation shall notify Cenco and afford Cenco the
right to participate in such action.  Cenco shall be
deemed to have waived its right to so participate
unless Cenco shall advise the New Corporation in writing
of its desire to participate within ten days after
notification by the New Corporation.  In connection
with this subparagraph, Cenco also agrees that it will
promptly transfer and deliver to the New Corporation,
as received from time to time, any cash or other
property that Cenco may receive in respect of all
receivables and other items transferred to the New
Corporation as provided herein.  The New Corporation
shall be entitled to retain for its own account any
amounts payable as interest in respect of any property
or asset referred to in this subparagraph.

      (d)  From time to time at the request of the
New Corporation, whether at or after the Closing Date
and without further consideration, Cenco shall execute
and deliver to the New Corporation such further instruments
of conveyance, transfer, assignment and confirmation and
take such other action as the New Corporation may
reasonably request in order more effectively to convey
and transfer to and to vest and confirm in the New
Corporation any of the Assets to be Acquired and shall

- 23 -

assist the New Corporation in the reduction to possession
of any such Assets to be Acquired.

(e)  At the Closing, Cenco and the New Corporation
shall prorate all items accounted for as either accrued
expenses or prepaid expenses of the Central Scientific
Division as of the Date of the Closing including, but
not limited to, real property rentals, vehicle, computer
and other personal property rentals and charges, premiums
on insurance assumed by the New Corporation, if any,
tax payments of any nature, and utility deposits, if any,
and the net amount due and owing as a result of such
prorations shall be paid within 60 days after the Closing
to the party to whom the net amount is owed.  With
respect to accrued vacation pay, there shall be no
adjustment for salaried employees but there shall be
an accrual adjustment for (1) union employees from
April 1, 1976 to the Closing and (2) hourly non-union
employees from April 30, 1976 to the Closing.  For the
purposes of this subparagraph, tax payments shall be
prorated over the period of time to which such payment
applies.

(f)  The New Corporation recognizes that Cenco must
obtain the consent of Walter E. Heller & Company and of
13 banks who are parties to a revolving credit agreement
with Cenco in order to carry out the terms of this
Agreement and that Cenco's execution and delivery of
this Agreement is subject to obtaining such consent.
Promptly upon the execution and delivery of this Agree-
ment, Cenco shall undertake to and use its best efforts
to obtain the consent required.  The Closing hereunder
may be postponed by Cenco for a period or periods of
up to a maximum aggregate period of 30 days by written

- 24 -

notice to the New Corporation if such postponements are necessary in order to obtain such consent.

Section 2.04. _The Closing_. The consummation of the assignment, transfer and conveyance to the New Corporation of the Assets to be Acquired shall constitute the Closing. Unless postponed pursuant to Section 7.04, the Closing shall take place at the offices of Walsh, Case and Coale, 104 South Michigan Avenue, Chicago, Illinois as of the close of business on July 31, 1976 or at such other place or time as shall be mutually agreed upon by the parties hereto, which date shall constitute the Closing Date. Whenever reference is made in this Agreement to a state of facts in existence on the Closing Date or to the taking place of events before or after the Closing Date, such reference shall be taken to refer to the close of business on the Closing Date.

ARTICLE III

Representations and Warranties of Cenco

Cenco represents and warrants to the New Corporation as follows:

Section 3.01. _Incorporation; Corporate Powers; Authorization; Conflicts; Qualifications; Consents._

(a) Cenco is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has full power and authority to own and lease its properties, to conduct its business as and where such properties are now owned or leased and such business is now conducted, and to sell, assign, transfer, convey and deliver the Assets to be Acquired to the New Corporation. Cenco will on the Closing Date own all the property and assets included in the Assets to be Acquired. Cenco has taken all necessary and proper corporate action to authorize, ratify and

- 25 -

and approve this Agreement, its consummation and the
performance by Cenco of all the terms and conditions
hereof to be performed by Cenco. The stockholders of
Cenco are not required under Delaware law to approve
the transactions contemplated by this Agreement. The
execution and delivery of this Agreement, the consummation
of the transactions contemplated hereby and the fulfillment
of and compliance with the terms and provisions hereof
do not violate any provision of law or administrative
regulation or any judicial or administrative order,
award, judgment or decree applicable to Cenco or its
properties, or agreement binding upon Cenco or its
properties, or conflict with any of the terms, conditions
or provisions of the Certificate of Incorporation or
By-laws of Cenco.

(b)  Cenco is qualified to do business as a foreign
corporation in the states of Illinois, New Jersey,
Oklahoma, and California.

(c)  Cenco will use its best efforts to obtain all
consents, approvals, authorization or orders required for
the authorization, execution, delivery and approval of
this Agreement by Cenco and the consummation by Cenco
of the transactions contemplated hereby prior to the
Closing Date and will furnish true, correct and complete
copies of each thereof to the New Corporation.

Section 3.02.  Financial Information.

(a)  Cenco has delivered to the New Corporation
profit and loss statements for the Central Scientific
Division for the fiscal year ended April 30, 1976 and
the preceding four fiscal years. These statements
represent management's estimates of the results of

- 26 -

operations for such periods including adjustments made
for discontinued operations so as to represent a pro
forma estimate of the operating results of the Central
Scientific Division as now constituted.  Cenco makes
no representation or warranty whatsoever with respect
to the accuracy of any such profit and loss statements.
The balance sheet of the Central Scientific Division at
April 30, 1976, based upon information furnished by the
independent public accountants of Cenco and subject to
such qualifications as Cenco may consider appropriate
in the circumstances, will, except as so qualified,
be true, correct and complete, have been prepared in
accordance with generally accepted accounting principles
consistently applied, and fairly present the
financial condition of the Central Scientific
Division at April 30, 1976.

     (b)  The books of account, records and files
of the Central Scientific Division fairly present the
financial position of the Central Scientific Division
and the results of the operations of the Central Scientific
Division, have been kept in accordance with generally
accepted accounting principles applied on a basis
consistent with those used in the preparation of such
financial statements and on the Closing Date will
fairly present the financial position of the Central
Scientific Division on such date and the results of
its operations for the period between May 1, 1976
and the Closing Date.  All statements and operating
reports relating to product sales, product profit and

losses, and product inventory which have been supplied
by Cenco to the representatives of the New Corporation
are figures which have been used by Cenco and relied
upon by Cenco in the operation of the Central Scientific
Division.

(c)  None of the property or assets reflected in
Exhibit A or the April 30, 1976 balance sheet of the
Central Scientific Division previously delivered to
the New Corporation which are included in the Assets
to be Acquired have been transferred, conveyed or other-
wise disposed of by Cenco except transfers, conveyances
or other dispositions of personal property in the ordinary
course of business.

Section 3.03.  Leases; Title to Properties; Liens;
Condition of Properties.

(a)  All of the leases which are not terminable
at the option of Cenco on not more than thirty days
notice whereunder Cenco leases real or personal property
on behalf of the Central Scientific Division at the date
of this Agreement are described in the Schedule of
Leases attached hereto.  Except as otherwise stated
in said Schedule and except for Permitted Liens, all
such leases are valid and subsisting and no default
exists under any thereof.  Cenco owns all property and
assets reflected in Exhibit A and the balance sheet of
the Central Scientific Division dated April 30, 1976
which are included in the Assets to be Acquired, except
personal property transferred, conveyed or otherwise
disposed of in the ordinary course of business since
the date of said balance sheets.  None of the property
or assets owned by Cenco and included in the Assets

- 28 -

to be Acquired is subject to any mortgage, pledge, lien, conditional sale agreement, security title, encumbrance or other charge except as stated in the Schedule of Liens attached hereto and except for Permitted Liens. At the Closing, Cenco will warrant good and marketable title to the New Corporation in the Assets to be Acquired free and clear of all liens and encumbrances except for Permitted Liens and liens on schedule. Except for this Agreement, there are no outstanding options or rights in any third person to acquire any of such leased or other property or assets or any interest therein except, with respect to inventory, the rights of customers under orders or contracts entered into by Cenco in the lawful and ordinary course of business.

(b)  The Central Scientific Division does not occupy and is not dependent on the right to use the property of others except under valid and enforceable leases, contracts or other arrangements, all of which are freely assignable by Cenco except as indicated in the Schedule of Leases.  The buildings, machinery and equipment owned or leased by Cenco and currently being used in the business of the Central Scientific Division are, taken as a whole, in a state of repair reasonably necessary to continue the business of the Central Scientific Division as it has been previously conducted. As of the date hereof, to the best of Cenco's knowledge, there is no pending or threatened change of any such ordinance, regulation or zoning or other law which might materially adversely affect the business, operations or property of the Central Scientific Division and there is no pending or threatened condemnation of any such property.

- 28a -

Section 3.04 <u>Accounts Receivable</u>. The Gross
Receivables of the Central Scientific Division as defined in
Section 1.01(1) as of April 30; 1976 and the Closing Date have
or shall have arisen in the ordinary course of business,
are subject to no counterclaims or set-offs other than those
arising in the ordinary course of business which are not un-
usual in amount and, except as indicated in the Schedule of
Contracts Requiring Consents attached hereto, are assignable
to the New Corporation without the consent of the debtor.
The Gross Receivables as so defined in the preceding sentence
totalled $3,785,867 on April 30, 1976 and the dollar value of
the Gross Receivables as of the Closing which is required to
determine the Actual Consideration for the purposes of
Section 2.01(c) (3)a will be a correct and accurate figure.
The agreement by Cenco to guarantee 80% of the Gross Receivables
as set forth in Section 2.01(d) hereof, is a valid obligation
of Cenco binding upon Cenco enforceable in accordance with
its terms.

Section 3.05 <u>Inventory</u>. The Inventory of the Central
Scientific Division as defined in Section 1.01(k) as of
April 30, 1976 and the Closing Date, after the deduction of
Non-Saleable Inventory as defined in Section 1.01(m), is
and will consist of the amounts of such Inventory in the Raw
Material Inventory, Work-in-Process Inventory and Finished
Goods Inventory categories (all as defined in Section 1.01(k))
as is represented to the New Corporation by Cenco and/or
the independent public accountants of Cenco. Moreover, such

_ 29 _

Inventory as of April 30, 1976, when valued in accordance
with 'Inventory Cost as defined in Section 101(n) and after
the deduction of Non-Saleable Inventory, was worth at least
$4,027,177 ⎽⎽⎽⎽⎽ for Raw Material Inventory, $1,034,578 ⎽⎽⎽⎽⎽⎽
for Work-in-Process Inventory, and $6,309,111 ⎽⎽⎽ for Finished
Goods Inventory. The calculations of the adjustments to
Inventory between April 30, 1976 and the Closing which are
required to determine the Actual Consideration for the
purposes of Section 2.01(c)(3)a accurately reflect (1) the
items of Raw Material Inventory and Finished Goods Inventory
which were purchased and sold by the Central Scientific
Division between April 30, 1976 and the Closing and (2)
the valuation at cost of the Raw Material Inventory and
Finished Goods Inventory purchased and sold between April 30,
1976 and the Closing in accordance with the requirements of
Section 2.01(c)(3)a.

Section 3.06. Liability for Finder's Fees. Cenco has
not incurred any liability for brokerage fees, finder's fees,
agent's commissions or other similar forms of compensation
payable by the New Corporation in connection with this
Agreement or any transaction contemplated hereby.

Section 3.07. Litigation; Compliance with Laws,
Regulations and Orders. On the date hereof, except as
indicated in the Schedule of Litigation, if any, attached
hereto and except asserted claims which are adequately covered
by insurance payable to the New Corporation, there are no
material actions, suits or proceedings pending or, to the
knowledge of Cenco, threatened against or affecting the
Central Scientific Division or any of the properties, assets
or business used in its operations and included in the Assets
to be Acquired or which would prevent or hinder the consummation
of the transactions contemplated by this Agreement. Except
as indicated in the Schedule of Litigation Cenco

- 30 -

is not charged with violating, or, to the knowledge of Cenco,
threatened with a charge of violating or under investigation
with respect to, a possible violation of any provision of
any federal, state or local law or administrative ruling or
regulation relating to any aspect of the business of the
Central Scientific Division including, without limitation,
the right to use, manufacture and sell the products of the
Central Scientific Division and the Assets to be Acquired.
To the best of its knowledge, Cenco has complied in all
material respects with all federal and state laws, regulations
or orders materially affecting the business and operations
of the Central Scientific Division.

Section 3.08.  Contracts, Agreements and Plans.

(a)  Except only this Agreement and the contracts,
agreements, plans, licenses and commitments which are
listed and described in the Schedule of Contracts
attached hereto, Cenco is not a party to or subject to
any of the following, whether written or oral, which
relate to the Central Scientific Division or affect
its operations:

(1)  Any management or employment contract or
contract for personal services with any officer,
consultant, or employee of the Central Scientific
Division which is not by its terms terminable
at will without penalty by Cenco;

(2)  any plan, contract or arrangement providing
for bonuses, pensions, deferred compensation,
retirement payments, profit sharing, incentive
pay, stock purchase, insurance, hospitalization,
medical expense or similar employee benefits
to the employees of the Central Scientific
Division or any one or more of such employees;

- 31 -

    (3)  any contract or agreement (other than with
respect to shop practices customary in the
industry) with any labor union;

    (4)  any contract or agreement not made in the
lawful and ordinary course of business;

    (5)  any contract or agreement containing covenants
by Cenco not to compete in any line of business
in which the Central Scientific Division
competes;

    (6)  any contract, agreement, arrangement or under-
standing upon which any material part of the
business of the Central Scientific Division
is dependent or which materially and adversely
affects the business, property or condition
(financial or otherwise) of the Central
Scientific Division; or

    (7)  any contract or agreement whose assignment or
attempted assignment hereunder without the
consent of another person would constitute a
breach of any agreement or commitment to which
Cenco is a party or by which Cenco may be
bound.

    (b)  The Schedule of Contracts, the Schedule of
Leases and the Schedule of Patents, Trademarks, Copyrights
and Royalties, all attached to this Agreement, set
forth, as of the date of this Agreement, all leases of
real and personal property, all licenses required for
the operation of business, all purchase orders from
suppliers, all sales contracts and orders from customers,
all patent, trademark, servicemark and copyright agree-
ments (including the licensing thereof), and all other

- 32-

agreements, to which Cenco is a party and which
relate to the Central Scientific Division, excepting
only purchase orders, sales contracts and other contracts
entered into in the ordinary course of the business of
the Central Scientific Division and having a face value
with respect to any one contract or order of less than
$25,000. The leases, licenses, agreements, plans,
contracts and commitments contained in each of the said
Schedules are valid and binding in accordance with their
terms and no defaults exist thereunder.  True and correct
copies of each of the foregoing have been delivered to
the New Corporation.

(c) Except as set forth in the Schedule of
Contracts Requiring Consents attached hereto, all
contracts between Cenco and federal, state or local
government agencies or authorities are transferable to
the New Corporation without the consent of third parties.

(d) Set forth in the Schedule of Cenco Relationships
affecting the Central Scientific Division attached hereto
is a list of all agreements, understandings and relation-
ships between Cenco and its subsidiaries and divisions
which relate to the operations of the Central Scientific
Division as such operations will be constituted after
the Closing.

Section 3.09. Absence of Material Change.  Except for
this Agreement and as otherwise specified in the Schedule of
Material Changes, if any, attached to this Agreement,
Cenco has not, without the written approval of the New
Corporation, since April 30, 1976:

(a) except in the lawful and ordinary course of
business, sold, leased, disposed of, mortgaged, pledged
or subjected to any lien or encumbrance (other than

- 33 -

Permitted Liens), or waived any substantial rights
relating to,  any  property or assets, tangible or
intangible of the Central Scientific Division;

(b)  made any change in the business or operations
or the manner of conducting business of the Central
Scientific Division other than changes in the lawful
and ordinary course of business none of which has and
which in the aggregate have not had a materially adverse
effect on such business or operations;

(c)  suffered any damage, destruction or loss (whether
or not covered by insurance) materially and adversely
affecting any of the properties, assets, business or
operations of the Central Scientific Division;

(d)  sold, assigned or transferred any patent,
trademark, trade name, patent application, copyright,
trade secret, customer list, manufacturing or secret
process or formula relating to the Central Scientific
Division or suffered any materially adverse change
in its rights with respect to any thereof;

(e)  entered into any material lease of real or
personal property relating to the operations of the
Central Scientific Division;

(f)  except in the lawful and ordinary course of
business, terminated or amended or suffered the
termination or amendment of, or failed to perform all
its obligations, or suffered or permitted any default
to exist under any material contract, lease, agreement,
or license  which related to the operations of the Central
Scientific Division;

(g)  suffered any change in the condition (financial
or otherwise) of the Central Scientific Division or in
the assets, liabilities (absolute or contingent) or
business of the Central Scientific Division, except

- 34 -

changes in the lawful and ordinary course of business,
none of which has, and which in the aggregate have not,
materially and adversely affected the business, property,
assets or condition of the Central Scientific Division,
nor has any event or condition of any character occurred
which materially and adversely affected or, to the present
knowledge of Cenco, may affect business or prospects
of the Central Scientific Division;

     (h) entered into any transaction, contract or
agreement relating to the Central Scientific Division or
its operations other than in the ordinary course of
business except transactions disclosed pursuant to and
permitted by this Agreement; or

     (i) increased the compensation payable to any
officer or employee whose annual salary exceeded $20,000
on December 31, 1975.

Section 3.10. <u>Trade Secrets, Customer Lists, etc.</u> Cenco
has the right to use free and clear of any claims or rights
of others, all trade secrets, customer lists, manufacturing
and secret processes, and formulae required for or incident
to the operations of the Central Scientific Division.

Section 3.11. <u>Patents, Trademarks and Copyrights.</u>
The Schedule of Patents, Trademarks, Copyrights and Royalties
attached hereto lists (to the best of its knowledge) all
royalty agreements, patents and patent applications,
trademark registrations and applications therefor, service
mark registrations and applications therefor and
copyrights (whether common law or statutory) and applications
therefor relating to the operations of the Central Scientific
Division which are owned by Cenco or to which Cenco is
equitably entitled. The foregoing patents, trademark
registrations, servicemark registrations and copyright
registrations are valid, have been duly issued and have not

- 35 -

been cancelled, abandoned or otherwise terminated and to
the best knowledge and belief of Cenco, do not infringe
upon the rights of others; and the foregoing trademark
applications, servicemark applications, copyright applications
and patent applications have been duly filed and actively
pursued to the date of this Agreement.

Section 3.12 Bulk Sales Laws. The Illinois, New
Jersey and Oklahoma Bulk Sales Laws do not apply to the
sale and transfer of the assets of the Central Scientific
Division contemplated by this Agreement.

Section 3.13 Disclosure. No representation or warranty
by Cenco contained in this Agreement and no statement con-
tained in any certificate, schedule, exhibit, list or other
instrument specified in this Agreement, whether heretofore
furnished to the New Corporation or hereafter required to
be furnished to the New Corporation, contains any untrue
statement of a material fact, or omits to state
a material fact necessary to make the statements contained
therein not misleading.

ARTICLE IV

Representations and Warranties of the New Corporation

The New Corporation represents and warrants to Cenco as
follows:

Section 4.01. Incorporation; Corporate Powers;
Authorization. The New Corporation is a corporation duly
organized, validly existing and in good standing under the
laws of Maryland and has full corporate power to own and lease
the Assets to be Acquired and to carry on the business presently
carried on by the Central Scientific Division. At the Closing,
the New Corporation will have taken all necessary and proper
corporate action to authorize, ratify and approve the terms

of this Agreement, its consummation and the performance by
it of all the terms and conditions hereof to be performed by
the New Corporation. The execution and delivery of this
Agreement, the consummation of the transactions contemplated
hereby and the fulfillment of and compliance with the
terms and provisions hereof, do not and will not violate any
contract, agreement, provision of law or administrative
regulation, or any judicial or administrative order, award,
judgment or decree applicable to the New Corporation and
do not and will not conflict with any of the terms, conditions
or provisions of the Articles of Incorporation or By-laws
of the New Corporation.

Section 4.02. Liability for Finder's Fees. The New
Corporation has not incurred any liability for brokerage
fees, finder's fees, agent's commissions or other similar
forms of compensation payable by Cenco in connection with
this Agreement or any transaction contemplated hereby.

Section 4.03. Securities to be Issued. The $8.50
Preferred Stock of the New Corporation to be included in the
Consideration will, when delivered to Cenco, be duly authorized,
validly issued and outstanding, fully paid and non-assessable,
and have preferential rights over the Common Stock of the
New Corporation and any other preferred stock to be issued by
the New Corporation in accordance with its terms. The 8.5%
Promissory Note and the New Note of the New Corporation to
be included in the Consideration will when delivered
to Cenco, be binding obligations of the
New Corporation in accordance with their terms. The 8.5%
Promissory Note and the New Note will be entitled to be collat-
eralized by a lien on the assets of the New Corporation which is
second to the lien on such assets of the primary lender of the
New Corporation.

- 37 -

## ARTICLE V

### Covenants of Cenco

Cenco covenants and agrees with the New Corporation that from the date hereof until the Closing Date (or thereafter to the extent provided herein):

Section 5.01. Maintenance of Business. Cenco shall carry on the business, maintain the plant and equipment and keep the books of account, records and files of the Central Scientific Division in substantially the same manner as heretofore, shall consult with the New Corporation before deciding or acting upon any question of more than routine importance which may arise in the transaction of, or in connection with the business of, the Central Scientific Division, shall give to the New Corporation and the New Corporation's counsel, accountants, and other representatives full access during normal business hours to all the plants, properties, inventories, books, records and files of every character of the Central Scientific Division, and shall furnish the New Corporation with all such information concerning the affairs of the Central Scientific Division as the New Corporation may reasonably request.

Section 5.02. Organization; Good Relationships. Cenco shall use its best efforts to preserve the business organization of the Central Scientific Division in tact, to retain the services of the present officers and employees of the Central Scientific Division and to preserve the present relationships with the suppliers, customers and others having business relations with the Central Scientific Division.

Section 5.03. Representations and Warranties. Promptly upon Cenco's becoming aware of the occurrence or the impending or threatened occurrence of any event which would cause or constitute a breach, or would have caused or constituted a breach had such event occurred prior to the date hereof,

of any of the representations and warranties of Cenco
contained in or referred to in this Agreement or in any
Schedule or Exhibit to this Agreement, Cenco shall give
detailed written notice thereof to the New Corporation and
shall use its best efforts to prevent or promptly remedy
the same.

Section 5.04. Agreement not to Compete. For a period
of five years after the Closing Date, Cenco, its successors
and assigns shall not directly or indirectly engage in, or
have an interest in (excluding ownership of shares of a
publicly-held corporation), the manufacture and distribution
of a full line of scientific educational products and
industrial laboratory equipment of the types presently
manufactured or sold by the Central Scientific Division
except through the acquisition of an active business operation
independently established by third parties. If Cenco does
manufacture and/or sell any products which are competitive
with products manufactured and/or sold by the New Corporation,
Cenco agrees that it will not use any confidential information,
trade secrets or customer lists which Cenco acquired as the
result of its operation of the Central Scientific Division.

Section 5.05. Financial Statements. Cenco shall cause
its independent public accountants to make an examination of
the Central Scientific Division as at April 30, 1976 and to
prepare and deliver to the New Corporation a letter and
accompanying financial statements relating to the Central
Scientific Division attached hereto as Exhibit F.

Section 5.06. Consummation of Agreement. Cenco shall
use its best efforts to (1) obtain all necessary consents
to the assignment to the New Corporation of all rights and
obligations of Cenco under all contracts to which Cenco
is a party and which are to be assigned or transferred to the
New Corporation pursuant to this Agreement and (2) perform
and fulfill all conditions and obligations to be performed

- 39 -

or fulfilled by Cenco under this Agreement, to the end that the transactions contemplated by this Agreement shall be fully carried out.

Section 5.07.  New Leases.  At the Closing, Cenco shall execute leases for the Chicago Facility and the Mountainside, New Jersey property with the New Corporation on terms mutually satisfactory to Cenco and the New Corporation, and shall assign to the New Corporation (and secure the consent of the owners, if required) the existing leases on the Tulsa, Oklahoma and San Jose, California facilities now used by the Central Scientific Division.

Section 5.08.  Restricted Securities.  Cenco understands that the $8.50 Preferred Stock will be issued to it pursuant to the private offering exemption from the registration requirements of the Securities Act of 1933 and may not be publicly resold without an opinion of counsel satisfactory to counsel for the New Corporation.

Section 5.09.  Allocation of Consideration.  Cenco and the New Corporation agree to request their respective certifying public accountants to allocate the consideration over the different categories of the Assets to be Acquired within 90 days after the Closing.

Section 5.10.  Work Papers of Certifying Public Accountant. If so requested by the New Corporation, Cenco will direct its certifying public accountant to furnish the work papers used in the preparation of the April 30, 1976 financial statements of the Central Scientific Division to the certifying public accountant of the New Corporation.

### ARTICLE VI

### Covenants of the New Corporation

The New Corporation covenants and agrees with Cenco that from the date hereof until the Closing Date (or thereafter to the extent provided herein):

Section 6.01.  Consummation of Agreement.  The New Corporation shall use  its best efforts to perform and fulfill

- 40 -

all conditions and obligations to be performed or fulfilled
by the New Corporation under this Agreement, to the end that
the transactions contemplated by this Agreement shall be fully
carried out.

Section 6.02. Records for Litigation Purposes. The
New Corporation agrees to provide Cenco from time to time, as
requested, access to and copies of such records (or the
originals thereof if required) as may be in the possession of
the New Corporation and which Cenco deems necessary for any
business purpose and further will make available for testimony,
in court or at deposition, any of the former employees of
the Central Scientific Division then employed by it in any
litigation involving Cenco. Cenco will reimburse the New
Corporation a reasonable amount for the time of any such
employee devoted to such litigation. Moreover, for a period
of seven years after the Closing, the New Corporation agrees
to use its best efforts to notify Cenco prior to the destruction
of any records relating to the Central Scientific Division
which were transferred to the New Corporation at the Closing and
to give Cenco an opportunity to take possession, at its expense
of the records which New Corporation intends to destroy.

Section 6.03. Non-Disclosure of Confidential Information.
The New Corporation agrees that, if the sale of the Central
Scientific Division to the New Corporation is not consummated
for any reason, the New Corporation will not disclose to third
parties any confidential information or trade secrets relating
to the Central Scientific Division which are furnished by
Cenco to the New Corporation.

Section 6.04. Leased Computer Facilities. At the Closing,
if required by Cenco, the New Corporation shall execute a
contract for the use of its leased computer facilities with
Cenco on terms as to cost and time period which are mutually
satisfactory to Cenco and the New Corporation.

- 41 -

Section 6.05.  <u>Other Series of Preferred Stock</u>.  So
long as any shares of the $8.50 Preferred Stock are
outstanding, the New Corporation shall not (1) issue any
other series of its preferred stock which is senior to,
ot on a parity with, the $8.50 Preferred Stock or (2) amend
its Articles of Incorporation for the purpose of either
revising or altering the terms of the $8.50 Preferred Stock
or cancelling the $8.50 Preferred Stock series,
without prior written consent of Cenco.



- 42 -

## ARTICLE VII

### Conditions

Section 7.01.  Mutual Conditions.  The mutual obligations
of the New Corporation and Cenco to consummate this Agreement
and the transactions contemplated hereby are subject to the
fulfillment, prior to or at the Closing, of the following
condition precedent:

No Restraining Order or Other Litigation.  No
private party or governmental department, court, agency
or commission shall have instituted, have notified
Cenco or the New Corporation of its intention to institute,
or have threatened to bring, any suit or proceeding
(1) to seek damages from either Cenco or the New
Corporation as the result of the transactions contemplated
by this Agreement, (2) to restrain or enjoin the
consummation of the Agreement or the transactions
contemplated hereby, or (3) to nullify or render
ineffective this Agreement or such transactions if
consummated.

Section 7.02.  Conditions to the Obligations of the
Buyers.  The obligations of the New Corporation to consummate
this Agreement and the transactions contemplated hereby are
subject to the fulfillment, prior to or at the Closing, of the
following conditions precedent:

(a)  Representations; Warranties; Conditions.  Each
of the representations and warranties of Cenco contained
in Article III and in the Schedules and Exhibits to this
Agreement shall be true and correct as though made again
on the Closing Date and Cenco shall, on or before the
Closing Date, have performed all its obligations here-
under (including the covenants in Article V to this

- 43 -

Agreement) which by the terms hereof are to be performed
by it on or before the Closing Date.  Cenco shall have
delivered to the New Corporation at the Closing a
certificate of the President or a Vice President of
Cenco dated the Closing Date to the effect that the
conditions set forth in the preceding sentence have been
fulfilled.

(b)  Financing.  The New Corporation shall have
procured loans from financial institutions on terms
satisfactory to the New Corporation in the amount
of not less than the cash down payment included in the
Consideration to be paid for the Assets to be Acquired,
to be collaterialized by the inventory and accounts
receivable of the Central Scientific Division to be
included in the Assets to be Acquired.  In addition, the
New Corporation shall have received equity (or equity
equivalent) financing (exclusive of the $8.50 Preferred
Stock to be issued pursuant to this Agreement) in the
amount of not less than $800,000.

(c)  Interim Casualties.  The Assets to be Acquired
shall not have been damaged between the date hereof and
the Closing Date by act of God, fire, explosion, earth-
quake, windstorm, accident, strike, lockout, combination
of workmen, flood, drought, war, embargo, riot, condemnation,
confiscation, seizure or activities of the armed forces
or other casualty, regardless of whether any such
casualty is covered by insurance, to such an extent as
materially to impair the value of the Assets to be
Acquired as a whole or to materially impair the ability
of the Central Scientific Division to operate its
business as a going concern.

- 44 -

(d) <u>Opinion of Counsel</u>.  At the Closing, the New
Corporation shall have received from Walsh, Case & Coale,
counsel for Cenco, an opinion dated the Closing Date,
in form and substance satisfactory to the New Corporation
and its counsel, to the following effect:

(1)  Cenco is a corporation duly organized,
validly existing and in good standing under the
laws of the State of Delaware and has full power
and authority to conduct the business of the
Central Scientific Division as now being conducted.
Cenco is in good standing in the states of Illinois,
California, Oklahoma and New Jersey.

(2)  Cenco has taken all necessary and proper
corporate action to authorize, ratify and approve
this Agreement, its consummation and the performance
by Cenco of all the terms and conditions hereof to be
performed by Cenco.  The stockholders of Cenco are
not required, under Delaware law, to approve the
transactions contemplated by this Agreement.

(3)  The execution and delivery of this
Agreement, the consummation of the transactions
contemplated hereby, and the fulfillment and
compliance with the terms and provisions hereof
do not, to the knowledge of such counsel (without
further investigation) violate any provision of
law, administrative regulation or any judicial or
administrative order, award, judgement or decree,
applicable to Cenco or its properties, or any
agreement  binding upon Cenco or its properties.

(4)  The execution and delivery of this
Agreement and the consummation of the transactions
contemplated hereby do not conflict with any of
the terms, conditions or provisions of the Certificate
of Incorporation or By-laws of Cenco.

- 45-

(5) Based upon a Uniform Commercial Code
lien search of recent date and to the best of the
knowledge of such counsel (without further
investigation), the Assets to be Acquired are
free and clear of all liens and encumbrances,
except as reflected in this Agreement or an
exhibit hereto.

(6) To the best of the knowledge of such
counsel and without further investigation, there
are no material actions, suits or proceedings
pending or threatened against Cenco affecting the
Central Scientific Division or any of the properties,
assets or business used in the operations of such
division included in the Assets to be Acquired or
which would prevent or hinder the consummation of
the transactions contemplated by this Agreement.

(7) To the best of the knowledge of such
counsel (without further investigation) the leases,
licenses, agreements, plans, contracts and commit-
ments contained in each of the schedules to this
Agreement are valid and binding in accordance with
their terms and no material defaults exist there-
under.

(8) This Agreement is a valid and binding
obligation of Cenco, enforceable in accordance
with its terms.

(9) Cenco has, subject to consents which must
be obtained, the complete and unrestricted power
to convey, transfer, assign and deliver to the
New Corporation all of the Assets to be Acquired
and the instruments of conveyance, transfer and
assignment to be executed and delivered to the
New Corporation at the Closing will be valid in

- 46 -

accordance with their terms and effectively vest
in the New Corporation all right, title and interest
of Cenco in and to the property and assets included
in the Assets to be Acquired, subject, to the
best of the knowledge of such counsel and without
further investigation, to no mortgage, lien,
encumbrance or charge whatsoever, except Permitted
Liens.

(10) Any reference in the foregoing opinion
to the validity, binding effect and enforceability
of any obligation is subject, as to enforcement
of remedies to applicable bankruptcy, reorganization,
insolvency and similar laws and to moratorium laws
from time to time in effect.

In rendering the foregoing opinion, such counsel may, when
reasonable, state their opinion on specific matters of fact
to the best of their knowledge and, to the extent they
deem such reliance proper, may rely on certificates of public
officials, certificates, in form and substance satisfactory
to the New Corporation and its counsel, of officers of Cenco,
and an opinion or opinions of other counsel satisfactory
to the New Corporation and its counsel.  In the event such
counsel for Cenco rely upon any such certificate, policy or
opinion, a counterpart of each thereof shall be delivered
to the New Corporation.

(e)  New Leases, Assignments and Other Contracts.
At the Closing, the New Corporation shall execute on
terms satisfactory to it (1) a lease with Cenco for the
rental of the Chicago Facility or such portion thereof
as may be required for the operations of the New
Corporation and (2) a lease for the Mountainside, New
Jersey property, and Cenco shall have assigned to the New

- 47 -

Corporation (and have procured the consent of the owners, if required) the existing leases on the Tulsa, Oklahoma and San Jose, California facilities now used by the Central Scientific Division.

(f) No Material Changes. The New Corporation shall have received from Cenco a certificate signed by Cenco's chief financial officer to the effect that, since April 30, 1976, there has not been (i) any material adverse change in the condition (financial or otherwise), properties, assets and business of the Central Scientific Division, (ii) any damage, destruction or loss (whether or not covered by insurance) materially and adversely affecting the Assets to be Acquired, or (iii) the occurrence of any event or condition of any character which materially and adversely affects the business of the Central Scientific Division.

(g) Consents to Assignment. Cenco shall have received from other parties to the contracts, leases and agreement of Cenco which are material to the operation of the Central Scientific Division and which are to be assigned to the New Corporation hereunder, such consents to such assignments as are required by the terms of such contracts, leases and agreements, or otherwise.

(h) Continuation of Relationships. Arrangements shall have been made on terms satisfactory to the New Corporation with respect to the continuation after the Closing of such presently existing agreements, relation-ships and understandings between Cenco and its subsidiaries and divisions relating to the operations of the Central Scientific Division as the New Corporation, in its sole discretion, may consider necessary.

- 48 -

Section 7.03.  Conditions to the Obligations of Cenco.
The obligations of Cenco to consummate this Agreement and
the transactions contemplated hereby are subject to the
fulfillment prior to or at the Closing, of the following
conditions precedent:

(a)  Representations; Warranties; Conditions.
Each of the representations and warranties of the
New Corporation contained in Article IV shall be true
and correct as though made again on the Closing Date
and the New Corporation shall, on or before the Closing
Date, have performed all its obligations hereunder
(including the covenants in Article VI to this Agree-
ment) which by the terms hereof are to be performed on
or before the Closing Date.  The New Corporation shall
have delivered to Cenco at the Closing a certificate
signed by its chief executive officer dated the
Closing Date to the effect that the conditions set
forth in the preceding sentence have been fulfilled.

(b)  Approval of Lenders.  Cenco shall have
received approval of the transactions contemplated by
this Agreement from Walter E. Heller & Company and the
thirteen banks which are parties to a revolving credit
agreement with Cenco.

(c)  Opinion of Counsel.  At the Closing, Cenco
shall have received from Reed, Smith, Shaw & McClay,
counsel for the New Corporation, an opinion dated the
Closing Date, in form and substance satisfactory to
Cenco and its counsel:

(1)  To the general effect stated in Sections 4.01
and 4.03;

(2)  that this Agreement is a valid and binding
obligation of the New Corporation enforceable
against the New Corporation in accordance with

- 49 -

(3) as to such other matters in connection with this Agreement and the transactions contemplated hereby as Cenco may reasonably request.

In rendering the foregoing opinion, such counsel may, to the extent they deem such reliance proper, rely on certificates of public officials, certificates, in form and substance satisfactory to Cenco and its counsel, of other counsel satisfactory to Cenco and its counsel. In the event such counsel for the New Corporation rely upon any such certificate, policy or opinion, a counterpart of each thereof shall be delivered to Cenco.

(d) Cenco shall have received from the other parties to the contracts, leases and agreements of Cenco which are material to the operations of the Central Scientific Division and which are to be assigned to the New Corporation hereunder, such consents to such assignments as are required by the terms of such contracts, leases and agreements, or otherwise.

Section 7.04. Rights of Termination or Postponement. On or before the Closing Date, either party may request a postponement of the Closing Date to a specified future date by delivering a written request for such postponement to the other party. The party receiving such request, in its sole discretion, may accept or refuse such request. If the request is accepted, the parties shall have all the rights, obligations and options set forth in this Agreement at the postponed Closing Date. If the request is refused, the Closing Date shall remain as specified in Section 2.04 of this Agreement.

- 50 -

ARTICLE VIII

Miscellaneous

Section 8.01.  Survival of Representations and Warranties;
Assignment; Successors and Assigns.

(a)    The representations and warranties and
covenants contained in Articles III, IV, V and VI
of this Agreement and in any schedule, certificate,
financial statement or other instrument or agreement to
this Agreement or delivered pursuant to this Agreement
shall survive the Closing.

(b)    This Agreement shall not be assignable by
either party without the written consent of the other.

(c)    This Agreement is binding upon the successors
and assigns of Cenco and the New Corporation.

Section 8.02.  Indemnification.  The New Corporation
shall indemnify and save harmless Cenco from and against any
loss, cost and damage or expense (including reasonable
attorneys' fees) in any way arising from or growing out of
the failure of the New Corporation to perform or discharge
the duties, liabilities or obligations of Cenco assumed by
the New Corporation hereunder.  The New Corporation hereby
agrees to indemnify Cenco against all loss, damage, and
expenses, including attorneys' fees, resulting from any
default occurring after the closing date, under any performance
or bid bond which Cenco has entered into with respect to any
contract assigned to and assumed by the New Corporation
under this Agreement.  Cenco shall indemnify and hold harmless
the New Corporation from and against any loss, cost, damage
or expense (including reasonable attorneys' fees) in any way
arising from or growing out of any claims, debts, liabilities
and obligations of Cenco which are not expressly assumed by the
New Corporation pursuant to this Agreement and from any loss

- 50a-

occasioned by any Cenco stockholder or creditor action
arising from the transactions contemplated by
this Agreement.  Cenco shall also indemnify the New
Corporation for any loss to the New Corporation
occasioned by the failure of Cenco to comply with the bulk
sales laws of Illinois, Oklahoma or New Jersey, including,
without limitation, (1) any amounts which the New Corporation
is required to pay to the creditors of either Cenco or the

- 51 -

Central Scientific Division as the result of such failure to
comply and (2) the reasonable expenses incurred by the New
Corporation in defending such creditor actions.  Cenco,
however, has the option to defend any such creditor claims
at its own expense  and New Corporation will give Cenco
prompt notice of any threatening or pending action.

Section 8.03.  Notices.  All notices, demands, and other
communications which may or are required to be given here-
under or with respect hereto shall be in writing, shall be
given either by personal delivery or by mail or telegraph,
and shall be deemed to have been given or made when personally
delivered, when deposited in the mail, first class postage
prepaid, or when delivered to the telegraph company, charges
prepaid, addressed to the respective parties as follows:

        (a)  if to the New Corporation:

            Mr. Robert E. Long
            Senior Vice President
            Johnston, Lemon & Company
            900 Southern Building
            Washington, D.C.

or to such other address as the New Corporation may from time
to time designate by notice to Cenco; and

        (b)  if to Cenco:
            Mr. S. D. Brinsfield
            Cenco, Incorporated
            2600 South Kostner
            Chicago, Illinois  60623

            with copy to:

            Messrs. Walsh, Case & Coale
            104 S. Michigan Avenue
            Chicago, Illinois  60603
            Attn:  R. O. Case

or to such other address as Cenco may from time to time
designate by notice to the New Corporation.

Section 8.04.  Entire Agreement.  This Agreement con-
stitutes the entire agreement  between the parties, and
supersedes and cancels any and all other agreements between
the parties relating to the subject matter hereof.

- 52 -

Section 8.05. Captions.  The captions of Articles and
Sections hereof are for convenience only and shall not
control or affect the meaning or construction of any of
the provisions of this Agreement.

Section 8.06  Counterparts.  This Agreement may be
executed simultaneously in two or more counterparts,
each of which shall be deemed an original, and it shall not
be necessary in making proof of this Agreement to produce
or account for more than one such counterpart.

Section 8.07.  Governing Law.  This Agreement shall be
governed by the laws of the State of Illinois.

Section 8.08  Press Releases.  The parties hereto each
will not make, issue or release any public announcement,
statement or acknowledgement of the existence of, or reveal
publicly the terms, conditions and status of, the transactions
provided for herein, without the prior consent of the other
party as to the content and time of release of and the media
in which such statement or announcement is to be made;
provided, however, in the case of announcements, statements,
acknowledgements or revelation without such prior approval
by the party so required to do so by law shall not constitute
a breach of this paragraph if such party shall have attempted,
to the extent reasonably possible, to clear such announcement,
statement, acknowledgement or revelation with the other
party.  Cenco and the New Corporation each agree not to
unreasonably withhold any such consent or clearance.

Section 8.09. Costs and Expenses.  Cenco and the New
Corporation each hereby covenant and agree that neither will
be responsible for the costs and expenses of the other in
connection with, or arising from or out of the negotiation or
conclusion of this Agreement or the consummation of the
transactions provided for herein.

-53 -

Section 8.10. <u>Cooperation</u>.  Cenco and the New Corporation
agree that prior to and for a reasonable period after the
Closing, they shall cooperate and use their respective best
efforts to obtain any consent of any governmental authority
required to transfer to the New Corporation the rights under
any permit or license held by Cenco.  Similarly, Cenco and
the New Corporation agree that, prior to and for a reasonable
period after the Closing, they shall cooperate and use their
respective best efforts to obtain the consent of any third
party to any contract, agreement, order or lease which is
to be transferred to the New Corporation.  Cenco and the
New Corporation further agree that they will at any time and
from time to time after Closing, upon request of the other,
execute, acknowledge and deliver, or will cause to be done,
executed, acknowledged and delivered all such further deeds,
assignments, transfers, conveyances, powers of attorney and
assurances as may be reasonably required to perfect the
transactions provided for herein and to perfect the right, title
and interest of the New Corporation in the Assets to be
Acquired on the terms and conditions provided for herein.

Section 8.11. <u>Payment of Accounts Payable</u>.  After
the Closing, Cenco agrees to promptly pay all accounts
payable of the Central Scientific Division in conformity
with the terms of the various contracts, agreements and
understandings between Cenco and the various suppliers and
other creditors of the Central Scientific Division.

Section 8.12. <u>Assignment of Certain Names</u>.  Cenco
agrees to assign to the New Corporation all of the right,
title and interest which Cenco has in the names "Refinery
Supply Company" and "Central Scientific Company" or
similar names.

- 54 -

IN WITNESS WHEREOF, Cenco Incorporated and Central Scientific Company, Inc., have executed this Acquisition Agreement by their duly authorized officers as of the date and year first above written.

ATTEST:                         CENCO INCORPORATED

_____         By: _____
Secretary

ATTEST:                         CENTRAL SCIENTIFIC COMPANY, INC.

_____         By: _____
Secretary or
Assistant Secretary

F I L E D

SEP 1 1982 4 30P.M

CERTIFICATE OF OWNERSHIP AND MERGER
MERGING
CENCO INCORPORATED
INTO
MANOR HEALTHCARE CORP.

MA R HEALTHCARE CORP., a corporation organized and existing under the laws of the State of Delaware,

DOES HEREBY CERTIFY:

FIRST:  That this corporation was incorporated on the first day of September, 1981, pursuant to the General Corporation Law of the State of Delaware.

SECOND:  That this corporation owns at least 90% of the outstanding shares of each class of stock of CENCO INCORPORATED, a corporation incorporated on the second day of September, 1948, pursuant to the General Corporation Law of the State of Delaware.

THIRD:  That this corporation, by the following resolutions of its Board of Directors, duly adopted by the unanimous written consent of its members on August 30, 1982, filed with the minutes of the board determined to and did merge into itself said CENCO INCORPORATED.

RESOLVED, that MANOR HEALTHCARE CORP. merge, and it hereby does merge into itself said CENCO INCORPORATED, and assumes all of its obligations; and further

RESOLVED, that the merger shall be effective upon the close of business on the date of filing the Certificate of Ownership and Merger with the Secretary of State of Delaware (the "Effective Time of the Merger"); and further

RESOLVED, that the terms and conditions of the merger are as follows:

At the Effective Time of the Merger, without any action on the part of the holders thereof

(i)  All shares of Cenco Incorporated Common Stock, $1 par value, owned by MANOR HEALTHCARE CORP. shall be cancelled.

(ii)  Each remaining outstanding share of Cenco Incorporated Common Stock, $1 par value, shall be converted into the right to

-2-

receive $16.50 in principal amount of
15 1/2% Subordinated Debentures due
2002 of Manor Care, Inc. (the "Deben-
tures") to be issued under an Indenture
dated as of August 1, 1982 between Manor
Care, Inc. and The Riggs National Bank
of Washington, D.C., except that any
holder of such shares who timely shall
have filed with CENCO INCORPORATED writ-
ten objection to the Merger and shall
have properly demanded payment for such
shares as provided in Section 262 of
the General Corporation Law of the
State of Delaware shall not be entitled
to receive Debentures in exchange for
such shares unless and until the right
of such holder to receive payment for
such shares under said Section shall
cease as provided therein; and further

RESOLVED, that all shares of $3 Convertible
Preferred Stock (Initial Series) (the "Preferred
Stock") of Cenco Incorporated have been called for
redemption by the irrevocable deposit of monies suf-
ficient to redeem such Preferred Stock, and any holders
of shares of Preferred Stock who convert their shares
of Preferred Stock on or after the Effective Time of
the Merger shall be entitled to receive $100 in cash,
plus accrued dividends from June 15, 1982 to the date
of such irrevocable deposit, for each share of Preferred
Stock so converted; and further

RESOLVED, that the proper officers of this corpo-
ration be and they hereby are directed to notify each
stockholder of record of said CENCO INCORPORATED en-
titled to notice, within 10 days after the effective
date of filing of the Certificate of Ownership and
Merger, that said Certificate of Ownership and Merger
has become effective and that appraisal rights are
available for shares of Cenco Incorporated Common
Stock, $1 par value; and further

RESOLVED, that the proper officers of this corpo-
ration be and they hereby are directed to make and
execute a Certificate of Ownership and Merger setting
forth a copy of the resolutions to merge said CENCO
INCORPORATED and assume its liabilities and obliga-
tions, and the date of adoption thereof, and to cause
the same to be filed with the Secretary of State and
a certified copy recorded in the offices of the
Recorder of Deeds of New Castle and Kent Counties and
to do all acts and things whatsoever, whether within
or without the State of Delaware, which may be any-
wise necessary or proper to effect said merger; and
further

-3-

RESOLVED, that anything herein or elsewhere to the contrary notwithstanding this merger may be terminated and abandoned by the Board of Directors of MANOR HEALTHCARE CORP. at any time prior to the date of filing the merger with the Secretary of State.

IN WITNESS WHEREOF, said MANOR HEALTHCARE CORP. has caused this certificate to be executed by its duly authorized officers this /ˢᵗ day of Sc/ᵗ. 1982.

MANOR HEALTHCARE CORP.

By _____
   James H. Rempe
   Senior Vice President

ATTEST:

By _____
   Assistant Secretary

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK    )
                              )ss.:
COUNTY OF NEW YORK   )

      SUZANNE M. RATCLIFFE, being duly sworn, deposes and says: deponent is not a party to the action is over 18 years of age and resides in New York.

      On November 8, 2006, deponent served **Plaintiffs' Response To Defendant ManorCare Health Services, Inc. First Set Of Corporate Interrogatories** upon:

      All counsel on attached rider sending a true copy thereof via Federal Express to the office of the above. Deponent knew the person so served to be an employee mentioned therein.

*Suzanne Ratcliffe*
SUZANNE M. RATCLIFFE

Sworn to before me this
13th day of February 2007

*Ronni Friedberg*
Notary Public

RONNI FRIEDBERG
Notary Public, State Of New York
No. 01FR6061196
Qualified In Westchester County
Commission Expires July 16, 2007

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER
-----------------------------------------------------------------X     Index No.: 1578-05
IRMA YELIN, as Executrix of the Estate of
PHILIP H. YELIN and IRMA YELIN, Individiually


                         Plaintiff(s),


                         -against-


AMCHEM PRODUCTS INC., et al.,

                         Defendant(s).


-----------------------------------------------------------------X
                         Service List
                         *As of 1-10-07*

Judith Yavitz, Esq.
ANDERSON, KILL, OLICK & OSHINSKY
1251 Avenue of the Americas
New York, NY 10020-1000
PH: (212) 278-1000
FX: (212) 278-1733
Attorney for Defendant:
        AMCHEM PRODUCTS, INC.,
            n/k/a RHONE POULENC AG CO.,
                n/k/a BAYER CROPSCIENCE INC.
        UNION CARBIDE CORP.

Theodore Eder, Esq.
SEGAL McCAMBRIDGE SINGER & MAHONEY
830 3rd Avenue, Suite 400
New York, NY 10022
PH: (212) 651-7500
FX: (212) 651-7499
Attorney for Defendant:
        ANCHOR PACKING CO.
        GARLOCK SEALING TECHNOLOGIES LLC
            f/k/a GARLOCK, INC.

Thuy Bui, Esq.
DRINKER, BIDDLE & REATH LLP
140 Broadway, 39th Floor
New York, NY 10017
PH: (212) 812-2100
FX: (212) 980-1894
Attorney for Defendant:
        CENTRAL SCIENTIFIC CO.
        VWR INTERNATIONAL, INC.
        SARGENT-WELCH SCIENTIFIC CO.

Cynthia Weiss Antonucci, Esq.
HARRIS, BEACH LLP
805 Third Avenue, 20th Floor
New York, NY 10022
PH: (212) 687-0100
FX: (212) 687-0659
Attorney for Defendant:
      **KENTILE FLOORS, INC.**

Joseph Carlisle, Esq.
MALABY, CARLISLE & BRADLEY LLC
150 Broadway
New York, NY 10038
PH: (212) 791-0285
FX: (212) 791-0286
Attorney for Defendant:
      **J.H. FRANCE REFRACTORIES CO.**

Greg Dadika, Esq.
REED SMITH LLP
Princeton Forrestal Village
136 Main Street, SUITE 250
Princeton, NJ
PH: (609) 984-0050
FX: (609)951-0824
Attorney for Defendant:
      **MANORCARE HEALTH SERVICES, INC.,**
           **d/b/a MANOR CARE, INC.,**
           **Individually and as successor to PRECISION-COSMET COMPANY, INC.**
      **CENTRAL SCIENTIFIC COMPANY, a division of CENCO INCORPORATED**
      **CENTRAL SCIENTIFIC COMPANY, a division of CENCO INSTRUMENTS**
      **CORPORATION**

Paul A. Scrudato, Esq.
SCHIFF HARDIN & WAITE
623 Fifth Avenue, Suite 2800
New York, NY 10022
PH: (212) 753-5000
FX: (212) 753-5044
Attorney for Defendant:
      **OWENS-ILLINOIS, INC.**

Linda Yassky, Esq.
SONNENSCHEIN NATH & ROSENTHAL
1221 Avenue of the Americas
New York, NY 10020
PH: (212) 398-5297
FX: (212) 768-6800
Attorney for Defendant:
      **RAPID AMERICAN CORPORATION**

<u>LICENSE AGREEMENT</u>

THIS AGREEMENT, made and entered into by and between
CENCO INCORPORATED, a Delaware corporation, having its
principal office and place of business at 2600 South Kostner
Avenue, Chicago, Illinois 60623 (hereinafter referred to as
"CENCO"), and CENTRAL SCIENTIFIC COMPANY, INC., a Maryland
corporation, having its principal office and place of business
at 2600 South Kostner Avenue, Chicago, Illinois 60623 (herein-
after referred to as "NEW CENTRAL SCIENTIFIC"),

<u>WITNESSETH:</u>

WHEREAS, CENCO has utilized the mark "CENCO" in its
trade name and as a trademark for its products and has
developed a certain good will symbolized thereby; and

WHEREAS, CENTRAL SCIENTIFIC COMPANY has heretofore
been operated as a division of CENCO and has utilized the mark
"CENCO" on many of the products sold by it in its capacity as
a division; and

WHEREAS, the assets of the CENTRAL SCIENTIFIC COMPANY
division have been transferred by CENCO to a new corporate
entity known as NEW CENTRAL SCIENTIFIC; and

WHEREAS, NEW CENTRAL SCIENTIFIC is desirous of obtain-
ing a worldwide license from CENCO to continue using the mark
"CENCO" on the products on which such mark has been utilized
in the past; and

WHEREAS, CENCO is willing to grant a license to
NEW CENTRAL SCIENTIFIC to use the mark "CENCO" in accordance
with the terms and provisions hereof;

NOW, THEREFORE, in consideration of Ten Dollars ($10.00), and other good and valuable considerations, receipt of which is hereby acknowledged by CENCO, and the mutual convenants herein contained, and as further contained in the agreement for the acquisition of the assets of the CENTRAL SCIENTIFIC COMPANY division between CENCO and NEW CENTRAL SCIENTIFIC, the parties hereto agree as follows:

1. CENCO hereby grants to NEW CENTRAL SCIENTIFIC a worldwide, non-exclusive license to use the mark "CENCO" on the products on which "CENCO" was utilized by CENTRAL SCIENTIFIC COMPANY while still a division of CENCO.

2. NEW CENTRAL SCIENTIFIC shall:

(a) use the mark "CENCO" only on or in connection with goods or services that have a quality equal or superior to the standards hereinbefore or hereinafter established by CENCO;

(b) comply with any quality standards established by CENCO for any goods or services on which the mark "CENCO" is utilized;

(c) refrain from taking any action that might reflect unfavorably upon CENCO or that might harm or diminish in any respect the image or reputation of CENCO or of the good will symbolized by the mark "CENCO";

(d) refrain from using the mark "CENCO" in any fashion that fails to comply with all applicable state or federal laws;

- 2 -

MHS - 0547

(e) deliver to CENCO, upon request, samples or specimens of goods upon which the mark "CENCO" is being utilized or complete descriptions of the services with which the mark "CENCO" is being associated;

(f) provide CENCO, upon request, with evidence that the quality standards established by CENCO are being met; and

(g) permit CENCO, upon reasonable request during normal business hours, to inspect the premises and examine all books, records, goods, procedures and any and all other aspect of the business of NEW CENTRAL SCIENTIFIC to verify that the quality standards established by CENCO are being met for any goods or services on which the mark "CENCO" is being utilized.

3. This License Agreement shall remain in effect for a period of five (5) years, after which NEW CENTRAL SCIENTIFIC shall discontinue all use of the mark "CENCO".

4. Upon termination of the license granted herein, NEW CENTRAL SCIENTIFIC shall immediately cease any usage of the mark "CENCO" and shall not contest or in any way impair CENCO's title to and enjoyment of the mark "CENCO". Not withstanding the foregoing, after such five-year period, NEW CENTRAL SCIENTIFIC may continue to sell its stock of products manufactured during such five-year period which bear the mark

MHS - 0548

"CENCO" until such supply is exhausted.

5. NEW CENTRAL SCIENTIFIC shall affix any and all statutory trademark notices at any and all places required or permitted by law.

6. The language used in this License Agreement shall be deemed to be language chosen by both parties hereto to express their mutual intent, and no rule of strict construction against either party shall apply to the license granted herein or to any term or provision of this License Agreement.

7. This License Agreement shall be deemed to be made and entered into pursuant to the laws of the United States of America and the laws of the State of Illinois. In the event of any dispute hereunder, this License Agreement shall be governed by and shall be construed in accordance with the laws of the State of Illinois.

8. The waiver by either of the parties hereto of any breach of any provision hereof shall not be construed to be a waiver of any succeeding breach of any such provision or a waiver of the provision itself.

9. This License Agreement and all of the obligations hereunder shall inure to the benefit of and shall be binding upon subsidiaries, affiliates, successors or assigns of the parties hereto; provided, however, that NEW CENTRAL SCIENTIFIC shall not transfer or assign this Agreement or any part hereof or any of its rights and obligations hereunder without the express prior written consent of CENCO.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be properly executed and delivered as of the

- 4 -

respective dates indicated below.

CENCO INCORPORATED

By: _____

Title: Vice President

ATTEST: _____    Date: 8-27-76

CENTRAL SCIENTIFIC COMPANY, INC.

By: _____

Title: President

ATTEST: _____    Date: 8/27/76

- 5 -

MHS - 0550

*State of Delaware*

## *Office of the Secretary of State*

PAGE  1

---

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF

DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT

COPY OF THE CERTIFICATE OF AMENDMENT OF "MANOR HEALTHCARE

CORP.", CHANGING ITS NAME FROM "MANOR HEALTHCARE CORP." TO

"MANORCARE HEALTH SERVICES, INC.", FILED IN THIS OFFICE ON THE

SIXTEENTH DAY OF JANUARY, A.D. 1997, AT 9 O'CLOCK A.M.

*Harriet Smith Windsor*
*Harriet Smith Windsor, Secretary of State*

0690117  8100

010166842

AUTHENTICATION: 1065090

DATE: 04-05-01

MHS 015

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 09:00 AM 01/16/1997
971016149 - 0690117

# CERTIFICATE OF AMENDMENT
## OF THE
## CERTIFICATE OF INCORPORATION
### OF
### MANOR HEALTHCARE CORP.

**Manor Healthcare Corp.**, a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware (the Corporation), does hereby certify the following:

FIRST:    That at a meeting of the Board of Directors of the Corporation, resolutions were duly adopted that setting forth a proposed amendment to the Certificate of Incorporation of the Corporation, declaring said amendment to be advisable.  The resolution setting forth the proposed amendment is as follows:

RESOLVED, that ARTICLE FIRST of the Certificate of Incorporation shall be amended, effective as of April 1, 1997, to read as follows:

"FIRST: The name of the Corporation is:

**ManorCare Health Services, Inc.**"

SECOND:    In accordance with Section 228 of the General Corporation Law of the State of Delaware, a consent in writing, approving the foregoing amendment, was signed by the sole stockholder of the Corporation.  Such consent is filed with the records of the Corporation.

THIRD:    The foregoing amendment has been duly adopted in accordance with Section 242 and 228 of the General Corporation Law of the State of Delaware.

FOURTH:    In accordance with Section 103 of the General Corporation Law of the State of Delaware, the foregoing amendment shall become effective on April 1, 1997.

IN WITNESS WHEREOF, Manor Healthcare Corp. has caused this Certificate of Amendment to be signed in its name and on its behalf by its Senior Vice-President and attested by its Assistant Secretary, in accordance with Section 103(a)(2) of the General Corporation Law of the State of Delaware and its Senior Vice-President acknowledges, under penalties of perjury,

that the matters and facts set forth above are true in all material respects to the best of his knowledge, information and belief.

Dated: January 13, 1997                MANOR HEALTHCARE CORP.

Attest:

[Corporate Seal]


_K. Peter Kemezys_
K. Peter Kemezys,
Assistant Secretary

_James H. Rempe_
James H. Rempe, Senior Vice
President

- 2 -

MHS 017