SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------x
In Re: NEW YORK CITY ASBESTOS LITIGATION  : Hon. Joan Madden
: (Part 11)
------------------------------------------------------------x
This Document Relates To:  : Index No. 114120-06

CHRISTIAN HOLINKA,

    Plaintiff

  -against-

A.W. CHESTERTON COMPANY, et al.,

    Defendants.
------------------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF THE LABORATORY SUPPLY DEFENDANTS' JOINT MOTION *IN LIMINE* TO PRECLUDE EVIDENCE REGARDING THE PRESENCE OF DEFENDANTS' CATALOGS IN THE LABORATORIES IN WHICH PLAINTIFF WORKED OR STUDIED BECAUSE THERE IS NO EVIDENCE THAT ANY OF THE PRODUCTS AT ISSUE WERE ORDERED FROM THOSE CATALOGS**

Defendants Baxter Healthcare Corporation (alleged to be a successor in interest to American Hospital Supply Corp. and American Scientific Products) ("Baxter"), ManorCare Health Services, Inc. (alleged to be a successor in interest to Central Scientific Company, a division of Cenco, Inc.) ("ManorCare"), Fisher Scientific International Inc. ("Fisher"), VWR International, Inc. ("VWR") and Univar USA Inc. ("Univar") (collectively, "Defendants") respectfully submit this memorandum of law in support of their joint motion *in limine* to preclude Plaintiff Christian Holinka ("Plaintiff") from offering testimony or evidence that Defendants' catalogs were present in any of the laboratories in which Plaintiff worked or studied during his career because there is no evidence in the record that the products at issue – Bunsen burner pads and heat-resistant mittens – were ever ordered from any of those catalogs.

## **PRELIMINARY STATEMENT & RELEVANT FACTS**

In this products liability case, plaintiff Christian Holinka ("Plaintiff") alleges that Defendants[1] (or their alleged respective predecessors) supplied Bunsen burner pads and heat-resistant mittens to various laboratories in which Plaintiff studied, researched, and/or worked over a thirty year period. Plaintiff claims that his exposure to asbestos fibers contained within those two products caused him to develop mesothelioma.

However, Plaintiff has failed entirely to identify which of the Defendants, if any, supplied the pads or mittens to any of the laboratories in which he worked or studied. Indeed, Plaintiff's lone product identification evidence consists of his testimony that Defendants were the "standard suppliers" of laboratory products during the relevant time periods because he purportedly saw some of the Defendants' catalogs in one or more of the labs. (*See* Affirmation of Greg A. Dadika, Esq. ("Dadika Aff."), Exh. A, Excerpts from Transcript Volume II of Deposition of Christian Holinka ("2T"), 2T98:13-23). Plaintiff candidly admits, however, that he did not order the products at issue -- Bunsen burner pads and heat-resistant mittens -- from those catalogs. (*See id.*, 2T158:25 to 159:16).

In addition, Plaintiff acknowledged that other companies' catalogs were also present at the same time -- indeed, approximately *twenty* other companies -- and that he does not know whether those other companies sold pads or mittens to the laboratory in which he worked. (*See id.*, 2T161:10 to 162:8). Most importantly, Plaintiff admits he does not know whether the laboratories in which he worked and studied purchased pads and mittens from Defendants or

---

[1] However, Univar USA Inc. contends that it is not a successor to the lab supply business of Van Waters & Rogers.

from any of the other companies whose catalogs were present. (*See id.*, 2T163:6-13; 174:16 to 177:5).

## LEGAL ARGUMENT

I. **THIS COURT SHOULD PRECLUDE PLAINTIFF FROM INTRODUCING EVIDENCE OF THE PRESENCE OF DEFENDANTS' CATALOGS IN THE LABORATORIES IN WHICH PLAINTIFF WORKED AND/OR STUDIED BECAUSE SUCH EVIDENCE HAS ABSOLUTELY NO PROBATIVE VALUE AND IS HIGHLY PREJUDICIAL**

When the probative value of evidence is slight and its illegitimate emotional appeal on the jury is great, the evidence should be excluded. *See* Richard T. Farrell, Prince, Richardson on Evidence § 4-206, at p. 145 (11th ed. 1995) (citing *People v. Singer*, 300 N.Y. 120, 89 N.E.2d 710 (1949); *Allen v. Stokes*, 260 A.D. 600, 23 N.Y.S.2d 443 (1st Dept. 1940)); *see also Minichiello v. Supper Club*, 296 A.D.2d 350, 352, 745 N.Y.S.2d 24, 25 (1st Dept. 2002); *Stevens v. Amar Atwal, M.D.*, 30 A.D.3d 993, 994, 817 N.Y.S.2d 469, 471 (4th Dept.); *U.W. Marx, Inc. v. Bonded Concrete, Inc.*, 7 A.D.3d 856, 859, 776 N.Y.S.2d 617, 620 (3d Dept. 2004).

In addition, New York courts have acknowledged that the mere presence of a product at a plaintiff's worksite, without more, is insufficient to establish that the plaintiff used that product. *See Cawein v. Flintkote Company*, 203 A.D.2d 105, 106 (1st Dep't 1994) (reversing denial of summary judgment and holding that the mere presence of an unopened bag of defendant's asbestos fiber at plaintiff's worksite was insufficient to prove that plaintiff was exposed to defendant's product).

Here, Plaintiff has not – because he can not – testified that he used *any* specific product supplied by *any* specific Defendant. Instead, Plaintiff has only testified that he used unidentified Bunsen burner pads and mittens, and that Defendants' catalogs were present at one or more of the laboratory sites in which he worked or studied. Applying the logic of *Cawein*, it follows that

if the actual *presence* of an asbestos containing product at plaintiff's worksite – but no evidence of exposure to or use of the products at issue by plaintiff – cannot carry plaintiff's burden of proof, then certainly the mere presence of Defendants' *catalogs* in certain of the laboratories in which Plaintiff worked and/or studied (which were only a few among many other catalogs), and with no evidence that any asbestos-containing products specifically from Defendants were present, cannot sustain Plaintiff's burden of proof here either.

Accordingly, allowing testimony of evidence of the presence of Defendants' catalogs at the laboratories in which Plaintiff worked has no probative value as to whether or not Plaintiff *actually used* a pad or mitten supplied by any one of the Defendants. Indeed, Plaintiff should be barred from presenting such evidence at trial because such testimony would only serve to create illegitimate emotional appeal to the finder of fact. Therefore, given that such testimony has absolutely no legal significance, and it will only act to prejudice Defendants, this Court should preclude the same.

## CONCLUSION

Based upon the foregoing case law and legal analysis, this Court should grant Defendants' motion *in limine* and preclude Plaintiff Holinka from presenting evidence or testimony of the presence of Defendants' catalogs at his laboratory worksites because such testimony (i) has no legal significance of proving whether or not Plaintiff actually used or was exposed to any of the Defendants' products and (ii) will only prejudice the Defendants' ability to obtain a fair trial.

*Dated*: August 22, 2007
New York, New York

Respectfully submitted,

| | |
|---|---|
| **DRINKER BIDDLE & REATH LLP**<br>140 Broadway, 39th Floor<br>New York, New York 10005<br>(212) 284-3140<br>Attorneys for Defendant<br>Baxter Healthcare Corporation<br><br>By: _____<br>Daniel B. Carroll | **REED SMITH LLP**<br>Princeton Forrestal Village<br>136 Main Street, Suite 250<br>Princeton, New Jersey 0850<br>(609) 987-0050<br>Attorneys for Defendant<br>ManorCare Health Services, Inc.<br><br>By: _____<br>Greg A. Dadika |
| **HOAGLAND, LONGO, MORAN, DUNST & DOUKAS, LLP**<br>40 Paterson Street<br>New Brunswick, New Jersey 08901<br>(732) 545-4717<br>Attorneys for Defendant<br>Fisher Scientific International Inc.<br><br>By: _____<br>Kristy Kulina Byons | **MARKS, O'NEILL, O'BRIEN & COURTNEY, P.C.**<br>530 Saw Mill River Road<br>Elmsford, NY 10523<br>Attorneys for Defendant<br>VWR International, Inc. and Univar USA Inc.<br><br>By: _____<br>Carol M. Tempesta, Esq. |

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------x
In Re: NEW YORK CITY ASBESTOS LITIGATION          :   Hon. Joan Madden
                                                  :   (Part 11)
------------------------------------------------------------x
CHRISTIAN HOLINKA,                                :   Index No. 114120-06
                                                  :
     Plaintiff                                    :
                                                  :   **AFFIRMATION OF GREG A.**
                                                  :   **DADIKA, ESQ. IN SUPPORT OF**
     -against-                                    :   **LABORATORY SUPPLY**
                                                  :   **DEFENDANTS' *IN LIMINE* MOTION**
A.W. CHESTERTON COMPANY, et al.,                  :   **TO PRECLUDE EVIDENCE**
                                                  :   **REGARDING THE PRESENCE OF**
     Defendants.                                  :   **DEFENDANTS' CATALOGS IN THE**
                                                  :   **LABORATORIES IN WHICH**
                                                  :   **PLAINTIFF WORKED OR STUDIED**
------------------------------------------------------------x

I, GREG A. DADIKA, being duly admitted to the bar of the State of New York and licensed to practice law before the Courts of this State, declare, under penalty of perjury, the following in support of the joint motion *in limine* to preclude Plaintiff Christian Holinka ("Plaintiff") from offering testimony or evidence that the Laboratory Supply Defendants' catalogs were present in any of the laboratories in which Plaintiff worked or studied during his career, which has been filed by and on behalf of Defendants Baxter Healthcare Corporation (alleged to be a successor in interest to American Hospital Supply Corp. and American Scientific Products) ("Baxter"), ManorCare Health Services, Inc. (alleged to be a successor in interest to Central Scientific Company, a division of Cenco, Inc.) ("ManorCare"), Fisher Scientific International Inc. ("Fisher"), VWR International, Inc. ("VWR") and Univar USA Inc. ("Univar") (collectively, the "Laboratory Supply Defendants"):

1. Attached hereto as **Exhibit A** is a true and correct copy of excerpts from Transcript Volume II of the Deposition of Christian Holinka dated February 22, 2007.

2. The relief requested herein has not previously been sought, and is not frivolous.

WHEREFORE, the Laboratory Supply Defendants respectfully request that the relief requested in their instant application be granted in its entirety.

Dated: August 21, 2007

_____
Greg A. Dadika
**REED SMITH LLP**
Princeton Forrestal Village
136 Main Street, Suite 250
Princeton, New Jersey 0850
(609) 987-0050
Attorneys for Defendant
ManorCare Health Services, Inc.

- 2 -

Exhibit A

**Page 1**

```
                              57
SUPREME COURT
ALL COUNTIES WITHIN THE STATE OF NEW YORK

IN RE:  NEW YORK CITY ASBESTOS LITIGATION


            DEPOSITION UNDER ORAL
              EXAMINATION OF
               CHRISTIAN HOLINKA
                (VOLUME II)



This Document Applies To:
CHRISTIAN HOLINKA
INDEX NO.: 114120-06




      PRIORITY ONE COURT REPORTING SERVICES, INC.
                  899 Manor Road
              Staten Island, New York  10314
                   (718) 983-1234
```

**Page 2**

```
                              58
   Transcript of the deposition of the Plaintiff,
called for Oral Examination in the above-captioned
matter, said deposition being taken pursuant to
Federal Rules of Civil Procedure by and before
CHERYL F. BAREN, a Notary Public and Shorthand
Reporter, at the Offices of Weitz & Luxenberg, 120
Wall Street, New York, New York, on Thursday, February
22, 2007, commencing at approximately 10:30 in the
forenoon.
```

**Page 3**

```
                              59
APPEARANCES:

   WEITZ & LUXENBERG, P.C.
      Attorneys for Plaintiff
      180 Maiden Lane, 17th Floor
      New York, New York  10038
   BY:  BENJAMIN DARCHE, ESQ.

   DRINKER, BIDDLE & REATH, LLP
      Attorneys for Defendants VWR International,
      Inc. and Univar USA, Inc.
      One Logan Square
      18th and Cherry Streets
      Philadelphia, Pennsylvania  19103-6996
   BY:  DAVID F. ABERNETHY, ESQ.

   REED SMITH, LLP
      Attorneys for Defendant Manor Health Care
      Princeton Forrestal Village
      136 Main Street, Suite 250
      P.O. Box 7839
      Princeton, New Jersey  08543-7839
   BY:  GREG A. DADIKA, ESQ.

   PEHLIVANIAN, BRAATEN & PASCARELLA, LLC.
      Attorneys for Defendant Ingersoll Rand Co.
      2430 Route 34
      Manasquan, New Jersey  08736
   BY:  SYLVIA K. LEE, ESQ.

   DARGER & ERRANTE, LLP
      Attorneys for Defendant Lennox Industries
      116 East 27th Street, 12th Floor
      New York, New York  10016
   BY:  CRAIG GLANTZ, ESQ.
```

**Page 4**

```
                              60
   DRINKER, BIDDLE & REATH, LLP
      Attorneys for Defendant Baxter Health Care
      500 Campus Drive
      Florham Park, New Jersey  07932-1047
   BY:  TIMOTHY J. FRASER, ESQ.

   HOAGLAND, LONGO, MORAN, DUNST & DOUKAS, LLP
      Attorneys for Defendant Fisher Scientific
      40 Paterson Street
      P.O. Box 480
      New Brunswick, New Jersey  08903
   BY:  KRISTY KULINA LYONS, ESQ.


   McGIVNEY & KLUGER, P.C.
      Attorneys for Defendant Beckman Coulter
      80 Broad Street, 23rd Floor
      New York, New York  10004
   BY:  LAURA HOLLMAN, ESQ.


   WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, LLP
      Attorneys for Defendant A.W. Chesterton
      150 East 42nd Street
      New York, New York  10017
   BY:  TODD DESIMONE, ESQ.


   MALABY, CARLISLE & BRADLEY, LLC
      Attorneys for Defendants Adience, CBS,
      and Kewannee Scientific
      150 Broadway
      New York, New York  10038
   BY:  DAVID P. SCHAFFER, ESQ.
        KOO LEE, ESQ.
```

**Page 97**

```
                Christian Holinka        153
 2  printing or anything on them that would identify their
 3  manufacturer?
 4      A    They did not.
 5      Q    Or their supplier.
 6      A    They did not.
 7      Q    As an instructor did you have the
 8  responsibility for ordering any pads that were used at
 9  Mount Sinai?
10      A    No.
11      Q    If you needed to pick up a replacement pad
12  at Mount Sinai, where would you go?
13      A    There was a central room for supplies for
14  the laboratory.
15      Q    Was that also located on the 20th floor?
16      A    Yes. It was really a large set of cabinets
17  in one of the laboratories.
18      Q    Was it located in one of the three rooms
19  that you were in as an instructor?
20      A    In one, yes.
21      Q    If I asked you which one could you tell me?
22      A    I believe a storage unit.
23      Q    Do you know which particular room it was in
24  or you believe it was in one of them?
25      A    I think it was in one.
```

**Page 98**

```
                Christian Holinka        154
 2      Q    When you would go to this storage area, did
 3  you see how the pads were kept in it?
 4      A    I saw it but I don't remember whether they
 5  were stacked or next to each other.
 6      Q    And do you recall if there was any
 7  packaging associated with any of these new pads that
 8  you would take?
 9      A    I don't remember.
10      Q    Do you know the brand, trade or
11  manufacturer's name of any of those pads?
12      A    I do not know a specific brand.
13      Q    Do you know who supplied those pads to
14  Mount Sinai during those years that you were an
15  instructor?
16      A    Well, we had basically four suppliers,
17  Fisher Scientific, Van Waters and Rogers, American
18  Scientific, Senco. They were big catalogs, they
19  looked like a book with in the back their names. And
20  there were other companies also that I don't recall
21  who supplied highly specific parts, supplies but those
22  were the main companies and we may even have had a
23  standing account with one, two or three of them.
24      Q    When you say "we," are you talking about
25  Mount Sinai itself or your particular department where
```

**Page 99**

```
                Christian Holinka        155
 2  you worked?
 3      A    In my department, my laboratory.
 4      Q    If there was such a standing type of
 5  relationship within your department, who within your
 6  department would have been the contact to deal with
 7  with respect to that?
 8      A    The main person, Dr. Gurpide.
 9      Q    Doctor who?
10      A    Erlio; E-R-L-I-O, G-U-R-P-I-D-E.
11      Q    And is Dr. Gurpide still alive?
12      A    Yes.
13      Q    Is he still at Mount Sinai?
14      A    No.
15      Q    Do you know where he lives?
16      A    I don't. He's in a retirement home
17  somewhere in the midwest.
18      Q    When would have been the last time you had
19  occasion to have any contact with him?
20      A    About ten years ago, eight years ago
21  probably.
22      Q    How often would you use the mittens as an
23  instructor at Mount Sinai?
24      A    Regularly.
25      Q    Can you define that?
```

**Page 100**

```
                Christian Holinka        156
 2      A    Once a day, whenever there was something
 3  hot to touch, once a day, once every two days, twice a
 4  day.
 5      Q    Did the physical appearance of these
 6  mittens to you seem the same as those as you had
 7  encountered earlier in your career?
 8      A    Yes.
 9      Q    Was there anything different about what
10  those mittens looked like as compared to the earlier
11  ones?
12      A    Not to my recollection, no.
13      Q    Besides those mittens did you use any other
14  types of gloves or mittens during your time as an
15  instructor?
16      A    No.
17      Q    Do you know the brand, trade or
18  manufacturer's name of any of those mittens that you
19  used while you were an instructor?
20      A    No.
21      Q    Do you know specifically who supplied any
22  of those mittens that you used as an instructor?
23      A    Specific suppliers I don't know.
24      Q    And you have mentioned four companies that
25  you believe generally provided supplies --
```

25 (Pages 97 to 100)

Page 157

1        Christian Holinka        213
2  Mount Sinai, the time that you worked in the lab as an
3  instructor or assistant professor. Tell me again all
4  the companies that you recall that you described as
5  standard suppliers at Mount Sinai?
6      A    I recall the major companies, Fisher
7  Scientific, Van Waters and Rogers, American
8  Scientific, Senco. And others were for specific
9  things like hormones or specific research areas.
10     Q    And when you referred to these four
11 companies that you just listed as major suppliers,
12 what is the basis for that, did you know, did you have
13 actual knowledge that they sold products that were
14 used in the lab at Mount Sinai?
15          (All defendants object to the form)
16          THE WITNESS: Can I answer?
17          MR. DARCHE: You can answer.
18     A    Yes, I did.
19     Q    And how did you know that they sold
20 products to --
21     A    Well -- sorry.
22          MR. DARCHE: Let him finish.
23     Q    How did you know that those companies sold
24 products that were used in the lab at Mount Sinai?
25     A    First, we had large catalogs of those

Page 158

1        Christian Holinka        214
2  companies. They're really catalogs, that's an
3  understatement, they're like books, 600, 800 pages,
4  whatever, with the names of those companies in the
5  back of the books clearly visible.
6          Secondly, for my specific research I
7  actually ordered, may have ordered things from those
8  companies. If you needed a small or a minor flask or
9  something specifically related to your own research.
10     Q    You started by saying "ordered" and then
11 you said "may have ordered," which is it? Do you have
12 an actual recollection of specific companies that you
13 ordered from for your research at Mount Sinai?
14     A    I did order from certainly any one or
15 several of those companies, I could not tell you at
16 this time which one and what I ordered.
17     Q    And you said for your specific research.
18 When you ordered for your specific research, were you
19 ordering general lab supplies or unusual things that
20 were just needed for your work?
21          MR. DARCHE: I am going to just object to
22     the terminology of "unusual."
23          MR. ABERNETHY: Let me rephrase the
24     question.
25     Q    When you yourself went to -- would you ask

Page 159

1        Christian Holinka        215
2  someone to order for you or would you actually do the
3  ordering yourself?
4      A    I would ask somebody to include it in
5  another order unless it was very urgent. And as I
6  said that we may, may even have had a special ordering
7  venue with one or several companies.
8      Q    When you asked someone at Mount Sinai to
9  order something specifically for your research, who
10 was the person that you asked?
11     A    My technician or the head of the
12 laboratory.
13     Q    Did you ever specifically ask for Bunsen
14 burner pads or mittens to be ordered specifically for
15 your research?
16     A    No, I did not.
17     Q    So, those were the general supplies that
18 were ordinarily ordered?
19     A    That is correct. Standard laboratory
20 equipment.
21     Q    And who was the person who ordered those
22 general kinds of supplies at Mount Sinai?
23     A    At my laboratory I could not tell you. We
24 may have gotten it from the central supply room.
25     Q    So, whoever the actual employee was at

Page 160

1        Christian Holinka        216
2  Mount Sinai who got those things from the companies,
3  you do not know the person's name?
4      A    My technician may have gotten some but I do
5  not recall the details.
6      Q    Can you tell me from your own knowledge
7  which, if any, of those major suppliers sold Bunsen
8  burner pads to Mount Sinai, which specific companies?
9      A    I would not know a specific company.
10     Q    Can you tell me which specific companies
11 among those four, if any, sold mittens to Mount Sinai?
12          (All defendants object)
13     A    No, I could not.
14     Q    Did you ever talk to any of the people who
15 ordered supplies at Mount Sinai about which specific
16 companies they ordered specific items from?
17     A    No, I didn't.
18     Q    Did you ever see any documents at Mount
19 Sinai that indicated what company's particular items
20 had been ordered from?
21     A    To the best of my knowledge, yes, ordering
22 forms that specified VWR, Fisher Scientific.
23     Q    Let me ask you about that. When you say
24 ordering forms, do you mean the blank forms that were
25 used to place an order or a form that had already been

Holinka v. Asbestos                                        Christian Holinka
February 22, 2007                                                         II

**Page 161**

Christian Holinka    217

1  filled out with a specific order?
2  A  Very likely both, filled out forms and
3  blank forms. And I do not even recall the type of the
4  form.
5  Q  Do you recall any of the specific contents
6  of any filled out forms that listed specific items
7  that were being ordered?
8  A  No, I don't.
9  Q  Where were the catalogs at Mount Sinai?
10 A  At the laboratory, shelves.
11 Q  How many catalogs were there?
12 A  Twenty, twenty-five.
13 Q  Did each catalog cover a different company?
14 A  Yes.
15 Q  Do you remember the names of any of the
16 other companies?
17 A  No, I don't.
18 Q  Did any of the other companies other than
19 the four that you listed sell Bunsen burner pads?
20    MR. DARCHE: If you know.
21 Q  Well, they are all if you know. Let me
22 repeat what has already been said: I only want to
23 know what you know, I do not want you to guess.
24 A  I don't know.

**Page 162**

Christian Holinka    218

1  Q  You do not know whether any of the others
2  did or didn't.
3  A  That's correct, I don't know.
4  Q  Do you know whether any of the companies
5  other than those four that you just named sold
6  asbestos mittens?
7  A  I don't know.
8  Q  Who else used the catalogs or --
9     MR. ABERNETHY: Let me withdraw that.
10 Q  Who else looked at the catalogs besides
11 you, if you know?
12 A  In terms of names or people that worked at
13 the lab?
14 Q  Either. Whatever information --
15 A  Pretty much graduate students and post
16 docs, post doctoral students.
17 Q  Did the graduate students or post doctorate
18 students order from the catalogs?
19 A  Very likely, yes. That was the source of
20 information.
21 Q  While you were at Mount Sinai, did you ever
22 see any of the original packaging or crates or cartons
23 that any Bunsen burner pads came in?
24 A  No, I did not.

**Page 163**

Christian Holinka    219

1  Q  While you were at Mount Sinai, did you ever
2  see any of the original packaging or cartons or crates
3  that asbestos mittens came in?
4  A  To the best of my recollection, I did not.
5  Q  Do you know whether or not Mount Sinai
6  bought asbestos Bunsen burner pads from any companies
7  other than the four that you specifically recall the
8  names of?
9  A  I do not know.
10 Q  Do you know if they bought mittens from any
11 other companies?
12 A  I do not know.
13 Q  Let me touch on a question that you were
14 asked with respect to certain places but I want to
15 make sure that we covered it for all.
16    During any of the time periods that you
17 worked with Bunsen burner pads, were there any pads
18 sold by any specific company that looked unique or
19 different from the pads sold by other companies?
20    MR. DARCHE: I am just going to object to
21    the form and the basis is it is too broad. Is
22    there a specific, is there a specific, you know,
23    thing that you are -- it would be different if
24    you are talking about the size, the width, the

**Page 164**

Christian Holinka    220

1  color, it could be a million things.
2     MR. ABERNETHY: Let me try it a different
3     way and we will break it down so that we are not
4     too broad, we will take it place by place.
5  Q  While you worked with or handled Bunsen
6  burner pads at Mount Sinai, if you went into the lab
7  on a particular day and picked up a particular pad,
8  would there be anything about the appearance of that
9  pad that would enable you to identify who specifically
10 made or sold it?
11 A  Not about the appearance but in retrospect
12 it is likely that they were different sizes.
13 Q  You used that term before "it is likely," I
14 want to probe that a little bit more.
15 A  Or it -- okay.
16 Q  Let me ask you a specific question: Do you
17 specifically recall as you sit here today handling
18 different sizes of Bunsen burner pads?
19 A  No, I don't.
20 Q  Is there anything that you can recall about
21 any specific Bunsen burner pad that you handled at
22 Mount Sinai that enabled you to identify it as coming
23 from a particular maker or supplier?
24 A  No.

41 (Pages 161 to 164)

Holinka v. Asbestos
February 22, 2007

Christian Holinka
II

Page 173

Christian Holinka    229

2  MR. DARCHE: You can answer if you can.
3  A    Okay, I don't recall exactly whether I said
4  I didn't see it. Wasn't the question more whether the
5  outside and the inside were similar?
6  Q    Did you ever see the material that was
7  underneath the external surface of the asbestos
8  mittens that you worked with?
9  A    I did not.
10     MR. DARCHE: Off the record.
11     (Discussion held off the record)
12  Q    Do you recall any of the specific companies
13  that sold Bunsen burner pads to the lab that you
14  worked in at Columbia Presbyterian?
15  A    No, I don't.
16  Q    Do you recall any of the specific companies
17  that sold Bunsen burner pads to the lab that you
18  worked in at SUNY Stony Brook?
19  A    No, I don't.
20  Q    Do you recall any of the specific companies
21  that sold Bunsen burner pads to the lab where you did
22  your chemistry lab at Hunter College?
23  A    No.
24  Q    Do you recall any of the specific companies
25  that sold Bunsen burner pads to the laboratory where

Page 174

Christian Holinka    230

2  you did your academic work at the University of
3  California at Berkeley?
4  A    No, I don't. But with there again, it was
5  a large research unit and they used standard
6  suppliers.
7  Q    And tell me again who the standard
8  suppliers were that you recall that were used in the
9  large research lab at UC Berkeley.
10  A    Fisher Scientific, Van Waters and Rogers,
11  American Scientific, Senco.
12  Q    But as you sit here today, can you tell me
13  which specific companies, if any, in that group sold
14  Bunsen burner pads for that lab?
15  A    I could not.
16  Q    Do you know whether any other companies
17  sold Bunsen burner pads to that lab?
18  A    I do not know.
19  Q    Do you know whether any other companies
20  sold Bunsen burner pads to the lab at Hunter College?
21  A    No, I don't know.
22  Q    Do you know if any other companies sold
23  Bunsen burner pads to the lab at SUNY Stony Brook?
24  A    No, I don't know.
25  Q    Do you know if any other companies sold

Page 175

Christian Holinka    231

2  Bunsen burner pads to the lab at Columbia Presbyterian?
3  A    No, I don't.
4  Q    As you sit here today can you tell me what
5  specific companies sold Bunsen burner pads to the lab
6  at Booth Hospital?
7  A    No, I don't know.
8  Q    Do you know if any companies other than the
9  ones that you mentioned earlier as standard suppliers
10  sold Bunsen burner pads to the lab at Booth Hospital?
11  A    No, I don't know.
12  Q    Let me ask you the same couple of questions
13  about mittens: As you sit here now can you identify
14  any specific company that sold Bunsen burner pads used
15  in the lab at Booth Hospital?
16  A    No, I cannot identify a specific company.
17     MR. DARCHE: Off the record.
18     (Discussion held off the record)
19  Q    Again, the question is, can you identify a
20  specific company that sold mittens to the lab at Booth
21  Hospital?
22  A    No, I cannot.
23  Q    And do you know whether any company other
24  than the standard suppliers sold mittens to Booth
25  Hospital?

Page 176

Christian Holinka    232

2  A    I do not know.
3  Q    Can you identify any specific company that
4  sold mittens to any of the labs that you did work in
5  at Cal Berkeley?
6  A    No, I cannot.
7  Q    Do you know whether anybody other than
8  standard suppliers as you described them sold mittens
9  to the lab at UCal Berkeley?
10  A    No, I do not know.
11  Q    Do you know who specifically sold mittens
12  to the lab at Hunter College?
13  A    No, I don't.
14  Q    Do you know whether any companies other
15  than those you recall as the standard suppliers sold
16  at Hunter College mittens?
17  A    No, I don't.
18  Q    Can you identify the specific company that
19  sold mittens to the lab at SUNY Stony Brook?
20  A    No, I don't.
21  Q    Do you know whether any other than the
22  standard suppliers did?
23  A    I don't.
24  Q    Do you know who sold, the specific company
25  who sold mittens to the lab at Columbia Presbyterian?

44 (Pages 173 to 176)

**Page 177**

```
 1            Christian Holinka      233
 2      A    No, I don't.
 3      Q    Do you know if any companies other than
 4   those you described as the standard suppliers did?
 5      A    No, I don't.
 6      Q    Without going through every location let me
 7   just ask you this: Do you recall as you sit here
 8   today ever discussing with any of the people who were
 9   responsible for ordering supplies at any of these labs
10   the specific sources they used to get Bunsen burner
11   pads?
12      A    No, I do not recall.
13      Q    Do you recall ever talking with any of
14   those people about the specific sources they used to
15   get asbestos mittens?
16      A    No, I do not recall.
17      Q    Do you have or do you know the location of
18   any documents that might indicate what specific
19   companies sold to any of the labs where you worked?
20      A    No, I don't.
21      Q    Do you recall answering written questions
22   called interrogatories in connection with this
23   lawsuit?
24           MR. DARCHE: Answer the question to the
25      best of your ability, if you can.
```

**Page 178**

```
 1            Christian Holinka      234
 2      A    I filled out some questionnaires related to
 3   Mr. Darche's questions.
 4      Q    Is it your understanding that your lawyers
 5   served on the other parties to this case written
 6   answers to specific questions including questions
 7   about your asbestos exposures, do you have an
 8   understanding about that?
 9      A    No, I don't have any direct understanding.
10      Q    I will represent to you that it is my
11   understanding that answers to written interrogatories
12   were served on your behalf in this litigation and one
13   of the answers to the written interrogatories makes
14   reference to potential exposure to asbestos in
15   connection with a product called an autoclave. Do you
16   recall answering any question indicating that you were
17   exposed to asbestos from a product called an
18   autoclave?
19           MR. DARCHE: Objection. The
20      interrogatories that you are referring to were
21      not verified by this witness, so it is my
22      position that you are not really confronting him
23      with something that he has verified.
24           MR. ABERNETHY: Well, forget the
25      verification, let me just ask a simpler question.
```

**Page 179**

```
 1            Christian Holinka      235
 2      Q    Do you believe that you were exposed to
 3   asbestos at any location from a product called an
 4   autoclave?
 5      A    I'm not sure. Initially I thought maybe
 6   but I'm not even sure if it contains, an autoclave
 7   contains asbestos.
 8      Q    You are familiar with a product or a type
 9   of product referred to as an autoclave?
10      A    Yes.
11      Q    What is an autoclave?
12      A    An autoclave sterilizes at high heat and
13   steam bacterial cultures or anything that you may want
14   to sterilize.
15      Q    In any of the laboratory or other work that
16   you have done, which the other counsel went over in
17   great detail earlier, in any of that work did you work
18   with autoclaves?
19      A    I did in the Army and I did at Sinai.
20      Q    What specifically did you do with
21   autoclaves in the Army?
22      A    Put in bacterial cultures, TB cultures,
23   gonorrhea cultures after you had diagnosed them and
24   sterilized them.
25      Q    Do you know the makers or suppliers of any
```

**Page 180**

```
 1            Christian Holinka      236
 2   of the autoclaves that you worked with in the Army?
 3      A    I don't.
 4      Q    Can you describe the physical appearance of
 5   any of the autoclaves you worked with in the Army?
 6      A    Yeah. It's typically a large round tube
 7   about -- stainless steel on the outside, about 4 feet,
 8   5 feet long, about 3 feet in diameter that has a door
 9   with this circular handle to close tight and then you
10   push a few buttons to let the steam and the heat in.
11      Q    Did you work with more than one autoclave
12   while you were in the Army?
13      A    I don't recall exactly but I don't believe
14   so.
15      Q    And am I correct you do not know who made
16   or sold that autoclave, the one that you remember?
17      A    You are correct, I don't remember.
18      Q    And as you sit here today you do not
19   remember whether it contained any asbestos or not?
20      A    That's correct, I don't know.
21      Q    What did you do with an autoclave or
22   autoclaves at Mount Sinai?
23      A    Sterilize cell cultures, culture dishes and
24   media.
25      Q    Was it one device that you worked with
```

45 (Pages 177 to 180)

### Page 189

```
 1            Christian Holinka      245
 2
 3        W I T N E S S   C E R T I F I C A T I O N
 4
 5       I have read the foregoing transcript of my
 6    testimony and find it to be true and accurate to
 7    the best of my knowledge and belief.
 8
 9
10    _____
           CHRISTIAN HOLINKA
11
12    Subscribed and sworn to
13    before me on this _____ day
14    of _____, 2007.
15
16
17    _____
           NOTARY PUBLIC
18
19
20
21
22
23
24
25
```

### Page 191

```
 1        CERTIFICATE OF NOTARY      247
 2
 3       I, CHERYL F. BAREN, a Stenotype Shorthand
 4    Reporter and Notary Public within and for the State of
 5    New York, do hereby certify that the within Continued
 6    Examination Before Trial of CHRISTIAN HOLINKA was held
 7    before me and I faithfully and impartially recorded
 8    stenographically the questions, answers and colloquy.
 9
10       I further certify that after said examination was
11    recorded stenographically by me, it was reduced to
12    typewriting under my supervision, and I hereby submit
13    that the within contents of said examination are true
14    and accurate to the best of my ability.
15
16       I further certify that I am not a relative of nor
17    an attorney for any of the parties connected with the
18    aforesaid examination, nor otherwise interested in the
19    testimony of the witness.
20
21
22           _____
                  CHERYL F. BAREN
23
24
25
```

### Page 190

```
 1                      246
 2            INDEX TO TESTIMONY
 3                 Page    Line
 4    Continued Direct Examination by    63    8
      Mr. Schaffer
 5
      Cross-Examination by Mr. Abernethy  210   2
 6
 7
 8
...
25
```