DOUGLAS POHL                    9/29/2005   EMMA GARDEA v. ABLE SUPPLY COMPANY, ET AL.

**Page 118**

1 moderate to marked in some cells.
2     Q. If you could, still referencing that, go
3 to Page 577 with me.
4          Are you there?
5     A. Yes.
6     Q. Under the heading Roman numeral X,
7 Positive Pleural Fluid Cytology, again, now
8 Dr. Cagle reiterates what we've talked about,
9 that: Metastatic lung carcinoma is the leading
10 cause of malignant pleural effusion and accounts
11 for about 30 percent of the cases.
12     A. Yes.
13     Q. That's what he reports?
14     A. Yes.
15     Q. And that metastatic breast carcinoma
16 is the second leading cause, for another 25
17 percent?
18     A. Yes.
19     Q. With lymphoma/leukemia group being
20 third, and that's where you think the
21 gastrointestinal might be third?
22     A. That's correct.
23     Q. All other tumors accounting for the
24 remaining 25 percent?
25     A. Correct.

**Page 119**

1     Q. Now I assume you agree, especially based
2 on the clinical path of Mr. Gardea, that the
3 prognosis of patients with malignant pleural
4 effusions is poor, as Dr. Cagle reports?
5     A. Absolutely. Typically ones with
6 effusions related to lung cancer survive longer,
7 on the order of a year and a half to two years,
8 whereas those with mesothelioma survive much less.
9     Q. He reports that the median life
10 expectancy after diagnosis with a malignant
11 pleural effusion is approximately 90 days?
12     A. I think that's inconsistent with a wide
13 body of oncologic literature.
14     Q. What would you put the median life
15 expectancy after diagnosis with a malignant
16 pleural effusion?
17     A. I'd say it's probably 12 months,
18 assuming the patient is receiving chemotherapy or
19 some other life-extending therapy.
20     Q. He also indicates that if the pleural
21 fluid glucose or pH is reduced, the median life
22 expectancy is only about 30 days.
23          Again, I'd ask: Do you disagree with
24 that?
25     A. I do.

**Page 120**

1     Q. What would you — I mean, if at all, do
2 you believe that pH reduction or glucose would
3 affect median life expectancy?
4     A. Well, I think what he's quoting is an
5 ancient technique that is no longer used by
6 anybody in practice. So it surprises me that
7 somebody would even consider measuring glucose or
8 pH in pleural fluid.
9     Q. Do you agree with his next statement
10 that: The presence of a malignant pleural
11 effusion indicates that the tumor has metastasized
12 to the pleura and the patient cannot be cured by
13 surgery?
14     A. That's only partially true. If it's a
15 primary mesothelioma, there's no metastasis that
16 arose in the pleura.
17     Q. I think we're done with that.
18          Turning back to the United States
19 Canadian Mesothelioma Panel's paper from 2000
20 entitled The Separation of Benign and Malignant
21 Mesothelioma Proliferations, on Page 1194, these
22 authors from this reference panel of pathologists
23 state that: Although cytologic atypia is
24 frequently mentioned as useful in diagnosing
25 mesothelioma, and then in italics:  In our

**Page 121**

1 experience, cytologic atypia is an unreliable
2 criterion for the potential malignancy of an
3 epithelial mesothelioma proliferation.
4          Do you agree or disagree with that?
5     A. I partially agree in that you can't use
6 cytologic atypia all by itself to diagnose a
7 malignancy. You have to put all the different
8 factors together.
9     Q. They state several reasons for that
10 conclusion, one of them being that epithelial
11 mesotheliomas are rather monotonous and sometimes
12 deceptively bland.
13          Agree or disagree?
14     A. Some of them can be, and that's why you
15 have to look for other architectural features.
16     Q. Would you — did we — we had prominent
17 nucleoli in this case?
18     A. We had prominent small nucleoli.
19     Q. What is a lumens?
20     A. It's the — remember I drew a picture of
21 a gland? It's the central portion of the gland.
22     Q. And so when they say that reactive
23 benign mesothelioma cells tend to enlarge and
24 develop more or less prominent nucleoli and
25 sometimes intracytoplasmic lumens, did you see

                                    31 (Pages 118 to 121)

DOUGLAS POHL                     9/29/2005   EMMA GARDEA v. ABLE SUPPLY COMPANY, ET AL.

Page 122

1  that in this case?
2      A. No.
3      Q. Would you be able to tell penetration
4  from this material that you reviewed?
5      A. Tissue invasion?
6      Q. Yes.
7      A. No. It's a cytologic specimen.
8      I would like to say that, on occasion,
9  cytologic specimens do include fragments of tissue
10 that you can see any infiltration in, but that was
11 not the case here.
12     MR. NOVAK: Are you done with that
13 publication?
14     MR. PETEREIT: I'm done with that
15 publication.
16     MR. NOVAK: Why don't we take a break
17 then.
18     MR. PETEREIT: That's fine.
19     MR. NOVAK: Ten minutes.
20     (A recess was taken at 3:15 p.m.)
21     (Defendants' Deposition Exhibit No. 8
22 was marked for identification by the reporter.)
23     (Back on the record at 3:27 p.m.)
24     MR. PETEREIT: Back on the record.
25     Q. (BY MR. PETEREIT) Doctor, I think I'm

Page 123

1  going to move away from some medical specific, and
2  I have just a couple more questions, and then I'll
3  pass you on to some of the other attorneys.
4      A. Okay.
5      Q. Do you intend to give any
6  product-specific testimony? Have you reviewed any
7  records, for example, from Crane Co.?
8      A. No.
9      Q. Certainly it's your understanding, as
10 reported in Dr. Segarra's report and what other
11 materials have been provided to you, that
12 Mr. Gardea is claiming significant exposure to
13 pipe insulation materials?
14     A. Yes.
15     Q. It's not uncommon for people, based on
16 the Selikoff studies of insulators, for these
17 cohorts to have a mesothelioma based on the high
18 amosite or amphibole content of those products,
19 true?
20     A. That's correct.
21     Q. Insulation is certainly regarded as a
22 highly friable material?
23     A. Yes.
24     Q. And he demonstrated, Dr. Selikoff, that
25 is, demonstrated in the '60s that these insulators

Page 124

1  were at a greatly increased risk for developing
2  asbestos-related disease from working with those
3  insulation products?
4      A. Correct.
5      Q. Would you be able to, in this case,
6  exclude Mr. Gardea's insulation exposure as being
7  the sole cause of his alleged malignant
8  mesothelioma?
9      A. Well, I couldn't exclude or include it
10 either way. It was certainly a part of his total
11 dose.
12     Q. You would agree that his insulation
13 that pipe insulation though would have been a
14 cause of his alleged mesothelioma, true?
15     A. A contributing factor, that's correct.
16     Q. And based on his 20-plus years of
17 working with insulation products as an insulator
18 that exposure, in and of itself, would be enough
19 to cause his mesothelioma without any other
20 exposures, true?
21     MR. NOVAK: Object to the form of the
22 question.
23     MR. RICE: Same.
24     THE WITNESS: Presupposing that he, in
25 fact, did work 20 years as an insulator, it

Page 125

1  certainly would have been a significant
2  contributing factor to his total dose.
3      Q. (BY MR. PETEREIT) My question was a
4  little bit different though.
5      Would his exposure to amosite from the
6  insulation he worked with or around have been
7  sufficient by itself to cause mesothelioma?
8      MR. NOVAK: Object to the form of the
9  question.
10     That wasn't the same question, by the
11 way.
12     THE WITNESS: I don't know. I just
13 don't have enough details on the exposure, whether
14 it was amosite or mixed amosite or chrysotile, to
15 answer the question.
16     Q. (BY MR. PETEREIT) Are you familiar with
17 the fiber content of Johns Manville insulations?
18     MR. NOVAK: Which insulations?
19     MR. PETEREIT: Pipe insulations, any of
20 them.
21     MR. NOVAK: Any of them?
22     MR. PETEREIT: Yes. That's what I'm
23 asking.
24     THE WITNESS: Only generally. It
25 contained approximately 15 percent, is the best of

32 (Pages 122 to 125)

DOUGLAS POHL                    9/29/2005    EMMA GARDEA v. ABLE SUPPLY COMPANY, ET AL.

Page 126

1 my recollection.
2 Q. (BY MR. PETEREIT) Fifteen percent
3 asbestos?
4 A. Yes.
5 Q. Do you know what fiber types that made
6 up that 15 percent composition?
7 A. It varied from -- depending on the year
8 of manufacture. Manville owned a significant
9 interest in the chrysotile mines in Quebec,
10 Canada. So they were using both chrysotile and
11 amosite in their products.
12 Q. What is your opinion today as to the
13 relative differences in potency, if any, between
14 the fiber types?
15 A. It's remained consistent over the years.
16 I have reviewed the available data out there and
17 largely concur with Nicholson's belief that
18 crocidolite is approximately a ten, amosite is
19 approximately a five, and chrysotile is a very
20 close third at a four.
21 Q. What particular criticisms do you have
22 of the Hodgson and Darden article where they've
23 suggested a relative potency between crocidolite,
24 amosite, and chrysotile of 500 to 100 to 1
25 respectively?

Page 127

1 A. The basic criticism is there's no
2 scientific data presented in that paper to support
3 that assertion.
4 Q. I take it then you disagree with the
5 Final Risk Assessment report submitted to the EPA
6 from the Environmental Research Group in which
7 they basically adopted the Hodgson and Darden and
8 Berman and Crump analyses?
9 A. Well, first of all, it was a draft.
10 It's been subject to a lot of criticism, and it's
11 unlikely that that will ever be adopted by the EPA
12 in its present form given the conflicts of
13 interest of the preparers of that draft that have
14 since surfaced.
15 With that said, I would disagree with
16 that draft that was largely put together by a
17 group that represents asbestos interest.
18 Q. Have you seen the final draft of that
19 report?
20 A. I have.
21 Q. What year did you become licensed as a
22 pathologist?
23 A. Well, I don't know what you mean by
24 "licensed as a pathologist." I received my board
25 certification in 1986.

Page 128

1 Q. You graduated med. school in what year?
2 A. That would have been 198- -- boy, time
3 flies. '83.
4 Q. Just in the year 2005 alone, do you have
5 an estimate as to how many depositions you've
6 given this year in asbestos personal injury
7 matters?
8 A. Probably about -- let me see. We're in
9 September. Probably about 15 so far this year.
10 Q. That's about one to two a month average?
11 A. Yes.
12 Q. Pretty consistent over the last three
13 years?
14 A. To be honest with you, you know, you can
15 go two months without doing a single one and then,
16 all of a sudden, there are three in one week. So
17 it just varies.
18 Q. Have you testified in any trials for
19 asbestos personal injury litigation this year?
20 A. I have.
21 Q. How many?
22 A. Probably about five this year.
23 Q. When was the last one, if you recall?
24 A. I actually never got to testify, but I
25 flew all the way to Pittsburgh for Goldberg,

Page 129

1 Persky, and the case was settled after I
2 arrived.
3 Q. What month was that in?
4 A. That was two weeks ago.
5 Q. Actually getting to testify, when was
6 the last time you actually testified at a trial
7 this year in 2005?
8 A. That would have been, I believe, in
9 Cleveland for Kelley & Ferraro. That was about
10 two months ago.
11 Q. How long have you been doing work at the
12 request of the Hissey Kientz firm?
13 A. I'd say three or four years.
14 Q. Are you approached by them to handle
15 both consulting work and also testifying work?
16 MR. NOVAK: What was your question
17 again?
18 Q. (BY MR. PETEREIT) Are you retained by
19 them for both consulting purposes and testifying
20 purposes?
21 A. Well, I receive no retainer. They
22 submit cases for my review, and inevitably they
23 wind up either settled or I get deposed and have
24 to go to trial for them.
25 Q. Do you typically issue reports for the

33 (Pages 126 to 129)

DOUGLAS POHL                    9/29/2005   EMMA GARDEA v. ABLE SUPPLY COMPANY, ET AL.

**Page 130**

1  Hissey Kientz Law Firm?
2      A. In almost all cases, except when I find
3  something wrong with the case, like the diagnosis
4  is incorrect or I can't attribute the exposure to
5  asbestos.
6      Q. So there have been case referrals to you
7  in which you have not confirmed an
8  asbestos-related disease?
9      A. That's correct.
10     Q. Is there a minimum dosage of asbestos
11 cumulative that you set as the threshold for
12 being -- from causing -- being able to cause
13 mesothelioma?
14     A. Yes.
15     Q. And what is that?
16     A. It's somewhere around one fiber a year
17 total exposure, according to the publication of
18 Rodelsperger.
19     Q. How do you spell that?
20     A. R-o-d-e-l-s-p-e-r-g-e-r.
21     Q. Is that an average of one fiber a year,
22 or does that -- I think I've previously read that
23 you've gone as two fibers a year.
24     A. Well, that's the minimum amount that has
25 been documented in the medical literature that I'm

**Page 131**

1  aware of, is one fiber a year total exposure.
2      Q. Agree or disagree that unless a product
3  is manipulated and results in an exposure greater
4  than a tenth of a fiber a year, that exposure
5  would not be a contributing factor in the
6  development of mesothelioma?
7      A. That's correct. By definition, unless
8  you exceed a tenth of a fiber per cc. total
9  exposure at any time, there's no way to prove that
10 that would be a contributing factor.
11     Q. Now Dr. Roggli -- and tell me if you can
12 understand this.
13        Are you familiar that he would require
14 an exposure to chrysotile dust of greater than 7.5
15 fibers -- fiber years to say that it contributed
16 to cause mesothelioma believe he believes the
17 threshold is higher, yes.
18     Q. And you disagree with him as to that for
19 chrysotile dust?
20     A. I think it's inconsistent with other
21 medical literature.
22     Q. Would you say it's higher than the one
23 fiber a year, generally speaking, that
24 Rodelsperger --
25     A. Yes. Rodelsperger is trying to define

**Page 132**

1  the lowest level of exposure at which mesothelioma
2  occurs. But in actual practice, it usually occurs
3  at higher levels of exposure.
4      Q. Do you know when the trial of this
5  matter is? Have you been told or asked to
6  appear?
7      A. I've been asked about availability,
8  but, at this time, I don't think the specific date
9  has been determined.
10     Q. What is your opinion as to the role of
11 genetic susceptibility to cancer as being a
12 factor, a risk factor, in the development of
13 mesothelioma?
14     A. I don't think that's been defined yet.
15 Certainly there is a susceptibility factor at play
16 because not all people exposed at the same dose to
17 the same material develop mesothelioma. So
18 there's another factor, but no one knows what that
19 is.
20     Q. In any of the tissue that you reviewed,
21 did you note pathologic evidence of pleural
22 plaques?
23     A. There wasn't that kind of tissue
24 available, so, no.
25     Q. You wouldn't see -- could you see

**Page 133**

1  artifact of pleural plaques in a pleural fluid?
2      A. No.
3      Q. Do you recall noting if any of the
4  underlying radiologists noted bilateral pleural
5  plaques in the case of Mr. Gardea?
6      A. I don't believe so.
7      Q. And you would agree that the presence
8  of fibrous plaques has been dubbed the calling
9  card of asbestos exposure?
10     A. It is one calling card, but
11 unfortunately it's not present consistently in
12 all patients who are exposed at the same dose.
13     Q. Are you familiar with other carcinogenic
14 exposures or chemicals which may be used in the
15 metals mining industry?
16     A. Not to a great extent, no.
17     Q. To the extent that you are familiar,
18 would you agree that there are several
19 carcinogenic agents sometimes at play or used in
20 the metals mining manufacturing process?
21     A. I know there are certain lung
22 carcinogens, like nickel, cadmium, other heavy
23 metals, that may be contaminants of the ore that
24 is being handled.
25     Q. Arsenic maybe?

34 (Pages 130 to 133)

DOUGLAS POHL                    9/29/2005   EMMA GARDEA v. ABLE SUPPLY COMPANY, ET AL.

Page 134

1    A. Arsenic is another, yes.
2        MR. PETERBIT: At this time, Dr. Pohl,
3    I thank you for your time, and I'll pass you to
4    some other attorneys that probably have some
5    questions.
6
7            CROSS-EXAMINATION
8    BY MR. RICE:
9        Q. Dr. Pohl, I have just very few. My name
10   is Steve Rice.
11       Does your report contain all of the
12   opinions --
13       MR. NOVAK: I'm sorry, Steve, do you
14   mind introducing the company that you represent?
15       MR. NOVAK: Sure.
16       MR. NOVAK: Thank you.
17       MR. RICE: Texaco and Conoco Phillips,
18   and I'm also here for Chevron.
19       MR. NOVAK: Okay. Thank you.
20       Q. (BY MR. RICE) Your report, Dr. Pohl,
21   contains the opinions that you intend to give in
22   this case?
23       A. Yes.
24       Q. All right. And I believe the other
25   gentleman asked you, you have not been asked to

Page 135

1    give opinions or testimony as it relates to any
2    specific defendant or their conduct?
3        A. That's correct.
4        Q. All right. I wanted to explore just for
5    a minute about the 1997 paraffin block that you
6    obtained.
7        First of all, I believe if you'd look at
8    the letter from Hissey Kientz in sending you the
9    materials -- would you look at that?
10       A. Okay.
11       Q. -- it actually mistakenly references it
12   as an '02 block, does it not?
13       A. It does.
14       Q. Okay. But, just so we're clear -- and
15   you referenced it correctly, I guess, in your
16   report, that it is, in fact, a 1997 paraffin
17   block?
18       A. That's correct.
19       Q. And tell me what you did or did not --
20   or just tell me what you did with that paraffin
21   block.
22       A. I did make an H&E slide of it, and
23   it didn't show any cells, so I didn't report on
24   it.
25       Q. It did not show any cells at all?

Page 136

1    A. That's correct.
2        Q. Whether benign or otherwise?
3        A. That's correct.
4        Q. And your understanding was that that was
5    taken from the same area as the 2002 block --
6    excuse me, 2002 thoracentesis?
7        A. It was taken from a different area. The
8    washings were taken from inside the bronchus of
9    the lung, on the right side, whereas the pleural
10   fluid was taken from the space between the lung
11   and the chest, on the right side.
12       Q. Can you have -- cells or mesothelioma
13   cells from an inflammatory process, can they have
14   a similar appearance to malignant cells?
15       A. No.
16       Q. There has not been any pleural-based
17   mass noted on any CT or chest x-ray in the case of
18   Mr. Gardea, has there?
19       A. That's correct. Unfortunately I didn't
20   see any studies that were taken after the fluid
21   was drained from the chest, so there's nothing
22   that really would show that.
23       Q. And there's no new mass that is noted in
24   any of the CT or chest x-rays that had not already
25   been present in the 1997 CTs; is that correct?

Page 137

1    A. That's correct.
2        Q. He had had previous pleural effusions,
3    had he not, before 2002?
4        A. The past ones were bilateral, and they
5    were smaller. The more current one was
6    unilateral, right-sided, and quite large.
7        Q. I believe you were shown some records
8    from the LBJ Hospital in the year 2000.
9        Do you recall what the nature of those
10   pleural effusions were?
11       A. They were small, as I said. They were
12   bilateral, both right and left sides, and I don't
13   believe that they considered them of significant
14   worry that a thoracentesis was warranted, so they
15   didn't do one.
16       Q. There can be many causes of pleural
17   effusions, can there not?
18       A. That's correct.
19       Q. Congestive heart failure could be one?
20       A. Yes.
21       Q. Are you familiar that he had been
22   diagnosed with congestive heart failure?
23       A. Yes.
24       Q. All right. Pneumonia can be a cause?
25       A. That's correct.

DOUGLAS POHL                    9/29/2005  EMMA GARDEA v. ABLE SUPPLY COMPANY, ET AL.

Page 138

```
 1      Q.  What other causes of pleural effusions
 2  could there be?
 3      A.  Any inflammatory condition of the pleura
 4  can produce a pleural effusion, cardiac failure,
 5  congestive heart failure; pulmonary edema, which
 6  would be right-sided heart failure, can produce
 7  pulmonary edema — I mean pleural effusion. The
 8  most common cause obviously of pleural effusion is
 9  malignancy.
10      Q.  Did you see that there were some earlier
11  CTs that mentioned pleural reactions?
12      A.  Yes.
13      Q.  Okay.  Could those lead to pleural
14  effusions?
15      A.  Yes.  Those are the inflammatory
16  processes of the pleura that I was mentioning.
17      Q.  Your opinion is that the condition of
18  Mr. Gardea is a mesothelioma?
19      A.  That's correct.
20      Q.  You are not going to testify at the
21  time of trial that this was a lung cancer, are
22  you?
23      A.  No, I am not.
24      Q.  Because that is not your opinion?
25      A.  That's correct.
```

Page 139

```
 1      Q.  And you would not be testifying that the
 2  mesothelioma that you allege is present was caused
 3  by silica, are you?
 4      A.  No.
 5      Q.  The masses that were shown in his prior
 6  films from '97 and 2000 and 2002, do you have an
 7  opinion as to the nature or the cause of those
 8  masses?
 9      A.  I do.
10      Q.  What is that?
11      A.  I believe that they were old, healed
12  granulomatous disease.
13      Q.  And just tell us what the cause of
14  granulomatous disease is.
15      A.  There are multiple different causes.  In
16  an individual like Mr. Gardea, Mexican extraction,
17  the most likely candidates are silica,
18  histoplasmosis, tuberculosis, or some other fungal
19  organism that he was exposed to in the past.
20      Q.  All right.  Now you heard today that —
21  or were shown records that for at least maybe ten
22  years he had worked in gold mines in Mexico?
23      A.  Yes.
24      Q.  All right.  And certainly he could
25  receive a substantial exposure to silica during
```

Page 140

```
 1  that work, could he not?
 2      A.  Yes.
 3      Q.  All right.  And that exposure of a
 4  person of an age of 10 to 20 years old, say, could
 5  that be more problematic in terms of creating
 6  future problems than if he was exposed as an
 7  adult?
 8          MR. NOVAK:  Object to the form of the
 9  question.  Vague, unless you can be more specific
10  as it relates to what it's problematic for, for
11  example, mesothelioma, if that's what you mean.
12          MR. RICE:  Well, we're talking about
13  silica.  So I don't think that would be —
14          MR. NOVAK:  That's why I objected.
15          MR. RICE:  Okay.
16      Q.  (BY MR. RICE)  Well, anyway, a person's
17  lungs, when they are 10 or 12, 15 years old, they
18  are still developing.
19          Would you agree with that?
20      A.  It's not that they're still developing,
21  but there are some studies that there is an
22  increased susceptibility to noxious agents,
23  including cigarette smoke and dust, that's higher
24  at a younger age than in later age.
25          So it's possible that an early mining
```

Page 141

```
 1  exposure may produce more damage to the lungs in a
 2  young individual than in an older individual.
 3      Q.  All right.  Are you familiar with
 4  studies that have indicated that asbestiform
 5  minerals also are present in mining activities
 6  such as gold mining?
 7      A.  It depends where the mine is, but some
 8  mines, gold mines, yes, had contaminating
 9  asbestiform agents present.
10      Q.  And would that exposure from mining, in
11  and of itself, be sufficient without any other
12  exposure to cause mesothelioma?
13      A.  I —
14          MR. NOVAK:  Object to the form of the
15  question, unless you can tell me what specific
16  mine that had asbestos in it that you're referring
17  to.
18      Q.  (BY MR. RICE)  Can you answer the
19  question?
20      A.  I've reviewed the literature
21  extensively, and I found virtually no cases of
22  mesothelioma due to asbestiform minerals present
23  as a byproduct of mining.  So I don't think so.
24      Q.  What about the Libby, Montana, type of
25  exposures?
```

36 (Pages 138 to 141)

DOUGLAS POHL                9/29/2005   EMMA GARDEA v. ABLE SUPPLY COMPANY, ET AL.

Page 142

1    A. Well, that was a tremolite exposure. So
2  that -- tremolite is a type of asbestos, and so
3  that's not an asbestiform material; that is
4  asbestos.
5    Q. Okay. So you're -- I understand what
6  you're saying.
7    You're making a differentiation between
8  asbestos per se and asbestiform --
9    A. Minerals, that's correct.
10    MR. NOVAK: And, just so the record is
11  clear, the Libby mine is not a gold mine. So the
12  record needs to be clear on that.
13    MR. RICE: Well, I --
14    MR. NOVAK: To this day, WR Grace is not
15  saying that Libby was a gold mine for them.
16    MR. RICE: I'll make a comment off the
17  record later.
18    Q. (BY MR. RICE) Doctor, you indicated one
19  of the bases of your position that you can make a
20  diagnosis of mesothelioma from cytology alone was
21  a textbook, and I did not get the name of the
22  authors of that textbook.
23    A. Koss, K-o-s-s.
24    Q. And what is the title of that book?
25    A. I believe it's Diagnostic Cytopathology.

Page 143

1  It's a two-volume set.
2    Q. And I believe you said that you were
3  going to provide us available articles, studies
4  that you would rely on for giving your opinions at
5  the time of trial as in support of your position
6  that cytology alone is sufficient for diagnosing
7  mesothelioma?
8    A. Yes.
9    Q. And you think that most of those would
10  be in the American Journal of Cytopathology?
11    A. That's one of the key journals they
12  would appear in. There are other similar journals
13  like that.
14    MR. RICE: All right. I believe that's
15  all the questions I have. Thank you.
16    THE WITNESS: Okay.
17
18    CROSS-EXAMINATION
19  BY MR. SHEPHERD:
20    Q. Dr. Pohl, my name is Scott Shepherd. I
21  represent Kelley Moore Paint Company.
22    I had several questions, and I've just
23  got literally two or three.
24    I know you said earlier you're not going
25  to testify about -- or provide any opinions about

Page 144

1  specific products or attribute attribution for
2  specific products as causation, right?
3    A. That's correct.
4    Q. You mentioned that you got part of
5  Mr. Gardea's exposure or asbestos exposure from
6  Dr. Segarra's report?
7    A. Yes.
8    Q. Looking at Dr. Segarra's report, it says
9  that, in the first paragraph -- do you have it
10  handy?
11    A. Yes.
12    Q. Under History --
13    A. Yes.
14    Q. -- about a third of the way down, it
15  says: He worked as a sandblaster, painter, and
16  insulator from 1960 to 1978?
17    A. Yes.
18    Q. And then it says he worked as a
19  carpenter and he installed drywall and sheetrock
20  and worked with roofing materials and insulation,
21  right?
22    A. Yes.
23    Q. Just from Dr. Segarra's report, we can't
24  even tell what years Mr. Gardea worked as a
25  carpenter, can we?

Page 145

1    A. No.
2    Q. Nor the frequency that he worked as a
3  carpenter, correct?
4    A. That's correct.
5    Q. We don't even know if was before 1960 or
6  after 1978, right?
7    A. Only abstracting from the Hissey Kientz
8  cover letter, they state that he worked as a
9  carpenter between '64 and '67.
10    Q. Right, but -- and that's just what you
11  got from Mr. Gardea's lawyers?
12    A. That's correct.
13    Q. Okay. Even from his work history sheet,
14  it says he was a carpenter, painter, and insulator
15  from 1960 to 1978?
16    A. That's correct.
17    Q. But there are no specifics when, where,
18  or how often, correct?
19    A. That's correct.
20    MR. SHEPHERD: Okay. That's all I have.
21  Thank you for your time.
22    THE WITNESS: Okay.
23    MR. NOVAK: Anyone on the phone that has
24  any questions?
25    MR. LaBOON: Karl, this is John LaBoon.

37 (Pages 142 to 145)

DOUGLAS POHL                    9/29/2005  EMMA GARDEA v. ABLE SUPPLY COMPANY, ET AL.

Page 146

```
1
2            CROSS-EXAMINATION
3    BY MR. LaBOON:
4        Q.  I think I've just got one question for
5    you, Dr. Pohl.
6            You were talking about a Rodelsperger
7    article earlier that you said stood for the
8    proposition that one fiber a year -- one fiber a
9    year was sufficient to cause mesothelioma.
10           Do you remember which article by
11   Dr. Rodelsperger that was, maybe a journal or a
12   year?
13       A.  I think it was in the American Journal
14   of Industrial Hygiene in 2001.  The title is
15   something like Asbestos and Manmade Vitreous
16   Fibers and Mesothelioma.
17       Q.  Okay.  That's the German hospital-based
18   case controlled study?
19       A.  Actually it's a mesothelioma registry
20   looking at the occupations of individuals who
21   develop mesothelioma and estimating their levels
22   of exposure in each occupation.
23       MR. LaBOON:  Okay.
24           All right.  That's the only question I
25   have.  Thank you very much.
```

Page 148

```
1            So, for example, if one was exposed at
2    the current threshold or time-weighted amount of
3    .1 over a period of ten years, they would acquire
4    a one fiber a year total dose of exposure.
5        Q.  All right.  If a person was exposed to
6    one fiber TWA for a year?
7        A.  That's correct.
8        MR. RICE:  Okay.
9        MR. NOVAK:  Anyone else have any more
10   questions?
11           Going once, twice, three times.
12           We are off the record.  Thank you very
13   much, everyone.
14       THE REPORTER:  Would you like to read or
15   waive?
16       MR. NOVAK:  You waive?
17       THE WITNESS:  Yes.
18       THE REPORTER:  Okay.  Thank you.
19       MR. PETEREIT:  I need to go back on real
20   quick, just real quick.  It's not a question.
21   It's not a question.
22       MR. NOVAK:  Oh, well, then if you're
23   back on for not a question, go ahead.  You won't
24   get an answer.
25       MR. PETEREIT:  This is John Petereit.  I
```

Page 147

```
1        THE WITNESS:  Okay.
2        MR. NOVAK:  Okay.  Anyone else on the
3    phone?
4        MR. RICE:  I just have one final
5    question.
6        MR. NOVAK:  Well, we'll clear them up
7    first.
8            All right.  Having heard nothing else on
9    the phone, we're going to go back to the live
10   audience.
11           Go ahead.
12
13           RECROSS-EXAMINATION
14   BY MR. RICE:
15       Q.  Just so I understand, when you say one
16   fiber a year total exposure was what Rodelsperger
17   found --
18       A.  Yes.
19       Q.  -- that was his conclusion, and just
20   to make it clear, what does one fiber a year
21   mean?
22       A.  It's the calculation of the dose, the
23   time-weighted average dose, which would be a
24   certain amount of fibers per cc. times the years
25   of exposure.
```

Page 149

```
1    will be sending the court reporter the medical
2    records which were discussed with Dr. Pohl from
3    LBJ Hospital, and we will attach those as Exhibit
4    Number 9.
5        THE REPORTER:  Okay.
6        MR. PETEREIT:  Thank you.
7        (Thereupon, the deposition concluded at
8    or about the hour of 4:06 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

38 (Pages 146 to 149)

DOUGLAS POHL                    9/29/2005    EMMA GARDEA v. ABLE SUPPLY COMPANY, ET AL.

Page 150

1        CERTIFICATE OF OATH
2
3
4    THE STATE OF FLORIDA, )
                          )
5    COUNTY OF PALM BEACH. )
6
7        I, the undersigned authority, certify that
8    DOUGLAS A. POHL, M.D., Ph.D., personally appeared
9    before me and was duly sworn.
10
11        WITNESS my hand and official seal this 5th day
12    of October 2005.
13
14
15
16    _____
17    Janette P. Hart, RPR, RMR, CRR
      Notary Public, State of Florida.
18    My Commission No. DD176040
      Expires: February 8, 2007
19
20
21
22
23
24
25

Page 151

1        CERTIFICATE
2
3    THE STATE OF FLORIDA, )
                          )
4    COUNTY OF PALM BEACH. )
5
6        I, Janette P. Hart, Registered Professional
7    Reporter, Registered Merit Reporter, and Certified
8    Realtime Reporter, certify that I was authorized
9    to and did stenographically report the deposition
10    of DOUGLAS A. POHL, M.D., Ph.D.; that a review of
11    the transcript was not requested; and that the
12    transcript is a true and complete record of my
13    stenographic notes.
14        I further certify that I am not a relative,
15    employee, attorney, or counsel of any of the
16    parties, nor am I a relative or employee of any of
17    the parties' attorney or counsel connected with
18    the action, nor am I financially interested in the
19    action.
20
21        DATED this 5th day of October 2005.
22
23
24    _____
      Janette P. Hart, RPR, RMR, CRR
25    Notary Public, State of Florida.

39 (Pages 150 to 151)

512-320-0185              RLS LEGAL SOLUTIONS              512-391-0269

Exhibit A

# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

ROSE MARIE BENSON, individually
and in her capacity as personal
representative of the ESTATE OF
STEVEN W. BENSON,

        Plaintiff

v.

UNITED STATES OF AMERICA,

        Defendant

Docket no. 02-CV-6-B-S

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SINGAL, Chief District Judge

    Decedent Steven Benson's ("Benson") widow brings this action pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671-2680, to recover for alleged medical malpractice by employees of the United States Department of Veterans Affairs. After a two day non-jury trial that began on April 14, 2003, the parties submitted post-trial briefs and proposed findings of fact and conclusions of law (Docket # 22, 23, 24). Pursuant to Rule 52(a), the Court makes the following findings of fact and conclusions of law. Fed. R. Civ. P. 52(a).

## I. FINDINGS OF FACT[1]

### A. Enlarged Prostate and Appearance of the Cheek Lesion

1.  In November 1995, doctors at the Veterans Hospital in Togus, Maine ("Togus VA") noted that Benson had a prominent protrusion in the floor of his bladder that might represent an enlarged prostate.

2.  On May 1, 1997, the Togus VA again noted that Benson's prostate was enlarged and admitted him for a transurethral resection of the prostate ("TURP").[2] The TURP findings were negative for cancer.

3.  On July 29, 1997, Benson first complained to Dr. Myers at the Togus VA of a lump in his right cheek that he thought might be an abscessed tooth.

4.  On September 3, 1997, Benson again complained to the doctors at the Togus VA that the swelling in his cheek was growing larger. As a result, Dr. Myers made a request for a surgical consult, but the consult was never performed.

### B. Cheek Biopsy

5.  In February 1998, Benson went to Eastern Maine Medical Center ("EMMC") with complaints of suprapubic abdominal pain. EMMC treated the pain. In addition, EMMC noted that Benson had a lump in his right cheek and referred him to the Togus VA for an evaluation.

6.  In January 1999, Benson made further complaints to the doctors at the Togus VA that the lump in his cheek was getting larger and harder. The doctors at the

---

[1] The Court relies on Benson's complete medical records, which were admitted into evidence, in summarizing Benson's medical history.

[2] A transurethral resection is a procedure that samples a portion of the prostate by means of a resectoscope passed through the urethra. Blakiston's Gould Medical Dictionary 1393 (4th ed. 1979).

2

Togus VA were uncertain whether the lump was an abscessed tooth or a tumor.  On

January 8, 1999, the matter was referred for a surgical consult.

7.    In March 1999, Dr. Diehl at the Togus VA provided a surgical consult in

which he noted that "Mr. Benson presents with a right facial mass that has been present

for at least a year, if not longer . . . I do not know what this represents . . . ." (See Def.'s

Ex. 169).  Dr. Diehl then ordered a computerized tomography ("CT") scan of the cheek

lesion.

8.    The results of the CT scan showed no obvious abnormality.  Nevertheless,

Dr. Diehl referred Benson to the Veterans Hospital in Boston, Massachusetts ("Boston

VA") for a second surgical consult opinion.

9.    The Boston VA performed biopsies on May 5, 1999, and May 20, 1999, to

assess the limits of the lesion.

10.    After the May 20 biopsy, the pathologist reported that:

> While some . . . stains performed on th[e] lesion led support to a
> diagnosis of melanoma . . ., the strong cytokeratin positivity . . .
> strongly argues against this interpretation and favors a poorly
> differentiated carcinoma (primary appendageal, local extension
> from an[] underlying tumor or metastatic from an unknown
> primary) . . . .

(See Def.'s Ex. 165).

11.    On June 9 1999, Benson returned to the Togus VA for treatment with Dr.

Feleppa.

12.    Dr. Feleppa informed Benson that he suffered from a virulent form of skin

appendageal cancer that had progressed from a lesion on his right cheek to  invade the

lymph nodes on both sides of his neck.

3

13.    Dr. Feleppa stated that she wished she could have treated Benson's cheek lesion sooner because his cancer was now very far advanced and likely incurable.

14.    Dr. Feleppa explained that she would attempt to treat Benson with chemotherapy, but that he would not be a candidate for radiation therapy unless he had a good response to the chemotherapy.

C. Treatment and New Symptoms

15.    On June 14, 1999, Benson began his chemotherapy treatment.

16.    In September 1999, the Togus VA began radiation treatment due to his positive response to the chemotherapy.

17.    Benson tolerated the treatment well and was able to continue enjoying certain activities, such as golf.

18.    After January 2000, however, Benson's condition began to rapidly deteriorate.

19.    In January 2000, Benson was admitted to the Togus VA for a bone biopsy, which revealed possible metastatic disease to the bone.[3]

20.    In addition, a CT scan of Benson's abdomen showed that his bladder had collapsed.

21.    On February 4, 2000, a cystoscopy revealed that Benson was suffering from an obstruction around his urethra.[4]  The Togus VA also noted that Benson's urinary function had diminished dramatically.

---

[3] The term "metastatic disease" describes cancer that spreads to other organs or to lymph nodes other than those near the primary tumor. See National Cancer Institute Cancer Facts, available at http://cis.nci.nih.gov/fact/6_20.htm (last visited May 16, 2003).

4

22.    On February 14, 2000, a scan of Benson's abdomen was consistent for metastatic disease, though not conclusive. Similarly, on February 17, 2000, the Togus VA found changes that were consistent with metastatic disease in the liver.

23.    On April 2, 2000, the Togus VA admitted Benson for probable urosepsis.

24.    On May 16, 2000, the Togus VA admitted Benson for possible jaundice or a urinary tract infection.

25.    Throughout this time Benson's prognosis was guarded with a high suspicion of metastatic disease, but tests could not confirm the condition.

D. Discovery of Transitional-Cell Carcinoma

26.    On May 4, 2000, EMMC discovered metastatic disease in the lumbar spine.

27.    On May 9, 2000, an EMMC bone biopsy revealed the presence of a rare uniform epithelial cancer.[5]

28.    On May 22, 2000, EMMC decided to perform a second TURP. The pathologist's report from the TURP stated that Benson suffered from "poorly differentiated carcinoma with lymphatic invasion and signet ring cells, consistent with poorly differential transitional-cell carcinoma."[6] (See Def.'s Ex. 377).

29.    As of June 20, 2000, Benson was suffering from end-stage cancer.

---

[4] A cystoscopy is a procedure used to diagnose and treat lesions of the urinary bladder, ureter, and kidney. Medical Dictionary at 352.
[5] Epithelial cancer is a malignant growth containing epithelial cells originating from the epithelium. Medical Dictionary at 457, 217.

[6] Transitional-cell carcinoma is a malignant tumor composed of epithelial cells from the transitional epithelium of the urinary tract. Medical Dictionary at 1392. At trial, Defendant's expert, Dr. Robert Young, testified that the transitional epithelium lines the bladder, urethra, and the tributaries from the prostate to the urethra, which he referred to as the "prostatic ducts."

30.    On June 23, 2000, Benson died at the age of 55 of a wasting disorder and renal failure.

E. Expert Testimony at Trial

31.    At trial, Plaintiff presented expert testimony by Dr. Douglas Pohl, the Director of Pathology at Central Maine Medical Center, and Dr. Donna Thompson, an oncologist with Hematology and Oncology Associates in Lewiston, Maine, to prove that Benson's cheek tumor was the primary source of his cancer and that Defendant's failure to promptly treat it caused his death.

32.    Defendant's experts, however, presented ample evidence to rebut Plaintiff's expert testimony and demonstrate an alternative cause of death. The Court credits the testimony of Defendant's experts over that of Plaintiff's experts.

33.    Defendant's first expert, Dr. Young, who is a senior pathologist at Massachusetts General Hospital, explained that, unlike metastatic sites, primary cancer sites are typically characterized by diffuse cell growth.

34.    Upon reviewing Benson's pathology slides, Dr. Young testified that the sample of Benson's prostate revealed diffuse growth typical of a primary site, whereas the cheek slide showed a more localized or focused pattern of cell growth characteristic of metastatic sites. According to Dr. Young, the difference in the slides was highly probative of the fact that Benson's cancer originated in his prostate and metastasized to his cheek.[7]

---

[7] To be exact, Dr. Young testified that Benson's cancer originated in his prostatic ducts.

35.    In addition, Defendant's second expert, Dr. Clark, who is the director of a head and neck tumor clinic at Massachusetts General Hospital, testified that cancer cells do not typically metastasize to the prostate. Dr. Clark explained that cancer cells spread most often to the liver, lung, bone, brain, and skin. According to Dr. Clark it is rare for cancer cells to metastasize to the prostate.

36.    Dr. Clark testified that in his many years of experience[8] he has never seen metastasis of cancer cells to the prostate, although he has seen several instances of transitional-cells spreading from the prostate to the skin.[9] Accordingly, Dr. Clark testified that it was his opinion that Benson's cancer spread from his prostate to his cheek, and not the other way around.

37.    By the time Benson's prostate cancer spread to his cheek, Dr. Clark testified that there was no effective cancer treatment. Therefore, according to Dr. Clark, Defendant's delay in performing a biopsy of Benson's cheek lesion made no difference in preventing Benson's death.

38.    Moreover, Dr. Young testified, as did Dr. Clark, that in the thousands of cases on which he has worked he has never seen an instance of a head or neck tumor spreading to the prostate.

39.    Finally, both Drs. Young and Clark testified that it is common for primary tumors to go undetected for significant periods of time, in spite of extensive tests.

---

[8] Dr. Clark has significant experience and specializes in head and neck cancer. He has treated approximately 5000 new patients in his career, of which approximately 200 had cheek cancer.

[9] Dr. Clark testified that, despite the fact that he has never seen transitional-cell cancers spread from the prostate specifically to the cheek, the location on the skin to where a cancer spreads is irrelevant because "skin is skin."

7

## II. CONCLUSIONS OF LAW

### A. Liability

40. To establish liability in a medical malpractice case, a plaintiff must show that the defendant departed from a recognized standard of care and that such departure was the proximate cause of the injury. Merriam v. Wanger, 757 A.2d 778, 780 (Me. 2000) (internal citations and quotations omitted).

41. Negligence alone on the part of the defendant is not enough to impose liability. Id., at 780 n.1 (internal citations and quotations omitted). Rather, negligence is actionable only if it proximately causes an injury to another. Id.

42. Proximate cause is "that cause which, in natural and continuous sequence, unbroken by an . . . intervening cause, produces the injury, and without which the result would not have occurred." Id. (internal citations and quotations omitted).

43. Evidence is sufficient to support a finding of proximate cause if it indicates that the alleged negligence played a substantial part in bringing about the harm. Id., at 780-81.

44. The mere possibility of such causation is not enough, and a defendant is entitled to judgment if the probabilities are evenly balanced. Id., at 781.

45. Here, the Court finds that Defendant was negligent in its failure to promptly diagnose and treat Benson's cheek cancer.[10] The issue, therefore, is whether Defendant's negligence caused Benson's death.[11]

---

[10] Defendant concedes that it should have performed a biopsy of Benson's cheek lesion sometime in September 1997.

[11] There is no allegation of error with respect to the discovery of Benson's prostate cancer.

8

46.     In light of the fact that the Court credits the testimony of Defendant's experts over that of Plaintiff's experts, the Court finds that Plaintiff has failed to prove by a preponderance of the evidence that Defendant's negligence in its diagnosis and treatment of Benson's cheek cancer caused his death.

**B. Damages**

47.     In Count One of her Complaint, Plaintiff seeks emotional distress damages resulting from Defendant's medical malpractice.

48.     Notwithstanding the above finding in favor of Defendant on the issue of medical malpractice, the Court finds that Plaintiff is entitled to damages for emotional distress.

49.     Under Maine law, a plaintiff's failure to prove the existence of an underlying tort does not preclude recovery for negligent infliction of emotional distress. See Bryan R. v. Watchtower Bible & Tract Soc'y of N.Y., Inc., 738 A.2d 839, 848 (Me. 1999) (stating that recovery for negligent infliction of emotional distress is permissible, despite the absence of proof of an underlying tort, where plaintiff demonstrates that the defendant owed her a particular duty based on the unique relationship between the parties).

50.     In order to prove negligent infliction of emotional distress a plaintiff must show that: 1) the defendant owed a duty to the plaintiff; 2) the defendant breached that duty; 3) the plaintiff suffered severe emotional distress as a result of defendant's negligence; and 4) the plaintiff's emotional distress was a reasonably foreseeable

9

consequence of defendant's negligent conduct.  See Veilleux v. NBC, 206 F.3d 92, 129-30 (1st Cir. 2000); see also Curtis v. Porter, 784 A.2d 18, 25 (Me. 2001).

51.     In the context of the physician-patient relationship, the physician owes the patient a duty to avoid emotional harm.  See Bolton v. Caine, 584 A.2d 615, 618 (Me. 1990) (holding that a physician-patient relationship gives rise to a duty to avoid emotional harm from failure to provide critical information to patient).

52.     Here, Defendant had a duty that arose from the physician-patient relationship to inform Benson of critical information relevant to a potentially life-threatening disease.  Defendant breached this duty by failing to promptly diagnose Benson's cheek tumor.

53.     Benson suffered severe emotional distress as a result of Defendant's negligent conduct.  At trial, Dr. Feleppa testified that Benson became very quiet upon being informed that his cancer was essentially incurable due to the delayed prognosis and treatment.  Similarly, Plaintiff testified that Benson, who was once a very active man, became generally more withdrawn.

54.     For approximately one year Benson lived with the understanding that earlier diagnosis and treatment of the cheek lesion by Defendant likely would have altered the course of his disease.[12]

55.     Due to the unique nature of a physician-patient relationship, Plaintiff's emotional distress was a reasonably foreseeable consequence of Defendant's negligent conduct.  See id. ("A factfinder could find it foreseeable that a patient might suffer

---

[12] The Court finds that Benson's emotional distress, though based on a misconception, is nevertheless compensable because his misconception was entirely reasonable in light of the information available to him at the time.  See Bolton v. Caine, 584 A.2d 615, 618 (Me. 1990).

psychological harm as the result of her physicians' breach of duty to inform her of critical information relevant to a potential life-threatening illness."").

    56.    Accordingly, the Court awards Plaintiff damages for emotional distress in the amount of $100,000.

    SO ORDERED.

                      /s/ George Z. Singal
                      GEORGE Z. SINGAL
                      Chief U.S. District Court Judge

Dated this 19th day of May 2002.

| | | |
|---|---|---|
| **ROSE MARIE BENSON,** *Individually and in her capacity as Personal Representative of the* ***ESTATE OF STEVEN W BENSON*** | represented by | **TERRENCE GARMEY** SMITH, ELLIOTT, SMITH & GARMEY, P.A. PO BOX 442 PORTLAND, ME 04112-0442 774-3199 *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |
| | | **KEITH JACQUES** SMITH, ELLIOTT, SMITH & GARMEY, P.A. 199 MAIN STREET PO BOX 1179 SACO, ME 04072 (207)282-1527 |
| **USA** | represented by | **EVAN ROTH** OFFICE OF THE U.S. ATTORNEY P.O. BOX 9718 PORTLAND, ME 04104-5018 (207) 780-3257 *LEAD ATTORNEY* |

11

*ATTORNEY TO BE NOTICED*

12

Exhibit E

LEXSEE 1989 U.S. DIST. LEXIS 1732



Cited
As of: Aug 19, 2007

**AGNES RUTKOWSKI, special Administrator for the Estate of LEO RUT-
KOWSKI, deceased, Plaintiff, v. OCCIDENTAL CHEMICAL CORPORATION, et
al., Defendants**

**No. 83 C 2339**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
ILLINOIS, EASTERN DIVISION**

*1989 U.S. Dist. LEXIS 1732*

**February 16, 1989, Decided**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants, a corporation
and others, filed a motion in limine to bar an engineer
from testifying as an expert witness on behalf of plaintiff
administrator in a wrongful death action.

**OVERVIEW:** The action involved the decedent's expo-
sure to asbestos. In granting the motion, the court held
that the engineer lacked the knowledge, skill, experience,
training, and education necessary to assist the trier of fact
to understand the evidence or to determine a fact in issue
within the meaning of *Fed. R. Evid. 702.*

**OUTCOME:** The court granted the motion.

**LexisNexis(R) Headnotes**

*Evidence > Testimony > Experts > Helpfulness*
*Evidence > Testimony > Experts > Qualifications*
[HN1] To qualify for expert witness status under *Fed.
R. Evid. 702,* an expert must be qualified as an expert, pro-
vide testimony that will assist a jury and rely on evidence
on which a reasonable expert in the field would rely.

*Evidence > Testimony > Experts > General Overview*
[HN2] See *Fed. R. Evid. 702.*

**OPINION BY:** [*1] GRADY

**OPINION**

*MEMORANDUM OPINION*

*JOHN F. GRADY, CHIEF UNITED STATES DISTRICT
JUDGE*

This case comes before us on defendants' motion in
limine to bar Barry I. Castleman ("Castleman") from
testifying as an expert witness on behalf of the plaintiff.
We grant the motion.

*FACTS*

[HN1] *To qualify for expert witness status under
Fed. R. Evid. 702,* [1] the expert "must be qualified as an
expert, provide testimony that will assist the jury and
rely on evidence on which a reasonable expert in the
field would rely." *United States v. Lundy, 809 F.2d 392,
395 (7th Cir. 1987).* In our view, Castleman does not
satisfy these minimum threshold requirements. Castle-
man has a bachelor's degree in chemical engineering, a
master's degree in environmental engineering and a doc-
tor of science degree. He has collected materials relating
to asbestos hazards dating back to the Nineteenth Cen-
tury. He has no medical degree.

1 *Federal Rule of Evidence 702* provides:

[HN2] If scientific, technical or other spe-
cialized knowledge will assist the trier of fact to
understand the evidence or to determine a fact in

1989 U.S. Dist. LEXIS 1732, *

issue, a witness qualified as an expert by knowledge, skill, experience, training and education may testify in the form of an opinion or otherwise.

[*2] In the answer to Expert Interrogatories, plaintiff asserts that Castleman will testify as to the existence and availability of numerous articles which discuss the hazards of exposure to asbestos dust and as to the knowledge that defendant had or should have about the health hazard posed by asbestos at the time each of them were shipping asbestos to the Johns-Manville Waukegan plant.

To properly support the factual conclusions described above, Castleman would have to offer competent evidence on at least three issues: (1) the existence of medical articles that discuss the relationship between asbestos dust and mesothelioma; (2) the conclusions reached by the authors of the articles concerning the relationship between asbestos dust and mesothelioma; and (3) whether the sources of these articles were well-known and how they were received by the medical community when they were published.

Castleman is certainly qualified to testify as to the existence of articles that discuss the relationship between asbestos dust and mesothelioma. As a librarian of asbestos research, he may well have amassed an impressive library of medical literature on the subject. However, Castleman lacks the medical [*3] background and experience to evaluate and analyze the articles in order to identify which parts of the articles best summarize the authors' conclusions. Furthermore, because he is not a medical expert, Castleman is not qualified to testify as to whether the sources which published the articles are well known or how the articles were received by members of the medical community when they were first published. We therefore conclude that plaintiff has failed to establish that Castleman has the "knowledge, skill, experience, training and education" necessary to "assist the trier of fact to understand the evidence or to determine a fact in issue" within the meaning of *Fed. R. Evid. 702.* [1]

2 We note that a plaintiff in a similar case offered Castleman as an expert witness to introduce into evidence a list of articles he had compiled, allegedly relating to the hazards of asbestos. *In Re Related Asbestos Cases, 543 F. Supp. 1142, 1150 (N.D. Cal. 1982).* Plaintiff claimed, as the plaintiff does here, that these articles were rele

vant to the question of whether defendants knew, or should have known, of the dangers of asbestos during the period when the articles were published. In denying Castleman the status of an expert, the court specifically found, as we do here, that Castleman lacked the expertise "necessary to read complex, technical medical articles and discern which portions of the articles would best summarize the authors' conclusions." *Id. at 1149.*

[*4] Finally, in *In Re Related Asbestos Cases, 543 F. Supp. at 1150,* Judge Peckham permitted Castleman, as a foundation witness, to describe his research methods and identify the articles he located. We decline to follow Judge Peckham's ruling on this point. Although Castleman is qualified to testify as to the ease or difficulty of locating medical material concerning asbestos hazards, such testimony is not relevant to the question of whether defendants knew, or should have known, of the dangers of asbestos because Castleman is not qualified to describe the contents of the articles or the conclusions reached by the authors. Rather, the introduction of what promises to be a long list of medical articles on the subject of asbestos hazards might unduly prejudice defendants' case by creating, without supporting evidence, the impression in the jury's mind that knowledge of asbestos hazards was commonplace at the time defendants shipped the asbestos products to the Johns-Manville plant. If plaintiff desires to create that impression, she should proffer a qualified expert medical witness who will clarify the contents of the articles for the jury, describe the sources which published the articles, [*5] and explain the reaction of the medical community to the articles when they were published. [1]

3 We point out to defendant ACL that the issue of whether Castleman is a professional pro-plaintiff witness in asbestos-related cases goes to his credibility and not to his competency as an expert witness. *See Gideon v. Johns-Manville Sales Corp., 761 F.2d 1129, 1136 (5th Cir. 1985).*

CONCLUSION

*We grant defendants' motion in limine to bar Barry I. Castleman from testifying as an expert witness.*

*DATED: February 16, 1989*

11297R

********** Print Completed **********

Time of Request: Sunday, August 19, 2007  11:43:13 EST

Print Number:     1842:43158223
Number of Lines: 110
Number of Pages:

Send To:   TEMPESTA, CAROL
           MARKS ONEILL OBRIEN & COURTNEY PC
           1800 JOHN F KENNEDY BLVD STE 1900
           PHILADELPHIA, PA 19103-7421