SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------X
IN RE: NEW YORK CITY ASBESTOS LITIGATION    :    NYCAL
-------------------------------------------------------------------X    I.A.S. Part 11
The Document Relates To:                                    :    (Madden, J.)
                                                                          :
FRANK BIANCO, et al.,                                          :    Index No. 115546-06
                                                                          :
                                    Plaintiff(s),            :
                                                                          :
              -against-                                          :
                                                                          :
A.O. SMITH WATER PRODUCTS, et al.,                :
                                                                          :
                                    Defendants.              :
-------------------------------------------------------------------X

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTIONS *IN LIMINE* TO EXCLUDE THE TESTIMONY OF BARRY
CASTLEMAN, D.Sc. AND DR. DOUGLAS POHL, M.D., Ph.d**

**PRELIMINARY STATEMENT**

Defendants Crane Co., Kentile Floors, Inc., the Laboratory Defendants (VWR

International, Inc., Univar USA Inc., Baxter Healthcare Corporation, ManorCare Health

Services, Inc., and Fisher Scientific International, Inc.), and Robert A. Keasbey Co.

(hereinafter collectively the "Defendants"), have filed motions *in limine* seeking an order

excluding Plaintiff's listed witnesses, Dr. Barry I. Castleman and Dr. Douglas Pohl, from

expressing opinions concerning the historical development of knowledge of the hazards

of asbestos in the medical, scientific, and industrial communities because the Defendants

do not agree with their opinions and disputes the methodology they employ in rendering

their opinions.  Defendants argue that Dr.'s Castleman and Pohl are not qualified as

experts to express opinions on certain documents because:  1) their testimony has not

gained general acceptance in the scientific community under Frye v. United States, 293 F.

1013 (D.C.Cir. 1923) and is, therefore, unreliable, 2) neither are qualified to render expert opinions, 3) their opinions are not based on admissible evidence, and 4) the documents and information are irrelevant to the Defendants.

Plaintiffs will show in response that by virtue of their education, training, and decades of study on the subject, that both Dr. Castleman and Dr. Pohl are highly qualified to identify and discuss the medical, scientific, and other published literature on asbestos and asbestos-related disease. Their review and analysis of this literature will assist the trier of fact in determining the extent of knowledge of the hazards of asbestos that was known (or should have been known) by the medical, scientific, and industrial communities from 1898 through the present. Moreover, their review of thousands of published articles and studies, as well as, corporate and other documents concerning the progression of the knowledge of health risks associated with exposure to asbestos help to present this complex medical and scientific historical information in a concise and understandable manner.

In addition, the Defendants will have their opportunity to challenge the basis for Dr. Castleman and Dr. Pohl's opinions. Pursuant to the New York Pattern Jury Instruction 1:190, it is the jury's responsibility to weigh the Defendant's argument as to the strength or weakness of the expert's opinion.[1] Therefore, Defendants' motions to exclude or limit the testimony of Dr. Castleman or Dr. Pohl should be denied as it has been on multiple prior occasions in courts throughout the country and New York state (see § V. infra).

---

[1] See Comment to PJI 1:190 at 131 *et seq.* for commentary and case law addressing the admissibility of expert testimony at trial.

## STATEMENT OF FACTS

Plaintiffs herein have alleged inter alia that the Defendants manufactured and marketed asbestos-containing materials or equipment on and in which asbestos-containing materials were used, without adequately warning those foreseeably exposed of the hazards of exposure to asbestos. Plaintiffs have alleged that Defendants knew or should have known of such hazards and either individually or in concert with others failed to adequately warn. Plaintiffs expect to show at trial that beginning with the end of the 19th Century, numerous articles began to appear in medical, scientific, technical and trade publications, journals and texts which discussed the hazards of exposure to asbestos dust. Plaintiffs contend that the Defendants, charged with the duty of keeping abreast of scientific and technical knowledge relating to the safety of their products, was (or should have been) alerted by these articles to the hazards posed by their products. Dr. Barry I. Castleman, or Dr. Douglas Pohl depending on availability at time of trial, will testify as to the existence and availability of the literature, and will discuss it as it relates to the state of knowledge of the hazards of asbestos, i.e. notice: what was known and knowable. Additionally, Plaintiffs will call Dr. Castleman and/or Dr. Pohl to identify and to testify concerning documents they have reviewed which demonstrate that several of the Defendants had actual knowledge of the health consequences of exposure to asbestos.

**Dr. Barry I. Castleman, Ph.D.**

Dr. Castleman is one of the world's leading experts on the history of knowledge regarding asbestos and disease. Dr. Castleman has received extensive formal training in environmental engineering and public health, requiring him to familiarize himself with various methods of scientific and medical research. In 1968, he received a Bachelor of

Science degree in Chemical Engineering from the Johns Hopkins University in Baltimore, Maryland. In 1971, he was awarded a Masters degree in Environmental Engineering, also from Johns Hopkins University in Baltimore. Dr. Castleman's Master's thesis, which resulted in the award of his Masters Degree, discusses asbestos-related diseases and their recognition in the medical literature. This paper, which was completed in 1971, outlines the development of knowledge concerning asbestos-related diseases. In May of 1985, Dr. Castleman was awarded an Sc.D. in Environmental Engineering at Johns Hopkins School of Hygiene and Public Health. His doctoral dissertation (which was later published as a book and now in its 5th edition), was a historical case study of asbestos, including the history of knowledge of asbestos diseases. As part of his academic training, Dr. Castleman received extensive course work training in Physiology, Epidemiology, Toxicology, Biostatistics, Environmental Cancer, and Occupational Medicine. His academic credentials, even taken alone, indicate that he is well-qualified to discuss the meaning and significance of medical and scientific articles dealing with the hazards of asbestos.

Dr. Castleman has authored numerous publications pertaining to asbestos disease, including "Asbestos and You," (1973), "Hazards of Asbestos for Brake Mechanics," published in the U. S. Public Health Reports, Volume 90, page 254, (1975) and other magazine and journal articles pertaining to asbestos and other hazardous substances. For other scientific publications authored by Dr. Castleman, please see his *curriculum vitae* (attached as **Exhibit A**). His book, Asbestos: Medical and Legal Aspects, first published by Harcourt, Brace & Jovanovich in 1984 and revised and updated in 1986, 1990, 1996, and 2005 is a detailed historical thesis which traces the development of knowledge in the

4

medical, scientific and business communities concerning the hazards of exposure to asbestos. Dr. Castleman's book has been recognized as a "learned treatise." Anderson v. A.P.I. Company of Minnesota, 559 N.W.2d 204, 206-209 (ND 1997) (citations omitted).

Dr. Castleman has acted as a consultant on environmental health policy for the Congress' Office of Technology Assessment, the Occupational Safety and Health Administration (OSHA), the Environmental Protection Agency (EPA), the United Nations Center on Transnational Corporations, the International Labor Office, the National Academy of Sciences, the Environmental Defense Fund, the Natural Resources Defense Council and the European Commission. He has testified, or offered written contributions, as an expert on asbestos before congressional committees concerning the hazards of asbestos and other toxic substances. From 1979 through 1981, Dr. Castleman was a paid consultant to the United States Environmental Protection Agency, performing policy-oriented research on environmental asbestos hazards.

Dr. Castleman has also lectured worldwide on asbestos and asbestos-related disease. He has made presentations at various academic institutions, including the University of Massachusetts Medical School, George Washington University Medical School, University of Cape Town (Cape Town, South Africa), Johns Hopkins School of Hygiene and Public Health, and Yale University Center for Health Studies. He is currently a lecturer on the faculty at Johns Hopkins School of Engineering.

**Dr. Douglas Pohl, M.D., Ph.D.**

Dr. Douglas Pohl is a practicing pathologist who is board certified in anatomic and clinical pathology. Moreover, he is also board certified in cytopathology, a discipline in which a small fraction of pathologists are certified. Dr. Pohl has reviewed hundreds, if

not thousands, of tissue specimens involving asbestos-related disease over the years. As a pathologist, his primary function is to diagnose disease, and he does so on a daily basis.

Dr. Pohl has testified as to the state-of-the-art on multiple occasions in multiple states, including New York. Dr. Pohl first became interested in state-of-the-art in 1988 after having given deposition testimony in an asbestos case in which he had performed an autopsy. At that time, and continuing to this day, he has conducted extensive research into state-of-the-art, having read well over a thousand articles on the subject. He often lectures to colleagues regarding the dangers of asbestos based on his years of research and clinical knowledge. Dr. Pohl brings his joint MD/Ph.D. degrees and years of knowledge as a leading practicing pathologist to the fore when reading state-of-the-art literature, much of which itself contains accounts of earlier pathologists detailing the ravages of asbestos on working populations at least since the late 1800s.

Dr. Pohl has received extensive medical training. In 1981, he received his Ph.D. in Clinical Pathology from St. Louis University School of Medicine while two years later, he received his M.D. from the same institution. Between 1980 and 1986, he received professional training at both the St. Louis School of Medicine and Tufts-New England Medical Center in Boston. Dr. Pohl is a Fellow of the College of American Pathologists, Fellow of the American Society of Clinical Pathologists, and member of the American Society of Cytopathology among other medical societies. For other appointments and publications by Dr. Pohl, please see his *curriculum vitae* (attached as **Exhibit B**).

## ARGUMENT

### I.

**DEFENDANTS REQUEST TO HOLD A <u>FRYE</u> HEARING IN THIS CASE IS ENTIRELY WITHOUT BASIS AS DR. CASTLEMAN AND DR. POHL'S TESTIMONY DOES NOT INVOLVE NOVEL SCIENTIFIC THEORY OR TECHNIQUE**

Defendants attempt to prevent Dr. Castleman and Dr. Pohl from testifying in this case on the basis of <u>Frye</u> is entirely without basis because their proposed testimony involves *no novel scientific theories or techniques*. Dr. Castleman and Dr. Pohl will present testimony as to the history surrounding the development of asbestos rather than opine on any specific scientific techniques or theories that may arise within various historical documents. They will testify to the existence of information concerning asbestos-related disease and its availability to the medical, scientific, and industrial communities during the periods of time that the plaintiff was exposed to the Defendants' asbestos-containing products. Moreover, the literature Dr. Castleman and Dr. Pohl have chronicled consists largely of reports by researchers not themselves clinicians, written for an audience of public health workers, industrial hygienists, safety engineers, labor industry, and governmental administrators, as well as medical doctors. They will not be giving medical testimony.

In this regard, the Court may take notice of the fact that Dr. Castleman and Dr. Pohl's state-of-the-art testimony has been widely accepted by many courts and has been used or sanctioned by numerous governmental agencies and reputable national private organizations that have addressed the problems created by asbestos. Accordingly, a <u>Frye</u> hearing is not, and has never in the past decades of asbestos litigation, been necessary to accept their testimony.

Curiously, Defendants emphasize Dr. Castleman and Dr. Pohl's characterization of their capacity as historians and chroniclers of science, as though for some reason this characterization undermines their qualifications to testify. Plaintiffs have no quarrel whatsoever with this characterization. It is precisely in their capacity as historians of science and chroniclers that Plaintiffs offer Dr. Castleman and Dr. Pohl to testify. Their expertise in this capacity is unparalleled, and the relevance of this expertise to the issue of Defendants' liability is absolute.

As Plaintiffs expert disclosures in this case indicates,[2] Dr. Castleman, or Dr. Pohl, depending on availability at time of trial, will discuss the availability of knowledge in the published literature which led to an awareness of the hazards of asbestos within the medical, business, and scientific communities. Such expert testimony is on all fours with that given in People v. Smith, where, in the context of evaluating the reliability and

---

[2] Dr. Castleman's Expert Witness Disclosure states he will testify to:

"...state-of-the-art issues...the availability of scientific information as to the hazards of asbestos, when information concerning those hazards became available, the nature of information that became available, the nature of the information that became available, the form of available scientific information and methods of its retrieval. Specifically, Dr. Castleman will trace the history of knowledge of asbestos hazards from the earliest of times, and in the modern era.....In addition, Dr. Castleman may testify as to the propensity of various asbestos containing products to release asbestos dust into the atmosphere, as well as the levels at which asbestos will produce various diseases. Dr. Castleman has been deposed and has previously testified on these issues on many occasions and such testimony is available to defendants..."

Dr. Pohl's Expert Witness Disclosure states he will testify to:

"...Dr. Pohl will testify concerning the availability of scientific information as to the hazards of asbestos, when information concerning those hazards became available, the nature of information that became available, the form of available scientific information and methods of its retrieval. Specifically, Dr. Pohl will trace the history of knowledge of asbestos hazards from the earliest of times, and in the modern era......Dr. Pohl will also testify as to corporate knowledge of the hazards of asbestos and conduct, including attempts to suppress knowledge and conspiratorial efforts, and trade association's knowledge, conduct and suppression of information..."

See Expert Witness Disclosure pursuant to C.P.L.R. § 3101(d)(attached as Exhibit A to Defendant Crane Co. and the Laboratory Defendant's Affirmations, Defendant Kentile's Affirmation as Exhibit C, and Robert A. Keasbey's Affirmation as Exhibit C).

accuracy of similarly non-scientific eyewitness identification testimony, the Court ruled

that:

> [t]o the extent that the testimony is helpful and offered by one who is
> trained, experienced or skilled in the relevant field of study, **but does not
> involve a novel scientific theory or technique**, a <u>Frye</u> hearing is
> unnecessary.

743 N.Y.S.2d 246, 248 (2002)(emphasis added). In that case, as in the present case, the

expert was present "merely [to] describe academic research and writings in a recognized

field of study and discuss the factors in the present case which may affect the ability to

identify accurately." <u>Ibid</u>.

Furthermore, a <u>Frye</u> hearing is not necessary where "practical experience is the

pertinent qualification and the proffered experts can demonstrate a reliable 'fit' between

their actual experience and the opinion to be rendered." <u>States v. Lourdes Hosp.</u>, 2001

N.Y.Misc. Lexis 223 (Sup. Ct. Suffolk Co. June 6, 2001). Courts facing such non-

scientific expert evidence in the past have, in refusing to apply <u>Frye</u>, relied upon the

traditional and time-tested methods of evaluating testimony via the crucible of 1)

vigorous cross-examination, 2) countervailing proof, and 3) careful instruction on the

burden of proof. <u>See</u> <u>People v. Kelly</u>, 288 A.D.2d 695, 696 (3rd Dept. 2001)(ruling that

the qualifications of an expert witness were not the proper subject of a <u>Frye</u> hearing

reasoning that inquiries into an expert's procedures relate to trial issues of foundation and

weight to be more fully explored in cross-examination); <u>Clemente v. Blumenberg</u>, 183

Misc.2d 923, 927 (Sup.Ct. Richmond Co. 1999)("<u>Frye</u> hearings are rarely conducted in

New York State courts unless the evidence being presented is novel. Judges usually

permit professionals to testify as experts and allow the adversary process of cross-

examination and opposing experts with different opinions to balance the playing field so

that jurors can weigh all the opinions and render a finding based upon what they believe to be true."); Wahl v. American Honda Motor Co., 181 Misc.2d 396, 398 (Sup. Ct. Suffolk Co. 1999)(stating the rule: "Where, however, the evidence is not scientific or novel, the Frye analysis is not applicable."); People v. Persaud, 244 A.D.2d 577, 578 (2nd Dept. 1997)(ruling "nothing novel" about fluorescent marking powder as device regularly used in police detective work).

## II.

### THE TESTIMONY OF DR. CASTLEMAN AND DR. POHL WILL ASSIST THE TRIER OF FACT TO BETTER UNDERSTAND THE EVIDENCE AND TO DETERMINE FACTS IN ISSUE

Both Dr. Castleman and Dr. Pohl's anticipated testimony meet the test of the New York Courts which permit the trial court to admit the testimony of a witness qualified as an expert by knowledge, skill, experience, training, or education if his testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. The test is whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute. Matott, 48 N.Y.2d 455; Price v. New York City Housing Authority, 92 N.Y.2d 553, 684 N.Y.S.2d 143 (1983).

In New York, expert witnesses may give opinion testimony where the conclusions to be drawn from the facts depend on professional or scientific knowledge or skill not within the range of ordinary training or intelligence. People v. Cronin, 60 N.Y.2d 430, 470 N.Y.S.2d 110 (1983). A foundation for expert testimony exists where such testimony "would help to clarify an issue calling for professional or technical knowledge beyond the ken of the typical jurors." De Long v. County of Erie, 60 N.Y.2d 296, 496

N.Y.S.2d 611 (1983); Price v. New York City Housing Authority, 92 N.Y.2d 553, 684

N.Y.S.2d 143 (1998). Expert witnesses in New York are "qualified, by knowledge, skill,

experience, training, or education, as an expert in the appropriate field." New York

Objections at § 16:20, *citing*, Price v. New York City Housing Authority, 92 N.Y.2d

553. Further, "[e]xpert testimony may be required if the issues presented are so complex

that the jury lacks the knowledge or skills necessary to interpret the facts or to draw

conclusions from them." Id. at § 16:20. The trial judge determines whether a witness is

qualified to testify as an expert, as well as the extent of the witness' expertise. Werner v.

Sun Oil Co., 65 N.Y.2d 839, 493 N.Y.S.2d 125 (1985). Once the court determines that a

witness qualifies as an expert, the trier of fact determines the weight to be given the

expert's testimony, including the degree of his or her qualification. Stevens v. Bronx

Cross County Medical Group, P.C., 256 A.D.2d 165 (1st Dept. 1998); Beck v. Albany

Medical Center Hosp., 191 A.D.2d 854, 594 N.Y.S.2d 844 (3d Dept. 1993). In addition,

the trial court is responsible for determining "when jurors are able to draw conclusions

from the evidence based on their day-to-day experience, their common observation and

their knowledge, and when they would be benefited by the specialized knowledge of an

expert witness." People v. Cronin, 60 N.Y.2d 430, 433.

Dr. Castleman and Dr. Pohl's opinions and conclusions relating to what the

defendants knew or should have known about the hazards of asbestos, are intrinsically

related to their expertise and special knowledge of the medical and scientific state-of-the-

art literature concerning those hazards which the defendants had access. Furthermore,

Dr. Castleman and Dr. Pohl have intimate knowledge of the numerous associations such

as the Industrial Hygiene Foundation, National Safety Council, Asbestos Information

Association and the Asbestos Textile Institute, in which some of the defendants had membership and which were a source of information as to the hazards of asbestos.

Notably, the Defendants do not suggest that Dr. Castleman or Dr. Pohl should have taken additional steps nor do they argue that Dr. Castleman and Dr. Pohl failed to use appropriate research techniques in acquiring their knowledge of their corporate conduct and knowledge regarding the hazards of asbestos. Indeed, Dr. Castleman and Dr. Pohl will rely in part upon primary source documents -- the companies' own historical records -- in reaching their conclusions. Both Dr. Castleman and Dr. Pohl are experienced in investigating such matters. Their testimony will enable the jury to place the Defendants' corporate documents in the proper context in light of the existing state-of-the-art, and in light of what was occurring in the industry as a whole -- both of which form the historical perspective through which corporate documents must be viewed. The historical knowledge and the opinion testimony presented by Dr. Castleman and Dr. Pohl is necessary so that the jurors may better understand the Defendants' documents as they pertain to the available medical and scientific knowledge in the twentieth century. Certainly such testimony is beyond the "ken" of the typical juror. See People v. Cronin, supra.

## III.

## DR. CASTLEMAN AND DR. POHL MAY RELY UPON MEDICAL, SCIENTIFIC, AND INDUSTRY JOURNALS AND PUBLICATIONS NOT THEMSELVES ADMISSIBLE IN EVIDENCE

The Defendants suggest that neither Dr. Castleman nor Dr. Pohl should be allowed to testify because their testimony will be based on a review of medical, scientific and industrial articles and corporate correspondence which are hearsay, and their testimony should not be a reliable substitute for authentic, relevant, and admissible evidence on highly judgmental and subjective issues such as the knowledge of corporate employees.

The only practical method of determining the extent of knowledge of the hazards of asbestos during the period or periods that these Plaintiffs were exposed to the Defendants' asbestos-containing products is from facts or data found in the medical, scientific, and industrial literature during those periods of time. It is this type of information that forms the basis not only of the testimony of Dr. Castleman and Dr. Pohl, but also of all the witnesses who are commonly known as "state-of-the-art experts" in the asbestos litigation.

Moreover, experts may rely on evidence which is not admissible if it is the type of evidence relied on generally in the field. Certainly historians routinely rely on documents published and/or otherwise available during the relevant time period for opinions as to what was known or knowable at a particular point in time. Defendants fail to recognize that, as a manufacturer of asbestos-containing products, they had the duty to stay abreast of developments in the scientific and medical literature regarding the hazards of asbestos. George v. Celotex, 914 F.2d 26, 28 (2d 1990)(ruling that a manufacturer "is held to the

knowledge of an expert in its field, and therefore has a duty to keep abreast of scientific knowledge, discoveries, and advances and is presumed to know what is imported thereby")(internal citations and quotations omitted).

Finally, the relevant medical, scientific, industrial and corporate publications and documents (plaintiff's state-of-the-art documents) are admissible for purposes of "notice" of the information contained therein. Since they are not offered for the truth of the matter asserted, these documents are not hearsay. George, at 30.

## IV.

## DEFENDANT'S CHALLENGE TO DR. CASTLEMAN AND DR. POHL IS TO THEIR CREDIBILITY, NOT THEIR ADMISSIBILITY

On reading the briefs of the Defendants, it becomes apparent that they do not believe that Dr. Castleman or Dr. Pohl have taken into consideration the articles that their experts will rely upon at trial. Dr. Castleman and Dr. Pohl have both testified in the past that they researched decades of materials from the early 1900's to the present time in laying the foundation for their opinions.

The issues that the Defendants raise here are issues for cross-examination of the witness at trial. Whether Dr. Castleman or Dr. Pohl reviewed a specific article or whether and why they would agree or disagree with a specific article is proper for cross-examination.

**V.**

## DR. CASTLEMAN AND DR. POHL HAVE OFFERED EXPERT TESTIMONY IN MANY COURTS THROUGHOUT THE UNITED STATES

The Defendants have cited a variety of cases in support of their argument that the testimony of Dr. Castleman should be excluded or limited in this litigation. This court need look no further than the opinion of the North Dakota Supreme Court that did a comprehensive review of Dr. Castleman's qualifications and the case law concerning qualifications and usefulness as an expert in asbestos cases. Anderson v. A.P.I. Company of Minnesota, 559 N.W.2d 204, 206-209 (ND 1997) (attached as **Exhibit C**). Dr. Castleman "has testified in more than 100 cases throughout the country" (This number has now grown to over 250 cases around the country). Id. at 207. Importantly, the North Dakota Supreme Court found that it did not find "a reported appellate court decision reversing a trial court's allowance of Castleman's unrestricted expert testimony." Id. In fact, the Court realized that Dr. Castleman had been allowed "to testify as an expert without forbidding him from testifying about the contents of medical articles." Id.

Defendants ignore those courts, including courts in New York that have, in published decisions, permitted Dr. Castleman to testify concerning state of the art, as well as those courts that reference either his testimony or his work. See Soebke v. Crane Co., et al., Index No. 1112947/04 at 4-5 (NY County, Part 57 March 22, 2006)(denying Crane Co.'s motion to preclude testimony of Barry Castleman based upon proposed Frye hearing: "It is my opinion that the testimony on state of the art is not the proper subject of a Frye hearing which should be held in cases where the scientific evidence that is sought to be presented is novel.....The motion for a preclusion order based on Frye or for

a <u>Frye</u> hearing is accordingly denied.")(<u>citing</u> <u>People v. Wesley</u>, 83 N.Y.2d 417)(attached hereto as **Exhibit D**); <u>Refermat v. A.C.&S., Inc., et al.</u>, Index No. I 2001-5870 (NY 8th Jud. Dist. Oct. 19, 2004)(denying motion to preclude testimony of Barry Castleman stating: "This Court is satisfied with Dr. Castleman's qualifications as a 'state of the art' expert. In addition, the majority of American courts which have considered the issue have allowed the testimony.")(attached as **Exhibit E**);.<u>Fibreboard Corp. v. Pool</u>, 813 SW2d 658, 692-93 (Tex. App.—Texarkana 1991, writ denied) (ruling that deposition testimony of Dr. Castleman was admissible "to show the knowledge in the industry generally of the dangers of asbestos"), <u>cert.</u> <u>denied sub.nom.</u>, <u>Garlock, Inc. v. Pool</u>, 113 S.Ct. 2339, and <u>cert.</u> <u>denied</u>, 113 S.Ct. 3037, and <u>cert.</u> <u>denied</u> <u>sub.nom.</u> <u>Owens-Illinois, Inc. v. Pool</u>, 113 S.Ct. 3064 (1993); <u>Celotex Corp. v. Tate</u>, 797 S.W.2d 197, 201 (Tex. App.--Corpus Christi 1990, writ dism'd by agr.) (affirming the trial court's decision to admit Dr. Castleman's testimony); <u>Anderson v. A.P.I. Co. of Minnesota</u>, 559 N.W.2d 204, 209 (N.D. 1997) (affirming Dr. Castleman's unrestricted state-of-the-art testimony based on the reading of the works of others); <u>Farrall v. A.C. & S. Co.</u>, 558 A.2d 1078, 1081 (Del. Super. Ct. 1989) (ruling that Dr. Castleman could testify as an expert on state of the art); <u>see also</u> <u>In re Joint Eastern and Southern Dist. Asbestos Litig.</u>, 129 B.R. 710 (E.D. & S.D. N.Y. 1991) (Judge Weinstein cites Dr. Castleman's treatise <u>Asbestos: Medical and Legal Aspects</u> twenty-eight (28) times as an authority on state of the art), <u>vacated on other grounds</u>, 982 F.2d 721 (2d Cir. 1992), <u>modified on other grounds</u>, 993 F.2d 7 (2d Cir. 1993); <u>In re North Dakota Personal Injury Asbestos Litig.</u>, 737 F. Supp. 1087, 1091, 1099 (D. N.D. 1990) (opinion discussing testimony of Dr. Castleman); <u>Eagle-Picher Indus. v. Balbos</u>, 604 A.2d 445, 452-53 (Md. 1992) (referring to Dr.

Castleman's testimony);  Skonberg v. Owens-Corning Fiberglas Corp., 576 N.E.2d 28, 30 (Ill. App.) appeal denied, 580 N.E.2d 135 (Ill. 1991) (opinion discussing Dr. Castleman's testimony);  Moran v. G. & W.H. Corson, Inc., 586 A.2d 416, 425 (Pa. Super. Ct. 1991), appeal denied, 602 A.2d 860 (Pa. 1992) (referencing testimony by Dr. Castleman); Nicolet, Inc. v. Nutt, 525 A.2d 146, 148-49 (Del. 1987) (trial court admitted testimony by Dr. Castleman on conspiracy issue);  Bordeaux v. Celotex Corp., 511 N.W.2d 899, 905 (Mich. Ct. App.), appeal denied, 530 N.W.2d 749 (Mich. 1995) (concluding that Dr. Castleman's testimony concerning industry-wide knowledge shows that the defendant knew or should have known the dangers of asbestos).

Because the Defendants cannot cite a recent published opinion finding Dr. Castleman or Dr. Pohl unqualified to testify as to the state-of-the-art, whereas Plaintiffs have cited a number of published opinions—including decisions from New York courts—recognizing the admissibility of Dr. Castleman's testimony, the weight of authority clearly leans in favor of admission.  See Backes, 783 F.2d at 79 (fact that a witness was allowed to testify as an expert in a similar suit is "some indication" of his qualifications in the instant action).  In addition, Plaintiffs' counsel has utilized Dr. Pohl as a state-of-the-art witness on multiple prior occasions in New York asbestos litigation. Accordingly, Plaintiff should be entitled to present Dr. Castleman and/or Dr. Pohl's testimony on the state-of-the-art.

## CONCLUSION

The Defendants' requests that Dr. Castleman and Dr. Pohl be restricted from offering opinions on the development of knowledge of the hazards of asbestos, or, in the alternative, that they be prohibited from commenting on such matters as the quality of medical articles, the known effects of asbestos on human beings, and the availability of medical journals. To restrict the testimony of Dr. Castleman and Dr. Pohl in this manner, given their respective years of study and acknowledged expertise in this area, would deprive the jury of the opportunity to view the articles in their proper context. Plaintiffs, therefore, respectfully request that the Defendants' Motions to limit testimony of Barry I. Castleman and Douglas Pohl be denied on the merits in their entirety. In the alternative, Plaintiffs submit that the issue cannot be properly decided until Dr. Castleman or Dr, Pohl has taken the witness stand and stated their qualifications. In any event, Defendants' Motions to Preclude the Testimony of Dr. Barry Castleman and Dr. Douglas Pohl should be denied.

Respectfully submitted,

WEITZ & LUXENBERG, P.C.
180 Maiden Lane, 17th Floor
New York, New York 10038
(212) 558-5500
Attorneys for Plaintiff

By: _Thomas M. Comerford._
       Thomas M. Comerford

Dated: New York, New York
       September 7, 2007

## CURRICULUM VITAE

**NAME:**

Douglas Alan Pohl, M.D., Ph.D.
18701 S.E. Crosswinds Lane
Jupiter, FL 33478
(561) 746-7211
Fax (561) 744-7594

## PERSONAL HISTORY:

| | |
|---|---|
| Date of Birth: | June 15, 1951 |
| Place of Birth: | Niskayuna, New York |
| Marital Status: | Married, three children |

## EDUCATIONAL BACKGROUND:

| | |
|---|---|
| 1983 | M.D., St. Louis University School of Medicine. St. Louis, Missouri |
| 1981 | Ph.D. (Clinical Pathology). St. Louis University School of Medicine. St. Louis, Missouri |
| 1972 | B.A. (Biology), Westminster College, Fulton, Missouri |
| 1969 | State University of New York at Buffalo |

## PROFESSIONAL TRAINING:

| | |
|---|---|
| 1983-86 | Resident in Pathology, Tufts-New England Medical Center, Boston, Massachusetts |
| 1983 | Internship in Pathology, Tufts-New England Medical Center, Boston, Massachusetts |
| 1980-1982 | Post-doctoral Fellow in Pathology. St. Louis University School of Medicine. St. Louis, Missouri. |

ACADEMIC APPOINTMENTS:

| | |
|---|---|
| 1995-2005 | Director, MLT Program<br>Central Maine Community College<br>Auburn, Maine |
| 1984-86 | Director, Clinical Immunology Laboratory,<br>Tufts-New England Medical Center, Boston,<br>Massachusetts |
| 1984 | Instructor, Northeastern University<br>Boston, Massachusetts |
| 1983 | Instructor, Tufts University Medical School,<br>Boston, Massachusetts |

CLINICAL EXPERIENCE:

| | |
|---|---|
| 5/05-Present | Cytopathologist<br>Cleveland Clinic Weston |
| 4/95-4/05 | Director of Laboratories and Pathology<br>Central Maine Medical Center, Lewiston, ME |
| 1/97-4/05 | Director of Pathology<br>Rumford Community Hospital, Rumford, ME |
| 4/91-4/95 | Associate Pathologist<br>University Hospital, Tamarac, FL. |
| 4/91-4/93 | Medical Director<br>CenPath Laboratory, Inc., Deerfield Beach, FL |
| 6/86-4/91 | Associate Pathologist<br>J.F.K. Medical Center, Lake Worth, FL. |
| 9/85-4/86 | Research Staff, Clinical Immunology, Lahey<br>Clinic, Boston, MA |
| 2/85-4/86 | Emergency Room Department<br>Hunt Memorial Hospital<br>Danvers, Massachusetts |
| 2/84-2/85 | Surgery Department<br>Lemuel Shattuck Hospital<br>Boston, Massachusetts |

12/83                St. Louis City Hospital (Emergency Department)
                     St. Louis, Missouri

SOCIETIES:

                     Fellow of the College of American Pathologists
                     Fellow of the American Society of Clinical Pathology
                     American Society of Cytopathology

CERTIFICATION:

        Diplomate of the National Board of Medical Examiners (Parts I, II and III)

        American Board of Pathology, Anatomic and Clinical Pathology, 5/30/86.
        Recertified 11/97.

        American Board of Pathology, Subspecialist in Cytopathology, 7/8/96

MEDICAL LICENSE:

                     Maine #13975
                     Massachusetts #53200
                     Florida #48614

## PUBLICATIONS

Papers:

1. Moore TL, Ryan Jr. RE, Pohl DA, Roodman ST, and Ryan RE: Immunoglobulin, complement and immune complex levels during a migraine attack. Headache 20:9, 1980.

2. Pohl, DA, Gibbons Jr. JJ, Tsai CC and Roodman ST: Isolation and purification of human Clq from plasma. J. Immunol. Meth. 36:13, 1980.

3. Pohl, DA, Tsai CC and Roodman ST: Detection of immune complexes using a solid phase Clq polystyrene ball assay. J. Immunol. Meth. 40:313, 1981.

4. Perillo RP, Pohl DA, Roodman ST and Tsai CC: Acute non-A non-B hepatitis with serum sickness-like syndrome and aplastic anemia. JAMA 245:494, 1981.

5. Gibbons Jr. JJ, Pohl DA, Tsai CC and Roodman ST: Temperature-sensitive binding of solid phase Clq to aggregated human immunoglobulin G. Biochim. Biophys. Acta 670:146, 1981.

6. Pohl, DA: Characterization of a polystyrene ball Clq solid phase assay for circulating immune complexes. Dissertation, April 10, 1981.

7. Lefebvre MP, Leape LL, Pohl DA, Safaii H and Grand RJ: Total colonic aganglionosis initially diagnosed in an adolescent. Gastroenterology 87:1364, 1984.

Abstracts:

1. Pohl, DA, Gibbons Jr. JJ and Roodman ST: Solid-phase Clq binding assay for immune complexes utilizing polystyrene balls. Fed. Proc. 38:1358, 1979.

2. Moore TL, Ryan Jr. RE, Pohl DA, Roodman ST, and Ryan RE: Comparison of immunoglobulin, complement and immune complex levels during a migraine headache and during a headache-free period. Headache 19:243, 1979.

3. Gibbons Jr. JJ, Pohl DA, Tsai CC, and Roodman ST: Effect of complement and temperature on binding of immune complexes to solid phase Clq. Fed. Proc. 38:5625, 1979.

Books:

Toth C., Pohl D. and Agnello V.  <u>Methods for the Detection of Immune Complexes Utilizing C1q or Rheumatoid Factors.</u>  Manual of Clinical Immunology, Rose, N.R. and Friedman, H., eds.  American Society for Microbiology, 1986.

## CURRICULUM VITAE

NAME:

Douglas Alan Pohl, M.D., Ph.D.
18701 S.E. Crosswinds Lane
Jupiter, FL 33478
(561) 746-7211
Fax (561) 744-7594

PERSONAL HISTORY:

Date of Birth: June 15, 1951
Place of Birth: Niskayuna, New York
Marital Status: Married, three children

EDUCATIONAL BACKGROUND:

1983    M.D., St. Louis University School of Medicine.
St. Louis, Missouri

1981    Ph.D. (Clinical Pathology). St. Louis University
School of Medicine. St. Louis, Missouri

1972    B.A. (Biology), Westminster College, Fulton,
Missouri

1969    State University of New York at Buffalo

PROFESSIONAL TRAINING:

1983-86    Resident in Pathology, Tufts-New England
Medical Center, Boston, Massachusetts

1983    Internship in Pathology, Tufts-New England
Medical Center, Boston, Massachusetts

1980-1982    Post-doctoral Fellow in Pathology. St. Louis
University School of Medicine. St. Louis,
Missouri.

## ACADEMIC APPOINTMENTS:

| | |
|---|---|
| 1995-2005 | Director, MLT Program<br>Central Maine Community College<br>Auburn, Maine |
| 1984-86 | Director, Clinical Immunology Laboratory,<br>Tufts-New England Medical Center, Boston,<br>Massachusetts |
| 1984 | Instructor, Northeastern University<br>Boston, Massachusetts |
| 1983 | Instructor, Tufts University Medical School,<br>Boston, Massachusetts |

## CLINICAL EXPERIENCE:

| | |
|---|---|
| 10/06-Present | Senior Staff Pathologist<br>Quest Diagnostics<br>Miramar, FL |
| 7/06-Present | Pathologist/Cytopathologist<br>Physicians Regional Medical Center<br>Naples, FL |
| 5/05-10/06 | Cytopathologist<br>Cleveland Clinic Weston<br>Weston, FL |
| 4/95-4/05 | Director of Laboratories and Pathology<br>Central Maine Medical Center<br>Lewiston, ME |
| 1/97-4/05 | Director of Pathology<br>Rumford Community Hospital<br>Rumford, ME |
| 4/91-4/95 | Associate Pathologist<br>University Hospital<br>Tamarac, FL. |
| 4/91-4/93 | Medical Director<br>CenPath Laboratory, Inc.<br>Deerfield Beach, FL. |
| 6/86-4/91 | Associate Pathologist |

J.F.K. Medical Center
Lake Worth, FL

9/85-4/86          Research Staff, Clinical Immunology,
                   Lahey Clinic
                   Burlington, MA

2/85-4/86          Emergency Room Department
                   Hunt Memorial Hospital
                   Danvers, Massachusetts

2/84-2/85          Surgery Department
                   Lemuel Shattuck Hospital
                   Boston, Massachusetts

12/83              St. Louis City Hospital (Emergency Department)
                   St. Louis, Missouri


SOCIETIES:

                   Fellow of the College of American Pathologists
                   Fellow of the American Society of Clinical Pathology
                   American Society of Cytopathology


CERTIFICATION:

Diplomate of the National Board of Medical Examiners (Parts I, II and III)

American Board of Pathology, Anatomic and Clinical Pathology, 5/30/86.
Recertified 11/97.

American Board of Pathology, Subspecialist in Cytopathology, 7/8/96


MEDICAL LICENSE:

                   Maine #13975
                   Massachusetts #53200
                   Florida #48614

## PUBLICATIONS

Papers:

1. Moore TL, Ryan Jr. RE, Pohl DA, Roodman ST, and Ryan RE:  Immunoglobulin, complement and immune complex levels during a migraine attack.  Headache 20:9, 1980.

2. Pohl, DA, Gibbons Jr. JJ, Tsai CC and Roodman ST:  Isolation and purification of human C1q from plasma.  J. Immunol. Meth.  36:13, 1980.

3. Pohl, DA, Tsai CC and Roodman ST:  Detection of immune complexes using a solid phase C1q polystyrene ball assay.  J.  Immunol. Meth. 40:313, 1981.

4. Perillo RP, Pohl DA, Roodman ST and Tsai CC:  Acute non-A non-B hepatitis with serum sickness-like syndrome and aplastic anemia.  JAMA 245:494, 1981.

5. Gibbons Jr. JJ, Pohl DA, Tsai CC and Roodman ST:  Temperature-sensitive binding of
   solid phase C1q to aggregated human immunoglobulin G.  Biochim. Biophys. Acta 670:146, 1981.

6. Pohl, DA:  Characterization of a polystyrene ball C1q solid phase assay for circulating immune complexes.  Dissertation, April 10, 1981.

7. Lefebvre MP, Leape LL, Pohl DA, Safaii H and Grand RJ:  Total colonic aganglionosis initially diagnosed in an adolescent.  Gastroenterology 87:1364, 1984.

Abstracts:

1. Pohl, DA, Gibbons Jr. JJ and Roodman ST:  Solid-phase C1q binding assay for immune complexes utilizing polystyrene balls.  Fed. Proc. 38:1358, 1979.

2. Moore TL, Ryan Jr. RE, Pohl DA, Roodman ST, and Ryan RE:  Comparison of immunoglobulin, complement and immune complex levels during a migraine headache
   and during a headache-free period.  Headache 19:243, 1979.

3. Gibbons Jr. JJ, Pohl DA, Tsai CC, and Roodman ST:  Effect of complement and temperature on binding of immune complexes to solid phase C1q.  Fed. Proc. 38:5625, 1979.

4

Books:

Toth C., Pohl D. and Agnello V. <u>Methods for the Detection of Immune Complexes Utilizing C1q or Rheumatoid Factors.</u> Manual of Clinical Immunology, Rose, N.R. and Friedman, H., eds. American Society for Microbiology, 1986.

1 of 1 DOCUMENT

Richard C. Anderson, Plaintiff and Appellee v. A.P.I. Company of Minnesota, a Minnesota corporation, (also known as A.P.I., Inc.), et al., Defendants and Owens-Corning Fiberglas Corp., a Delaware corporation, Defendant and Appellant

Civil No. 950392

SUPREME COURT OF NORTH DAKOTA

*1997 ND 6; 559 N.W.2d 204; 1997 N.D. LEXIS 4*

January 16, 1997, Filed

PRIOR HISTORY: [***1]   Appeal from the District Court for Grand Forks County, Northeast Central Judicial District, the Honorable Bruce E. Bohlman, Judge.

DISPOSITION: AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

COUNSEL: David C. Thompson (argued), of David C. Thompson, P.C., P.O. Box 5235, Grand Forks, ND 58206-5235, Thomas A. Dickson (on brief), of Dickson Law Office, P.O. Box 1896, Bismarck, ND 58502-1896, and Jeanette T. Boechler (on brief), of Boechler Law Firm, P.O. Box 1932, Fargo, ND 58107-1932, for plaintiff and appellee.

Bruce Jones (argued), of Faegre & Benson, 2200 Norwest Center, 90 South Seventh Street, Minneapolis, MN 55402, for defendant and appellant.

JUDGES: Opinion of the Court by Neumann, Justice. William A. Neumann, Mary Muehlen Maring, Herbert L. Meschke, Dale V. Sandstrom, Gerald W. VandeWalle, C.J.

OPINIONBY: William A. Neumann

OPINION: [**205]

   NEUMANN, Justice.

   [*P1]   Owens-Corning Fiberglas Corporation (Owens-Corning) appeals from a judgment entered on a jury verdict ordering Owens-Corning to pay Richard C Anderson $ 85,000 [***2]  as its share of the damages suffered by Anderson in this asbestos-related personal injury action, and from orders denying Owens-Corning's post-trial motions. We affirm in part, reverse in part, and remand for a reduction in the amount of economic damages awarded to Anderson.

   [*P2]   From 1959 until 1985, Anderson operated and maintained boilers in the main heating plant at the Minot Air Force Base. During those years, Owens-Corning manufactured an asbestos-containing pipe covering and block insulation under the trade name "Kaylo." Kaylo products were shipped to the main heating plant at the Base while Anderson worked there, and Anderson personally handled, installed, and removed large amounts of pipe covering, cutting it with a saw and inhaling the resulting dust. He also handled, installed, and removed block insulation at the heating plant.

   [**206] [*P3]   In 1991, Anderson was diagnosed with asbestosis, an incurable but non-malignant disease caused by exposure to asbestos. Anderson sued Owens-Corning and other former manufacturers, distributors, and installers of asbestos-containing products, alleging negligence and strict product liability theories of recovery. Owens-Corning was the only defendant [***3] appearing at trial. The jury found Anderson had an asbestos-related disease and suffered $ 340,000 in damages. The jury apportioned 25 percent of the fault to Owens-Corning, and judgment was entered awarding Anderson $ 85,000, plus interest and costs. The trial court denied Owens-Corning's post-trial motions, and this appeal followed.

   1

   [*P4]   Owens-Corning's primary argument on appeal is the trial court committed reversible error in admitting the testimony of Anderson's "state-of-the-art" expert witness, Dr Barry I Castleman.

   [*P5]   In a pretrial motion in limine, Owens-Corning moved to exclude Castleman's proposed testimony or, in the alternative, to limit the testimony "to an identification of medical and scientific articles upon which he relies and limiting [him] to reciting the text of those articles without offering any opinions or conclu-

1997 ND 6, *; 559 N.W.2d 204, **;
1997 N.D. LEXIS 4, ***

sions he may have relative to those articles." Owens-Corning argued the proposed testimony would be beyond the scope of Castleman's qualifications, would be confusing to the jury and more prejudicial than probative, would be inadmissible hearsay, and would lack proper foundation. The trial court denied the motion in limine, but noted it would "expect [***4] that [Anderson] will establish a proper foundation at the time of trial for the testimony ...."

[*P6] The night before Castleman was to testify, Anderson's counsel informed Owens-Corning Castleman would be unavailable, and he intended to instead offer a transcript of Castleman's testimony from a 1991 North Dakota federal district court case against Owens-Corning. The following day, the trial court found Castleman was unavailable to testify in person and, over Owens-Corning's objection, allowed Anderson to use the transcript of his prior testimony. The transcript of Castleman's prior testimony was read to the jury.

[*P7] On appeal, Owens-Corning does not assert the trial court's finding of unavailability is clearly erroneous or the trial court erred in finding Anderson's offer of Castleman's 1991 testimony complied with the hearsay exception in N.D.R.Ev. 804(b)(1). Rather, Owens-Corning asserts Castleman was not qualified as an expert to testify about historical medical articles reflecting the state of the medical community's knowledge of asbestos dangers.

[*P8] It is well established that the qualifications of an expert witness are primarily for the determination of the trial court, and its determination [***5] will not be reversed on appeal unless that discretion was abused. *Oberlander v. Oberlander, 460 N.W.2d 400, 402 (N.D. 1990).* As N.D.R.Ev. 702 explains:

> "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

[*P9] Rule 702 envisions generous allowance of the use of expert testimony if the witnesses are shown to have some degree of expertise in the field in which they are to testify. *Matter of Estate of Aune, 478 N.W.2d 561, 564 (N.D. 1991).* The rule does not require an expert to have a formal title or be licensed in any particular field, but recognizes it is the witness's actual qualifications that count by providing that an expert can be qualified by knowledge, skill, experience, training, or education. *Oberlander; 3 Weinstein's Evidence P 702[04] (1996).*

Thus, an expert witness's "knowledge may be derived from reading alone in some fields, from practice alone in some fields, or as is more commonly the case, from both." [***6] 1 McCormick on Evidence § 13, at pp. 54-55 (4th ed. 1992) (footnote omitted). While the trial court decides the qualifications of the witness to express an opinion on a given topic, the trier of fact decides the expert witness's [**207] credibility and the weight to be given to the testimony. *Construction Assoc. v. Fargo Water Equip., 446 N.W.2d 237, 239 (N.D. 1989).*

[*P10] Castleman received a bachelor of science degree in chemical engineering from Johns Hopkins University in 1968 and, four years later, obtained a masters degree in environmental engineering from the same university. His masters thesis was titled "Asbestos: Effects on Health." In 1985, Castleman was awarded a doctorate in environmental engineering from Johns Hopkins University School of Hygiene and Public Health. His thesis was titled "Asbestos: An Historical Case Study of Corporate Response to an Industrial Health Hazard." Castleman has authored numerous publications relating to asbestos disease, most notably Asbestos: Medical and Legal Aspects, which has been judicially recognized as a "learned treatise." *Nicolet, Inc. v. Nutt, 525 A.2d 146, 148 (Del. 1987).* See also *Peerman v. Georgia-Pacific Corp., 35 F.3d [***7] 284, 285 (7th Cir. 1994); In re North Dakota Personal Injury Asbestos Lit., 737 F. Supp. 1087, 1091 (D.N.D. 1990); ACandS v. Godwin, 340 Md. 334, 667 A.2d 116, 131 (1995).* The treatise details the development of knowledge in the medical, scientific, and business communities concerning the hazards of human exposure to asbestos. Castleman has been a consultant for many private organizations and governmental agencies and has testified before United States congressional committees concerning the hazards of asbestos and other substances. He has testified in more than 100 court cases throughout the country. During the course of his research, Castleman has reviewed thousands of publications pertaining to asbestos-related diseases.

[*P11] Anderson offered Castleman's testimony, based on the specialized knowledge he had derived from his education, training, skill, and experience as an occupational health policy consultant and historian, to discuss the historical progression of knowledge concerning the hazards of asbestos within the scientific, medical, technical, and business communities. Castleman's testimony here focused on historical medical knowledge of the hazards of asbestos.

[*P12] Owens-Corning [***8] asserts Castleman is "merely a lay librarian of asbestos medical research," and although this might qualify him to testify about the existence of medical articles addressing the relationship between asbestos and certain diseases, it does not qualify

1997 ND 6, *; 559 N.W.2d 204, **;
1997 N.D. LEXIS 4, ***

him to testify about the contents of the articles because
Castleman is not a medical doctor. Claiming Castleman
lacks the medical background and experience to evaluate
and analyze the articles he reviewed, Owens-Corning
asserts his testimony was actually medical opinion he
was, unqualified to give and, therefore, the testimony
could not have been of any assistance to the jury.

[*P13] Owens-Corning relies on several examples
of what it considers improper and unqualified medical
testimony given by Castleman, including the following
excerpts:

"Q. Because of what Dr. Merewether
called a maturation period, Doctor, what
would happen if you looked at a group of
workers exposed to asbestos for disease
after only a couple of years of exposure?

"A. You wouldn't find any.

"Q. Why?

"A. Well, if Merewether didn't find it
under the totally worst conditions imagin-
able in the asbestos textile industry, the
unregulated asbestos textile industry of
[***9] the early twentieth century, if he
didn't find the workers that were exposed
in those conditions had disease until after
five years from onset, it's hard to imagine
any find of an asbestos industry where
one would see asbestosis that soon.

. . . .

"Q. Of what significance, again, Doc-
tor -- from a Public Health policy view-
point, of what significance is it, if any,
that asbestos causes both asbestosis and
lung cancer in terms of the use of a
threshold limit value?

"A. Well, the guideline here is in-
tended to limit, if not to prevent, the dis-
ease of lung scarring, asbestosis; but the
identification of a separate disease process
that asbestos also caused, namely the ini-
tiation of cancer, throws open the question
anew about what level might be consid-
ered acceptable or what might approach a
safe [**208] level from the standpoint of
preventing this disease of cancer. It's a
very different type of disease process
Cancer reproduces itself, once it starts. It
doesn't need a massive amount of asbestos
fibers to cause the scars throughout the
lungs.

. . . .

"Q. Now, did the authors of the arti-
cle put forward some conclusions?

"A. Yes.

"Q. And can you tell us what those
conclusions were? [***10]

"A. They concluded, first, that dust
control was available for some of the
more dusty operations and recommended
at various points in the article things like
the use of respiratory protection, wet
methods and ventilation to reduce the ex-
posure to workers. They also reported that
-- they concluded -- after saying that they
had found one case of advanced asbesto-
sis and two moderately developed cases
based on chest x-rays, they then went on
to say that since they had only seen three
cases of asbestosis in this workforce of
more than a thousand people, that this was
not a very dangerous occupation, and
that's why we've been talking about it in
courts ever since."

[*P14] We believe Owens-Corning's attempt to de-
fine medical opinion testimony as including anything
Castleman had read or perceived through his asbestos
research is overly broad. The jury was aware Castleman
was not a medical doctor and had not personally con-
ducted experiments to determine the hazards of asbestos.
Castleman did not testify concerning diagnosis of asbes-
tos disease. Rather, Castleman testified about the devel-
opment of the awareness of the hazards of asbestos in the
corporate, scientific and technical communities [***11]
at the pertinent time. This state-of-the-art testimony ob-
viously derives from a reading of the works of others. As
the court pointed out in *Steinfurth v. Armstrong World
Industries, 27 Ohio Misc. 2d 21, 500 N.E.2d 409, 411
(1986).*

"Experts have always been permitted
to testify regarding information which
forms the basis of their opinions. This has
never been limited to 'hands-on' experi-
ence, but can include review of applicable
treatises, formal classes, discussions with
colleagues, personal investigations, read-
ing of books of science, and information
gained from other experts in the field.
These science items are 'perceived' by
state-of-the-art witnesses in compliance
with Evid.R. 703."

1997 ND 6, *; 559 N.W.2d 204, **;
1997 N.D. LEXIS 4, ***

Castleman's perceptions of the articles he reviewed during his asbestos research can hardly be considered medical opinion testimony in the normal sense of the term.

[*P15] We are aware of the reported decisions relied on by Owens-Corning that have excluded or severely restricted Castleman's testimony in other asbestos litigation. But *Wilson v. Johns-Manville Sales Corp., 810 F.2d 1358, 1362-1363* (5th Cir.), cert. denied, *484 U.S. 828, 108 S. Ct. 97, 98 L. Ed. 2d 58* (1987), was an [***12] appellate court decision affirming a district court's discretionary exclusion of Castleman's testimony as a discovery sanction for failing to produce documents in response to a subpoena duces tecum, and *In re Related Asbestos Cases, 543 F. Supp. 1142, 1149-1150* (N.D.Cal. 1982), was a trial court decision precluding Castleman from testifying as an expert witness for many of the same reasons asserted by Owens-Corning in this case. What Owens-Corning has not cited, and we have not found, is a reported appellate court decision reversing a trial court's allowance of Castleman's unrestricted expert testimony.

[*P16] Indeed, trial courts in reported decisions have allowed Castleman to testify as an expert without forbidding him from testifying about the contents of medical articles. See, e.g., *Johns-Manville Corp. v. United States, 13 Cl. Ct. 72, 147* (1987); *Farrell v. A.C. & S. Co., Inc., 558 A.2d 1078, 1081* (Del.Super.Ct. 1989). Most reported appellate court decisions do not reflect that Castleman's testimony was restricted by the trial courts in the manner sought by Owens-Corning in this case. In those decisions, no issue was raised about the scope of Castleman's testimony on appeal, [***13] or if it was, the appellate court deemed the issue waived. See, e.g., *Ingram v. Acands, Inc., 977 F.2d 1332, 1342* (9th Cir. 1992); *Eagle-Picher v. Balbos, 326 Md. 179, 604 A.2d 445, 452* (1992), *Bordeaux v. Celotex Corp., 203 Mich. App. 158, 511* [**209] *N.W.2d 899, 905* (1993), *Fibreboard Corp. v. Pool, 813 S.W.2d 658, 692* (Tex.Ct.App. 1991), cert. denied, *509 U.S. 923, 113 S. Ct. 3037, 125 L. Ed. 2d 724* (1993), *Celotex Corp. v. Tate, 797 S.W.2d 197, 202* (Tex.Ct.App. 1990); *Davis v. Celotex Corp., 187 W. Va. 566, 420 S.E.2d 557, 560* (1992). In the one reported appellate decision addressing whether the trial court erred in allowing Castleman's testimony about articles he had read and the knowledge of the medical community of asbestos-related hazards, the appeals court found no abuse of discretion in admitting the testimony. See *Moran v. G. & W.H. Corson, Inc., 402 Pa.Super. 101, 586 A.2d 416, 428-429* (1991).

[*P17] If there is a thread of consistency in the reported litigation over Castleman's qualifications as a state-of-the-art expert witness and the scope of his testimony, it is found in the broad discretion afforded trial courts in determining the qualifications and [***14]

usefulness of expert witnesses and the reluctance of appellate courts to interfere with that discretion. Owens-Corning has not persuaded us to interfere with the trial court's discretionary decision in this case.

[*P18] The trial court, in the exercise of its discretion, determined Castleman had sufficient specialized knowledge, skill, experience, training, and education to synthesize his research and knowledge and render an opinion which would assist the jury. A trial court abuses its discretion when it acts in an arbitrary, unreasonable, or unconscionable manner, or when its decision is not the product of a rational mental process. *Bruner v. Hager, 547 N.W.2d 551, 554* (N.D. 1996). On the record before us, we cannot say the trial court abused its discretion.

[*P19] Owens-Corning also argues Castleman's testimony was inadmissible hearsay under N.D.R.Ev. 801(c) because it revolved around the substance of articles written by others. But once Castleman was found qualified as an expert, N.D.R.Ev. 703 became applicable:

> "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. [***15] If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

Thus, "expert witnesses can testify to opinions based on hearsay or other inadmissible evidence if experts in the field reasonably rely on such evidence in forming their opinions." *United States v. Locascio, 6 F.3d 924, 938* (2nd Cir. 1993), cert. denied, *U.S. , 114 S. Ct. 1645, 128 L. Ed. 2d 365* (1994). Owens-Corning does not argue experts in the field do not reasonably rely on the articles about which Castleman testified. Therefore, the purported inadmissible hearsay nature of the testimony about the articles did not render Castleman's expert opinion testimony inadmissible in this case.

II

[*P20] Owens-Corning asserts it is entitled to a new trial because it was prejudiced by the misconduct of Anderson's trial counsel. Owens-Corning contends Anderson's counsel improperly insinuated and falsely stated during questioning that Anderson had cancer, improperly attempted to present to the jury contents of deposition testimony and Owens-Corning answers to interrogatories from other [***16] cases, and made multiple references to supposedly incriminating Owens-

1997 ND 6, *; 559 N.W.2d 204, **;
1997 N.D. LEXIS 4, ***

Corning answers to interrogatories, then refrained from further questioning "after the damage had been done."

[*P21] The determination to grant or deny a new trial for misconduct of counsel rests almost entirely in the discretion of the trial court and will not be reversed on appeal absent a clear abuse of discretion. *State v. Thiel, 515 N.W.2d 186, 189 (N.D. 1994); Kresel v. Giese, 231 N.W.2d 780, 790 (N.D. 1975).* While we agree that counsel, as an officer of the court, must refrain from improper and potentially prejudicial comments during trial, see *Andrews v. O'Hearn, 387 N.W.2d 716, 731 (N.D. 1986),* we do not believe counsel's improper remarks and questioning in this case were so prejudicial as to deny Owens-Corning a fair trial.

[*P22] Counsel's isolated comment about Anderson having cancer caused no prejudice. [**210] Counsel did not argue to the jury that Anderson had cancer. Indeed, Anderson testified himself he did not have cancer and the jury was made well aware of that fact. The other improper questions were also isolated occurrences when considered in the context of this eight-day trial. Moreover, the trial [***17] court instructed the jury to "decide the case based solely on the evidence, which consists of the testimony of the witnesses, the exhibits, and all the facts which may have been stipulated." This court has noted the curative effect of this type of instruction on allegations of prejudicial misconduct of counsel. See *Holte v. Carl Albers, Inc., 370 N.W.2d 520, 526-527 (N.D. 1985); Kresel.* The trial court was in a superior position to gauge the potential prejudice of counsel's misconduct and its probable effect on the jury in the context of this lengthy trial. We conclude the trial court did not abuse its discretion in denying Owens-Corning's motion for a new trial.

III

[*P23] Owens-Corning asserts the jury's award to Anderson of $ 25,000 in past economic damages is unsupported by the evidence. Owens-Corning claims the only evidence Anderson presented to the jury about past economic loss consisted of medical bills totaling $ 17,453.09.

[*P24] In *Johnson v. Monsanto Co., 303 N.W.2d 86, 92 (N.D. 1981)* (citation omitted), this court said:

"The determination of the amount of damages is in the province of the jury and rests largely in the discretion of the jury. Nevertheless, [***18] the jury must determine the compensation to which a party is entitled within reasonable limits, based upon the evidence. If those limits have been exceeded, it is the duty of the court to make a proper reduction or grant a new trial."

[*P25] Anderson has not directed our attention to anything in the record to support an award of past economic damages in excess of $ 17,453.09. Judges, whether trial or appellate, are not ferrets, obligated to engage in unassisted searches of the record for evidence to support a litigant's position. See *Linrud v. Linrud, 552 N.W.2d 342, 345 (N.D. 1996); First Nat. Bank & Trust Co. v. Jacobsen, 431 N.W.2d 284, 288 (N.D. 1988).* We deem Anderson's failure to direct our attention to any record evidence to support the jury's award of $ 25,000 in past economic damages a concession that no such evidence exists. We therefore conclude, as a matter of law, the jury's award of $ 25,000 in past economic damages must be reduced to $ 17,453.09, thus reducing the judgment entered on the verdict against Owens-Corning to $ 83,114.

[*P26] Accordingly, we affirm in part, reverse in part, and remand for an appropriate reduction of the jury's award of past economic damages [***19] to Anderson.

[*P27] William A. Neumann

Mary Muehlen Maring

Herbert L. Meschke

Dale V. Sandstrom

Gerald W. VandeWalle, C.J.

CONCURBY: Gerald W. VandeWalle

CONCUR:

VandeWalle, Chief Justice, concurring specially:

[*P28] As the majority opinion notes, Owens-Corning Fiberglass Corporation objected to allowing Richard Anderson to use a transcript of Dr. Barry Castleman's testimony in another case rather then testifying in person because Castleman was unavailable. See *Crowston v. Goodyear Tire & Rubber Co., 521 N.W.2d 401 (N.D. 1994)* (affirming trial courts exclusion of deposition testimony under N.D.R.Evid. 804(b)(1) because deponents were not unavailable within meaning of N.D.R.Evid. 804(a)(5) merely because they were not residents of North Dakota). I agree that issue is not raised by Owens-Corning in this appeal.

[*P29] Gerald W. VandeWalle, C.J.

1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK - CIVIL TERM - PART: 57
-------------------------------------------------X
GEORGE W. SOEBKE and URSULA SOEBKE and RONALD
GORI,

                                        PLAINTIFFS,


                    -against-


CRANE CO., et al,


                                        DEFENDANTS.

-------------------------------------------------X

Index No. 1112947/04              80 Centre Steeet
          111252/04               New York, New York
                                  March 22, 2006


B E F O R E:

    HONORABLE MARCY S. FRIEDMAN, Justice


A P P E A R A N C E S:

        WEITZ & LUXENBERG, P.C.
        Attorneys for the Plaintiffs
        180 Maiden Lane
        New York, New York 10038-4925
             BY:  JAMES C. LONG, JR., ESQ.,


        KIRKPATRICK & LOCKHART NICHOLSON GRAHAM LLP
        Attorneys for the Crane Co.
        2828 North Harwood Street Suite 1800
        Dallas, TX 75201-6966
             BY:  JAMES A. LOWERY III, ESQ.
                  MICHAEL E. WALLER, ESQ.


        LYNCH DASKAL EMERY LLP
        Attorney for Goodyear
        264 West 40TH Street
        New York, New York 10018
             BY:  SCOTT R. EMERY, ESQ.

                        STEVEN L. KARLIN, CSR
                        OFFICIAL COURT REPORTER

2

1                             Proceedings

2               THE COURT:  The record will reflect that

3     in accordance with my usual procedures I have

4     requested that one or two counsel for the

5     defendants who are still parties to this case

6     serve as the primary spokespersons for the

7     defendants on the issues being heard today with

8     the opportunity for any of the other appearing

9     defendants to the heard if they have anything to

10    add or any disagreement with anything that their

11    fellow counsel had to say.

12          Mr. Emory initially undertook that role

13    and again in accordance with my usual procedures I

14    had hearing on the motion to consolidate the Gori

15    and Soebke cases off the record.

16          I then also had hearing off the record of

17    Crane Company's motion for an order precluding the

18    testimony of Doctors Barry Castleman and Douglass

19    Pohn pursuant to Frye versus United States, and

20    Mr. Long on behalf of plaintiffs was heard on both

21    motions.

22          With respect to the motion to consolidate

23    or join for trial the Gori and Soebke cases as

24    discussed off the record, I will have a

25    supplemental affirmation by the plaintiffs setting

26    forth the dates of the last exposures as to which

3

|     |                                                            |
|-----|------------------------------------------------------------|
| 1   | Proceedings                                                |
| 2   | testimony will be offered for Gori and Soebke and          |
| 3   | discussing the effect of any difference in the             |
| 4   | periods of the exposures on whether the motion to          |
| 5   | consolidate or join should be granted.                     |
| 6   | I will have an opposing affirmation in                     |
| 7   | this case.  The affirmation of the plaintiff can           |
| 8   | both set forth the dates of the exposures and the          |
| 9   | legal argument on the impact, and an affirmation           |
| 10  | or a memorandum as the defendants wish or as may           |
| 11  | be appropriate, may address the same issues and            |
| 12  | the effect of the exposures on the motion to               |
| 13  | consolidate or join.  And ofcourse if there is any         |
| 14  | factual -- I don't see how there will be a factual         |
| 15  | dispute.                                                   |
| 16  | The plaintiff is going to represent what                   |
| 17  | will be the date of the last exposer that will be          |
| 18  | introduced.                                                |
| 19  | MR. LONG:  Can I comment on that?  When                    |
| 20  | you say date of last exposure, no matter what the          |
| 21  | testimony is we're going to tell you that anything         |
| 22  | after the latency period is irrelevant.  So I will         |
| 23  | give you two dates what he said and what we allege         |
| 24  | contributed to the injury.                                 |
| 25  | THE COURT:  But I am particularly                          |
| 26  | interested in knowing what evidence you will seek          |

Steven Karlin, CSR

4

1            Proceedings

2      to offer as to the last exposure date or what will

3      be the last exposure date that you will seek to

4      prove.

5                 MR. LONG:  Understood, your Honor.

6                 THE COURT:  And the supplemental

7      affirmation from the plaintiff will be served so

8      received by March 28th.  The supplemental

9      affirmation or legal memorandum as appropriate

10     will be served by April 4.  All papers will be

11     filed with the Clerk of the part, 57, by

12     April 5th.

13                With respect to Crane Company's motion

14     for a Frye hearing regarding the testimony of

15     Doctors Castleman and Pohl, I note that the

16     plaintiff has clarified that the plaintiff will

17     offer testimony from whichever of these experts

18     may be called solely on the state of the art issue

19     and will not seek to offer these witnesses to

20     testify about the propensity of asbestos

21     containing products to release asbestos dust and

22     the levels at which asbestos will produce

23     diseases.

24                That latter proffer had been included in

25     the expert witness disclosers.  However, the

26     plaintiff has clarified that it will not in fact

                 Steven Karlin, CSR

5

```
1                           Proceedings
2       be made at the trial and that the testimony will
3       be limited to the state of the art.
4              It is my opinion that the testimony on
5       state of the art is not the proper subject of a
6       Frye hearing which should be held in cases where
7       the scientific evidence that is sought to be
8       presented is novel. See People versus Wesley, 83
9       N.Y.2d 417.
10             This is not a case involving novel
11      scientific evidence or novel scientific
12      methodologies or principles.  While the defendant
13      raises some interesting issues about whether the
14      experts may testify based on particular documents
15      in particular issues as to whether the documents
16      have been sufficiently authenticated, those issues
17      go not to any matter that would be the proper
18      subject of the Frye hearing but rather to a
19      foundation which is properly determined at the
20      trial when testimony based on specific documents
21      is proferred.  Again, see People versus Wesley 83
22      N.Y.2d 417.
23             The motion for a preclusion order based
24      on Frye or for a Frye hearing is accordingly
25      denied.  This concludes the Court's ruling on the
26      motion.
```

Steven Karlin, CSR

6

```
1                           Proceedings
2                In addition, and on another matter, I
3        have received letters from several defendants
4        copied to the plaintiff indicating that they would
5        wish to make motions in limine on the specified
6        issues, that is, the issues specified in the
7        letters.
8                I see no basis given the issues that were
9        identified to alter my usual procedure which is
10       that the motions in limine will be entertained
11       orally on the record at the trial rather than in
12       writing.
13               Finally, the plaintiff has requested a
14       settlement conference and to meet with the Court
15       out of the presence of the defendants.  I have
16       asked whether any defendant who is appearing has
17       an objection to my meeting separately with the
18       plaintiff and then with the defendant which may be
19       the subject of the settlement discussions.  And my
20       understanding is that no defendant objects to this
21       settlement procedure being followed.  If I am
22       incorrect and there is any objection to holding
23       settlement conferences in this way, please let me
24       know at this time.
25               I am not hearing anything.  So that will
26       confirm that my understanding was correct.  I have
```

Steven Karlin, CSR

7

1    Proceedings

2    nothing further.  If any of the defendants or the

3    plaintiff wishes to be heard on any other issues

4    this would be your opportunity.

5    MR. LONG:  Do you want to talk about

6    Zuckerman before we confer about settlement or

7    after?

8    THE COURT:  Zucjerman is the separate

9    case that has some discovery issues.  I think we

10   will talk about that before and I will do that off

11   the record, and then if there is anything I need

12   to put on the record about it I will do that.

13   Do any of the defendants have any other

14   issues?  I am not hearing anything.  Thank you

15   very much.

16   I will just ask Mr. Long to identify the

17   defendants out of my presence the cases which he

18   wishes settlement discussions today, and I will

19   ask those defendants to remain.  Of course any

20   defendants that wish to remain while we conference

21   the Zuckerman case are also welcome to do so.

22   Thank you.  The record is closed for the moment.

23   (Discussion held off the record.)

24   THE COURT:  I just want to let you know

25   given that we have a final trial date for April

26   17th, that if I should rule that the two cases

Steven Karlin, CSR

8

|    |                                                              |
|----|--------------------------------------------------------------|
| 1  | Proceedings                                                  |
| 2  | will be tried separately, I will try them back to            |
| 3  | back.  And I would like you to confer and let me             |
| 4  | know if there is any agreement, if I do try them             |
| 5  | separately, as to which should be tried first.  If           |
| 6  | not, I will just do them in caption order.  I will           |
| 7  | do the earliest one in the caption first.                    |
| 8  | MR. LONG:  The only comment I would make                     |
| 9  | on that is Mr. Gori is alive and Mr. Soebke is               |
| 10 | dead, and I would prefer you try the case of the             |
| 11 | living first so he can get his day in court first            |
| 12 | while he is still with us.                                   |
| 13 | THE COURT:  That would probably make                         |
| 14 | sense.                                                       |
| 15 | Would any of the defendants have any                         |
| 16 | objection to that?  I am not hearing anything so I           |
| 17 | will try the Gori case first, if they are tried             |
| 18 | separately.  I just wanted you to know that so               |
| 19 | that you would be able to prepare for trial since            |
| 20 | the April 17th date is final.  We will go off the            |
| 21 | record again.                                                |
| 22 | (Discussion held off the record.)                            |
| 23 | THE COURT:  The record will reflect that                     |
| 24 | I have conferenced the discovery issues in the               |
| 25 | Zuckerman case with Mr. Long and Mr. Barnett for             |
| 26 | Conair, and the record will further reflect                  |

Steven Karlin, CSR

9

| | |
|---|---|
| 1 | Proceedings |
| 2 | April 17th will be the final date for the |
| 3 | completion of all outstanding discovery in this |
| 4 | case.  The parties will appear on April 17th for a |
| 5 | final pretrial conference in part 57 at 9:30 a.m. |
| 6 | Is there anything further for the record |
| 7 | on this by either counsel?. |
| 8 | MR. LONG:  No, your Honor. |
| 9 | MR. BARNETT:  No, your Honor. |
| 10 | THE COURT:  The record is closed. |
| 11 | |
| 12 | It is hereby certified that the |
| 13 | foregoing is a true and accurate |
| 14 | transcript of the proceedings. |
| 15 | |
| 16 | |
| 17 | STEVEN KARLIN |
| 18 | Official Court Reporter |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |

Steven Karlin, CSR

SUPREME COURT OF THE STATE OF NEW YORK
EIGHTH JUDICIAL DISTRICT
************************************************************

In Re Eighth Judicial District Asbestos Litigation

************************************************************

STATE OF NEW YORK
SUPREME COURT: COUNTY OF ERIE
************************************************************
PATRICIA D. REFERMAT, Individually and as Executrix
of the Estate of RICHARD D. REFERMAT,

                          Plaintiff

                                              Index No. I 2001-5870

vs.

A. C. and S, INC., et al.,

                          Defendants

************************************************************


### A P P E A R A N C E S

WEITZ & LUXENBERG, P.C.

(Douglas D. von Oiste, Esq., of Counsel)
Attorneys for Plaintiff
180 Maiden Lane
New York, New York 10038-4925

HARRIS BEACH LLP
(Andrew J. Orenstein, Esq., of Counsel)
(Michael J. Masino,  Esq., of Counsel)
Attorneys for Defendant Kentile Floors, Inc.
805 Third Avenue
New York, New York 10022

**TYDINGS & ROSENBERG, LLP**
(Harold M. Walter, Esq., of Counsel)
Attorneys for Defendant Kentile Floors, Inc.
100 East Pratt Street, 26th Floor
Baltimore, Maryland 21202
••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

### DECISION AND ORDER

Defendant Kentile Floors Inc. ("Kentile") moves *in limine* to preclude the testimony of Barry I. Castleman, Sc.D. , one of plaintiff's listed experts. Plaintiff intends to call Dr. Castleman for his opinion "concerning the historical development of knowledge of the hazards of asbestos in the medical scientific and industrial communities."

Kentile claims that, because Dr. Castleman is not a medical doctor, he is not qualified to fully explain or analyze the medical articles or methodology or principles which (underlie' the articles. Further, the material about which Dr. Castlemean is to testify is hearsay, Kentile claims. Finally, it argues, the proposed testimony is irrelevant because it is not specific to Kentile's floor tile products.

This motion is denied. Plaintiffs have succeeded in showing that Dr. Castleman's training, education, background and experience qualify him to opine on the topic of asbestos knowledge. He has concentrated his studies and research in this area for over twenty years and has published numerous articles on the topic. This Court is satisfied with Dr. Castleman's qualifications as a "state of the art" expert.

In addition, the majority of American courts which have considered the issue

have allowed the testimony. (*see, e.g. Anderson v. A. P. I. Company of Minnesota,*

559 NW 2d 204 [Supreme Court, N. Dakota, 1977] and the cases cited therein)

SO ORDERED

JAMES B. KANE , JHO

DATED:  Buffalo, New York
         ~~January~~      ,2004
         *October 19*

GRANTED

OCT 1 9 2004

BY

KATHLEEN S. FINNERTY
COURT CLERK

-3-