SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

----------------------------------------------------------x

In Re: NEW YORK CITY ASBESTOS
LITIGATION

    NYCAL
    I.A.S. Part 11
    (Madden, J.)

----------------------------------------------------------x

This Document Relates To:

    Index No. 114120/06

CHRISTIAN HOLINKA,

      Plaintiff

   -against-
A.W. CHESTERTON COMPANY, et al.,

      Defendants.

----------------------------------------------------------x

## THE LABORATORY SUPPLY DEFENDANTS' JOINT MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE* SEEKING TO PRECLUDE EXPERT TESTIMONY ON EXPOSURE ASSESSMENT AND THE CASE SPECIFIC REPORTS OF DRS. RABINOWITZ AND WEINBERG

        Defendants Baxter Healthcare Corporation (alleged to be a successor in interest to American Hospital Supply Corp. and American Scientific Products), Fisher Scientific International Inc., VWR International, Inc. and Univar USA Inc. (collectively, "Defendants") respectfully submit this joint memorandum of law in opposition to the motion *in limine* of Plaintiff Christian Holinka ("Plaintiff Holinka") to preclude Defendants' experts from opining as to Plaintiff Holinka's level of asbestos exposure and to strike the report of Dr. Kenneth Weinberg and a portion of the report of Dr. Sheldon Rabinovitz.

## PRELIMINARY STATEMENT

Plaintiffs[1] seek to strike the expert reports of over twelve different industrial hygienists from across the country because they claim that exposure assessment testimony is "novel" and "not generally accepted" within the scientific community. Contrary to Plaintiffs' hyperbole and rhetoric, however, this assault upon exposure assessment is entirely without merit. Indeed, exposure assessment is a common scientific technique[2], which has been a scientifically accepted methodology in the industrial hygiene field for years. (*See Asbestos Exposure Dose Reconstruction*, American Industrial Hygiene Conference & Expo 2002, June 27, 2002, at T4:21 to 5:5, attached as Exhibit C to *Affirmation of Thomas Comerford, Esq.*, dated August 21, 2007 ("*Comerford Aff.*"). Ignoring the statements contained within their own submissions, Plaintiffs attempt to turn science on its head by attacking a well-founded and generally accepted methodology simply in an attempt to obfuscate the shortcomings of their own experts.

Accordingly, because exposure assessment is generally accepted within the industrial hygiene and scientific communities -- and therefore satisfies the *Frye* standard -- this Court should deny Plaintiffs' motion or conduct a *Frye* hearing.

---

[1] Since Weitz and Luxenberg has filed a joint motion *in limine* for all of the cases in which consolidation is sought, but has not been ordered, the term "Plaintiffs" is used herein to refer to all such cases in which consolidation has been sought. Defendants have opposed plaintiffs' motion to consolidate Holinka with other cases and object to consolidation of Holinka with any other case. Nothing contained in this Opposition is intended to waive, and Defendants maintain, their objection and opposition to any proposed consolidation.

[2] The simple fact that Plaintiffs seek to strike no less than *twelve* different experts on this issue speaks volumes as to the merits of their contention that exposure assessment is a "novel" science.

**LEGAL ARGUMENT**

I.   **THE EXPOSURE ASSESSMENT CONDUCTED BY DEFENDANTS'
     INDUSTRIAL HYGIENIST WAS DONE IN ACCORDANCE WITH THE
     GENERALLY ACCEPTED PRINCIPLES AND PROCEDURES AND,
     THEREFORE, IS ADMISSIBLE UNDER THE *FRYE* STANDARD.**

In this products liability case specifically, Plaintiff Holinka alleges that Defendants[3] (or

their alleged respective predecessors) may have supplied Bunsen burner pads and heat-resistant

mittens to various laboratories in which Plaintiff Holinka studied, researched, and/or worked

over a thirty year period. Plaintiff Holinka believes that those products contained asbestos (but

does not know for sure) and claims that his exposure to asbestos fibers from those products

caused him to develop mesothelioma. As with any toxic tort based products liability case,

Plaintiff Holinka must prove that he inhaled asbestos fibers from those specific products and that

he was exposed to a sufficient level of asbestos to cause his alleged illness, more commonly

referred to as "specific causation." *See Parker v. Mobil Oil Corp.*, 7 N.Y. 3d 434 (2006).

In an effort to counter Plaintiff Holinka's specious allegations, Defendants have produced

the expert opinion of Robert Adams, MS, CIH, CSP. Mr. Adams is a certified industrial

hygienist and a nationally certified safety professional. By examining the testimony of Plaintiff

Holinka, reviewing the scientific literature regarding similar laboratory products and applying a

scientifically accepted methodology, Mr. Adams has concluded that the level of asbestos fibers

to which Plaintiff Holinka would have been exposed (if he was exposed) during his alleged use

of Bunsen burner pads and mittens would be well below ambient environmental levels and, thus,

---

[3]       However, Univar USA Inc. contends that it is not a successor to the lab supply business
of Van Waters & Rogers.

could not cause mesothelioma. As will be demonstrated herein, Mr. Adams' exposure assessment opinion is not only generally accepted within the scientific community, but under the *Parker* decision Defendants are clearly permitted to introduce such testimony.

This Court should deny Plaintiff Holinka's motion or conduct a *Frye* hearing.

A.    The *Frye* Standard

Although the admissibility of expert evidence is left to the sound discretion of the trial court, *People v. Brown*, 97 N.Y.2d 500 (2002), New York Courts have adopted the standard set forth in *Frye v. United States* regarding the admissibility of expert evidence. In *Frye*, the Court set forth the following rule governing the admissibility of expert testimony:

> [O]pinions of experts or skilled witnesses are admissible in evidence in those cases in which the matter of inquiry is such that inexperienced persons are unlikely to prove capable of forming a correct judgment upon it, for the reason that the subject-matter so far partakes of a science, art, or trade as to require a previous habit or experience or study in it, in order to acquire a knowledge of it. When the question involved does not lie within the range of common experience or common knowledge, but requires special experience or special knowledge, then the opinions of witnesses skilled in that particular science, art, or trade to which the question relates are admissible in evidence.

*Frye v. United States*, 54 App. D.C. 46, 293 F. 1013, 1014 (D.C. Cir. 1923).

The standard set forth in *Frye* was adopted by the New York Court of Appeals in *People v. Wesley*, which stated in relevant part, that "[t]he long-recognized rule of *Frye* . . . is that expert testimony based on scientific principles or procedures is admissible but only after a principle or procedure has 'gained general acceptance' in its specified field. *People v. Wesley*, 83 N.Y.2d 417 (1994). General acceptance in the field can be established through scientific or legal writings, judicial opinions or expert opinion (other than that of the proffered expert). *Parker v. Mobil Oil Corp.*, 16 A.D.3d 648, 651 (2nd Dept. 2005), aff'd, 7 N.Y.3d 434 (2006).

- 4 -

**B.**   **Exposure Assessment Is Admissible Under *Frye*.**

1.   Exposure Assessment is Generally Accepted in the Field of Industrial Hygiene.

Plaintiff Holinka contends that "dose reconstruction" and "exposure assessment" are just two names for an analytical process that has been shunned by the industrial hygiene community. This couldn't be further from the truth.

Exposure assessment and dose reconstruction are related, but distinct analytical tools. Exposure assessment is the estimation of airborne concentrations of a substance given a set of conditions or circumstances. (*Affidavit of Robert C. Adams*, M.S., C.I.H., C.S.P., dated September 7, 2007 ("*Adams Aff.*"), at ¶ 7.) Dose reconstruction takes the analysis one step further; it focuses on the amount of the substance in issue that enters the body and/or interacts with organs or tissues. (*Adams Aff.* at ¶ 9.)

Defendants' industrial hygienist, Mr. Adams, conducted an exposure assessment, not a dose reconstruction. (*Adams Aff.* at ¶ 9.) Mr. Adams has no opinion regarding the *precise* amount (if any) of asbestos fibers that actually entered Plaintiff's body and/or interacted with his organs or tissues; indeed, any such determination would be impossible. (*Expert report of Robert C. Adams*, dated July 17, 2007, attached as Exhibit A to *Adams Aff.*) Rather, using generally accepted scientific methods, he has estimated Plaintiff's asbestos exposure from his alleged use of asbestos-containing Bunsen-burner pads and heat-resistant mittens. (*Id.*)

Contrary to Plaintiffs' arguments, such exposure assessment is generally accepted in the field of industrial hygiene. (*Adams Aff.* at ¶ 8; *Asbestos Exposure Dose Reconstruction*, American Industrial Hygiene Conference & Expo 2002, June 27, 2002, at T4, attached as Exhibit C to *Comerford Aff.*)    It "is an integral component of environmental epidemiology, risk

- 5 -

assessment, risk management, and disease diagnosis and treatment." (National Research Council, *Human Exposure Assessment for Airborne Pollutants: Advances and Opportunities* (1991), attached as Exhibit A to *Affidavit of Timothy J. Fraser*, dated September 10, 2007 ("*Fraser Aff.*")) It also is an "essential tool" for evaluating occupational health risks. (Department of Health and Human Services, *Exposure Assessment Methods: Research Needs and Priorities* (July 2002), attached as Exhibit B to *Fraser Aff.*)

Exposure assessment has been a cornerstone of the practice of industrial hygiene for at least the last 60 years. (*Adams Aff.* at ¶ 8; *Asbestos Exposure Dose Reconstruction*, American Industrial Hygiene Conference & Expo 2002, June 27, 2002, at T4, attached as Exhibit C *Comerford Aff.*) According to the United States Environmental Protection Agency, exposure assessment has been around in some form for over 100 years. (United States Environmental Protection Agency, *Guidelines for Exposure Assessment*, Risk Assessment Forum, Washington D.C. (1992)). Hardly a "novel" concept as Plaintiffs claims.

In light of the importance of exposure assessment, it should come as no surprise that exposure assessment is taught in universities, is the subject of professional development courses and represents the largest component of the two-stage written examination given to those seeking to be Board certified in industrial hygiene. (*Adams Aff.* at ¶¶ 3-5.) The principles and procedures upon which exposure assessment is based have been discussed and detailed in the published literature for at least the past 25 years. (*Id.* at ¶ 8.) A list of some of the key texts and articles that discuss exposure assessment is attached as Exhibit C to the *Adams Aff.*

Several federal agencies, including the National Research Counsel, the United States Environmental Protection Agency and the National Institute for Occupational Safety and Health, routinely use exposure assessment in their work and have published comprehensive summaries

of the underlying principles and procedures. (*See Adams. Aff.*, Ex. C; National Research Council, *Human Exposure Assessment for Airborne Pollutants: Advances and Opportunities* (1991), attached as Exhibit A to *Fraser Aff.*)

The general acceptance of exposure assessment is further demonstrated by the fact that Plaintiff Holinka himself had planned to have Dr. William Longo, an oft-used plaintiffs' expert, testify regarding the estimated level of Plaintiff Holinka's asbestos exposure until Plaintiff Holinka realized that a prior report from Dr. Longo demonstrated that Plaintiff Holinka's alleged use of asbestos-containing Bunsen burner pads and heat-resistant mittens would have generated an insignificant amount of fiber release. Specifically, Plaintiff Holinka's initial expert witness list, served on April 13, 2007, disclosed that Dr. Longo would testify regarding the results of his analysis of Plaintiff Holinka's exposure, as follows:

> [Dr. Longo] has examined the amount of dust released by mixing and/or manipulating various asbestos-containing products ... has quantified the asbestos release generated from the aforementioned use of these materials ... may compare his result of these dust studies by analysis using both particles per cubic foot, fibers per cc ... [and] may testify that the levels of asbestos dust measured during these tests **exceeded** established [Threshold Limit Values] and [Permissible Exposure Limits] in many instances.

(*Expert Witness Disclosure Pursuant to CPLR 3101(d)*, attached as Exhibit C to *Fraser Aff.* (emphasis added)). However, contrary to this disclosure, Dr. Longo had authored a report in 2001 that concluded that the use of asbestos-containing gloves released only a **small amount** of asbestos fibers – an amount that would not approach, much less "exceed" the established Threshold Limit Values and Permissible Exposure Limits.

Mr. Adams relied on that 2001 study in arriving at his opinions in this case, and Defendants then served their expert disclosures and Mr. Adams' expert report on July 30, 2007.

Two weeks later, Plaintiff Holinka announced that he would not call Dr. Longo or Dr. Longo's business partner, Richard Hatfield, who had also been designated as one of Plaintiff Holinka's experts, to testify at trial. Having realized that even his own expert believes the use of asbestos-containing heat-resistant mittens would have generated an insignificant fiber release, Plaintiff Holinka now seeks to preclude the Defendants from introducing that evidence at trial.

The sole support for Plaintiff Holinka's motion to exclude are three *unpublished* decisions and the transcript from a 2002 American Industrial Hygiene Conference. None of Plaintiff Holinka's "authorities" are applicable to this case because, as Plaintiff Holinka acknowledges in his motion, those materials all relate to dose reconstruction and **not** to exposure assessment. Mr. Adams conducted an exposure assessment.

In addition, the panel at the 2002 American Industrial Hygiene Conference observed that dose reconstruction is "**generally acceptable by the scientific community** and it is reproducible within an acceptable degree of scientific certainty." (*Asbestos Exposure Dose Reconstruction*, American Industrial Hygiene Conference & Expo 2002, June 27, 2002, at T4:21-23, attached as Exhibit C to *Comerford Aff.* (emphasis added)). Further, the handful of words that Plaintiff Holinka extracts out of context from the transcript to "support" his contention that dose reconstruction has been "shunned" by the industrial hygiene community were in fact spoken by a member of the audience, not by a panelist.

      2.    Plaintiff Holinka's Attempt to Bar Defendants from Introducing Evidence Regarding His Level of Exposure Violates the Holding of *Parker v. Mobil Oil Corp.*

The Weitz & Luxenberg Plaintiffs seek to prevent all defendants from introducing *any* evidence regarding actual exposure levels in violation of the Court of Appeals' decision in *Parker v. Mobil Oil Corp.*, 7 N.Y.3d 434, 448 (2006), which establishes that a plaintiff in a toxic

- 8 -

tort matter has the burden of proving not only general causation, but specific causation as well.

Plaintiffs seek to bar testimony of *twelve* experts, but they do not challenge those experts' qualifications or make any attempt to show that the experts' methodology deviated from the principles and procedures set forth in the published literature. Plaintiffs do not even limit their motion to exclude experts based on the particular methodology used. Instead, fully aware they cannot prove that Plaintiff Holinka (or other plaintiffs) were exposed to significant levels of asbestos fibers, Plaintiffs challenge the entire concept of estimating actual exposure level.

For example, Plaintiff Holinka has moved to exclude Dr. Robert Sawyer's opinion that "the combination of insignificant fiber release, if any, and brevity of infrequent occurrence, cannot generate dose of causative disease risk of any asbestos related disease." Dr. Sawyer's opinion is based on the fact that there is no competent industrial hygiene evidence that working with Bunsen burner pads and heat-resistant mittens can cause asbestos-related disease and the fact that Plaintiff Holinka specifically testified that his use of the products in issue was brief and intermittent.[4] (*Expert Report of Robert Sawyer, M.D.*, at 3, attached as Exhibit K to *Comerford Aff.*) Plaintiffs do not challenge the manner in which Dr. Sawyer arrived at his opinions; rather, Plaintiffs seek to exclude Dr. Sawyer merely because he had the temerity to render an opinion based on Plaintiff Holinka's likely exposure level.

_____

[4] Dr. Sawyer is qualified to review the published literature regarding asbestos and opine regarding causation. He has a Masters Degree in Public Health from Yale University and obtained his medical degree from Case Western Reserve University in 1963. He did his residency in the Department of Epidemiology and Public Health at Yale University as well as Post Doctoral research in Epidemiology at Yale University. In addition, he was a professor in the Department of Environmental Health and Toxicology at SUNY Albany from 1996 to 2003 and in 2006 was a faculty member at SUNY Albany in the Department of Environmental and Health Services. Dr. Sawyer also lectured in Epidemiology from 1972 to 1989 and has several publications regarding asbestos over the course of his 34 year career.

If the Court grants the Weitz & Luxenberg Plaintiffs' motion to preclude any evidence regarding Plaintiff Holinka's exposure levels, Defendants will be barred from challenging Plaintiff Holinka's very contention that he was exposed to a sufficient level of asbestos to develop mesothelioma. In other words, the Weitz & Luxenberg Plaintiffs would have this Court relieve them of their obligation to prove specific causation.

In *Parker*, the plaintiff, who was a gasoline attendant for two decades, alleged that exposure to benzene contained within gasoline products to which he was exposed caused him to develop acute myelogenous leukemia ("AML"). *See* 7 N.Y. 3d at 442. At trial, the defendants moved to preclude the plaintiff's expert testimony on the issue of medical causation as scientifically unreliable under *Frye*. *Id.* Specifically, the defendants argued that low levels of benzene exposure from gasoline service work were below the necessary threshold dose levels to cause AML. *Id.* at 443. The trial court denied the defendants' motion. On appeal, the Appellate Division reversed the decision of the trial court and dismissed Plaintiff's complaint. *Id.* at 446. The Court of Appeals affirmed the dismissal by the Appellate Division. *Id.*

In affirming the Appellate Division's decision, the Court of Appeals held that while precise levels of exposure do not need to be established to prove causation, a plaintiff's causation expert must quantify exposure levels in a method that is generally accepted within the scientific community. *Id.* at 448. In doing so, the Court stated that "[i]t is well established that an opinion on causation should set forth a plaintiff's exposure to a toxin, that the toxin is capable of causing the particular illness (general causation) and that plaintiff was exposed to sufficient levels of the toxin to cause the illness (specific causation)." *See id.* The *Parker* Court found that while it is not necessary for a causation expert to quantify precise exposure levels, *see id.*, an expert testifying as to causation in a toxic tort matter must objectively establish a proper "scientific

- 10 -

expression of [the plaintiff's] exposure level." *See id.* at 449.

Here, the Weitz & Luxenberg Plaintiffs attempt to turn this rule of law on its head by seeking to bar Defendants' experts from presenting any testimony whatsoever on the issue of specific causation; essentially arguing that Defendants have no method to *disprove* specific causation. Again, that is simply not the standard. By arguing that no defendant can ever be permitted to present evidence of exposure assessment (instead of challenging the *specific* methodology employed by any one expert in conducting exposure assessment), Plaintiffs are looking for this Court to grant an exception to the *Parker* requirements in asbestos cases. Indeed, Plaintiffs advocate for this Court to find that exposure reassessment is "junk science." By doing so, Plaintiffs' motives are clear: they hope to avoid having to actually have to prove specific causation.

The Court cannot allow Plaintiffs to do an end run around their proof burden. Accordingly, this Court should deny Plaintiffs' motion to exclude all evidence regarding his levels of asbestos exposure.

### C.    Mr. Adams Followed the Generally Accepted Methods of Exposure Assessment.

Although Plaintiffs make absolutely no attempt to challenge the specific methodologies employed by Mr. Adams – and instead rely solely upon wild aspersions and rhetoric – this Court should nonetheless find that the methodology of exposure assessment employed by Mr. Adams in this matter is proper and admissible under *Frye*.

The standard process for conducting exposure assessment set forth in the published literature is as follows:

- Basic characterization of the substance in issue, which includes gathering information about its physical and chemical properties and about the relevant

toxicological properties and health hazards, and identifying established regulations and suggested guidelines.

- Basic characterization of the work place, which involves gathering as much information about specific exposure conditions, including time and duration of use, the number of years of exposure, percentage of time spent in the workplace, conditions under which it was used, the environment in which it was used, any other sources of exposure in or around the workplace or outside of the work environment, use of protective equipment and other factors that define the general work conditions and which might have an effect on the exposure levels.

- Preparation of an exposure profile based on the above factors, which requires determining whether there are any live or contemporary data that relates specifically to airborne concentrations that are typical for persons with the same exposure profile; if not, reviewing the literature and looking for information about the type of work the individual did or studies that are analogous to the work they did and review and reconcile the data in light of the exposure profile.

- Development of the estimated exposure, which involves matching the exposure conditions and reliable data and calculating the time weighted average and then extrapolating to generate a lifetime exposure; where there is uncertainty with respect to some aspect of the exposure condition, the calculations are based on worse-case estimations of the uncertain aspects of the exposure so as to arrive at a reasonable maximum exposure, to which there is 95% confidence will be greater than the actual exposure.

- Comparison of the estimated exposure to the available published scientific literature, reported background concentrations to which people are not known to develop disease and applicable regulations to determine whether the individual was at an increased level of risk for the development of disease.

(*Adams Aff.* at ¶ 12.)

As discussed in his July 18, 2007 report, and outlined below, Mr. Adams followed the standard process for conducting exposure assessment when he estimated Dr. Holinka's asbestos exposure from his claimed use of asbestos-containing Bunsen burner pads and heat-resistant mittens. (*Adams Aff.* at ¶ 13.

- Basic characterization of the substance in issue – Pages 5 and 6.

- Basic characterization of the work place – Pages 7 through 9.

- Preparation of an exposure profile – Pages 9 through 13.

- 12 -

- Development of the estimated exposure – Pages 9 through 13.

- Comparison of the estimated exposure to the available published scientific literature – Page 13.

Mr. Adams' opinion is consistent with the holding of *Parker*. According to the Court of Appeals in *Parker*, an expert can establish the dosage at which a substance is toxic through a number of possible methods such as: (i) establishing the exact level of exposure sustained by a plaintiff; (ii) establishing the intensity of exposure; (iii) estimating the exposure through the use of mathematical modeling; or (iv) by qualitatively comparing the exposure levels of the subjects of other studies to the plaintiff, provided that the expert can show how the plaintiff's levels related to those other subjects. *See* 7 N.Y. 3d at 449. Here, Mr. Adams' opinion uses several of these accepted methodologies cited by the Court of Appeals as proper means of establishing dosage.

Accordingly, the expert opinion presented by Mr. Adams follows generally accepted methods of exposure assessment as established by the AIHA and meets the requirements for establishing dosage as set forth by the New York Court of Appeals.

## D.    Mr. Adams Had Sufficient Information To Conduct an Exposure Assessment.

Contrary to Plaintiff Holinka's arguments, Mr. Adams had sufficient information to conduct his exposure assessment. That he did not observe Plaintiff Holinka working in the laboratories or have contemporaneous data from 20, 30, and 40 years ago is not material. Indeed, it is not uncommon for industrial hygienists to rely on historic information when conducting an exposure assessment. (*Adams Aff.* at ¶ 10.)  In fact, all of the texts and publications cited in Exhibit C to Mr. Adams' Affirmation discuss how to conduct such a historical reconstruction of a person's exposure.

- 13 -

To the extent Plaintiff Holinka's testimony regarding the nature and extent of his use of the products in issue was ambiguous, Mr. Adams compensated by being conservative in his calculations. This means that Mr. Adams based his calculations on the maximum estimates for the uncertain aspects of Plaintiff Holinka's exposure, to arrive at a reasonable maximum exposure, which (to a 95% confidence level) exceeds Plaintiff Holinka's actual exposure. (*Adams Aff.* at ¶¶ 12-13.) For example, Plaintiff Holinka claims that Mr. Adams' opinions should be excluded because he cannot accurately quantify such factors as ventilation, exhaust, room size and air flow. Ventilation is the movement of air over time from general and local exhaust. (*Id.* at ¶ 14.) Exhaust volume, room size and air velocity are factors in determining room ventilation. (*Id.*) Air flow is a colloquial term that can have several meanings, including exhaust volume, air velocity and air changes per hour. (*Id.*) However, for the purposes of his analysis in this case, Mr. Adams assumed that Plaintiff Holinka was working in rooms with only standard room ventilation and did not consider the presence of enhanced ventilation, such as local exhaust via fume hoods, or the possibility that the laboratories where Plaintiff Holinka worked were designed with enhanced general exhaust to limit the risk of exposure to toxic chemicals. (*Id.*) If Mr. Adams had considered such increased levels of ventilation (which is, in fact, typical in laboratories), Plaintiff Holinka's estimated level of exposure would have decreased by at least 15% to 20%. (*Id.*)

Mr. Adams likewise considered and addressed the other factors that Plaintiff Holinka raised. Specifically:

- Amount of workers working with asbestos-containing products during exposure periods – Plaintiff Holinka did not testify that there were other people in the laboratories working with asbestos-containing products during the periods when

he was present. However, even if there were others working with asbestos-containing products, the amount of fiber release from those products would have been so low as to have had an insignificant impact on Plaintiff Holinka's level of exposure. (*Adams Aff.* at ¶ 15.)

- Proximity of a worker to airborne dust – The studies relied upon in Mr. Adams' report involved the use of asbestos-containing products at varying ranges from the breathing zone, which would have been similar to the manner in which Plaintiff Holinka likely used the Bunsen burner pads and heat-resistant mittens. In addition, the types of activities that the studies involved would have generated significantly higher levels of asbestos fiber release than did Plaintiff Holinka's actual use of the Bunsen burner pads and heat-resistant mittens. (*Id.* at ¶ 16.)

- Re-entrainment of asbestos during movement – Re-entrainment would not have been a factor in Plaintiff Holinka's exposure to asbestos due to the low amount of fiber release (if any) and the encapsulation of the fibers. In addition, the results from the published studies would have reflected any re-entrainment. (*Id.* at ¶ 17.)

- Existence of asbestos remaining on clothing and brought home – It is likely that Plaintiff Holinka's clothing would have been an insignificant source for asbestos exposure because of the low level of asbestos fiber release (if any), because he wore laboratory coats at most, if not all, of the laboratories where he worked, and because it is unlikely that he took his laboratory coats home. (*Id.* at ¶ 18.)

The exposure assessment conducted by Mr. Adams is based on reliable data and is,

therefore, admissible under *Frye*. Plaintiff Holinka's motion should be denied, or this Court should conduct a Frye hearing.

## II.    DR. WEINBERG'S OPINIONS ARE WELL-FOUNDED AND PROPER

Kenneth S. Weinberg, Ph.D. has extensive experience working in and managing laboratories. His education, research and professional experiences are similar to those of Plaintiff Holinka. He has reviewed Plaintiff Holinka's publications, which provide a detailed description of the research that Plaintiff Holinka did throughout his career, and is familiar with and proficient in the same biochemical processes that Plaintiff Holinka used in his research. He was certified as an asbestos monitor and has personally conducted or overseen testing for airborne asbestos. He also is familiar with the products in issue in this case, their characteristics and how and when they are used in laboratories.

Similar to Plaintiff Holinka's expert, Charles Ay, Dr. Weinberg will provide the jury with an unique understanding of how laboratories work and why the risk of asbestos exposure from the use of Bunsen burner pads and heat-resistant mittens is negligible. Dr. Weinberg also will opine that asbestos Bunsen burner pads and heat-resistant mittens are durable, that the asbestos and non-asbestos versions of these products appear identical and that Plaintiff Holinka's description of the pads he used is more consistent with the non-asbestos version. Dr. Weinberg is qualified to render these opinions and has proper factual bases for doing so. Plaintiff Holinka's motion to exclude Dr. Weinberg should be denied.

### A.    Dr. Weinberg's Background and Qualifications.

Dr. Weinberg has spent 34 years working in and managing laboratories. He started working in laboratories in 1966 as an Assistant at the Boston University Chemistry Laboratories. (*Affirmation of Kenneth S. Weinberg, Ph.D.*, dated August 30, 2007 ("*Weinberg Aff.*"), at ¶ 4.)

He worked as a technician or research assistant from 1967 to 1969 and 1971 to 1978. (*Id.*) He conducted his own research from 1974 to 1986. (*Id.* at ¶ 5.) He managed a commercial laboratory in 1987. (*Id.* at ¶ 11.) He also was Director of Safety at Massachusetts General Hospital from 1989 to 2000, where he had responsibility for the safety of the personnel in approximately 40 clinical and 500 research laboratories. (*Id.* at ¶ 18.)

Dr. Weinberg's Educational and Professional experiences parallel Plaintiff Holinka's own background. Plaintiff Holinka obtained degrees in French literature, physiology and biology sciences; Dr. Weinberg's study of biology, biochemistry and pathology was substantially similar to Plaintiff Holinka's course of study regarding the biological sciences (i.e., physiology and biology sciences). (*Weinberg Aff.* at ¶ 8.) Like Plaintiff Holinka, Dr. Weinberg also took laboratory courses in chemistry and physiology. (*Id.* at ¶ 9.) Plaintiff Holinka worked as a laboratory technician analyzing human materials, including serum and urine; Dr. Weinberg also has experience analyzing serum and urine. (*Id.* at ¶ 10.) Plaintiff Holinka also worked at a research laboratory testing soil samples; Dr. Weinberg managed a laboratory that tested soil samples. (*Id.* at ¶ 11.)

Dr. Weinberg is proficient in the same biochemical techniques used in plaintiff's research. Dr. Weinberg has reviewed approximately 38 articles that describe the research that Plaintiff Holinka performed at UC Berkeley, SUNY Stony Brook, University of Southern California and Mount Sinai School of Medicine. (*Weinberg Aff.* at ¶ 12.) The research described in these articles is consistent with Plaintiff Holinka's deposition testimony regarding the types of research he conducted at those institutions. (*Id.*) As is customary in the scientific community, these articles provide a detailed description of the methods used in the research, so that other researchers can reproduce the same results. (*Id.* at ¶ 13.) Based on his education, research and

- 17 -

other laboratory experiences, Dr. Weinberg is familiar with the biochemical techniques that Plaintiff Holinka used in his research. (*Id.* at ¶ 14.)

Dr. Weinberg was trained as an Asbestos Project Manager and Monitor in 1988 and was re-certified several times before allowing the certification to lapse in or around 1992 when it was no longer needed for his employment. (*Weinberg Aff.* at ¶ 16.) He continued, however, to take courses to maintain and further expand his knowledge in this area. (*Id.*) As an Asbestos Project Manager and Monitor, Dr. Weinberg was trained to recognize possible asbestos contamination and was aware of the known sources of asbestos. (*Id.*) Neither asbestos-containing Bunsen burner pads nor asbestos-containing heat-resistant mittens were identified or considered potentially hazardous. (*Id.*)

Dr. Weinberg personally conducted or oversaw asbestos monitoring while Manager of Toxikon Environmental Laboratory, the Industrial Hygienist at the V.A. Medical Center in Brockton, Massachusetts and the Director of Safety at Massachusetts General Hospital. (*Weinberg Aff.* at ¶ 17.) On several occasions, he conducted asbestos monitoring in laboratories, and in no instance was any asbestos detected. (*Id.*) The primary reason for conducting asbestos monitoring at the V.A. Medical Center and Massachusetts General Hospital was to address employee concerns about possible exposure to asbestos. (*Id.*) At no time was it suspected that using Bunsen burner pads and heat-resistant mittens could result in asbestos exposure. (*Id.*)

As the Director of Safety at Massachusetts General Hospital, Dr. Weinberg's responsibilities included the environmental health and safety of the personnel in approximately 40 clinical and 500 research laboratories. (*Weinberg Aff.* at ¶ 18.) He trained new personnel regarding laboratory safety on a weekly basis. (*Id.*) He also visited laboratories one or two days per week to observe the laboratory practices and techniques and make related recommendations.

- 18 -

(*Id.*) These training sessions and follow-up discussions involved the proper use of laboratory equipment, including Bunsen burners. (*Id.*) Dr. Weinberg also wrote the manual detailing how asbestos should be handled at the Massachusetts General Hospital and prepared a map identifying the locations of all known asbestos-containing materials. (*Id.*) at ¶ 19. Asbestos-containing Bunsen burner pads and heat-resistant mittens were not identified in either the manual or map because neither product was identified as, or considered to be, a potential asbestos exposure risk. (*Id.*)

Dr. Weinberg also is familiar with Bunsen burner pads and heat-resistant mittens. (*Weinberg Aff.* at ¶¶ 20 & 23.) He started working with pads in 1966 and mittens in 1968. (*Id.*) He periodically used these products until he stopped working in laboratories in 1988. *Id.*) He saw them being used until 2000 when he stopped working at Massachusetts General Hospital. (*Id.*)

**B.    Dr. Weinberg's Testimony Regarding Plaintiff's Use of Bunsen Burner Pads and Heat-Resistant Mittens.**

Based on his review of Plaintiff Holinka's deposition testimony, publications and curriculum vitae and all of his education, training, research, and work experiences described above, Dr. Weinberg is prepared to explain to the jury what type of work Plaintiff Holinka was doing, how it should have been performed, whether it involved the use of heat and whether it would have been appropriate to use Bunsen burners (and, thus, Bunsen burner pads) or heat-resistant mittens. His understanding of laboratories and how they operate is beyond the ken of the average juror. For example:

- Plaintiff Holinka's research often involved incubating specimens for extended periods of time at specific temperatures ranging between 30°C (86°F) and 60°C

(140°F). (*Weinberg Aff.* at ¶ 15.) One of the hallmarks of successful research is reproducible results. (*Id.* at ¶ 13.) Plaintiff Holinka would, therefore, have needed to be able obtain and maintain predictable and accurate temperatures. (*Id.* at ¶ 15.) Bunsen burners can reach 1500°C and are difficult to control and, thus, are not well suited for incubation – especially when the sought-after temperature is so low. (*Id.*) In addition, the heat from Bunsen burners easily could destroy a specimen. (*Expert Report of Kenneth S. Weinberg*, dated July 30, 2007, at 3, attached as Exhibit A to *Weinberg Aff.*) As a result, the standard practice when using heat for incubation is to use warming baths. (*Weinberg Aff.* at ¶ 15.)

- Plaintiff worked for several years at a UC Berkeley research laboratory testing soil samples for chemicals or other substances. (*Weinberg Aff.* at ¶ 11.) This is done by soaking the sample in a solution, often for long periods of time (i.e., overnight) and then analyzing the residual. This process is typically facilitated by adding small amounts of heat and/or agitating the sample. It also is common to process many samples simultaneously – not only because there are samples from different locations, but also because the original sample was divided into smaller portions, each of which is being tested for different substances. The standard practice when conducting soil testing is to use heating mantles to warm the flasks. (*Id.*) Bunsen burners are ill-suited because (i) the high heat could destroy the sample, (ii) the high heat could release volatile or toxic chemicals, and (iii) it would be dangerous to have numerous open flames for extended periods of time.

Dr. Weinberg's opinions regarding laboratory operations are proper – just as is the proposed testimony of Plaintiff Holinka's expert, Charles Ay. According to Plaintiff Holinka's

expert witness disclosure, Mr. Ay is a former asbestos worker/insulator who worked at various locations. (*Expert Witness Disclosure Pursuant to CPLR 3101 (d)* at 1, attached as Exhibit C to *Fraser Aff.*)

> Mr. Ay may testify as to **plaintiff's circumstance, opportunity for exposure and generally to practices, procedures,** the types of ships, the types of asbestos products used in shipyards, on board ships, in Marine construction and at industrial sites, including but not limited to refineries and commercial building sites. He may testify as to the **manner in which asbestos containing products were used,** the tendencies of asbestos containing products to release dust into the atmosphere, **and the manner of proper removal**.

(*Id.* (emphasis added)) Mr. Ay would be called to explain how and why Plaintiff Holinka[5] was exposed to asbestos so as to bolster his testimony. Dr. Weinberg's testimony is no different. He seeks to explain to the jury why Plaintiff Holinka would have used Bunsen burner pads infrequently. Contrary to Plaintiff Holinka's contention, Dr. Weinberg's vast experience and review of the case-specific materials are proper bases for his opinions. Thus, Dr. Weinberg's testimony regarding Plaintiff Holinka's use of Bunsen burner pads and heat-resistant mittens is admissible.

### C.    Dr. Weinberg's Testimony Regarding the Nature of Bunsen Burner Pads and Heat-Resistant Mittens.

During Dr. Weinberg's 34 years working in and managing laboratories he regularly worked with and observed Bunsen burner pads and heat-resistant mittens. He found that these

---

[5] Weitz & Luxenberg served the same expert disclosure in all its May 2007 in extremis cases. The disclosure states that Mr. Ay would be called to testify in those cases where the plaintiff alleges exposure to asbestos in connection with pumps, turbines, boilers and related equipment. It is unlikely, therefore, that Plaintiff Holinka will call Charles Ay as a witness in this case since Plaintiff does not allege any of the foregoing exposures. It is likely, however, that Mr. Ay will be called as a witness in several of the other cases presently before Your Honor and that plaintiffs seek to consolidate with this action.

products were similar regardless of where he worked or who supplied them. Dr. Weinberg made the following observations based on his use and observation of the pads and mittens, his training as an Asbestos Project Manager and Monitor, and his experiences conducting asbestos monitoring and working as an industrial hygienist and director of safety:

- Asbestos Bunsen burner pads are durable. Even after extensive use, they do not disintegrate or generate white dust or powder. (*Weinberg Aff.* at ¶¶ 20-21.)

- The asbestos and non-asbestos versions of Bunsen burner pads often appear identical; one has to look closely to tell the difference. (*Id.* at ¶ 21.)

- The non-asbestos versions of Bunsen burner pads typically are ceramic. (*Id.*) Ceramic Bunsen burner pads will become brittle and crack over time. (*Id.* at ¶ 22.) Plaintiff's testimony that his Bunsen burner pads would crack is consistent with ceramic, not asbestos pads. (*Id.*)

- Asbestos heat-resistant mittens are durable. (*Id.* at ¶ 25.) When used in laboratories, they do not fall apart or release dust. (*Id.*)

- The asbestos and non-asbestos versions of heat-resistant mittens often appear identical; one has to look closely to tell the difference. (*Id.* at ¶ 24.)

Dr. Weinberg's observations over 34 years of working with and observing the products in issues go to heart of this matter – whether plaintiff the Bunsen burner pads and mittens that Plaintiff Holinka used contained asbestos and whether they would have generated asbestos dust. His testimony "fits" this case because he found the Bunsen burner pads and heat-resistant mittens to be virtually the same regardless of where he worked or who supplied the products. Plaintiff Holinka's description of the pads and mittens he used during his career was similar to the pads and mittens Dr. Weinberg used – in fact, Plaintiff Holinka testified that the products looked the

same and had no distinguishing marks or were looked different. Dr. Weinberg's observations of countless Bunsen burner pads and heat-resistant mittens is a proper foundation for his testimony. It is immaterial that he did not have an opportunity to observe or test the products plaintiff used. Thus, Dr. Weinberg's testimony regarding Bunsen burner pads and heat-resistant mittens is admissible, and Plaintiff's motion to exclude Dr. Weinberg should be denied.

## III.    DR. RABINOVITZ'S OPINION REGARDING EMPLOYER RESPONSIBILITY IS PROPER

Plaintiff Holinka further argues that Dr. Sheldon Rabinovitz's opinions should be precluded in part because they are beyond the scope of proper expert testimony. He contends Dr. Rabinovitz's report is "rife with interpretations of statutes and regulations drawing legal conclusions, which constitute improper subjects of expert testimony." Plaintiff Holinka is wrong.

Dr. Rabinovitz is not drawing legal conclusions. Rather, he is stating his opinion, as an industrial hygienist, that employers are in the best position to provide a safe work environment for their employees. (*See Comerford Aff.*, Ex. V at 8-9). "As defined by the American Industrial Hygiene Association, industrial hygiene is 'the science and art devoted to the anticipation, recognition, evaluation, and control of those environmental factors or stresses arising in or from the workplace which may cause sickness, impaired health and well being, or significant discomfort among workers or among citizens of the community' (http://www.aiha.org/Content/AboutAIHA/whatisIH.htm)." (*See Comerford Aff.*, Ex. J at 4).

Dr. Rabinovitz has over 35 years of experience in the Industrial Hygiene field. He has been the Vice-President, Senior Certified Industrial Hygienist and Toxicologist, of Sandler Occupational Medicine Associates, Inc. (SOMA) located in Gaithersburg, MD since 1989. As

part of his work, he manages many SOMA industrial hygiene and toxicology projects, including: indoor air quality evaluations; lead, asbestos and fungal exposure and remediation projects; chemical risk assessments and recommended controls; worker right-to-know; hazardous waste evaluation and remediation projects; comprehensive industrial hygiene sampling surveys, audits and respirator programs including selection, fit testing and program design; and in-plant evaluations to identify, quantify and control health hazards. (*See Curriculum Vitae of Sheldon Rabinovitz*, attached as Exhibit D to *Fraser Aff.*)

Industrial Hygienists look to the Occupational Safety and Health Administration Act. (OSHA) for guidelines and regulations regarding safe work environments. According to OSHA, its "mission is to assure the safety and health of America's workers by setting and enforcing standards; providing training, outreach, and education; establishing partnerships; and encouraging continual improvement in workplace safety and health." (http://www.osha.gov/oshinfo/mission.html). Consistent with the intent behind OSHA and its related guidelines and regulations, Dr. Rabinovitz holds the opinion that "only the employer has the ability to ensure that the employees work in a safe and healthful environment." (*See Comerford Aff.*, Ex. V at 8). Thus, Dr. Rabinovitz's testimony regarding employers responsibility is admissible and Plaintiff's motion to exclude the "employer responsibility" portion of his report should be denied.

## CONCLUSION

Based upon the foregoing, this Court should (a) deny Plaintiffs' motion *in limine* to preclude the exposure assessment testimony of Messrs. Adams and Sawyer and (b) should deny Plaintiffs' *in limine* motion to preclude the case specific reports of Drs. Rabinovitz and Weinberg.   In the alternative, the Court should hold a *Frye* hearing on the admissibility of these opinions.

*Dated*: September 10, 2007
       New York, New York

                                                  Respectfully submitted,

| | |
|---|---|
| **DRINKER BIDDLE & REATH LLP**<br>140 Broadway, 39th Floor<br>New York, New York 10005<br>(212) 284-3140<br>Attorneys for Defendant<br>Baxter Healthcare Corporation<br><br><br>By: _____<br>Daniel B. Carroll | **HOAGLAND, LONGO, MORAN, DUNST & DOUKAS, LLP**<br>40 Paterson Street<br>New Brunswick, New Jersey 08901<br>(732) 545-4717<br>Attorneys for Defendant<br>Fisher Scientific International Inc.<br><br><br>By: _____<br>Kristy Kolina Lyons |
| **MARKS, O'NEILL, O'BRIEN & COURTNEY, P.C.**<br>530 Saw Mill River Road<br>Elmsford, NY 10523<br>Attorneys for Defendant<br>VWR International, Inc. and Univar USA Inc.<br><br><br>By: _____<br>Carol M. Tempesta, Esq. | |

- 3 -