

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF NEW YORK

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-X

|  |  |  |
|---|---|---|
| IN RE: NEW YORK CITY | : | Hon. Helen E. Freedman |
| ASBESTOS LITIGATION | : | (Part 39) |

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-X

|  |  |  |
|---|---|---|
| CHRISTIAN F. HOLINKA, | : | Index No. 114120/06 |
|  | : |  |
| Plaintiff | : |  |
|  | : |  |
| - against - | : | **AFFIDAVIT OF** |
|  | : | **ROBERT C ADAMS, M.S., C.I.H, C.S.P.** |
| A.W. CHESTERTON, et al, including | : |  |
| VWR INTERNATIONAL, INC., | : |  |
|  | : |  |
| Defendant | : |  |

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-X

STATE OF NEW JERSEY    )
                                            ) ss:
COUNTY OF MERCER      )

ROBERT C. ADAMS, being duly sworn according to law, upon his oath deposes and says:

1.    This affirmation incorporates and supplements my July 18, 2007 report, attached hereto as Exhibit A.

2.    My education, training, certifications and experience are detailed in my July 18, 2007 report and my *curriculum vitae*, which is attached hereto as Exhibit B.

3.    In 1992, I was certified in the comprehensive practice of industrial hygiene by the American Board of Industrial Hygiene. The requirements for this certification were a Bachelors degree in industrial hygiene, safety or a related science, minimum five years of professional

practice, and successful completion of a two-stage written examination process. Exposure assessment was the largest component of the exam.

4.     I have attended numerous professional development lectures on exposure assessment, including topics such as estimating exposures and using those estimates to determine risks of injury from certain airborne substances. For example, I attended Risk Assessment Methods for Hazardous Waste Sites in 1996 and Reconstruction Exposure and Dose in 2004, both of which were day-long courses that dealt with exposure assessment.

5.     Since 1998, I have been teaching a Master's level course on industrial hygiene at St. Joseph's University in Philadelphia. One of the course topics is exposure assessment.

6.     I hold the following opinions to a reasonable degree of scientific certainty. These opinions are based on my education, professional training, experience and review of the case-specific materials identified in my July 18, 2007 report, including Dr. Holinka's testimony.

7.     Exposure assessment is the process of evaluating the range of airborne concentrations under a given set of conditions or circumstances to which people are exposed to chemical substances.

8.     Exposure assessment is a scientific technique that is generally accepted in the field of industrial hygiene. The principles and procedures upon which exposure assessment is based have been discussed and detailed in the published literature for at least the past 25 years, and have been a cornerstone of the practice of industrial hygiene for at least the last 60 years. A list of some of the texts and articles that discuss the principles and procedures of exposure assessment is attached as Exhibit C.

9.     Dose Reconstruction is the process of estimating the actual amount of a substance that enters the body and/or interacts with organs or tissues given the conditions or circumstances

of a person's exposure to that substance. This requires consideration of additional factors, such as body clearance mechanisms, biological half-life of the chemical substance, size and shape, and reactivity of the substance and other mechanisms of action.

10.    During my 26 years as a safety and health professional, I have conducted hundreds (if not thousands) of exposure assessments. These assessments sometimes are based solely on historic information. Only a small number of the exposure assessments in my career, approximately 12 to 15, were conducted in the context of litigation. I follow the same approach regardless of whether the exposure assessment relates to litigation.

11.    The estimation of Dr. Holinka's asbestos exposure from the use of asbestos-containing Bunsen burner pads and heat-resistant mittens that is discussed in my July 18, 2007 report is an exposure assessment, not a dose reconstruction.

12.    The standard process for conducting exposure assessment begins with basic characterization of the substance in issue, which includes gathering information about its physical and chemical properties and about the relevant toxicological properties and health hazards, and identifying established regulations and suggested guidelines. Next is basic characterization of the work place, which involves gathering as much information about specific exposure conditions, including time and duration of use, the number of years of exposure, percentage of time spent in the workplace, conditions under which it was used, the environment in which it was used, any other sources of exposure in or around the workplace or outside of the work environment, use of protective equipment and other factors that define the general work conditions and which might have an effect on the exposure levels. Third is the preparation of an exposure profile based on the foregoing factors, which requires determining whether there are any live or contemporary data that relates specifically to airborne concentrations that are typical

for persons with the same exposure profile; if not, reviewing the literature and looking for information about the type of work the individual did or studies that are analogous to the work they did and review and reconcile the data in light of the exposure profile. Fourth is the development of the estimated exposure, which involves matching the exposure conditions and reliable data and calculating the time weighted average and then extrapolating to generate a lifetime exposure; where there is uncertainty with respect to some aspect of the exposure condition, the calculations are based on worse-case estimations of the uncertain aspects of the exposure so as to arrive at a reasonable maximum exposure, to which there is 95% confidence will be greater than the actual exposure. The final step is to compare the estimated exposure to the available published scientific literature, reported background concentrations to which people are not known to develop disease and applicable regulations to determine whether the individual was at an increased level of risk for the development of disease.

13.    As discussed in my July 18, 2007 report, I followed the standard process for conducting exposure assessment when I estimated Dr. Holinka's asbestos exposure from the use of asbestos-containing Bunsen burner pads and heat-resistant mittens.

14.    Ventilation is the movement of air over time from general and local exhaust. Exhaust volume, room size and air velocity are factors in determining room ventilation. Air flow is a colloquial term that can have several meanings, including exhaust volume, air velocity and air changes per hour. For the purposes of my analysis in this case, I assumed that Dr. Holinka was working in rooms with standard room ventilation and did not consider the presence of local exhaust, such as fume hoods, or the possibility that the laboratories where Dr. Holinka worked were designed with enhanced general exhaust to limit the risk of exposure to toxic chemicals. If I had considered the increased level of ventilation that is typical in laboratories, Dr. Holinka's

estimated level of exposure would have decreased by at least 15% to 20%.

15.    Dr. Holinka did not testify that there were other workers in the laboratories working with asbestos-containing products during the periods when he was present. Even if there were others working with asbestos-containing products, the amount of fiber release from these products would have been so low as to have had an insignificant impact on Dr. Holinka's level of exposure.

16.    The studies relied upon in my report involved the use of asbestos-containing products at varying ranges from the breathing zone, which would have been similar to the manner in which Dr. Holinka likely used the Bunsen burner pads and heat-resistant mittens. In addition, the types of activities that the studies involved would have generated significantly higher levels of asbestos fiber release than Dr. Holinka's use of the Bunsen burner pads and heat-resistant mittens.

17.    Re-entrainment would not have been a factor in Dr. Holinka's exposure to asbestos due to the low amount of fiber release and the encapsulation of the fibers. In addition, the results from the published studies would have reflected any re-entrainment.

18.    It is likely that Dr. Holinka's clothes would have been an insignificant source for asbestos exposure because of the low level of asbestos fiber release and because he wore laboratory coats at most, if not all, of the laboratories where he worked and it is unlikely that he took his laboratory coats home.

19.    I reserve the right to further amend and/or supplement my opinions to the extent

new or additional information is provided prior to and/or at the time of trial.

_____
Robert C. Adams

Sworn to and subscribed before me on
this the _9th_ day of September, 2007.

_____
          Notary Public
ATTORNEY -AT- LAW, STATE OF NJ
GREG A. DADEKA

Exhibit A

E N V I R O N

July 18, 2007

Mr. David Abernathy, Esq.
Drinker, Biddle & Reath, LLP
One Logan Square
18th and Cherry Streets
Philadelphia, PA  19103-6996

Mr. Greg Dadika, Esq.
Reed Smith, LLP
Princeton Forrestal Village
136 Main Street, Suite 250
P.O. Box 7839
Princeton, NJ  08543-7839

Mr. Timothy Fraser, Esq.
Drinker, Biddle & Reath, LLP
500 Campus Drive
Florham Park, NJ  07932-1047

Ms. Kristy Lyons, Esq.
Hoagland, Longo, Moran, Dunst, & Doukas, LLP
40 Paterson Street, PO Box 480
New Brunswick, NJ   08903

Ms. Carol Tempesta, Esq.
Marks, O'Neill, O'Brien & Courtney, PC
530 Saw Mill River Road
Elmsford, NY  10523

RE:          **New York City Asbestos Litigation**
             **Christian Holinka**
             **Index No. 114120-06**

Dear Sirs and Madams:

Thank you for the opportunity to review this matter and conduct an industrial hygiene
assessment of the potential asbestos exposures in this case.  It is my understanding that the
Plaintiff in this matter, Dr. Christian Holinka, claims that his mesothelioma is the result of
exposure to laboratory materials that he associates with having contained asbestos and which
he handled over the course of his academic and professional career. I have been retained by
Defendants ManorCare Health Services, Inc. (alleged to be a successor in interest to Central
Scientific Company, a division of Cenco, Inc.) ("ManorCare"), Fisher Scientific International
Inc. ("Fisher"), Baxter Healthcare Corporation (alleged to be a successor in interest to
American Hospital Supply Corp. and American Scientific Products) ("Baxter"), VWR
International, Inc. ("VWR") and Univar USA  Inc. ("Univar")  (collectively, the "Lab Supply
Defendants") to render opinions related to potential asbestos exposures, if any, that might
have arisen during the activities that Dr. Holinka undertook related to the use of certain

Lab Supply Defendants                    -2-                    July 18, 2007

laboratory materials, specifically mittens and Bunsen burner pads, and to assess the
possibility that there may have been alternative exposures that might explain the
development of his mesothelioma.

In the preparation of this report, I have reviewed the following documents supplied to me in
this matter or in related matters that have relevance to this case:

| Document Provided | Description | Date |
|---|---|---|
| Moline Report | Dr. Jacqueline Moline expert report | 03/08/2007 |
| Answers to Interrog | Letter of Application (complaint) and Plaintiff's Answers to Interrogatories | 10/03/2006 |
| Social Security Records | Social Security Records | Various |
| Holinka Depo I | Deposition under oral examination of Christian Holinka | 02/12/2007 |
| Holinka Depo II | Deposition under oral examination of Christian Holinka (Volume II) | 02/22/2007 |
| Holinka Depo III | Deposition under oral examination of Christian Holinka (Volume III) | 03/01/2007 |
| Plaintiff's Expert Report | Dr. James Strauchen, MD expert report Expert for the Plaintiff Pathologist | 04/30/2007 |
| Holinka CV | Curriculum Vitae of Christian Holinka | 06/22/2006 |
| Medical Records - Dr. Meyers | Medical Records from Dr. Robert Meyers | 11/21/2006 |
| Medical Records – NY Presbyterian Hospital | Medical Records from New York Presbyterian Hospital | |
| Medical Records – Dr. Taub | Medical Records from Dr. Robert Taub at the Herbert Irving Cancer Center | |
| Medical Records – Radiology | Medical Records from Columbia Presbyterian Eastside Radiology | 02/01/2007 |
| SSN Records | Social Security Records | |
| Workplace simulation report – Dr. Longo | The use of asbestos containing gloves: a work practice study (supplied in the matter of Thames v. Fisher Scientific) | 08/2001 |

These documents provided information on the plaintiff's activities in academic, part-time
employment, and full time employment settings. This report is intended to render an
opinion on the sources of exposure to asbestos containing materials (ACM) and what
contribution, if any, materials provided by the Lab Supply Defendants would have had on
that exposure.

**Qualifications**

I am a nationally certified safety professional and certified industrial hygienist with more
than 26 years experience as a safety and health professional. I have been involved in the
assessment of asbestos exposures in numerous industries, including laboratories. I have had
first hand experience with the laboratory products described in this case through my own
academic training. During my time as the Director of Environmental Health and Safety for
the New York City Department of Design and Construction, a public works agency

responsible for the construction and renovation of the majority of New York City's publicly owned buildings and infrastructure, I was involved in work in several city-owned laboratory facilities. I have conducted industrial hygiene studies of many different industrial workplaces, including laboratories and educational facilities. I have conducted a number of air sampling studies for the presence of asbestos in many different types of buildings. I carry United States Environmental Protection Agency (USEPA) and New York State Certificates as an Asbestos Building Inspector and Asbestos Project Designer and am intimately familiar with the uses of ACM in buildings, laboratory products and in other applications. I am a Fellow of the American Industrial Hygiene Association, a Professional Member of the American Society of Safety Engineers and a Diplomate of the American Academy of Industrial Hygiene. I am an adjunct professor at the Master's level teaching courses in industrial hygiene at St. Joseph's University in Philadelphia. My Curriculum Vitae is attached.

My opinions in this matter are stated within a reasonable degree of professional and scientific certainty.

### Overview of Life and Work History

Dr. Holinka was born on July 7, 1937 in Germany and was a lifelong non-smoker. He immigrated to the United States in 1956 and worked briefly as an elevator operator before enlisting in the U.S. Army in that same year. After completing basic training, Dr. Holinka was stationed at Fort Sam where he was trained as a medical laboratory technician. From 1957 to 1959, Dr. Holinka worked in a medical laboratory while stationed at the 98 General Hospital. Dr. Holinka left military service in 1959 and worked for Booth Memorial Hospital for three to five months before enrolling as a student at the University of California at Berkeley. While an undergraduate, Dr. Holinka also worked part time in a research laboratory. Dr. Holinka then enrolled as a graduate student in biology at Hunter College, but transferred to medical school at McGill University after two semesters. In 1964, Dr. Holinka withdrew from medical school and started working full time for the same laboratory he had worked while an undergraduate. That same year, Dr. Holinka enrolled as a graduate student in physiology at UC Berkeley. After completing his Master of Science in physiology, Dr. Holinka enrolled as a graduate student in comparative literature and continued taking classes and working as a teaching assistant until 1971. In 1971, Dr. Holinka enrolled as a graduate student in biological sciences at the State University of New York at Stony Brook (SUNY Stony Brook). He was awarded his doctorate in 1974 and worked as a post-doctoral fellow from 1974 to 1977. Following his post-doctoral fellowship, Dr. Holinka worked as a research instructor and professor until 1989 at Mt. Sinai Hospital. From 1989 to 1996, Dr. Holinka was employed in the pharmaceutical industry with various companies. Since 1996, he has continued working with the pharmaceutical industry as an independent consultant.

In August of 2006, Dr. Holinka was diagnosed with malignant pleural mesothelioma.

### Overview of industrial hygiene assessment of this case

In reviewing the information in this case, I have assessed the peer reviewed literature relative to the potential levels of exposure that would be associated with the use of the laboratory materials that Dr. Holinka alleges to have handled in the course of his academic studies, part time and full time employment, post graduate research, and faculty research. He claims that

Expert Report of Robert C. Adams                                    ENVIRON

his asbestos exposure occurred throughout his academic and occupational career. From his deposition testimony, I have assessed the exposure factors (time, frequency of use, duration of exposure and opportunities for exposure) that might have led to asbestos exposure. Based on this information, I calculated a reasonable maximum estimate of his potential average daily and lifetime cumulative exposures from the use of certain products that Dr. Holinka allegedly handled, including mittens and Bunsen burner pads, and that he alleges contained asbestos. I compared the reasonable maximum estimates to available data on cumulative exposure studies associated with the development of mesothelioma. I also compared this to cumulative levels that are associated with lifetime exposures to asbestos in the ambient environment as well as the level that a worker exposed at the current Occupational Safety and Health Administration (OSHA) Permissible Exposure Limit (PEL) would have over a working lifetime.

### The industrial hygiene approach

As defined by the American Industrial Hygiene Association (AIHA), industrial hygiene (IH) is "the science and art devoted to the anticipation, recognition, evaluation, and control of those environmental factors or stresses arising in or from the workplace which may cause sickness, impaired health and well being, or significant discomfort among workers or among citizens of the community" (http://www.aiha.org/Content/AboutAIHA/whatisIH.htm). The anticipation and recognition functions of industrial hygienists are supported by reviews of the relevant scientific literature and by familiarity with various workplaces and work practices. The evaluation function is supported by visual inspections of work places and practices, knowledge of the processes, the sources of emission, and by objective measurements of the agent of concern. Such objective measurements can be obtained from peer-reviewed studies of the specific tasks or studies of analogous tasks that have similar exposure conditions or through contemporary field measurements or workplace simulations. A critical aspect of the industrial hygiene approach is identifying and implementing measurement techniques and analysis methods appropriate to the type of compound of interest and considering the potential interferences that can arise from the work environment.

When properly performed, the results of the workplace measurements can be compared to regulatory standards, such as the OSHA PEL, or consensus non-regulatory guidelines, such as the American Conference of Governmental Industrial Hygienists Threshold Limit Values. However, the assessment process is not limited to the comparison of results to standards or guidelines. The appropriate interpretation of exposure measurements includes an assessment of the magnitude of human health risks experienced by individuals with exposures at various levels and for different amounts of time. This assessment includes calculating a likely range of exposures experienced by individuals under different circumstances, and comparing those exposure estimates to exposure levels that have been associated with health risks as described in the literature.

If the potential for an unacceptable level of exposure is identified in the course of an evaluation, IH practitioners also posses the training and expertise to recommend appropriate and practical methods to reduce or eliminate exposure through engineering, environmental, or administrative controls, or the use of personal protective equipment.

Lab Supply Defendants                      -5-                              July 18, 2007

**Exposure estimation using IH data**

From the IH perspective, the assessment of an individual's asbestos exposure is evaluated based on the following factors:

- exposure magnitude (concentration in the air);
- exposure intensity (hours of exposure each day or week); and
- exposure duration (number of years of exposure).

With respect to asbestos-related diseases, it is also essential to account for fiber type and fiber size in order to characterize health risks appropriately.

<u>Exposure magnitude, intensity and duration</u>
Industrial hygienists typically summarize exposure with measures that integrate magnitude, intensity and duration of exposure. The magnitude of exposure to asbestos is generally measured in units of fibers per cubic centimeter of air (f/cc). When multiplied by the intensity of exposure, the result is the daily average or time-weighted average (TWA). For the assessment of occupational exposures, an 8-hour workday is assumed. Cumulative exposure metrics additionally account for the exposure duration, in years, and are typically expressed as fiber-years/cc or sometimes simply fiber-years. For example, a daily TWA exposure of 0.1 f/cc for 1 year would result in a cumulative exposure of 0.1 fiber-years/cc.

Lifetime cumulative exposure associated with employment is considered to occur over 40 to 45 years (i.e., the expected duration of a person's working life, if employment begins at age 20 and ends at age 60 or 65). The lifetime cumulative asbestos exposure of a worker employed for 40 years at the current OSHA PEL of 0.1 f/cc (OSHA 1994) will be 4 fiber-years/cc. Asbestos-related lung diseases (malignant and nonmalignant) or signs of these diseases have been reported in groups of occupationally exposed humans with cumulative exposures ranging from about 5 to 1,200 fiber-years/cc. Such cumulative exposures would result from 40 years of occupational exposure to concentrations ranging from 0.125 to 30 f/cc. (ATSDR 2001).

Small quantities of asbestos fibers are ubiquitous in air, arising from natural sources, windblown soil from hazardous waste sites, deterioration of automobile clutches and brakes, or breakdown of asbestos-containing materials such as insulation (ATSDR 2001). In some urban environments, the ambient concentration of asbestos has been reported to be as high as 0.001 f/cc (IPCS 1986). For a 70-year lifetime, this would result in a total cumulative exposure of 0.07 fiber-years/cc. Such a cumulative level of exposure is not known to be associated with any increased risk of asbestos related disease.

<u>Fiber type</u>
Chrysotile asbestos is unique in that it has a serpentine fiber-formation (curled fibers) compared to the amphibole fibers, including amosite and crocidolite, which are straight and needle-like. Chrysotile asbestos is less likely to be retained in the lung if inhaled with a short half-life on the order of weeks or months. In contrast, amphibole fibers have a half-life in the lung of 20 to 40 years. Amphiboles are thus considered to be more biologically active than chrysotile (Rasmuson 2004) and have been found to be more strongly and consistently

Expert Report of Robert C. Adams                                          ENVIRON

Lab Supply Defendants                    -6-                         July 18, 2007

associated with risk of mesothelioma, compared with chrysotile, in persons occupationally exposed to asbestos (Hodgson, 2005).

According to a 1988 review by Churg, although chrysotile asbestos may produce mesothelioma in man, the total number of such cases is small and the required doses are extremely high. Some studies suggest that the cumulative lifetime exposure to chrysotile would need to be in the range of 25 fiber-years/cc to 100 fiber-years/cc (Rasmuson 2004). In the absence of any amphibole exposure, the risk of mesothelioma from exposure to chrysotile fibers alone, especially in low concentrations, is considered insignificant.

Chrysotile is the most common form of asbestos used in the United States, making up nearly 99% of all asbestos products that were produced (NIOSH/OSHA 1980; ATSDR 2001). Vitra (2005) reported that chrysotile accounted for 96% of the world production and consumption of asbestos products from 1900 to 2003. Laboratory products that have been studied, such as asbestos gloves, have been found to contain only chrysotile. It is likely that products like Bunsen burner pads would also be chrysotile containing since the amphiboles tend to be more inflexible and thus are more limited in being fabricated into products (ATSDR 2001). The white color of the center is also a indication that the product is chrysotile containing; chrysotile fibers are white, amosite is yellowish-brown, and crocidolite is a lavender or blue color (Vitra 2005). The amphibole forms, based on information in the literature and my personal experience in the inspection and sampling of buildings for the presence of ACM, are more commonly associated with friable insulation materials, especially steam pipes and boilers. Amosite was commonly used in marine vessels (Harries 1971) and industries with hot processes such as steel mills. Crocidolite was also used in some marine vessels (Harries 1971) and was used in gaskets associated with acid piping in pulp and paper mills (Mangold 2006).

Fiber size
The final determinant of risk for the development of asbestos related diseases is fiber size. Studies have consistently shown that long thin fibers greater than 5 microns in length with an aspect ratio (length to width ratio) equal to or greater than 3:1 present the greatest risk of mesothelioma development (ERG 2003). Particles that do not meet these size parameters are not known to be associated with an increased risk for the development of asbestos related diseases.

Exposure estimation
The first step in the estimation of the exposure that an individual may have received is a careful review of the scientific literature for information on historic exposures associated with the job or task that the person performed. A tool that is used for this purpose is PubMed, provided by the US National Library of Medicine. PubMed is a powerful standard research tool available free over the internet, which can search the scientific literature published since about 1966. Publications available via the NIOSH, OSHA and USEPA websites can also provide valuable historic exposure information. Where there is no specific data available for a particular work task, the industrial hygienist will use estimates from jobs with similar exposure conditions or work practices. In addition, there are also general groupings of exposure values associated with the use and handling of certain types of materials. For example, work involving non-friable asbestos materials have had historic airborne concentrations that range from 0.01 to 0.1 f/cc, with many data in the ambient

Expert Report of Robert C. Adams                                    ENVIRON

Lab Supply Defendants                    -7-                          July 18, 2007

background range (Rasmuson 2004). If an individual is working with a non-friable material, then the industrial hygienist will assign a value based on the nature of the work that is being performed, selecting the lower end of the range for work that involves limited opportunities for disturbance and selecting the higher end of the range if the work involves tasks with more potential for disturbance. From this information, an exposure value (or range of values) is assigned to each job or task and, with the exposure time factors, is used to provide a reasonable maximum estimate of the daily 8-hour TWA. When multiplied by the duration of exposure, the individual contribution to the cumulative lifetime exposure can be determined for each task or job. The sum of the individual contributions is the total cumulative lifetime exposure for the individual, which can then be compared to information related to the lifetime risk for the development of disease.

## Opportunities for Exposure

### U.S. Army
Dr. Holinka trained and worked as a laboratory technician in the U.S. Army from 1956 to 1959. During the four and a half to five months of training, Dr. Holinka reportedly spent 5 to 6 hours per day working in a laboratory. The alleged asbestos exposures occurring during training included asbestos Bunsen burner pads and components from incubators; however, no exposures were alleged to have occurred during the first two months (basic training) and during the last two months of his training. Bunsen-burners were used approximately 2-hours per week and the pads were replaced "once they became brittle or somewhat dusty". Dr. Holinka alleges that he used an incubator for bacterial cultures and that the incubator may have contained components manufactured from asbestos. After completing training, Dr. Holinka worked as a laboratory technician in biochemistry, hematology, and pathology at the 98 General Hospital in Germany. While stationed in Germany, Dr. Holinka alleged exposure from asbestos mittens and Bunsen burner pads. The pads were used on a daily basis and changed once per week due to observed wearing of the asbestos pad. Asbestos mittens were also used on a daily basis for short periods, only minutes in many cases. With the exception of wearing a mask while working with bacterial cultures, no respiratory protection was worn while training or working in the laboratory for the U.S. Army.

### Academic Coursework and Research
As an undergraduate, Dr. Holinka majored in French literature and had a minor in physiology. He completed his degree requirements and graduated in two and a half years. During the course of his undergraduate education, Dr. Holinka alleges that he used asbestos mittens and Bunsen burner pads in approximately six laboratory courses in chemistry and physiology. The mittens were reportedly used several times a session; a session defined as meeting twice a week for 3 hours over twelve weeks.

From the fall of 1962 to late spring of 1963, Dr. Holinka attended Hunter College in New York. He reported using asbestos burner pads in one course that met for three hours once a week for four months. Dr. Holinka left after two semesters to attend medical school at McGill University in Montreal. He alleged no use of asbestos products while at McGill, which lasted only two semesters.

From August of 1964 to August of 1968, Dr. Holinka was enrolled as a graduate student in physiology at UC Berkeley. He alleges exposure to asbestos mittens and burner pads while

Expert Report of Robert C. Adams                                    ENVIRON

performing research for his dissertation but the frequency and duration were not provided. His research was focused on rat brain endocrinology. After completing this degree, Dr. Holinka continued further studies in comparative literature, a program where he had no opportunities for exposure to laboratory equipment.

From 1971 to 1974, Dr. Holinka was enrolled as a graduate student in biological sciences at SUNY Stony Brook. He reported using asbestos mittens and Bunsen burner pads while performing research in the anatomy department for his degree. His research focused on hormonal control of the maternal paramount in rats. Most of the experiments conducted for his research were behavioral experiments. Dr. Holinka alleges that burner pads were used on a daily basis and were replaced no more than once per month. The mittens were reportedly used once every few days and were replaced approximately every four months.

*Part Time and Temporary Laboratory Employment*
After leaving military service, Dr. Holinka worked for 3-months (40hrs/week) as a laboratory technician at Booth Memorial Hospital. His work included clinical chemistry and analysis of human material serum and urine. Alleged asbestos exposure occurred as a result of his handling of asbestos mittens and Bunsen burner pads. Burner pads were used on a daily basis and were reportedly replaced every few days due to wearing of the pad. Mittens were used on a daily basis to handle hot glassware

While attending UC Berkeley as an undergraduate, Dr. Holinka worked part-time (12-20 hrs/week) in a research laboratory from the spring of 1960 to summer of 1962. His responsibilities were generally limited to analysis of California soils. He alleges use of asbestos burner pads and mittens. The burner pads were changed once ever two to three weeks. The mittens were reportedly used several times a week to handle hot glassware. Dr. Holinka described using mittens to swirl a flask while heating solutions and to remove glassware from a hot drying oven.

In the winter of 1964, Dr. Holinka left medical school and started working full time (40 hrs/week) in the same laboratory he had worked in as an undergraduate. He remained a full time employee of the laboratory until August of 1964. This time period of employment is not reflected in the social security records that were provided. During this period of time, Dr. Holinka allegedly used asbestos mittens and burner pads. From the end of 1961 until the beginning of 1971, Dr. Holinka did not work for a private employer as evidenced by his social security records.

Dr. Holinka was employed part-time (18 hrs/week) at the Columbia University Presbyterian Medical Center from 1971 to 1974 while pursuing his doctorate in biological sciences at SUNY Stony Brook. While working in this laboratory, Dr. Holinka's primary responsibility was the analysis of human serum plasma. Dr. Holinka alleges that he used asbestos mittens once every two weeks and burner pads on a daily basis.

*Post-Doctoral and Faculty Research*
From 1974 to 1977, Dr. Holinka worked as a post-doctoral fellow at the University of Southern California. This was primarily a research position; however, five to ten percent of his time was devoted to teaching. His research included animal work and biochemical

Lab Supply Defendants                              -9-                              July 18, 2007

analysis and he would wear a surgical mask while performing experiments. Dr. Holinka reported using asbestos burner pads and mittens during this period of time.

After completing his post-doctoral fellowship, Dr. Holinka worked as a research instructor and later as a research professor at Mount Sinai from August 1977 to July 1989. He was involved in animal research and biochemical research in women's health care. Asbestos burner pads and mittens were used on a daily basis. Burner pads were replaced once every two months.

After 1989, Dr. Holinka began employment in the pharmaceutical industry with a number of firms and then became an independent consultant to the industry. He did not have any known asbestos exposures during this period of his career.

*Summary of Opportunities for Exposure*
Dr. Holinka provided limited information on the exact amount of time that he handled the Bunsen burner pads and the mittens that he claimed to use routinely. From his depositions, Dr. Holinka's first alleged asbestos exposure occurred while training and working as a laboratory technician in the U.S. Army from 1956 to 1959. From 1959 to 1963, Dr. Holinka had limited intermittent asbestos exposure while working with asbestos mittens and burner pads in academic and part-time employment laboratories. No alleged asbestos exposure occurred during the two semesters that Dr. Holinka was enrolled in medical school. From 1964 to 1966, Dr. Holinka again had limited intermittent exposure to asbestos mittens and burner pads. No alleged asbestos exposures occurred while he was pursuing a degree in comparative literature from 1966 to 1968 or while taking literature courses from 1968 to 1971. From 1971 to 1989, Dr. Holinka had limited exposure to burner pads and asbestos mittens. No alleged asbestos exposures have occurred since 1989.

In all, based on the very limited information that Dr. Holinka provided, I have estimated that his daily handling of the Bunsen burner pads would have been only about 60 minutes per day, three days per week for 20 years (taking into consideration the fact that he had several years where he did not have any potential exposure, did not work in the laboratory full time for much of this time, and had periods of time where he did not handle the pads on a daily basis). Likewise, his use of mittens for handling hot glassware would also be no more than 60 minutes per day, but the usage was likely only two days per week for 20 years (again considering that he did not use the mittens on a daily basis, did not work full time in the laboratory, and had time periods where he did not perform any lab work).

From his depositions, it was not possible to identify any other sources of asbestos exposure from his academic or professional careers.

**Exposure Assessment**

*Asbestos Mittens*
There have been studies of the use of asbestos containing gloves and mittens similar to the products used by Dr. Holinka. One study that has been frequently cited is the 1981 study by Samimi on asbestos exposure from wearing asbestos gloves. As part of the study, Samimi reported concentrations of airborne fibers emitted in five actual workplace laboratories that would have been similar to the laboratory environment in which Dr. Holinka worked. The

Lab Supply Defendants                    -10-                          July 18, 2007

results ranged from 0.07 f/cc to 2.93 f/cc (mean = 0.83 f/cc; 7 samples). Samimi noted that the gradual soiling of gloves reduces the extent of fiber emissions although prolonged use could result in damage or deterioration. In discussing the range of measurements obtained from the five workplace laboratories, the study authors assert that differences in room size and arrangements, room ventilation system, and amount of moisture on the gloves are factors that influence exposure of workers. Gloves were composed of asbestos cloth containing 80-85% asbestos and 15-20% rayon and were treated with an acrylate-base compound to make them "lint-free." The fiber type was not specified in the study.

One of the major limitations of the study by Samimi is the use of the Phase Contrast Microscopy (PCM) analytical methodology. The PCM method is the most common method for the measurement of asbestos fibers in air and continues to be used extensively today. However, a significant limitation is that it does not distinguish asbestos fibers from other fibers. Although optical counting methods using membrane filters had been employed previously, the standard PCM methodology was not established by the National Institute for Occupational Safety and Health (NIOSH) until 1977. It was superseded by NIOSH Method 7400 around 1984. The approach to determining the level of fibers is defined by fiber counting rules. The fiber counting criteria include the counting of only fibers equal to or longer than 5 microns and the counting of all particles *as asbestos* (emphasis added) that have a length-to-width ratio (aspect ratio) of 3:1 or greater (NIOSH 1994). As stated in the documentation of the method, other airborne fibers (that is, non-asbestos fibers) may interfere, since all particles meeting the counting criteria are counted (NIOSH 1994). Thus the presence of gypsum, cement, silica, mineral wool, fiberglass, cellulose and other natural and man-made particles can, and often are, counted and treated as if they were asbestos. Consequently, an analysis by PCM indicating elevated fiber counts does not necessarily indicate the presence of asbestos nor the true magnitude of the exposure. At best, PCM merely provides an index of exposure to particles present in a given size range and shape, not necessarily that those fibers are asbestos (Baron 2001).

Another major limitation is that no background samples were reported to have been collected in the laboratories where Samimi conducted his measurements prior to the sampling to assess ambient fiber levels. Without controlling for ambient fibers, such as clothing, human hair, fibrous glass, or other fibrous matter, the asbestos exposure levels obtained in the Samimi study most likely overstate the true concentration.

Samimi also conducted testing in isolation chambers, which resulted in concentrations ranging from 0.95 to 11.74 f/cc. The range of results from the isolation chambers, which are substantially greater than the modern OSHA PEL, were most likely due to poor quality assurance methods that were in place at the time of the study and potentially poor housekeeping practices between simulations (Cherrie 2005). I am aware of some modern simulations that were carried out in isolation chambers that had high ambient fiber backgrounds, specifically a study by Dr. William Longo, of gaskets in which the background concentration in one of the simulations exceeded the OSHA PEL (Longo 2002). This type of poor quality control could explain the elevated results that were found during the sampling in the isolation chambers.

In a 2005 study on asbestos exposure from wearing asbestos mittens, Cherrie collected measurements during three separate glass manufacturing tasks. Chrysotile asbestos mittens

Expert Report of Robert C. Adams                                    ENVIRON

made in the 1970s were used. This study simulated three test conditions that would involve aggressive handling of materials while wearing mittens, methods that would be more aggressive than would be typical of use in a laboratory. In this study, the authors provided detailed information as to how they controlled for non-asbestos fibers through a process of cleaning and vacuuming the chambers after each simulation.

The tasks were performed both with no ventilation and with high ventilation within a 45 cubic meter enclosure. Laboratories typically have high ventilation rates due to the presence of fume hoods and the handling of chemical and biological agents. Ventilation requirements in the current American Society of Heating, Refrigerating and Air Conditioning Engineers (ASHRAE 2004) for laboratories require 1.0 cubic foot of air volume for every square foot of laboratory space. This requirement is greater than for nearly all other occupancies, except of automobile garages. The presence of fume hoods places additional demand for replacement air that can result in up to 10 air changes per hour in laboratory spaces (DiBerardinis 1993), again a level that is higher than most other occupancies.

The reported mean personal airborne fiber concentration from 33 samples ranged from 0.03 f/cc to 0.48 f/cc. The lowest mean fiber concentrations were obtained when high localized ventilation was used, and the highest mean concentrations were obtained when no ventilation was used. Both new and aged mittens were utilized, and the differences between mean airborne fiber concentrations for aged gloves and new mittens were not statistically significant. Based on observations made during the tests, obvious releases of airborne dust occurred when the mittens were abraded on sharp metal edges. Each simulation was carried out over a 30-minute period, and each task investigated was continuously repeated during that period. Cherrie found levels of fiber release from gloves, but ultimately concluded that the levels are not indicative of increased risk. As with the Samimi study, the authors used the PCM method for analysis, which could overstate the levels of fiber in the air. In addition, these results were not weighted for an 8-hour work day.

I have been provided with a workplace simulation conducted by Dr. Longo, provided to me in another matter. While Dr. Longo has used methods that are not consistent with accepted IH practice in other workplace simulations that he has undertaken, such as using Tyndall lighting and indirect preparation of samples for transmission electron microscopy analysis, my review of this simulation found that his methods and interpretation were in general conformance with good IH practice. In this simulation, gloves composed of 75% chrysotile asbestos were used. This simulation involved the repeated handling of bricks, which would result in aggressive and abrasive methods that would not be typical for laboratory use. In the simulation, 12 bricks were moved while wearing the gloves and the activity was repeated once each hour for four hours. The task based concentration results from this simulation were reported to be 0.02 f/cc.

It is my opinion that the data from the Cherrie and Longo studies are the best representation of Dr. Holinka's likely exposure from the use of the mittens. Based on the Cherrie study and the Longo simulation, it is my opinion that a reasonable maximum task based exposure would be 0.02 f/cc and a reasonable maximum estimate of the TWA exposure for Dr. Holinka, based on the frequency of glove use (which was infrequent, intermittent and irregular), would be 0.001 f/cc. With a daily average in this range for fifteen years, the reasonable maximum contribution to Dr. Holinka's lifetime cumulative exposure from his

Lab Supply Defendants                    -12-                    July 18, 2007

use of asbestos mittens would be no more than 0.02 fiber-years/cc. The fiber type would have been chrysotile asbestos.

Bunsen Burner Pad

There have been no studies of the potential for the release of asbestos from the use of Bunsen burner pads in the peer-reviewed scientific literature. Bunsen burner pads were composed of iron wire mesh gauze, which came in various sizes and had a thin, small diameter, white circular center that contained asbestos. The white coloration of the center material is an indication that it is chrysotile containing as discussed previously. This thin layer of asbestos was designed to protect the bottom of the glassware from the high heat of a Bunsen burner flame.

While the fiber type and percentage of asbestos content in the pad is not known, it was most likely chrysotile due to the preponderance of chrysotile use in the United States. In addition, the center of the pad would not be friable, that is, not easily crushed or pulverized to powder by hand pressure, and would not release fibers under normal handling due to the binding of the asbestos fibers within a solid matrix. Using the pads as intended would not release fibers readily when used in normal laboratory heating procedures. It would require aggressive actions like sanding, grinding or abrading the center to release fibers, an activity that was not done by Dr. Holinka.

I have had personal first hand experience in the use of these Bunsen burner pads both in my academic experience and as a result of laboratory health and safety audits that I have conducted throughout my career. From my personal experience in a laboratory, the actual time spent handling the pads is minimal, only minutes per day. The pad is placed on a ring stand upon which a flask, beaker, or other type of glassware would be placed. The Bunsen burner would be placed underneath. During the heating of the glassware, there is no opportunity to come into contact with the pad. If running multiple tests, the pad would be left on the ring stand. Once the tests were completed, the pad would typically be stored once it had cooled and could be safely handled.

Dr. Holinka repeatedly stated that he believed that ambient asbestos fibers were likely generated as the heat from the Bunsen burners caused the fibers in the burner pads to become brittle. He could not recall the temperature of the Bunsen burner, nor could he recall the fuel source for the burners. Based on his descriptions, it is my opinion that the flaking and damage of the pads was due to thermal degradation of the asbestos due to the application of high heat.

A Bunsen burner is a gas burner commonly used in laboratories, most typically using natural gas as a fuel source, which can produce a flame capable of reaching temperatures of 1,500° Celsius (°C) or 2,732° Fahrenheit (°F) or higher (Bunsen burner 1998; Flinn 2007). All forms of asbestos are subject to melting and thermal degradation at temperatures beginning at 600 °C. Chrysotile will decompose to forsterite, a member of the olivine mineral family and a material that is not asbestos, starting around 500 °C with conversion to well-crystallized forsterite at temperatures from 800 °C (Jeyaratnam 1994) to 850 °C (ATSDR 2001; Vitra 2002). The amphibole forms also degrade with exposure to high temperatures. Amosite will degrade in to spinel, hematite and cristobalite starting at 600 °C. Crocidolite

Expert Report of Robert C. Adams                                    ENVIRON

Lab Supply Defendants                    -13-                    July 18, 2007

will degrade into acmite, hematite and cristobalite starting at 800 °C. Heating for as little as 30 minutes at temperatures of 900 °C will result in the breakdown of all asbestos (Jeyaratnam 1994). These degradation reactions are not reversible.

As described by Dr. Holinka, the pads would wear out and he would replace them, sometimes as often as once every few days. Being subjected to frequent high heating with the Bunsen burner, at temperatures that were at or above 900 °C, the degradation reported by Dr. Holinka was reasonably the result of the breakdown of the asbestos fibers in the pad to non-fibrous, non-asbestos forms that are not linked to the development of mesothelioma.

Dr. Holinka's opportunity for exposure to asbestos from the use of the burner pads was irregular, intermittent and very limited. On average, he would have used these pads no more than a few hours per week, in many cases reasonably only minutes per day, with many periods of non-use. While the pads may have worn out frequently and needed to be replaced, this does not mean that he was exposed to asbestos fibers. He did not grind or pulverize the pads and did not take actions that would have readily released the asbestos fibers from the binder material.

The burner pads were not subject to aggressive handling other than the heating. If the use of woven gloves, picking up bricks, as simulated by Dr. Longo, could not create levels of asbestos greater than 0.02 f/cc, there is no possibility that the brief handling of intact burner pads could create levels higher than 0.02 f/cc. Any particulate that would be released from used pads that had been heated repeatedly would not be asbestos, having been degraded by the heat to non-asbestos forms. It is my opinion that, with a task based exposure that would be no greater than 0.02 f/cc for no more than 60 minutes per day for about three days a week, a reasonable maximum estimate of the TWA exposure for Dr. Holinka, based on the frequency of pad use (which was infrequent, intermittent and irregular), would be 0.0015 f/cc as a daily average. The reasonable maximum contribution to Dr. Holinka's lifetime cumulative exposure as a result of his use of the Bunsen burner pads would be no more than 0.03 fiber-years/cc.

**Exposure Summary**

The total cumulative exposure that Dr. Holinka would have had from the use and handling of the two primary laboratory products identified in his depositions has been reasonably estimated to be no more than 0.05 fiber-years/cc and with a high degree of certainty that the true exposure was in fact lower than this estimate. This level is still less than the cumulative exposure that a person living 70 years in an urban environment would receive from the presence of asbestos that is naturally present in the air. This level is also nearly two orders of magnitude less than the lifetime occupational exposure that a person working in an environment with TWA concentrations at the current OSHA PEL would receive.

**Opinion**

It is my overall opinion, within a reasonable degree of professional and scientific certainty, that Dr. Holinka's pleural mesothelioma was not the direct result of exposure to any asbestos containing products identified by Dr. Holinka. It is reasonable that the products allegedly used by Dr. Holinka were only chrysotile containing, a material that is not known

Expert Report of Robert C. Adams                                        ENVIRON

Lab Supply Defendants                    -14-                    July 18, 2007

to have the potency for inducing mesothelioma, particularly at the exposure levels that would have been present in the laboratory environments in which he worked. Even at higher levels, the association of chrysotile to mesothelioma is weak. The 8-hour TWA concentrations and the lifetime cumulative exposures he had would be insignificant and irrelevant to the development of mesothelioma.

Further, it is my opinion that he had little or no exposure to asbestos from the brittle Bunsen burner pads due the asbestos undergoing thermal degradation because of the routine heating to elevated temperatures of greater than 900 °C. Asbestos present in the pad would be converted to other non-asbestos mineral forms, such as forsterite, that are not associated with a risk of mesothelioma development.

It is my opinion that there was no substantial asbestos exposure in Dr. Holinka's academic and professional career to explain the development of his pleural mesothelioma.

If you have any questions please do not hesitate to call me at (609) 243-9848.

Respectfully yours;

Robert C. Adams, MS, CIH, CSP
Senior Manager
ENVIRON International Corporation




Expert Report of Robert C. Adams                                    ENVIRON

Lab Supply Defendants                    -15-                    July 18, 2007

## References

American Society of Heating, Refrigerating and Air Conditioning Engineers (ASHRAE). 2004. *Ventilation for Acceptable Indoor Air Quality.* Standard 62.1-2004. Atlanta GA.

Agency for Toxic Substances and Disease Registry. 2001. *Toxicological Profile for Asbestos.* Public Health Service, US Department of Health and Human Services, Atlanta, GA. September.

Baron, P.A. 2001. *Measurement of airborne fibers: A review.* Ind. Health. 39, 39-50

Bunsen burner. 1998. In *QPB Science Encyclopedia.* p.118.

Cherrie, JW et al. 2005. *Exposure and Risks from Wearing Asbestos Mitts.* Particle and Fibre Toxicology. 2:5.

Churg, A. 1988. *Chrysotile, Tremolite, and Malignant Mesothelioma in Man.* Chest, 93: 621-628.

DiBerardinis, L.J., Baum, J.S., First, M.W., et al. 1993. Common elements of laboratory design in *Guidelines for Laboratory Design* 2nd Ed. John Wiley and Sons. New York.

Eastern Research Group, Inc (ERG). 2003. *Report on Expert Panel on Health Effects of Asbestos and Synthetic Vitreous Fibers: The Influence of Fiber Length.* Report prepared for the Agency for Toxic Substances and Disease Registry, Atlanta, GA.

Flinn Scientific Inc. 2007. *Chemical and biological catalog and reference manual.* p. 204. Batavia IL.

Harries, P.G. 1971. *Asbestos Dust Concentrations in Ship Repairing: A Practical Approach to Improving Asbestos Hygiene in Naval Dockyards.* Annals of Occupational Hygiene. 14:241-254.

Hodgson, J. T.; Darnton, A. 2006. *The quantitative risks of mesothelioma and lung cancer in relation to asbestos exposure.* Annals of Occupational Hygiene. 44 (8) 565–601.

International Programme on Chemical Safety. 1986. *Asbestos and Other Natural Mineral Fibres.* Environmental Health Criteria 53. World Health Organization.

Jeyaratnam, M., and West, N.G. 1994. *A study of heat-degraded chrysotile, amosite and crocidolite by x-ray diffraction.* Ann Occup Hyg 38: 137-148.

Longo, W.E., Egeland, W.B., Hatfield, R.L., Newton, L.R. 2002. *Fiber release during the removal of asbestos-containing gaskets: a work practice simulation.* Appl. Occup. Environ. Hyg. 17(1):55-62.

Mangold, C., K. Clark, et al. 2006. *An exposure study of bystanders and workers during the installation and removal of asbestos gaskets and packing.* J Occup Environ Hyg 3(2):87-98.

National Institute for Occupational Safety and Health (NIOSH)/ Occupational Safety and Health Administration (OSHA). 1980. *Workplace Exposure To Asbestos: Review and*

Expert Report of Robert C. Adams                              ENVIRON

Lab Supply Defendants                    -16-                         July 18, 2007

*Recommendations.* Asbestos Work Group Recommendation. DHHS (NIOSH) Publication No. 81-103. Washington DC. November

National Institute for Occupational Safety and Health (NIOSH). 1994.  *Asbestos and Other Fibers by PCM.*  Manual of Analytical Methods 4th Ed.  NIOSH Method 7400.

Occupational Safety and Health Administration (OSHA). 1994. *Occupational exposure to asbestos - 59:40964-41162.*

Samimi, BS et al.  (1981)  *Occupational Exposure to Asbestos Fibers Resulting from Use of Asbestos Gloves.* Am Ind Hyg Assoc J. 42:870-875.

Rasmuson, J. 2004. *The Exposure Assessment Process: Principles of Exposure Reconstruction Utilizing Asbestos as an Example.*  Unpublished work presented at the American Industrial Hygiene Conference and Exposition. Atlanta GA. May.

Vitra, R.L. 2002. *Asbestos – geology, mineralogy, mining and uses.* U.S. Geological Survey Open file Report 02-149. Reston VA.

Vitra, R.L. 2005. *Mineral commodity profile - Asbestos.* U.S. Geological Survey Circular 1255 – KK. Reston VA.

Exhibit B

1

# ROBERT C. ADAMS, C.I.H., C.S.P.

## Education

1991    M.S., Safety Sciences, Indiana University of Pennsylvania

1980    B.S., Biology, Clarion University of Pennsylvania

## Registrations & Affiliations

Certified Industrial Hygienist (Certificate #5460) – American Board of Industrial Hygiene.
Certified Safety Professional (Certificate #8774) – Board of Certified Safety Professionals.
Asbestos Inspector and Project Designer – State of New York Department of Labor
Member ANSI A10.26 Subgroup – Emergency Procedures for Construction

## Experience

Mr. Adams is a Manager at ENVIRON International Corporation in Princeton, NJ. He has 24 years of experience in the environmental health, and safety (EHS) field in both the public and private sectors. He has managed a wide range of projects including occupational health and safety risk and exposure assessments; health and safety audits; emergency preparedness planning and managing multidisciplinary EHS teams in a crisis situation; field monitoring for air contaminants, noise, radiation, and temperature extremes; administrative programs and engineering control technology; litigation support and expert testimony; development of OSHA compliance programs for lead, silica, respiratory protection, noise and hearing conservation, laboratory safety, hazard communication, asbestos, polychlorinated biphenyls, radiation and others; and development and presentation of training programs on industrial hygiene methods, bloodborne pathogens, noise, hazard communication, respiratory protection, and Hazardous Waste Operations and Emergency Response.

Mr. Adams is also an Adjunct Professor at Saint Joseph's University in Philadelphia PA.

## Professional Activities

### Crisis Response

*EHS Management during the World Trade Center Disaster. New York City Department of Design and Construction, New York, NY.* As Director of Environmental Health and Safety (EHS) for the New York City Agency assigned to manage the clean-up of the World Trade Center disaster, was responsible for directing and coordinating environmental health and safety response for the private contractors hired by the City to remove debris and assist in rescue and recovery. On 10/29/2001 was placed in overall charge of site EHS programs. Responsibilities included organizing the response effort to minimize risks of injury and exposure to workers, overseeing preparation of, and revisions to, a site-wide EHS plan, preparing directives and guidance based on the site-wide EHS plan for distribution to the site workforce, serving as liaison with Federal, State and Local regulatory agencies and uniform services, coordinating the services of safety, health and environmental consultants and participating in numerous task forces. Oversaw an aggressive industrial hygiene monitoring program that evaluated hundreds of air contaminants, including asbestos, lead, VOCs, silica and mold. The results of this coordinated, multi-agency health and safety effort included no fatalities, no disabling injuries and a lost-time accident rate that was well below the construction industry average.

R–USURP–14



ENVIRON

*printed 8/10/06*

2

## ROBERT C. ADAMS, C.I.H., C.S.P.

*Security and Vulnerability Analysis of NYC Construction Agency. New York City Department of Design and Construction, New York, NY.* As Director of EHS for this New York City Agency, participated in a task force to analyze the potential threats that might impact the agency and its operations. Assessed resources and developed recommendations for a comprehensive emergency response plan in the aftermath of the World Trade Center disaster. Provided strategic recommendations to the agency commissioner on establishing integrated emergency preparedness plans with other NYC agencies and the Office of Emergency Management. Assigned to represent the agency at the Emergency Operations Center upon activation in a crisis situation.

*On-site Leader/Coordinator Training. Occupational Safety and Health Administration. Washington DC.* Retained to assist with the training of Federal and State OSHA managers, including OSHA Specialized Response Team coordinators and staff assigned Regional Emergency Management Plan coordination responsibilities, who will be in on-site leadership and management positions during a nationally significant incident. Developed and led sessions on safety and health management activities after the World Trade Center collapse. Developed "lessons learned" examples and recommendations for improvements in emergency preparedness. Developed and led tabletop exercises on the use of individual and groups of technical specialists to aid decision making; development of control strategies; decision making in an emergency response (i.e., life saving) and recovery (i.e., life saving is not an issue) situations; risk assessment tools used on site both during emergency response and recovery; and finding alternative means to achieve safety goals.

### Health and Safety Auditing

*Compliance Assessment and Program Development, Vivendi Universal Entertainment, Hollywood, CA and Orlando, FL.* As part of the acquisition of Vivendi Universal Entertainment (VUE) by GE/NBC, assisted VUE EHS management to meet OSHA compliance requirements at numerous locations. Managed a team that performed a comprehensive chemical inventory of the Universal Studios theme parks in Orlando, provided technical support on lock-out / tag-out, electrical safety, fire and life safety, fall protection, emergency action plans and confined space entry. Prepared written programs and assessed applicability of local regulations to VUE operations.

*Health and Safety Audits of Quarry Operations, Genstar Stone Products Company, Various Locations, Md.* As part of an insurance loss control service program, conducted audits of all of the Genstar operations in Maryland, including quarries, sand and gravel plants, a calcium carbonate plant, asphalt paving plants and ancillary operations. Assisted with the development of health and safety programs. Performed exposure monitoring for various chemical contaminants at several of the facilities.

*Management Program Audit of Health and Safety at a Pharmaceutical R&D Facility, Bristol - Myers Squibb Company, Lawrenceville, NJ.* Participated in a multi-media compliance and management audit of environmental and occupational health and safety programs for a pharmaceutical research and development facility. Audited industrial hygiene, safety and radiological control programs. Conducted facility assessments and interviewed key management personnel. Recommendations were developed to address regulatory compliance, industrial hygiene and safety issues.

## ROBERT C. ADAMS, C.I.H., C.S.P.

*Environmental Due Diligence Assessment at a Particleboard Manufacturing Facility, Confidential Client, Bradford, PA.* In conjunction with an environmental due diligence review on behalf of a buyer, conducted a baseline health and safety assessment of manufacturing operations at a particleboard and fiberboard manufacturing plant. Assessed compliance with OSHA regulations, evaluated safety and industrial hygiene hazards and provided recommendations to management on recordkeeping, improved hazard control and implementation of industrial hygiene monitoring programs.

*Asbestos Policy Analysis, Volpe National Transportation Center (Federal Aviation Administration), Cambridge, MA.* Conducted an analysis of asbestos exposure data from maintenance work on floor tile to develop a negative exposure determination for the Federal Aviation Administration. Co-authored several documents for the FAA analyzing the regulatory status of asbestos and co-authored draft revisions to existing FAA Orders pertaining to the safe handling of asbestos containing material during maintenance work.

*Management Program Audit of Health and Safety at a Petroleum Research and Development (R&D) Facility, Mobil Research and Development, Paulsboro, NJ.* Conducted a two-month audit of health and safety programs, and procedures in place at the Paulsboro Research Laboratory. Evaluated program support and direction, training, monitoring and inspection protocols, recordkeeping, and reviewed the safety and health procedures manual. Identified areas for program improvement and assisted with revisions and updates of programs and procedures.

*Baseline Assessment of Health, Safety and Environmental Program for Research Laboratory, The National High Magnetic Field Laboratory, Tallahassee FL.* Conducted an assessment of the NHMFL safety, health and environmental programs to identify hazards, controls and necessary programs. Management systems were evaluated and organizational staffing needs were identified. Special safety health and environmental programs were evaluated including high power electrical systems, static magnetic fields, lasers, cryogens and radiation. Recommendations were developed to address regulatory compliance, safety management systems, training programs, safety organization and staffing, and content of a safety reference manual.

*Independent Technical Review of Audit Programs, U.S. Department of Energy Uranium Mill Tailings Remedial Action Project, Multiple Sites.* Participated in an independent technical review of the audit process conducted for the U.S. D.O.E. UMTRA sites. Responsible for reviewing the health and safety audit process, including an on-site observation of the conduct of the audit, interviews with auditors and review of the audit reports. Evaluated the audit operating procedures and provided recommendations for improving the effectiveness and efficiency of the program.

*Management Program Audit of Industrial Hygiene Operations at a High-Technology Research and Development (R&D) Manufacturing Facility, International Business Machines, Manassas, VA.* Led a team of three industrial hygienists conducting a comprehensive management audit of an industrial hygiene program at a large electronics R&D and manufacturing facility. Evaluated program support and direction, staffing, training, professional development, monitoring protocols, recordkeeping, and the industrial hygiene technical manual. Developed 20 management improvement recommendations, including implementation schedules with milestones and measures of success.

4

## ROBERT C. ADAMS, C.I.H., C.S.P.

*Technical Review and Quality Assurance Audits of Asbestos Survey Reports, Department of Veterans Affairs Medical Center, Coatesville, PA.* Provided on-site technical assistance and quality control inspections of DVAMC facilities. Reviewed facility reports of asbestos building surveys to assure proper identification, assessment and evaluation of asbestos containing materials. Provided technical guidance to the project team during the final report writing stages, including the development of an operations and maintenance document.

*Best Management Practices for Safety, Health and Environmental Programs, Department of Energy, Office of Energy Research, Washington DC.* Participated in the development of a concept for a "Model Facility Safety Program" to be used by the DOEs Office of Energy Research. The goal of the effort was to review state of the art approaches to safety management and develop a plan for the implementation of the most practical and effective management of safety within DOE facilities. Key elements of the "Model" program were use of best management practices and integration of safety, health and environmental programs.

*Health and Safety Program for an Electronic Equipment Manufacturer, Bear Automotive, Bangor, PA.* As a result of corporate restructuring, a manufacturing facility required a review of its health and safety program. Led a team of three health and safety professionals in a management systems assessment and audit of the facility operations. Revised plant health and safety manual with significant modification to hazard communication, ergonomics, hearing conservation, and other OSHA-required programs. Facilitated the establishment of an ergonomics task force. Conducted ergonomics evaluations of workstation design. Conducted industrial hygiene exposure assessments of several processes and performed monitoring for noise and air contaminants. Assisted plant management in working with the OSHA area office by providing technical support and conducting an audit of OSHA recordkeeping.

*Plantwide Health and Safety Audit of Manufacturing Plants, The Dial Corp., Multiple Locations.* Conducted wall-to-wall industrial hygiene and safety audits of three plants manufacturing consumer products. Evaluated OSHA-required programs, including respiratory protection, hazard communication, and hearing conservation. Conducted employee exposure evaluations for chemical and noise stressors. Developed and verified the effectiveness of engineering and administrative control recommendations.

*Health and Safety Audit of a R&D Laboratory, Congoleum Corporation, Trenton, NJ.* Audited health and safety program and compliance with the OSHA laboratory safety standard for a R&D laboratory of a flooring manufacturer. Developed several management recommendations to improve the health and safety program, including development of a chemical hygiene plan. Follow-up audits indicated completion of all outstanding recommendations and improved compliance with OSHA regulations.

*Technical Review of Asbestos Survey Reports, Department of Veterans Affairs Medical Center, Northpoint, NY.* Reviewed 30 facility reports of asbestos building surveys to assure proper identification, assessment and evaluation of asbestos containing materials in the DVAMC facility. Provided technical guidance to the project team during the final report writing stages.

### Industrial Hygiene Risk and Exposure Assessment

*Fungal Contamination of a Building Under Construction, The Security and Exchange Commission, Washington DC.* On behalf of the SEC, conducted assessments of water intrusion sources during the construction of the new SEC headquarters building. Identified poor

ENVIRON

## ROBERT C. ADAMS, C.I.H., C.S.P.

construction practices and logistics that were contributing to damaged porous building materials and growth of mold in wallboard, carpeting and insulation materials. Identified leaking roof drains, improper roof pitch allowing standing water, installation of interior finish materials before completion of the building envelope and potential foundation problems requiring corrective action.

*Asbestos Abatement of Publicly-owned Buildings, NYC Department of Design and Construction, New York, NY.* As Director of the NYC construction agency, was responsible for the oversight of numerous asbestos abatement projects required under NYC public law. Oversaw the preparation of bid specifications for removal, hired consultants to monitor abatement work and monitored contractor compliance with specifications and regulatory requirements.

*Air and Noise Monitoring and Engineering Control Survey for a Refractory, Confidential Client, Northeast, MD.* Conducted noise monitoring of press operators at a major refractory to identify personnel exposed to elevated noise levels. Monitored silica exposures during various manufacturing processes. Developed engineering and administrative control recommendations to reduce noise, including acoustic barriers and enclosures. Provided performance specifications for the design of acoustic barriers and enclosures, including possible materials of construction. Developed engineering design specifications to reduce silica exposures, including local exhaust ventilation.

*Construction Worker Exposures to Silica, Reliance National Insurance, New York, NY.* On behalf of an insurance company, conducted industrial hygiene surveillance of several work sites where construction employees were potentially exposed to silica from a variety of sources. Exposure assessment involved worker personal breathing zone sampling, collection of bulk samples of dust for silica content and assessment of various controls to reduce exposure.

*Silica and Dust Exposure Monitoring In Concrete Bagging Operation, Confidential Client, Md.* For a supplier of bagged concrete, evaluated worker exposures to silica and dust during bag filling operations. Worker exposures to silica were found to be three times the OSHA PEL. Provided client with recommendations for modifications to the dust collection system to improve capture of dust.

*Ventilation System Evaluation and Design Modification, Confidential Client, Showell, MD.* Conducted an evaluation and review of local exhaust system design for a large poultry-processing plant. Evaluation consisted of a review of design plans following the velocity pressure method and identification of system losses that required modification to achieve optimal airflow. Recommended design changes were developed to correct for system losses identified.

*Industrial Hygiene Monitoring During Refinery Shutdown, Chevron, USA, Philadelphia, PA.* To evaluate contractor worker exposures during a refinery shutdown, conducted exposure assessment sampling for benzene, total welding and metal fumes, total and respirable dust, silica and isocyanates to characterize potential exposures. Assisted the project manager with the overall project effort, including mobilization, staffing and general project oversight.

*Industrial Hygiene Monitoring during the Excavation and Removal of Contaminated Soils, The Henderson Corporation, Eddystone, PA.* In response to reported solvent odors during excavation work, conducted sampling for volatile organic compounds (VOCS) to identify suspect compounds and characterize potential exposures. Developed a health and safety plan (HASP) for specific phases of the project that would involve exposure to solvents in the contaminated soils,

## ROBERT C. ADAMS, C.I.H., C.S.P.

including confined space entry operations. Managed the industrial hygiene monitoring of the solvents during each phase with potential exposure and prepared final report on the effort.

*Industrial Hygiene Monitoring During Refinery Shutdown, TOSCO Refining Company, Trainer, PA.* To evaluate contractor worker exposures during a refinery shutdown, developed strategic plan for evaluating potential exposures, coordinated and oversaw industrial hygiene staff to carry out plan and conducted exposure assessment sampling. Evaluated exposures during confined space entry, including oxygen levels, lower explosive level, hydrogen sulfide, total petroleum hydrocarbons and carbon monoxide. Also evaluated benzene, total welding and metal fumes, total and respirable dust and silica to characterize potential exposures.

*Wood Dust Exposure Assessment, Evaluation, and Control in a Furniture Manufacturing Plant, Pennsylvania House, Lewisburg, PA.* Evaluated levels of hard wood dust created by the sanding of furniture at various stages of manufacture. Initial exposure assessments identified operators of power sanders with the greatest risk of exposure, which was confirmed by air monitoring. Recommended methods to reduce exposures and provided follow-up evaluations on the effectiveness of controls.

*Evaluation of Radiofrequency (RF) Radiation From Portable Di-Electric Heat Sealers, Confidential Clients, Various Locations in Pennsylvania.* Responding to concerns about RF radiation using hand-held heat sealers, evaluated 10 different units used in two woodworking plants for personal exposure to RF radiation. To address overexposure posed by 7 of the 10 units studied, devised concept for improved copper shielding. Follow-up evaluation indicated that exposures were reduced on each unit that was retrofitted.

*Formaldehyde Exposure Assessment, Evaluation, and Control in a Woodworking Plant, Confidential Client, Goodville, PA.* Evaluated employee exposures to formaldehyde produced from spray finishing of wood products using formaldehyde-based lacquers. Study included employee exposure assessment, air monitoring, and control recommendations for ventilation systems to reduce airborne levels, and follow-up monitoring to confirm the effectiveness of controls.

*Indoor Air Quality Investigation, MCI Telecommunications, Pittsburgh, PA and Fairfax, VA.* Responded to several requests to evaluate the indoor air quality concerns at two multi-tenant office buildings. Investigated reports of employee illness and discomfort and correlated to observable building design, construction, and maintenance factors. Developed improvement recommendations and provided follow-up technical support through implementation.

*Bioaerosol Investigation of a Multi-story Office Building, Confidential Client, Denver, CO.* Conducted an assessment of indoor and outdoor levels of bacteria and fungi on behalf of a building management company. Twenty samples were collected throughout a fifteen-story office building to assess levels and identify species. The building HVAC system was evaluated, and procedures for controlling bacteria and fungi in the heating and cooling system were reviewed. Results of testing indicated there was no amplification of bioaerosols inside the building.

*Bioaerosol investigation of an Office Building, Confidential Client, Wilmington, DE.* On behalf of a bank, evaluated levels of bioaerosols inside a three-story office building. Fifteen samples were collected at various areas inside and outside the building to assess levels of bacteria and fungi. Also, samples of standing water inside the buildings air handling units were collected to determine the presence of Legionella species. Results indicated no amplification of bioaerosols

7

## ROBERT C. ADAMS, C.I.H., C.S.P.

levels was occurring in the building. No Legionella was found, although there was visible fungal growth in several air handling units. Corrective action recommendations were submitted.

*Exposure Monitoring of Lead Exposure during Bridge Rehabilitation, Confidential Clients, Various Sites in Baltimore, MD.* Conducted exposure evaluation and air sampling of several phases of bridge rehabilitation projects, including abrasive blasting, burning, cutting, and welding operations. Developed procedures to control worker exposures and investigated alternative control technologies for possible use in future projects.

### Litigation Support To Law Firms and Insurance Companies

*Silica Exposures at an Abrasives Manufacturer, Confidential Client, Hasbrouck Heights, NJ.* On behalf of a law firm representing a manufacturer, provided independent third party review of industrial hygiene monitoring for silica conducted by OSHA. At issue was an alleged exposure to workers in the packaging operation from silica above the OSHA permissible exposure limit resulting in citation. Reviewed OSHA citation and conducted follow-up monitoring. Provided technical assistance to counsel during OSHA informal conference. As a result of rechecking OSHA data, identified error in calculation of time weighted average, which resulted in withdrawal of citation.

*Respiratory Illness Case, Confidential Client, Wheeling, WV.* Conducted a field investigation of ammonia exposures in a food processing plant to assist in evaluating the work-relatedness of an alleged non-specific respiratory disorder claim. Monitored worst case exposure conditions throughout plant and prepared industrial hygiene opinion of the probability of work-relatedness based on exposure data and chemical toxicity data.

*Occupational Leukemia Case, Confidential Client, New York.* On behalf of a law firm representing a chemical manufacturer, reviewed ten years of industrial hygiene data related to employee exposure to formaldehyde in a can manufacturing plant. Assessed the monitoring methodologies, analytical methods and exposure data to develop an exposure profile and prepare an opinion of the probability of concentrations of formaldehyde in excess of historic and current exposure limits.

*Microbiological Contamination of a Residential Home, Confidential Client, St. Petersburg, FL.* On behalf of a law firm representing a mortgage company, provided indoor air quality investigation of bioaerosol contamination of a home to establish contamination levels and identify potential sources. Conducted five days of bioaerosol monitoring and collected bulk samples of potentially contaminated building materials. Completed a thorough inspection of the home and identified multiple sources. Reviewed previous monitoring conducted by consultant retained by homeowners and provided opinion on the appropriateness of the methodologies used and the conclusions drawn. Assisted counsel in preparing questions for deposition of consultant.

*Asbestos Exposure Risk Assessment, Confidential Client, Frenchtown, NJ.* On behalf of a law firm representing a manufacturer, conducted an assessment of residual asbestos exposures in the aftermath of a fire at a manufacturer of industrial compressed gases. Assessed various data collected by clean-up contractors and consultants, oversaw field clean-up and collected bulk samples of suspected asbestos-containing material in the surrounding community. Prepared a risk assessment report that was presented to several regulatory agencies to obtain a "No Further Action" classification.

ENVIRON

## ROBERT C. ADAMS, C.I.H., C.S.P.

*Lead Exposures at a Printing Operation, Confidential Client, Maywood, NJ.* On behalf of a law firm representing a manufacturer, provided independent third party review of industrial hygiene monitoring for lead being conducted by OSHA and another consulting industrial hygienist. Issue was alleged exposure of workers in a linotype remelt operation to lead above the OSHA permissible exposure limit. Reviewed OSHA and consultant reports and observed follow-up monitoring. Provided technical assistance to counsel during OSHA closing conference.

*Program Audit of Health and Safety at a Pharmaceutical Manufacturing Facility, Confidential Client, Bronx, NY.* On behalf of a law firm, conducted a health and safety compliance review of operations at a pharmaceutical manufacturing plant. Audit focused on manufacturing and laboratory processes and procedures, including chemical handling, use and storage, quality assurance test protocols, ventilation system effectiveness, safety programs and hazard communication.

*Occupational Asthma Case, Crawford & Co., Cleveland, OH.* On behalf of the claims department of a third party administrator, reviewed exposure data and chemical information concerning an alleged case of occupational asthma. Provided an industrial hygiene opinion on the probability of work-relatedness of the case based on available exposure and toxicity information.

### Compliance And Training Programs

*Analysis of Beryllium Exposure Metrics, Occupational Safety and Health Administration, Washington, DC.* Conducted a review of published literature related to various methods of evaluating workplace exposures to beryllium and assessed possible new exposure metrics which the agency might use for the promulgation of a new exposure limit. Prepared a report to be submitted as required under the Small Business Regulator Flexibility Act.

*Health and Safety Compliance Manual Development, The New Yorker Hotel, New York NY.* Developed a comprehensive health and safety manual for a large hotel complex, including all written programs, training materials and reporting forms to assist client meet OSHA requirements. Also provided various support to the hotel and its legal counsel during negotiations with OSHA regarding issued citations.

*OSHA Compliance Program, United States Postal Service, Various locations in New York and New Jersey.* Developed and presented a multi-media training program on OSHA compliance requirements to nearly 1000 USPS managers and supervisors as a result of the <u>Postal Employees Safety Enhancement Act</u> of 1998, which placed the USPS under federal OSHA jurisdiction.

*Training Program Development for a Clinical Laboratory, Smith-Kline Beecham, King of Prussia, PA.* Developed four train-the-trainer modules to facilitate OSHA compliance for a pharmaceutical clinical laboratory facility. Developed training programs for hazard communication, respiratory protection, hearing conservation, universal precautions and personal protective equipment (PPE). Developed lesson plans, trainer outlines, and visuals to be used by management personnel. Programs were tailored to address the client's corporate policies and procedures for both domestic and international operations.

*Confined Space Entry Program for Corporate Health and Safety Management, Consolidated Rail Corporation, Philadelphia, PA.* Developed a corporate program for Conrail, a major freight railroad, to comply with the OSHA confined space entry standard. Program included

## ROBERT C. ADAMS, C.I.H., C.S.P.

management policies, compliance procedures, decision-making flow charts, terms, and definitions.

*Ergonomics Evaluations and Program Development for a Garment Manufacturer, Londontown Corporation, Baltimore, MD.* Conducted initial evaluations of ergonomic exposures in five cut and sew plants and a distribution center. Developed and delivered ergonomics training to engineering and supervisory staff. Assisted Corporate Safety and Health Manager develop an ergonomics program manual.

*Indoor Air Quality Training Program, PECO Energy, Philadelphia, PA.* Developed and conducted a client-specific, eight-hour, indoor air quality training program for PECO Energy, a major southeastern Pennsylvania utility.

*HAZWOPER Training, The Dial Corp., Various Locations in the United States.* Developed a client-specific training program for operations-level emergency responders and presented the program at six manufacturing sites. The program was designed to comply with the training requirements of OSHA Regulation 1910.120 while addressing the unique needs of the facility operations.

Prior to joining ENVIRON, Mr. Adams held the following positions:

- Director – Environmental Health and Safety Services Bureau, City of New York Department of Design and Construction, Long Island City, NY

- Division Manager – ATC Associates, Inc., New York, NY

- Vice President – The Darien Group, Glen Mills, PA

- Senior Industrial Hygienist – Golder Associates, Mount Laurel, NJ

- Section Manager – Roy F. Weston, Inc., West Chester, PA.

- Industrial Hygienist – Crawford & Company, Broomall, PA.

- Senior Industrial Hygienist – Liberty Mutual Insurance Company, Mechanicsburg, PA.

## HONORS AND RECOGNITIONS

- NYC Department of Design and Construction Commissioner's Award – April 2001

- A&E Biography/New York Mayor's Office Community Hero Award – June 2002

- Liberty Mutual Insurance Company Vice Presidents Safety Award – June 2002

- Greater New York Construction Users Council – Special Recognition for Safety Achievement in a Crisis Situation – November 2002

ENVIRON

## ROBERT C. ADAMS, C.I.H., C.S.P.

## PRESENTATIONS

Adams, R. K. DeLeo. 2004. Dirty Dirt: Is it Construction or is it Hazardous Waste? Presented at the American Industrial Hygiene Conference and Exposition. Atlanta, GA.

Adams. R. 2002. WTC: EHS Success Stories. Presented at the Northeast Regional Industrial Hygiene Conference. Princeton, NJ.

Adams, R. 2002. WTC: Environmental, Health and Safety Challenges at a Disaster Site. Presented at the Fall Technical Conference of the American Industrial Hygiene Association and the American Society of Safety Engineers. Denver, CO.

Adams, R. 2002. WTC: Environmental, Health and Safety Challenges during Recovery and Clean-up. Presented at the Air and Waste Management Association Annual Conference and Exhibition. Baltimore, MD.

Adams, R. 2002. WTC: Environmental, Health and Safety Challenges during Recovery and Clean-up Phases. Presented at the American Industrial Hygiene Conference and Exposition. San Diego, CA.

Adams, R. 2002. WTC: Environmental, Health and Safety Challenges during Rescue Phase. Presented at the American Industrial Hygiene Conference and Exposition. San Diego, CA.

Adams, R., Glass, J. 2002. Professional Development Seminar: Construction Health and Safety Current Topics. Presented at the American Industrial Hygiene Conference and Exposition. San Diego, CA.

Adams, R. 2002. WTC: Environmental, Health and Safety Challenges. Presented at the New York Interagency Engineering Council Annual Conference. New York, NY.

Adams, R. 2002. Managing EHS in a Disaster: Safety and Health Challenges from 9/11. Presented at the Safety Executives of New York Annual Professional Development Conference. Briarcliff Manor, NY.

Adams. R. 2002. World Trade Center Recovery and Safety Issues. Presented to the Municipal Engineers of the City of New York. New York, NY.

Adams. R. 2001. Ground Zero: Environmental Issues in New York City after 9/11. Presented at the Society of Women Environmental Professionals of Greater Philadelphia Annual Conference. Philadelphia, PA.

Adams. R. 2001. Ground Zero: Lessons Learned. Presented at the Northeast Regional Industrial Hygiene Conference. Princeton, NJ.

Adams, R., Garvey, D., Drysdale, D. 2000. Professional Development Seminar: Industrial Hygiene in the Construction Environment. Presented at the American Industrial Hygiene Conference and Exposition. Orlando. FL.

Adams, R. 1999. Construction Safety and Health. Presented at the Northeast Regional Industrial Hygiene Conference. Princeton, NJ.

ENVIRON

11

## ROBERT C. ADAMS, C.I.H., C.S.P.

Adams, R. 1996 – 2003. Industrial Hygiene Sampling and Analytical Methods. Presented on behalf of the New Jersey Section of the American Industrial Hygiene Association. Cook College. New Brunswick, NJ

Adams, R. 1994. Office Ergonomics. Presented to the Building Owners and Managers Association. Edison, NJ.

Adams, R., D.L. Jones. 1994. Developing a Strategy for Injury Prevention: A Team Approach. Presented at the Industrial Hygiene and Occupational Medicine Seminar. Penn State University. Malvern, PA

Adams, R., R. Donze. 1994. A Common Sense Approach to Personal Protective Equipment: The Amended OSHA PPE Regulations. Presented at the Industrial Hygiene and Occupational Medicine Seminar. Penn State University. Malvern, PA.

Adams, R. 1994. Residential Indoor Air Quality: Impact on Asthmatics. Presented to the Chester County Chapter of the American Lung Association. Paoli, PA.

Adams, R. 1983. Occupational Health and Safety in Batch Plant Operations. Presented to the Maryland Asphalt Paving Association. Baltimore, MD.



PUBLICATIONS DISCUSSING THE PRINCIPLES AND PROCEDURES
OF EXPOSURE ASSESSMENT

**Texts**

1.    National Research Council (U.S.). (1983) Risk Assessment in the Federal Government: Managing the Process. Committee on the Institutional Means for Assessment of Risks to Public Health. National Academy Press. Washington DC

2.    United States Environmental Protection Agency. (1989). Risk Assessment Guidance for Superfund Vol. 1: Human Health Evaluation Manual. Chapter 6. Exposure Assessment. Office of Emergency and Remedial Response. Washington DC. EPA/540/1-89/002

3.    United States Environmental Protection Agency. (1992). Guidelines for Exposure Assessment. Risk Assessment Forum, Washington, DC, 600Z-92/001

4.    Ignacio, J.S. Bullock, W.H. eds. (2006) A Strategy for Assessing and Managing Occupational Exposures. 3rd Edition. AIHA Press. Fairfax, VA

5.    Damiano J, Mulhausen JR, eds. [1998]. A strategy for assessing and managing occupational exposures. 2nd ed. Fairfax, VA: American Industrial Hygiene Association.

6.    National Institute for Occupational Safety and Health. (1973).   The Industrial Environment – its Evaluation and Control. US Department of Health and Human Services, Centers for Disease Control. Washington DC.

7.    National Institute for Occupational Safety and Health.  (1979).  Guide to the Work Relatedness of Disease.  U.S. Department of Health and Human Services, Centers for Disease Control.  Washington DC.

8.    DiNardi, S.R. ed. (1997). The Occupational Environment – its Evaluation and Control. AIHA Press. Fairfax VA.

9.    Jayjock, M.A.; Lynch, J.R., Nelson, D.I. (2000). Risk Assessment Principles for the Industrial Hygienist.  AIHA Press. Fairfax VA.

10.   Keil, C.B. ed. (2000). Mathematical Models for Estimating Occupational Exposure to Chemicals. AIHA Press. Fairfax VA.

## Articles

11.   Henn, Scott A.; Utterback, David F.; Waters, Kathleen M.; Markey, Andrea M.; Tankersley, William G.. "Task- and Time-Dependent Weighting Factors in a Retrospective Exposure Assessment of Chemical Laboratory Workers" Journal of Occupational and Environmental Hygiene 4.2 (2007). 05 Sep. 2007

12.   Spencer, John W.; Plisko, Marc J.. "A Comparison Study Using a Mathematical Model and Actual Exposure Monitoring for Estimating Solvent Exposures During the Disassembly of Metal Parts" Journal of Occupational and Environmental Hygiene 4.4 (2007). 05 Sep. 2007

13.   Boelter, Fred W.; Spencer, John W.; Simmons, Catherine E.. "Heavy Equipment Maintenance Exposure Assessment: Using a Time-Activity Model to Estimate Surrogate Values for Replacement of Missing Data" Journal of Occupational and Environmental Hygiene 4.7 (2007). 05 Sep. 2007

14.   Naidoo, Rajen; Seixas, Noah; Robins, Thomas. "Estimation of Respirable Dust Exposure Among Coal Miners in South Africa" Journal of Occupational and Environmental Hygiene 3.6 (2006). 05 Sep. 2007

15.   Drummond, Ian; Murray, Neil; Armstrong, Thomas; Schnatter, A. Robert; Lewis, R. Jeffrey. "Exposure Assessment Methods for a Study of Mortality and Cancer Morbidity in Relation to Specific Petroleum Industry Exposures" Journal of Occupational and Environmental Hygiene 3.10 (2006). 05 Sep. 2007

16.   Proctor, D. M.; Panko, J. P.; Liebig, E. W.; Paustenbach, D. J.. "Estimating Historical Occupational Exposure to Airborne Hexavalent Chromium in a Chromate Production Plant: 1940&ndash;1972" Journal of Occupational and Environmental Hygiene 1.11 (2004). 05 Sep. 2007

17.   Friesen, M. C.; Davies, H. W.; Teschke, K.; Marion, S.; Demers, P. A.. "Predicting Historical Dust and Wood Dust Exposure in Sawmills: Model Development and

Validation" Journal of Occupational and Environmental Hygiene 2.12 (2005). 05 Sep. 2007

18.    Bennett, James S.; Feigley, Charles E.; Khan, Jamil; Hosni, Mohamed H.. "Comparison of Mathematical Models for Exposure Assessment With Computational Fluid Dynamic Simulation" Applied Occupational and Environmental Hygiene 15.1 (2000). 05 Sep. 2007

19.    Ramachandran, Gurumurthy; Vincent, James H.. "A Bayesian Approach to Retrospective Exposure Assessment" Applied Occupational and Environmental Hygiene 14.8 (1999). 05 Sep. 2007

20.    Benke, G.; Sim, M.; Fritschi, L.; Aldred, G.; Forbes, A.; Kauppinen, T.. "Comparison of Occupational Exposure Using Three Different Methods: Hygiene Panel, Job Exposure Matrix (JEM), and Self Reports" Applied Occupational and Environmental Hygiene 16.1 (2001). 05 Sep. 2007

21.    Armstrong, Thomas W.; Pearlman, Eileen D.; Schnatter, A. Robert; Bowes, Stephen M.; Murray, Neil; Nicolich, Mark J.. "Retrospective Benzene and Total Hydrocarbon Exposure Assessment for a Petroleum Marketing and Distribution Worker Epidemiology Study" American Industrial Hygiene Association Journal 57.4 (1996). 05 Sep. 2007

22.    Barnard, Anthony E.; Torma-Krajewski, Janet; Viet, Susan M.. "Retrospective Beryllium Exposure Assessment at the Rocky Flats Environmental Technology Site" American Industrial Hygiene Association Journal 57.9 (1996). 05 Sep. 2007

23.    Owen, Cynthia Venners; Acquavella, John A.; Lynch, Jeremiah; Bird, Michael G.. "AN INDUSTRIAL HYGIENE METHODOLOGY DEVELOPED IN SUPPORT OF A RETROSPECTIVE MORBIDITY CASE-CONTROL STUDY" American Industrial Hygiene Association Journal 53.9 (1992). 05 Sep. 2007

24.    Hornung, Richard W.; Herrick, Robert F.; Stewart, Patricia A.; Utterback, David F.; Feigley, Charles E.; Wall, David K.; Douthit, Donald E.; Hayes, Richard B.. "An Experimental Design Approach to Retrospective Exposure Assessment" American Industrial Hygiene Association Journal 57.3 (1996). 05 Sep. 2007

25.    Williams P, Paustenbach D, Balzer JL, Mangold C. (2007) Retrospective exposure assessment of airborne asbestos related to skilled craftsmen at a petroleum refinery in Beaumont, Texas (1940-2006). J Toxicol Environ Health A. Jul;70(13):1076-107.

26.    Bailey CR, Somers JH, Steenland K. (2003). Exposures to diesel exhaust in the International Brotherhood of Teamsters, 1950-1990.    AIHA J (Fairfax, Va). Jul-Aug;64(4):472-9.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

NYCAL
I.A.S. Part 39

Index No. 114120-06

IN RE: NEW YORK CITY
ASBESTOS LITIGATION

CHRISTIAN F. HOLINKA,

Plaintiff,

-against-

A.W. CHESTERTON COMPANY, et al.

Defendants

**AFFIDAVIT OF ROBERT C. ADAMS, M.S., C.I.H., C.S.P.**

DRINKER BIDDLE & REATH LLP
140 Broadway, 39th Floor
New York, New York 10005-1116
(212) 248-3140

Attorneys for Defendant, BAXTER HEALTHCARE, INC.